# 23-6333

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖❖

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LOW TAEK JHO, AKA JHO LOW,

*Defendant,*

NG CHONG HWA, AKA ROGER NG,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANT-APPELLANT
## VOLUME I OF V
### (Pages A-1 to A-300)

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
AVERY D. MEDJUCK
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Sealed Indictment, filed October 3, 2018 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . . A-43

Superseding Indictment, filed December 9, 2020 (Dkt. 55) . . . . . . . . . . . . . A-77

Letter Agreement (Redacted), dated February 12, 2019 (Dkt. 58-2) . . . . A-110

Affirmation of Marc Agnifilo in Support of Motion to Dismiss,
   filed January 22, 2021 (Dkt. 61) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-113

   Exhibit 1 to Agnifilo Affirmation—
   Email, dated February 14, 2019 (Dkt. 61-1) . . . . . . . . . . . . . . . . . . . . . A-118

   Exhibit 2 to Agnifilo Affirmation—
   Email, dated February 14, 2019 (Dkt. 61-2) . . . . . . . . . . . . . . . . . . . . . A-123

   Exhibit 3 to Agnifilo Affirmation—
   Article, "Lawyer tells court ex-Goldman banker now accepts
   US extradition", dated February 15, 2019 (Dkt. 61-3) . . . . . . . . . . . . . A-128

   Exhibit 4 to Agnifilo Affirmation—
   Email, dated February 14, 2019 (Dkt. 61-4) . . . . . . . . . . . . . . . . . . . . . A-134

Affirmation of Teny R. Geragos in Support of Motion to Dismiss,
   filed January 22, 2021 (Dkt. 62) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-139

   Exhibit 1 to Geragos Affirmation—
   Handwritten Notes of Phone Call on January 23, 2019
   (Dkt. 62-1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-142

   Exhibit 2 to Geragos Affirmation—
   Handwritten Notes of Phone Call on February 7, 2019
   (Dkt. 62-2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-144

Second Superseding Indictment, filed December 20, 2021 (Dkt. 105) . . A-146

ii

PAGE

Letter Motion to Admit Video Recording, filed February 6, 2022
    (Dkt. 132) ...................................................... A-182

Draft Transcript of Lim-Leissner Video Call,
    dated October 16, 2018 (Dkt. 132-1) ............................ A-195

Video Recording of Lim-Leissner Video Call, dated October 16, 2018
    (lodged at Dkt. 225-1) (Filed Conventionally)

Government's Reply Memorandum in Opposition to Admission of
    Video Recording, dated February 9, 2022 (Dkt. 134) ............. A-213

Excerpts of Trial Transcript ......................................... A-226

Government's Exhibits

    GX-55       Demonstrative of Four Meetings ................. A-984

    GX-157      Total Traced Funds from 1MDB Bond Deals ...... A-985

    GX-803      Committee Memo – Project Magnolia,
                  dated April 2, 2012 ............................ A-986

    GX-839      Project Magnolia Committee Memo Addendum,
                  dated May 15, 2012 ........................... A-1023

    GX-1352-A   March 2012 TEEMS Records for Tim Leissner ... A-1029

    GX-1599    Email From Patrick Kidney to Shane Reidel,
                  dated March 12, 2012 ......................... A-1137

    GX-1601    Email from Shane Reidel to Christopher French
                  et al., dated March 15, 2010 .................... A-1139

    GX-1793    Email from Tim Leissner to Jasmine Loo,
                  dated March 9, 2012 .......................... A-1157

iii

PAGE

GX-1974      Email from Andy Tai to Tim Leissner and
             Roger Ng, dated September 10, 2012 ............ A-1158

GX-2226      Email from Tim Leissner to Roger Ng,
             dated January 21, 2012 ........................ A-1172

GX-2252      Email from Jho Low to Mohamed al-Husseiny,
             dated March 7, 2012 ........................... A-1174

GX-2272      Chat Transcript, dated May 4, 2012 ............. A-1176

GX-2272-T    Translation of Chat Transcript,
             dated May 4, 2012 ............................. A-1185

GX-2812      Spreadsheet of Attendees,
             dated November 2, 2012 ........................ A-1192

Defendant's Exhibits

DX-03        TEEMS Chart ................................... A-1203

DX-2102      Email from Tim Leissner,
             dated January 12, 2012 ........................ A-1207

DX-2103      Email from Christine Chan to Tim Leissner,
             dated January 12, 2012 ........................ A-1208

DX-2104      Email from Tim Leissner,
             dated January 18, 2012 ........................ A-1209

DX-2445      SMS from +6590259555 to Andrea Vella,
             dated November 1, 2012 ........................ A-1210

Motion for Forfeiture of Property, filed March 3, 2023 (Dkt. 228) .... A-1211

Excerpts of Transcript of Sentencing, dated March 9, 2023 ........... A-1212

Notice of Appeal, filed April 5, 2023 (Dkt. 252) ..................... A-1220

APPEAL

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:18-cr-00538-MKB All Defendants

Case title: USA v. Jho et al                    Date Filed: 10/03/2018

Assigned to: Chief Judge Margo K. Brodie

**Defendant (1)**

**Low Taek Jho**                   represented by   **Kevin Thomas Carroll**
*also known as*                                     Hughes Hubbard & Reed LLP
Jho Low                                             1775 I Street, N.W.
                                                    Ste 6th Floor
                                                    Washington DC, DC 20006
                                                    202-721-4603
                                                    Email: kevin.carroll@hugheshubbard.com
                                                    *Designation: Retained*

**Pending Counts**                                  **Disposition**

18:371 and 3551 et seq. - CONSPIRACY
TO DEFRAUD THE UNITED STATES
(1)

Title 18, United States Code, Sections 371
and 3551 et seq.- Conspiracy to Violate the
FCP A-Bribery
(1s)

18:271 and 3551 seq. - CONSPIRACY TO
DEFRAUD THE UNITED STATES
(1ss)

18:1956(h)and 1956(h)and 3551 et seq. -
MONEY LAUNDERING - INTERSTATE
COMMERCE
(3)

Title 18, United States Code, Sections
1956(h) and 3551 et seq. - Conspiracy to
commit Money Laundering
(3s)

18:1956(h) and 3551 et seq. - MONEY
LAUNDERING - INTERSTATE
COMMERCE
(3ss)

**Highest Offense Level (Opening)**

Felony

**A-1**

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

Assigned to: Chief Judge Margo K. Brodie

**Defendant (2)**

Ng Chong Hwa
*TERMINATED: 03/24/2023*
*also known as*
Roger Ng
*TERMINATED: 03/24/2023*

represented by **Jacob Kaplan**
Brafman & Associates, P.C.
256 Fifth Avenue
Ste 2nd Floor
New York, NY 10001
212-750-7800
Email: jkaplan@braflaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Kevin Thomas Carroll**
(See above for address)
*Designation: Retained*

**Marc A. Agnifilo**
Brafman & Associates, P.C.
256 Fifth Avenue
Ste 2nd Floor
New York, NY 10001
212-750-7800
Email: magnifilo@braflaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Teny Rose Geragos**
Brafman & Associates, P.C.
256 Fifth Avenue
Ste 2nd Floor
New York, NY 10001
212-750-7800
Email: tgeragos@braflaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Zach Intrater**
Brafman & Associates, P.C.
767 Third Avenue
Ste 26th Floor

**A-2**

New York, NY 10017
212-750-7800
Email: zintrater@braflaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| | Defendant was sentenced to a total term of imprisonment of one hundred and twenty (120) months: Five (5) years on Counts One and Two to run concurrently with each other; Five (5) years on Count Three to run consecutively to the sentence imposed on Counts One and Two. A supervised release term of Two (2) years on each count to run concurrently with each other. A Special Assessment of $300 dollars. No fine. |
| 18:271 and 3551 seq. - CONSPIRACY TO DEFRAUD THE UNITED STATES (1ss) | |
| | Defendant was sentenced to a total term of imprisonment of one hundred and twenty (120) months: Five (5) years on Counts One and Two to run concurrently with each other; Five (5) years on Count Three to run consecutively to the sentence imposed on Counts One and Two. A supervised release term of Two (2) years on each count to run concurrently with each other. A Special Assessment of $300 dollars. No fine. |
| 18:371 and 3551 et seq. - CONSPIRACY TO DEFRAUD THE UNITED STATES (2ss) | |
| | Defendant was sentenced to a total term of imprisonment of one hundred and twenty (120) months: Five (5) years on Counts One and Two to run concurrently with each other; Five (5) years on Count Three to run consecutively to the sentence imposed on Counts One and Two. A supervised release term of Two (2) years on each count to run concurrently with each other. A Special Assessment of $300 dollars. No fine. |
| 18:1956(h) and 3551 et seq. - MONEY LAUNDERING - INTERSTATE COMMERCE (3ss) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371 and 3551 et seq. - CONSPIRACY TO DEFRAUD THE UNITED STATES (1-2) | Dismissed on Government's Motion |
| Title 18, United States Code, Sections 371 and 3551 et seq.- Conspiracy to Violate the FCP A-Bribery (1s) | Dismissed on Government's Motion |

| | |
|---|---|
| Title 18, United States Code, Sections 371 and 3551 et seq- Conspiracy to Violate the FCPA-Circumvention of Internal Accounting Controls (2s) | Dismissed on Government's Motion |
| 18:1956(h)and 1956(h)and 3551 et seq. - MONEY LAUNDERING - INTERSTATE COMMERCE (3) | Dismissed on Government's Motion |
| Title 18, United States Code, Sections 1956(h) and 3551 et seq. - Conspiracy to commit Money Laundering (3s) | Dismissed on Government's Motion |

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                          **Disposition**

None

---

**Interested Party**

**Kimora Lee Simmons Leissner**         represented by   **David Karl Willingham**
                                                         King & Spalding LLP
                                                         633 W. Fifth Street
                                                         Suite 1600
                                                         Los Angeles, CA 90071
                                                         213-218-4005
                                                         Fax: 213-443-4310
                                                         Email: dwillingham@kslaw.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

---

**Plaintiff**

**USA**                                  represented by   **Drew Godfrey Rolle**
                                                         United States Attorney's Office
                                                         Eastern District Of New York
                                                         271 Cadman Plaza East
                                                         Brooklyn, NY 11201
                                                         718-254-6783
                                                         Fax: 718-254-6076
                                                         Email: drew.rolle@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*
                                                         *Designation: Government Attorney*

                                                         **Jacquelyn M. Kasulis**
                                                         United States Attorneys Office

**A-4**

271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6103
Fax: 718-254-6076
Email: jacquelyn.kasulis@usdoj.gov
*TERMINATED: 02/02/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Jennifer Ambuehl**
DOJ-Crm
Poc Deb Sachs
1400 New York Ave NW
Room 7113
Washington, DC 20530
202-307-3066
Email: jennifer.ambuehl@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alixandra Eleis Smith**
United States Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6370
Fax: 718-254-6076
Email: alixandra.smith@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Brent Scott Wible**
DOJ-Crm
700 13th Street, NW
Ste 10th Floor
Washington, DC 20005
202-934-0882
Email: brent.wible@usdoj.gov
*ATTORNEY TO BE NOTICED*

**David A. Last**
DOJ-Crm
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530
202-616-5651
Email: david.last2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Dylan Alexander Stern**
Department of Justice
US Attorney's Office - EDNY
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6213

**A-5**

Email: Dylan.Stern@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Katherine Nielsen**
DOJ-Crm
Fraud Section
1400 New York Ave., NW
Washington, DC 20530
202-616-5672
Email: katherine.nielsen@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Margaret Moeser**
DOJ-Crm
Money Laundering and Asset Recovery
Section
1400 New York Ave
10th Floor
Washington, DC 20530
202-598-2345
Email: margaret.moeser@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Mary Ann McCarthy**
DOJ, MLARS
1400 New York Avenue Nw
Washington, DC 20005
202-616-5584
Fax: 202-514-5522
Email: mary.mccarthy@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Nikhila Raj**
DOJ-Crm
Fraud Section
1400 New York Avenue
Washington, DC 20005
202-305-9823
Email: nikhila.raj@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tanisha R. Payne**
United States Attorney's Office
Eastern District Of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
(718) 254-6358
Fax: (718) 254-6321
Email: Tanisha.Payne@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|

**A-6**

| 10/03/2018 | 1 | SEALED INDICTMENT as to Low Taek Jho (1) count(s) 1, 3, Ng Chong Hwa (2) count(s) 1-2, 3. (Attachments: # 1 Criminal Information Sheet, # 2 Indictment Sealing Form, # 3 Sealing Cover Sheet) (Piper, Francine) (Entered: 10/04/2018) |
|---|---|---|
| 10/07/2018 | | Case as to Low Taek Jho, Ng Chong Hwa Reassigned to Judge William F. Kuntz, II. Chief Judge Dora Lizette Irizarry no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Mahoney, Brenna) (Entered: 10/07/2018) |
| 10/24/2018 | | ORDER REASSIGNING CASE as to Low Taek Jho, Ng Chong Hwa. Reassigned to Judge Margo K. Brodie. Judge William F. Kuntz, II no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Dora Lizette Irizarry on 10/24/2018. (Williams, Erica) (Entered: 10/24/2018) |
| 11/01/2018 | 11 | NOTICE OF ATTORNEY APPEARANCE Jennifer Ambuehl appearing for USA. (Ambuehl, Jennifer) (Entered: 11/01/2018) |
| 11/06/2018 | 12 | NOTICE OF ATTORNEY APPEARANCE Katherine Nielsen appearing for USA. (Nielsen, Katherine) (Entered: 11/06/2018) |
| 11/06/2018 | 13 | NOTICE OF ATTORNEY APPEARANCE Nikhila Raj appearing for USA. (Raj, Nikhila) (Entered: 11/06/2018) |
| 11/09/2018 | 14 | NOTICE OF ATTORNEY APPEARANCE Mary Ann McCarthy appearing for USA. (McCarthy, Mary) (Entered: 11/09/2018) |
| 04/25/2019 | 15 | NOTICE OF ATTORNEY APPEARANCE Alixandra Eleis Smith appearing for USA. (Smith, Alixandra) (Entered: 04/25/2019) |
| 05/06/2019 | 16 | Minute Entry for proceedings held before Magistrate Judge Peggy Kuo:Arraignment as to Ng Chong Hwa (2) Count 1-2,3 held on 5/6/2019, Initial Appearance as to Ng Chong Hwa held on 5/6/2019, Detention Hearing as to Ng Chong Hwa held on 5/6/2019, Plea entered by Ng Chong Hwa (2) Count 1-2,3. by Ng Chong Hwa Not Guilty to all counts. Bond set at $20 million. Dft released. 1 Surety signed the bond. Order of Excludable Start 5/6/19 - Stop 5/23/19. 2nd Call, Surety present and sworn and signed the bond ( Status Conference set for 5/23/2019 10:00 AM in Courtroom 6F North before Judge Margo K. Brodie.) AUSA Drew Rolle & Alix Smith; Defense Counsel, Marc Agnifill. (FTR Log #2:52 - 3:01; 4:04 - 4:10.) (Piper, Francine) (Entered: 05/07/2019) |
| 05/06/2019 | 17 | NOTICE OF ATTORNEY APPEARANCE: Jacob Kaplan appearing for Ng Chong Hwa (Piper, Francine) (Entered: 05/07/2019) |
| 05/06/2019 | 18 | NOTICE OF ATTORNEY APPEARANCE: Teny Rose Geragos appearing for Ng Chong Hwa (Piper, Francine) (Entered: 05/07/2019) |
| 05/06/2019 | 19 | NOTICE OF ATTORNEY APPEARANCE: Marc A. Agnifilo appearing for Ng Chong Hwa (Piper, Francine) (Entered: 05/07/2019) |
| 05/06/2019 | 20 | ORDER FOR ACCEPTANCE OF CASH BAIL as to Ng Chong Hwa. Ordered by Magistrate Judge Peggy Kuo on 5/6/2019. (Piper, Francine) (Additional attachment(s) added on 5/7/2019: # 1 Exhibits) (Piper, Francine). (Entered: 05/07/2019) |
| 05/06/2019 | 21 | Bail Receipt in the amount of $1,000,000 as to Ng Chong Hwa (Piper, Francine) (Entered: 05/07/2019) |

| 05/06/2019 | 22 | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa Time excluded from 5/6/19 until 5/23/19.Ordered by Magistrate Judge Peggy Kuo on 5/6/2019. (Piper, Francine) (Entered: 05/07/2019) |
| --- | --- | --- |
| 05/06/2019 | 23 | ORDER Setting Conditions of Release as to Ng Chong Hwa (2) 20,000,000. Ordered by Magistrate Judge Peggy Kuo on 5/6/2019. (Piper, Francine) (Entered: 05/07/2019) |
| 05/23/2019 | | **Status Conference** as to Ng Chong Hwa was held before Judge Margo K. Brodie on May 23, 2019. AUSAs Drew Rolle, Jacquelyn Kasulis, Alix Smith, Woo Lee and Katherine Nielsen appeared on behalf of the government. Retained counsel Marc Agnifilo and Jacob Kaplan appeared on behalf of defendant. The Court deemed the case complex. Status Conference set for **July 9, 2019 at 4:00 PM** in Courtroom 6F North before Judge Margo K. Brodie. The time between May 23, 2019 and July 9, 2019 is excluded. (Court Reporter: David Roy) (Brucella, Michelle) (Entered: 05/23/2019) |
| 05/23/2019 | | **ORDER TO CONTINUE - Ends of Justice** as to Ng Chong Hwa: Time excluded from 5/23/2019 until 7/9/2019. Ordered by Judge Margo K. Brodie on 5/23/2019. (Brucella, Michelle) (Entered: 05/23/2019) |
| 07/01/2019 | 24 | MOTION to Continue by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 07/01/2019) |
| 07/01/2019 | | **ORDER** granting 24 Motion to Continue as to Ng Chong Hwa. Status Conference is adjourned to **July 18, 2019 at 10:00 AM**. Time is excluded. Ordered by Judge Margo K. Brodie on 7/1/2019. (Brucella, Michelle) (Entered: 07/01/2019) |
| 07/18/2019 | | **Status Conference** as to Ng Chong Hwa was held before Judge Margo K. Brodie on July 18, 2019. AUSAs Drew Rolle, Jacquelyn Kasulis, Alix Smith appeared on behalf of the government. Retained counsel Jacob Kaplan and Teny Geragos appeared on behalf of defendant. Jury Selection and Trial set for **May 11, 2020 at 9:30 AM**. A Status Conference is set for **August 20, 2019 at 10:00 AM** in Courtroom 6F North before Judge Margo K. Brodie. The Court previously deemed this case complex. The time between July 18, 2019 and August 20, 2019 is excluded. Bond continued. (Court Reporter: Linda Marino) (Brucella, Michelle) (Entered: 07/18/2019) |
| 07/18/2019 | | **ORDER TO CONTINUE - Ends of Justice** as to Ng Chong Hwa: Time excluded from 7/18/2019 until 8/20/2019. Ordered by Judge Margo K. Brodie on 7/18/2019. (Brucella, Michelle) (Entered: 07/18/2019) |
| 07/23/2019 | 25 | Consent MOTION for Protective Order by USA as to Ng Chong Hwa. (Rolle, Drew) (Entered: 07/23/2019) |
| 07/23/2019 | 26 | **ORDER** granting 25 Motion for Protective Order as to Ng Chong Hwa (2). Ordered by Judge Margo K. Brodie on 7/23/2019. (Brucella, Michelle) (Entered: 07/23/2019) |
| 08/07/2019 | | **SCHEDULING ORDER** as to Ng Chong Hwa: Status Conference is adjourned to **September 13, 2019 at 10:00 AM** in Courtroom 6F North before Judge Margo K. Brodie. Ordered by Judge Margo K. Brodie on 8/7/2019. (Brucella, Michelle) (Entered: 08/07/2019) |
| 09/08/2019 | 28 | Letter *Requesting Curcio Inquiry* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 09/08/2019) |
| 09/13/2019 | | Curcio Hearing as to Ng Chong Hwa was held before Judge Margo K. Brodie on September 13, 2019. The Court addressed the potential conflict of interest discussed in the government's September 8, 2019 letter. Defendant Hwa waived his right to a conflict-free counsel. The government advised the Court that a portion of discovery has been provided. The parties will propose a motion schedule at the next status conference. A Status conference is scheduled for November 15, 2019 at 9:30 a.m. in Courtroom 6F |

**A-8**

| | | |
|---|---|---|
| | | North before Judge Margo K. Brodie. (Court Reporter Stacy Mace.) (Valentin, Winnethka) (Entered: 09/13/2019) |
| 09/13/2019 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 9/13/2019 until 11/15/2019. Ordered by Judge Margo K. Brodie on 9/13/2019. (Valentin, Winnethka) (Entered: 10/28/2019) |
| 11/13/2019 | 29 | Letter MOTION to Continue *status conference from November 15, 2019 to November 22, 2019* by Ng Chong Hwa. (Geragos, Teny) (Entered: 11/13/2019) |
| 11/14/2019 | 30 | ENDORSED ORDER granting 29 Motion to Continue as to Ng Chong Hwa (2); ( Status Conference set for 11/22/2019 10:00 AM in Courtroom 6F North before Judge Margo K. Brodie.) Speedy Trial excluded.Signed by Judge Margo K. Brodie on 11/14/2019. (Marziliano, August) (Entered: 11/14/2019) |
| 11/22/2019 | | Status Conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on November 22, 2019. AUSA Drew Rolle appeared on behalf of the government. Retained counsel Jacob Kaplan and Teny Geragos appeared on behalf of defendant. The Court established the following motion briefing schedule: defendant shall file his motions on or before February 7, 2020; the government's response shall be filed on or before February 21, 2020; defendant's reply, if any, shall be filed on or before February 28, 2020. Status conference set for January 31, 2020, at 10:00 A.M. in Courtroom 6F North before Judge Margo K. Brodie. The time between November 22, 2019 and January 31, 2020 is excluded in the interest of justice. (Court Reporter Anette Montalvo.) (Valentin, Winnethka) (Entered: 11/25/2019) |
| 11/22/2019 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 11/22/2019 until 1/31/2020. Ordered by Judge Margo K. Brodie on 11/25/2019. (Valentin, Winnethka) (Entered: 11/25/2019) |
| 01/24/2020 | 31 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on November 22, 2019, before Judge Margo K. Brodie. Court Reporter/Transcriber Annette M. Montalvo, Telephone number 718-804-2711. Email address: annette.montalvo@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 2/14/2020. Redacted Transcript Deadline set for 2/24/2020. Release of Transcript Restriction set for 4/23/2020. (Montalvo, Annette) (Entered: 01/24/2020) |
| 01/30/2020 | 32 | NOTICE OF ATTORNEY APPEARANCE David A. Last appearing for USA. (Last, David) (Entered: 01/30/2020) |
| 01/30/2020 | 33 | Letter *regarding ongoing discovery, motion schedule and trial date* as to Ng Chong Hwa (Attachments: # 1 Exhibit 1: Transcript of 11/22/19 Appearance) (Agnifilo, Marc) (Entered: 01/30/2020) |
| 01/31/2020 | | Status Conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on January 31, 2020. AUSAs Drew Rolle, Alix Smith and David Last appeared on behalf of the government. Retained counsel Jacob Kaplan, Teny Geragos and Marc A. Agnifilo appeared on behalf of Mr. Hwa. The Government consents to the adjournment of trial date and motion practices. The party shall file a proposed motion schedule on ECF. Jury charge and proposed voir dire shall be filed on or before September 4, 2020. Jury Selection set for September 14 trial will commence on September 21, 2020 at 9:30 AM. Status conference set for April 29, 2020, at 4:00 P.M. in Courtroom 6F North before Judge Margo K. Brodie. The time between January 31, 2020 and April 29, 2020 is |

| | | |
|---|---|---|
| | | excluded in the interest of justice. (Court Reporter Tony Mancuso.) (Almonte, Kelly) (Entered: 01/31/2020) |
| 01/31/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 1/31/2020 until 4/29/2020. Ordered by Judge Margo K. Brodie on 1/31/2020. (Valentin, Winnethka) (Entered: 01/31/2020) |
| 02/04/2020 | 34 | Letter *requesting modification of hours at attorney's offices* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/04/2020) |
| 02/05/2020 | | ORDER granting 34 Letter requesting modification of hours as to Ng Chong Hwa. Ordered by Judge Margo K. Brodie on 2/5/2020. (Valentin, Winnethka) (Entered: 02/05/2020) |
| 03/20/2020 | 35 | Consent MOTION for Protective Order *Modification* by Ng Chong Hwa. (Attachments: # 1 Proposed Order (Exhibit A)) (Agnifilo, Marc) (Entered: 03/20/2020) |
| 03/20/2020 | 36 | ORDER granting 35 Motion for Protective Order as to Ng Chong Hwa. Ordered by Judge Margo K. Brodie on 3/20/2020. (Valentin, Winnethka) (Entered: 03/20/2020) |
| 04/22/2020 | 37 | Letter *requesting approximate one-month adjournment of 4/29/2020 status conference* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 04/22/2020) |
| 04/23/2020 | | ORDER granting 37 Letter requesting adjournment as to Low Taek Jho and Ng Chong Hwa. Status Conference set for 6/4/2020 at 10:00 AM in Courtroom 6F North before Judge Margo K. Brodie. Ordered by Judge Margo K. Brodie on 4/23/2020. (Valentin, Winnethka) (Entered: 04/23/2020) |
| 04/23/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 4/29/2020 until 6/4/2020. Ordered by Judge Margo K. Brodie on 4/23/2020. (Valentin, Winnethka) (Entered: 04/23/2020) |
| 06/04/2020 | | Status Conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on June 4, 2020. AUSAs Drew Rolle, Alix Smith and David Last appeared on behalf of the government. Retained counsel Jacob Kaplan and Marc A. Agnifilo appeared on behalf of Mr. Hwa. Defense counsel request to adjourn the trial date in order to travel to South East Asia to obtain documents and conduct interviews. The Government consents to the adjournment of trial date and motion practices. Motion schedule will be set at the July conference. Jury Selection set for January 19, 2021. Status conference set for July 15, 2020, at 10:00 A.M. The time between June 4, 2020 and July 15, 2020 is excluded in the interest of justice. The Court previously deemed this case complex. Bond conditions remain the same. (Court Reporter Andronikh Barna.) (Valentin, Winnethka) (Entered: 06/04/2020) |
| 06/04/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 6/4/2020 until 7/15/2020. Ordered by Judge Margo K. Brodie on 6/4/2020. (Valentin, Winnethka) (Entered: 06/04/2020) |
| 07/14/2020 | 38 | Letter *jointly requesting adjournment of 7/15/2020 status conference* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 07/14/2020) |
| 07/14/2020 | | ORDER granting 38 Letter jointly requesting adjournment of 7/15/2020 status conference as to Ng Chong Hwa. Status conference set for August 13, 2020 at 10:00 AM. The parties are directed to call 1-888-684-8852 using access code 9801036. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any |

| | | other sanctions deemed necessary by the Court. Ordered by Judge Margo K. Brodie on 7/14/2020. (Valentin, Winnethka) (Entered: 07/14/2020) |
|---|---|---|
| 07/14/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 7/14/2020 until 8/13/2020. Ordered by Judge Margo K. Brodie on 7/14/2020. (Valentin, Winnethka) (Entered: 07/14/2020) |
| 08/12/2020 | 39 | Letter *jointly proposing briefing schedule* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 08/12/2020) |
| 08/13/2020 | | Status Conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on August 13, 2020. AUSAs Drew Rolle, Katherine Nelsen and David Last appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan and Zachary Intrater appeared on behalf of Mr.Ng. The Court informed the parties that it expects jury trials to resume mid-October pursuant to a court protocol which will decide the order of trials. As a result, the trial will likely not proceed as scheduled on January 19, 2021. The Court will consider the fact that Mr.Ng was extradited in determining when the case can be tried. The Court approved the parties' proposed motion schedule. Defense counsel raised with the Court, but will discuss with the government before making a formal application, modification of Mr. Hwa's bail conditions. A Status conference is set for October 6, 2020, at 10:00 A.M. The time between August 13, 2020 and October 6, 2020 is excluded in the interest of justice. Bond conditions remain the same. (Court Reporter Anthony Frisilone.) (Valentin, Winnethka) (Entered: 08/13/2020) |
| 08/13/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 8/13/2020 until 10/6/2002. Ordered by Judge Margo K. Brodie on 8/13/2020. (Valentin, Winnethka) (Entered: 08/13/2020) |
| 10/01/2020 | 40 | Letter *jointly requesting adjournment of briefing schedule* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 10/01/2020) |
| 10/01/2020 | | ORDER granting 40 Letter jointly requesting adjournment of briefing schedule. Defense motions shall be filed by October 16, 2020, the government's response shall be filed by November 6, 2020, and the defendant's reply, if any, shall be filed by November 13, 2020. Ordered by Judge Margo K. Brodie on 10/1/2020. (Valentin, Winnethka) (Entered: 10/01/2020) |
| 10/06/2020 | | Status Conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on October 6, 2020. AUSAs Drew Rolle, Katherine Nelsen and David Last, Alexandra Smith and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan and Zachary Intrater appeared on behalf of Mr.Ng. The Court informed the parties that pursuant to the District's protocol, the case was scheduled for jury selection and trial on January 26, 2021. Because of the challenges with travel to and from Malaysia, and other challenges posed by Covid 19, the parties requested an adjournment of the trial date to February (Mr. Ng) or March/April (the government). The Court will attempt to secure a trial date for February 22 or March 1, 2021. The parties may seek a one-week adjournment of the current motion schedule. Defense counsel raised with the Court, but will discuss with the government before making a formal application, the designation by the government of certain discovery matters for "counsel eyes only." The Court reiterated the complexity of the case and excluded the time between now and the next status conference scheduled for November 18, 2020, at 10:00 A.M. The time between October 6, 2020 and November 18, 2020 is excluded in the interest of justice. Bond conditions remain the same. (Court Reporter Anthony Mancuso.) (Valentin, Winnethka) (Entered: 10/06/2020) |
| 10/15/2020 | 41 | Letter *requesting adjournment of briefing schedule* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 10/15/2020) |

| 10/16/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 10/6/2020 until 11/18/2020. Ordered by Judge Margo K. Brodie on 10/6/2020. (Valentin, Winnethka) (Entered: 10/16/2020) |
| --- | --- | --- |
| 10/16/2020 | | ORDER granting 41 Letter requesting adjournment of briefing schedule as to Ng Chong Hwa. Defendant's motion shall be filed on October 30, 2020, the government's response by December 4, 2020. Defendant shall file a reply, if any, by December 14, 2020. Ordered by Judge Margo K. Brodie on 10/16/2020. (Valentin, Winnethka) (Entered: 10/16/2020) |
| 10/20/2020 | | ORDER. As the parties are aware, as a result of Covid 19, the Eastern District of New York is currently scheduling trials pursuant to a protocol. This case has been scheduled to proceed to trial on March 8, 2021. On or before November 3, 2020, the parties must confirm whether they are available to commence trial on the date identified. Ordered by Judge Margo K. Brodie on 10/20/2020. (Valentin, Winnethka) (Entered: 10/20/2020) |
| 10/30/2020 | 42 | Notice of MOTION to Dismiss *the Indictment and Other Relief* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 10/30/2020) |
| 10/30/2020 | 43 | MEMORANDUM in Support re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Agnifilo, Marc) (Entered: 10/30/2020) |
| 10/30/2020 | 44 | Letter *pursuant to para 9 of the Protective Order (Dkt. 26 ) requesting Dkt. 43 be unsealed* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 10/30/2020) |
| 11/01/2020 | 45 | Letter *pursuant to para 9 of the Protective Order (Dkt. 26 ) requesting Dkt. 43 be unsealed (CORRECTED FILING)* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 11/01/2020) |
| 11/02/2020 | 46 | MEMORANDUM in Support re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief (CORRECTED FILING of Dkt. 43 )* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Agnifilo, Marc) (Entered: 11/02/2020) |
| 11/03/2020 | 47 | Letter *Confirming Availability for 3/8/21 Trial Date* as to Ng Chong Hwa (Raj, Nikhila) (Entered: 11/03/2020) |
| 11/16/2020 | 48 | Consent MOTION to Continue *November 18, 2020 Status Conference* by USA as to Ng Chong Hwa. (Raj, Nikhila) (Entered: 11/16/2020) |
| 11/17/2020 | | ORDER granting 48 Motion to Continue as to Ng Chong Hwa. A status conference is scheduled for December 10, 2020 at 10:30 a.m. before Judge Margo K. Brodie. The parties are directed to call 1-888-684-8852 using access code 9801036. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge Margo K. Brodie on 11/17/2020. (Valentin, Winnethka) (Entered: 11/17/2020) |
| 11/20/2020 | 49 | Letter *Response to Defendant's Motion to Unseal (Docket No. 45)* as to Low Taek Jho, Ng Chong Hwa (Smith, Alixandra) (Entered: 11/20/2020) |
| 11/20/2020 | 50 | Letter *re Government's Letter (Dkt. 49 )* as to Ng Chong Hwa (Attachments: # 1 Memorandum in Support 46 re 42 Notice of MOTION to Dismiss the Indictment and Other Relief) (Agnifilo, Marc) (Entered: 11/20/2020) |

| | | |
|---|---|---|
| 11/23/2020 | 51 | Letter *reply to Govt's letter (Dkt. 49 ) in response to Ng's motion to unseal (Dkt. 45 )* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 11/23/2020) |
| 11/24/2020 | 52 | Letter dated 11/20/2020 from Alixandra E. Smith to the Honorable Margo K. Brodie as to Ng Chong Hwa*just to supplement to its publicly-filed response (Public Letter) to the defendants November 1, 2020 letter motion (see Dkt. No. 45 (Motion)) seeking to unseal portions of his memorandum of law in support of various motions filed on October 30, 2020 (see Dkt. No. 46 (Memorandum)). (Marziliano, August) (Entered: 11/24/2020) |
| 12/03/2020 | 53 | ORDER. The Court grants the government's application and files the requested portions of the Memorandum and this Order under seal. The parties shall publicly file the redacted Memorandum consistent with this Order. Ordered by Judge Margo K. Brodie on 12/3/2020. (Valentin, Winnethka) (Entered: 12/03/2020) |
| 12/04/2020 | 54 | RESPONSE in Opposition re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief* (Attachments: # 1 Exhibit A) (Rolle, Drew) (Entered: 12/04/2020) |
| 12/09/2020 | 55 | SUPERSEDING INDICTMENT (S-1) as to Low Taek Jho (1) count(s) 1s, 3s, Ng Chong Hwa (2) count(s) 1s, 2s, 3s. (Marziliano, August) (Entered: 12/09/2020) |
| 12/10/2020 | 56 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations as to Ng Chong Hwa. Ordered by Judge Margo K. Brodie on 12/10/2020. (Piper, Francine) (Entered: 12/10/2020) |
| 12/10/2020 | | Status conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on December 10, 2020. AUSAs Drew Rolle, Katherine Nelsen and David Last, Alexandra Smith and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan and Zachary Intrater appeared on behalf of Mr.Ng. A superseding Indictment was filed on December 9, 2020. Plea entered by NG Chong Hwa- Not Guilty on all counts. The Court found that the three requirements of the CARES Act were met in arraigning Mr. NG. on the superseding indictment and defense counsel acknowledge the same. The Court orally notified the prosecutor of its obligations pursuant to Rule 5(f) of the Rules of Criminal Procedure and the prosecution acknowledge same. The Court informed the parties pursuant to Administrative Order 26 pending trials were suspended until January 19, 2021. The Court will confirm by the end of January if the trial date currently scheduled for March 8, 2021 will move forward. The Court excluded the time between now and the next status conference scheduled for January 28, 2021 at 9:00 A.M. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718)613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. The time between December 10, 2020 and January 28, 2021 is excluded in the interest of justice. Bond conditions remain the same. (Court Reporter David Roy.) (Valentin, Winnethka) (Entered: 12/10/2020) |
| 12/10/2020 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 12/10/2020 until 1/28/2021. Ordered by Judge Margo K. Brodie on 12/10/2020. (Valentin, Winnethka) (Entered: 12/10/2020) |
| 12/11/2020 | 57 | NOTICE OF ATTORNEY APPEARANCE: Zach Intrater appearing for Ng Chong Hwa (Intrater, Zach) (Entered: 12/11/2020) |

| | | |
|---|---|---|
| 12/22/2020 | 58 | REPLY TO RESPONSE to Motion re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief and Motion to Dismiss Superseding Indictment* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Agnifilo, Marc) (Entered: 12/22/2020) |
| 01/13/2021 | 59 | RESPONSE in Opposition re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G) (Rolle, Drew) (Entered: 01/13/2021) |
| 01/22/2021 | 60 | REPLY TO RESPONSE to Motion re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief* (Agnifilo, Marc) (Entered: 01/22/2021) |
| 01/22/2021 | 61 | AFFIDAVIT in Support re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief of Marc Agnifilo, Esq. re Dkt. 60* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Agnifilo, Marc) (Entered: 01/22/2021) |
| 01/22/2021 | 62 | AFFIDAVIT in Support re 42 Notice of MOTION to Dismiss *the Indictment and Other Relief re Dkt. 60* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Geragos, Teny) (Entered: 01/22/2021) |
| 01/27/2021 | 63 | Letter MOTION to Modify Conditions of Release by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 01/27/2021) |
| 01/28/2021 | | Status conference as to Ng Chong Hwa was held before Judge Margo K. Brodie on January 28, 2021. AUSAs Drew Rolle, Nikhila Raj and David Last, Alexandra Smith and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan appeared on behalf of Mr.Ng. The Court informed the parties pursuant to Administrative Order 26-2 pending trials were suspended until March 2021. Trial currently scheduled for March 8, 2021 is adjourned sine die. The Court will provide further trial information at the next status conference. The Court imposed a curfew from 8pm-8am, giving the discretion to Pretrial Services, if necessary, to adjust that time period based on specific requests from Mr. Ng. The Court excluded the time between now and the next status conference scheduled for March 18, 2021 at 10:00 A.M. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Bond conditions remain the same. (Court Reporter Linda Marino.) (Valentin, Winnethka) (Entered: 01/28/2021) |
| 01/28/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 1/28/2021 until 3/18/2021. Ordered by Judge Margo K. Brodie on 1/28/2021. (Valentin, Winnethka) (Entered: 01/28/2021) |
| 03/12/2021 | 64 | Letter *re Razak v. Leissner and Goldman Sachs, S.D.N.Y. Misc. No. 20-387* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/12/2021) |
| 03/14/2021 | 65 | Letter MOTION for Hearing , Letter MOTION for Joinder by Low Taek Jho, Ng Chong Hwa. (Carroll, Kevin) (Entered: 03/14/2021) |
| 03/15/2021 | | ORDER re 65 Letter Motion for Joinder. The Court directs the government to respond to the letter motion for joinder on or before March 22, 2021. Ordered by Chief Judge Margo K. Brodie on 3/15/2021. (Valentin, Winnethka) (Entered: 03/15/2021) |
| 03/17/2021 | | ORDER re 65 Letter Motion for Joinder. The Court directs the parties to respond to the letter motion for joinder on or before March 24, 2021 Ordered by Chief Judge Margo K. Brodie on 3/17/2021. (Valentin, Winnethka) (Entered: 03/17/2021) |

| 03/17/2021 | 66 | NOTICE OF ATTORNEY APPEARANCE Dylan Alexander Stern appearing for USA. (Stern, Dylan) (Entered: 03/17/2021) |
|---|---|---|
| 03/17/2021 | 67 | Letter *re outstanding discovery issue in advance of status conference [UNDER SEAL]* as to Ng Chong Hwa (Attachments: # 1 Exhibit A) (Agnifilo, Marc) (Entered: 03/17/2021) |
| 03/17/2021 | 68 | Letter *response to the defendant's March 12, 2021 letter* as to Ng Chong Hwa (Attachments: # 1 Exhibit A) (Stern, Dylan) (Entered: 03/17/2021) |
| 03/18/2021 | 69 | Letter *re outstanding discovery issue in advance of status conference [REDACTED public version of Dkt. 67 ]* as to Ng Chong Hwa (Attachments: # 1 Exhibit A) (Agnifilo, Marc) (Entered: 03/18/2021) |
| 03/18/2021 | 70 | Letter *reply in response to the Government's March 17, 2021 Letter (Dkt. 68 )* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/18/2021) |
| 03/23/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on March 23, 2021. AUSAs Drew Rolle, David Last, Alexandra Smith, Dylan Stern, and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Ng Chong Hwa. The Court heard from the parties about several issues including access to Tim Leissner's personal devices and directed the parties to provide supplemental briefings on the issue. The Court scheduled a status conference for May 7, 2021 at 10:00 A.M. and excluded the time between March 23, 2021 and May 7, 2021. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Bond conditions remain the same.(Court Reporter Andronikh Barna.) (Valentin, Winnethka) (Entered: 03/23/2021) |
| 03/23/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 3/23/2021 until 5/7/2021. Ordered by Chief Judge Margo K. Brodie on 3/23/2021. (Valentin, Winnethka) (Entered: 03/23/2021) |
| 03/24/2021 | 71 | Letter *opposing Motion to Intervene and Joinder (Dkt. 65 )* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/24/2021) |
| 03/24/2021 | 72 | RESPONSE in Opposition re 65 Letter MOTION for Hearing Letter MOTION for Joinder (Stern, Dylan) (Entered: 03/24/2021) |
| 04/02/2021 | 73 | Letter as to Ng Chong Hwa dated March 25, 2021 from Kevin Carroll to Judge Brodie, requesting permission to receive notices of electronic filings, and requesting that the court note that counsel represents Mr. Razak on behalf of Wiggin and Dana LLP. (Piper, Francine) (Entered: 04/02/2021) |
| 04/05/2021 | 74 | ORDER as to Ng Chong Hwa, The Court denies Defendant's motion to modify the Protective Order. (See Gov't Letter dated Mar. 24, 2021.) Ordered by Chief Judge Margo K. Brodie on 4/2/2021. (Piper, Francine) (Entered: 04/05/2021) |
| 04/05/2021 | 75 | Letter *pursuant to the Court's 3/23/2021 Order* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 04/05/2021) |
| 04/06/2021 | 76 | ORDER as to Ng Chong Hwa, The Court denies Razak's motion to intervene. (See Def.'s Letter dated Mar. 24, 2021; Gov' Letter dated Mar. 24, 2021.) The Court grants Carroll ECF access for the sole purpose of receiving the instant Order and grants his request that |

| | | |
|---|---|---|
| | | the information on ECF be adjusted to list him accurately. The Court otherwise denies Carroll's application as moot. Ordered by Chief Judge Margo K. Brodie on 4/2/2021. (Piper, Francine) (Entered: 04/06/2021) |
| 04/19/2021 | 77 | NOTICE OF ATTORNEY APPEARANCE Brent Scott Wible appearing for USA. (Wible, Brent) (Entered: 04/19/2021) |
| 05/11/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on May 11, 2021. AUSAs Drew Rolle, Katherine Nielson, Nikhila Raj, Alexandra Smith, Dylan Stern, and Brent Scott Wible appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, and Jacob Kaplan appeared on behalf of Ng Chong Hwa. The Court discussed with the parties the availability of trial dates in January of 2022 and directed the parties to discuss and agree on a trial date. The Court scheduled a status conference for June 16, 2021, at 9:30 A.M. and excluded the time between May 11, 2021 and June 16, 2021. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Bond conditions remain the same. Ordered by Chief Judge Margo K. Brodie on 5/11/2021. (Court Reporter Georgette Betts.) (Ajagu, Vanessa) (Entered: 05/11/2021) |
| 05/11/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 5/11/2021 until 6/16/2021. Ordered by Chief Judge Margo K. Brodie on 5/11/2021. (Valentin, Winnethka) (Entered: 05/11/2021) |
| 05/19/2021 | 78 | Letter *jointly proposing a January 2022 trial date* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 05/19/2021) |
| 06/11/2021 | 79 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on 3/23/2021, before Judge Margo K. Brodie. Court Reporter/Transcriber Andronikh M. Barna, Telephone number 718-613-2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 7/2/2021. Redacted Transcript Deadline set for 7/12/2021. Release of Transcript Restriction set for 9/9/2021. (Barna, Andronikh) (Entered: 06/11/2021) |
| 06/15/2021 | | ORDER granting 78 Letter as to Ng Chong Hwa re jury selection on January 18, 2022 and trial commencing on January 24, 2022. The status conference scheduled for June 16, 2021 is adjourned. Ordered by Chief Judge Margo K. Brodie on 6/15/2021. (Valentin, Winnethka) (Entered: 06/15/2021) |
| 06/15/2021 | 80 | Consent MOTION to Continue *June 16, 2021 Status Conference* by USA as to Ng Chong Hwa. (Rolle, Drew) (Entered: 06/15/2021) |
| 06/16/2021 | | ORDER granting 80 Motion to Continue as to Ng Chong Hwa. Status conference scheduled for July 20, 2021 at 10:00 a.m. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718)613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these |

A-16

| | | |
|---|---|---|
| | | prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 6/16/2021. (Valentin, Winnethka) (Entered: 06/16/2021) |
| 06/16/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 6/16/2021 until 7/20/2021. Ordered by Chief Judge Margo K. Brodie on 6/16/2021. (Valentin, Winnethka) (Entered: 06/16/2021) |
| 07/15/2021 | 81 | Letter *pursuant to 7/8/2021 Order* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 07/15/2021) |
| 07/19/2021 | 82 | Letter *requesting change of PTS ankle monitor* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 07/19/2021) |
| 07/20/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on July 20, 2021. AUSAs Drew Rolle, Alexandra Smith, Dylan Stern, Brent Wible, and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Ng Chong Hwa. Pretrial Services Officer Bianca Carter. The Court heard from the parties re defendant's motion 82 to modify conditions of release and granted defendants application for the reasons stated on the record. The Court scheduled a status conference for September 10, 2021 at 10:30 A.M. and excluded the time between July 20, 2021 and September 10, 2021. The parties agreed to proceed by phone. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter Linda Danelczyk.) (Valentin, Winnethka) (Entered: 07/20/2021) |
| 07/20/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 7/20/2021 until 9/10/2021. Ordered by Chief Judge Margo K. Brodie on 7/20/2021. (Valentin, Winnethka) (Entered: 07/20/2021) |
| 09/03/2021 | 83 | MEMORANDUM AND ORDER. For the reasons explained in the attached Memorandum and Order, the Court denies Ng's motion to dismiss the Superseding Indictment. The Court also declines to modify the Deferred Prosecution Agreement, to compel the production of the requested materials under Rule 16, Brady, and Giglio, and to order the Government to change the designation of Attorneys' Eyes Only material to Sensitive Discovery Material. The Court urges the Government to consider disclosing all 3500 material to counsel and Ng at least six weeks or as soon as practicable in advance of trial. The Memorandum and Order is being filed under seal. The parties shall submit an agreed upon redacted version within seven days. Ordered by Chief Judge Margo K. Brodie on 9/3/2021. (Valentin, Winnethka) (Entered: 09/03/2021) |
| 09/10/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on September 10, 2021. AUSAs Drew Rolle, Alexandra Smith, Dylan Stern, Brent Wible, and Jennifer Ambuehl appeared on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Ng Chong Hwa. The Court scheduled a status conference for November 17, 2021 at 10:30 A.M. and excluded the time between September 10, 2021 and November 17, 2021. The parties will confer and propose a briefing schedule for in limine motions. Jury selection is scheduled for January 18, 2022. Trial will commence on January 24, 2022. The call-in information for the telephone conference is 1-888-684-8852 and the |

| | | |
|---|---|---|
| | | access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter Avery Armstrong.) (Valentin, Winnethka) (Entered: 09/10/2021) |
| 09/10/2021 | | ORDER TO CONTINUE - Ends of Justice as to Ng Chong Hwa. Time excluded from 9/10/2021 until 11/17/2021. Ordered by Chief Judge Margo K. Brodie on 9/10/2021. (Valentin, Winnethka) (Entered: 09/10/2021) |
| 09/10/2021 | 84 | Letter *regarding the parties' proposed redactions to ECF No. 83 the Court's September 3, 2021 Opinion* as to Ng Chong Hwa (Attachments: # 1 Exhibit Redacted Opinion) (Rolle, Drew) (Entered: 09/10/2021) |
| 09/14/2021 | 85 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on May 11, 2021, before Judge Margo K. Brodie. Court Reporter/Transcriber Georgette K. Betts, Telephone number 718.804.2777. Email address: Georgette_Betts@nyed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 10/5/2021. Redacted Transcript Deadline set for 10/15/2021. Release of Transcript Restriction set for 12/13/2021. (Betts, Georgette) (Entered: 09/14/2021) |
| 09/26/2021 | 86 | Letter *jointly proposing motion in limine schedule* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 09/26/2021) |
| 09/27/2021 | | ORDER granting 86 proposed Motion in Limine schedule as to Ng Chong Hwa. Motion in Limine to be filed by November 1,2021, response to be filed by November 17,2021, and reply, if any, to be filed by November 24, 2021. Ordered by Chief Judge Margo K. Brodie on 9/27/2021. (Valentin, Winnethka) (Entered: 09/27/2021) |
| 10/30/2021 | 88 | Letter *re Extension of Time to File Motions in Limine* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 10/30/2021) |
| 11/01/2021 | | ORDER granting 88 extension of time to file motions in limine as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 11/1/2021. (Valentin, Winnethka) (Entered: 11/01/2021) |
| 11/03/2021 | 89 | MOTION in Limine *for FRE 104 hearing, Government Witness and Exhibit List* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 11/03/2021) |
| 11/04/2021 | 90 | MOTION in Limine by USA as to Ng Chong Hwa. (Attachments: # 1 Exhibit A) (Rolle, Drew) Modified on 3/20/2022 (Marziliano, August). (Entered: 11/04/2021) |
| 11/04/2021 | 91 | Letter *Regarding Redactions in Gov't Motions In Limine* as to USA as to Ng Chong Hwa (Rolle, Drew) (Entered: 11/04/2021) |
| 11/16/2021 | 92 | Letter *re Extension of Time to File Motion in Limine Responses and Replies* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 11/16/2021) |
| 11/16/2021 | | SCHEDULING ORDER as to Ng Chong Hwa. Status Conference set for 12/7/2021 at 10:30 AM before Chief Judge Margo K. Brodie. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against |

| | | |
|---|---|---|
| | | photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 11/16/2021. (Valentin, Winnethka) (Entered: 11/16/2021) |
| 11/17/2021 | | ORDER granting 92 extension of time to file as to Ng Chong Hwa. Response shall be filed by November 22,2021, and replies, if any, shall b filed by December 1, 2021. Ordered by Chief Judge Margo K. Brodie on 11/17/2021. (Valentin, Winnethka) (Entered: 11/17/2021) |
| 11/22/2021 | 93 | MEMORANDUM in Opposition re 89 MOTION in Limine *for FRE 104 hearing, Government Witness and Exhibit List* (Stern, Dylan) (Entered: 11/22/2021) |
| 11/22/2021 | 94 | MEMORANDUM in Opposition re 90 MOTION in Limine *[REDACTED]* (Agnifilo, Marc) (Entered: 11/22/2021) |
| 12/02/2021 | 95 | REPLY TO RESPONSE to Motion re 90 MOTION in Limine *in Further Support of the Government's Motions [Redacted]* (Rolle, Drew) (Entered: 12/02/2021) |
| 12/02/2021 | 96 | MOTION for Leave to Electronically File Document under Seal *the Government's Unredacted Reply Memorandum (ECF No. 95) and Exhibits* by USA as to Ng Chong Hwa. (Attachments: # 1 Exhibit Unredacted Gov't Reply (ECF No. 95), # 2 Exhibit 1, # 3 Exhibit 2) (Rolle, Drew) (Entered: 12/02/2021) |
| 12/06/2021 | 97 | Letter *in advance of 12/7/21 status conference* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 12/06/2021) |
| 12/09/2021 | 98 | Letter *regarding trial day schedule* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 12/09/2021) |
| 12/09/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on December 7, 2021. AUSAs Drew Rolle, Alexandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, and Jacob Kaplan appeared on behalf of Defendant Ng Chong Hwa. The Court heard from the parties regarding Defendant's 89 motion in limine. The Court denied Defendant's request for a pretrial hearing to determine the admissibility of purported coconspirator statements but will provide the parties an opportunity to challenge any evidence either at the start or at the end of the trial date. The government will produce its witness list and 3500 material, with the exception of certain sensitive material, by the end of December. The Court also heard from Defendant on his 97 letter. Defendant may submit a letter brief to the Court, and the government may respond in writing, if the grand jury did not charge specific Malaysian offenses as part of the money laundering offense. The Court discussed with the parties the logistics of the trial. The Court will notify the parties if trial will be held in courtroom 4F or 6F north. Jury selection will take place in the Ceremonial courtroom and will proceed as discussed. The parties shall confer and propose a trial schedule to the Court. If the 9:30 AM or 10:00 AM to 5:00 PM slot is selected, the Court will not hear testimony on Fridays. The parties are required to wear a mask during trial and the trial will proceed as discussed. The Court will keep the parties updated as to any changes regarding trial logistics. The Court will confirm that the trial courtroom is wired as needed to accommodate remote witnesses. The Court scheduled a status conference for December 21, 2021 at 9:00 AM. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court |

| | | |
|---|---|---|
| | | proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 12/9/2021. (Valentin, Winnethka) (Entered: 12/09/2021) |
| 12/16/2021 | | ORDER. The parties are directed to file their unredacted motion papers relating to the Government's 90 motion in limine under seal. Ordered by Chief Judge Margo K. Brodie on 12/16/2021. (Valentin, Winnethka) (Entered: 12/16/2021) |
| 12/16/2021 | 99 | UNREDACTED DOCUMENT by Ng Chong Hwa re 94 Memorandum in Opposition (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Agnifilo, Marc) (Entered: 12/16/2021) |
| 12/16/2021 | 100 | UNREDACTED DOCUMENT by USA as to Ng Chong Hwa re 95 Reply to Response (Attachments: # 1 Exhibit, # 2 Exhibit) (Stern, Dylan) (Entered: 12/16/2021) |
| 12/18/2021 | 101 | UNREDACTED DOCUMENT by USA as to Ng Chong Hwa re 90 MOTION in Limine filed by USA (Attachments: # 1 Exhibit A) (Stern, Dylan) (Entered: 12/18/2021) |
| 12/20/2021 | 102 | Letter *in advance of 12/21/21 status conference* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 12/20/2021) |
| 12/20/2021 | 103 | UNREDACTED DOCUMENT by Ng Chong Hwa re 102 Letter (Agnifilo, Marc) (Entered: 12/20/2021) |
| 12/20/2021 | 105 | SUPERSEDING INDICTMENT (S-2) as to Low Taek Jho (1) count(s) 1ss, 3ss, Ng Chong Hwa (2) count(s) 1ss, 2ss, 3ss. (Attachments: # 1 Criminal Information Sheet) (Piper, Francine) (Entered: 12/21/2021) |
| 12/21/2021 | 104 | Letter *re Superseding Indictment, Request for Grand Jury Material, Request for 3500 Material* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 12/21/2021) |
| 12/21/2021 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on December 21, 2021. AUSA Alixandra Smith appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc A. Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Court heard from the parties regarding the government's 90 motion in limine, the 105 Second Superseding Indictment, and Defendant's 102 and 104 letters filed on 12/20/21 and 12/21/21, respectively. The parties resolved the government's third, sixth, seventh, and tenth requests in its motion in limine. The Court deferred ruling on the government's fifth and eighth requests until trial. The Court found the government's ninth request to be moot on the issue of nationality raised in the government's motion and deferred ruling on the broader scope of the request until trial. The parties resolved the government's eleventh request; the defense agreed to produce prior to trial any new materials it plans on introducing during cross examination of government witnesses pursuant to Rule 16 of the Federal Rules of Evidence. The Court reserved ruling on the government's first, second, and fourth requests. Defendant waived the reading of the 105 Second Superseding Indictment and entered a not guilty plea as to all counts. The Court directed the parties to discuss Defendant's requests in his 102 letter dated 12/20/21 and to reach out to the Court if further assistance is needed. Regarding Defendant's 104 letter dated 12/21/21, the government informed the Court that it will produce additional 3500 material today and file under seal a letter responding to Defendant's request for grand jury material. The Court scheduled a status conference for January 7, 2022, at 9:30 AM. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the |

| | | |
|---|---|---|
| | | general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter Charleane Heading.) (Bacchi, Joseph) (Entered: 12/21/2021) |
| 12/27/2021 | 106 | Letter *in Response to Defendant's Request to Inspect GJ Transcripts* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 12/27/2021) |
| 12/28/2021 | 107 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on December 7, 2021, before Judge Margo K. Brodie. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 1/18/2022. Redacted Transcript Deadline set for 1/28/2022. Release of Transcript Restriction set for 3/28/2022. (Danelczyk, Linda) (Entered: 12/28/2021) |
| 12/31/2021 | 108 | Letter *re Scheduled Trial Date* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 12/31/2021) |
| 12/31/2021 | 109 | Letter *Opposing Gov't Request for an Adjournment* 108 as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 12/31/2021) |
| 01/01/2022 | 110 | Letter *re* 108 *Gov't Request for Adjournment* as to Ng Chong Hwa (Rolle, Drew) (Entered: 01/01/2022) |
| 01/01/2022 | 111 | REDACTION by USA as to Ng Chong Hwa to 110 1 - Sealed Document CR, Letter (Rolle, Drew) (Entered: 01/01/2022) |
| 01/03/2022 | 112 | Letter *responding to Gov't Request for Adjournment* 110 111 as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 01/03/2022) |
| 01/03/2022 | 113 | REDACTION by Ng Chong Hwa to 112 1 - Sealed Document CR, Letter (Agnifilo, Marc) (Entered: 01/03/2022) |
| 01/04/2022 | | ORDER re 108 Letter re Scheduled Trial Date as to Ng Chong Hwa. The Court will discuss the Government's request for adjournment with the parties at the January 7, 2022 conference. Ordered by Chief Judge Margo K. Brodie on 1/4/2022. (Valentin, Winnethka) (Entered: 01/04/2022) |
| 01/04/2022 | 114 | Letter *Reply re* 106 *Gov't Letter in Response to Defendant's Request for Malaysian Statutes* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 01/04/2022) |
| 01/05/2022 | 115 | Letter MOTION to Modify Conditions of Release by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 01/05/2022) |
| 01/05/2022 | 116 | REDACTION by Ng Chong Hwa to 115 Letter MOTION to Modify Conditions of Release filed by Ng Chong Hwa (Agnifilo, Marc) (Entered: 01/05/2022) |
| 01/07/2022 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on January 7, 2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Court granted Defendant's 115 motion to modify conditions of release. The Court modified Mr. Ng's 8:00 PM to 8:00 AM curfew to 10:00 |

PM to 7:00 AM and reduced the amount securing Mr. Ng's bail from $1,000,000 to $250,000. The Court also granted the Government's 108 letter motion for an adjournment of trial. Jury selection is scheduled to commence on February 7, 2022, and opening statements are scheduled to commence the following Monday, on February 14, 2022. The Court heard from the parties regarding the government's first, second, and fourth requests in its 90 motion in limine, on which the Court reserved ruling at the December 21, 2021 conference. The Court granted in part and denied in part the Government's first request for rulings on the admissibility of certain bank records and statements contained within them, finding that the 2012 Checklist and 2013 Call Report are admissible as business records and that the statements contained within them are admissible as nonhearsay, but that the 2014 Call Report is not admissible as a business record. The Court also granted in part the Government's second request for rulings on the admissibility of three categories of evidence that post-date the charged conspiracies, finding that the evidence in the first and third categories, as well as some of the evidence in the second category, is admissible. The Court deferred ruling on the admissibility of the remaining evidence in the second category and invited the parties to submit supplemental briefing as to some of it and to take time to resolve their issues with respect to the rest of it. Although the Court found the evidence in the third category admissible, the Court invited defense counsel to review the evidence in this category again and to challenge it in a letter brief if appropriate. The Court deferred ruling on the Government's fourth request regarding the admissibility of certain co-conspirator statements.The Court also heard from the parties on Nr. Ng's 104 request for grand jury and 3500/Giglio materials. The Court invited defense counsel to submit a supplemental letter regarding his request for grand jury materials, demonstrating either how the standard for access to such materials has been met or why it does not apply. The Court noted that it lacks authority to order the pretrial disclosure of 3500 material, see 18 U.S.C. § 3500; United States v. Coppa, 267 F.3d 132, 145-46 (2d Cir. 2001), but encouraged the Government to disclose Giglio material two weeks in advance of the relevant testimony. The Court noted that if defense counsel requires additional time to prepare based on the timing of the Government's disclosures, the Court will entertain an application to delay the trial.The Court scheduled a status conference for January 20, 2022, at 10:00 AM, before which time the parties should notify the Court of any unresolved issues so that the Court may rule on them at the conference. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter Michele Lucchese.) (Valentin, Winnethka) (Entered: 01/07/2022)

| 01/08/2022 | 117 | Letter *attaching Proposed Order as to bail reduction* as to Ng Chong Hwa (Attachments: # 1 Proposed Order) (Agnifilo, Marc) (Entered: 01/08/2022) |
| 01/11/2022 | 118 | ORDER REDUCING BAIL. Ordered by Chief Judge Margo K. Brodie on 1/11/2022. (Valentin, Winnethka) (Entered: 01/11/2022) |
| 01/20/2022 | | ORDER: Due to a conflict in the Court's calendar, the status conference scheduled for January 20, 2022, is RESCHEDULED to January 26, 2022, at 10:00 am. The parties are directed to call 1-888-684-8852 using access code 9801036. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any |

| | | |
|---|---|---|
| | | other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 1/20/2022. (Valentin, Winnethka) (Entered: 01/20/2022) |
| 01/21/2022 | [119](#) | Letter re *Jointly-Proposed Briefing Schedule and Filing Dates for Jury Instructions and Voir Dire* as to Ng Chong Hwa (Rolle, Drew) (Entered: 01/21/2022) |
| 01/24/2022 | | ORDER granting [119](#) Letter re proposed briefing schedule as to Ng Chong Hwa. Additional motions in limine and motions related to remote testimony to be filed on or before January 26, 2022. Proposed voir dire to be filed on or before January 26, 2022. Proposed jury instructions to be filed on or before February 4, 2022. Ordered by Chief Judge Margo K. Brodie on 1/24/2022. (Valentin, Winnethka) (Entered: 01/24/2022) |
| 01/26/2022 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on January 26, 2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Court deferred ruling until trial on the Government's fourth request in its [90](#) motion in limine. The parties will discuss the Government's request to prevent Ng from raising the status of his codefendant at trial and will attempt to resolve this issue. The parties will jointly file their proposed jury instructions and attempt to resolve any differences they may have. The Government informed the Court that it produced substantial Giglio material regarding its cooperating witness and that it expects to produce the core of its 3500 material related to this witness a week before trial. The Court informed the parties that trial will take place in courtroom 4F and that they may contact the Court's case manager to schedule a time to review the courtroom and its technology. The Court will inform the parties whether an attorney for a witness may sit in the courtroom rather than an overflow room and will notify the parties if trial will take place on February 25, 2022. The Court scheduled a final pretrial conference for February 3, 2022, at 10:00 AM. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter David Roy.) (Valentin, Winnethka) (Entered: 01/26/2022) |
| 01/26/2022 | [120](#) | Proposed Voir Dire by USA as to Ng Chong Hwa (Stern, Dylan) (Entered: 01/26/2022) |
| 01/26/2022 | [121](#) | Proposed Voir Dire by Ng Chong Hwa (Agnifilo, Marc) (Entered: 01/26/2022) |
| 01/26/2022 | [122](#) | MOTION in Limine *requesting testimony via CCTV and Malaysian charges the Grand Jury voted* by Ng Chong Hwa. (Attachments: # [1](#) Affidavit of Marc Agnifilo, # [2](#) Exhibit 1, # [3](#) Exhibit 2, # [4](#) Exhibit 3) (Agnifilo, Marc) (Entered: 01/26/2022) |
| 01/26/2022 | [123](#) | REDACTION by Ng Chong Hwa to [122](#) MOTION in Limine *requesting testimony via CCTV and Malaysian charges the Grand Jury voted* filed by Ng Chong Hwa (Attachments: # [1](#) Affidavit of Marc Agnifilo, # [2](#) Exhibit 1, # [3](#) Exhibit 2, # [4](#) Exhibit 3) (Agnifilo, Marc) (Entered: 01/26/2022) |
| 01/26/2022 | [124](#) | MOTION in Limine by USA as to Ng Chong Hwa. (Rolle, Drew) (Entered: 01/26/2022) |
| 01/31/2022 | [125](#) | MOTION to Appoint Counsel *and Conduct a Curcio Hearing* by USA as to Ng Chong Hwa. (Stern, Dylan) (Entered: 01/31/2022) |
| 02/03/2022 | | MINUTE ENTRY: Final Pretrial Conference by telephone was held before Chief Judge Margo K. Brodie on February 3, 2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan |

| | | |
|---|---|---|
| | | Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The parties shall file their 122 and 124 MOTION in limine responses by end of the day February 3, 2022. The Court heard from the parties on the government's 125 MOTION to Appoint Counsel and Conduct a Curcio Hearing and deferred ruling on it until trial. Jury selection will commence at 9:30 AM until 5:00 PM on February 7, 2022, in the ceremonial courtroom. The parties are directed to arrive by 9:00 AM. Defense counsel will submit a proposed order to allow paralegals to bring their laptops and cellphones into the courthouse. The Court will inform the parties on February 7, 2022, whether it will sit for trial on February 25, 2022. (Court Reporter Denise Parisi.) (Valentin, Winnethka) (Entered: 02/03/2022) |
| 02/03/2022 | 126 | Letter *attaching Proposed Order as to electronic devices* as to Ng Chong Hwa (Attachments: # 1 Proposed Order) (Agnifilo, Marc) (Entered: 02/03/2022) |
| 02/03/2022 | 127 | ORDER as to Ng Chong Hwa. Upon the application of the defendant, Ng Chong Hwa a.k.a Roger Ng, by his attorneys, Brafman & Associates, P.C.: I hereby authorize the following attorney and attorney staff members to bring the General Purpose Computing Devices listed below into the Eastern District of New York Courthouse for use in a trial or proceeding in the action entitled United States v. Ng Chong Hwa a.k.a Roger Ng, 18 Cr. 538 (MKB) which is anticipated to begin on February 7, 2022 and conclude on or about March 16. 2022. Ordered by Chief Judge Margo K. Brodie on 2/3/2022. (Valentin, Winnethka) (Entered: 02/03/2022) |
| 02/03/2022 | 128 | MEMORANDUM in Opposition re 122 MOTION in Limine *requesting testimony via CCTV and Malaysian charges the Grand Jury voted* (Stern, Dylan) (Entered: 02/03/2022) |
| 02/03/2022 | 129 | REDACTION by USA as to Ng Chong Hwa to 128 1 - Sealed Document CR, Memorandum in Opposition (Stern, Dylan) (Entered: 02/03/2022) |
| 02/03/2022 | 130 | RESPONSE in Opposition re 124 MOTION in Limine (Agnifilo, Marc) (Entered: 02/03/2022) |
| 02/04/2022 | 131 | Letter *requesting extension to file proposed jury instructions* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/04/2022) |
| 02/04/2022 | | ORDER granting 131 Letter requesting extension to file proposed jury instructions by February 9, 2022 as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 2/4/2022. (Valentin, Winnethka) (Entered: 02/04/2022) |
| 02/06/2022 | 132 | Letter MOTION in Limine *to admit recording* by Ng Chong Hwa. (Attachments: # 1 Exhibit 1 - transcript) (Agnifilo, Marc) (Entered: 02/06/2022) |
| 02/07/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Selection held on February 7, 2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Jury Selection held. Jury Selection continued to 2/8/2022. (Court Reporter Georgette Betts.) (Piper, Francine) (Entered: 02/10/2022) |
| 02/08/2022 | 133 | Letter *re: Bloomberg L.P.'s Request for Access re: U.S. v. Ng Chong Hwa* as to Ng Chong Hwa (Attachments: # 1 Exhibit A) (Browning, John) (Entered: 02/08/2022) |
| 02/08/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury Selection held on 2/8/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the |

| | | |
|---|---|---|
| | | Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Jury Trial will commence on 2/14/2022 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie (Court Reporter Georgette Betts.) (Piper, Francine) Modified on 2/11/2022 (Valentin, Winnethka). (Entered: 02/10/2022) |
| 02/09/2022 | 134 | REPLY TO RESPONSE to Motion re 124 MOTION in Limine *in Further Support of the Government's Motions*, RESPONSE in Opposition re 132 Letter MOTION in Limine *to admit recording* (Stern, Dylan) (Entered: 02/09/2022) |
| 02/11/2022 | 135 | MOTION for Release of Brady Materials by Ng Chong Hwa. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Agnifilo, Marc) (Entered: 02/11/2022) |
| 02/11/2022 | 136 | REDACTION by Ng Chong Hwa to 135 MOTION for Release of Brady Materials filed by Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/11/2022) |
| 02/11/2022 | 137 | ORDER re 133 Letter re: Bloomberg L.P.'s Request for Access re: U.S. v. Ng Chong Hwa as to Ng Chong Hwa. For the reasons stated in the attached Order, the Court denies Bloomberg's request to be permitted to cover future proceedings from within the courtroom. Ordered by Chief Judge Margo K. Brodie on 2/11/2022. (Bacchi, Joseph) (Entered: 02/11/2022) |
| 02/11/2022 | | ORDER re 135 MOTION for Release of Brady Materials. The government shall file a response on February 11, 2022 at 5:00 PM. Ordered by Chief Judge Margo K. Brodie on 2/11/2022. (Valentin, Winnethka) (Entered: 02/11/2022) |
| 02/11/2022 | 138 | MEMORANDUM AND ORDER. The Court (1) denies at this time Ng's request to allow the Lims to testify remotely via CCTV, (2) denies Ng's request to obtain information as to the Grand Jury's vote (or non-vote) as to specific SUAs, and (3) denies Ng's request to admit the October 2018 Recording. As to the Government's motion, the Court (1) grants the request to preclude Ng from introducing the Low-Leissner Call, (2) grants the request to limit the scope of cross-examination on Nu Horizons in accordance with Rule 608, and (3) defers ruling on the request to preclude Ng from cross-examining Leissner on aspects of Leissner's personal life. Ordered by Chief Judge Margo K. Brodie on 2/11/2022. (Valentin, Winnethka) (Entered: 02/11/2022) |
| 02/11/2022 | 139 | RESPONSE to Motion re 135 MOTION for Release of Brady Materials (Stern, Dylan) (Entered: 02/11/2022) |
| 02/11/2022 | 140 | REDACTION by USA as to Ng Chong Hwa to 139 1 - Sealed Document CR, Response to Motion (Stern, Dylan) (Entered: 02/11/2022) |
| 02/11/2022 | 141 | REPLY TO RESPONSE to Motion re 135 MOTION for Release of Brady Materials (Agnifilo, Marc) (Entered: 02/11/2022) |
| 02/14/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury trial held on 2/14/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Jurors were sworn, and jury trial began. Sworn testimony was heard from Andy Tai. The jury trial will continue on February 15, 2022 at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie (Court Reporter Denise Parisi.) (Fernandez, Erica) (Entered: 02/16/2022) |
| 02/15/2022 | 142 | Letter *requesting all discovery material and Court inquiry* as to Ng Chong Hwa (Attachments: # 1 Exhibit 1 - January 2022 Letter) (Agnifilo, Marc) (Entered: |

| | | 02/15/2022) |
|---|---|---|
| 02/15/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury trial held on 2/15/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Andy Tai, Robert A. Moss, and Alex Cohen. The jury trial will continue on February 16, 2022 at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie.(Court Reporter Denise Parisi.) (Fernandez, Erica) (Entered: 02/16/2022) |
| 02/16/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury trial held on 2/16/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The jury trial will continue on February 22, 2022 at 9:45 AM in Courtroom 4F North before Chief Judge Margo K. Brodie.(Court Reporter Denise Parisi.) (Fernandez, Erica) (Entered: 02/16/2022) |
| 02/17/2022 | 143 | Letter *re Defense Opening Statement and Rebuttal Evidence* as to Ng Chong Hwa (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Stern, Dylan) (Entered: 02/17/2022) |
| 02/17/2022 | 144 | REDACTION by USA as to Ng Chong Hwa to 143 1 - Sealed Document CR, Letter (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Stern, Dylan) (Entered: 02/17/2022) |
| 02/18/2022 | 145 | Letter *re Update on Travel for Defense Witness* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 02/18/2022) |
| 02/19/2022 | 146 | Letter *supplementing and responding to Gov't Letter 145* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/19/2022) |
| 02/20/2022 | 147 | Letter *Regarding Precluding Certain Hearsay Evidence* as to Ng Chong Hwa (Stern, Dylan) (Entered: 02/20/2022) |
| 02/22/2022 | 148 | Letter *in Opposition to Govt's Letter re Opening Statement and Rebuttal Evidence 143* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/22/2022) |
| 02/22/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury trial held on 2/22/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice also participated on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The jury trial will continue on February 23, 2022 at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Anthony Frisolone.) (Bacchi, Joseph) (Entered: 02/23/2022) |
| 02/23/2022 | 149 | Letter *re Privilege Team* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 02/23/2022) |
| 02/23/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie. Jury trial held on 2/23/2022 as to Ng Chong Hwa. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The jury trial will continue on February 24, 2022, at 9:30 AM |

| | | |
|---|---|---|
| | | in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Anthony Frisolone.) (Bacchi, Joseph) (Entered: 02/23/2022) |
| 02/24/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 2/24/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern appeared on behalf of the government. Brent Wible and Jennifer Ambuehl of the Department of Justice appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The jury trial will continue on 2/28/2022 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Anthony Frisolone) (Piper, Francine) (Entered: 02/24/2022) |
| 02/25/2022 | | SCHEDULING ORDER as to Ng Chong Hwa. The Court scheduled a status conference for February 25, 2022, at 3:00 PM. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Chief Judge Margo K. Brodie on 2/25/2022. (Valentin, Winnethka) (Entered: 02/25/2022) |
| 02/25/2022 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on February 25, 2022. AUSAs Drew Rolle, Alexandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Henry Mazurek and Ilana Haramati appeared on behalf of Mr. Lessiner. The jury trial will continue on March 1, 2022, at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. The Court scheduled a status conference for February 28, 2022, at 10:00 AM. The parties will notify the Court if a status conference is needed by February 27, 2022. The call-in information for the telephone conference is 1-888-684-8852 and the access code is 9801036. If any party has any difficulty accessing the telephone, please call chambers at (718) 613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (Court Reporter Anthony Frisolone.) (Valentin, Winnethka) (Entered: 02/25/2022) |
| 02/25/2022 | [150](150) | Letter *response to Gov't motion to preclude evidence [147](147)* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/25/2022) |
| 02/27/2022 | [151](151) | Letter *re Status Conference and Remaining Challenged Documents* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 02/27/2022) |
| 02/27/2022 | [152](152) | Letter *dated 2/27/2022 to Chief Judge Margo K. Brodie from David K. Willingham, Esq. and Brian R. Michael, Esq., as counsel for third-party Kimora Lee Simmons Leissner regarding clients privileged marital communications being produced in this matter and intention to appear at telephone conference on 2/28/2022* as to Low Taek Jho, Ng Chong Hwa (Lesser, David) (Entered: 02/27/2022) |
| 02/28/2022 | [153](153) | Letter *in response to Dkt. [151](151) and [152](152)* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/28/2022) |

| 02/28/2022 | 154 | Letter *re GX-2470 and Lim Statements* as to Ng Chong Hwa (Stern, Dylan) (Entered: 02/28/2022) |
|---|---|---|
| 02/28/2022 | | MINUTE ENTRY: Status conference by telephone was held before Chief Judge Margo K. Brodie on February 28, 2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, Zach Intrater, and Jennifer Silverstein appeared on behalf of Defendant Ng Chong Hwa. Henry Mazurek and Ilana Haramati appeared on behalf of Tim Leissner. David Willingham and Brian Michael appeared on behalf of Kimora Lee Simmons Leissner. Ronald White appeared on behalf of Judy Chan. Curt Bolhing and David Steier appeared on behalf of the filter team. The parties continue to discuss the Government's privilege log, and defense counsel is working with the privilege holders to determine whether certain documents on the log can be produced. Mr. Leissner has asserted attorney-client privilege with respect to certain documents. Ms. Simmons Leissner has not had an opportunity to review the relevant communications and will do so expeditiously. Ms. Simmons Leissner has asserted marital privilege as to certain communications. The parties and counsel for Ms. Simmons Leissner will submit briefing on whether the communications are subject to the marital privilege and will notify the Court of their agreed upon briefing schedule. The jury trial will continue on March 1, 2022, at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter David Roy.) (Valentin, Winnethka) (Entered: 02/28/2022) |
| 03/01/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/1/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The Jury Trial will continue on 3/2/2022 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Linda Danelczyk.) (Piper, Francine) (Entered: 03/01/2022) |
| 03/02/2022 | 155 | Letter *Brief dated 3/02/2022 to Chief Judge Margo K. Brodie from David K. Willingham, Esq. and Brian R. Michael, Esq., as counsel for third-party Kimora Lee Simmons Leissner regarding clients privileged marital communications* as to Low Taek Jho, Ng Chong Hwa (Attachments: # 1 Affidavit of David K. Willingham in Support of Letter Brief) (Lesser, David) (Entered: 03/02/2022) |
| 03/02/2022 | 156 | Letter *re Marital Communications* as to Ng Chong Hwa (Stern, Dylan) (Entered: 03/02/2022) |
| 03/02/2022 | 157 | Letter *re communications between Leissner and Simmons-Leissner* as to Ng Chong Hwa (Attachments: # 1 Exhibit 1) (Agnifilo, Marc) (Entered: 03/02/2022) |
| 03/02/2022 | 158 | REDACTION by Ng Chong Hwa to 157 1 - Sealed Document CR, Letter (Attachments: # 1 Exhibit 1) (Agnifilo, Marc) (Entered: 03/02/2022) |
| 03/02/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/2/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The Jury Trial will continue on 3/3/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie (Court Reporter Anthony Frisolone.) (Fernandez, Erica) (Entered: 03/02/2022) |

| 03/03/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/3/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The Jury Trial will continue on 3/7/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie(Court Reporter Michele Luchesse.) (Fernandez, Erica) (Entered: 03/03/2022) |
| 03/03/2022 | 159 | MOTION to Appear Pro Hac Vice *David K. Willingham* Filing fee $ 150, receipt number ANYEDC-15343704.by Kimora Lee Simmons Leissner as to Ng Chong Hwa. (Attachments: # 1 Affidavit in Support of Motion to Admit Counsel Pro Hac Vice, # 2 Certificate of Good Standing, # 3 [Proposed] Order for Admission Pro Hac Vice) (Willingham, David) (Entered: 03/03/2022) |
| 03/03/2022 | 160 | Letter *as to Privileged Spousal Communications* as to Ng Chong Hwa (Willingham, David) (Entered: 03/04/2022) |
| 03/04/2022 | 161 | Letter *as to Privileged Spousal Communications [REDACTED]* as to Ng Chong Hwa (Willingham, David) (Entered: 03/04/2022) |
| 03/04/2022 | 162 | Letter *Reply in Further Support of the Government's February 20, 2022 Letter Motion to Preclude Certain Hearsay Evidence* as to Ng Chong Hwa (Stern, Dylan) (Entered: 03/04/2022) |
| 03/05/2022 | 163 | Letter *regarding FRE 608(b)* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/05/2022) |
| 03/06/2022 | | ORDER re 163 Letter regarding FRE 608(b). The Government is directed to respond to Defendant's 163 Letter regarding FRE 608(b). Ordered by Chief Judge Margo K. Brodie on 3/6/2022. (Bacchi, Joseph) (Entered: 03/06/2022) |
| 03/06/2022 | 164 | Letter *requesting that the Court take judicial notice of Exhibit 1* as to Ng Chong Hwa (Attachments: # 1 Exhibit 1) (Agnifilo, Marc) (Entered: 03/06/2022) |
| 03/06/2022 | 165 | Letter *re FRE 401, 404, 608 and in Response to 163 Def. Letter* as to Ng Chong Hwa (Rolle, Drew) (Entered: 03/06/2022) |
| 03/07/2022 | 166 | Letter *Response to Defense Request for the Court to take Judicial Notice of Documents (ECF No. 164)* as to Ng Chong Hwa (Smith, Alixandra) (Entered: 03/07/2022) |
| 03/07/2022 | 167 | Letter *reply in response to Dkt. 166* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/07/2022) |
| 03/07/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/7/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The Jury Trial will continue on 3/8/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Stacy Mace.) (Piper, Francine) (Entered: 03/08/2022) |
| 03/08/2022 | | ORDER granting 159 Motion for Leave to Appear. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that he receives electronic notification of activity in this case. Also, the attorney shall ensure the 150 admission fee be submitted to the Clerks |

| | | |
|---|---|---|
| | | Office via filing the event *Pro Hac Vice Filing Fee*. as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 3/8/2022. (Bacchi, Joseph) (Entered: 03/08/2022) |
| 03/08/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/8/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner. The Jury Trial will continue on 3/9/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan) (Piper, Francine) Modified on 3/9/2022 to list the correct Court Reporter (Piper, Francine). (Entered: 03/09/2022) |
| 03/09/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/9/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Tim Leissner, Paul Garofallou, and Martin Sullivan. The Jury Trial will continue on 3/10/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan.) (Piper, Francine) (Entered: 03/10/2022) |
| 03/10/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/10/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Martin Sullivan and Patrick Kidney. The Jury Trial will continue on 3/14/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan.) (Piper, Francine) (Entered: 03/11/2022) |
| 03/11/2022 | 168 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on December 21, 2021, before Judge Brodie. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718-613-2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/1/2022. Redacted Transcript Deadline set for 4/11/2022. Release of Transcript Restriction set for 6/9/2022. (Heading, Charleane) (Entered: 03/11/2022) |
| 03/14/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/14/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Eric Van Dorn and Stephen O'Flaherty. The Jury Trial will continue on 3/15/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Charleane Heading.) (Bacchi, Joseph) (Entered: 03/15/2022) |
| 03/15/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/15/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was |

| | | |
|---|---|---|
| | | heard from Stephen O'Flaherty, Christopher Graham French, and Kevin Swampillai. The Jury Trial will continue on 3/16/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Charleane Heading.) (Bacchi, Joseph) (Entered: 03/15/2022) |
| 03/15/2022 | 169 | Letter *re Recently Obtained Evidence* as to USA as to Ng Chong Hwa (Stern, Dylan) (Entered: 03/15/2022) |
| 03/15/2022 | 170 | Letter *re FRE 803(5) and Previously Admitted Evidence* as to Ng Chong Hwa (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Rolle, Drew) (Entered: 03/15/2022) |
| 03/16/2022 | 171 | Letter *re Admissibility of GX-101* as to Ng Chong Hwa (Attachments: # 1 Exhibit A) (Rolle, Drew) (Entered: 03/16/2022) |
| 03/16/2022 | 172 | Letter *re Admissibility of GX-101* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/16/2022) |
| 03/16/2022 | 173 | Letter *re FRE 803(5)* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/16/2022) |
| 03/16/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/16/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Kevin Swampillai, Gautam Awalegaonkar, Bella Belkin, and Seth Harris. The Jury Trial will continue on 3/17/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie.(Court Reporter Charleane Heading.) (Fernandez, Erica) (Entered: 03/16/2022) |
| 03/16/2022 | 174 | Letter *re Co-Conspirator Statements* as to Ng Chong Hwa (Stern, Dylan) (Entered: 03/16/2022) |
| 03/17/2022 | 175 | Letter *Reply to Def. Letter re Testimony Admitted Under FRE 803(5)* as to Ng Chong Hwa (Rolle, Drew) (Entered: 03/17/2022) |
| 03/17/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/17/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Christian Isolda, Gregory Phillips, Eric Lee, Kirk Godby, and Roberto Amenta. The Jury Trial will continue on 3/21/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Georgette K. Betts.) (Fernandez, Erica) (Entered: 03/17/2022) |
| 03/18/2022 | 176 | Letter *Response to Gov't Letter re Co-Conspirator Statements (Dkt. 147 )* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/18/2022) |
| 03/18/2022 | 177 | Proposed Jury Instructions/Verdict Form by USA as to Ng Chong Hwa (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Stern, Dylan) (Entered: 03/18/2022) |
| 03/19/2022 | 178 | Proposed Jury Instructions/Verdict Form by Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/19/2022) |
| 03/20/2022 | 179 | Letter as to Ng Chong Hwa (Smith, Alixandra) (Entered: 03/20/2022) |

| | | |
|---|---|---|
| 03/20/2022 | 180 | *SEALED* MEMORANDUM AND ORDER. For the reasons explained in the attached Memorandum and Order, the Court grants the Governments 90 and 174 request to admit certain statements made by Hwee Bin Lim as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). The Memorandum and Order is being filed under seal. The parties shall submit an agreed upon redacted version within seven days. Signed by Chief Judge Margo K. Brodie on 3/20/2022. (Marziliano, August) (Entered: 03/20/2022) |
| 03/20/2022 | 181 | Proposed Jury Instructions/Verdict Form by Ng Chong Hwa (Attachments: # 1 Supplement Revised Defense Request No. 5) (Agnifilo, Marc) (Entered: 03/20/2022) |
| 03/21/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/21/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Craig Broderick, Vikram Sarker, Selwyn Deloach, and Sean Fern. The Jury Trial will continue on 3/22/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie.(Court Reporter Sophie Nolan.) (Fernandez, Erica) (Entered: 03/22/2022) |
| 03/22/2022 | 182 | Letter *objecting to Goldman Sachs training materials and internal policies* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/22/2022) |
| 03/22/2022 | 183 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on 02/15/22, before Judge BRODIE. Court Reporter/Transcriber rivka teich, Telephone number 7186132268. Email address: rivkateich@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/12/2022. Redacted Transcript Deadline set for 4/22/2022. Release of Transcript Restriction set for 6/20/2022. (Teich, Rivka) (Entered: 03/22/2022) |
| 03/22/2022 | 184 | ORDER. For the reasons explained in the attached Order, the Court adheres to its prior rulings admitting Government Exhibit 3003 and the use of that information in Government Exhibit 159 and denies Defendant's 173 request to strike Robert Pepitone's testimony and the portions of charts relying on it. Ordered by Chief Judge Margo K. Brodie on 3/22/2022. (Bacchi, Joseph) (Entered: 03/22/2022) |
| 03/22/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/22/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Sean Fern and Tracy Montenegro. The Jury Trial will continue on 3/23/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan.) (Fernandez, Erica) (Entered: 03/23/2022) |
| 03/23/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/23/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Caroline Jane Fraser and Special Agent Ryan Collins. The Jury Trial will continue on 3/24/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan.) (Piper, Francine) (Entered: 03/23/2022) |

| 03/23/2022 | 185 | Letter *re Def. Requests to Charge* as to Ng Chong Hwa (Rolle, Drew) (Entered: 03/23/2022) |
|---|---|---|
| 03/24/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/24/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Ryan Collins, Katelyn Giesler, and Salvatore Fortunato. The Jury Trial will continue on 3/28/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Sophie Nolan.) (Fernandez, Erica) (Entered: 03/28/2022) |
| 03/26/2022 | 186 | MOTION for Acquittal *on Count Two pursuant to Rule 29* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 03/26/2022) |
| 03/27/2022 | 187 | MEMORANDUM AND ORDER. For the reasons explained in the attached Memorandum and Order, the Court grants the Government's 90 and 174 request to admit certain statements made by Hwee Bin Lim as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Ordered by Chief Judge Margo K. Brodie on 3/27/2022. (Bacchi, Joseph) (Entered: 03/27/2022) |
| 03/27/2022 | 188 | Letter *Regarding Precluding Certain Improper Testimony* as to Ng Chong Hwa (Stern, Dylan) (Entered: 03/27/2022) |
| 03/27/2022 | 189 | RESPONSE in Opposition re 186 MOTION for Acquittal *on Count Two pursuant to Rule 29* (Stern, Dylan) (Entered: 03/27/2022) |
| 03/28/2022 | 190 | Letter *Response to Gov't Letter 188 re Ms. Lim's Testimony* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/28/2022) |
| 03/28/2022 | 191 | Letter *re: Malaysian Law Jury Instructions* as to Ng Chong Hwa (Attachments: # 1 Affidavit Dato Mah Weng Kwai, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Ambuehl, Jennifer) (Entered: 03/28/2022) |
| 03/28/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/28/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Katelyn Giesler and Hwee Bin Lim. The Jury Trial will continue on 3/29/2022 at 09:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Charleane Heading.) (Fernandez, Erica) (Entered: 03/29/2022) |
| 03/29/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/29/2022. AUSAs Drew Rolle, Alixandra Smith and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Hwee Bin Lim. The Jury Trial will continue on 3/30/2022 at 10:00 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Victoria Butler.) (Fernandez, Erica) (Entered: 03/30/2022) |
| 03/30/2022 | | ORDER as to Ng Chong Hwa. The parties are directed to file a proposed verdict sheet. Ordered by Chief Judge Margo K. Brodie on 3/30/2022. (Bacchi, Joseph) (Entered: 03/30/2022) |
| 03/30/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 3/30/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan |

| | | |
|---|---|---|
| | | Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. Sworn testimony was heard from Hwee Bin Lim, Eric Van Dorn, and Sean Fern. The Jury Trial will continue on 4/4/2022 at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie. (Court Reporter Victoria Butler.) (Bacchi, Joseph) (Entered: 03/30/2022) |
| 04/03/2022 | 192 | Proposed Jury Instructions/Verdict Form by USA as to Low Taek Jho, Ng Chong Hwa (Stern, Dylan) (Entered: 04/03/2022) |
| 04/03/2022 | 193 | Proposed Jury Instructions/Verdict Form by Ng Chong Hwa (Agnifilo, Marc) (Entered: 04/03/2022) |
| 04/03/2022 | 194 | Letter *Regarding Updated Jury Instructions* as to Ng Chong Hwa (Stern, Dylan) (Entered: 04/03/2022) |
| 04/03/2022 | 195 | Letter *opposing government's request at Dkt. 194* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 04/03/2022) |
| 04/03/2022 | | ORDER as to Ng Chong Hwa. During trial on March 30, 2022, as part of its rebuttal case, the Government sought to admit into evidence reports and financial statements showing the income of defense witness Hwee Bin Lim's family business across several years beginning in 2016, arguing that these documents are relevant to whether the $35 million traceable from the 1MDB bond deals to Defendant were kickbacks from the alleged bribery scheme, or, as Defendant argues, the return on an investment made by Lim between 1996 and 1999 with funds from her family's business and investments, as well to whether Lim made false representations on bank account opening documents. Defendant objected to the admission of these documents, arguing that the money the business generated in 2016 and later is neither relevant to nor probative of the state of the business between 1996 and 1999. For the reasons discussed on the record, the Court denies the Government's application to admit the 2017, 2018, 2019, and 2020 reports and financial statements. As Ng argues, the probative value of the records is diminished by the almost "two decades" between the investment and the records. Ordered by Chief Judge Margo K. Brodie on 4/3/2022. (Bacchi, Joseph) (Entered: 04/03/2022) |
| 04/04/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 4/4/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Government rested its rebuttal case and the parties presented closing arguments. The Jury Trial will continue on 4/5/2022 at 9:30 AM in Courtroom 4F North before Chief Judge Margo K. Brodie.(Court Reporter Denise Parisi.) (Fernandez, Erica) (Entered: 04/05/2022) |
| 04/05/2022 | 196 | Letter *re Jury Charge* as to Ng Chong Hwa (Stern, Dylan) (Entered: 04/05/2022) |
| 04/05/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 4/5/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Court charged the jury and jury deliberations began. (Court Reporter Denise Parisi.) (Valentin, Winnethka) (Entered: 04/06/2022) |
| 04/06/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 4/6/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on |

| | | |
|---|---|---|
| | | behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The jury deliberated. Trial to continue on April 7, 2022 at 9:30 AM. (Court Reporter Denise Parisi.) (Valentin, Winnethka) (Entered: 04/06/2022) |
| 04/07/2022 | 197 | Jury Instructions as to Ng Chong Hwa. (Valentin, Winnethka) (Entered: 04/07/2022) |
| 04/07/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 4/7/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The jury deliberated. Trial to continue on April 8, 2022 at 9:30 AM. (Court Reporter Denise Parisi.) (Bacchi, Joseph) (Entered: 04/07/2022) |
| 04/08/2022 | | Minute Entry for proceedings held before Chief Judge Margo K. Brodie: Jury Trial as to Ng Chong Hwa held on 4/8/2022. AUSAs Drew Rolle, Alixandra Smith, and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Retained counsel Marc Agnifilo, Teny Geragos, Jacob Kaplan, and Zach Intrater appeared on behalf of Defendant Ng Chong Hwa. The Jury rendered a guilty verdict as to Count One, Count Two, and Count Three of the Second Superseding Indictment. Following the delivery of the verdict, the jurors were polled and dismissed. (Court Reporter Denise Parisi.) (Valentin, Winnethka) (Entered: 04/08/2022) |
| 04/08/2022 | 198 | JURY VERDICT as to Ng Chong Hwa (2) Guilty on Count 1ss,2ss,3ss. (Lee, Tiffeny) (Entered: 04/08/2022) |
| 04/08/2022 | 199 | COURT EXHIBIT 1 - Jury Instructions re Ng Chong Hwa. (Lee, Tiffeny) (Entered: 04/08/2022) |
| 04/08/2022 | 200 | COURT EXHIBIT 2 Verdict Sheet re Ng Chong Hwa. (Lee, Tiffeny) (Entered: 04/08/2022) |
| 04/08/2022 | 201 | Jury Notes (Court Exhibits 3-13) re to Ng Chong Hwa. (Lee, Tiffeny) (Entered: 04/08/2022) |
| 04/08/2022 | 202 | MEMORANDUM AND ORDER denying 186 Motion for Acquittal as to Ng Chong Hwa. The Court denied Defendant's motion for acquittal on the record on March 28, 2022, for the reasons explained in the attached Memorandum and Order. Ordered by Chief Judge Margo K. Brodie on 4/8/2022. (Bacchi, Joseph) (Entered: 04/08/2022) |
| 04/28/2022 | 203 | Consent MOTION for Extension of Time to File *Post-Trial Motions and Requesting a Sentencing Date in September 2022* by USA as to Ng Chong Hwa. (Rolle, Drew) (Entered: 04/28/2022) |
| 04/28/2022 | 204 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on March 1, 2022, before Judge Margo K. Brodie. Court Reporter/Transcriber Linda D. Danelczyk, Telephone number 718-613-2330. Email address: LindaDan226@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/19/2022. Redacted Transcript Deadline set for 5/29/2022. Release of Transcript Restriction set for 7/27/2022. (Danelczyk, Linda) (Entered: 04/28/2022) |
| 04/28/2022 | | ORDER granting 203 Consent MOTION for Extension of Time to File Post-Trial Motions. Ordered by Chief Judge Margo K. Brodie on 4/28/2022. (Valentin, Winnethka) |

| | | |
|---|---|---|
| | | (Entered: 04/28/2022) |
| 04/28/2022 | | SCHEDULING ORDER as to Ng Chong Hwa. Sentencing set for 9/13/2022 at 10:00 AM in Courtroom 6F North before Chief Judge Margo K. Brodie..Ordered by Chief Judge Margo K. Brodie on 4/28/2022. (Valentin, Winnethka) (Entered: 04/28/2022) |
| 05/22/2022 | 205 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on 03/03/2022, before Judge Margo K. Brodie. Court Reporter/Transcriber Michele Lucchese, Telephone number 718-613-2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 6/12/2022. Redacted Transcript Deadline set for 6/22/2022. Release of Transcript Restriction set for 8/20/2022. (Lucchese, Michele) (Entered: 05/22/2022) |
| 05/25/2022 | 206 | Letter MOTION to Modify Conditions of Release *temporarily to allow for attendance of religious prayers* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 05/25/2022) |
| 05/26/2022 | | ORDER granting 206 Motion to Modify Conditions of Release as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 5/26/2022. (Valentin, Winnethka) (Entered: 05/26/2022) |
| 05/26/2022 | 207 | NOTICE OF ATTORNEY APPEARANCE Margaret Moeser appearing for USA. (Moeser, Margaret) (Entered: 05/26/2022) |
| 05/31/2022 | 208 | Letter *regarding post-trial motions* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 05/31/2022) |
| 06/29/2022 | 209 | Consent MOTION to Continue Sentencing by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 06/29/2022) |
| 07/01/2022 | | ORDER granting 209 Motion to Continue Sentencing as to Ng Chong Hwa. Sentencing set for 11/9/2022 10:00 AM in Courtroom 6F North before Chief Judge Margo K. Brodie. Ordered by Chief Judge Margo K. Brodie on 7/1/2022. (Valentin, Winnethka) (Entered: 07/01/2022) |
| 07/13/2022 | 210 | PRE Request for Modification of Bail Conditions as to Ng Chong Hwa (Carrera, Thalia) (Entered: 07/13/2022) |
| 07/28/2022 | 211 | ORDER granting 210 Request for Modification of Bail Conditions as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 7/28/2022. (Valentin, Winnethka) (Entered: 07/28/2022) |
| 08/11/2022 | 212 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on March 17, 2022, before Judge Margo K. Brodie. Court Reporter/Transcriber Georgette K. Betts, Telephone number 718.804.2777. Email address: georgetteb25@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/1/2022. Redacted Transcript Deadline set for 9/11/2022. Release of Transcript Restriction set for 11/9/2022. (Betts, Georgette) (Entered: 08/11/2022) |
| 08/26/2022 | 213 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on January 26, 2022, before Judge Margo K. Brodie. Court Reporter/Transcriber David R Roy, Telephone number (718) 613-2609. Email address: |

A-36

| | | |
|---|---|---|
| | | drroyofcr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/16/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 11/24/2022. (Roy, David) (Entered: 08/26/2022) |
| 08/26/2022 | 214 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on January 28, 2022, before Judge Margo K. Brodie. Court Reporter/Transcriber David R Roy, Telephone number (718) 613-2609. Email address: drroyofcr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 9/16/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 11/24/2022. (Roy, David) (Entered: 08/26/2022) |
| 09/09/2022 | 215 | Consent MOTION to Continue Sentencing by USA as to Ng Chong Hwa. (Stern, Dylan) (Entered: 09/09/2022) |
| 09/12/2022 | | ORDER granting 215 Motion to Continue Sentencing as to Ng Chong Hwa. Sentencing set for 12/9/2022 11:00 AM in Courtroom 6F North before Chief Judge Margo K. Brodie. Ordered by Chief Judge Margo K. Brodie on 9/12/2022. (Okonta, Patricia) (Entered: 09/12/2022) |
| 10/20/2022 | 216 | MOTION to Modify Conditions of Release by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 10/20/2022) |
| 10/20/2022 | | ORDER granting 216 Motion to Modify Conditions of Release as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 10/20/2022. (WV) (Entered: 10/20/2022) |
| 10/27/2022 | 217 | Status Report: SENTENCE ADJOURNMENT REQUEST as to Ng Chong Hwa (MW) (Entered: 10/27/2022) |
| 11/04/2022 | 218 | ORDER granting 217 PROB Status Report as to Ng Chong Hwa. Sentencing set for February 16, 2023 at 10:00 AM before Chief Judge Margo K. Brodie in courtroom 6f North. Ordered by Chief Judge Margo K. Brodie on 11/4/2022. (WV) (Entered: 11/04/2022) |
| 11/08/2022 | 219 | Letter MOTION to Modify Conditions of Release *on 11/15/2022* by Ng Chong Hwa. (Geragos, Teny) (Entered: 11/08/2022) |
| 11/08/2022 | | ORDER granting 219 Motion to Modify Conditions of Release as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 11/8/2022. (WV) (Entered: 11/08/2022) |
| 01/19/2023 | 221 | Letter MOTION to Continue Sentencing *from 2/16/23 to 3/7/23* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 01/19/2023) |
| 01/23/2023 | | ORDER granting 221 Motion to Continue Sentencing as to Ng Chong Hwa. Sentencing set for 3/9/2023 at 11:00 AM in Courtroom 6F North before Chief Judge Margo K. Brodie. Ordered by Chief Judge Margo K. Brodie on 1/23/2023. (WV) (Entered: 01/23/2023) |
| 01/31/2023 | 222 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT by Ng Chong Hwa (Agnifilo, Marc) (Entered: 01/31/2023) |

| 02/15/2023 | 223 | OBJECTION TO PRESENCE INVESTIGATION REPORT by USA as to Ng Chong Hwa *Response to Defendant's Objections* (Rolle, Drew) (Entered: 02/15/2023) |
|---|---|---|
| 02/24/2023 | 224 | Letter *requesting curfew extension on 2/24/23* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 02/24/2023) |
| 02/24/2023 | | ORDER granting 224 Letter requesting curfew extension on 2/24/23 as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 2/24/2023. (WV) (Entered: 02/24/2023) |
| 02/25/2023 | 225 | SENTENCING MEMORANDUM by Ng Chong Hwa (Attachments: # 1 Appendix of Exhibits) (Agnifilo, Marc) (Entered: 02/25/2023) |
| 02/25/2023 | 226 | REDACTION by Ng Chong Hwa to 225 1 - Sealed Document CR, Sentencing Memorandum filed by Ng Chong Hwa (Attachments: # 1 Appendix of Exhibits) (Agnifilo, Marc) (Entered: 02/25/2023) |
| 03/01/2023 | 227 | Letter *requesting extended curfew until 11 pm on 3/1/2023* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/01/2023) |
| 03/01/2023 | | ORDER granting 227 Letter requesting extended curfew until 11 pm on 3/1/2023 as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 3/1/2023. (WV) (Entered: 03/01/2023) |
| 03/03/2023 | 228 | MOTION for Forfeiture of Property by USA as to Ng Chong Hwa. (Attachments: # 1 Proposed Order) (Payne, Tanisha) (Entered: 03/03/2023) |
| 03/03/2023 | 229 | SENTENCING MEMORANDUM by USA as to Ng Chong Hwa (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Rolle, Drew) (Entered: 03/03/2023) |
| 03/03/2023 | 230 | REDACTION by USA as to Ng Chong Hwa to 229 1 - Sealed Document CR, Sentencing Memorandum filed by USA (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Rolle, Drew) (Entered: 03/03/2023) |
| 03/07/2023 | 231 | Letter *requesting public dial-in for sentencing* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/07/2023) |
| 03/08/2023 | 232 | Letter *reply in response to Dkt. 229* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/08/2023) |
| 03/08/2023 | | ORDER denying 231 Letter requesting public dial-in for sentencing as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 3/8/2023. (WV) (Entered: 03/08/2023) |
| 03/10/2023 | | Minute Entry for proceedings held before Judge Margo K. Brodie: Sentencing was held on March 9, 2023 as to Ng Chong Hwa, also known as Roger Ng. AUSAs Alexandra Smith, Drew Rolle and Dylan Stern, and Brent Wible and Jennifer Ambuehl of the Department of Justice, appeared on behalf of the government. Pretrial Officer Amanda Carlson and Probation Officer Jennifer Baummann were also present. Marc Agnifilo, Teny Geragos, Jacob Kaplan and Zach Intrater appeared on behalf of Defendant. Defendant was sentenced to a total term of imprisonment of one hundred and twenty (120) months: Five (5) years on Counts One and Two to run concurrently with each other; Five (5) years on Count Three to run consecutively to the sentence imposed on Counts One and Two. A supervised release term of Two (2) years on each count to run concurrently with each other. A Special Assessment of $300 dollars. No fine. The Judgment will remain open while the court decides the issue of forfeiture. The Court directed the government to file a letter regarding forfeiture by March 10, 2023 and directed Defendant to respond by March 11. Defendant was advised of his right to appeal. The Court granted the government's motion to dismiss the underlying Indictment and |

| | | |
|---|---|---|
| | | superseding indictment as to the defendant. Defendant is to surrender to BOP custody on May 4, 2023. (Court Reporter Avery Armstrong.) (WV) (Entered: 03/10/2023) |
| 03/10/2023 | 234 | MEMORANDUM in Support re 228 MOTION for Forfeiture of Property (Rolle, Drew) (Entered: 03/10/2023) |
| 03/13/2023 | 235 | RESPONSE in Opposition re 228 MOTION for Forfeiture of Property *and 234 MEMORANDUM in Support* (Agnifilo, Marc) (Entered: 03/13/2023) |
| 03/15/2023 | 236 | REPLY TO RESPONSE to Motion re 228 MOTION for Forfeiture of Property (Rolle, Drew) (Entered: 03/15/2023) |
| 03/15/2023 | | ORDER re 228 Motion for Forfeiture, 234 Memorandum in Support of Motion, and 235 Response in Opposition to Motion. Having reviewed the parties submissions, and reviewed additional law, the Court concludes that it is statutorily required to impose forfeiture. However, the Court directs defendant to file a letter on or before March 18, 2023, addressing the 8th Amendment argument fleetingly mentioned in footnote 2 of his letter, and directs the government to respond on or before March 21, 2023. See United States v. Bajakajian, 524 U.S. 321, 334 (1998) ("[A] punitive forfeiture violates the Excessive Fines Clause [of the Eighth Amendment] if it is grossly disproportional to the gravity of a defendants offense."); United States v. Castello, 611 F.3d 116, 120 (2d Cir. 2010) ("The proper amount of forfeiture... is the total forfeitable amount required by the statute, discounted by whatever amount is necessary to render the total amount not grossly disproportional to the offense of conviction."). Signed by Chief Judge Margo K. Brodie on 3/15/2023. (AB) (Entered: 03/15/2023) |
| 03/18/2023 | 237 | RESPONSE in Opposition re 228 MOTION for Forfeiture of Property *234 and 236 , pursuant to the Court's 3/15/23 Order* (Agnifilo, Marc) (Entered: 03/18/2023) |
| 03/21/2023 | 238 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on February 16, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 239 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on February 14, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 240 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on April 4, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction |

| | | |
|---|---|---|
| | | Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 241 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on April 5, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 242 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on April 6, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 243 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on April 7, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 244 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on April 8, 2022, before Judge Brodie. Court Reporter/Transcriber Denise Parisi, Telephone number 7186132605. Email address: deniseparisi72@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 4/11/2023. Redacted Transcript Deadline set for 4/21/2023. Release of Transcript Restriction set for 6/19/2023. (Parisi, Denise) (Entered: 03/21/2023) |
| 03/21/2023 | 245 | Letter *requesting designation at FCI Danbury* as to Ng Chong Hwa (Agnifilo, Marc) (Entered: 03/21/2023) |
| 03/21/2023 | 246 | REPLY TO RESPONSE to Motion re 228 MOTION for Forfeiture of Property (Rolle, Drew) (Entered: 03/21/2023) |
| 03/24/2023 | 247 | MEMORANDUM AND ORDER. For the reasons set forth in the attached Memorandum and Order, the Court grants the government's motion for a forfeiture money judgment in the amount of thirty-five million one hundred thousand dollars and zero cents ($35,100,000.00). Ordered by Chief Judge Margo K. Brodie on 3/24/2023. (WV) (Entered: 03/24/2023) |
| 03/24/2023 | 248 | NOTICE OF ATTORNEY APPEARANCE Tanisha R. Payne appearing for USA. (Payne, Tanisha) (Entered: 03/24/2023) |

| 03/24/2023 | 249 | JUDGMENT as to Ng Chong Hwa (2), Count(s) 1-2, 1s, 2s, 3, 3s, Dismissed on Government's Motion; Count(s) 1ss, 2ss, 3ss Defendant was sentenced to a total term of imprisonment of one hundred and twenty (120) months: Five (5) years on Counts One and Two to run concurrently with each other; Five (5) years on Count Three to run consecutively to the sentence imposed on Counts One and Two. A supervised release term of Two (2) years on each count to run concurrently with each other. A Special Assessment of $300 dollars. No fine. Ordered by Chief Judge Margo K. Brodie on 3/23/2023. (FP) (Additional attachment(s) added on 3/24/2023: # 1 Memorandum and Order) (FP). (Entered: 03/24/2023) |
| 03/28/2023 | 251 | Letter MOTION to Modify Conditions of Release *on 3/31/23* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 03/28/2023) |
| 03/28/2023 | | ORDER granting 251 Motion to Modify Conditions of Release as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 3/28/2023. (WV) (Entered: 03/28/2023) |
| 04/05/2023 | 252 | NOTICE OF APPEAL by Ng Chong Hwa re 249 Judgment,, Filing fee $ 505, receipt number ANYEDC-16570639. (Shapiro, Alexandra) (Entered: 04/05/2023) |
| 04/05/2023 | | Electronic Index to Record on Appeal as to Ng Chong Hwa sent to US Court of Appeals 252 Notice of Appeal - Final Judgment Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 04/07/2023) |
| 04/28/2023 | 253 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on March 14, 2022, before Judge Brodie. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718-613-2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/19/2023. Redacted Transcript Deadline set for 5/29/2023. Release of Transcript Restriction set for 7/27/2023. (Heading, Charleane) (Entered: 04/28/2023) |
| 04/28/2023 | 254 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on March 15, 2022, before Judge Brodie. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718-613-2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/19/2023. Redacted Transcript Deadline set for 5/29/2023. Release of Transcript Restriction set for 7/27/2023. (Heading, Charleane) (Entered: 04/28/2023) |
| 04/28/2023 | 255 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Ng Chong Hwa held on March 16, 2022, before Judge Brodie. Court Reporter/Transcriber Charleane M. Heading, Telephone number 718-613-2643. Email address: cheading@aol.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 5/19/2023. Redacted Transcript Deadline set for 5/29/2023. Release of Transcript Restriction set for 7/27/2023. (Heading, Charleane) (Entered: 04/28/2023) |
| 04/28/2023 | 256 | Letter MOTION to Continue *Surrender Date* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 04/28/2023) |

| | | |
|---|---|---|
| 04/30/2023 | 257 | RESPONSE in Opposition re 256 Letter MOTION to Continue *Surrender Date* (Smith, Alixandra) (Entered: 04/30/2023) |
| 05/01/2023 | 258 | REPLY TO RESPONSE to Motion re 256 Letter MOTION to Continue *Surrender Date* (Agnifilo, Marc) (Entered: 05/01/2023) |
| 05/01/2023 | | ORDER granting 256 Motion to Continue as to Ng Chong Hwa. Mr. Chong Hwa shall self-surrender on August 7, 2023. Ordered by Chief Judge Margo K. Brodie on 5/1/2023. (WV) (Entered: 05/01/2023) |
| 05/17/2023 | 259 | Letter MOTION to Modify Conditions of Release *from 5/27/23 - 5/29/23* by Ng Chong Hwa. (Agnifilo, Marc) (Entered: 05/17/2023) |
| 05/18/2023 | | ORDER granting 259 Motion to Modify Conditions of Release as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 5/18/2023. (WV) (Entered: 05/18/2023) |
| 07/11/2023 | 260 | Consent MOTION to Unseal Document *at ECF Nos.1, 2, 20, 43, 46, 52, 53, 67, 81, 83, 91, 96, 99, 100, 101, 103, 110, 112, 115, 122, 124, 125, 128, 130, 132, 134, 138, 135, 139, 143, 157, 160, 164, 169, 179, 180, 201, 210, 211, 217, and 218.* by USA as to Ng Chong Hwa. (Rolle, Drew) (Entered: 07/11/2023) |
| 07/11/2023 | | ORDER granting 260 Motion to Unseal Documents as to Ng Chong Hwa. Ordered by Chief Judge Margo K. Brodie on 7/11/2023. (WV) (Entered: 07/11/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/12/2023 14:43:49 | | |
| **PACER Login:** | AveryMedjuck | **Client Code:** Ng |
| **Description:** | Docket Report | **Search Criteria:** 1:18-cr-00538-MKB |
| **Billable Pages:** | 30 | **Cost:** 3.00 |

F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

LOW TAEK JHO,
    also known as "Jho Low," and
NG CHONG HWA,
    also known as "Roger Ng,"

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

IRIZARRY, CH.J.

GOLD, M.J.

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.

★ OCT - 3 2018 ★

BROOKLYN OFFICE

I N D I C T M E N T

CR. 18 — 00538

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b), 1956(h) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

    At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants

    1.    LOW TAEK JHO, also known as "Jho Low," ("LOW" or "JHO

LOW") was a Malaysian national who advised on the creation of Terengganu Investment

Authority ("TIA"), the predecessor entity to 1Malaysia Development Berhad ("1MDB"),

Malaysia's state-owned and state-controlled investment development company.   LOW

worked as an intermediary in relation to 1MDB and other foreign government officials on

numerous financial transactions and projects involving U.S. Financial Institution #1[1] and

others, though he did not hold a formal position at 1MDB nor was he ever employed by the

Governments of Malaysia or Abu Dhabi.

---

[1]    The identity of U.S. Financial Institution #1 and all other anonymized entities and
individuals discussed herein are known to the Grand Jury.

2.     NG CHONG HWA, also known as "Roger Ng," ("NG" or "ROGER

NG") was a Malaysian national who was employed as a Managing Director by various

subsidiaries, and acted as an agent and employee, of U.S. Financial Institution #1.   NG

worked with Co-Conspirator #1 at U.S. Financial Institution #1 from approximately 2005 to

May 2014.   NG was thus an "employee" and "agent" of an "issuer" within the meaning of

the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-

1(a).

II.     <u>Relevant Entities and Individuals</u>

A.     <u>U.S. Financial Institution #1</u>

3.     U.S. Financial Institution #1 was a global investment banking, securities

and investment management firm incorporated in Delaware and headquartered in New York,

New York.   It conducted its activities primarily through various subsidiaries and affiliates

(collectively "U.S. Financial Institution #1"), including those that employed the defendant

ROGER NG and some of his co-conspirators, including Co-Conspirator #1.   U.S. Financial

Institution #1 had a class of securities registered pursuant to Section 12 of the Securities and

Exchange Act of 1934 (Title 15, United States Code, Section 78) (the "Exchange Act") and

was required to file reports with the U.S. Securities and Exchange Commission under Section

15(d) of the Exchange Act (Title 15, United States Code, Section 78o(d)).   As such, U.S.

Financial Institution #1 was an "issuer" within the meaning of the FCPA, Title 15, United

States Code, Section 78dd-1(a).

B.      1MDB and Other Relevant Entities

4.      1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia through its Ministry of Finance ("MOF").   It was formed in or around 2009, when the Malaysian government took federal control of TIA, which had previously been the sovereign wealth fund of the state of Terengganu in Malaysia.   1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments.   1MDB's development projects were focused in the areas of energy, real estate, tourism and agribusiness.   1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a government function on behalf of Malaysia.   Malaysian Official #1, further described below, was a high-ranking official in the Malaysian government and the MOF with high-level authority to, among other things, approve and influence 1MDB business decisions.   1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

5.      Foreign Agency A was an investment fund wholly owned by the Government of Abu Dhabi.   It was established by the Government of Abu Dhabi pursuant to an Emiri Decree in or around 1984, with a mandate to advance Abu Dhabi's natural petroleum wealth for the development of the emirate.   Foreign Agency A was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi, which appointed all the members of Foreign Agency A's board of directors, and performed a government function on behalf of Abu Dhabi.   Foreign Agency A was thus an

"instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

6.      Foreign Investment Firm A, a subsidiary of Foreign Agency A, was a private joint stock company incorporated under the laws of Abu Dhabi.

C.      Other Relevant Individuals

7.      Between in or around 1998 and in or around February 2016, Co-Conspirator #1 was employed by various subsidiaries, and acted as an agent and employee, of U.S. Financial Institution #1.   Prior to his separation from U.S. Financial Institution #1 in or around February 2016, Co-Conspirator #1 was the Southeast Asia Chairman and a Participating Managing Director of U.S. Financial Institution #1.   Co-Conspirator #1 was an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.      Co-Conspirator #2 was a U.S. citizen who was a high-ranking official of Foreign Investment Firm A from at least in or around 2012 until in or around 2014.

9.      Co-Conspirator #3 was a Malaysian national who was a close relative of Malaysian Official #1 and owned U.S. Motion Picture Company #1, a U.S. legal entity in the business of film production.

D.      Foreign Government Officials

10.      1MDB Official #1 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #1 served as one of the principal points of contact between 1MDB and U.S. Financial Institution #1 in connection with 1MDB business.

11.    1MDB Official #2 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #2 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

12.    1MDB Official #3 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #3 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #3 served as one of the principal points of contact between 1MDB and U.S. Financial Institution #1 in connection with 1MDB business.

13.    Malaysian Official #1 was a Malaysian national and high-ranking official in the Malaysian government and the MOF from in or around at least 2009 until in or around 2018, with high-level authority to approve 1MDB business decisions.   Malaysian Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

14.    Abu Dhabi Official #1 was a high-ranking official of Foreign Agency A between at least in or around 2012 until in or around 2014, and a high-ranking official of Foreign Investment Firm A.   Abu Dhabi Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

III.    The Criminal Scheme

A.    Overview

15.    1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people.   However, between approximately 2009

and 2014, billions of dollars were misappropriated and fraudulently diverted from 1MDB through various means, in part for the purpose of paying bribes to foreign officials.   The defendants JHO LOW, ROGER NG, Co-Conspirator #1 and others conspired to launder the proceeds of that criminal conduct in and through the U.S. financial system.   These laundered funds were used, in among other ways, to pay bribes to obtain and retain business for U.S. Financial Institution #1, and for the personal benefit of the co-conspirators and their relatives and associates, including, among other things, for the purchase of luxury residential real estate in the United States and artwork from an auction house in New York, New York, and the funding of major Hollywood films.

16.     The defendants JHO LOW and ROGER NG, while NG was acting within the scope of his employment as an agent of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S. Financial Institution #1, together with others, conspired to obtain and retain business from 1MDB for U.S. Financial Institution #1 through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi.   LOW and NG, Co-Conspirator #1 and others also conspired to launder funds embezzled from 1MDB, some of which were used to pay bribes to government officials in Malaysia and Abu Dhabi, through financial systems in the United States and elsewhere.   As part of the scheme, LOW, NG, Co-Conspirator #1 and others used LOW's close personal relationships with government officials in Abu Dhabi and Malaysia, including LOW's relationship with Malaysian Official #1, to obtain and retain 1MDB business for U.S. Financial Institution #1 through the promise and payment of bribes to these government officials.

17.     In the course of the scheme, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others obtained and retained 1MDB business for U.S. Financial

Institution #1, including three bond offerings that raised a total of approximately $6.5 billion

for 1MDB in 2012 and 2013.   These three bond offerings and related transactions ultimately

earned U.S. Financial Institution #1 approximately $600 million in fees and revenue and

resulted in NG, Co-Conspirator #1 and others receiving large bonuses from U.S. Financial

Institution #1 and enhancing their professional reputations at U.S. Financial Institution #1.

18.   Although the stated purpose of the approximately $6.5 billion raised by

the three bond transactions was to support 1MDB projects for the benefit of the Malaysian

people, more than $2.7 billion was instead misappropriated by the defendants JHO LOW,

ROGER NG and others and distributed, in part, as bribes and kickbacks to government

officials in Malaysia and Abu Dhabi, including 1MDB Official #1, 1MDB Official #2,

1MDB Official #3, Malaysian Official #1 and Abu Dhabi Official #1 and their families,

including Co-Conspirator #3, as well as to other co-conspirators, including NG, LOW, Co-

Conspirator #1 and their families.

19.   In order to get the deals, the defendant ROGER NG also conspired with

other employees and agents of U.S. Financial Institution #1, including Co-Conspirator #1, to

knowingly and willfully circumvent the internal accounting controls of U.S. Financial

Institution #1 in connection with the three 1MDB bond transactions and other 1MDB

business.   U.S. Financial Institution #1's internal accounting controls were overseen and

enforced by its compliance function (the "Compliance Group") and part of its legal

department, referred to internally as the "Business Intelligence Group" (the "Intelligence

Group").   These groups worked in conjunction with, and as part of, various committees in

reviewing transactions, including the three 1MDB bond deals, for approval.   However, the

business culture at U.S. Financial Institution #1, particularly in Southeast Asia, was highly

focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions.

20.     The defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 knew that the defendant JHO LOW played a central role in the bond transactions, including by acting as an intermediary between U.S. Financial Institution #1, 1MDB and other Malaysian and Abu Dhabi government officials. NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 also knew that bribes had been promised to these officials to secure 1MDB business for U.S. Financial Institution #1.   NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 conspired to conceal that and other information from U.S. Financial Institution #1's Compliance Group and Intelligence Group to prevent those groups from attempting to stop U.S. Financial Institution #1 from participating in the lucrative transactions.   Based on, among other things, their experience at U.S. Financial Institution #1 and in the region, the willingness of co-conspirators and colleagues to assist them, the high fees that the 1MDB deals would generate for U.S. Financial Institution #1 if the deals were successful, and a system of internal accounting controls at U.S. Financial Institution #1 that could be easily circumvented, NG, Co-Conspirator #1 and others believed that they would have, and they in fact did have, repeated success in concealing LOW's involvement from, and pushing these deals through, U.S. Financial Institution #1's control functions to obtain very lucrative business for U.S. Financial Institution #1, themselves and others.

B.    The Defendant ROGER NG and Co-Conspirator #1 Began to Conspire to
      Circumvent U.S. Financial Institution #1's Internal Accounting Controls and
      Win Business for U.S. Financial Institution #1

21.    Beginning in or around 2009, the defendant ROGER NG began to

conspire with Co-Conspirator #1 and others to circumvent U.S. Financial Institution #1's

internal accounting controls and win business for U.S. Financial Institution #1.   At the time,

NG and Co-Conspirator #1 were both agents acting within the scope of their employment on

behalf of U.S. Financial Institution #1, with the intent, at least in part, to benefit U.S.

Financial Institution #1, and they collaborated on the creation of, and potential fundraising

for, TIA, while knowing that the defendant JHO LOW was an adviser for TIA.   While

working on this deal, NG and Co-Conspirator #1 selectively disclosed to other employees of

U.S. Financial Institution #1 that they were working with LOW as an intermediary to secure

the deal, because they knew that disclosure more widely could have triggered steps to be

taken by certain personnel within the Compliance Group and the Intelligence Group to

investigate the business relationship with LOW and possibly jeopardize the deal.

22.    During the course of the TIA transaction and afterwards, the defendants

JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others to develop

business for U.S. Financial Institution #1, including with TIA's successor entity, 1MDB.

Notwithstanding LOW's public denials about any involvement with 1MDB during this time,

NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1

knew that LOW remained close to various 1MDB officials and government officials in Abu

Dhabi and Malaysia, including Malaysian Official #1, and worked with him for that reason.

During the course of his work with NG and Co-Conspirator #1, LOW also specifically

requested that NG, Co-Conspirator #1 and others conceal his involvement in 1MDB and U.S.

Financial Institution #1's business, and NG, Co-Conspirator #1 and others continued to conspire to conceal LOW's involvement in their efforts to obtain and retain 1MDB business for U.S. Financial Institution #1 from the Compliance Group and the Intelligence Group.

23.     Between in or around September 2009 and in or around March 2011, the defendant ROGER NG, Co-Conspirator #1 and others supported at least three attempts to make the defendant JHO LOW a formal client of U.S. Financial Institution #1.   NG and Co-Conspirator #1 supported these efforts because, in part, they believed that LOW would work to deliver lucrative business deals, including from 1MDB, for the ultimate benefit of U.S. Financial Institution #1, NG, Co-Conspirator #1 and others.   Ultimately, these attempts were unsuccessful because certain personnel at U.S. Financial Institution #1 within the Compliance Group and the Intelligence Group refused to approve the business relationship between LOW and U.S. Financial Institution #1 based, in part, on concerns that they had about the source of LOW's wealth.   Personnel within the Compliance Group and the Intelligence Group communicated the rejection of LOW's application to U.S. Financial Institution #1 to NG, Co-Conspirator #1 and others.   Notwithstanding their knowledge about the concerns that had been raised by the Compliance Group and the Intelligence Group about LOW not being a suitable client for U.S. Financial Institution #1, NG and other employees and agents of U.S. Financial Institution #1, including Co-Conspirator #1, continued to conspire with LOW based upon their belief that LOW would help ensure that government officials within Malaysia, including at 1MDB, and within Abu Dhabi would deliver lucrative business deals to U.S. Financial Institution #1.

C.   <u>The Defendants JHO LOW and ROGER NG, Together with Others, Won</u>
<u>Business for U.S. Financial Institution #1 Through the Payment of Bribes and</u>
<u>Kickbacks</u>

24.   Throughout approximately 2012 and 2014, the defendants JHO LOW
and ROGER NG conspired with Co-Conspirator #1 and others with the intent, at least in part,
to obtain and retain business from 1MDB for the benefit of U.S. Financial Institution #1
through the promise and payment of bribes to government officials in Malaysia and Abu
Dhabi using, in part, funds misappropriated and embezzled from the 1MDB bond
transactions.   During this time, and through the course of the scheme, LOW, NG, Co-
Conspirator #1 and others laundered hundreds of millions of dollars in funds misappropriated
and embezzled from 1MDB and used some of those funds to pay millions of dollars in bribes
to government officials to obtain 1MDB business for U.S. Financial Institution #1, in
particular, three bond offering transactions underwritten by U.S. Financial Institution #1 for
1MDB referred to as "Project Magnolia," "Project Maximus" and "Project Catalyze."

<u>PROJECT MAGNOLIA</u>

25.   On or about January 23, 2012, the defendant JHO LOW sent an email
to the defendant ROGER NG, Co-Conspirator #1 and a high-ranking 1MDB official to
introduce NG and Co-Conspirator #1 to the high-ranking 1MDB official for purposes of
discussing the purchase of an asset by 1MDB.   In the email, LOW stated, "[p]lease exclude
me from the email list going forward."

26.   In or around early 2012, the defendants JHO LOW and ROGER NG
met in Malaysia with Co-Conspirator #1, 1MDB Official #1, 1MDB Official #3 and others.
The purpose of the meeting was to discuss 1MDB's proposed purchase of a Malaysian energy
company ("Malaysian Energy Company A"), and U.S. Financial Institution #1's ability to

assist in obtaining financing for the purchase, among other things. During that meeting, NG, Co-Conspirator #1 and others discussed with LOW, among other things, the type of guarantee that 1MDB needed to obtain to make the bond issuance acceptable to U.S. Financial Institution #1 and ultimately agreed on the suitability of a guarantee from Foreign Agency A. NG, Co-Conspirator #1 and others understood that LOW was acting as an intermediary between 1MDB, Malaysian Official #1 and other government officials from Abu Dhabi.

27.     In or around late February 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss the proposed financing. During this meeting, LOW explained that to obtain the necessary support for the financing and the guarantee from Foreign Agency A discussed at the prior meeting with NG, Co-Conspirator #1 and others they would have to pay bribes to government officials in Malaysia and Abu Dhabi, including to Malaysian Official #1 and a high-ranking Abu Dhabi government official, to gain their approval for portions of the transaction. After the meeting, it was understood that U.S. Financial Institution #1 would be engaged by 1MDB to act as an adviser and arrange the purchase and financing of Malaysian Energy Company A.

28.     Following the February 2012 meeting, the defendant ROGER NG told another employee of U.S. Financial Institution #1 about the plan to pay bribes to government officials in Malaysia and Abu Dhabi. NG understood and agreed with Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 not to disclose this information to personnel within the Compliance Group, the Intelligence Group or the committees within U.S. Financial Institution #1 that would review this proposed bond issuance and other 1MDB transactions.

29.     In or around March 2012, 1MDB selected U.S. Financial Institution #1 to be the sole bookrunner and arranger for the $1.75 billion bond deal, guaranteed by Foreign Agency A, and designed, in part, to pay for the acquisition of Malaysian Energy Company A.   This transaction was referred to internally at U.S. Financial Institution #1 as "Project Magnolia."

30.     Following U.S. Financial Institution #1's formal engagement to work on Project Magnolia, the defendant ROGER NG continued to conspire with Co-Conspirator #1 and others, including other employees and agents of U.S. Financial Institution #1, to work with the defendant JHO LOW on the transaction.

31.     In or around early March 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, various 1MDB officials and others traveled to Abu Dhabi for meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss the guarantee for Project Magnolia.   Throughout that time, NG knew that LOW arranged the meetings with the officials of Foreign Agency A and Foreign Investment Firm A, and that some of these officials, among others, would be paid bribes by LOW, or at his direction, to influence the approval of the guarantee.

32.     During this same time, in an effort to win and retain the bond deal to finance the purchase of Malaysian Energy Company A, the defendant JHO LOW also enlisted the assistance of various 1MDB officials with the promise of remuneration.   For example, on or about March 8, 2012, 1MDB Official #1 and LOW discussed 1MDB's acquisition of Malaysian Energy Company A via an online chat, during which chat LOW stated he would "[g]ive [1MDB Official #1] big present" when the transaction was done.   In the same chat, LOW further instructed 1MDB Official #1 to delete at least one email and other documents he

**A-55**

had sent to 1MDB Official #1, and stated "delete from email and destroy once done."
Additionally, LOW informed Co-Conspirator #1 that 1MDB Official #3 was being paid a
bribe for her assistance in obtaining and retaining the bond deal.

33.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and
others also knew that LOW intended to use funds misappropriated from 1MDB's bond deal
to pay and cause to be paid bribes to foreign officials in Malaysia and Abu Dhabi to
influence those officials to obtain the necessary approvals and any additional assistance to
execute Project Magnolia for U.S. Financial Institution #1.

34.     In or around the end of May 2012, near the closing of Project
Magnolia, the defendants JHO LOW and ROGER NG continued to conspire with Co-
Conspirator #1 and others to divert some of the funds from Project Magnolia into the bank
accounts of shell companies that NG, LOW, Co-Conspirator #1 and others beneficially
owned and controlled.   At this time, NG, LOW and Co-Conspirator #1 expected to keep
some of the diverted funds for their personal use, and understood that other Project Magnolia
funds would be used to pay bribes to government officials in Malaysia and Abu Dhabi and
elsewhere in exchange for their assistance in obtaining and retaining business for U.S.
Financial Institution #1 with respect to the execution of the bond transaction and the
purchase of Malaysian Energy Company A.

35.     On or about May 20, 2012, Co-Conspirator #1 sent an email asking his
close relative for the account details for a bank account in the name of Holding Company #1
("Holding Company #1 Account").   Holding Company #1 was a shell company incorporated
in the British Virgin Islands that was owned by this close relative of Co-Conspirator #1 and
was controlled by both Co-Conspirator #1 and his close relative.   Co-Conspirator #1 wrote,

"[b]est if they are US$ accounts.   We should also tell the bank that we will receive a transfer."

36.   On or about May 21, 2012, the bond deal known as Project Magnolia closed, earning significant fees for U.S. Financial Institution #1, and resulting in large year-end bonuses paid by U.S. Financial Institution #1 to the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 who participated in obtaining and structuring the bond deal.   NG and other employees and agents of U.S. Financial Institution #1 intentionally structured Project Magnolia, and future transactions, as bond deals rather than other forms of financing, because doing so generated much higher revenues and fees for U.S. Financial Institution #1, improved the bank's reputational standing in both the Southeast Asia region and globally and provided NG and other bankers with increased remuneration and professional prestige, even though the bond financing was more expensive for 1MDB.

37.   U.S. Financial Institution #1 transferred part of the proceeds of the Project Magnolia bond offering via wire to 1MDB's wholly-owned subsidiary, from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.   At the time, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of the bond would be diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.

38.   On or about May 22, 2012, approximately $577 million of the bond proceeds were transferred from the account of 1MDB's wholly-owned subsidiary to Shell Company Account #1, an account at Foreign Financial Institution A in the name of a

company incorporated in the British Virgin Islands with a name similar to Foreign Investment Firm A, but which was not in fact associated with Foreign Investment Firm A. Although the signatories on Shell Company Account #1 were Abu Dhabi Official #1 and Co-Conspirator #2, the defendant JHO LOW and another co-conspirator controlled Shell Company Account #1.

39.     On or about May 25, 2012, approximately $295 million was transferred via wire from Shell Company Account #1 to an account at a foreign bank in the name of a shell company beneficially owned and controlled by the defendant JHO LOW and a co-conspirator ("Shell Company Account #2").

40.     Within three months of the closing of Project Magnolia, millions of dollars of bond proceeds that had been transferred to Shell Company Account #2 were transferred into Holding Company #1 Account, and these funds were transferred via wire to and from the United States.   Approximately $24 million of these funds was subsequently transferred to a bank account beneficially owned by a relative of the defendant ROGER NG.

41.     Within one month of the closing of Project Magnolia, approximately $133 million of the bond proceeds that had been funneled into Shell Company Account #1 was then transferred to an account at Foreign Financial Institution A opened in the name of a company incorporated in the British Virgin Islands and beneficially owned and controlled by Co-Conspirator #3, a close relative of Malaysian Official #1 ("Shell Company Account #3"). Between on or about June 20, 2012 and November 20, 2012, 11 wires totaling approximately $60 million was then transferred from Shell Company Account #3 to Holding Account #2, an account at U.S. Financial Institution #2 in Los Angeles, California.   Holding Account #2 is owned and controlled by U.S. Motion Picture Company #1, a U.S. legal entity owned in part

by Co-Conspirator #3 whose funds, among other things, were used to assist in the production of the film "The Wolf of Wall Street."

PROJECT MAXIMUS

42.     In or about May 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others began to plan a second bond transaction, known internally at U.S. Financial Institution #1 as "Project Maximus," which was designed, in part, to raise capital for 1MDB to purchase a second Malaysian power generation company.   LOW, NG, Co-Conspirator #1 and others knew that LOW and others would and did pay bribes to influence Malaysian and Abu Dhabi officials to obtain the necessary approvals to execute the bond offering.   1MDB also awarded this bond offering, which was structured similarly to the first bond issuance, but with an indirect guarantee from Foreign Agency A, to U.S. Financial Institution #1.

43.     As with Project Magnolia, while the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution #1 continued to work with the defendant JHO LOW to acquire this business for U.S. Financial Institution #1 and to execute the second bond issuance, they concealed LOW's involvement in the transaction from the Compliance Group and the Intelligence Group at U.S. Financial Institution #1 for the same reasons that they concealed his involvement with Project Magnolia.

44.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of Project Maximus would be illegally diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.   NG knew at the

time that Malaysian Official #1, Abu Dhabi government officials and 1MDB officials,

among others, would receive money from the proceeds of Project Maximus that passed

through bank accounts of various shell companies beneficially owned and controlled by

LOW and others, including Co-Conspirator #1 and his close relative, to influence those

officials to execute the bond with U.S. Financial Institution #1. In fact, NG provided

direction to Co-Conspirator #1's close relative regarding the transfer of some of these funds.

Abu Dhabi Official #1 and Co-Conspirator #3, among others, received some of the funds

traceable to the Project Maximus bond issuance.

45.     Project Maximus closed on or about October 17, 2012, raising

approximately $1.75 billion for a 1MDB wholly-owned subsidiary, and resulting in

substantial revenues and other fees for U.S. Financial Institution #1. U.S. Financial

Institution #1 transferred part of the proceeds of Project Maximus via wire to the subsidiary

of 1MDB from a place within the United States to and through a place outside of the United

States, including through the Eastern District of New York. Thereafter, some of the

proceeds from the bond offering were diverted and transferred via wire to a place in the

United States from and through a place outside of the United States, and from a place in the

United States to and through a place outside of the United States, including through the

Eastern District of New York.

46.     On or about October 19, 2012, two days after Project Maximus closed,

approximately $790 million of the proceeds of the bond was transferred to and through a

series of shell company accounts beneficially owned and controlled by the defendant JHO

LOW and a co-conspirator. Some of these funds were later transferred to Holding Company

#1 Account and the accounts of Malaysian and Abu Dhabi officials, including various 1MDB officials.

47.     Within one week of Project Maximus closing, approximately $60 million of the bond proceeds was transferred to Shell Company Account #3.   On or about November 14, 2012, an additional approximately $45 million of bond proceeds was transferred to Shell Company Account #3.   Within approximately one day of the November 14, 2012 transfer, approximately $35.8 million was transferred from Shell Company Account #3 to U.S. Law Firm Account #1, owned and controlled by U.S. Law Firm #1 based in New York, New York.   Nearly all of these funds were then transferred approximately four days later to U.S. Law Firm Account #2, owned and controlled by U.S. Law Firm #2 based in New York, New York.   These funds were used by Co-Conspirator #3 to acquire a condominium in New York, New York that was beneficially owned by the defendant JHO LOW.

48.     Between on or about May 29, 2012 and November 30, 2012, the defendant JHO LOW and others also caused the transfers via wire of approximately $472,750,000 traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to an account at Foreign Financial Institution B in the name of a company beneficially owned by Abu Dhabi Official #1 ("Shell Company Account #4").

49.     Between on or about May 29, 2012 and December 3, 2012, the defendant JHO LOW and others also transferred via wire approximately $55 million traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to the account of a company at Foreign Financial Institution C beneficially

owned and controlled by Co-Conspirator #2 and a close relative of Co-Conspirator #2

("Shell Company Account #5").

50.    The defendant ROGER NG knew that some of the bond proceeds from

Project Maximus were transferred by the defendant JHO LOW or at his request to Holding

Company #1 Account in furtherance of the scheme.   Thereafter, LOW, NG, Co-Conspirator

#1 and others caused some of these funds to be transferred to the accounts of 1MDB officials

or relatives of such officials, or to the accounts of shell companies beneficially owned and

controlled by 1MDB officials, including 1MDB Official #1 and 1MDB Official #2, in

exchange for their assistance in obtaining and retaining business for U.S. Financial

Institution #1.

## PROJECT CATALYZE

51.    In or about November 2012, despite having raised over $3 billion in the

prior 11 months, 1MDB sought to raise an additional $3 billion through a third bond issuance

known internally at U.S. Financial Institution #1 as "Project Catalyze."   This bond issuance

was purportedly designed to fund 1MDB's portion of a joint venture with Foreign Investment

Firm A.   U.S. Financial Institution #1 was engaged on the project in or around early 2013

and, again, secured substantial revenues and fees from the deal.

52.    As they had with the two prior 1MDB bond issuances, the defendant

ROGER NG, Co-Conspirator #1 and other employees and agents of U.S. Financial Institution

#1 continued to work with the defendant JHO LOW as an intermediary between U.S.

Financial Institution #1, 1MDB officials, Malaysian Official #1 and other foreign government

officials, and they continued to conceal this fact from the Compliance Group, the Intelligence

Group and committees at U.S. Financial Institution #1.   Further, although required by

21

internal policies of U.S. Financial Institution #1, the defendant ROGER NG failed to disclose that he and Co-Conspirator #1 had received a portion of the funds diverted from the prior bond transactions through LOW and that LOW, NG, Co-Conspirator #1 and others had caused bribes and kickbacks to be paid to 1MDB officials and others who were involved in the transactions.

53.     The Project Catalyze bond issued on or about March 19, 2013.   By or at the direction of the defendant JHO LOW, some of the approximately $3 billion raised by this bond issuance was transferred to and through a series of transactions to Holding Company #1 Account, which account was owned and controlled by Co-Conspirator #1 and his close relative.   These misappropriated and embezzled funds were transferred via wire to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States.   Some of these funds were further transferred via wire to accounts in the name of entities beneficially owned and controlled by 1MDB officials, including 1MDB Official #2 and 1MDB Official #3. More than $4 million of these funds were also transferred via wire to a bank account beneficially owned by a relative of NG.

54.     Within seven days of Project Catalyze closing, the defendant JHO LOW and other co-conspirators caused the transfers via wire of approximately $1.2 billion in funds traceable to Project Catalyze to a bank account at Foreign Financial Institution D in the name of another shell company ("Shell Company Account #6").   Within two months of the closing of Project Catalyze, LOW caused a client account to be opened in the name of that shell company ("Shell Company #6") at Art Auction House #1, an auctioneer of high-end artworks based in New York, New York.   In approximately May 2013, at auctions held at Art Auction

**A-63**

House #1 in New York, New York, LOW acquired five works of art for approximately $58.3 million in the name of Shell Company #6.   The following month, LOW caused approximately $58.3 million in funds traceable to Project Catalyze to be transferred from Shell Company Account #6 to Art Auction House #1 to purchase the artworks.   Between on or about July 3, 2013 and September 9, 2013, additional funds traceable to Project Catalyze totaling approximately $79 million were transferred from Shell Company Account #6 to Art Auction House #1 to acquire additional artworks.

55.     Following the closing of Project Catalyze, through the end of 2014, the defendant ROGER NG, Co-Conspirator #1 and U.S. Financial Institution #1 sought to obtain and worked to execute several additional transactions with 1MDB, particularly focusing on a proposed initial public offering ("IPO") of 1MDB's energy assets ("1MDB Energy"). Throughout the time period of these additional transactions, the defendant JHO LOW and others, including Co-Conspirator #1, continued to pay bribes and kickbacks to certain Malaysian and 1MDB officials and others, including from the proceeds of the Project Catalyze bond and other 1MDB transactions, to influence those officials to award a role for U.S. Financial Institution #1 in the IPO.

56.     On or about June 2, 2014, Co-Conspirator #1 and the defendant JHO LOW discussed, via electronic chat, efforts to win a position for U.S. Financial Institution #1 in the 1MDB Energy IPO, including the need to "suck up to" 1MDB Official #2 and to send "cakes," referring to bribes, to "madam boss."   In prior email correspondence, the defendant ROGER NG, LOW and Co-Conspirator #1 referred to the wife of Malaysian Official #1 as "the Madam."   LOW asked Co-Conspirator #1 if he could transfer money from Shell Account #1 directly into the account of another company incorporated in the British Virgin

Islands and beneficially owned and controlled by Co-Conspirator #1 and his close relative

("Management Company #1 Account") so that Co-Conspirator #1 could "settle madam

cakes 2."

57.     The defendant ROGER NG continued his personal relationship with

Co-Conspirator #1 after NG's departure from U.S. Financial Institution #1, and continued to

work with Co-Conspirator #1 on other business ventures.

<u>COUNT ONE</u>
(Conspiracy to Violate the FCPA—Bribery)

58.     The allegations contained in paragraphs one through 57 are realleged

and incorporated as if fully set forth in this paragraph.

59.     In or about and between January 2009 and October 2014, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also

known as "Roger Ng," together with others, did knowingly and willfully conspire to commit

offenses against the United States, namely:

(a)     being an employee and agent of an issuer, to corruptly make use

of the mails and means and instrumentalities of interstate commerce in furtherance of an

offer, payment, promise to pay, and authorization of the payment of any money, offer, gift,

promise to give, and authorization of the giving of anything of value, to one or more foreign

officials, and to one or more persons, while knowing that all or a portion of such money and

thing of value would be and had been offered, given, and promised to one or more foreign

officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or

her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation

of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist U.S. Financial Institution #1 and others in obtaining and retaining business, for and with, and directing business to, NG, LOW, U.S. Financial Institution #1 and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a); and

(b)      while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendants and others in obtaining and retaining business, for and with, and directing business to, U.S. Financial Institution #1, NG, LOW and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-3 and 78ff(a).

60.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)     On or about March 23, 2012, LOW met with a banker from Foreign Financial Institution A in Los Angeles, California, during which meeting LOW explained Project Magnolia and discussed funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

(b)     On or about March 25, 2012, LOW, NG, Co-Conspirator #1 and others met in Los Angeles, California and New York, New York to discuss, among other things, matters related to Project Magnolia and the acquisition of the Malaysian Energy Company A.

(c)     On or about April 21, 2012, LOW, NG, Co-Conspirator #1 and others met with bankers from Foreign Financial Institution A in Singapore and discussed, among other things, funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

(d)     On or about May 29, 2012, LOW and others caused approximately $158 million traceable to the proceeds of Project Magnolia to be transferred via wire from Shell Company Account #2 through a U.S. correspondent bank to Shell Company Account #4.

**A-67**

(e)      On or about December 19, 2012, LOW and others caused approximately $5 million traceable to Project Maximus to be transferred from Shell Company Account #2 to Holding Company #1 Account.

(f)      On or about December 20, 2012, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Maximus to be transferred from Holding Company #1 Account to the bank account, for which LOW had made the banking referral, of a company beneficially owned and controlled by 1MDB Official #1.

(g)      On or about July 22, 2013, LOW, Co-Conspirator #1 and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from Management Company #1 Account to a bank account, for which LOW had made the banking referral, of an entity beneficially owned and controlled by 1MDB Official #3.

(h)      On or about July 29, 2013, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be transferred from Holding Company #1 Account to the account of a company beneficially owned and controlled by 1MDB Official #2.

(i)      On or about September 28, 2013, at LOW's request, a high-end New York jeweler ("N.Y. Jeweler #1") met with LOW, Malaysian Official #1 and the wife of Malaysian Official #1 at a hotel in New York, New York to show a pink diamond necklace that N.Y. Jeweler #1 had designed for Malaysian Official #1's wife. Approximately three weeks earlier, the pink diamond necklace was purchased using

approximately $27.3 million, which funds were sent from a shell company beneficially owned and controlled by LOW and other co-conspirators.

(j)      On or about October 10, 2014, LOW, Co-Conspirator #1 and others caused approximately $4.1 million to be transferred via wire from Management Company #1 Account to the U.S. bank account of N.Y. Jeweler #1, in part, to pay for certain gold jewelry for the wife of Malaysian Official #1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT TWO</u>
(Conspiracy to Violate the FCPA—Circumvention of Internal Accounting Controls)

61.      The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

62.      In or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely, to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at U.S. Financial Institution #1, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

63.      In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)     On or about January 15, 2009, a high-ranking official at

1MDB's predecessor entity, TIA, advised LOW, NG and Co-Conspirator #1 that it was "best

to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by U.S.

Financial Institution #1.

(b)     On or about January 27, 2009, NG and Co-Conspirator #1

discussed via email whether to disclose to the Intelligence Group at U.S. Financial Institution

#1 LOW's involvement in the transaction referenced in Paragraph 63(a), and decided not to

make such disclosure.

(c)     During a telephone call in mid to late March 2012, Co-

Conspirator #1 falsely stated to a senior member of the Intelligence Group at U.S. Financial

Institution #1 that LOW was not involved in Project Magnolia.

(d)     On or about April 3, 2012, in response to questioning, Co-

Conspirator #1 falsely told a senior member of the Intelligence Group at U.S. Financial

Institution #1 that LOW was not involved in Project Magnolia.

(e)     On or about April 4, 2012, NG and Co-Conspirator #1 falsely

stated in a committee meeting at U.S. Financial Institution #1 that LOW was not involved in

Project Magnolia other than to set up one meeting with an Abu Dhabi official.   The meeting

was attended by committee members and others located in New York, New York using U.S.

Financial Institution #1's telecommunication facilities, which transited through the Eastern

District of New York.

(f)     On or about October 10, 2012, Co-Conspirator #1 falsely stated

in a committee meeting at U.S. Financial Institution #1 that LOW was not involved in

**A-70**

Project Maximus.   The meeting was attended by committee members and others located in

New York, New York using U.S. Financial Institution #1's telecommunication facilities,

which transited through the Eastern District of New York.

(g)   On or about April 24, 2013, Co-Conspirator #1 falsely stated to

a senior employee of U.S. Financial Institution #1 based in New York, New York who was

also a member of a committee that reviewed the 1MDB bond transactions, that there was no

intermediary involved in any of the three 1MDB bond transactions and, specifically, that

LOW was not involved in Projects Magnolia, Maximus or Catalyze.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT THREE
### (Conspiracy to Commit Money Laundering)

64.   The allegations contained in paragraphs one through 57 are realleged

and incorporated as if fully set forth in this paragraph.

65.   In or about and between January 2009 and October 2014, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also

known as "Roger Ng," together with others, did knowingly and intentionally conspire to:

(a)   transport, transmit and transfer monetary instruments and funds

from a place in the United States to and through a place outside the United States and to a

place in the United States from and through a place outside the United States, (i) with the

intent to promote the carrying on of one or more specified unlawful activities, to wit: felony

violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B),

78m(b)(5) and 78ff(a), and offenses against a foreign nation involving the misappropriation,

theft and embezzlement of public funds by and for the benefit of a public official, in

violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section

1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds of some form of unlawful

activity, and knowing that such transportation, transmission and transfer was designed in

whole and in part to conceal and disguise the nature, location, source, ownership and control

of the proceeds of one or more specified unlawful activities, to wit: felony violations of the

FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and

78ff(a), and offenses against a foreign nation involving the misappropriation, theft and

embezzlement of public funds by and for the benefit of a public official, in violation of

Malaysian Penal Law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b)    engage in one or more monetary transactions within the United

States involving property of a value greater than $10,000 that was derived from one or more

specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States

Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a

foreign nation involving the misappropriation, theft and embezzlement of public funds by

and for the benefit of a public official, in violation of Malaysian Penal Law, knowing that the

funds were the proceeds of some unlawful activities and were in fact proceeds of one or more

specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States

Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a

foreign nation involving the misappropriation, theft and embezzlement of public funds by

and for the benefit of a public official, in violation of Malaysian Penal Law, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO</u>

66.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One or Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

67.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

       (a)     cannot be located upon the exercise of due diligence;

       (b)     has been transferred or sold to, or deposited with, a third party;

       (c)     has been placed beyond the jurisdiction of the court;

       (d)     has been substantially diminished in value; or

       (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

68.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

69.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

   (a)     cannot be located upon the exercise of due diligence;

   (b)     has been transferred or sold to, or deposited with, a third party;

   (c)     has been placed beyond the jurisdiction of the court;

   (d)     has been substantially diminished in value; or

   (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

33

other property of the defendants, up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DEBORAH L. CONNOR
CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
AND ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE

_____
SANDRA L. MOSER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**A-75**

F.#: 2016R00467
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*LOW TAEK JHO, ALSO KNOWN AS "JHO LOW," AND NG CHONG HWA, ALSO KNOWN AS "ROGER NG,"*

Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b), 1956(h) and 3551 *et seq.*; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
Foreperson

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
Clerk

*Bail, $* _____

*Jacquelyn M. Kasulis, Drew G. Rolle, Assistant U.S. Attorneys, (718) 254-7000*
*Jennifer C. Ambuehl, Katherine A. Nielsen, Mary Ann McCarthy, Nikhila Raj*
*Trial Attorneys, U.S. Department of Justice (202) 514-2000*

**A-76**

F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

LOW TAEK JHO,
    also known as "Jho Low," and
NG CHONG HWA,
    also known as "Roger Ng,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**SUPERSEDING
INDICTMENT**

Cr. No. 18-538 (S-1) (MKB)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
982(a)(1), 982(b), 1956(h) and 3551
et seq.; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

          At all times relevant to this Superseding Indictment, unless otherwise

indicated:

I.     <u>The Defendants</u>

          1.    LOW TAEK JHO, also known as "Jho Low," ("LOW" or "JHO

LOW") was a Malaysian national who advised on the creation of Terengganu Investment

Authority ("TIA"), the predecessor entity to 1Malaysia Development Berhad ("1MDB"),

Malaysia's state-owned and state-controlled investment development company.   LOW

worked as an intermediary in relation to 1MDB and other foreign government officials on

numerous financial transactions and projects involving The Goldman Sachs Group, Inc.

("Goldman Sachs Group") and its subsidiaries and affiliates, and others, though he did not

hold a formal position at 1MDB nor was he ever employed by the Governments of Malaysia

or Abu Dhabi.

2

2.      NG CHONG HWA, also known as "Roger Ng," ("NG" or "ROGER

NG") was a Malaysian national who was employed as a Managing Director by various

subsidiaries of Goldman Sachs Group and acted as an agent and employee of Goldman Sachs

Group from approximately 2005 to May 2014.   NG also owned stock in Goldman Sachs

Group.   NG was thus an "employee," "agent" and "stockholder" of an "issuer" within the

meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code,

Section 78dd-1(a).

II.     Relevant Entities and Individuals

   A.    The Goldman Sachs Group

      3.      Goldman Sachs Group was a global investment banking, securities and

investment management firm incorporated in Delaware and headquartered in New York, New

York.   Goldman Sachs Group had a class of securities registered pursuant to Section 12 of

the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78l) (the

"Exchange Act") and was required to file reports with the U.S. Securities and Exchange

Commission under Section 15(d) of the Exchange Act (Title 15, United States Code, Section

78o(d)).   As such, Goldman Sachs Group was an "issuer" within the meaning of the FCPA,

Title 15, United States Code, Section 78dd-1(a).   Goldman Sachs Group conducted its

activities primarily through various subsidiaries and affiliates (collectively referred to herein

as "Goldman"), including those that employed the defendant ROGER NG and some of his co-

conspirators, including Co-Conspirator #1.[1]

---

[1]      The identity of Co-Conspirator #1 and all other anonymized entities and individuals
discussed herein are known to the Grand Jury.

B.    <u>1MDB and Other Relevant Entities</u>

    4.    1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia through its Ministry of Finance ("MOF"). It was formed in or around 2009, when the Malaysian government took federal control of TIA, which had previously been the sovereign wealth fund of the state of Terengganu in Malaysia. 1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments. 1MDB's development projects were focused in the areas of energy, real estate, tourism and agribusiness. 1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a government function on behalf of Malaysia. Malaysian Official #1, further described below, was a high-ranking official in the Malaysian government and the MOF with high-level authority to, among other things, approve and influence 1MDB business decisions. 1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

    5.    Foreign Agency A was an investment fund wholly owned by the Government of Abu Dhabi. It was established by the Government of Abu Dhabi pursuant to an Emiri Decree in or around 1984, with a mandate to advance Abu Dhabi's natural petroleum wealth for the development of the emirate. Foreign Agency A was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi, which appointed all the members of Foreign Agency A's board of directors, and performed a government function on behalf of Abu Dhabi. Foreign Agency A was thus an

4

"instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

6.     Foreign Investment Firm A, a subsidiary of Foreign Agency A, was a private joint stock company incorporated under the laws of Abu Dhabi.

C.     Other Relevant Individuals

7.     Between in or around 1998 and in or around February 2016, Co-Conspirator #1 was employed by various subsidiaries, and acted as an agent and employee, of Goldman Sachs Group.   Prior to his separation from Goldman in or around February 2016, Co-Conspirator #1 was the Southeast Asia Chairman and a Participating Managing Director of Goldman Sachs Group.   Co-Conspirator #1 was thus an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

8.     Co-Conspirator #2 was a U.S. citizen who was a high-ranking official of Foreign Investment Firm A from at least in or around 2012 until in or around 2014.

9.     Co-Conspirator #3 was a Malaysian national who was a close relative of Malaysian Official #1 and owned U.S. Motion Picture Company #1, a U.S. legal entity in the business of film production.

D.     Foreign Government Officials

10.     1MDB Official #1 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #1 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.

5

11.     1MDB Official #2 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #2 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

12.     1MDB Official #3 was a high-ranking official at 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #3 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #3 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.

13.     Malaysian Official #1 was a Malaysian national and high-ranking official in the Malaysian government and the MOF from in or around at least 2009 until in or around 2018, with high-level authority to approve 1MDB business decisions.   Malaysian Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

14.     Abu Dhabi Official #1 was a high-ranking official of Foreign Agency A between at least in or around 2012 until in or around 2014, and a high-ranking official of Foreign Investment Firm A.   Abu Dhabi Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

III.    The Criminal Scheme

    A.    Overview

15.     1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people.   However, between approximately 2009

and 2014, billions of dollars were misappropriated and fraudulently diverted from 1MDB through various means, in part for the purpose of paying bribes to foreign officials. The defendants JHO LOW, ROGER NG, Co-Conspirator #1 and others conspired to launder the proceeds of that criminal conduct in and through the U.S. financial system. These laundered funds were used, in among other ways, to pay bribes to obtain and retain business for Goldman, and for the personal benefit of the co-conspirators and their relatives and associates, including, among other things, for the purchase of luxury residential real estate in the United States and artwork from an auction house in New York, New York, and the funding of major Hollywood films.

16.     The defendants JHO LOW and ROGER NG, while NG was acting within the scope of his employment as an employee and agent of Goldman Sachs Group, and as a stockholder thereof acting on behalf of Goldman Sachs Group, with the intent, at least in part, to benefit Goldman, together with others, conspired to obtain and retain business from 1MDB for Goldman through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi. LOW, NG, Co-Conspirator #1 and others also conspired to launder funds embezzled from 1MDB, some of which were used to pay bribes to government officials in Malaysia and Abu Dhabi, through financial systems in the United States and elsewhere. As part of the scheme, LOW, NG, Co-Conspirator #1 and others used LOW's close personal relationships with government officials in Abu Dhabi and Malaysia, including LOW's relationship with Malaysian Official #1, to obtain and retain 1MDB business for Goldman through the promise and payment of bribes to these government officials.

17.     In the course of the scheme, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others obtained and retained 1MDB business for Goldman,

including three bond offerings that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013.   These three bond offerings and related transactions ultimately earned Goldman approximately $600 million in fees and revenue and resulted in NG, Co-Conspirator #1 and others receiving large bonuses from Goldman and enhancing their professional reputations at Goldman.

18.    Although the stated purpose of the approximately $6.5 billion raised by the three bond transactions was to support 1MDB projects for the benefit of the Malaysian people, more than $2.7 billion was instead misappropriated by the defendants JHO LOW, ROGER NG and others and distributed, in part, as bribes and kickbacks to government officials in Malaysia and Abu Dhabi, including 1MDB Official #1, 1MDB Official #2, 1MDB Official #3, Malaysian Official #1 and Abu Dhabi Official #1 and their families, including Co-Conspirator #3, as well as to other co-conspirators, including NG, LOW, Co-Conspirator #1 and their families.

19.    In order to get the deals, the defendant ROGER NG also conspired with other employees and agents of Goldman Sachs Group, including Co-Conspirator #1, to knowingly and willfully circumvent the internal accounting controls of Goldman Sachs Group in connection with the three 1MDB bond transactions and other 1MDB business. Goldman Sachs Group's internal accounting controls were overseen and enforced by Goldman Sachs Group's compliance function (the "Compliance Group") and part of its legal department, referred to internally as the "Business Intelligence Group" (the "Intelligence Group").   These groups worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval.   However, the business culture at Goldman, particularly in Southeast Asia, was highly focused on

8

consummating deals, at times prioritizing this goal ahead of the proper operation of its

compliance functions.

      20.    The defendant ROGER NG, Co-Conspirator #1 and other employees

and agents of Goldman Sachs Group knew that the defendant JHO LOW played a central

role in the bond transactions, including by acting as an intermediary between Goldman,

1MDB and other Malaysian and Abu Dhabi government officials.   NG, Co-Conspirator #1

and other employees and agents of Goldman Sachs Group also knew that bribes had been

promised to these officials to secure 1MDB business for Goldman.   NG, Co-Conspirator #1

and other employees and agents of Goldman Sachs Group conspired to conceal that and other

information from Goldman Sachs Group's Compliance Group and Intelligence Group to

prevent those groups from attempting to stop Goldman from participating in the lucrative

transactions.   Based on, among other things, their experience at Goldman and in the region,

the willingness of co-conspirators and colleagues to assist them, the high fees that the 1MDB

deals would generate for Goldman if the deals were successful, and a system of internal

accounting controls at Goldman Sachs Group that could be easily circumvented, NG, Co-

Conspirator #1 and others believed that they would have, and they in fact did have, repeated

success in concealing LOW's involvement from, and pushing these deals through, Goldman

Sachs Group's control functions to obtain very lucrative business for Goldman, themselves

and others.

      B.    <u>The Defendant ROGER NG and Co-Conspirator #1 Began to Conspire to
Circumvent Goldman Sachs Group's Internal Accounting Controls and Win
Business for Goldman</u>

      21.    Beginning in or around 2009, the defendant ROGER NG began to

conspire with Co-Conspirator #1 and others to circumvent Goldman Sachs Group's internal

accounting controls and win business for Goldman.    At the time, NG and Co-Conspirator #1 were both employees and agents acting within the scope of their employment on behalf of Goldman Sachs Group, and NG as a stockholder thereof acting on behalf of Goldman Sachs Group, with the intent, at least in part, to benefit Goldman, and they collaborated on the creation of, and potential fundraising for, TIA, while knowing that the defendant JHO LOW was an adviser for TIA.    While working on this deal, NG and Co-Conspirator #1 selectively disclosed to other employees of Goldman that they were working with LOW as an intermediary to secure the deal, because they knew that disclosure more widely could have triggered steps to be taken by certain personnel within the Compliance Group and the Intelligence Group to investigate the business relationship with LOW and possibly jeopardize the deal.

   22.  During the course of the TIA transaction and afterwards, the defendants JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others to develop business for Goldman, including with TIA's successor entity, 1MDB.    Notwithstanding LOW's public denials about any involvement with 1MDB during this time, NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group knew that LOW remained close to various 1MDB officials and government officials in Abu Dhabi and Malaysia, including Malaysian Official #1, and worked with LOW for that reason.    During the course of his work with NG and Co-Conspirator #1, LOW also specifically requested that NG, Co-Conspirator #1 and others conceal his involvement in 1MDB and Goldman's business, and NG, Co-Conspirator #1 and others continued to conspire to conceal LOW's involvement in their efforts to obtain and retain 1MDB business for Goldman from the Compliance Group and the Intelligence Group.

23.     Between in or around September 2009 and in or around March 2011, the defendant ROGER NG, Co-Conspirator #1 and others supported at least three attempts to make the defendant JHO LOW a formal client of Goldman.   NG and Co-Conspirator #1 supported these efforts because, in part, they believed that LOW would work to deliver lucrative business deals, including from 1MDB, for the ultimate benefit of Goldman, NG, Co-Conspirator #1 and others.   Ultimately, these attempts were unsuccessful because certain personnel at Goldman within the Compliance Group and the Intelligence Group refused to approve the business relationship between LOW and Goldman based, in part, on concerns that they had about the source of LOW's wealth.   Personnel within the Compliance Group and the Intelligence Group communicated the rejection of LOW's application to Goldman to NG, Co-Conspirator #1 and others.   Notwithstanding their knowledge about the concerns that had been raised by the Compliance Group and the Intelligence Group about LOW not being a suitable client for Goldman, NG and other employees and agents of Goldman Sachs Group, including Co-Conspirator #1, continued to conspire with LOW based upon their belief that LOW would help ensure that government officials within Malaysia, including at 1MDB, and within Abu Dhabi would deliver lucrative business deals to Goldman.

C.     The Defendants JHO LOW and ROGER NG, Together with Others, Won Business for Goldman Through the Payment of Bribes and Kickbacks

24.     Throughout approximately 2012 and 2014, the defendants JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others with the intent, at least in part, to obtain and retain business from 1MDB for the benefit of Goldman through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi using, in part, funds misappropriated and embezzled from the 1MDB bond transactions.   During this time,

11

and through the course of the scheme, LOW, NG, Co-Conspirator #1 and others laundered hundreds of millions of dollars in funds misappropriated and embezzled from 1MDB and used some of those funds to pay millions of dollars in bribes to government officials to obtain 1MDB business for Goldman, in particular, three bond offering transactions underwritten by Goldman for 1MDB referred to as "Project Magnolia," "Project Maximus" and "Project Catalyze."

PROJECT MAGNOLIA

25.     On or about January 23, 2012, the defendant JHO LOW sent an email to the defendant ROGER NG, Co-Conspirator #1 and a high-ranking 1MDB official to introduce NG and Co-Conspirator #1 to the high-ranking 1MDB official for purposes of discussing the purchase of an asset by 1MDB.   In the email, LOW stated, "[p]lease exclude me from the email list going forward."

26.     In or around early 2012, the defendants JHO LOW and ROGER NG met in Malaysia with Co-Conspirator #1, 1MDB Official #1, 1MDB Official #3 and others. The purpose of the meeting was to discuss 1MDB's proposed purchase of a Malaysian energy company ("Malaysian Energy Company A"), and Goldman's ability to assist in obtaining financing for the purchase, among other things.   During that meeting, NG, Co-Conspirator #1 and others discussed with LOW, among other things, the type of guarantee that 1MDB needed to obtain to make the bond issuance acceptable to Goldman and ultimately agreed on the suitability of a guarantee from Foreign Agency A.   NG, Co-Conspirator #1 and others understood that LOW was acting as an intermediary between 1MDB, Malaysian Official #1 and other government officials from Abu Dhabi.

12

27.    In or around late February 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss the proposed financing.   During this meeting, LOW explained that to obtain the necessary support for the financing and the guarantee from Foreign Agency A discussed at the prior meeting with NG, Co-Conspirator #1 and others they would have to pay bribes to government officials in Malaysia and Abu Dhabi, including to Malaysian Official #1 and a high-ranking Abu Dhabi government official, to gain their approval for portions of the transaction.   After the meeting, it was understood that Goldman would be engaged by 1MDB to act as an adviser and arrange the purchase and financing of Malaysian Energy Company A.

28.    Following the February 2012 meeting, the defendant ROGER NG told another employee of Goldman about the plan to pay bribes to government officials in Malaysia and Abu Dhabi.   NG understood and agreed with Co-Conspirator #1 and other employees and agents of Goldman Sachs Group not to disclose this information to personnel within the Compliance Group, the Intelligence Group or the committees within Goldman that would review this proposed bond issuance and other 1MDB transactions.

29.    In or around March 2012, 1MDB selected Goldman to be the sole bookrunner and arranger for the $1.75 billion bond deal, guaranteed by Foreign Agency A, and designed, in part, to pay for the acquisition of Malaysian Energy Company A.   This transaction was referred to internally at Goldman as "Project Magnolia."

30.    Following Goldman's formal engagement to work on Project Magnolia, the defendant ROGER NG continued to conspire with Co-Conspirator #1 and others, including other employees and agents of Goldman Sachs Group, to work with the defendant JHO LOW on the transaction.

31.     In or around early March 2012, the defendants JHO LOW and ROGER

NG, Co-Conspirator #1, various 1MDB officials and others traveled to Abu Dhabi for

meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss the

guarantee for Project Magnolia.   Throughout that time, NG knew that LOW arranged the

meetings with the officials of Foreign Agency A and Foreign Investment Firm A, and that

some of these officials, among others, would be paid bribes by LOW, or at his direction, to

influence the approval of the guarantee.

32.     During this same time, in an effort to win and retain the bond deal to

finance the purchase of Malaysian Energy Company A, the defendant JHO LOW also enlisted

the assistance of various 1MDB officials with the promise of remuneration.   For example, on

or about March 8, 2012, 1MDB Official #1 and LOW discussed 1MDB's acquisition of

Malaysian Energy Company A via an online chat, during which chat LOW stated he would

"[g]ive [1MDB Official #1] big present" when the transaction was done.   In the same chat,

LOW further instructed 1MDB Official #1 to delete at least one email and other documents he

had sent to 1MDB Official #1, and stated "delete from email and destroy once done."

Additionally, LOW informed Co-Conspirator #1 that 1MDB Official #3 was being paid a

bribe for her assistance in obtaining and retaining the bond deal.

33.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and

others also knew that LOW intended to use funds misappropriated from 1MDB's bond deal

to pay and cause to be paid bribes to foreign officials in Malaysia and Abu Dhabi to

influence those officials to obtain the necessary approvals and any additional assistance to

execute Project Magnolia for Goldman.

34.    In or around the end of May 2012, near the closing of Project Magnolia, the defendants JHO LOW and ROGER NG continued to conspire with Co-Conspirator #1 and others to divert some of the funds from Project Magnolia into the bank accounts of shell companies that NG, LOW, Co-Conspirator #1 and others beneficially owned and controlled.   At this time, NG, LOW and Co-Conspirator #1 expected to keep some of the diverted funds for their personal use, and understood that other Project Magnolia funds would be used to pay bribes to government officials in Malaysia and Abu Dhabi and elsewhere in exchange for their assistance in obtaining and retaining business for Goldman with respect to the execution of the bond transaction and the purchase of Malaysian Energy Company A.

35.    On or about May 20, 2012, Co-Conspirator #1 sent an email asking his close relative for the account details for a bank account in the name of Holding Company #1 ("Holding Company #1 Account").   Holding Company #1 was a shell company incorporated in the British Virgin Islands that was owned by this close relative of Co-Conspirator #1 and was controlled by both Co-Conspirator #1 and his close relative.   Co-Conspirator #1 wrote, "[b]est if they are US$ accounts.   We should also tell the bank that we will receive a transfer."

36.    On or about May 21, 2012, the bond deal known as Project Magnolia closed, earning significant fees for Goldman, and resulting in large year-end bonuses paid by Goldman to the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group who participated in obtaining and structuring the bond deal.   NG and other employees and agents of Goldman Sachs Group intentionally structured Project Magnolia, and future transactions, as bond deals rather than other forms of financing, because

doing so generated much higher revenues and fees for Goldman, improved the bank's reputational standing in both the Southeast Asia region and globally and provided NG and other bankers with increased remuneration and professional prestige, even though the bond financing was more expensive for 1MDB.

37.     Goldman transferred part of the proceeds of the Project Magnolia bond offering via wire to 1MDB's wholly-owned subsidiary, from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.  At the time, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of the bond would be diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.

38.     On or about May 22, 2012, approximately $577 million of the bond proceeds were transferred from the account of 1MDB's wholly-owned subsidiary to Shell Company Account #1, an account at Foreign Financial Institution A in the name of a company incorporated in the British Virgin Islands with a name similar to Foreign Investment Firm A, but which was not in fact associated with Foreign Investment Firm A. Although the signatories on Shell Company Account #1 were Abu Dhabi Official #1 and Co-Conspirator #2, the defendant JHO LOW and another co-conspirator controlled Shell Company Account #1.

39.     On or about May 25, 2012, approximately $295 million was transferred via wire from Shell Company Account #1 to an account at a foreign bank in the name of a shell company beneficially owned and controlled by the defendant JHO LOW and a co-conspirator ("Shell Company Account #2").

40.    Within three months of the closing of Project Magnolia, millions of dollars of bond proceeds that had been transferred to Shell Company Account #2 were transferred into Holding Company #1 Account, and these funds were transferred via wire to and from the United States.   Approximately $24 million of these funds was subsequently transferred to a bank account beneficially owned by a relative of the defendant ROGER NG.

41.    Within one month of the closing of Project Magnolia, approximately $133 million of the bond proceeds that had been funneled into Shell Company Account #1 was then transferred to an account at Foreign Financial Institution A opened in the name of a company incorporated in the British Virgin Islands and beneficially owned and controlled by Co-Conspirator #3, a close relative of Malaysian Official #1 ("Shell Company Account #3"). Between on or about June 20, 2012 and November 20, 2012, 11 wires totaling approximately $60 million were then transferred from Shell Company Account #3 to Holding Account #2, an account at U.S. Financial Institution #1 in Los Angeles, California.   Holding Account #2 is owned and controlled by U.S. Motion Picture Company #1, a U.S. legal entity owned in part by Co-Conspirator #3 whose funds, among other things, were used to assist in the production of the film "The Wolf of Wall Street."

<u>PROJECT MAXIMUS</u>

42.    In or about May 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others began to plan a second bond transaction, known internally at Goldman as "Project Maximus," which was designed, in part, to raise capital for 1MDB to purchase a second Malaysian power generation company.   LOW, NG, Co-Conspirator #1 and others knew that LOW and others would and did pay bribes to influence Malaysian and Abu Dhabi officials to obtain the necessary approvals to execute the bond offering.   1MDB also

awarded this bond offering, which was structured similarly to the first bond issuance, but with an indirect guarantee from Foreign Agency A, to Goldman.

43.     As with Project Magnolia, while the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group continued to work with the defendant JHO LOW to acquire this business for Goldman and to execute the second bond issuance, they concealed LOW's involvement in the transaction from the Compliance Group and the Intelligence Group at Goldman for the same reasons that they concealed his involvement with Project Magnolia.

44.     The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of Project Maximus would be illegally diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.   NG knew at the time that Malaysian Official #1, Abu Dhabi government officials and 1MDB officials, among others, would receive money from the proceeds of Project Maximus that passed through bank accounts of various shell companies beneficially owned and controlled by LOW and others, including Co-Conspirator #1 and his close relative, to influence those officials to execute the bond with Goldman.   In fact, NG provided direction to Co-Conspirator #1's close relative regarding the transfer of some of these funds.   Abu Dhabi Official #1 and Co-Conspirator #3, among others, received some of the funds traceable to the Project Maximus bond issuance.

45.     Project Maximus closed on or about October 17, 2012, raising approximately $1.75 billion for a 1MDB wholly-owned subsidiary, and resulting in substantial revenues and other fees for Goldman.   Goldman transferred part of the proceeds

18

of Project Maximus via wire to the subsidiary of 1MDB from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.   Thereafter, some of the proceeds from the bond offering were diverted and transferred via wire to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States, including through the Eastern District of New York.

46.     On or about October 19, 2012, two days after Project Maximus closed, approximately $790 million of the proceeds of the bond was transferred to and through a series of shell company accounts beneficially owned and controlled by the defendant JHO LOW and a co-conspirator.   Some of these funds were later transferred to Holding Company #1 Account and the accounts of Malaysian and Abu Dhabi officials, including various 1MDB officials.

47.     Within one week of Project Maximus closing, approximately $60 million of the bond proceeds was transferred to Shell Company Account #3.   On or about November 14, 2012, an additional approximately $45 million of bond proceeds was transferred to Shell Company Account #3.   Within approximately one day of the November 14, 2012 transfer, approximately $35.8 million was transferred from Shell Company Account #3 to U.S. Law Firm Account #1, owned and controlled by U.S. Law Firm #1 based in New York, New York.   Nearly all of these funds were then transferred approximately four days later to U.S. Law Firm Account #2, owned and controlled by U.S. Law Firm #2 based in New York, New York.   These funds were used by Co-Conspirator #3 to acquire a condominium in New York, New York that was beneficially owned by the defendant JHO LOW.

48.     Between on or about May 29, 2012 and November 30, 2012, the defendant JHO LOW and others also caused the transfers via wire of approximately $472,750,000 traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to an account at Foreign Financial Institution B in the name of a company beneficially owned by Abu Dhabi Official #1 ("Shell Company Account #4").

49.     Between on or about May 29, 2012 and December 3, 2012, the defendant JHO LOW and others also transferred via wire approximately $55 million traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company Account #2 to the account of a company at Foreign Financial Institution C beneficially owned and controlled by Co-Conspirator #2 and a close relative of Co-Conspirator #2 ("Shell Company Account #5").

50.     The defendant ROGER NG knew that some of the bond proceeds from Project Maximus were transferred by the defendant JHO LOW or at his request to Holding Company #1 Account in furtherance of the scheme.   Thereafter, LOW, NG, Co-Conspirator #1 and others caused some of these funds to be transferred to the accounts of 1MDB officials or relatives of such officials, or to the accounts of shell companies beneficially owned and controlled by 1MDB officials, including 1MDB Official #1 and 1MDB Official #2, in exchange for their assistance in obtaining and retaining business for Goldman.

## PROJECT CATALYZE

51.     In or about November 2012, despite having raised over $3 billion in the prior 11 months, 1MDB sought to raise an additional $3 billion through a third bond issuance known internally at Goldman as "Project Catalyze." This bond issuance was purportedly designed to fund 1MDB's portion of a joint venture with Foreign Investment Firm A. Goldman was engaged on the project in or around early 2013 and, again, secured substantial revenues and fees from the deal.

52.     As they had with the two prior 1MDB bond issuances, the defendant ROGER NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group continued to work with the defendant JHO LOW as an intermediary between Goldman, 1MDB officials, Malaysian Official #1 and other foreign government officials, and they continued to conceal this fact from the Compliance Group, the Intelligence Group and committees at Goldman Sachs Group. Further, although required by internal policies of Goldman Sachs Group, the defendant ROGER NG failed to disclose that he and Co-Conspirator #1 had received a portion of the funds diverted from the prior bond transactions through LOW and that LOW, NG, Co-Conspirator #1 and others had caused bribes and kickbacks to be paid to 1MDB officials and others who were involved in the transactions.

53.     The Project Catalyze bond issued on or about March 19, 2013. By or at the direction of the defendant JHO LOW, some of the approximately $3 billion raised by this bond issuance was transferred to and through a series of transactions to Holding Company #1 Account, which account was owned and controlled by Co-Conspirator #1 and his close relative. These misappropriated and embezzled funds were transferred via wire to a place in the United States from and through a place outside of the United States, and from a

place in the United States to and through a place outside of the United States.   Some of these funds were further transferred via wire to accounts in the name of entities beneficially owned and controlled by 1MDB officials, including 1MDB Official #2 and 1MDB Official #3. More than $4 million of these funds were also transferred via wire to a bank account beneficially owned by a relative of NG.

54.   Within seven days of Project Catalyze closing, the defendant JHO LOW and other co-conspirators caused the transfers via wire of approximately $1.2 billion in funds traceable to Project Catalyze to a bank account at Foreign Financial Institution D in the name of another shell company ("Shell Company Account #6").   Within two months of the closing of Project Catalyze, LOW caused a client account to be opened in the name of that shell company ("Shell Company #6") at Art Auction House #1, an auctioneer of high-end artworks based in New York, New York.   In approximately May 2013, at auctions held at Art Auction House #1 in New York, New York, LOW acquired five works of art for approximately $58.3 million in the name of Shell Company #6.   The following month, LOW caused approximately $58.3 million in funds traceable to Project Catalyze to be transferred from Shell Company Account #6 to Art Auction House #1 to purchase the artworks.   Between on or about July 3, 2013 and September 9, 2013, additional funds traceable to Project Catalyze totaling approximately $79 million were transferred from Shell Company Account #6 to Art Auction House #1 to acquire additional artworks.

55.   Following the closing of Project Catalyze, through the end of 2014, the defendant ROGER NG, Co-Conspirator #1 and Goldman sought to obtain and worked to execute several additional transactions with 1MDB, particularly focusing on a proposed initial public offering ("IPO") of 1MDB's energy assets ("1MDB Energy").   Throughout the time

period of these additional transactions, the defendant JHO LOW and others, including Co-

Conspirator #1, continued to pay bribes and kickbacks to certain Malaysian and 1MDB

officials and others, including from the proceeds of the Project Catalyze bond and other

1MDB transactions, to influence those officials to award a role for Goldman in the IPO.

56.     On or about June 2, 2014, Co-Conspirator #1 and the defendant JHO

LOW discussed, via electronic chat, efforts to win a position for Goldman in the 1MDB

Energy IPO, including the need to "suck up to" 1MDB Official #2 and to send "cakes,"

referring to bribes, to "madam boss."   In prior email correspondence, the defendant ROGER

NG, LOW and Co-Conspirator #1 referred to the wife of Malaysian Official #1 as "the

Madam."   LOW asked Co-Conspirator #1 if he could transfer money from Shell Account #1

directly into the account of another company incorporated in the British Virgin Islands and

beneficially owned and controlled by Co-Conspirator #1 and his close relative ("Management

Company #1 Account") so that Co-Conspirator #1 could "settle madam cakes 2."

57.     The defendant ROGER NG continued his personal relationship with

Co-Conspirator #1 after NG's departure from Goldman, and continued to work with Co-

Conspirator #1 on other business ventures.

<u>COUNT ONE</u>
(Conspiracy to Violate the FCPA—Bribery)

58.     The allegations contained in paragraphs one through 57 are realleged

and incorporated as if fully set forth in this paragraph.

59.     In or about and between January 2009 and October 2014, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also

23

known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)      being an employee and agent of an issuer, and a stockholder thereof acting on behalf of such issuer, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Goldman Sachs Group and others in obtaining and retaining business, for and with, and directing business to, NG, LOW, Goldman and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a); and

(b)      while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion

24

of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendants and others in obtaining and retaining business, for and with, and directing business to, Goldman, NG, LOW and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-3 and 78ff(a).

   60.   In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

<u>OVERT ACTS</u>

   (a)   On or about March 23, 2012, LOW met with a banker from Foreign Financial Institution A in Los Angeles, California, during which meeting LOW explained Project Magnolia and discussed funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

   (b)   On or about March 25, 2012, LOW, NG, Co-Conspirator #1 and others met in Los Angeles, California and New York, New York to discuss, among other things, matters related to Project Magnolia and the acquisition of the Malaysian Energy Company A.

(c)     On or about April 21, 2012, LOW, NG, Co-Conspirator #1 and others met with bankers from Foreign Financial Institution A in Singapore and discussed, among other things, funds from Project Magnolia that would be sent to Shell Company Account #1 at Foreign Financial Institution A.

(d)     On or about May 29, 2012, LOW and others caused approximately $158 million traceable to the proceeds of Project Magnolia to be transferred via wire from Shell Company Account #2 through a U.S. correspondent bank to Shell Company Account #4.

(e)     On or about December 19, 2012, LOW and others caused approximately $5 million traceable to Project Maximus to be transferred from Shell Company Account #2 to Holding Company #1 Account.

(f)     On or about December 20, 2012, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Maximus to be transferred from Holding Company #1 Account to the bank account, for which LOW had made the banking referral, of a company beneficially owned and controlled by 1MDB Official #1.

(g)     On or about July 22, 2013, LOW, Co-Conspirator #1 and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from Management Company #1 Account to a bank account, for which LOW had made the banking referral, of an entity beneficially owned and controlled by 1MDB Official #3.

(h)     On or about July 29, 2013, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be

26

transferred from Holding Company #1 Account to the account of a company beneficially owned and controlled by 1MDB Official #2.

(i)   On or about September 28, 2013, at LOW's request, a high-end New York jeweler ("N.Y. Jeweler #1") met with LOW, Malaysian Official #1 and the wife of Malaysian Official #1 at a hotel in New York, New York to show a pink diamond necklace that N.Y. Jeweler #1 had designed for Malaysian Official #1's wife. Approximately three weeks earlier, the pink diamond necklace was purchased using approximately $27.3 million, which funds were sent from a shell company beneficially owned and controlled by LOW and other co-conspirators.

(j)   On or about October 10, 2014, LOW, Co-Conspirator #1 and others caused approximately $4.1 million to be transferred via wire from Management Company #1 Account to the U.S. bank account of N.Y. Jeweler #1, in part, to pay for certain gold jewelry for the wife of Malaysian Official #1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT TWO</u>
(Conspiracy to Violate the FCPA—Circumvention of Internal Accounting Controls)

61.   The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

62.   In or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely, to knowingly and willfully circumvent and cause to be circumvented a system of internal

accounting controls at Goldman Sachs Group, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

63.    In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

<u>OVERT ACTS</u>

(a)    On or about January 15, 2009, a high-ranking official at 1MDB's predecessor entity, TIA, advised LOW, NG and Co-Conspirator #1 that it was "best to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by Goldman.

(b)    On or about January 27, 2009, NG and Co-Conspirator #1 discussed via email whether to disclose to the Intelligence Group at Goldman LOW's involvement in the transaction referenced in Paragraph 63(a), and decided not to make such disclosure.

(c)    During a telephone call in mid to late March 2012, Co-Conspirator #1 falsely stated to a senior member of the Intelligence Group at Goldman that LOW was not involved in Project Magnolia.

(d)    On or about April 3, 2012, in response to questioning, Co-Conspirator #1 falsely told a senior member of the Intelligence Group at Goldman that LOW was not involved in Project Magnolia.

(e)    On or about April 4, 2012, NG and Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Magnolia

28

other than to set up one meeting with an Abu Dhabi official.   The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(f)      On or about October 10, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Maximus.   The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(g)      On or about April 24, 2013, Co-Conspirator #1 falsely stated to a senior employee of Goldman based in New York, New York who was also a member of a committee that reviewed the 1MDB bond transactions, that there was no intermediary involved in any of the three 1MDB bond transactions and, specifically, that LOW was not involved in Projects Magnolia, Maximus or Catalyze.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT THREE
(Conspiracy to Commit Money Laundering)

64.      The allegations contained in paragraphs one through 57 are realleged and incorporated as if fully set forth in this paragraph.

65.      In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and intentionally conspire to:

(a)    transport, transmit and transfer monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b)    engage in one or more monetary transactions within the United States involving criminally derived property of a value greater than $10,000 that was derived from one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and

offenses against a foreign nation involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

66.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One or Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

67.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

68.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

69.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

32

other property of the defendants, up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DEBORAH L. CONNOR
CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
AND ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE

_____
DANIEL S. KAHN
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**A-108**

F.#: 2016R00467

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*LOW TAEK JHO, ALSO KNOWN AS "JHO LOW," AND NG CHONG
HWA, ALSO KNOWN AS "ROGER NG,"*

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 371, 981(a)(1)(C), 982(a)(1), 982(b), 1956(h) and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                      *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
                                      *Clerk*

*Bail, $* _____

*Alexandra E. Smith, Drew G. Rolle, Assistant U.S. Attorneys, (718) 254-7000
Jennifer C. Ambuehl, David A. Last, Katherine K. Nielsen, Nikhila Raj
Trial Attorneys, U.S. Department of Justice (202) 514-2000*

**A-109**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 12, 2019

Marc Agnifilo
Brafman & Associates, P.C.
767 Third Avenue
New York, New York 10017

   Re: United States v. Ng Chong Hwa, also known as "Roger Ng"
   <u>Crim. Docket No. 18-538 (MKB)</u>

Dear Mr. Agnifilo,

   The U.S. Attorney's Office for the Eastern District of New York and the Money Laundering and Asset Recovery Section and Fraud Section of the U.S. Department of Justice's Criminal Division ("the Offices") write to confirm our understanding regarding your client Ng Chong Hwa, also known as "Roger Ng," with regard to his potential waiver of extradition to the United States in connection with the above-referenced criminal case.

   To the extent your client knowingly and willfully waives extradition[1] to the United States no later than February 15, 2019 ("the Deadline"), the Offices agree that your client will not be detained, tried or punished at the request of our Offices except for (1) the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded, and (2) any offense committed after the waiver of extradition and initial appearance in the Eastern District of New York. However, if your client leaves the United States after waiver of extradition or does not leave the United States within fifteen (15) days of the day on which your client is free to leave, this agreement is void and our Offices may seek the detention, trial and punishment of your client for any offense, whenever committed, that is within the relevant statute of limitations.



---

[1] This agreement pertains only to your client's waiver of extradition and not to any consent to extradition.



**EXHIBIT**

**2**

U.S. v. Ng Chong Hwa, 18 Cr. 538 (MKB)



This letter memorializes the entirety of the agreement between the Offices and your client.  No promises, agreements, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.

Sincerely,

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York


By: _____
        Jacquelyn M. Kasulis
        Drew G. Rolle

DEBORAH L. CONNOR
Chief, Money Laundering and
Asset Recovery Section


By: _____
        Jennifer E. Ambuehl
        Woo S. Lee
        MaryAnn McCarthy

ROBERT ZINK
Acting Chief, Fraud Section


By: __  __   ___  ___    ____   ____
        Katherine A. Nielsen
        Nikhila Raj

2

**A-111**

**Marc Agnifilo**

| | |
|---|---|
| **From:** | Nielsen, Katherine (CRM) ███████████████ |
| **Sent:** | Tuesday, February 12, 2019 8:21 PM |
| **To:** | Marc Agnifilo; Kasulis, Jacquelyn (USANYE) |
| **Cc:** | Ambuehl, Jennifer (CRM); Jacob Kaplan; Teny Geragos |
| **Subject:** | RE: Mr. Ng |
| **Attachments:** | Roger Ng  2.12.19.pdf |

Marc,

Please find attached the final approved letter, as discussed last week.

Best regards,

Kate Nielsen
Trial Attorney
Fraud Section, Criminal Division
██████████████████

1

**A-112**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 18 Cr. 00538 (MKB) (S-1) |
| - v. - | |
| NG CHONG HWA a.k.a. Roger Ng, | **AFFIRMATION OF**<br>**MARC A. AGNIFILO, ESQ.** |
| Defendant. | |

I, MARC A. AGNIFILO, hereby declare pursuant to 28 U.S.C. § 1746:

1.      I am Of Counsel at Brafman & Associates, P.C., counsel to defendant Ng Chong

Hwa ("Roger Ng") and am listed as counsel of record in the case of United States v. Ng Chong

Hwa together with Teny Geragos, Esq., Jacob Kaplan, Esq., and Zach Intrater, Esq. (Dkts. 17, 18,

57).

2.      I make this Affirmation based on my first-hand involvement in the events

discussed, a review of court records of proceedings both in the United States and Malaysia,

conversations with Ng's Malaysian counsel, Datuk Tan Hock Chuan, and other information.

3.      On October 30, 2018, Roger Ng was arrested on a provisional arrest warrant based

on the original U.S. indictment (Dkt 1). He was incarcerated on the U.S. case in a Malaysian jail

between his arrest and his initial appearance in the United States on May 7, 2019.

4.      In addition to the U.S. case, Ng was charged by the Malaysian Attorney General's

Chambers on December 19, 2018 with crimes related to his involvement in the 1MDB bond deals

that Goldman Sachs led from 2012 to 2013. He was ordered released on the Malaysian charges.

Due to the U.S. charges, however, he remained in prison.

5.      During the first two months of 2019, I traveled to Malaysia two times. First, in early January 2019. Second, between February 11 and February 16, 2019. During each of these trips, I discussed with Ng the prospect of waiving extradition to the United States.

6.      During January and February 2019, the undersigned had a number of telephone and email conversations with Assistant United States Attorneys in the Eastern District of New York and with trial lawyers with the Department of Justice concerning the possibility of Mr. Ng waiving extradition to the U.S.

7.      The undersigned stated to the Government that while Mr. Ng would consider waiving extradition, we wanted an agreement with the Government that it would not change the indictment after Mr. Ng came to the United States. There was explicit discussion that once Mr. Ng waived extradition, he would lose all rights afforded him under the treaty. However, we discussed with the Government that Mr. Ng should not lose the right commonly known as the Rule of Specialty.

8.      The Government said that it would draft a letter agreement providing Mr. Ng the protections afforded him under the Rule of Specialty as provided by the U.S./Malaysian Extradition treaty.

9.      The Government consistently told the undersigned that it was imperative that Mr. Ng waive extradition and that this waiver be on the record in court in Malaysia.

10.     As to one particular telephone conversation on February 7, 2019, Teny Geragos was on the phone along with the undersigned. Ms. Geragos's notes, which are consistent with the undersigned's recollection, reflect that the Government informed us that Mr. Ng must waive extradition and do so in open court. The Government also advised that it was still working on the letter agreement that was previously discussed.

A-114

11.     On the evening of Monday, February 11, 2019, the undersigned left for Malaysia and arrived in Kuala Lumpur on Wednesday afternoon, February 13th (Malaysian time, 13 hours ahead of Eastern Standard Time in the U.S.). By the time I landed in Kuala Lumpur, I had received the Government's February 12, 2019 letter. The email accompanying the letter stated, "please find the final approved letter, as discussed last week." (See Dkt. 58, Ex. 2 at 1-3.)

12.     On Thursday February 14th, I, along with Mr. Ng's Malaysian-based lawyer, Datuk Tan Hock Chuan ("Datuk Tan"), went to the Sungai Buloh prison, on the outskirts of Kuala Lumpur, and met with Mr. Ng.  Among other things, I read the Government's February 12th letter to him and informed him, in substance, that aside from the possibility of ministerial modifications, the Government agreed not to change the indictment (which was the October 2018 indictment). In explicit reliance on the Government's promises in the February 12th letter, Mr. Ng agreed to waive extradition the next day, February 15, 2019, the date required for waiver under the letter.

13.     I also told Mr. Ng and Datuk Tan that our agreement with the U.S. Government requires that we waive extradition, and that we do not consent to extradition. I told him this so that he would make it clear the next day in court that we were waiving extradition.

14.     Following the prison visit, and in response to a question from the Government, I sent an email to representatives of the EDNY and the DOJ that I had met with Mr. Ng and that "we are waiving extradition at Friday's hearing." (Ex. 1, 2/14/19 Email at 1.)

15.     On the morning of Friday February 15th, I re-emphasized that Mr. Ng would waive extradition. Specifically, I wrote to the EDNY and the DOJ, "First, as noted, Roger will waive extradition this morning."  (Ex. 2, 2/14/19 7:34 PM EST Email at 1.)

16.     I then appeared in the Sessions Court in Kuala Lumpur for the Friday morning hearing. Not being a Malaysian lawyer, I sat in the gallery. Datuk Tan appeared on Mr. Ng's

A-115

behalf. While explaining the procedures to Mr. Ng, the court used the term "consent to waiver."

Upon hearing this, I stood up from where I was sitting and walked up to the bar of the court. This

caught the judge's attention and I believe he motioned to Datuk Tan that I was trying to get his

attention. Datuk Tan turned around and apparently saw me standing at the bar. He then walked to

the bar and he and I spoke. I said, in substance, "we shouldn't use the phrase 'consent to waiver'

because it is confusing." I asked Datuk Tan to say only that Mr. Ng is waiving extradition.

17.     Datuk Tan returned to the defense table, and, as has been quoted in the press, stated

the following: "I am instructed to inform the Court that the respondent has agreed to a waiver of

the committal/extradition proceedings before this honourable court." (Ex. 3,

https://www.malaymail.com/news/malaysia/2019/02/15/lawyer-tells-court-ex-goldman-banker-

now-accepts-us-extradition/1723257.) During the balance of the proceedings, the court asked

questions to ensure that the waiver was knowing and intelligently entered.

18.     Shortly after the end of the hearing, and I believe while I was still in the Court

building, I sent an email to the EDNY and DOJ saying only, "waiver has been made.  All done."

(Ex. 4, 2/14/19 10:17 PM EST Email at 1.)

19.     The reason I sent multiple emails to the Government explicitly saying that Mr. Ng

would, and later, did waive extradition is because the Government told me that the distinction

between waiving and consenting to extradition was critical.

20.     As the Court is aware, the Government provided the Court with an order of the

Malaysian Sessions Court dated February 15, 2019 stating that Mr. Ng did "consent to the waiver

of the committal proceedings." This language in the order, "consent to the waiver" was the same

language that the Judge used in open court that prompted me to ensure that Mr. Ng was waiving,

**A-116**

and not consenting, to the extradition. However, while the language is confusing, it is not inconsistent with our contention that Mr. Ng waived extradition.

21.     In closing, I wish to make clear that Mr. Ng explicitly relied on the Government's February 12, 2019 letter, represented to be the final approved letter from the Government, and that Mr. Ng absolutely waived extradition, and that he did not consent to extradition.


Dated:          January 22, 2021
                New York, NY


                                              Respectfully submitted,

                                              Marc A. Agnifilo, Esq.

5

**A-117**

# EXHIBIT 1

**Thursday, January 14, 2021 at 2:10:49 PM Eastern Standard Time**

**Subject:** Re: Mr. Ng
**Date:** Thursday, February 14, 2019 at 11:12:23 AM Eastern Standard Time
**From:** Marc Agnifilo
**To:** Kasulis, Jacquelyn (USANYE)
**CC:** Nielsen, Katherine (CRM), Ambuehl, Jennifer (CRM), Jacob Kaplan, Teny Geragos

I did. We are waiving extradition at Friday's hearing.

Do you have a sense for how long it will take for him to come to the US. We are in the process of raising the $1M and securing a rental apartment.

Thank you.

Sent from my iPhone

On Feb 14, 2019, at 11:27 PM, Kasulis, Jacquelyn (USANYE) < ▮▮▮▮▮▮▮▮ > wrote:

> Marc - just checking in. We're you able to meet with Roger?
>
> Best,
> Jackie
>
> On Feb 12, 2019, at 8:20 PM, Nielsen, Katherine (CRM)
> ▮▮▮▮▮▮▮▮ wrote:
>
> Marc,
>
> Please find attached the final approved letter, as discussed last week.
>
> Best regards,
>
> Kate Nielsen
> Trial Attorney
> Fraud Section, Criminal Division
> ▮▮▮▮▮▮▮▮
>
>
> From: Marc Agnifilo ▮▮▮▮▮▮▮▮
> Sent: Monday, February 11, 2019 11:27 PM
> To: Kasulis, Jacquelyn (USANYE) < ▮▮▮▮▮▮▮▮
> Cc: Ambuehl, Jennifer (CRM) ▮▮▮▮▮▮▮▮ Nielsen,
> Katherine (CRM)
> ▮▮▮▮▮▮▮▮ ; Jacob Kaplan
> ▮▮▮▮▮▮▮▮ Teny Geragos
> >
> Subject: Re: Mr. Ng
>
> Guys. A couple of things.

**A-119**

First, do you think you will have a written, approved position as to Roger's release conditions prior to Friday morning Malaysia time. We went through them on the phone and they are clear but I know there are certain approvals pending and there is an advantage to having the government's position in writing.

Second, an application has been made for me to get into the jail to see roger on Wednesday and Thursday. The jail still has not given approval. I understand that you don't necessarily have tremendous sway with the Malaysian jails but if there is some way of pushing this over the edge, that would be helpful.

That's all for now. Thank you.

I may be hard to reach. But if you can communicate with me, Jacob and Teny, I will certainly get the messages. Thanks again.

Marc
Sent from my iPhone

On Feb 7, 2019, at 1:54 PM, Kasulis, Jacquelyn (USANYE) ██████ wrote:

How about 2:30 pm?

On Feb 7, 2019, at 12:33 PM, Marc Agnifilo ██████ wrote:

Just left mdc. How is 2 pm?

Sent from my iPhone

On Feb 7, 2019, at 9:18 AM, Kasulis, Jacquelyn (USANYE) ██████ wrote:

Hi, Marc. I hope you're well. Do you have time this afternoon or tomorrow morning to walk through over the phone the agreement that we're working on regarding Roger's waiver of extradition? It's still going through the approval process on our end, so we can't send it to you, but we want to make sure there are no major issues from your perspective before we get final sign off.

Thank you,
Jackie



From: Marc Agnifilo ██████

Sent: Tuesday, February 5, 2019 11:14 AM
To: Ambuehl, Jennifer (CRM) ██████
Cc: Kasulis, Jacquelyn (USANYE) ██████
██████ Nielsen, Katherine (CRM)

oj.gov%3e%3e>

Subject: Re: Mr. Ng

Great. Thank you.
Sent from my iPhone

**A-120**



Page 3 of 4

**A-121**



**A-122**

# EXHIBIT 2

**Subject:** Re: Mr. Ng
**Date:** Thursday, February 14, 2019 at 7:34:05 PM Eastern Standard Time
**From:** Marc Agnifilo
**To:** Kasulis, Jacquelyn (USANYE)
**CC:** Nielsen, Katherine (CRM), Ambuehl, Jennifer (CRM), Jacob Kaplan, Teny Geragos

Hi everyone. A few things.

First, as I noted, roger will waive extradition this morning.

Second, once he waives, do you have a sense of timing. I hope to have the conditions in place very soon.

Third, would you be amenable to permitting his wife to come to the US at some point. I'm assuming she is not a subject but this is not something I have discussed yet with you guys.

That's it for right now.

Marc

Sent from my iPhone

On Feb 14, 2019, at 11:27 PM, Kasulis, Jacquelyn (USANYE) ███████████████ wrote:

> Marc - just checking in. We're you able to meet with Roger?
>
> Best,
> Jackie
>
> On Feb 12, 2019, at 8:20 PM, Nielsen, Katherine (CRM)
> ██████████████████████████ wrote:
>
>> Marc,
>>
>> Please find attached the final approved letter, as discussed last week.
>>
>> Best regards,
>>
>> Kate Nielsen
>> Trial Attorney
>> Fraud Section, Criminal Division
>>
>> ████████████████████████
>>
>>
>> From: Marc Agnifilo███████████████████████
>> Sent: Monday, February 11, 2019 11:27 PM
>> To: Kasulis, Jacquelyn (USANYE)██████████████
>> Cc: Ambuehl, Jennifer (CRM)
>> ████████████████████████████Nielsen,
>> Katherine (CRM)
>> ███████████████████████████ Jacob Kaplan

Teny Geragos
>

Subject: Re: Mr. Ng

Guys. A couple of things.

First, do you think you will have a written, approved position as to Roger's release conditions prior to Friday morning Malaysia time. We went through them on the phone and they are clear but I know there are certain approvals pending and there is an advantage to having the government's position in writing.

Second, an application has been made for me to get into the jail to see roger on Wednesday and Thursday. The jail still has not given approval. I understand that you don't necessarily have tremendous sway with the Malaysian jails but if there is some way of pushing this over the edge, that would be helpful.

That's all for now. Thank you.

I may be hard to reach. But if you can communicate with me, Jacob and Teny, I will certainly get the messages. Thanks again.

Marc
Sent from my iPhone

On Feb 7, 2019, at 1:54 PM, Kasulis, Jacquelyn (USANYE) wrote:

How about 2:30 pm?

On Feb 7, 2019, at 12:33 PM, Marc Agnifilo < wrote:

Just left mdc. How is 2 pm?

Sent from my iPhone

On Feb 7, 2019, at 9:18 AM, Kasulis, Jacquelyn (USANYE) wrote:

Hi, Marc. I hope you're well. Do you have time this afternoon or tomorrow morning to walk through over the phone the agreement that we're working on regarding Roger's waiver of extradition? It's still going through the approval process on our end, so we can't send it to you, but we want to make sure there are no major issues from your perspective before we get final sign off.

Thank you,
Jackie

From: Marc Agnifilo <
Sent: Tuesday, February 5, 2019 11:14 AM
To: Ambuehl, Jennifer (CRM) <J
Cc: Kasulis, Jacquelyn (USANYE)
Nielsen, Katherine (CRM)

Page 2 of 4

**A-125**

Case 1:18-cr-00538-MKB   Document 61-2   Filed 01/22/21   Page 4 of 5 PageID #: 1076





**A-127**

# EXHIBIT 3

1/20/2021

COVID-19  ABOUT US
ADVERTISE WITH US

HOME    MALAYSIA    SINGAPORE    WORLD    MONEY    LIFE    EAT/DRINK    SHOWBIZ    OPINION    SPORTS    TECH/GADGETS    DRIVE    VIDEOS

精彩大马    PROJEKMM

HOME / MALAYSIA

# Lawyer tells court ex-Goldman banker now accepts US extradition (VIDEO)

Friday, 15 Feb 2019 11:10 AM MYT

By Ida Lim



Roger Ng's lawyer Datuk Tan Hock Chuan speaks to reporters in Kuala Lumpur February 15, 2019, after proceedings for his client's extradition to the US. — Picture by Hari Anggara

KUALA LUMPUR, Feb 15 — Former Goldman Sachs banker Roger Ng officially abandoned his action against his extradition to the US today and will head there to stand trial over charges related to the 1MDB scandal.

One of Ng's lawyers, Datuk Tan Hock Chuan, said his client wished to be sent to the US within 30 days.

"First, I am instructed to inform the court that the respondent has agreed to a waiver of the committal/extradition proceedings before this honourable court," he told Sessions Court judge MM Edwin Paramjothy.

IN MALAYSIA

JUST IN    POPULAR

32 minutes ago
CIMB Asean Research Institute: Malaysia should be developed as a digital nation


37 minutes ago
Sabah to seek federal allocation to repair collapsed Taman Kinabalu car park after landslide, says deputy CM


45 minutes ago
MCMC urges public to report spread of fake news


52 minutes ago
Johor police: Rusty hand grenade discovered in Skudai


1 hour ago
Covid-19: Three Malaysians among new community cases in Singapore


2 hours ago
Police patrol Penang schools to ensure SOP followed




MOST READ

MALAYSIA / 14 hours ago
Group says Covid-19 frontliner died due to...


MALAYSIA / 7 hours ago
Anwar reveals bipartisan appeal for...


MALAYSIA / 9 hours ago
Hamzah's office says minister receiving...


MALAYSIA / 5 hours ago
Malaysia's new Covid 19 cases shoot past...


1/20/2021                    Case 1:18-cr-00538-MKB   Document 61-3   Filed 03/22/21   Page 3 of 6 PageID #: 1080

Notifications Powered By

On December 12, 2018, the Malaysian government via the Attorney General's Chambers filed an application on behalf of the US government to extradite Ng to the US to face three criminal charges related to 1MDB.

On December 19, 2018, Ng pleaded not guilty in the Sessions Court here to four counts of abetting Goldman Sachs over the sale of 1MDB bonds totalling US$6.5 billion (RM26.71 billion) by leaving out material facts and making false statements.

Tan said his client plans to defend the charges against him in a court of the Eastern District of New York on its merits.

"Thirdly, the respondent has reached an agreement with the Department of Justice of the United States for bail and the terms thereof," he said without elaborating on the bail and terms.

"Fourthly and finally, the respondent requests that he be returned to the United States within 30 days," he added.

When asked to confirm this, Ng confirmed voluntarily agreeing to the waiver.

Following the procedures under Section 22(1)(b) of the Extradition Act 1992, the judge then informed Ng that his waiver would require he be imprisoned here pending the home minister's issuance of a warrant to return him to the US.

As required under Section 22(1)(b), the judge also told Ng was not eligible to apply for habeas corpus to challenge the incarceration, and that he would be tried for offences that led to the extradition request upon his return to the US.

As for Tan's request for his client to be returned to the US within one month, DPP Faizal Aswad Masri highlighted the maximum three-month timeframe provided under the law.

"The timeframe is given under Section 43 of the Extradition Act, they can ask to expedite the matter, it's up to the process and up to the minister of home affairs," he said.

Under Section 43, the maximum period given is three months, where a person can be discharged if he is not sent out of Malaysia within three months of being committed of being committed to prison while waiting to be returned to any country.

The judge said he would expedite the process initiated to have Ng returned to the US, and committed the former banker to prison pending his return to the US.

Yesterday, another of Ng's lawyers, Marc Agnifilo, was reported saying Ng was discontinuing his fight against the extradition and intended to defend himself before a US court.

Ng was arrested by Malaysian police on November 1, 2018 pursuant to a provisional arrest warrant issued at US' request, and has been detained since then.

On the same day Ng was arrested, three counts of criminal indictments charging fugitive businessman Low Taek Jho and Ng were unsealed in the federal court in New York, involving their alleged conspiracy to launder of dollars embezzled from 1MDB and alleged conspiracy to

MOST READ



**MALAYSIA** / 14 hours ago
Group says Covid-19 frontliner died due to...



**MALAYSIA** / 7 hours ago
Anwar reveals bipartisan appeal for...



**MALAYSIA** / 9 hours ago
Hamzah's office says minister receiving...



**MALAYSIA** / 5 hours ago
Malaysia's new Covid 19 cases shoot past...

‹  ›

https://www.malaymail.com/news/malaysia/2019/02/15/lawyer-tells-court-ex-goldman-banker-now-accepts-extradition/1723257

A-130

Notifications Powered By ·

Ng was also charged then in the US with conspiring to violate the law by circumventing the internal accounting controls of Goldman Sachs when he was working there as a managing director.

On December 12, 2018, the Malaysian government via the Attorney General's Chambers filed an application on behalf of the US government to extradite Ng to the US to face three criminal charges related to 1MDB.

On December 19, 2018, Ng pleaded not guilty in the Sessions Court here to four counts of abetting Goldman Sachs over the sale of 1MDB bonds totalling US$6.5 billion (RM26.71 billion) by leaving out material facts and making false statements.

When met outside the courtroom, lawyers Tan and Agnifilo declined to elaborate on the bail terms for their client as agreed by the US DoJ.

"We have an agreement in principle, the specifics of which I am not prepared to get into at this point," he told reporters.

Tan confirmed that no trial date has been fixed in the US for Ng, while also saying that March 18 has been fixed for mention in the Sessions Court in Kuala Lumpur for the criminal charges that Ng is facing.

When asked how Ng's return to the US would affect his case in Malaysia, Tan replied: "I think that's up to the government of Malaysia, what they want to do."

When highlighted that a return to US for Ng within 30 days would be ahead of the Malaysian court date, Tan said: "It really doesn't make a difference. It's only for mention. March 18 is not the trial date, it's just the mention date."

Tan confirmed that Ng has been in prison for 114 days while pending the extradition proceedings, also saying that his client's health was in better condition than previously.

Tan declined comment when asked if his client feels that he would get a fairer trial in the US compared to Malaysia.

Agnifilo explained that his client's waiver of the extradition was akin to him starting afresh in proceedings in the US, without having Malaysian procedures relating to the treaty between the US and Malaysia being tacked along.

"So what he has essentially done is he has waived all of those rights and protections to go to the United States fresh and so we will start the US proceedings fresh without any of the procedures in place," he said.

YOU MAY ALSO LIKE



Only RM70 Electricity Bill With 6 Airconds

MOST READ

**MALAYSIA** / 14 hours ago
Group says Covid-19 frontliner died due to...



**MALAYSIA** / 7 hours ago
Anwar reveals bipartisan appeal for...



**MALAYSIA** / 9 hours ago
Hamzah's office says minister receiving...



**MALAYSIA** / 5 hours ago
Malaysia's new Covid 19 cases shoot past...



1/20/2021

Notifications Powered By



You can suspend Parliament, so why not delay building RM35m halls in Johor? PKR Youth tells Muhyiddin | Malay Mail



Did beer chuggers at Likas Covid-19 quarantine centre have inside help? Cops on...



Police patrol Penang schools to ensure SOP followed | Malay Mail

Permai package: PM announces improved wage subsidy programme, SIP Prihatin extension | Malay Mail

Ismail Sabri: Increasing interstate, inter-district travel violations during...

Malaysian workers in Singapore start getting Pfizer's Covid-19 vaccine...

### Related Articles

- [1MDB audit report trial postponed to Feb 22 due to MCO](#)
- [Prosecution asks High Court to warn Najib against attacking 1MDB trial witness Zeti on social media](#)
- [Zeti denies 'false and malicious' claims her family benefited from 1MDB funds](#)

## News

MALAYSIA

SINGAPORE

WORLD

MONEY

LIFE

EAT/DRINK

SHOWBIZ

MOST READ

## About

OPINION

WHAT YOU THINK

SPORTS

TECH/GADGETS

DRIVE

VIDEOS

COVID-19

ARCHIVES

ABOUT US

PRIVACY POLICY

TERMS OF USE

ADVERTISE WITH US

## Download

## Subscribe to Newsletter

Name

Email

SUBSCRIBE

MALAYSIA / 14 hours ago
Group says Covid-19 frontliner died due to...



MALAYSIA / 7 hours ago
Anwar reveals bipartisan appeal for...



MALAYSIA / 9 hours ago
Hamzah's office says minister receiving...



MALAYSIA / 5 hours ago
Malaysia's new Covid 19 cases shoot past...



‹ ›

**A-132**

1/20/2021

Notifications Powered By

MOST READ

**MALAYSIA** / 14 hours ago
Group says Covid-19 frontliner died due to...


**MALAYSIA** / 7 hours ago
Anwar reveals bipartisan appeal for...


**MALAYSIA** / 9 hours ago
Hamzah's office says minister receiving...


**MALAYSIA** / 5 hours ago
Malaysia's new Covid 19 cases shoot past...


**A-133**

# EXHIBIT 4

Thursday, January 14, 2021 at 2:11:38 PM Eastern Standard Time

**Subject:** Re: Mr. Ng
**Date:** Thursday, February 14, 2019 at 10:17:01 PM Eastern Standard Time
**From:** Marc Agnifilo
**To:** Kasulis, Jacquelyn (USANYE)
**CC:** Nielsen, Katherine (CRM), Ambuehl, Jennifer (CRM), Jacob Kaplan, Teny Geragos

Waiver has been made. All done.

Sent from my iPhone

On Feb 15, 2019, at 8:34 AM, Marc Agnifilo ███████████ wrote:

> Hi everyone. A few things.
>
> First, as I noted, roger will waive extradition this morning.
>
> Second, once he waives, do you have a sense of timing.  I hope to have the conditions in place very soon.
>
> Third, would you be amenable to permitting his wife to come to the US at some point. I'm assuming she is not a subject but this is not something I have discussed yet with you guys.
>
> That's it for right now.
>
> Marc
>
> Sent from my iPhone
>
> On Feb 14, 2019, at 11:27 PM, Kasulis, Jacquelyn (USANYE) ███████████ wrote:
>
>> Marc - just checking in. We're you able to meet with Roger?
>>
>> Best,
>> Jackie
>>
>> On Feb 12, 2019, at 8:20 PM, Nielsen, Katherine (CRM) ███████████ wrote:
>>
>>> Marc,
>>>
>>> Please find attached the final approved letter, as discussed last week.
>>>
>>> Best regards,
>>>
>>> Kate Nielsen
>>> Trial Attorney
>>> Fraud Section, Criminal Division
>>> ███████████

**A-135**

From: Marc Agnifilo ███████████████████
Sent: Monday, February 11, 2019 11:27 PM
To: Kasulis, Jacquelyn (USANYE)
Cc: Ambuehl, Jennifer (CRM)

Nielsen, Katherine (CRM)

Jacob Kaplan                                    ; Teny Geragos

Subject: Re: Mr. Ng

Guys. A couple of things.

First, do you think you will have a written, approved position as to Roger's release
conditions prior to Friday morning Malaysia time. We went through them on the phone
and they are clear but I know there are certain approvals pending and there is an
advantage to having the government's position in writing.

Second, an application has been made for me to get into the jail to see roger on
Wednesday and Thursday. The jail still has not given approval. I understand that you
don't necessarily have tremendous sway with the Malaysian jails but if there is some way
of pushing this over the edge, that would be helpful.

That's all for now. Thank you.

I may be hard to reach. But if you can communicate with me, Jacob and Teny, I will
certainly get the messages. Thanks again.

Marc
Sent from my iPhone

On Feb 7, 2019, at 1:54 PM, Kasulis, Jacquelyn (USANYE)
████████████████████████████████████████████wrote:
How about 2:30 pm?

On Feb 7, 2019, at 12:33 PM, Marc Agnifilo

████████████████████████████████████████████

Just left mdc. How is 2 pm?

Sent from my iPhone

On Feb 7, 2019, at 9:18 AM, Kasulis, Jacquelyn (USANYE)

████████████████████████████████████████████

wrote:

Hi, Marc. I hope you're well. Do you have time this afternoon or tomorrow morning to
walk through over the phone the agreement that we're working on regarding Roger's
waiver of extradition? It's still going through the approval process on our end, so we
can't send it to you, but we want to make sure there are no major issues from your
perspective before we get final sign off.

Page 2 of 4

**A-136**

Thank you,
Jackie

From: Marc Agnifilo
<mailto

Sent: Tuesday, February 5, 2019 11:14 AM
To: Ambuehl, Jennifer (CRM)

Cc: Kasulis, Jacquelyn (USANYE)

Subject: Re: Mr. Ng

Great. Thank you.
Sent from my iPhone

On Feb 5, 2019, at 8:32 AM, Ambuehl, Jennifer (CRM)



**A-137**



**A-138**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 18 Cr. 00538 (MKB) (S-1) |
| - v. - | |
| NG CHONG HWA a.k.a. Roger Ng, | **AFFIRMATION OF<br>TENY R. GERAGOS, ESQ.** |
| Defendant. | |

I, TENY R. GERAGOS, hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am an Associate at Brafman & Associates, P.C., counsel to defendant Ng Chong Hwa ("Roger Ng") and am listed as counsel of record in the case of <u>United States v. Ng Chong Hwa</u> together with Marc Agnifilo, Esq., Jacob Kaplan, Esq., and Zach Intrater, Esq. (Dkts. 17, 18, 19, 57).

2.  I make this Affirmation based on my first-hand involvement in the events discussed, a review of court records of proceedings both in the United States and Malaysia, conversations with Ng's Malaysian counsel, Datuk Tan Hock Chuan, and other information.

3.  This Affirmation relates to two telephone calls that Mr. Agnifilo and I had with the United States Attorney's Office on January 23, 2019, and February 7, 2019, prior to Mr. Ng's extradition to the United States to fight the charges brought against him.

4.  On January 23, 2019, I joined Mr. Agnifilo for the first phone call with Assistant United States Attorney Jacquelyn Kasulis. During our phone call with Ms. Kasulis, I took simultaneous notes of the conversation, which is part of my regular practice for all of my cases. These notes are attached as Exhibit 1. This conversation took place in the weeks before Mr.

**A-139**

Agnifilo traveled to Kuala Lumpur, Malaysia, to meet with Mr. Ng a second time to facilitate Mr. Ng's extradition to the United States.

5.      During this phone call, Mr. Agnifilo and Ms. Kasulis discussed, among other topics, potential suretors to secure Mr. Ng's bail in the United States.

6.      Next, and most relevant here, Ms. Kasulis explained the mechanics of Mr. Ng's extradition. Ms. Kasulis stressed to Mr. Agnifilo that the extradition "would have to be a waiver" and not "consent because under the treaty, [if Mr. Ng consented] he would have to remain in custody." (Exhibit 1 at 1.)

7.      Mr. Agnifilo responded that he would be traveling to Kuala Lumpur for the February 15, 2019, court hearing and that he intended to go to Malaysia the week prior to the hearing to sort out the mechanics of the extradition. Mr. Agnifilo also asked Ms. Kasulis if that U.S. Attorney's Office would consider "that the rule of specialty would apply even if [Mr. Ng] waives [extradition]." Ms. Kasulis responded that she would have to take that back, but that she would get back to us. (Id.)

8.      On February 7, 2019, Mr. Agnifilo and I had a telephone call with the Department of Justice, with Ms. Kasulis and Katherine Nielson, Trial Attorney in the DOJ Fraud Section. (See Ex. 2, 2/7/19 Notes.) This call was organized by Ms. Kasulis who emailed Mr. Agnifilo asking: "Do you have time this afternoon or tomorrow morning to walk through over the phone the agreement that we're working on regarding Roger's waiver of extradition?" (Agnifilo Affirmation, Ex. 1 at p. 2 (Kasulis 2/7/19 9:18 AM EST Email).) As is my regular practice with all cases (as stated above), I simultaneously took notes of this phone call.

9.      This call began at approximately 2:30 PM EST, with Ms. Nielsen speaking for the DOJ. She stated that the agreement that the DOJ (meaning the Eastern District of New York and

the Money Laundering and Fraud Section of the DOJ) was willing to enter into with Mr. Ng required him to "waiv[e] extradition before [the] 15th of February." (Ex. 2.) My shorthand notes read "not detained, tried, punished only ind. On Oct. 15th." (Id.) Though my notes are shorthand, I understand my notes to mean that Ms. Nielsen was promising that Mr. Ng would further "not [be] detained" and would only be "tried [and] punished only on" the Original Indictment in this case, which was unsealed in October 2018. Ms. Nielsen further stated that Mr. Ng could be tried on any offense Mr. Ng committed within the EDNY after he was extradited here. Ms. Nielsen further stated that if Mr. Ng left after the waiver and voluntarily returned, then the agreement between DOJ and him would be void. (Id.)

10.   The government went on to discuss Mr. Ng's terms of detention. Ms. Nielsen ended the conversation by telling Mr. Agnifilo that the "waiver of ext[radition]" needed to be "on the record in court in [Kuala Lumpur]." (Id.)

Dated:      January 22, 2021
            New York, NY

_____
Teny R. Geragos, Esq.

3

**A-141**

# EXHIBIT 1

DATE  1/23/19

PURPOSE  Ng call w/ G014

MA / TRG

CUT COLUMN                    NOTES

JK



MA

③ mechanics on extradition - would have to be a _waiver_ vs.
   consent b/c under the treaty, consent would have to remain in
① Feb 15 court hearing                                    custody
   MA wants to go wk before to sort out
② would USAO consider that the rule of speciality
   would apply even if waives?
   JK will take it back & get back to us.

rule of specialty     can't change charges at all

SUMMARY

**A-143**

# EXHIBIT 2

DATE 2/7/19    2:30pm
PURPOSE Ng
Katherine Neilson

CUE COLUMN

agreement

NOTES

· EDNY w/ ML & Fraud Section
· waiving extradition before 15th of Feb.
· not detained, tried, punished only ind. on Oct. 15th
· any offense AFTER w/m EDNY
· if leaves after waiver & voluntarily returns
    then agreement void

waiver of ext.

· need it on the record in court in KL

SUMMARY

**A-145**

Clerk's Office
Filed Date:  12/20/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

LOW TAEK JHO,
      also known as "Jho Low," and
NG CHONG HWA,
      also known as "Roger Ng,"

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

1:18-cr-00538(MKB)(RER)

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. <u>18-538 (S-2) (MKB)</u>
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
  982(a)(1), 982(b), 1956(h) and 3551
  <u>et</u> <u>seq.</u>; T. 21, U.S.C., § 853(p); T. 28,
  U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

          At all times relevant to this Superseding Indictment, unless otherwise

indicated:

I.    <u>The Defendants</u>

          1.    LOW TAEK JHO, also known as "Jho Low," ("LOW" or "JHO

LOW") was a Malaysian national who advised on the creation of Terengganu Investment

Authority ("TIA"), the predecessor entity to 1Malaysia Development Berhad ("1MDB"),

Malaysia's state-owned and state-controlled investment development company.   LOW

worked as an intermediary in relation to 1MDB and other foreign government officials on

numerous financial transactions and projects involving The Goldman Sachs Group, Inc.

("Goldman Sachs Group") and its subsidiaries and affiliates, and others, though he did not

hold a formal position at 1MDB nor was he ever employed by the Governments of Malaysia

or Abu Dhabi.

2.     NG CHONG HWA, also known as "Roger Ng," ("NG" or "ROGER

NG") was a Malaysian national who was employed as a Managing Director by various

subsidiaries of Goldman Sachs Group and acted as an agent and employee of Goldman Sachs

Group from approximately 2005 to May 2014.   NG also owned stock in Goldman Sachs

Group.   NG was thus an "employee," "agent" and "stockholder" of an "issuer" within the

meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code,

Section 78dd-1(a).

II.     Relevant Entities and Individuals

A.     The Goldman Sachs Group

3.     Goldman Sachs Group was a global investment banking, securities and

investment management firm incorporated in Delaware and headquartered in New York, New

York.   Goldman Sachs Group had a class of securities registered pursuant to Section 12 of

the Securities and Exchange Act of 1934 (Title 15, United States Code, Section 78l) (the

"Exchange Act") and was required to file reports with the U.S. Securities and Exchange

Commission under Section 15(d) of the Exchange Act (Title 15, United States Code, Section

78o(d)).   As such, Goldman Sachs Group was an "issuer" within the meaning of the FCPA,

Title 15, United States Code, Section 78dd-1(a).   Goldman Sachs Group conducted its

activities primarily through various subsidiaries and affiliates (collectively referred to herein

as "Goldman"), including those that employed the defendant ROGER NG and some of his co-

conspirators, including Co-Conspirator #1.[1]

---

[1]     The identities of Co-Conspirator #1 and all other anonymized entities and individuals
discussed herein are known to the Grand Jury.

**A-147**

B.    1MDB and Other Relevant Entities

4.    1MDB was a strategic investment and development company wholly owned and controlled by the Government of Malaysia through its Ministry of Finance ("MOF").   It was formed in or around 2009, when the Malaysian government took federal control of TIA, which had previously been the sovereign wealth fund of the state of Terengganu in Malaysia.   1MDB was created to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund these investments.   1MDB's development projects were focused in the areas of energy, real estate, tourism and agribusiness.   1MDB was overseen by senior Malaysian government officials, was controlled by the Government of Malaysia and performed a government function on behalf of Malaysia.   Malaysian Official #1, further described below, was a high-ranking official in the Malaysian government and the MOF with high-level authority to, among other things, approve and influence 1MDB business decisions.   1MDB was thus an "instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

5.    Foreign Agency A was an investment fund wholly owned by the Government of Abu Dhabi.   It was established by the Government of Abu Dhabi pursuant to an Emiri Decree in or around 1984, with a mandate to advance Abu Dhabi's natural petroleum wealth for the development of the emirate.   Foreign Agency A was overseen by senior Abu Dhabi government officials, was controlled by the Government of Abu Dhabi, which appointed all the members of Foreign Agency A's board of directors, and performed a government function on behalf of Abu Dhabi.   Foreign Agency A was thus an

4

"instrumentality" of a foreign government within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

6.      Foreign Investment Firm A, a subsidiary of Foreign Agency A, was a private joint stock company incorporated under the laws of Abu Dhabi.

7.      Silken Waters Enterprise Limited Incorporated was a shell company incorporated in the British Virgin Islands on or about April 23, 2012, the name of which was subsequently changed on or about July 26, 2012 to Victoria Square Capital Limited ("Silken Waters / Victoria Square").   On or about May 24, 2012, a bank account in the name of Silken Waters / Victoria Square was opened at a bank in Singapore (the "Silken Waters / Victoria Square Account"), and the beneficial owner of the account was listed as a relative of the defendant ROGER NG.

8.      Capital Place Holding Company ("Capital Place") was a shell company incorporated in the British Virgin Islands that was owned by Co-Conspirator #1, defined below, and was controlled by both Co-Conspirator #1 and his close relative.   Capital Place had a bank account at a bank in Hong Kong (the "Capital Place Account").

C.      Other Relevant Individuals

9.      Co-Conspirator #1 was employed by various subsidiaries, and acted as an agent and employee, of Goldman Sachs Group between in or around 1998 and in or around February 2016.   Prior to his separation from Goldman in or around February 2016, Co-Conspirator #1 was the Southeast Asia Chairman and a Participating Managing Director ("PMD") of Goldman Sachs Group.   Co-Conspirator #1 was thus an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

10.     Co-Conspirator #2 was a U.S. citizen who was a high-ranking official of Foreign Investment Firm A from at least in or around 2012 until in or around 2014.

11.     Co-Conspirator #3 was a Malaysian national who was a close relative of Malaysian Official #1 and owned U.S. Motion Picture Company #1, a U.S. legal entity in the business of film production.

12.     Co-Conspirator #4 was employed by at least one Goldman subsidiary, and acted as an agent and employee of Goldman.   In or about and between October 2007 and November 2018, Co-Conspirator #4 served as a PMD and, during the relevant time period, held various leadership positions in Goldman's Asia operations.   Co-Conspirator #4 was thus an "employee" and "agent" of an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

D.     <u>Foreign Government Officials</u>

13.     1MDB Official #1 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).   1MDB Official #1 served as one of the principal points of contact between 1MDB and Goldman in connection with 1MDB business.

14.     1MDB Official #2 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #2 was thus a "foreign official" within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

15.     1MDB Official #3 was a high-ranking official of 1MDB from at least in or around 2012 until in or around 2014.   1MDB Official #3 was thus a "foreign official"

within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and

78dd-3(f)(2)(A).   1MDB Official #3 served as one of the principal points of contact between

1MDB and Goldman in connection with 1MDB business.

16.   Malaysian Official #1 was a Malaysian national and high-ranking

official of the Malaysian government and the MOF from in or around at least 2009 until in or

around 2018, with high-level authority to approve 1MDB business decisions.   Malaysian

Official #1 was thus a "foreign official" within the meaning of the FCPA, Title 15, United

States Code, Sections 78dd-1(f)(1)(A) and 78dd-3(f)(2)(A).

17.   Abu Dhabi Official #1 was a high-ranking official of Foreign Agency

A between at least in or around 2012 until in or around 2014, and a high-ranking official of

Foreign Investment Firm A.   Abu Dhabi Official #1 was thus a "foreign official" within the

meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-

3(f)(2)(A).

III.   The Criminal Scheme

A.   Overview

18.   1MDB was created to pursue investment and development projects for

the economic benefit of Malaysia and its people.   However, between approximately 2009

and 2014, billions of dollars were misappropriated and fraudulently diverted from 1MDB

through various means, in part for the purpose of paying bribes to foreign officials.   The

defendants JHO LOW, ROGER NG, Co-Conspirator #1 and others conspired to launder the

proceeds of that criminal conduct in and through the U.S. financial system.   These laundered

funds were used, in among other ways, to pay bribes to obtain and retain business for

Goldman, and for the personal benefit of the co-conspirators and their relatives and

associates, including, among other things, for the purchase of luxury residential real estate in the United States and artwork from an auction house in New York, New York, and the funding of major Hollywood films.

19.    The defendants JHO LOW and ROGER NG, while NG was acting within the scope of his employment as an employee and agent of Goldman Sachs Group, and as a stockholder thereof acting on behalf of Goldman Sachs Group, with the intent, at least in part, to benefit Goldman, together with others, conspired to obtain and retain business from 1MDB for Goldman through the promise and payment of bribes to government officials in Malaysia and Abu Dhabi.   LOW, NG, Co-Conspirator #1 and others also conspired to launder funds embezzled from 1MDB, some of which were used to pay bribes to government officials in Malaysia and Abu Dhabi, through financial systems in the United States and elsewhere.   As part of the scheme, LOW, NG, Co-Conspirator #1 and others used LOW's close personal relationships with government officials in Abu Dhabi and Malaysia, including LOW's relationship with Malaysian Official #1, to obtain and retain 1MDB business for Goldman through the promise and payment of bribes to these government officials.

20.    In the course of the scheme, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, Co-Conspirator #4 and others obtained and retained 1MDB business for Goldman, including three bond offerings that raised a total of approximately $6.5 billion for 1MDB in 2012 and 2013.   These three bond offerings and related transactions ultimately earned Goldman approximately $600 million in fees and revenue and resulted in NG, Co-Conspirator #1, Co-Conspirator #4 and others receiving large bonuses from Goldman and enhancing their professional reputations at Goldman.

8

21.     Although the stated purpose of the approximately $6.5 billion raised by the three bond transactions was to support 1MDB projects for the benefit of the Malaysian people, more than $2.7 billion was instead misappropriated by the defendants JHO LOW and ROGER NG and others and distributed, in part, as bribes and kickbacks to government officials in Malaysia and Abu Dhabi, including 1MDB Official #1, 1MDB Official #2, 1MDB Official #3, Malaysian Official #1 and Abu Dhabi Official #1 and their families, including Co-Conspirator #3, as well as to other co-conspirators, including NG, LOW, Co-Conspirator #1 and their families.

22.     In order to get the deals, the defendant ROGER NG also conspired with other employees and agents of Goldman Sachs Group, including Co-Conspirator #1 and Co-Conspirator #4, to knowingly and willfully circumvent the internal accounting controls of Goldman Sachs Group in connection with the three 1MDB bond transactions and other 1MDB business.   Goldman Sachs Group's internal accounting controls were overseen and enforced by Goldman Sachs Group's compliance function (the "Compliance Group") and part of its legal department, referred to internally as the "Business Intelligence Group" (the "Intelligence Group").   These groups worked in conjunction with, and as part of, various committees in reviewing transactions, including the three 1MDB bond deals, for approval. However, the business culture at Goldman, particularly in Southeast Asia, was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions.

23.     The defendant ROGER NG, Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group knew that the defendant JHO LOW played a central role in the bond transactions, including by acting as an intermediary between

Goldman, 1MDB and other Malaysian and Abu Dhabi government officials.   NG, Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group also knew that bribes had been promised to these officials to secure 1MDB business for Goldman and that NG and Co-Conspirator #1 would themselves personally profit from the deals.   NG, Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group conspired to conceal that and other information from Goldman Sachs Group's Compliance Group and Intelligence Group to prevent those groups from attempting to stop Goldman from participating in the lucrative transactions.   Based on, among other things, their experience at Goldman and in the region, the willingness of co-conspirators and colleagues to assist them, the high fees that the 1MDB deals would generate for Goldman if the deals were successful, and a system of internal accounting controls at Goldman Sachs Group that could be easily circumvented, NG, Co-Conspirator #1, Co-Conspirator #4 and others believed that they would have, and they in fact did have, repeated success in concealing LOW's involvement from, and pushing these deals through, Goldman Sachs Group's control functions to obtain very lucrative business for Goldman, themselves and others.

> B.   The Defendant ROGER NG and Co-Conspirator #1 Began to Conspire to Circumvent Goldman Sachs Group's Internal Accounting Controls and Win Business for Goldman

24.   Beginning in or around 2009, the defendant ROGER NG began to conspire with Co-Conspirator #1 and others to circumvent Goldman Sachs Group's internal accounting controls and win business for Goldman.   At the time, NG and Co-Conspirator #1 were both employees and agents acting within the scope of their employment on behalf of Goldman Sachs Group, and NG as a stockholder thereof acting on behalf of Goldman Sachs

Group, with the intent, at least in part, to benefit Goldman, and they collaborated on the creation of, and potential fundraising for, TIA, while knowing that the defendant JHO LOW was an adviser for TIA.   While working on this deal, NG and Co-Conspirator #1 selectively disclosed to other employees of Goldman that they were working with LOW as an intermediary to secure the deal, because they knew that disclosure more widely could have triggered steps to be taken by certain personnel within the Compliance Group and the Intelligence Group to investigate the business relationship with LOW and possibly jeopardize the deal.

25.   During the course of the TIA transaction and afterwards, the defendants JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others to develop business for Goldman, including with TIA's successor entity, 1MDB.   Notwithstanding LOW's public denials about any involvement with 1MDB during this time, NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group knew that LOW remained close to various 1MDB officials and government officials in Abu Dhabi and Malaysia, including Malaysian Official #1, and worked with LOW for that reason.   During the course of his work with NG and Co-Conspirator #1, LOW also specifically requested that NG, Co-Conspirator #1 and others conceal his involvement in 1MDB and Goldman's business, and NG, Co-Conspirator #1 and others continued to conspire to conceal LOW's involvement in their efforts to obtain and retain 1MDB business for Goldman from the Compliance Group and the Intelligence Group.

26.   Between in or around September 2009 and in or around March 2011, the defendant ROGER NG, Co-Conspirator #1 and others supported at least two attempts to make the defendant JHO LOW a formal client of Goldman.   NG and Co-Conspirator #1

supported these efforts because, in part, they believed that LOW would work to deliver

lucrative business deals, including from 1MDB, for the ultimate benefit of Goldman, NG,

Co-Conspirator #1 and others.   Ultimately, these attempts were unsuccessful because certain

personnel at Goldman within the Compliance Group and the Intelligence Group refused to

approve the business relationship between LOW and Goldman based, in part, on concerns

that they had about the source of LOW's wealth.   Personnel within the Compliance Group

and the Intelligence Group communicated the rejection of LOW's application to Goldman to

NG, Co-Conspirator #1 and others.   Notwithstanding their knowledge about the concerns

that had been raised by the Compliance Group and the Intelligence Group about LOW not

being a suitable client for Goldman, NG and other employees and agents of Goldman Sachs

Group, including Co-Conspirator #1, continued to conspire with LOW based upon their

belief that LOW would help ensure that government officials within Malaysia, including at

1MDB, and within Abu Dhabi would deliver lucrative business deals to Goldman.

     C.    <u>The Defendants JHO LOW and ROGER NG, Together with Others, Won</u>
            <u>Business for Goldman Through the Payment of Bribes and Kickbacks</u>

     27.    From approximately 2012 through approximately 2014, the defendants

JHO LOW and ROGER NG conspired with Co-Conspirator #1 and others with the intent, at

least in part, to obtain and retain business from 1MDB for the benefit of Goldman through

the promise and payment of bribes to government officials in Malaysia and Abu Dhabi using,

in part, funds misappropriated and embezzled from the 1MDB bond transactions.   During

this time, and through the course of the scheme, LOW, NG, Co-Conspirator #1 and others

laundered hundreds of millions of dollars in funds misappropriated and embezzled from

1MDB and used some of those funds to pay millions of dollars in bribes to government

officials to obtain 1MDB business for Goldman, in particular, three bond offering transactions underwritten by Goldman for 1MDB referred to as "Project Magnolia," "Project Maximus" and "Project Catalyze."

PROJECT MAGNOLIA

28.     On or about January 23, 2012, the defendant JHO LOW sent an email to the defendant ROGER NG, Co-Conspirator #1 and a high-ranking 1MDB official to introduce NG and Co-Conspirator #1 to the high-ranking 1MDB official for purposes of discussing the purchase of an asset by 1MDB.   In the email, LOW stated, "[p]lease exclude me from the e-mail list going forward."

29.     In or around early 2012, the defendants JHO LOW and ROGER NG met in Malaysia with Co-Conspirator #1, 1MDB Official #1, 1MDB Official #3 and others. The purpose of the meeting was to discuss 1MDB's proposed purchase of a Malaysian energy company ("Malaysian Energy Company A"), and Goldman's ability to assist in obtaining financing for the purchase, among other things.   During that meeting, NG, Co-Conspirator #1 and others discussed with LOW, among other things, the type of guarantee that 1MDB needed to obtain to make the bond issuance acceptable to Goldman and ultimately agreed on the suitability of a guarantee from Foreign Agency A.   NG, Co-Conspirator #1 and others understood that LOW was acting as an intermediary between 1MDB, Malaysian Official #1 and other government officials from Abu Dhabi.

30.     In or around late February 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss the proposed financing.   During this meeting, LOW explained that to obtain the necessary support for the financing and the guarantee from Foreign Agency A discussed at the prior meeting with NG,

**A-157**

Co-Conspirator #1 and others, they would have to pay bribes to government officials in Malaysia and Abu Dhabi, including to Malaysian Official #1 and a high-ranking Abu Dhabi government official, to gain their approval for portions of the transaction.   After the meeting, it was understood that Goldman would be engaged by 1MDB to act as an adviser and arrange the purchase and financing of Malaysian Energy Company A.

31.    Following the February 2012 meeting, the defendant ROGER NG told Co-Conspirator #4 about the plan to pay bribes to government officials in Malaysia and Abu Dhabi.,  NG understood and agreed with Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group not to disclose this information to personnel within the Compliance Group, the Intelligence Group or the committees within Goldman that would review this proposed bond issuance and other 1MDB transactions.

32.    In or around March 2012, 1MDB selected Goldman to be the sole bookrunner and arranger for the $1.75 billion bond deal, guaranteed by Foreign Agency A, and designed, in part, to pay for the acquisition of Malaysian Energy Company A.   This transaction was referred to internally at Goldman as "Project Magnolia."

33.    Following Goldman's formal engagement to work on Project Magnolia, the defendant ROGER NG continued to conspire with Co-Conspirator #1, Co-Conspirator #4 and others, including other employees and agents of Goldman Sachs Group, to work with the defendant JHO LOW on the transaction.

34.    In or around early March 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1, various 1MDB officials and others traveled to Abu Dhabi for meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss the guarantee for Project Magnolia.   Throughout that time, NG knew that LOW arranged the

**A-158**

meetings with the officials of Foreign Agency A and Foreign Investment Firm A, and that some of these officials, among others, would be paid bribes by LOW, or at his direction, to influence the approval of the guarantee.

35. During this same time, in an effort to win and retain the bond deal to finance the purchase of Malaysian Energy Company A, the defendant JHO LOW also enlisted the assistance of various 1MDB officials with the promise of remuneration. For example, on or about March 8, 2012, 1MDB Official #1 and LOW discussed 1MDB's acquisition of Malaysian Energy Company A via an online chat, during which chat LOW stated he would "[g]ive [1MDB Official #1] big present" when the transaction was done. In the same chat, LOW further instructed 1MDB Official #1 to delete at least one email and other documents he had sent to 1MDB Official #1, and stated "delete from email and destroy once done." Additionally, LOW informed Co-Conspirator #1 that 1MDB Official #3 was being paid a bribe for her assistance in obtaining and retaining the bond deal.

36. The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others also knew that LOW intended to pay and cause to be paid bribes to foreign officials in Malaysia and Abu Dhabi to influence those officials to obtain the necessary approvals and any additional assistance to execute Project Magnolia for Goldman.

37. On or about May 20, 2012, Co-Conspirator #1 sent an email asking his close relative for the account details for the Capital Place Account. Co-Conspirator #1 wrote, "[b]est if they are US$ accounts. We should also tell the bank that we will receive a transfer."

38. On or about May 21, 2012, the bond deal known as Project Magnolia closed, earning significant fees for Goldman, and resulting in large year-end bonuses paid by

Goldman to the defendant ROGER NG, Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group who participated in obtaining and structuring the bond deal.   NG and other employees and agents of Goldman Sachs Group intentionally structured Project Magnolia, and future transactions, as bond deals rather than other forms of financing because doing so generated much higher revenues and fees for Goldman, improved the bank's reputational standing in both the Southeast Asia region and globally and provided NG and other bankers with increased remuneration and professional prestige, even though the bond financing was more expensive for 1MDB.

39.     Goldman transferred part of the proceeds of the Project Magnolia bond offering via wire to 1MDB's wholly-owned subsidiary from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.

40.     On or about May 22, 2012, approximately $577 million of the bond proceeds were transferred from the account of 1MDB's wholly-owned subsidiary to an account at Foreign Financial Institution A in the name of a company incorporated in the British Virgin Islands with a name similar to Foreign Investment Firm A (the "Shell Company Account #1"), but which was not in fact associated with Foreign Investment Firm A.   Although the signatories on the Shell Company Account #1 were Abu Dhabi Official #1 and Co-Conspirator #2, the defendant JHO LOW and another co-conspirator controlled the Shell Company Account #1.

41.     On or about May 25, 2012, approximately $295 million was transferred via wire from the Shell Company Account #1 to an account at a foreign bank in the name of

a shell company beneficially owned and controlled by the defendant JHO LOW and a co-conspirator (the "Shell Company Account #2").

42.     Within three months of the closing of Project Magnolia, millions of dollars of bond proceeds that had been transferred to the Shell Company Account #2 were transferred into the Capital Place Account, and these funds were transferred via wire to and from the United States.   Approximately $24 million of these funds were subsequently transferred to the Silken Waters / Victoria Square Account.

43.     Within one month of the closing of Project Magnolia, approximately $133 million of the bond proceeds that had been funneled into the Shell Company Account #1 was then transferred to an account at Foreign Financial Institution A opened in the name of a company incorporated in the British Virgin Islands and beneficially owned and controlled by Co-Conspirator #3, a close relative of Malaysian Official #1 (the "Shell Company Account #3").   Between on or about June 20, 2012 and November 20, 2012, 11 wires totaling approximately $60 million were transferred from the Shell Company Account #3 to an account at U.S. Financial Institution #1 in Los Angeles, California (the "Holding Account #1").   The Holding Account #1 was owned and controlled by U.S. Motion Picture Company #1, a U.S. legal entity owned in part by Co-Conspirator #3 whose funds, among other things, were used to assist in the production of the film "The Wolf of Wall Street."

PROJECT MAXIMUS

44.     In or about May 2012, the defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others began to plan a second bond transaction, known internally at Goldman as "Project Maximus," which was designed, in part, to raise capital for 1MDB to purchase a second Malaysian power generation company.   LOW, NG, Co-Conspirator #1 and

others knew that LOW and others would and did pay bribes to influence Malaysian and Abu Dhabi officials to obtain the necessary approvals to execute the bond offering.  1MDB also awarded this bond offering, which was structured similarly to the first bond issuance, but with an indirect guarantee from Foreign Agency A to Goldman.

45.   As with Project Magnolia, while the defendant ROGER NG, Co-Conspirator #1, Co-Conspirator #4 and other employees and agents of Goldman Sachs Group continued to work with the defendant JHO LOW to acquire this business for Goldman and to execute the second bond issuance, they concealed LOW's involvement in the transaction from the Compliance Group and the Intelligence Group at Goldman for the same reasons that they concealed his involvement with Project Magnolia.

46.   The defendants JHO LOW and ROGER NG, Co-Conspirator #1 and others knew that a large portion of the proceeds of Project Maximus would be illegally diverted to themselves and others, including foreign government officials, through shell companies beneficially owned and controlled by themselves and others.   NG knew at the time that Malaysian Official #1, Abu Dhabi government officials and 1MDB officials, among others, would receive money from the proceeds of Project Maximus that passed through bank accounts of various shell companies beneficially owned and controlled by LOW and others, including Co-Conspirator #1 and his close relative, to influence those officials to execute the bond with Goldman.   In fact, NG provided direction to Co-Conspirator #1's close relative regarding the transfer of some of these funds.   Abu Dhabi Official #1 and Co-Conspirator #3, among others, received some of the funds traceable to the Project Maximus bond issuance.

47.     Project Maximus closed on or about October 17, 2012, raising approximately $1.75 billion for a 1MDB wholly-owned subsidiary, and resulting in substantial revenues and other fees for Goldman.   Goldman transferred part of the proceeds of Project Maximus via wire to the subsidiary of 1MDB from a place within the United States to and through a place outside of the United States, including through the Eastern District of New York.   Thereafter, some of the proceeds from the bond offering were diverted and transferred via wire to a place in the United States from and through a place outside of the United States, and from a place in the United States to and through a place outside of the United States, including through the Eastern District of New York.

48.     On or about October 19, 2012, two days after Project Maximus closed, approximately $790 million of the proceeds of the bond was transferred to and through a series of shell company accounts beneficially owned and controlled by the defendant JHO LOW and a co-conspirator.   Some of these funds were later transferred to the Capital Place Account and the accounts of Malaysian and Abu Dhabi officials, including various 1MDB officials.

49.     Within one week of Project Maximus closing, approximately $60 million of the bond proceeds was transferred to the Shell Company Account #3.   On or about November 14, 2012, an additional approximately $45 million of bond proceeds was transferred to the Shell Company Account #3.   Within approximately one day of the November 14, 2012 transfer, approximately $35.8 million was transferred from the Shell Company Account #3 to an account owned and controlled by U.S. Law Firm #1 based in New York, New York (the "U.S. Law Firm Account #1").   Nearly all of these funds were then transferred approximately four days later to an account owned and controlled by U.S.

Law Firm #2 based in New York, New York (the "U.S. Law Firm Account #2").   These

funds were used by Co-Conspirator #3 to acquire a condominium in New York, New York

that was beneficially owned by the defendant JHO LOW.

50.     Between on or about May 29, 2012 and November 30, 2012, the

defendant JHO LOW and others also caused the transfers via wire of approximately

$472,750,000 traceable to the Project Magnolia and Project Maximus bond proceeds from

the Shell Company Account #2 to an account at Foreign Financial Institution B in the name

of a company beneficially owned by Abu Dhabi Official #1 (the "Shell Company Account

#4").

51.     Between on or about May 29, 2012 and December 3, 2012, the

defendant JHO LOW and others also transferred via wire approximately $55 million

traceable to the Project Magnolia and Project Maximus bond proceeds from Shell Company

Account #2 to the account of a company at Foreign Financial Institution C beneficially

owned and controlled by Co-Conspirator #2 and a close relative of Co-Conspirator #2 (the

"Shell Company Account #5").

52.     The defendant ROGER NG knew that some of the bond proceeds from

Project Maximus were transferred by the defendant JHO LOW or at his request to Capital

Place Account in furtherance of the scheme.   Thereafter, LOW, Co-Conspirator #1 and

others caused some of these funds to be transferred to the accounts of 1MDB officials or

relatives of such officials, or to the accounts of shell companies beneficially owned and

controlled by 1MDB officials, including 1MDB Official #1 and 1MDB Official #2, in

exchange for their assistance in obtaining and retaining business for Goldman.

PROJECT CATALYZE

53.     In or about November 2012, despite having raised over $3 billion in the

prior 11 months, 1MDB sought to raise an additional $3 billion through a third bond issuance

known internally at Goldman as "Project Catalyze."   This bond issuance was purportedly

designed to fund 1MDB's portion of a joint venture with Foreign Investment Firm A.

Goldman was engaged on the project in or around early 2013 and again secured substantial

revenues and fees from the deal.

54.     As they had with the two prior 1MDB bond issuances, the defendant

ROGER NG, Co-Conspirator #1 and other employees and agents of Goldman Sachs Group

continued to work with the defendant JHO LOW as an intermediary between Goldman,

1MDB officials, Malaysian Official #1 and other foreign government officials, and they

continued to conceal this fact from the Compliance Group, the Intelligence Group and

committees at Goldman Sachs Group.   Further, although required by internal policies of

Goldman Sachs Group, the defendant ROGER NG failed to disclose that he and Co-

Conspirator #1 had received a portion of the funds diverted from the prior bond transactions

through LOW and that LOW, NG, Co-Conspirator #1 and others had caused bribes and

kickbacks to be paid to 1MDB officials and others who were involved in the transactions.

55.     The Project Catalyze bond issued on or about March 19, 2013.   By or

at the direction of the defendant JHO LOW, some of the approximately $3 billion raised by

this bond issuance was transferred to and through a series of transactions to the Capital Place

Account.   These misappropriated and embezzled funds were transferred via wire to a place

in the United States from and through a place outside of the United States, and from a place

in the United States to and through a place outside of the United States.   Some of these funds

were further transferred via wire to accounts in the name of entities beneficially owned and

controlled by 1MDB officials, including 1MDB Official #2 and 1MDB Official #3.   In or

about September 2013, more than $4 million of these funds were also transferred via wire

from the Capital Place Account to the Silken Waters / Victoria Square Account.   At or

around the same time, approximately $6.5 million was transferred from an account in the

name of Co-Conspirator #1's close relative to the Silken Waters / Victoria Square Account.

      56.      Within seven days of Project Catalyze closing, the defendant JHO

LOW and other co-conspirators caused the transfers via wire of approximately $1.2 billion in

funds traceable to Project Catalyze to a bank account at Foreign Financial Institution D in the

name of another shell company (the "Shell Company Account #6").   Within two months of

the closing of Project Catalyze, LOW caused a client account to be opened in the name of that

shell company ("Shell Company #6") at Art Auction House #1, an auctioneer of high-end

artworks based in New York, New York.   In approximately May 2013, at auctions held at Art

Auction House #1 in New York, New York, LOW acquired five works of art for

approximately $58.3 million in the name of Shell Company #6.   The following month, LOW

caused approximately $58.3 million in funds traceable to Project Catalyze to be transferred

from the Shell Company Account #6 to Art Auction House #1 to purchase the artworks.

Between on or about July 3, 2013 and September 9, 2013, additional funds traceable to

Project Catalyze totaling approximately $79 million were transferred from the Shell Company

Account #6 to Art Auction House #1 to acquire additional artworks.

      57.      Following the closing of Project Catalyze, the defendant ROGER NG,

Co-Conspirator #1 and Goldman sought to obtain and worked to execute several additional

transactions with 1MDB, particularly focusing on a proposed initial public offering ("IPO") of

1MDB's energy assets ("1MDB Energy").   Throughout the time period of these additional

transactions, the defendant JHO LOW and others, including Co-Conspirator #1, continued to

pay bribes and kickbacks to certain Malaysian and 1MDB officials and others, including from

the proceeds of the Project Catalyze bond and other 1MDB transactions, to influence those

officials to award a role for Goldman in the IPO.

   58. On or about June 2, 2014, Co-Conspirator #1 and the defendant JHO

LOW discussed, via electronic chat, efforts to win a position for Goldman in the 1MDB

Energy IPO, including the need to "suck up to" 1MDB Official #2 and to send "cakes,"

referring to bribes, to "madam boss."   In prior email correspondence, the defendant ROGER

NG, LOW and Co-Conspirator #1 referred to the wife of Malaysian Official #1 as "the

Madam."   LOW asked Co-Conspirator #1 if he could transfer money from an account for a

shell company LOW controlled directly into the account of another company incorporated in

the British Virgin Islands and beneficially owned and controlled by Co-Conspirator #1 and his

close relative (the "Management Company #1 Account") so that Co-Conspirator #1 could

"settle madam cakes 2."

   59. The defendant ROGER NG continued his personal relationship with

Co-Conspirator #1 after NG's departure from Goldman, and continued to work with Co-

Conspirator #1 on other business ventures.

## COUNT ONE
### (Conspiracy to Violate the FCPA—Bribery)

60.     The allegations contained in paragraphs one through 59 are realleged and incorporated as if fully set forth in this paragraph.

61.     In or about and between January 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely:

(a)     being an employee and agent of an issuer, and a stockholder thereof acting on behalf of such issuer, to corruptly make use of the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Goldman Sachs Group and others in obtaining and retaining business, for and with, and directing business to, NG, LOW, Goldman and others,

24

contrary to the FCPA, Title 15, United States Code, Sections 78dd-1, 78ff(a) and 78ff(c)(2)(a); and

(b)     while in the territory of the United States, to corruptly make use of the mails and means and instrumentalities of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value, to one or more foreign officials, and to one or more persons, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to one or more foreign officials, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendants and others in obtaining and retaining business, for and with, and directing business to, Goldman, NG, LOW and others, contrary to the FCPA, Title 15, United States Code, Sections 78dd-3 and 78ff(a).

62.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

**A-169**

<u>OVERT ACTS</u>

(a)    In or about late February 2012, LOW, NG, Co-Conspirator #1, 1MDB Official #3 and others met in London to discuss, among other things, the proposed financing for Project Magnolia, during which LOW discussed the need to pay bribes to government officials in Malaysia and Abu Dhabi to gain their approval for Project Magnolia.

(b)    In or around early March 2012, LOW, NG, Co-Conspirator #1 and others traveled to Abu Dhabi for meetings with officials of Foreign Agency A and Foreign Investment Firm A to discuss, among other things, the guarantee for Project Magnolia.

(c)    On or about March 23, 2012, LOW met with a banker from Foreign Financial Institution A in Los Angeles, California, during which meeting LOW explained Project Magnolia and discussed, among other things, funds from Project Magnolia that would be sent to the Shell Company Account #1 at Foreign Financial Institution A.

(d)    On or about March 25, 2012, LOW, NG, Co-Conspirator #1 and others met in Los Angeles, California to discuss, among other things, matters related to Project Magnolia and the acquisition of the Malaysian Energy Company A.

(e)    On or about March 26, 2012, LOW, Co-Conspirator #1 and others flew on a private jet from Los Angeles, California to Teterboro Airport in Bergen County, New Jersey.

(f)    On or about March 26, 2012, LOW, Co-Conspirator #1 and others traveled from Teterboro Airport in Bergen County, New Jersey, to New York, New York, transiting through the Eastern District of New York, to attend a meeting in New York, New York to discuss, among other things, Project Magnolia.

26

(g)     On or about April 21, 2012, LOW, NG and Co-Conspirator #1 traveled to Singapore, where NG and Co-Conspirator #1 met with employees of Foreign Financial Institution A and discussed, among other things, the due diligence that Goldman had done in connection with Project Magnolia.

(h)     On or about April 23, 2012, NG and others caused Silken Waters / Victoria Square to be incorporated in the British Virgin Islands under the name Silken Waters Enterprise Limited.

(i)     On or about May 24, 2012, NG and others caused the Silken Waters / Victoria Square Account to be opened at a bank in Singapore, and the beneficial owner of the account was listed as a relative of NG.

(j)     On or about May 29, 2012, LOW and others caused approximately $158 million traceable to the proceeds of Project Magnolia to be transferred via wire from the Shell Company Account #2 through a U.S. correspondent bank to the Shell Company Account #4.

(k)     On or about June 5, 2012, Co-Conspirator #1 sent an email to NG with banking details for the Capital Place Account.

(l)     On or about June 14, 2012, NG, Co-Conspirator #1 and others caused approximately $17.5 million traceable to the proceeds of Project Magnolia to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(m)     On or about July 16, 2012, an email account in the name of a close relative of Co-Conspirator #1 sent an email to another email account in the name of the same relative, which contained details of a transfer of funds to the Silken Waters / Victoria Square Account and the notation "For Roger."

**A-171**

(n)     On or about July 16, 2012, NG, Co-Conspirator #1 and others caused approximately $6.9 million traceable to the proceeds of Project Magnolia to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(o)     On or about December 19, 2012, LOW and others caused approximately $5 million traceable to Project Maximus to be transferred from the Shell Company Account #2 to the Capital Place Account.

(p)     On or about December 20, 2012, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Maximus to be transferred from the Capital Place Account to the bank account, for which LOW had made the banking referral, of a company beneficially owned and controlled by 1MDB Official #1.

(q)     On or about December 27, 2012, an email account in the name of a close relative of NG sent an email to the account representative for the Silken Waters / Victoria Square Account attaching three invoices for diamonds and other jewelry—one of which was addressed to 1MDB Official #3—and requesting payment to the jeweler in the amount of approximately $300,500.

(r)     On or about July 22, 2013, LOW, Co-Conspirator #1 and others caused approximately $6 million traceable to the proceeds of Project Catalyze to be transferred from the Management Company #1 Account to a bank account, for which LOW had made the banking referral, of an entity beneficially owned and controlled by 1MDB Official #3.

(s)     On or about July 29, 2013, LOW, Co-Conspirator #1 and others caused approximately $1 million traceable to the proceeds of Project Catalyze to be

transferred from the Capital Place Account to the account of a company beneficially owned and controlled by 1MDB Official #2.

(t)     On or about September 23, 2013, NG, Co-Conspirator #1 and others caused approximately $6.5 million in funds to be transferred from a bank account held by a close relative of Co-Conspirator #1 to the Silken Waters / Victoria Square Account.

(u)     On or about September 24, 2013, NG, Co-Conspirator #1 and others caused approximately $4.2 million in funds traceable to Project Catalyze to be transferred from the Capital Place Account to the Silken Waters / Victoria Square Account.

(v)     On or about September 28, 2013, at LOW's request, a high-end New York jeweler ("N.Y. Jeweler #1") met with LOW, Malaysian Official #1 and the wife of Malaysian Official #1 at a hotel in New York, New York to show a pink diamond necklace that N.Y. Jeweler #1 had designed for Malaysian Official #1's wife. Approximately three weeks earlier, the pink diamond necklace was purchased using approximately $27.3 million, which funds were sent from a shell company beneficially owned and controlled by LOW and other co-conspirators.

(w)     On or about October 10, 2014, LOW, Co-Conspirator #1 and others caused approximately $4.1 million to be transferred via wire from the Management Company #1 Account to the U.S. bank account of N.Y. Jeweler #1, in part, to pay for certain gold jewelry for the wife of Malaysian Official #1.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO

(Conspiracy to Violate the FCPA—Circumvention of Internal Accounting Controls)

63.     The allegations contained in paragraphs one through 59 are realleged and incorporated as if fully set forth in this paragraph.

64.     In or about and between January 2009 and May 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, did knowingly and willfully conspire to commit offenses against the United States, namely, to knowingly and willfully circumvent and cause to be circumvented a system of internal accounting controls at Goldman Sachs Group, contrary to the FCPA, Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5) and 78ff(a).

65.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant NG CHONG HWA, also known as "Roger Ng," together with others, committed and caused the commission of, among others, the following:

OVERT ACTS

(a)     On or about January 15, 2009, a high-ranking official at 1MDB's predecessor entity, TIA, advised LOW, NG and Co-Conspirator #1 that it was "best to get [LOW] involve[d] at every stage" of a TIA transaction that was being handled by Goldman.

(b)     On or about January 27, 2009, NG and Co-Conspirator #1 discussed via email whether to disclose to the Intelligence Group at Goldman LOW's

**A-174**

30

involvement in the transaction referenced in Paragraph 65(a), and decided not to make such disclosure.

(c)     On or about April 30, 2011, NG, using a private, non-Goldman email account, forwarded an email from LOW to Co-Conspirator #1 at a private, non-Goldman email account, and advised Co-Conspirator #1 "this is Roger FYI."   The content of the forwarded email from LOW discussed potential business with 1MDB.

(d)     On or about May 5, 2011, LOW emailed NG at a private, non-Goldman email account and requested a document related to potential business with 1MDB, and further directed NG "pls do not state names."   NG then forward that email to Co-Conspirator #1 at a private, non-Goldman email account and asked for Co-Conspirator's help with that request.

(e)     On or about February 7, 2012, LOW emailed 1MDB Official #3 at a private, non-1MDB email account, copying NG and Co-Conspirator #1 at private, non-Goldman email accounts, as well as another person at an anonymized email account, regarding a draft document in connection with the asset sale related to Project Magnolia. LOW asked NG and Co-Conspirator #1 "Any comments?" and wrote "No name pls."

(f)     During a telephone call in mid to late March 2012, Co-Conspirator #1 falsely stated to a senior member of the Intelligence Group at Goldman that LOW was not involved in Project Magnolia.

(g)     On or about April 4, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman attended by NG that LOW was not involved in Project Magnolia other than to set up one meeting with an Abu Dhabi official.   The meeting was also attended by committee members and others located in New York, New York using

**A-175**

Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(h)     On or about May 12, 2012, Co-Conspirator #1, using a private, non-Goldman email account, forwarded an email from LOW to NG at a private, non-Goldman email account, which included a timeline related to closing details for Project Magnolia.

(i)     On or about May 18, 2012, a member of the Project Magnolia deal team sent an email to the members of two Goldman committees, among others, in which she stated that "we have now completed all committee follow up items," including various approvals.

(j)     On or about October 10, 2012, Co-Conspirator #1 falsely stated in a committee meeting at Goldman that LOW was not involved in Project Maximus.   The meeting was attended by committee members and others located in New York, New York using Goldman's telecommunication facilities, which transited through the Eastern District of New York.

(k)     On or about April 24, 2013, Co-Conspirator #1 falsely stated to a senior employee of Goldman based in New York, New York who was also a member of a committee that reviewed the 1MDB bond transactions, that there was no intermediary involved in any of the three 1MDB bond transactions and, specifically, that LOW was not involved in Projects Magnolia, Maximus or Catalyze.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

<u>COUNT THREE</u>
(Conspiracy to Commit Money Laundering)

66.     The allegations contained in paragraphs one through 59 are realleged

and incorporated as if fully set forth in this paragraph.

67.     In or about and between January 2009 and October 2014, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants LOW TAEK JHO, also known as "Jho Low," and NG CHONG HWA, also

known as "Roger Ng," together with others, did knowingly and intentionally conspire to:

(a)      transport, transmit and transfer monetary instruments and funds

from a place in the United States to and through a place outside the United States and to a

place in the United States from and through a place outside the United States, (i) with the

intent to promote the carrying on of one or more specified unlawful activities, to wit: felony

violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B),

78m(b)(5) and 78ff(a), and offenses against a foreign nation involving bribery of a public

official and the misappropriation, theft and embezzlement of public funds by and for the

benefit of a public official, in violation of Malaysian law, as defined in Title 18, United

States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section

1956(a)(2)(A); and (ii) knowing that the monetary instruments and funds involved in the

transportation, transmission and transfer represented the proceeds of some form of unlawful

activity, and knowing that such transportation, transmission and transfer was designed in

whole and in part to conceal and disguise the nature, location, source, ownership and control

of the proceeds of one or more specified unlawful activities, to wit: felony violations of the

FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and

78ff(a), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i); and

(b)      engage in one or more monetary transactions within the United States involving criminally derived property of a value greater than $10,000 that was derived from one or more specified unlawful activities, to wit: felony violations of the FCPA, Title 15, United States Code, Sections 78dd-1, 78dd-3, 78m(b)(2)(B), 78m(b)(5) and 78ff(a), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of Malaysian law, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

68.      The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Count One and Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

69.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)      cannot be located upon the exercise of due diligence;

**A-178**

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendants up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States

Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE

70.     The United States hereby gives notice to the defendants that, upon their

conviction of the offense charged in Count Three, the government will seek forfeiture in

accordance with Title 18, United States Code, Section 982(a)(1), which requires any person

convicted of such offense to forfeit any property, real or personal, involved in such offense,

or any property traceable to such property.

71.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

**A-179**

(e)    has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendants, up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b); Title 21, United

States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

_____
DEBORAH L. CONNOR
CHIEF
CRIMINAL DIVISION, MONEY LAUNDERING
AND ASSET RECOVERY SECTION
U.S. DEPARTMENT OF JUSTICE

_____
JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**A-181**

# Brafman & Associates, P.C.

### ATTORNEYS AT LAW

256 FIFTH AVENUE, 2ND FLOOR

NEW YORK, NEW YORK 10001

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: ATTORNEYS@BRAFLAW.COM

BENJAMIN BRAFMAN
———
MARK M. BAKER
OF COUNSEL
MARC A. AGNIFILO
OF COUNSEL
ZACH INTRATER
OF COUNSEL

ANDREA L. ZELLAN
JACOB KAPLAN
TENY R. GERAGOS
ADMITTED IN NY & CA
STUART GOLD

## TO BE FILED UNDER SEAL[1]

February 6, 2022

VIA ECF
The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    United States v. Ng Chong Hwa a.k.a. Roger Ng, 18 Cr. 538 (S-2) (MKB)

Dear Chief Judge Brodie:

On Friday evening, the defense was first able to access a recording that contains powerful evidence of actual innocence. The defense now moves to admit this recording into evidence at Roger Ng's upcoming trial. On October 16, 2018, while cooperating with the government, Tim Leissner sat in his home office and conducted a video call with Hwee Bin Lim, Roger Ng's wife. The FBI recorded this video call (the "October 16 Recording"). The October 16 Recording therefore includes audio and video of Ms. Lim.

The October 16 Recording is admissible into evidence for several different reasons, which are detailed below. However, we will first briefly review how and when we found this piece of video evidence.

---

[1] Counsel files this letter under seal because the discovery discussed herein is covered by the Protective Order.

**A-182**

Brafman & Associates, P.C.

1. <u>Procedural History</u>

On February 2, 2022, at 10:40 pm, the government shared with defense counsel information pursuant to 18 U.S.C. § 3500, which included 48 documents related to the government's cooperating witness, Tim Leissner. On February 3, 2022, counsel began reviewing these documents, which included lengthy FBI 302 reports and the corresponding FBI notes from interviews with Mr. Leissner.

On February 4, 2022, counsel reviewed government Exhibit ("GX") 3500-TL-19, which is an email from Trial Attorney Jennifer Ambuehl to Assistant United States Attorneys Drew Rolle, Jacquelyn Kasulis, and Main Justice Attorneys MaryAnn McCarthy, Katherine Nielsen, Nikhila Raj and Woo Lee with the subject "recording." The email read:

> Spoke with Justin briefly this evening regarding the recording. We did not have the recording handy, but at a high-level he walked me through some parts of it. In summary, I now understand that Ms. Lim told Arnold the authorities came asking her questions and that with regard to the money they received she/they needed to show proof of the investment. Arnold said he didn't have any documents supporting the purported investment but that she should ask Judy. In response, Ms. Lim said something to the effect of "okay." Ms. Lim also indicated that they didn't have lawyers and that Roger had wanted to leave the country a while ago but she hadn't wanted to and they feel they've now missed their window to do so.

(<u>See</u> GX 3500-TL-19, enclosed.) Counsel, upon reading this email, assumed that "Arnold" was the FBI's code name for Leissner, but did not recognize this recording as one that was produced in discovery. We reviewed the video and audio recordings that had been provided but could not locate any recording corresponding to the description in the above email. Therefore, at 8:26 pm, counsel emailed the prosecution team asking, "Can you please produce to use the recording mentioned in this email immediately?" AUSA Rolle quickly responded to counsel, stating:

> These were produced to you on April 10, 2020 as DOJ-0002370692 and DOJ-0002370693 along with the other Ms. Lim recordings and WeChat messages. They were also re-produced to you on November 10, 2021 on a disc FedEx'd to your attention.

Counsel promptly searched their files, first checking the April 10, 2020, production, where the Admitted Ms. Lim/Leissner Recordings (described in Dkt. 90, Gov't motions <u>in limine</u> ("Gov't MIL") at 27-28) were located. Counsel's copy of the April 2020 production did not include the recording referenced in 3500-TL-19. Next, counsel searched the November 10, 2021 production disc.[2] Counsel played the recordings located on the disc, but the recording only

---

[2] The first disc that was produced to counsel on November 10, 2021 was corrupted. Counsel asked for a reproduction of the disc, which the government provided on November 12, 2021.

2

**A-183**

Brafman & Associates, P.C.

played beeping and clicking noises. In other words, neither Leissner nor Ms. Lim's voices were detected on the recording.

Counsel asked if AUSA Rolle was available to call and he, together with Ms. Ambuehl, called our offices at 9:08 pm. We stated that our copy of the disc did not play a recording of Leissner and Ms. Lim and instead played differing clicks and noises. AUSA Rolle stated that the disc contained two separate recordings from October 16, 2018—one with video and audio, and one with only audio. AUSA Rolle confirmed that Leissner's only two consensually recorded conversations with Ms. Lim were the June 22, 2018 Admitted Recordings and the October 16, 2018 recording contained the November 2021 discovery disc. Counsel told AUSA Rolle that they would work with their tech company to try to open the files. AUSA Rolle left a duplicate copy of the November 2021 discovery disc downstairs at the U.S. Attorney's Office.

At 11:16 pm on February 4th, counsel was able to view and listen to both recordings for the first time.

2. Summary of the Relevant Recording

Ms. Lim had a particular urgent purpose on the October 16 recording—she was seeking documentary evidence from Leissner's wife, Judy Chan. (See Exhibit 1, Draft Transcript ("Tr.") at 4.) The Malaysian authorities had seized money belonging to Ms. Lim and her family, claiming that the money in the Victoria Square account—the same money the government has built its case around here—was derived from 1MDB and was therefore forfeitable.

Ms. Lim was seeking to get the money released because she had done nothing wrong: Ms. Lim's family and Judy Chan's family had longstanding business in China, and to Ms. Lim's knowledge, the money that Judy Chan transferred to her family's accounts were related to this "real business ongoing." (Tr. at 5.) Indeed, "it has always been the case where there was . . . business ongoing." (Tr. at 5.) And so, when confronted by the Malaysian authorities, "I told them the truth. I told them that it was an investment." (Tr. at 5.)

But the Malaysian authorities wanted documentary proof: "[t]hey said, 'oh, you know, because you cannot provide me any form of documents . . . how to prove that the, that the, whole thing is yours.'" (Tr. at 5-6.) Leissner then clarified, "You mean the Capital Place money right? You mean the Capital Place money?" (Tr. at 6.).

And here Ms. Lim got to the point of the call: She wanted documents from Judy Chan to prove the money related to investments in China. She "just wanted to see . . . [w]hether we have any form of documents, and I mean if you could help me with any form of documents." (Tr. at 8.) Again, Leissner made perfectly clear that he understood what Ms. Lim was talking about: Her family's money, which had been invested with Judy Chan's family in China. "Oh, I got you, you mean with Capital Place, with Judy?" (Tr at 8.) Ms. Lim confirmed: "Yeah, if she still kept any, any, any, any form of documents. If I could contact her." (Tr at 8.) *At all times in the recording, Leissner agrees with Ms. Lim*. Leissner either frequently affirmed by saying, "mhm" or he affirmed in his commentary that she meant the "Capital Place" money. (See Tr. at 6, 8.)

3

## Brafman & Associates, P.C.

Leissner's responses are indicative of his mind-set, showing what he believed to be true about the money sent to Ms. Lim. His reaction to Ms. Lim's words are not just relevant, but are perhaps the most critical evidence in this case. Leissner—secretly recording the conversation at the government's direction with the FBI in the room—does not say, for instance, "What are you talking about?! That is Roger's cut of the stolen 1MDB proceeds!" He does not say, "We had the meeting with Master Pong and we all came up with our cover story to hide the source of this stolen money!" (Cf. Gov't MIL at 67.) He does not say, "Ms. Lim, this is what I am concerned about, because that money was derived from specified unlawful activity and is therefore evidence of our conspiracy to launder funds derived from a Foreign Corrupt Practices Act violation."

He did not say anything like this. Far from it. Leissner said, "Yeah, maybe so, maybe so. I would have to tell—I would have to speak with her." (Tr. at 8.) When Ms. Lim said "this thing happened like way back in 2005 and then, you know, the whole and then the investment starts and then we decided to wind down in 2011. And why is it you're doing this to me. I mean, who kept documents since those days?" Leissner said, "yeah." (Tr. at 6.) He also recognized that he knew the money was transferred to a bank account in Singapore. (Tr. at 6.) He responded to her descriptions of the business and request for documents in the affirmative "mhm" fifteen times, and alternated the "mhm" with "yeah" (Tr. at 7), "right" (Tr. at 6, 8, 9) and "I see" (Tr. at 6, 7). He said "Oh, I got you." (Tr. at 8.) He immediately recognized what Ms. Lim meant: "you mean with Capital Place, with Judy?" (Tr at 8.) And, *he did not once say anything to the contrary*.

Leissner four times tried to change the subject to Jho Low (Tr. at 8, 12, 14) and Celsius (Tr. at 10), but Ms. Lim repeatedly and immediately turned the subject back to her forward-looking request for the documentation—the reason she wanted to have the call (Tr. at 8, 11, 13). Finally, she told Leissner, "what I'll do is I'll try to reach out to [Judy Chan] myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there." (Tr. at 13.) Leissner responded, "Okay. I think that's perfect." (Tr. at 13.)

3. This Motion Is Timely

Though this motion comes after the motion in limine dates proposed by the parties and Ordered by this Court, this motion is timely because it is based in part on the 3500 materials that were first produced to counsel on February 2, 2022. The only reason defense counsel became aware of this recording is because there was a piece of Leissner 3500 material that made reference to a recording between Ms. Lim and "Arnold." Figuring that for some reason the prosecutors are referring to Leissner as "Arnold," we realized for the first time late this past Friday evening that there was a recording between Ms. Lim and Leissner that we did not know about, and that we were unable to open. After Ms. Geragos alerted our technical support team to the problem, the tech team, after well over an hour, figured out how to play the recording.

4

**A-185**

Brafman & Associates, P.C.

4. <u>The Recording Is Relevant Because It Reliably Establishes That the Victoria Square Transfers Were Not for a Criminal Purpose</u>

The defense has repeatedly argued that the $35 million in transfers from Capital Place Holdings and Judy Chan's personal Morgan Stanley account to the Silken Waters / Victoria Square account were related to investments, and were not Mr. Ng's cut of 1MDB bribe proceeds:

- *Motion to Dismiss*: "Judy Chan Leissner's relative(s) owed a debt to Ng's relative(s). This debt was wholly unrelated to any of the allegations or events in the Indictment." (Dkt. 46, Memorandum in Support Ng's of Motion to Dismiss at 115.)
- *January 7, 2022 Transcript*: "So what I expect some of the trial evidence to show is that these funds did not come from Switzerland, for instance, the way that Fanny Khng said; that they were related to investments in China, and that is problematic because of the way that money moves in and out of China, it is very difficult to do that. And it is our contention, and we think the evidence is going to bear out that this money was related to investments in China." (1/7/22 Tr. at 18-19.)
- *Motion for CCTV Testimony*: "Ms. Lim will testify directly on that issue. Her testimony will directly contradict the government's allegations regarding the $35 million – perhaps the single central issue in the case. Moreover, as this money was sent to Ms. Lim's family, not Mr. Ng, she has greater knowledge of the facts surrounding these transfers than Mr. Ng does." (Dkt. 122 at 6.)
- *Affirmation in Support of Motion for CCTV Testimony*: "The defense contends that the money sent by Ms. Judy Chan Leissner to the Silken Waters/Victoria Square account is wholly unrelated to the crimes charged, and that indeed these funds relate to a pre-existing debt owed by Judy Chan Leissner to Ms. Lim." (Dkt. 122-1 at 5 ¶17.)

First, the October 16 Recording is relevant because it helps establish, as Mr. Ng has always claimed, that the $35 million was payback for an investment and not his share of proceeds from the 1MDB theft, as the government alleges. Second, the October 16 Recording is relevant to the question of whether Ms. Lim is a co-conspirator, as the government has alleged. If the $35 million payment was payback on an investment, and not criminal proceeds, then Ms. Lim cannot be a co-conspirator, as there is simply no other evidence of her wrongful involvement in any aspect of this case. Third, the October 16 Recording is relevant because it contradicts Leissner's proposed testimony, as alleged in the government's motions <u>in limine</u>, that Mr. Ng, Ms. Lim, Leissner and Judy Chan all met in Hong Kong in 2016 and agreed to make up a story that the Capital Place payments were payback for an investment. As it turns out, and as is evident from the October 16 Recording, the parties did not have to invent a story for the payment because there already was a true and innocent one: it was payback on a previous investment. Significantly, Leissner's words and actions demonstrate his mental state: Leissner knows that the money is from legitimate business investments and he agrees with Ms. Lim's assertion over and over that this is the source of these funds. For the above stated reasons, this video goes to a critical fact that is "of consequence in determining the action." Fed. R. Evid. 401.

5

**A-186**

Brafman & Associates, P.C.

5. <u>The Recording Should Be Admitted Because It Is Reliable and Satisfies Several Specified Non-Hearsay Purposes</u>

Statements from the October 16 Recording are admissible into evidence at trial, for four independent reasons.

a. *The recording is admissible under Rule 803(3)*

The statements of Ms. Lim and Leissner in the October 16 Recording that the defense seeks to admit for the truth of the matter asserted are hornbook examples of both Ms. Lim's and Leissner's states of mind at the time of the October 16 Recording. These statements are therefore admissible pursuant to Federal Rule of Evidence 803(3).

Among the categories of statements that "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness," are "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Fed. R. Evid. 803(3).

Judge Friendly examined Rule 803(3) in <u>United States v. DiMaria</u>, and its analysis controls the outcome here. <u>See</u> 727 F.2d 265 (2d Cir. 1984). DiMaria was charged with conspiring to possess stolen cigarettes and untaxed cigarettes, respectively, and with the accompanying substantive offenses. <u>See id.</u> at 267. The evidence at trial established that a tractor trailer loaded with cigarettes was hijacked. <u>See id.</u> Law enforcement located the stolen trailer in a yard where the conspirators had parked it and established surveillance. <u>See id.</u> at 267-68. After DiMaria and others loaded cigarettes from the trailers into a van, DiMaria got into his Cadillac and left the yard. <u>See id.</u> The FBI stopped him. <u>See id.</u> As Special Agents approached him, DiMaria said, "'I thought you guys were just investigating white collar crime; what are you doing here? I only came here to get some cigarettes real cheap.'" <u>Id.</u> at 270.

At trial, the defense sought to introduce this statement through an FBI Special Agent pursuant to Rule 803(3), on the theory that "real cheap" cigarettes meant untaxed (or "bootleg") cigarettes, not stolen cigarettes, and therefore the statement helped disprove that DiMaria intended to transact in stolen cigarettes. <u>See id.</u> The District Court refused to allow the statement into evidence and DiMaria was convicted. <u>See id.</u>

The Court of Appeals reversed. Judge Friendly explained that DiMaria's statement indicated "that his existing state of mind was to possess bootleg cigarettes, not stolen cigarettes. It was not offered to prove that the cigarettes were not stolen cigarettes but only to show that DiMaria did not think they were." <u>Id.</u> The Court then explained that while the Rule 803(3) exception to hearsay permits evidence of the declarant's then existing state of mind, there is an "exception to the exception" built into Rule 803(3) that bans "a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

Brafman & Associates, P.C.

The exception to the exception was elucidated in Shepard v. United States, 290 U.S. 96, 98 (1933). The defendant in Shepard, a doctor, was charged with murdering his wife. The defendant's wife—the victim—had stated "'Dr. Shepard has poisoned me.'" Id. at 98. The government sought to introduce this statement pursuant to the state of mind exception.  Justice Cardozo's opinion rejected this attempt, holding that the statement was not being used "to prove [the victim's] present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by someone else, as evidence that she was dying of poison given by her husband . . . . The testimony now questioned faced backward and not forward . . . ," and was therefore properly analyzed under the "exception to the exception." Id. at 104.

But a statement like DiMaria's (or Ms. Lim's statements regarding the documents she was seeking) "was not a statement, like Mrs. Shepard's, of what he or someone else had done in the past. It was a statement of what he was thinking in the present." DiMaria, 727 F.2d at 271 (citing United States v. Zito, 467 F.2d 1401, 1404 & n. 4 (2d Cir. 1973); United States v. Partyka, 561 F.2d 118, 125 (8th Cir. 1977)).

Ms. Lim's statements, like DiMaria's, fall squarely into the 803(3) exception, and not into the "exception to the exception." The statements are clearly what Ms. Lim was thinking in the present, when she called Leissner—they are the sole reason she called Leissner at the time she called him. Ms. Lim called Leissner with just one motive: To get documentary proof of the investments her family had made with Judy Chan's family in China. (See, e.g., Tr. at 4 ("Um, yeah so that's, that's why I thought I wanted to call you and then talk to you about."); Tr. at 8 ("so that's how I thought . . . just wanted to see . . . . [w]hether we have any form of documents, and I mean if you could help me with . . . any form of documents.").)

Leissner agrees with her—and provides crucial details that demonstrate his own state of mind.  (Tr. at 8 ("Yeah, maybe so, maybe so. I would have to tell—I would have to speak with [Judy Chan].") Leissner could have said anything to Ms. Lim. He could have tried to tie her to the crimes charged in this case in any number of ways—including all of the lies that he has told the government about feng shui masters and secret meetings. (See, e.g., Gov't MIL at 24-25.) But he didn't do any of that. Leissner's response to Ms. Lim proves his own mental state.

The law is clear that "statements of future intent are not excludable as hearsay." United States v. Badalamenti, 794 F.2d 821, 826 (2d Cir. 1986); see also United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds."); Shelden v. Barre Belt Granite Employer Union Pension Fund, 25 F.3d 74, 79 (2d Cir. 1994) ("[U]nder [Rule 803(3)], the existence of the plan or intention may be proven by evidence of the person's own statements as to its existence."(citation and internal quotation marks omitted).) Ms. Lim's statements regarding the documentation she was seeking from Leissner or Judy Chan are exactly these types of statements, and are therefore admissible pursuant to Rule 803(3).

Indeed, the government itself cited to Rule 803(3) in seeking admission of various purported statements in the June 22 "Video Call," and the same rationale they used there applies

7

**A-188**

Brafman & Associates, P.C.

here. For example, the government sought to introduce pursuant to Rule 803(3) a purported "written response" that Ms. Lim made on the "Video Call" (of which there is no actual video, unlike the October 16 Recording, and of which there is no actual evidence aside from Leissner's word that the written responses were made). Leissner told the government that Ms. Lim wrote, "My Victoria is ok" during the so-called "Video Call." (See Gov't MIL at 38.) The government claimed that "[t]o the extent that the statement 'My Victoria is ok' is hearsay, it is a statement of Lim's then-existing mental condition. Fed. R. Evid. 803(3)." (Id.) If this purported statement does not fall into the "exception to the exception" of a statement of belief to prove the fact believed, then of course the Ms. Lim's statements on the October 16 Recording regarding the documents she sought from Leissner and Judy Chan do not either. Similarly, relating to Ms. Lim's purported written statement that "Friend/Everybody was worried you might be compromised," which Leissner told the government Ms. Lim wrote down (but which no one else has ever seen), the government contended "[t]he statement is also not hearsay because it is a statement of Lim's then-existing mental condition (i.e., her worry that, as a co-conspirator, Leissner might be cooperating)." (Gov't MIL at 37-38 (citing Fed. R. Evid. 803(3) and United States v. Cardascia, 951 F.2d at 487)). As with Ms. Lim's statements in the June 2016 recording, the statements in the October 16 Recording that relate to the truth of the matter are statements of what the participants were "thinking in the present." DiMaria, 727 F.2d at 271. They look forwards, not backwards. They are therefore admissible under Fed. R. Evid. 803(3).

> b. *The recording is admissible Under Rule 106*

The October 16 Recording is independently admissible pursuant to Rule 106, which provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Because excluding the October 16 Recording would "exclude information substantially exculpatory" of Roger Ng and Ms. Lim, it should be admitted into evidence. See United States v. Cooper, Crim. A. No. 19-159 (ARR), 2019 WL 5394622, at *7-8 (holding, in the context of two different oral statements made by the defendant, that "[t]he first oral statement that the government seeks to exclude is relevant to and explanatory of the oral statement that it plans to admit . . . and it is also potentially exculpatory," as "[r]edaction would distort the meaning" of the other statement," and the first statement "provides important context and ensures that the jury receives a 'fair and impartial' understanding" of the evidence as a whole).

Recall that in its motions in limine, the government argued vigorously to introduce statements from three audio recordings that Leissner (and the FBI) made with Ms. Lim on June 22, 2018 (the "June 22 Recordings"). Recall, too, that the government had the temerity to categorize one of these recordings misleadingly as a "Video Call," notwithstanding that the government *does not* have a video recording of that call. (Compare Gov't MIL at 27-28 (claiming the recording is a "Video Call," and claiming that Ms. Lim "on multiple occasions" "held up a page of printer paper to the camera with writing on it" and "made several non-audible gestures on the [V]ideo [C]all") with Gov't MIL Reply at 26 (conceding that the "Video Call" "was not video-recorded but was only audio-recorded," and "the Video Call was not video-recorded.").)

Brafman & Associates, P.C.

The government therefore has no evidence that Ms. Lim actually wrote anything, or made any facial expressions, except for Leissner's word. But the government has trumpeted these supposed writings and "gestures," and remarkably even included them in its draft transcript of the "Video Call." (See Gov't MIL at 28 ("In the draft transcript of the Video Call, these written statements and gestures are indicated by the bracket [ACTION].").) The Section 3500 material that has been produced to date, however, makes clear that Leissner was not taking contemporaneous notes of the so-called "Video Call": FBI notes state that "TL not write anything down." (GX 3500-TL-12-H at 2).

For all of its detailing of the June 22 recordings, the government completely failed to inform the Court that there was *another* recording of Ms. Lim and Leissner: The October 16 Recording. The government completely failed to inform the Court that the October 16 Recording, unlike the "Video Call," was actually videotaped. These failures speak volumes.

The government's failures demonstrate why it is so critical that the October 16 Recording be admitted to avoid "the misleading impression created by taking matters out of context." Fed. R. Evid. 106 Advisory Committee's Note. During the June 22 "Video Call," Leissner asked Ms. Lim, "You're not worried about Capital Place, are you?" Ms. Lim responded, "No. I'm not." (Gov't MIL at 38.) The government claims (based solely on what Leissner told them) that Lim then wrote, "My Victoria is ok." Id.

The government's rationale for admitting these statements is as follows, quoted directly from their motion:

> Leissner's question is not hearsay. See Coplan, 703 F.3d at 84. Lim's responses are also not hearsay because they are not being offered for their truth—it is not relevant whether Lim was in fact worried about Capital Place, or merely was saying she was to encourage Leissner to respond— but rather to show that Lim, an alleged co-conspirator, knows what 'Capital Place' is and why Leissner would be asking about it in a conversation about the defendant's potential arrest. In particular, her response 'My Victoria is ok'—which Leissner understood was a reference to the Silken Waters / Victoria Square Bank Account—further underscores the nature of the prior relationship between Leissner and Lim, and that Lim is aware of the entities used by Leissner and the defendant to transfer criminal proceeds, *and the problems it would create for the defendant, Leissner, and Lim should information about such entities become known to law enforcement*.

(Gov't MIL at 38 (emphasis added).) But here's the thing: The October 16 Recording demonstrates that the actual truth is exactly the opposite. Ms. Lim is seeking documents relating to Capital Place *to affirmatively show to the authorities in Malaysia* and get her family's money back. She's not looking for the documents to *hide* the Capital Place transfers—she is looking for the documents to *show* evidence relating to those transfers to her government and defeat any claim for forfeiture of those funds. The statements in the June 22 "Video Call" are not complete without the October 16 Recording—the October 16 Recording provides actual evidence to

9

**A-190**

Brafman & Associates, P.C.

disprove what Leissner made up and which the government seeks to put before a jury in Your Honor's court. This is exactly the evil which Rule 106 is designed to prevent.

Ms. Lim explains that while there are no criminal proceedings happening, the Malaysian authorities had seized her family's money and were "looking at [] forfeiture." (Tr. at 4.) Ms. Lim continued, "So, I tried to explain to them, right? That, um, it has always been the case where there was, uh, business ongoing . . . . I told them the truth. I told them that it was an investment." (Id. at 5.) Leissner does not challenge anything that Ms. Lim said. (See id.) Ms. Lim is standing up to the Malaysian authorities, and refusing to go along with their forfeiture, because "it was a big thing, you know? And, uh, I don't believe what was said [by the Malaysian authorities]." (Id.) She refused to just "surrender" her family's money, "because there is a real business ongoing" between her family and Judy Chan's and the proceeds of that "real business" is what was sent from Capital Place to Ms. Lim's family—at least as far as she understood. (Id.) So, Ms. Lim continued, the Malaysian authorities were demanding documentation of her claim. See id. at 6 (relaying that Malaysian authorities told Ms. Lim "'oh you know, because you cannot provide me any form of documents and what's so, what not, how to prove that the, that the [money] is yours.'").

Leissner then clarifies exactly what Ms. Lim is referring to: "You mean the Capital Place money right? You mean the Capital Place money?" (Id.) Ms. Lim confirms, "Mm, mm, correct." (Id.) Ms. Lim tells Leissner that the reason she was calling him—the entire point of her communication—was to get the Malaysian authorities the documentation they were demanding, in the hopes that by providing this documentation, they would release her family's money.  It is precisely the opposite of what the government is try to make the jury believe by using the June 22 recordings selectively—that Ms. Lim somehow wanted to hide the Capital Place transfers from the authorities. Ms. Lim is asking Leissner "[w]hether we have any form of documents, and I mean if you could help me with . . . any form of documents" relating to Capital Place, so that she can show them to the Malaysian authorities.  What the October 16 Recording shows is that Ms. Lim knows of Capital Place because it was the entity that returned her family's money—not that her knowledge of Capital Place came from the conspiracy, but for a completely innocent reason.

Next, the simple fact that the October 16 recording includes actual video of Ms. Lim, and the June 22 "Video Call" does not, is relevant to avoid leaving the jury with the misimpression that Ms. Lim is somehow scared or nervous about talking to Leissner. This is the inference that the government wants the jury to draw from their gloss on the June 22 "Video Call"—first, that Ms. Lim actually wrote anything, and second that she wrote things, instead of saying them, because she was afraid of being recorded talking about criminal activity. If that was so, then why would she speak freely on October 16, and why would she not write anything down and show it to Leissner? Why would she be so open with him? The Court must allow the jury to look at Ms. Lim's face, her tone, her gestures, her entire countenance—and determine for itself if Ms. Lim is a scared and cowering co-conspirator or not. The answer will be clear to anyone with eyes. To not allow the October 16 Recording but allow the June 22 "Video Call" would leave a definitive misimpression in the jury's minds—a misimpression that is contradicted by the actual evidence.

Brafman & Associates, P.C.

Beyond the misleading impression relating to the Capital Place transfers, the October 16 Recording also contains a direct reference to the June 22 recordings that the government wants to introduce, which is necessary to complete that topic for the jury. Leissner, speaking about Jho Low, says that "I think he spread a bunch of rumors around about me, to be honest, also and, which I don't, quite frankly I didn't quite understand that, Ms. Lim, but, I don't know." (<u>Id.</u> at 8.). Ms. Lim responded, "I did mention to you the last time, right, that was a couple of months back. Yeah." (<u>Id.</u>). So the October 16 Recording relates directly to the June 22 recordings, and completes them.

Moreover, the background information contained in the October 16 recording is admissible. As the government says in its own motions <u>in limine</u>, "to the extent that any of this background information contains what might be otherwise be deemed hearsay, such statements are admissible as context and to explain the interactions with Lim that followed. <u>See United States v. Pedroza</u>, 750 F.2d 187, 200 (2d Cir. 1987) ("When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed."); <u>United States v. Certified Environmental Servs., Inc.</u>, 753 F.3d 72, 89 (2d Cir. 2014) ("An out-of-court statement offered for some other purpose [than to prove the truth of a fact asserted], such as . . . to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay." (citations omitted))." (Gov't MIL at 36.)

c.   *The recording is admissible under Rule 807*

This evidence is also admissible under Rule 807, the residual hearsay exception, which allows otherwise inadmissible hearsay to be admitted where:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Here, both prongs are met. First, there is no doubt that Ms. Lim made the statements, as they are captured on both video and audio recording made by the government's cooperator. As to the facts underlying her statement—that the money sent from Capital Place was for a prior investment and not proceeds of the 1MDB fraud—this too has sufficient guarantees of trustworthiness. There will be no dispute that $35 million was sent by Tim Leissner and Judy Chan to Silken Waters/Victoria Square. The only question is why. The government asserts that the $35 million was sent to Mr. Ng's in-laws as Mr. Ng's alleged proceeds from the 1MDB fraud. The only evidence the government has directly supporting its theory will be the testimony of its cooperator, Leissner. In the October 16 Recording, however, Ms. Lim makes clear several

11

**A-192**

## Brafman & Associates, P.C.

times that the money Leissner and Chan sent was to pay back a prior investment and not proceeds. As noted above, not only does Leissner not challenge this assertion when made by Ms. Lim, but he actually confirms that he knows exactly what she is referring to by responding: "Oh, I got you, you mean with Capital Place, with Judy?" Additionally, when Ms. Lim asks numerous times for records establishing the investment, Leissner does not once challenge Ms. Lim that the investment happened. This is important because the only person the government has to support its proceeds argument is the same person who establishes the trustworthiness of Ms. Lim's statements by acknowledging that the money was for a prior investment.

As to the second prong, this video is the best evidence of Ms. Lim's plea to Leissner to prevail on Judy to get the documents she needs. She is clearly concerned on the call itself when she is telling Leissner that the Malaysian authorities are not persuaded that she is innocent because has not presented documentation of the investment. This is a pressing crisis at the time, and her call with Leissner is the action she is taking in order to get the documents she needs. Also, having the jury see her face and hear the tone in her voice as she describes the Malaysian authorities and her need for the documents is far better evidence than testimony about this legal crisis over three years after the fact. This videotape _is_ the evidence, the evidence of what Ms. Lim was going through at the time with the Malaysian authorities, the evidence of how she endeavored to solve this problem by contacting Leissner, and the evidence of how she tried to convince Leissner to contact Judy to get the records she needs. Only by watching the videotape itself can the jury pass upon the earnest nature of Ms. Lim, upon the genuineness of her request, and upon the evidence of her mind set at the time that these documents exist, that she needs them, and that Leissner can help her get them.

As courts in this Circuit have recognized, "although '[t]he residual exception should be invoked sparingly,' Robinson v. Shapiro, 646 F.2d 734, 742 (2d Cir. 1981), 'the rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay . . . . [S]uch 'reliable hearsay' has, of course, the effect of promoting the truth-seeking function of a . . . trial and, therefore, ought to be presented to the finders of facts." Picard v. Sage Realty, No. 20 CIV. 10057 (JFK), 2021 WL 5826295, at *2 (S.D.N.Y. Dec. 8, 2021) (citing United States v. Carneglia, 256 F.R.D. 384, 392 (E.D.N.Y. 2009) & Davis v. City of New York, 959 F. Supp. 2d 427, 434 (S.D.N.Y. 2013)). To promote the truth-seeking function of the jury, the jury must hear the truth. As the October recording makes clear, the truth is that Ms. Lim asked Leissner to help her obtain the records demonstrating that Ms. Lim's family had invested with Judy Leissner's family years earlier, and that the money paid by the Leissners from Capital Place to Silken Waters/Victoria Square was to pay back the investment. Keeping this reliable information from the jury—as the government hopes will happen—does not serve the truth-seeking function of the jury, Mr. Ng's constitutional right to defend himself or justice itself.

### d.  *The other grounds of admissibility*

Additionally, the fact that Ms. Lim asked and directed Leissner to help her obtain records of the investment is admissible non-hearsay because an "inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir.1999); see also United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) ("The

BRAFMAN & ASSOCIATES, P.C.

statement '[d]o not accept money from these people' was an order, *i.e.*, an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said. It was therefore not hearsay."); United States v. Kuthuru, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted"); United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("The most significant statements fall into the category of commands as to which the witness was the percipient hearer of the command. Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay."); United States v. Amato, No. 03-CR-1382 (NGG), 2006 WL 1891119, at *1 (E.D.N.Y. June 27, 2006) (admitting evidence, over the Government's objection, that the declarant directed the witness to "place a car on a street at a particular time" because directives are not hearsay (citing Bellomo)). Ms. Lim's requests of Leissner are—to quote the government's motion in limine regarding the June 22 Recording, which they seek to admit— "best understood not as assertions of fact by Lim, but rather as a directive or imperative, and therefore are not hearsay." United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein" are not hearsay); United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) (an "imperative rather than a declarative statement," such as a directive to do or not to do something, is "not hearsay" when "offered not for its truth, but for the fact that it was said").

> e. *The recording is highly probative and there will be no undue prejudice to the government in admitting it into evidence*

For the reasons set forth above, the October 16 Recording is relevant, and there are multiple bases for its admission. The final step is to examine whether, under Rule 403, the October 16 Recording is more prejudicial than probative. There is no serious contention that it is. Here, too, the Government's own words are useful in demonstrating why. It may well be that the government does not want to see a critical pillar of their case—the transfers from Capital Place—crumble when the truth comes out, "so it is understandable that [the government] would prefer not to have them presented to the jury." (Gov't Reply MIL at 25 n. 15.) But, as the government noted, "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair." Costantino v. Herzog, 203 F.3d 164, 174 (2d Cir. 2000) (emphasis in original). There is nothing unfair about this evidence, much less so substantially so that preclusion under Rule 403 is warranted." (Id.).

Thank you for your consideration.

Respectfully submitted,

Marc A. Agnifilo, Esq.
Zach Intrater, Esq.
Teny R. Geragos, Esq.
Jacob Kaplan, Esq.

cc:     Counsel for the government (via email)

13

**A-194**

# EXHIBIT 1

**DRAFT**

<u>United States v. Ng Chong Hwa</u>

DRAFT TRANSCRIPT OF HAWK MP3

<u>DATE:</u>                         October 16, 2018 at 4:22pm

<u>PARTICIPANTS:</u>

     Lim Hwee Bin        LIM

     Tim Leissner        LEISSNER

<u>KEY:</u>

     [U/I]               Unintelligible

     [SP]                Spelling

1

**A-196**

| Special Agent Nathan Lumby | Special Agent Nathan Lumby [SP?] of the FBI. I'm here at, uh, October 16, 2018, at approximately 4:22pm. Timothy Leissner is going to do a consensual recording with Hwee Bin Lim, beginning now. |
|---|---|
| | [phone ringing] |
| LIM | Hi, morning, I'm U/I |
| LEISSNER | Good morning, sorry, Hwee Bin. Good morning. |
| LIM | Good morning. |
| LEISSNER | It's a little bit early. I thought I just tried to grab you in case you guys have things to do this morning. |
| LIM | Oh, yeah, Don't worry because I actually watched a movie until quite late last night. [laughter] |
| LEISSNER | Oh my goodness. |
| LIM | How are you? |
| LEISSNER | I'm good, I'm good. What were you watching? |
| LIM | No, just one of those Netflix movies. You look good—you look so much better now. |
| LEISSNER | Thank you—I thought I always look like this. Maybe, I got, I got a haircut; that's what I did. |
| LIM | [laughter]. How how how's things; how's things? |
| LEISSNER | For me, everything is good, um, you know, in, um, was traveling quite a little bit you know in the summer. When we spoke last, I think I was in New York then LA, back to New York and back and forth. What's—It's been good. Lots of business. You know, our friends at Celsius are keeping me busy and I think keeping Roger busy. And that's pretty much it. I mean, all the press that you read, Hwee Bin, little bit crazy. Too too much, you know, and so I wouldn't, I wouldn't, worry about those things. |
| LIM | Oh, good good good good good. |
| LEISSNER | [laughter] |
| LIM | Good good. |

| LEISSNER | How are you guys? |
|---|---|
| LIM | Um, |
| LEISSNER | How is it going with you and Rog? |
| LIM | Yeah, I just want to tell you that, um, when we met—I met the lady master last night. Everything is still intact. |
| LEISSNER | Ok, great. |
| LIM | So I, I was, I thought it was very good so I wanted to let you know that. |
| LEISSNER | Oh, that's very sweet. |
| LIM | So I wanted to let you know that, and now— |
| LEISSNER | The fung shui is good? The fung shui is good? |
| LIM | Yeah, um, yeah. So things are moving very very, you know, in the right direction. |
| LEISSNER | Mhm. |
| LIM | You will have that that up and down and everything, but yes, they said everything's going to be good for you. |
| LEISSNER | That's great. |
| LIM | So I'm glad, I'm glad, it be, yeah, yeah. |
| LEISSNER | Thank you very much. But, I'm happy, because as you know I'm sweating it everyday too, of course. You know, and I'm worried. Um. |
| LIM | Hm, Yeah. |
| LEISSNER | Especially with our young friend. You never know with our young friend. |
| LIM | [laughter] |
| LEISSNER | I'm very worried about him. |
| LIM | Oh, ok. I don't know. I mean, I also read from the press right about him sometimes. |
| LEISSNER | Mhm. |
| LIM | But I don't know where, what is out there, what's he doing and all these things. So. |
| LEISSNER | He's the one I worry the most. |

**A-198**

| | |
|---|---|
| LIM | Everything is just [U/I[ press these days. Yeah. Yeah. And um. |
| LEISSNER | How's Rog doing? |
| LIM | And um . . . Okay—I mean, he's trying to keep himself busy. I mean, you know, like you said the last time when the press came out that, you know, he vanished, so, from the web. But people read it as another banker being murdered. [laughter]. And, and, and, the rumor has it that one more banker has been murdered. |
| LEISSNER | Really? That's what they said in Malaysia? |
| LIM | Yeah, well, you know, they, they only reads the headline. They read half the headline. |
| LEISSNER | Hm. |
| LIM | And, and, that's how it got, it got, it got, it got, it got passed around and all that stuff, yeah. |
| LEISSNER | That's crazy, Hwee Bin. That's crazy. |
| LIM | So crazy. Yeah. |
| LEISSNER | But no no problems with the authorities and stuff like that? They keeping away from you? |
| LIM | Um, yeah so that's, that's why I thought I wanted to call you and then talk to you about. Because um, we, well, have our fair share of things. |
| LEISSNER | Hm. |
| LIM | Thing were okay—moving very very, um, moving in the right direction. So, uh, uh, uh, uh talking about authority-wise, there was nothing, uh, that uh, it's not, it's not, it's not penalty. It's not, um, a legal, legal, basis, you know, they were talking about just looking at uh forfeiture. |
| LEISSNER | I see. |
| LIM | Right, so that's why I wanted to, you know, ask, um, if everything's okay. |
| LEISSNER | I think so, I mean, from my side, there's no need. I mean, my lawyers are talking to the authorities in America—you know whether it's the |

4

**A-199**

|  | SEC, the Federal Reserve Bank and everybody. I'm, nobody really has much of a view, to be honest, Hwee Bin, on this side. So, I think, I'm not so sure how they're working with Malaysia. That's why I'm interested to see always what Malaysia's been saying or Singapore whatever you know because it's really a mystery to me here. |
|---|---|
| LIM | Malaysia Malaysia Malaysia, right, Malaysia has been a lot of forfeiture happening now. They, they, I think uh it comes to the point where, they think, you know, uh they wanted the money back. |
| LEISSNER | Mhm. |
| LIM | So, I tried to explain to them, right? That, um, it has always been the case where there was , uh, business ongoing. |
| LEISSNER | Mhm. |
| LIM | I told them the truth. I told them that it was an investment. |
| LEISSNER | Mhm. |
| LIM | And it was a big thing, you know? And, uh, I don't believe what was said, I said, right? |
| LEISSNER | Mhm. |
| LIM | I did not believe what was said. And um, I think a lot of this was, I felt that it was, "oh, you know, we      it was like this," "we      it was like that. So, hence, uh, we wanted to forfeit." So, I told them, I said, "no, you cannot just forfeit. Because how can you just forfeit without no, I mean, you want me to just sign an SD to say that you know, you want, you want, you want me to surrender." |
| LEISSNER | Mhm. |
| LIM | Right? I said "I cannot just sign an SD to just say I want to surrender because I am telling you the truth. I'm telling you because there is a real business ongoing uh –there was business. " |
| LEISSNER | Mhm. |
| LIM | And that's how the whole thing happens that way. So, they said, "oh you know, because you cannot provide me any form of documents |

5

**A-200**

|  | and what's so, what not, how to prove that the, that the, whole thing is yours." |
| LEISSNER | You mean the Capital Place money right? You mean the Capital Place money? |
| LIM | Mm, mm, correct. So, I said "that is so crazy because this thing happened like way back in 2005 and then, you know, the whole and then the investment starts and then we decided to wind down in 2011. And why is it you're doing this to me. I mean, who kept documents since those days?" |
| LEISSNER | Yeah. |
| LIM | And all this things happens in China. I said, "this is very crazy." |
| LEISSNER | Right. |
| LIM | So—yeah, so—I was just hope— |
| LEISSNER | So that's what they're trying to get. But, is that Malaysia or Singapore? Because, I think that all went into Singapore, but Malaysia. |
| LIM | Malaysia. |
| LEISSNER | Hm. |
| LIM | Malaysia. |
| LEISSNER | Hm. So they're working with Singapore, probably, very closely. |
| LIM | Um, I don't know if they're really working with Singapore very closely because, um, um, I think I think they're quite independent of each other now. |
| LEISSNER | I see. |
| LIM | It's not exactly—yeah, yeah. |
| LEISSNER | That's also the feeling I get here you know, I don't—in America I don't know I don't see how they're working with the other countries. I'm sure they, they do. But, it's, it's, um, my lawyers are pretty much handling it now, which is good, because, you know, it leaves me to do whatever I have to do—my little businesses, Celsius and everything. That's good. |

6

**A-201**

| | |
|---|---|
| LIM | We have decided we don't even bother having lawyers here. |
| LEISSNER | Really? |
| LIM | We do not even hire lawyers. So, because, um, because the thing is that they come and then they said "oh, you know, all we wanted was to forfeit." They go around forfeiting almost everyone. I think I think that target was pretty clear. And then things they cannot prove, they say "oh we just want the money back. That's it." |
| LEISSNER | I see. |
| LIM | Right. You know, but the thing is, it comes to a point where I say, "look you cannot do that to me right? You cannot do that to me because I just cannot just say 'oh, I'm going to let you have everything.' How can I? I mean, you, you've got to prove to me too as the authority to say that I am, you know, taking what it is.' But, you are just saying, 'oh, you know just because of this and that.' And you refuse to believe me that, you know, there was business in the first place." |
| LEISSNER | Mhm. |
| LIM | And so they were saying, "ok if you can provide      form of documentation, then, um that would be how was it." So, I thought that was pretty crazy. |
| LEISSNER | Yeah. |
| LIM | And they were so insistent and all, you know. Uh, they, they, they think that it was, um, you know, the company was actually, you know, uh, somehow link or related to you or even your. And so we said "no, we never think so and we never believe. And then, it was never the case, at least during the time when we were investing." |
| LEISSNER | Mhm. |
| LIM | So, we were very, very clear about that one. Because we knew it wasn't, at least at that time. So, I said, "no, I mean, you know, at that time, at least you're telling me during my time of investment I knew who it was." Right? |

7

**A-202**

| | |
|---|---|
| LEISSNER | Mhm. |
| LIM | I knew who I was dealing with. |
| LEISSNER | Right. |
| LIM | Very clearly. |
| LEISSNER | Hm. Interesting. |
| LIM | So that it was it is. Yeah, so. |
| LEISSNER | And no word from our friend ever because I don't, also, by the way, you know, he took me off the WeChat, you know. Nothing ever from him again. |
| LIM | Oh, oh, oh. |
| LEISSNER | So, and I think he spread, I think he spread a bunch of rumors around about me, to be honest, also and, which I don't, quite frankly I didn't quite understand that, Hwee Bin, but, I don't know. |
| LIM | I did, I did, I did I did mention to you the last time, right, that was a couple of months back. Yeah. |
| LEISSNER | Yeah. But then it's not right that he spread that rumor. What's in it for him? Anyways. |
| LIM | I also don't know. [laughter]. I tell you the way he talks, right? So, we're just, um, so that's how I thought well, you know. So, just, just start as a friend, just wanted to see if there is anything, um, you know. But, uh— |
| LEISSNER | Nothing. |
| LIM | Whether we have any form of documents, and I mean if you could help me with any form of— |
| LEISSNER | Oh, I got you, you mean with Capital Place, with Judy? |
| LIM | Yeah, if she still kept any, any, any, any form of documents. If I could contact her. |
| LEISSNER | Yeah, maybe so, maybe so. I would have to tell—I would have to speak with her. You know, we don't speak that much anymore these days, with Judy. Rarely, and mainly about the girls. That's about it, that's about it. |

8

**A-203**

| | |
|---|---|
| LIM | Oh, okay, I see, I see, okay. Um, okay, maybe I can try to reach her— |
| LEISSNER | Yeah. |
| LIM | —and speak to her. Because, I, I was, I was, I was telling I said, okay fine, if you need me to speak, I did mention that. Right? To the authorities, yeah. |
| LEISSNER | Mhm, mhm. |
| LIM | That, okay, "if you want me to get the documents I'll have to speak to her" and then they said "oh, by all means, you speak to her." So I said, "But, are you sure you want me to speak to her and then you don't come back to say that 'oh, you know, I'm talking to someone you shouldn't be talking to?' And—" |
| LEISSNER | Yeah. |
| LIM | You know all this stuff. And they said "no, you are, you are very welcome to speak to anybody—and we just want your money." |
| LEISSNER | Yeah, it's tricky, I mean, of course, they'll say that today and then you'll go back and say "I spoke to her and here are the documents," then they may say, you know. |
| LIM | No, no, at Malaysia is—they will either ignore it, but knowing Malaysia, they just want the money. |
| LEISSNER | Right, right. So, whatever it is, they'll just take it. |
| LIM | Mm. Mm. |
| LEISSNER | Yeah. |
| LIM | Yeah without prejudice, they'll take everything without prejudice. Yeah. So, I was telling them, "No, you got to believe me. This is a real, you know, it was an investment. I mean who kept documents, I mean, back in like, you know, those days until now. |
| LEISSNER | Yeah. |
| LIM | So they said, "Yeah, you can't even provide me with anything." |
| LEISSNER | Hm. |

9

**A-204**

| LIM | So, I thought, well, that's so crazy. Yeah, yeah, so, they've been um, pressing me to, um, to sign, um, um, um SD to— |
| LEISSNER | What's an, what's an SD, Hwee Bin? |
| LIM | To—surrender—statutory declaration. To surrender. |
| LEISSNER | Oh. Hm. |
| LIM | Yeah, yeah. |
| LEISSNER | That sounds pretty crazy. |
| LIM | Yeah, yeah, but otherwise… |
| LEISSNER | Hm. |
| LIM | Everything is the same. |
| LEISSNER | [laughter]. I hear Roger is busy with Celsius because, you know, I don't speak to him, but they, you know I speak with the Celsius people. They tell me he's doing a good job. |
| LIM | Yeah, he's still running around. He's still uh trying to sort out the, uh, I heard some, um, getting the approvals for Malaysia and they're setting up the plant and something like that. |
| LEISSNER | Right. |
| LIM | And then also on all other things that you all spoke about, right? |
| LEISSNER | Yeah. |
| LIM | Yeah, all those things. I think, um, the last time I heard, he was, uh, said you came up with some very good ideas or something, I heard him talking to John. He said yeah, that's the good one. And then he said yeah, we should get more involved in that route. Something like that. |
| LEISSNER | I can't remember. The only thing I said to Celsius, was, was that you know, don't— |
| LIM | He can't wait to, he can't wait to work with you again. [laughter] |
| LEISSNER | I know, I know, I know because I give, I give my feedback I give my feedback to, you know, to the Celsius folks and then I know they talk to Roger. And then they said to me as well that Roger thought those |

10

**A-205**

|  | were good ideas. But, he cannot travel yet. Can he? No, I guess not. You guys are stuck in KL. |
| --- | --- |
| LIM | Until, [U/I]. If if I had signed it a month ago, we would've been able to travel. If I had signed it two months ago, we would've been able to travel. |
| LEISSNER | Really? But, this way no? |
| LIM | It was my timing. |
| LEISSNER | Yeah, yeah, yeah, yeah, yeah. |
| LIM | But yeah but I thought it was pretty crazy if you can't as the authority you come to me so hard and just say you just want everything. Right? You just want everything and then, and then, and then you say just because you cannot prove to me—you don't have the documents. |
| LEISSNER | Yeah. |
| LIM | I thought that was pretty crazy. |
| LEISSNER | Yeah. That's really—that's sad. |
| LIM | Yeah. But, uh, but, uh you where you are, they are not even asking that? They are not even bothered, right? |
| LEISSNER | They are bothered. You know, people are bothered. But, I think they are talking. They happily talking to my lawyers. And I think that's, that the best way for me to handle it—so keep it away from my family, keep it away from me. And, you know, the lawyers can handle and speak to them. So, sorry— |
| LIM | Oh, I see. |
| LEISSNER | —that was a new update from my iPhone. [laughter] that was just popped up. |
| LIM | [Laughter]. |
| LEISSNER | Yeah, no, so I think, that's the most comfortable for me as well, I have to say. |
| LIM | Mm. Mm. that's good, that's good. At least, you kept yourself, you know, and then back to work and all that thing. |
| LEISSNER | Yeah. Correct. |

11

**A-206**

| | |
|---|---|
| LIM | Okay, okay. Okay. |
| LEISSNER | And, you know the one thing I didn't tell you. Some people here worried, you know, about my safety also because they thought between our young friend, you know, the Abu Dhabis and people, you know, this could be dangerous. Especially with when he, and we thought he put out that news that I was, you know, in plea discussions and whatever, you know. So, we thought it could be a little bit dangerous, you know, especially if he's in China or some places. You never know, right? Life is very inexpensive there. Or Abu Dhabi, his friends there, life is inexpensive. So, we were worried about that for a while. |
| LIM | Are you serious? Wow, but is that okay now? Is it better for you now? |
| LEISSNER | Nothing has happened in the last three months, you know, so, uh, you know, going by that we feel we feel more comfortable, but you never know of course, right? So. |
| LIM | Right. But no, um, not according to the lady master. You're going to do one more. [laughter] |
| LEISSNER | Okay, well. |
| LIM | You're going to do more than what you have now. |
| LEISSNER | That's good news, that's good news for me, you know, to have, uh, to have that in place. |
| LIM | Right right right, yeah. |
| LEISSNER | The fung shui master. |
| LIM | Yeah, yeah. |
| LEISSNER | Well, |
| LIM | Okay. |
| LEISSNER | Please feel free— |
| LIM | I'm glad to hear. |

12

**A-207**

| | |
|---|---|
| LEISSNER | Feel free to reach out anytime, Hwee Bin. You know, in the mornings, in the mornings I normally take the boys to school, so that's when I get stuck in traffic. And that's— |
| LIM | Oh, the two boys, the two young boys. Okay. |
| LEISSNER | Yeah, they go to the same school. |
| LIM | Is the little boy going to school as well? |
| LEISSNER | Yes. |
| LIM | Good. |
| LEISSNER | Preschool— |
| LIM | Such a big boy now. |
| LEISSNER | —three and a half years old. three and a half years old. So he's going to preschool and Kenzo is going to the same school. And he's in like 4th grade or something, so. |
| LIM | This is such a—this is so much better for you now that you actually missed out on all that family life before that. You were working too hard. You were working too hard. |
| LEISSNER | Yeah, I know. Now finally now finally I'm a home man, I'm a family man. Took many years to get there. |
| LIM | Yes, yes, yes. And I think it's good, it's good. It's very good. At least, you know, having family around is very different, right? |
| LEISSNER | Yeah, for sure. |
| LIM | Having family around is very different. |
| LEISSNER | Yeah, totally. |
| LIM | Yeah. Yeah. Okay. Okay, okay I'm telling you, I'm telling you–what I'll do is I'll try to reach out to her myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there. |
| LEISSNER | Okay. I think that's perfect, Hwee Bin. |
| LIM | [U/I]. Yeah yeah yeah. |

13

**A-208**

| | |
|---|---|
| LEISSNER | If you do hear anything from young friend that I should be concerned about or anything—any rumblings, let me know. You know, because, maybe Terrence– |
| LIM | Mm. Definitely |
| LEISSNER | –because you guys have a good, you're on the ground with that gang. |
| LIM | Yes, we hear, um, um, people talk, we hear rumors. But sometimes, I do not know. But last time I thought I saw in the papers right, um, not the papers, the web—this web Malaysia Inside. |
| LEISSNER | Mhm. |
| LIM | That they were saying that he was also, uh, he was also trying to strike a deal, right? Or something like that, on the firm—throw the firm under the bus, or something like that. So… |
| LEISSNER | You mean, the firm. |
| LIM | That was the last one. |
| LEISSNER | The firm being, you know. Goldman Sachs? |
| LIM | Yeah, isn't it? Oh, it was all over the news in Malaysia. |
| LEISSNER | Jho was trying to throw the firm under the bus? |
| LIM | Mm. Mm. |
| LEISSNER | I didn't see that news. I didn't see that news. |
| LIM | Oh, it was all over the, uh, Malaysia. And I think it also came out in Bloomberg. |
| LEISSNER | I see, okay, I'll check that out. |
| LIM | Yeah, yeah, yeah, yeah. You can check that out. It was also in Bloomberg but I saw it in Malaysia inside quoting Bloomberg. |
| LEISSNER | Got you, got you. |
| LIM | Mm mm. |
| LEISSNER | K that's interesting. |
| LIM | So, so, which, I think probably that should be true because it's out in the web, so that might just be true, so, that was his direction of moving. |
| LEISSNER | Jho's direction. Mm. |

| LIM | After supposedly the [U/I] got stuck in Malaysia. That was the direction he was taking. Yeah, yeah, yeah. |
| --- | --- |
| LEISSNER | Interesting. Interesting |
| LIM | But, I, I, I, want to believe it's true. |
| LEISSNER | Right, got you. And do you guys still see Terry from time to time or has he gone underground as well? Totally underground. |
| LIM | I—when was the last time—I think we saw him, I think it was last year, you know, the last time I saw him. |
| LEISSNER | Wow. |
| LIM | Mm. It was quite some time ago, yeah, so I do not, I don't know so much about that really. I saw him probably in December last year. |
| LEISSNER | Hm. |
| LIM | Yeah, yeah. Yeah. |
| LEISSNER | Does Boon-kee ever? [CROSS TALK] |
| LIM | I think at that time he was-- |
| LEISSNER | Does Boon-Kee ever show up in Malaysia? No nothing huh, so sad huh? |
| LIM | Never. |
| LEISSNER | So sad. |
| LIM | No, that was even further than that. That was even before the, uh, the incident in Singapore. |
| LEISSNER | Right, right. |
| LIM | Remember the incident in Singapore? |
| LEISSNER | Yes, yes, of course. |
| LIM | Never did after that, hm, hm. Never did after that, so that was pretty. |
| LEISSNER | Yeah, I tried to reach out— |
| LIM | Not even a phone call not even a text. You did? |
| LEISSNER | Yeah, I tried to reach out to her and I never heard back from her, either. |
| LIM | The last, the last, the last article came out, right? On Bloomberg. |
| LEISSNER | Mhm. |

15

**A-210**

| LIM | Saying that, uh, she was asked, right? Something like that. |
|---|---|
| LEISSNER | She was interviewed |
| LIM | That was in Singapore. |
| LEISSNER | Yes, she was interviewed, that's what it said. [U/I] see that. |
| LIM | Mm. Mm. Mm. But, the good thing is you know, you're getting back to your usual self. Getting, getting, getting there. Almost there, almost there. |
| LEISSNER | [laughter] Thank you. |
| LIM | So that's good. You keep yourself very very active and doing, going around. I think that's very important. And it's very good to hear. |
| LEISSNER | I keep myself under the radar screen and quiet though, you know, so. Other than that, a lot of time with the family, which is the best. |
| LIM | That's good. |
| LEISSNER | Yeah, exactly. |
| LIM | Good to hear that. [laughter] |
| LEISSNER | Well, tell Rog good luck. Tell Roger good luck with, um, with Celsius. We need his help—because that's going to be an import-- |
| LIM | Yes I will I'll tell him that. And [U/I] concentrate on doing that too. And hoping to get back to many other things. Oh my gosh. [laughter] |
| LEISSNER | Yeah. One of these days. One of these days, it will be normal again. |
| LIM | Mm. I'm glad—I'm really glad all is well there. |
| LEISSNER | Yeah. |
| LIM | I get so worried not hearing from you for a while. |
| LEISSNER | Yeah I know, that's why, you know, ping me anytime you want to. You know, if I can, I speak |
| LIM | Okay, okay, and its always safe to talk to you. |
| LEISSNER | Yes yes, well certainly if I'm in my own little surroundings, yes. |
| LIM | [laughter] Okay, definitely, that's great. Yeah. And I will keep ourselves very safe here as well. |
| LEISSNER | Please. |
| LIM | I will keep myself very safe here. Yes. Definitely, I will. |

16

**A-211**

| | |
|---|---|
| LEISSNER | And tell Roger all my best regards. And Victoria of course as well. |
| LIM | Yes, yeah you can hear Victoria just came into the room. [laughter] |
| LEISSNER | Oh, that's cute. That's very cute. Alright, see you guys. |
| LIM | Okay, good. |
| LEISSNER | Thanks for reaching out, okay, and be in touch. Don't worry about it, be in touch anytime. |
| LIM | Okay. Okay. Thank you. |
| LEISSNER | Thank you. Bye, be good. bye, |
| VICTORIA | [U/I] |
| LEISSNER | Bye, Victoria. [laughter] |
| LIM | Alright bye |
| LEISSNER | Bye |
| LIM | Okay. |

17

**A-212**



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

F. #2016R00467                                        *271 Cadman Plaza East*
_____        *Brooklyn, New York 11201*

February 9, 2022

<u>**TO BE FILED UNDER SEAL**</u>

<u>By ECF</u>

The Honorable Margo K. Brodie
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ng Chong Hwa
              <u>Criminal Docket No. 18-538 (S-2) (MKB)</u>

Dear Chief Judge Brodie:

        The government respectfully submits this reply memorandum of law in further support of its January 26, 2022 motions <u>in limine</u> to: (1) preclude the defendant from introducing into evidence the Low-Leissner Call;[1] (2) preclude improper cross-examination of Leissner concerning a pending civil lawsuit in California; and (3) preclude improper cross-examination of Leissner concerning aspects of his personal life. <u>See</u> ECF No. 124 ("Gov't Mot."). For the reasons set forth below, the defendant's arguments in opposition, <u>see</u> ECF No. 130 ("Ng Opp."), are without merit, and the Court should grant the government's motions in their entirety.

        In addition, the government submits this memorandum in opposition to the defendant's February 6, 2022 motion <u>in limine</u> to admit an October 16, 2018 recorded call between the defendant's wife, Hwee Bin Lim, and Leissner (the "October 2018 Call"). <u>See</u> ECF No. 132 ("Ng Mot."). Each of the defendant's proffered bases for admission of the October 2018 Call find no basis in law or fact, and his motion should be denied accordingly.

_____

     [1]     Capitalized terms not otherwise defined herein are defined in reference to the government's January 26, 2022 motions <u>in limine</u>, ECF No. 124.

**A-213**

I.      The Court Should Grant the Government's January 26, 2022 Motions *in Limine*

      A.      The Court Should Preclude the Defense From Offering the Low-Leissner Call

           1.      The Low-Leissner Call is Not Admissible as Evidence of Leissner's Credibility

      In its opposition brief, the defendant concedes that the Low-Leissner Call cannot be offered for its truth.  See Ng Opp. at 2 ("The defense does not argue, nor will it argue, that any of the statements in the [Low-Leissner Call] are actually true, and therefore, the recording will not be introduced 'for the truth of the matter asserted.'" (quoting Fed. R. Evid. 801(c))).  Instead, the defendant argues that the Low-Leissner Call "demonstrate[s] that Leissner was willing to lie to others as part of his cooperation with the government" and is admissible "to show that the statements Leissner made to Low are outright lies and go directly to his credibility."  Id. at 2-3.  This argument is baseless.

      The government expects that Leissner will testify that he placed a number of calls as a proactive cooperator to people involved in the scheme and that he was directed by law enforcement agents to lie on those calls, including about his cooperation.  While the defense may then, if it wishes, cross-examine Leissner regarding this testimony, introduction of the Low-Leissner Call for the purposes proffered by the defendant would constitute a "waste of time" and a "needless presentation of cumulative evidence," because the statements Leissner made at the direction and under the supervision of law enforcement do not bear on his credibility.  See United States v. Crowley, 318 F.3d 401, 417 (2d Cir. 2003) (citing Fed. R. Evid. 403); accord United States v. Flaharty, 295 F.3d 182, 191 (2d Cir. 2002).  In addition, the specific statements that Leissner made to Low at the direction of law enforcement are, at most, minimally relevant, and the specific way in which those statements are false is not probative and is unfairly prejudicial.  See Fed. R. Evid. 401, 403; see also, e.g., Ng Opp. at 2 (noting the defendant's intent to cross-examine Leissner on his statement to Low, "I've been stuck in Europe pretty much," with evidence of international private-jet travel and Leissner's meeting with a mistress).

      Moreover, the law is clear that "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack . . . the witness's character for truthfulness."  Fed. R. Evid. 608(b); see, e.g., United States v. Brown, 2009 WL 497606, at *3 (E.D.N.Y. Feb. 26, 2009) ("Under the plain mandate of Rule 608(b), extrinsic evidence of a witness's prior conduct may not be admitted to attack his truthfulness.").  The defendant's request runs counter to Rule 608(b):  he seeks to admit extrinsic evidence—the Low-Leissner Call—to prove specific instances of Leissner's untruthfulness.  That should not be allowed.

           2.      The Low-Leissner Call is Not Admissible Under Rule 106

      The defendant also argues that admission of the Low-Leissner Call is appropriate under Rule 106 because it is necessary to contextualize "several statements" in the Admitted Communications and "ensure a fair and impartial understanding" of those calls.  Ng Opp. at 3.  Specifically, the defendant asserts that "the Low-Leissner Call is necessary to explain that Leissner is lying to Lim in their recorded call."  Id. at 4 (internal quotation marks omitted).

As an initial matter, Rule 106 does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999). This rule is strictly applied. For example, the Second Circuit has held that a defendant could not introduce a portion of his confession relating "to the execution of a robbery" where the portion introduced by the government concerned only "plans to execute the robbery." United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotations and citations omitted) (emphasis in original). The Circuit further observed that the admitted portion pertained to conduct that took place before the defendant entered an apartment, while the excluded portion pertained to conduct that took place after the defendant entered an apartment, which further underscored that the excluded portion was not necessary to complete the admitted portion. See id. Here, there is nothing about the Low-Leissner Call that is necessary to explain, clarify or complete the substantive content of the Admitted Communications, which took place on a different date between different parties and are clear and complete on their face.

Furthermore, the defendant's assertion that the Low-Leissner call is somehow "necessary" to demonstrate that Leissner is "lying" to Lim in the Admitted Communications is not true. The government anticipates that Leissner will testify that when he was speaking to Lim, he was doing so at the direction of law enforcement agents, and that his statements to her about being nervous and expressing concern for Low were designed, at least in part, to elicit information from Lim. See Ng Opp. at 3-4. This is not a situation where Leissner's motive or intent when speaking to Lim in the Admitted Communications is in doubt and the Low-Leissner Call can provide necessary insight—Leissner will do that himself through his testimony.

The defendant's invocation of the rule of completeness is simply an attempt to reiterate his flawed credibility argument. In fact, he admits as much in his opposition, asserting that the Low-Leissner Call is necessary—ostensibly, under Rule 106—"to show that Lim is not the only person Leissner is lying to in order to help himself." Ng Opp. at 4. "Rule 106 does not render admissible evidence that is otherwise inadmissible," United States v. Terry, 702 F.2d 299, 314 (2d Cir. 1983), and for the reasons stated above, the Court should reject the defendant's attempt to shoehorn his credibility argument into the Rule 106 framework, see United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2010) (noting that the rule of completeness cannot be used as a "mechanism to bypass [evidentiary] rules").

For these reasons and those stated in the government's moving brief, the defendant should be precluded from admitting the Low-Leissner Call.

B.   The Court Should Preclude the Defense from Litigating the California Civil Suit at Trial

In its moving brief, the government acknowledged that it would be inappropriate to "seek to preclude questions concerning Nu Horizons wholesale." Gov't Mot. at 6. Rather, the government sought a ruling precluding the defense from invoking the Nu Horizons lawsuit and litigating the issues therein, while recognizing that defense could ask questions based on the allegations in the lawsuit that go to credibility. See id. at 6-7. The defendant, however, insists that it would be proper to reference the Nu Horizons lawsuit and use it to impeach Leissner. See Ng Opp. at 5-6. The defendant is wrong.

As an initial matter, the defendant does not dispute the government's assertion that Rule 608(b) categorically bars his use of extrinsic evidence—such as the Nu Horizons lawsuit—to attack Leissner's credibility.  See Ng Opp. at 6 (conceding the Rule 608 "would prevent counsel from seeking to introduce extrinsic evidence (such as the lawsuit itself) into evidence").  The defendant attempts to elude this bar by arguing that he should be permitted to cross-examine Leissner about the fact of the suit because the suit provides Leissner with a "motive to tailor his testimony."  Ng Opp. at 5.  This argument fails to recognize, however, that courts routinely preclude cross-examination of witnesses regarding unsubstantiated allegations and pending civil lawsuits.  See, e.g., United States v. Dekattu, 2019 WL 885620, at *1 (E.D.N.Y. Feb. 22, 2019) (precluding cross-examination of police officer about allegations in civil lawsuit where lawsuit did not include any findings of fact or credibility); United States v. Ahmed, 2016 WL 3647686, at *3 (E.D.N.Y. July 1, 2016) (precluding cross-examination of government witnesses about prior civil lawsuits "containing unproven allegations").  This is because "[c]omplaints can—and frequently do—contain allegations that range from exaggerated to wholly fabricated."  Bernstein v. Bernstein Litowitz Berger & Grossmann LLP, 814 F.3d 132, 143 (2d Cir. 2016).  The mere existence of civil allegations against Leissner in a collateral matter does not establish a specific "motive to testify falsely" in the trial of Roger Ng.  United States v. Harvey, 547 F.2d 720, 722 (2d Cir. 1976).  The defendant's motive argument therefore fails.

Moreover, cross-examining Leissner about the Nu Horizons suit is improper under Rule 403.  As the government explained in its moving brief, a detour into the Nu Horizons suit would require the government to introduce substantial additional evidence that has minimal connection to the charges in the instant case in order to rebut the allegations.  Despite his claim that he has "no intention . . . of litigating [the Nu Horizons suit] in a 'mini trial,'" Ng Opp. at 6, that is precisely what permitting cross-examination regarding the suit would yield.  This trial within a trial would be time-consuming, confusing and distracting, factors that severely outweigh any probative value of the Nu Horizons suit.  See Crowley, 318 F.3d at 417.  It would also be needlessly cumulative; as the defendant's opposition makes clear on its face, even without the Nu Horizons suit, the jury will indisputably already have "sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely and in favor of the government."  United States v. Scarpa, 913 F.2d 993, 1018 (2d Cir. 1990).  The defendant should therefore be precluded from raising the Nu Horizons suit under Rule 403.

Finally, the government agrees that the defendant may "ask[] questions with a good faith basis, even if that good faith basis comes from the Simmons lawsuit."  Ng Opp. at 6.  The fact that the lawsuit provides a good faith basis for questions, however, does not permit defense counsel to cross-examine Leissner about the lawsuit itself.  As explained in the government's moving brief, the defendant may ask questions of Leissner bearing on his character for truthfulness—even a question whose basis is derived from the allegations in the Nu Horizons suit.  But once those questions are asked and answered, it would be improper to allow the defendant to point to the allegations in the Nu Horizons suit to impeach that answer or ask if it was true Leissner had been sued for such a claim.  See United States v. Masino, 275 F.2d 129, 133 (2d Cir. 1960) (when attempting impeachment "by proof of specific acts of misconduct not the subject of a conviction, the examiner must be content with the answer"); Brown, 2009 WL 497606, at *3 ("Because of this categorical bar on extrinsic evidence of prior instances of conduct, the cross-examiner may not introduce documents or other proof to contradict a witness

4

**A-216**

who denies committing the prior act or does not recall all or some of its details."). Accordingly, the Court should preclude cross-examination of Leissner regarding the Nu Horizons lawsuit.

       C.    <u>The Court Should Preclude Cross Examination on Irrelevant Aspects of Leissner's Personal Life</u>

      In its moving brief, the government requested that the defendant be precluded "from delving into Leissner's personal life on cross examination in an attempt to embarrass Leissner or shock the jury into assessing issues unrelated to Leissner's credibility or the facts in this case." Gov't Mot. at 7. The defendant opposes this request, essentially seeking free rein to question Leissner about every contour of his personal life. <u>See</u> Ng Opp. at 6-7. As the law makes clear and the defendant's opposition demonstrates, the government's requested limitations on cross-examination are essential here.

      Rule 608 permits cross-examination concerning specific instances of conduct only insofar as the conduct in question is "probative of truthfulness." <u>Flaharty</u>, 295 F.3d at 191. Even then, inquiry into specific instances of conduct may be further curtailed in order to "protect witnesses from harassment or undue embarrassment," Fed. R. Evid. 611(a)(3), or where the "probative value" of such evidence "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, . . . undue delay, [or] wasting time," Fed. R. Evid. 403. <u>See</u> <u>United States v. Sampson</u>, 898 F.3d 287, 309 (2d Cir. 2018) ("[A] district court is accorded broad discretion . . . [to] impose reasonable limits on cross-examination to protect against, <u>e.g.</u>, harassment, prejudice, confusion, and waste.") (internal quotation marks omitted). Thus, when considering whether to allow inquiry on cross-examination into specific instances of conduct that the Court finds probative of truthfulness, the Court must conduct a balancing test under Rule 403 and adhere to the restrictions of Rule 611. <u>See</u> <u>Brown</u>, 2009 WL 497606, at *4.

      Under this framework, courts have routinely precluded cross-examination on the topic of extramarital affairs. <u>See, e.g.</u>, <u>United States v. Siraj</u>, 2006 WL 2738952, at *1 (E.D.N.Y. Sept. 25, 2006); <u>United States v. Gotti</u>, 2005 WL 1214321, at *3-4 (S.D.N.Y. May 19, 2005); <u>see also</u> <u>United States v. Giovinco</u>, 2020 WL 832920, at *3 (S.D.N.Y. Feb. 20, 2020) ("Evidence of an affair is not particularly probative of a witness's character for truthfulness, and is often unduly prejudicial, justifying exclusion under Rule 403."). Nevertheless, the government does not seek to fully preclude cross-examination regarding Leissner's extramarital affairs, but rather requests only a ruling that such questioning be restricted "to those aspects of the affairs that bear directly on Leissner's credibility (<u>e.g.</u>, his concealment of those affairs from his spouse or false statements about the nature of those relationships to others)." Gov't Mot. at 5. The defendant's opposition to these proposed limitations finds no basis in law or fact, and it is clear that the defendant intends to cross-examine Leissner in a manner designed to cause him undue embarrassment or inflame the jury on irrelevant matters. This approach should not be countenanced, and the government's motion should be granted, in advance of trial, to set clear boundaries for cross-examination regarding Leissner's personal life.

      The defendant's suggestion that he will ask questions concerning Leissner's statements to and interactions with his minor children is particularly troubling. Leissner's lack of honesty or transparency with his young children regarding his extramarital relationships is, at most, minimally probative of truthfulness—indeed, it would be unreasonable to expect full

disclosure to his children on this topic.  Any invocation of his children on cross-examination is far more likely to harass Leissner than inform the jury and should be categorically barred.

## II.     The Court Should Deny the Defendant's Motion to Admit the October 2018 Call

Despite possessing multiple copies of the October 2018 Call well before trial, the defendant now belatedly moves to admit that call contrary to well-settled law precluding him from doing exactly that.  In his motion, the defendant recounts the purported "procedural history" of the October 2018 Call,[2] mischaracterizes the substance of the call, and argues that it is "admissible into evidence at trial, for four independent reasons."  Ng Mot. at 6.  As discussed below, each of those reasons are without merit.

### A.     Relevant Background

On October 3, 2018, a grand jury in the Eastern District of New York returned a sealed indictment against the defendant, charging him with the same offenses now pending before the Court.  That indictment would remain sealed until November 1, 2018.  On October 16, 2018, while the indictment remained sealed, Leissner was contacted via WeChat—an online messaging service—by Lim, who asked Leissner to set up a time for a call with "us."  Leissner understood this message to be a request for call between Leissner, Lim and the defendant.  Following Leissner's exchange via WeChat, Lim continued to press Leissner to arrange a time for the phone call with them.

At the direction of agents with the Federal Bureau of Investigation, Leissner set up a time for the call.  Because the defendant was under indictment at the time, the government directed a separate taint agent and taint prosecutor to handle the recording and review of the call in an abundance of caution to ensure there was no infringement on the defendant's Sixth Amendment rights.  That call happened on October 16, 2018, and was subsequently reviewed and released to the prosecution team and produced to the defense.

In that call, Lim informed Leissner that law enforcement in Malaysia was "looking at forfeiture" related to criminal proceeds traced to Silken Waters / Victoria Square and wanted to know from Leissner "if everything's okay."  Thereafter, Lim began telling Leissner what she purportedly "tried to explain to [the authorities]" concerning the money.  She described

---

[2]      The October 2018 Call was produced in discovery nearly two years ago, along with the Admitted Communications.  Specifically, the October 2018 Call was produced in April 2020 and then re-produced—on its own individual disc—twice in November 2021:  first on November 10, 2021, and then again on November 12, 2021, after the defendant stated that the disc from two days earlier was corrupted.  See Ng Mot. at 2.  The government did not hear anything from the defense about the October 2018 Call, including anything about technological issues, until February 4, 2022, nearly three months after it had been re-produced to the defense on a standalone disc.  The government responded by leaving yet another disc containing the recording at the government's office for defense counsel to retrieve.  See Ng Mot. at 3.  However, defense counsel had not picked up the disc before filing their motion, meaning that they were "able to view and listen to [the October 2018 Call] for the first time" by accessing the production that was made in either April 2020 or November 2021.  Id.

how she told the authorities the false story the defendant, Lim, Leissner and Leissner's wife, Judy Chan, had concocted after the fact to explain the movement of money between Capital Place Holdings and Silken Waters / Victoria Square.  She then asked if Leissner had access to any supporting documents for that story and suggested getting in touch with Judy Chan.

B.    The October 2018 Call Is Not Admissible Under Rule 803(3)

The defendant first argues that the October 2018 Call presents a "hornbook example[]" of the state-of-mind exception to the hearsay rule and "fall[s] squarely into" Rule 803(3).  Ng Mot. at 6-7.  The defendant is wrong.  The defendant attempts to introduce the October 2018 Call for the purpose of establishing the truth of the matter asserted—namely that that Lim's family had invested with Judy Chan's family many years before the call took place, and this investment was repaid into the Silken Waters / Victoria Square Account, also many years prior to the call.  Because the defendant seeks to admit the October 2018 Call to demonstrate a prior event rather than any forward-looking intent, Rule 803(3) provides no basis for its admission.

Rule 803(3) carves out a narrow exception to the hearsay rule for "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)."  Fed. R. Evid. 803(3).  The rule also includes a key exception that is fatal to the defendant's argument here: Rule 803(3) does not permit admission of "a statement of memory or belief to prove the fact remembered or believed."  Id.  "That exclusion 'is necessary to prevent the exception from swallowing the hearsay rule.  This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind.'"  United States v. Dawkins, 999 F.3d 767, 790 (2d Cir. 2021) (quoting United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991)).  Thus, to satisfy Rule 803(3), "the statement must face forward, rather than backward," United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993), because the "plain text of this rule does not cover the admission of statements regarding conduct or events that occurred earlier in time," United States v. Mendlowitz, 2019 WL 6977120, at *9 (S.D.N.Y. Dec. 20, 2019).

Courts have repeatedly held that it is inappropriate to admit a statement pursuant to Rule 803(3) when the statement concerns conduct or events that occurred years, or even months, earlier.  See, e.g., Cardascia, 951 F.2d at 488 ("To admit statements of one's state of mind with regard to conduct that occurred eight months earlier as in this case would significantly erode the intended breadth of this hearsay exception."); Mendlowitz, 2019 WL 6977120, at *9 (excluding a statement made six years after the relevant conduct).  Indeed, "the statements sought to be introduced must relate to the declarant's state of mind during the various fraudulent transactions"—not "after the fraudulent transactions had taken place and as the scheme itself was being discovered."  United States v. Netschi, 511 F. App'x 58, 61 (2d Cir. 2013) (emphasis in original).

Here, the defendant improperly seeks to admit the October 2018 Call to prove conduct or events that occurred significantly earlier in time.  Specifically, the defendant's purpose for admitting the October 2018 Call would not be to establish some relevant aspect of Lim's future-facing intent in October 2018, but rather to establish that Lim's family had invested

with Judy Chan's family many years prior, and that the 2012 and 2013 transfers to the Silken Waters / Victoria Square Account were a repayment of that debt. Because the October 2018 Call would be used to establish the truth of purported historical facts from years earlier, it cannot be admitted under Rule 803(3). Moreover, the October 2018 Call is ultimately little more "than a self-serving explanation of past events," United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016), that "so far post-dates the events that were the subject of the indictment, there was ample time for fabrication, which renders the 'state of mind' exception inapplicable," United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004), aff'd, 220 F. App'x 5 (2d Cir. 2007). For these reasons, the defendant should be precluded from admitting the October 2018 Call.

The defendant seeks to analogize Lim's statements on the October 2018 Call to her statements in the Video Call, arguing that they are both admissible under Rule 803(3) because "the same rationale [the government] used there applies here." Ng Mot. at 7-8. This analogy does not withstand scrutiny. Lim's statements on the Video Call—"My Victoria is ok" and "Friend/Everybody was worried you might be compromised"—demonstrate her then-existing mental condition—i.e., her current feelings in 2018 that the Silken Waters / Victoria Square Account had not been compromised and that she was worried, respectively—and the government sought to introduce those statements to demonstrate those facts. The October 2018 Call, by contrast, discussed purported documentation related to an investment that the conspirators agreed they would claim occurred many years before the conversation; it was not a statement of then-existing state-of-mind, but rather a statement that the defendant now seeks to introduce to establish events that he claims occurred in the distant past.[3] Essentially, while the government sought to admit Lim's statements on the video call to demonstrate her state of mind at the very moment she was speaking to Leissner in June 2018, the defendant, despite his claims to the contrary, is seeking to admit the October 2018 Call to substantiate a claim that there was a legitimate investment between Lim's and Judy Chan's families from approximately 2005-2011. The two situations are not on all fours, and this Court should reject the comparison.

Finally, even if certain of Lim's statements on the October 2018 Call fall into an exception to the hearsay rule—which, for the reasons discussed above, they do not—the defendant does not even attempt to address the fact that nearly all of Lim's statements on the call are inadmissible hearsay within hearsay, as Lim is recounting to Leissner what she claimed she previously told Malaysian authorities on unknown prior occasions. See, e.g., Ng Mot. Ex. 1 at 5-6 (recounting statements to Malaysian authorities that the investment started in 2005, wound down in 2011 and happened in China); id. at 7 (recounting her statements to authorities that the investment was not linked to Leissner); id. at 9 (repeating that she told Malaysian authorities, "This is a real, you know, it was an investment"). These are statements that Lim claims she first made to Malaysian law enforcement, which she is then relaying to Leissner, and which the defendant would seek to admit for their truth—namely, that there was a legitimate investment between Lim's family and Judy Chan's family. Moreover, it is not clear that Lim's claimed

_____

[3]     For each of the statements in the Video Call referenced in the defendant's motion, the government proffered multiple numerous other bases for admissibility, none of which are challenged by the defendant here. See ECF No. 90 at 37-38. As noted herein, the defendant's other purported bases for admission are, like his Rule 803(3) argument, without merit.

statements reflected any firsthand knowledge of the alleged financial arrangements between her family and Judy Chan's family. See Fed. R. Evid. 602. This is yet another layer of potential hearsay the defendant has not addressed.

In sum, the October 2018 Call does not fall within the narrow Rule 803(3) hearsay exception. The defendant seeks to admit the call to establish conduct or events that occurred years prior, and precedent makes clear that such statements do not fall within the ambit of Rule 803(3). There is also a hearsay-within-hearsay problem regarding nearly all of Lim's statements on the call that the defendant does not consider or confront. The October 2018 Call should therefore be precluded in its entirety.

      C.    The October 2018 Call Is Not Admissible Under Rule 106

The defendant asserts that the October 2018 call is "independently admissible pursuant to Rule 106" because it is "substantially exculpatory" and "demonstrates the actual truth" concerning the Silken Waters / Victoria Square Account. Ng Mot. at 8-9. The defendant's argument misapprehends Rule 106 and the underlying law, and this basis for admission should be rejected.

Rule 106 states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The Second Circuit has made clear, however, that Rule 106 does not provide a defendant with a blanket opportunity to offer additional prior statements simply because the government has introduced inculpatory statements. See United States v. Terry, 702 F.2d 299, 314 (2d Cir. 1983) ("Rule 106 does not render admissible evidence that is otherwise inadmissible."); see also United States v. Williston, 862 F.3d 1023, 1038 (10th Cir. 2017) (the rule of completeness "does not give an interview declarant a general right to introduce selected statements to try to counter the statements in the proponent's offered segment"). Rather, a defendant must demonstrate that the additional writing or recorded statement is "necessary to explain the admitted [statement], to place the admitted [statement] in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted [statement]." Johnson, 507 F.3d at 796 (internal quotations and citations omitted). As detailed above, this rule is strictly applied. See supra Section I.A.2. for discussion of Johnson; see also United States v. Glover, 101 F.3d 1183, 1190 (7th Cir. 1996) ("[T]he proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent.").

Here, the defendant has not met his burden with regard to the October 2018 Call. As an initial matter, the Admitted Communications are each clear and complete on their own. This is also not a situation where one party seeks to introduce excerpts of a communication and the other seeks to introduce other portions of the same communication—the October 2018 Call occurred approximately four months after each of the Admitted Communications. In the intervening months, Leissner's potential cooperation with the government was a subject of press

speculation in both the United States and Malaysia.[4]  Thus, not only was there a significant amount of time between the Admitted Communications and the October 2018 Call, but in the interim, a clear motive emerged for Lim to distrust Leissner and to fabricate an explanation for the criminal proceeds when she spoke to him.  In fact, when Lim spoke to Leissner in June 2018, she told him that "Friend/Everybody was worried you might be compromised," demonstrating that she was already concerned about speaking to him honestly.  Gov't Mot. Ex. E.  These concerns would only escalate following news reports of Leissner's cooperation.  Lim's worry that Leissner was cooperating not only renders her statements to him unreliable (as discussed below), but also—importantly for the Rule 106 analysis—establishes separate and distinct contexts for the Admitted Communications and the October 2018 Call.  The Admitted Communications and the October 2018 Call are therefore not statements that "ought to be considered at the same time."  Fed. R. Evid. 106.

In addition, when a defendant seeks to admit an additional statement under Rule 106, courts have "particular . . . discretion to exclude . . . post-hoc justifications" for criminal conduct.  United States v. Lumiere, 249 F. Supp. 3d 748, 757 (S.D.N.Y. 2017) (citing United States v. Rutigliano, 614 F. App'x 542, 545 (2d Cir. 2015)).  Indeed, exclusion under Rule 106 is proper where the defendant seeks to admit "post hoc attempts . . . to minimize his own culpability."  Id. at 758; see also United States v. Lesniewski, 2013 WL 3776235, at *5 (S.D.N.Y. July 12, 2013) (finding that "self-serving attempts to shoehorn after-the-fact justifications for his actions into his descriptions of his actions . . . is not the type of material envisioned by Rule 106")  That is precisely what the defendant is attempting to do here:  admit an after-the-fact explanation for his conduct, relayed through his wife and co-conspirator, that erases his culpability.  This is impermissible under Rule 106.

Thus, because the October 2018 Call provides only an unreliable post-hoc justification for criminal conduct and does not explain or contextualize the Admitted Communications—all of which occurred four months prior and before news of Leissner's potential cooperation had leaked—it should not be admitted pursuant to Rule 106.

D.      The October 2018 Call Is Not Admissible Under Rule 807

The defendant also argues that the October 2018 Call is admissible under Rule 807, also known as the residual hearsay exception.  See Ng Mot. at 11-12.  This is a particularly narrow exception to the hearsay rule that does not cover the October 2018 Call for multiple reasons.

A statement is admissible under Rule 807 only if:  (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative

---

[4]      See, e.g., Former Goldman Banker Is in Plea Talks Over Malaysian 1MDB Scandal, Wall Street Journal (July 9, 2018), available at https://www.wsj.com/articles/former-goldman-banker-in-plea-talks-over-malaysian-1mdb-scandal-1531165030; US gets ex-banker Leissner to cooperate in 1MDB probe, The Malaysian Insight (July 9, 2018), available at https://www.themalaysianinsight.com/s/74695.

10

**A-222**

on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.  "A statement will be admitted under this rule if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party."  United States v. Morgan, 385 F.3d 196, 208 (2d Cir. 2004) (internal quotation marks omitted).  The Second Circuit has made clear that a "hearsay statement admitted under the residual exception, then, must satisfy all of these requirements, and we have explained that it must be particularly trustworthy."  United States v. Hill, 658 F. App'x 600, 604 (2d Cir. 2016) (emphasis in original) (internal quotations marks omitted).  "The residual exception in Rule 807 is used 'very rarely, and only in exceptional circumstances.'"  United States v. Little, 2018 WL 461238, at *1 (S.D.N.Y. Jan. 3, 2018) (quoting Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991)).

Here, the October 2018 Call fails under the first prong of the analysis:  it is not "particularly trustworthy."  "[T]he proponent of the hearsay has the burden of showing its trustworthiness."  Lopez v. Miller, 915 F. Supp. 2d 373, 424 (E.D.N.Y. 2013).  "To carry this burden, he must point to evidence that corroborates both the declarant's trustworthiness and the truth of the statement."  United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006).  When evaluating trustworthiness in this context, the first "'risk peculiar to this kind of evidence [is] insincerity.'"  United States v. Mejia, 948 F. Supp. 2d 311, 316 (S.D.N.Y. 2013) (quoting Schering Corp v. Pfizer Inc., 189 F.3d 218, 232-33 (2d Cir. 1999)).  Ultimately, the burden is on the movant to demonstrate that "exceptional guarantees of trustworthiness exist."  United States v. James, 2007 WL 1579977, at *3 (E.D.N.Y. May 31, 2007) (internal quotation marks omitted).

The defendant's primary argument in support of the trustworthiness of the October 2018 Call is that "Leissner does not once challenge Ms. Lim that the investment happened."  Ng Mot. at 12.  This argument, however, fails to account for the simple fact that Leissner was cooperating with the government at this time and had been instructed by law enforcement agents not to raise alarms and to attempt to elicit information.  The government anticipates that Leissner will testify to that fact.  Thus, the primary factor the defendant relies upon as a purported indicator of trustworthiness and sincerity is undermined by the circumstances of the October 2018 Call and the other participant's testimony.  See, e.g., Hill, 658 F. App'x at 603 ("In considering whether hearsay evidence is admissible under Rule 807, we have explained that district courts should view the evidence in context." (internal quotations marks omitted)).  Moreover, as discussed above, Lim—who is alleged to be a co-conspirator in certain of the charged conspiracies—would have learned from news reports before October 2018 that Leissner was potentially cooperating with the government.  Accordingly, she had a clear incentive not to be sincere with Leissner when she spoke to him about the proceeds transferred into the Silken Waters / Victoria Square Account and instead to repeat the cover story that had been concocted for the proceeds in 2016.

There are also numerous other factors that undermine the trustworthiness of Lim's claims on the October 2018 Call.  First, to the government's knowledge, there is no documentation of the claimed investment between Lim's family and Judy Chan's family, and the defendant has never pointed to any such documents.  Second, the $35 million in transfers from the Capital Place Account to the Silken Waters / Victoria Square Account that the defendant claims are a repayment of a debt are criminal proceeds traceable to the 1MDB bond deals.

Third, Lim had an email exchange with a banker, over the banker's personal email account, on May 21, 2012, the very day the first 1MDB bond deal closed, to open the Silken Waters / Victoria Square Account.  Fourth, as described in the government's prior motions, there is ample evidence that Lim took steps to make it appear as though her mother, Tan Kim Chin, controlled the account when she in fact did so, including by using an email account she created that appeared to be in her mother's name.  The defendant has thus failed to carry his burden of demonstrating that the October 2018 Call is particularly trustworthy, and it is therefore inadmissible under Rule 807.

The October 2018 Call is also not the "most probative evidence" available.  The best evidence would be the document or agreement reflecting the alleged $35 million investment.  In the absence of that, the most probative evidence would be Lim's own testimony, which the defendant has stated he intends to offer at trial,[5] or the testimony of the individual with firsthand knowledge of the alleged investment, as even according to the defendant's version of events, the investment was made by Lim's family member, not Lim herself.  See ECF No. 122; see also Parsons, 929 F.2d at 907-08 (explaining that declarant's testimony would be more probative than proffered hearsay and holding that residual hearsay exception did not apply); Mejia, 948 F. Supp. 2d at 318 (denying a defendant's motion to admit a statement under Rule 807 and noting that "[i]n general, where the declarant is available to testify, hearsay testimony is not more probative than the in-person testimony of the declarant"); United States v. Zapata, 356 F.Supp.2d 323, 328 (S.D.N.Y. 2005) (holding that residual exception did not apply where the defendant could subpoena the declarant to testify). For this reason, as well, the October 2018 Call is not admissible under Rule 807.

E.   The Defendant's Other Purported Bases for Admitting the October 2018 Call Fail

Finally, the defendant argues that statements during the October 2018 Call when Lim "asked and directed Leissner to help her obtain records of the investment is admissible non-hearsay." Ng Mot. at 12; see also id. at 13 (describing Lim's statements to Leissner as "a directive or imperative" (internal quotation marks omitted)).  This argument falls short as well.  As an initial matter, the defendant does not point to a single example when Lim is directing Leissner to do anything on the October 2018 Call.  See id. at 3-4, 12-13.  More generally, however, the basis for considering questions, directives and imperatives as non-hearsay is that they are offered not for the truth of the assertion, but for the fact that it was said.  See, e.g., Dawkins, 999 F.3d at 789 (an "imperative rather than a declarative statement," such as a directive to do or not to do something, is "not hearsay" when "offered not for its truth, but for the fact that it was said"); United States v. Kuthuru, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter

---

[5]      The government has opposed this motion on numerous grounds.  See ECF No. 128.  If the Court were to grant the defendant's motion to permit Lim to testify remotely or if it were to deny the defendant's motion but she were to be called to testify in person, the October 2018 Call should still be excluded based on its lack of trustworthiness and because it is not the most probative evidence.

12

**A-224**

asserted." (citing United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999); United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990))).

Here, however, the defendant seeks to offer the statements from the October 2018 not for the fact that they were said, but for the truth of the matter asserted—i.e., that there are documents establishing the investment between Lim's family and Judy Chan's family that explains the $35 million transfer to the Silken Waters / Victoria Square Account.  Thus, to the extent that Lim's statements to Leissner on the call could be understood as questions, directives or imperatives, they would in fact be offered by the defendant for their truth, not the fact that they were said.  They are therefore properly considered hearsay, without an exception, and should be precluded.

III.    Conclusion

For the reasons set forth above and in the government's moving brief, the Court should grant the government's requests to (1) preclude the defendant from introducing the Low-Leissner Call; (2) preclude improper cross examination concerning the pending California civil lawsuit against Leissner; and (3) preclude improper cross-examination concerning Leissner's personal life.  In addition, the Court should deny the defendant's motion to admit the October 2018 Call.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     s/_____
        Alixandra E. Smith
        Drew G. Rolle
        Dylan A. Stern
        Assistant U.S. Attorneys

DEBORAH L. CONNOR                          JOSEPH BEEMSTERBOER
Chief, Money Laundering and Asset          Acting Chief, Fraud Section
Recovery Section, Criminal Division        Criminal Division
U.S. Department of Justice                 U.S. Department of Justice

s/_____                  s/_____
Jennifer E. Ambuehl                        Brent Wible
Trial Attorney                             Trial Attorney

cc:     Counsel for the defendant (via email)

13

**A-225**

A. TAI - DIRECT - MS. SMITH

177

1  Q   Turn to tab 23, Government's Exhibit 1785 already in
2  evidence.  What is the date on this e-mail?
3  A   March 5, 2012.
4  Q   Is this also in the Magnolia time period?
5  A   Yes, it is.
6  Q   Who is it an e-mail from?
7  A   Roger.ng1@gmail.com.
8  Q   Who is the e-mail to?
9  A   Me.
10 Q   Just looking at the e-mail, what is it generally asking
11 you to do?
12     THE COURT:  Can you restate the exhibit number?
13     MS. SMITH:  Government's Exhibit 1785.
14     THE COURT:  Thank you.
15 Q   Mr. Tai, what is the e-mail asking you to do?
16 A   Asking me to prepare a board paper for IPIC.  It looks
17 like overview of Project Maximus and Turin as well.
18 Q   If you look at the list of bullets there, what is the
19 third bullet talking about?
20 A   So it's basically the benefits and rationale for why IPIC
21 and Aabar were going to participate and work with 1MDB.
22 Q   This e-mail that we're looking at now and also the last
23 e-mail we were just looking at, both have e-mails from
24 Roger.ng1@gmail.com.  Was it common for Mr. Ng to send you
25 Goldman Sachs related e-mails from his gmail account?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

A. TAI - DIRECT - MS. SMITH

178

1  A   Not common.
2  Q   Did Goldman have a policy regarding the use of personal
3  e-mail accounts for work?
4  A   Yes.
5  Q   What was the policy?
6  A   Not to use it for personal e-mails for work.
7  Q   What was your understanding of why Goldman Sachs had that
8  policy?
9  A   Wanted to make sure any information is kept within the
10 Goldman system and no leaks.
11 Q   What do you mean by any information?
12 A   Any all information relating to business is kept within
13 the Goldman Sachs system.
14 Q   Was your personal e-mail address ever used in connection
15 with conducting work for Goldman?
16 A   I generally tried to avoid it, but yes.
17 Q   What were the circumstances under which your personal
18 e-mail address was used?
19 A   So in Asia clients from time to time like to send e-mails
20 to your personal address.  Usually either initiated by a
21 client and they ask for it.  Or Tim will wrote me in from
22 time to time as well.
23 Q   When you say Tim, who are you referring to?
24 A   Tim Leissner.
25 Q   When you say wrote me in from time to time, what do you

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

A. TAI - DIRECT - MS. SMITH

179

1  mean?
2  A   There were instances where he would kind of CC my
3  personal e-mails.
4  Q   What was your practice if someone else e-mailed you or
5  copied you on your personal e-mail address in connection with
6  work at Goldman?
7  A   I would generally tell the client not to do so, or I
8  would generally also have forward the e-mail back into the
9  Goldman system for record keeping.
10 Q   Why would you forward the e-mail back to the Goldman
11 system?
12 A   To make sure I keep all the information within the
13 Goldman Sachs system.
14 Q   Did the personal e-mail address sometimes used by others
15 in connection with your work at Goldman, did that have your
16 name in it?
17 A   Yes.
18 Q   It contained the words Andy and Tai?
19 A   That's correct.
20 Q   Is that e-mail address still an e-mail address that you
21 use?
22 A   Yes.
23 Q   Did you use any other personal e-mail address?  Did any
24 other personal e-mail address get copied in that did not have
25 your name on it?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

---

A. TAI - CROSS - MR. AGNIFILO

203

1  Q   All right.  And then he goes on to say the IC number --
2  which you just told us what that was -- that we have to do a
3  company search, okay?  Do you know what kind of company search
4  he's talking about?
5  A   I think it's -- in Malaysia, there's a registry of
6  companies, because companies need to be registered --
7  Q   Right.
8  A   -- and so you can check the Government database for the
9  company background.
10 Q   And this is something that people can do.  You don't need
11 an in to be able to do that; right?
12 A   I don't know how specific.  There may be, like, a
13 firewall to pay for a fee, but, yes, I think typically you can
14 access it.
15 Q   So if you pay the fee, you can get access to that
16 information; right?
17 A   Yes.
18 Q   Okay.  And so what he's basically telling you is the
19 information that you are looking for is on a website, and you
20 can also pay a fee and access it if this person is part of a
21 public company; right?
22 A   That's correct.
23 Q   Okay.  And that was his only involvement in all of the
24 issues that we looked at in this chain of emails; fair to say?
25 A   I don't know this.  I don't remember if there's

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

A-226

A. TAI - CROSS - MR. AGNIFILO                    204

1    additional emails in the future --
2    Q    Right.
3    A    -- so based on what I'm seeing now.
4    Q    That's all I'm asking.
5    A    Yeah.
6    Q    On the emails we just talked about in this one particular
7    Government exhibit, you guys are all doing your stuff talking
8    about, you know, BIG and trying to get the deal done, and then
9    there's one issue that comes up about trying to get
10   information about the Genting Treasurer, and Roger tells you
11   there's a website you can look at, and you can also pay money
12   and access this public information; right?
13   A    That's what he's saying on the email, yes.
14   Q    Okay.  Very good.
15        Thank you.
16        All right.  So let me ask you a couple of other
17   questions.
18        Fair to say that Tim Leissner was an aggressive
19   business person in terms of pursuing business and clients; is
20   that fair to say?
21   A    Yes.  Generally, yes.
22   Q    Okay.  And why is that so?  I mean, what in your
23   experience of him makes him an aggressive person in terms of
24   getting clients and business?
25   A    He would like to be in front of clients.  He would like

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

---

A. TAI - CROSS - MR. AGNIFILO                    205

1    to interact as much as possible, get meetings, talk to clients
2    as much as possible, and, you know, get mandates.
3    Q    You found him to be a social person?  "Social," like,
4    going out and meeting people.
5    A    Meeting people, yeah.  He liked to meet clients and meet
6    people.
7    Q    And he traveled a lot?
8    A    And he traveled a lot, yes.
9    Q    Would you say he traveled an unusual amount, in your
10   experience?
11   A    I can't -- I don't know all his travel plans.
12   Q    Fair enough.  Fair enough.
13        Fair to say that Leissner developed social
14   relationships as a way of getting new business?
15   A    Yes.
16   Q    Okay.  And how -- from what you could see, how did he go
17   about doing that?  How did he develop social relationships as
18   a way of getting new business?
19   A    That one, I actually don't know because, for me, it's
20   like all of a sudden there's this relationship and -- and the
21   person became a client.  Like, how he did it before, how he
22   knew the person, typically, I actually -- or how he knew a
23   client, I, typically, don't know actually.
24   Q    Have you ever been with him and Jasmine Loo together?
25   A    In meetings, yes.

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

---

A. TAI - CROSS - MR. AGNIFILO                    206

1    Q    Have you ever been in situations where it was just you
2    and Tim and Jasmine Loo?
3    A    Yes.
4    Q    All right.  How many times would you say you've been with
5    just you and Tim Leissner and Jasmine Loo?
6    A    Oh, I actually don't know.  I don't remember.
7    Q    Okay.  Do you think it's more than ten?  Less than ten?
8    A    I don't know.  I don't know.
9    Q    That's fine.
10        Did they seem to know each other well?
11   A    Yes.
12   Q    Okay.  Did they seem, from what you were able to observe,
13   to have a close relationship?
14   A    Yes.
15   Q    And it's fair to say that Tim Leissner would often bring
16   issues concerning 1MDB to Jasmine Loo's attention directly;
17   correct?
18   A    From -- there are instances.  I just can't say how often,
19   but, yes, he has done that before.
20   Q    So the question is, something would be going on
21   concerning 1MDB; correct?
22   A    Yes.
23   Q    And Leissner would specifically seek out Jasmine Loo in
24   addressing the issue?
25        MS. SMITH:  Objection, Your Honor.  Personal

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

---

A. TAI - CROSS - MR. AGNIFILO                    207

1    knowledge.
2        THE COURT:  Rephrase.
3        MR. AGNIFILO:  Sure.
4    BY MR. AGNIFILO:
5    Q    From what you understand being involved in these deal
6    teams; right?
7    A    (No verbal response.)
8    Q    So what you have to do, just because everything gets
9    written down, so if you're affirming, like, an answer -- or
10   saying no, whatever the answer is -- you have to verbally say
11   the answer.
12   A    I'm sorry.  Yes.  Okay.  Your question?
13   Q    You're doing fine.
14   A    I wasn't sure of your question.
15   Q    So let me -- I gave you a bad question.  Let me start
16   again.  Okay.
17        How many deals did you work on with Tim Leissner,
18   would you say?
19   A    When you -- when you define "deals," is it just
20   transactions we closed or, in general, like, clients, because
21   there were transactions, you know, that we -- there was deals
22   that didn't close -- there were deals that did not involve
23   1MDB, those were deals as well.
24   Q    Yeah, yeah, all the deals.
25   A    A few.  I don't remember how many.

                    Denise Parisi, RPR, CRR
                    Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO          208

```
1   Q   Okay.  Would you say it's more than ten?
2   A   No.
3   Q   Less than ten?
4   A   I think so.  I think -- I think it's generally less than
5   ten.
6   Q   Okay.  So you were involved with Leissner in the three
7   1MDB bond deals that you talked about on direct examination;
8   is that correct?
9   A   That's correct.
10  Q   What other deals can you think of sitting here today that
11  you worked on with Tim Leissner other than the three 1MDB
12  deals?
13  A   The three 1MDB acquisitions.
14  Q   Yep.
15  A   Deals -- one deal was the lottery business we talked
16  about previously.  It's a deal, but we didn't close, so that's
17  why I wasn't sure how we defined a deal.
18  Q   That's okay.
19  A   So that stands out.  And I'm sure there were other
20  clients that we worked on together.  I just don't remember how
21  many.
22  Q   Did you work on the Astro initial public offering with
23  Leissner?
24  A   No, I did not.
25  Q   Did you work on anything involving Ananda Krishnan with
```

                Denise Parisi, RPR, CRR
                Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO          210

```
1   gentle.  That's why I'm saying more approachable.
2   Q   You use the word "gentle."  Tell us how Roger was gentle
3   in your experience.
4           MS. SMITH:  Objection, Your Honor.
5           THE COURT:  Basis?
6           MS. SMITH:  Just relevance.
7           THE COURT:  Overruled.
8           Go ahead.
9   BY MR. AGNIFILO:
10  Q   Go ahead.  Please tell us how Roger was gentle.
11  A   Roger was more gentle in the sense that he was not too --
12  he liked to seek opinions.  He was thoughtful and -- he didn't
13  just stamp down his -- you know, his own kind of thoughts.
14  Q   He was open-minded?
15  A   He was open-minded, yes.
16  Q   He would talk to a lot of people?
17  A   He would talk to a lot of people.
18  Q   In your experience, was he kind?
19  A   He was kind, yes.
20  Q   Now, Roger was a specialist on topics concerning
21  Malaysia; fair to say?
22  A   Yes, that's correct.
23  Q   He was from Malaysia; you know that.
24  A   Yes.
25      And tell me if this is right.  And I might not have all
```

                Denise Parisi, RPR, CRR
                Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO          209

```
1   Leissner?
2   A   Well, Project Turin which was the power asset was --
3   Project Turin involved Ananda Krishnan because he was the
4   seller of the assets.
5   Q   Now, from what you were able to observe, have you
6   observed Leissner bring things to Jasmine Loo's attention when
7   it concerned 1MDB?
8   A   Yes, he has done that before.
9   Q   Fair to say that -- and you worked with Roger Ng quite a
10  bit as well; correct?
11  A   That's correct.
12  Q   Fair to say Roger Ng was a far less aggressive business
13  person than Tim Leissner?
14  A   In -- yes -- yes, more approachable.
15  Q   Roger was more approachable?
16  A   Yes.  So -- yes.
17  Q   Okay.  What do you mean by that?  When you say that Roger
18  was more approachable, just tell the jury what you're talking
19  about.
20  A   So I think in terms of wanting to meet clients, they
21  were -- probably, you know, have the drive to want to meet
22  clients and find businesses.  Where I think the difference,
23  from my perspective, was, Tim was more insistent in terms of
24  tone and, kind of, talking to people; whereas, Roger was more
25  thoughtful and, I would say, gentle.  Maybe the right way is
```

                Denise Parisi, RPR, CRR
                Official Court Reporter

A. TAI - CROSS - MR. AGNIFILO          211

```
1   the terms right, so if I say something wrong, you will correct
2   me, and I will appreciate that.
3       Fair to say that the -- let's just talk about the
4   first 1MDB deal -- Magnolia -- okay?
5       There were issues that had to be addressed with the
6   Malaysian Central Bank; am I right?
7   A   That's correct.
8   Q   Okay.  And do you recall what those were?
9   A   I don't -- not all of it.
10  Q   At a high level.  We will use that high-level talk.  At a
11  high level.
12  A   The main thing that comes to mind, if that's okay, is,
13  obviously, it's a Malaysian Government, and the deal that is
14  involved, we wanted to make sure that the Central Bank was
15  aware of this, because -- because 1MDB was owned by the
16  Malaysian Government.
17  Q   Okay.  And so tell me if this is right.
18      Okay.  You guys were raising funds -- forget "you
19  guys."  So Ananda Krishnan is selling his power assets;
20  correct?
21  A   (No verbal response.)
22  Q   And that company is --
23  A   Tanjong, PLC.
24  Q   Tanjong.  Tanjong.
25      So he's selling Tanjong; correct?
```

                Denise Parisi, RPR, CRR
                Official Court Reporter

**A-228**

221

A. TAI - CROSS - MR. AGNIFILO

1   A   (No verbal response.)
2   Q   You just have to answer yes.
3   A   Yes, yes.  I'm sorry.
4   Q   All right.
5       And 1MDB is buying the power plants from Ananda;
6   correct?
7   A   That's correct.
8   Q   In the overall view -- tell me if this is right -- money
9   was being raised in two different currencies; correct?
10  A   For Tanjong PLC.
11  Q   Yes.
12  A   Yes, correct, yes.
13  Q   So money was being raised in U.S. dollars; correct?
14  A   That's correct.
15  Q   And money was being raised in Malaysian ringgit; correct?
16  A   That's correct.
17  Q   Were you, as a Goldman Sachs person on the deal team,
18  involved in any way in the ringgit raise?
19  A   We tried to be helpful in terms of sharing some of our
20  diligence, because we advised on the acquisition, so we knew
21  the assets operating and stats and some of the stuff fairly
22  well.
23  Q   Right.
24  A   So, yes, we tried to help in terms of giving -- sharing
25  some of that diligence information --

Denise Parisi, RPR, CRR
Official Court Reporter

222

1   A   Yes.
2   Q   Okay.  All right.  I want to ask you a few questions
3   about these committee conference calls that you talked about
4   for a little bit yesterday.
5       I think you said yesterday you listened in on
6   several conference calls that are, you know, these committee
7   meetings by conference call; right?
8   A   That's correct.
9   Q   All right.  And there's the capital committee; correct?
10  A   Yes.
11  Q   And then there's a firm-wide capital committee which is
12  all of Goldman Sachs; right?
13  A   Yes.
14  Q   And then there's an Asia Pacific Capital Committee, is
15  that another entity?
16  A   Yes.
17  Q   So tell me if I have this right.  So if there is a deal
18  or a transaction in Asia, it will first go sometimes to the
19  Asia Capital Committee for review?
20  A   That's correct.
21  Q   And then sometimes it will go up to the firm-wide, the
22  whole company capital committee; correct?
23  A   That's correct.
24  Q   And then there are things called suitability committees
25  too; right?

Michele Lucchese, RPR, CRR

223

1   A   Yes.
2   Q   And then there will be an Asia Pacific suitability
3   committee; right?
4   A   Yes.
5   Q   And then a firm-wide, the whole company suitability;
6   correct?
7   A   Yes.
8   Q   And you participate -- you listen on the phone for some
9   of these firm-wide capital committee meetings and suitability
10  committee meetings; correct?
11  A   That's correct.
12  Q   All right.  Do these meetings have a protocol about who's
13  expected to speak?
14  A   Typically, it's the senior members of the team.
15  Q   Okay.  And tell me if this is your understanding, so the
16  senior members of the team are going to be speaking in a
17  firm-wide capital committee meeting, for instance; correct?
18  A   Yes.
19  Q   And the only reason -- and the only way that someone
20  other than a team leader would speak at such a meeting is if
21  the team leader specifically delegated that person to speak;
22  right?
23  A   It's not always the case there is a delegation.
24  Sometimes, you know, the other members of the team, if they
25  know the facts, they can also speak up.

Michele Lucchese, RPR, CRR

224

1   Q   Okay.  Now, if one were to speak -- well, let me withdraw
2   the question.  Sorry.
3       Andrea Vella and Tim Leissner are both partners of
4   Goldman Sachs; correct?
5   A   That's correct.
6       MR. AGNIFILO:  Can we just pull up Government
7   Exhibit 803 for a second?
8   Q   We're going to go to the ELMO.  We're looking at -- I
9   can tell you this is Government Exhibit 803.  There it is.  I
10  have taken the liberty to highlight senior members of
11  management on there.
12      And, so, the members of senior management are Tim
13  Leissner and Andrea Vella.
14  A   That's correct.
15  Q   All right.  And what you said is that at these capital
16  committee meetings the people you're expecting to speak are
17  the members of senior management, which, in this case, would
18  be Leissner and Bella; correct?
19  A   Yes.
20  Q   All right.  And you were not a partner at the time at
21  Goldman Sachs and you're not a partner today?
22  A   Still not a partner, no.
23  Q   Okay.  And Roger was not a partner at the time of Goldman
24  Sachs and to your knowledge, he's never been a partner?
25  A   He's never been a partner.

Michele Lucchese, RPR, CRR

225

1  Q   Okay.  And, so, without the partner's approval -- in your
2  experience, without the partner's approval, is someone who's
3  not a partner expected to weigh in on something that he or she
4  thinks at one of these capital committee meetings?
5      A   At the committee or just the --
6  Q   No, no, no.  And during the meeting itself, unless you
7  talk to the senior management, to the partner beforehand,
8  would the partner expect you to take the lead and start making
9  comments during the call?
10         MS. SMITH:  Objection, Your Honor.  What the partner
11 would expect.
12         THE COURT:  Rephrase the question.
13         MR. AGNIFILO:  Sure.
14 Q   You have been working with partners at Goldman Sachs for
15 how long?
16 A   15 years.
17 Q   Okay.  Do you endeavor to figure out what the partner
18 expects of you?
19 A   Yes.
20 Q   Okay.  Do you expect -- let me ask you a question.  If
21 you don't think the partner wants you to talk at a meeting,
22 are you going to talk at a meeting?
23 A   No.
24 Q   That's not a good way to ever be a partner; right?
25 A   Yeah, that's correct.

                Michele Lucchese, RPR, CRR

227

1  different locations in Manhattan, it was on 85 Broad; right?
2  Near Wall Street?
3  A   That's correct.
4  Q   Which is very much in Manhattan; right?
5  A   Yes.
6  Q   And it was also at -- at the current time it's at 200
7  West Street; right?
8  A   Yes.
9  Q   Very much Manhattan; right?
10 A   Yes.
11 Q   And you worked at Goldman Sachs in New York for what,
12 about two years?
13 A   Two and a half.
14 Q   Two and a half years.  You left Michigan.  Was that --
15 you went somewhere else and then went to Goldman Sachs?
16 A   I went to UBS in L.A. for a year and then --
17 Q   Okay.
18 A   -- came to Goldman.
19 Q   And when you worked at Goldman Sachs here in New York,
20 you worked at 200 West?
21 A   No.  85 Broad Street.
22 Q   You were at 85 Broad Street, before they moved?
23 A   Before they moved.
24 Q   To your knowledge, does Goldman Sachs have any offices in
25 Brooklyn?

                Michele Lucchese, RPR, CRR

226

1  Q   At the current time, there's 400 partners, about, at
2  Goldman Sachs?
3  A   That's what I think.  I think so.
4  Q   Yeah.  40,000 people, 40,000 people work at Goldman
5  Sachs, and they've got 400 partners?
6  A   Roughly around there, yes.
7  Q   Now, do you know if at any point in time any of these
8  committee meetings were such that certain people were not able
9  to speak, they're in a listening-only mode on the call?
10 A   That one I actually don't know.
11 Q   Have you heard that, that certain committee meetings
12 certain people might be in a listen-only mode?
13 A   I've never heard that before, actually.  I don't....
14 Q   Since we're talking about Goldman Sachs, you talked
15 yesterday -- you were asked questions about Goldman Sachs in
16 New York; right?
17 A   Yes.
18 Q   And Goldman Sachs headquarters is in New York; right?
19 A   Yes.
20 Q   And by New York, we mean Manhattan; right?
21 A   Yes.
22 Q   That's -- Goldman headquarters has always been in
23 Manhattan; right?
24 A   Yes.
25 Q   Okay.  I think you said yesterday that it was in two

                Michele Lucchese, RPR, CRR

228

1  A   Not that I'm aware of.
2  Q   Do you know if it has an office in Queens?
3  A   Not I'm aware of.
4  Q   Do you know if it has an office in Staten Island?
5  A   Not I'm aware of.
6  Q   Okay.  And how about Long Island, does it have an office
7  on Long Island?
8  A   I don't know about.
9  Q   The one that you know is in Manhattan; right?
10 A   We have one in New Jersey, 30 Hudson.
11 Q   All right.  So there's Manhattan and there's New Jersey?
12 A   Right.
13 Q   And then there are a number of other offices all over the
14 world; right?
15 A   That's correct.
16 Q   But none in Brooklyn, Queens, Staten Island, Long Island,
17 as far as you know?
18 A   As far as I know.
19 Q   Okay.  So when you are having a meeting at Goldman Sachs
20 in New York, that's a meeting in Manhattan; right?
21 A   In New York, it could be wherever the client wants it to
22 be as well.
23 Q   But if you're at the Goldman Sachs offices?
24 A   If I'm at the Goldman Sachs offices, yes.
25 Q   And when you have -- I think you were asked yesterday

                Michele Lucchese, RPR, CRR

**A-230**

229

```
 1   about these -- these committee meetings, the firm-wide capital
 2   committee meetings.  That is a meeting with people that you
 3   understand are sitting in Manhattan; right?
 4   A    I think most of them are, because it's global.  It could
 5   be individuals from other offices.  I just don't remember.
 6   Q    Right.  But the people that are at the Goldman Sachs
 7   office here in New York, they're in Manhattan; right?
 8   A    They could do it from their home as well.
 9   Q    No, no.  Right.  They could be home.  But if they're in
10   the office.
11   A    Oh, they're in their office?
12   Q    If they're in the office here in New York, what that
13   means is Manhattan; right?
14   A    I would think so, yes.
15   Q    You don't know of any office in New York that's not the
16   one in Manhattan?
17   A    No, I don't know.
18   Q    You talked earlier today about the fact that from time to
19   time you yourself would use your personal e-mail for Goldman
20   Sachs business; correct?  From time to time?
21   A    Yeah.  There are instances, yes.
22   Q    And I think you even said earlier today that, and tell
23   me, I don't want to get this wrong, that in Asia it happens
24   from time to time that people will ask for your personal
25   e-mail address as opposed to your work e-mail address?
```

Michele Lucchese, RPR, CRR

231

```
 1   the office, but do you remember seeing him soon after he came
 2   back?
 3   A    I don't remember the specific -- I mean, I'm sure I've
 4   seen him when he came back.
 5   Q    All right.  Did you and he ever talk -- I'm not asking
 6   what each of you said.  Did you and he ever talk about the
 7   bike accident?
 8   A    I don't remember.
 9   Q    But you said you know he had a bike accident?
10   A    I remember he had a bike accident.
11   Q    Now, I'm just going to ask you a few questions on topic
12   and I'm not trying to -- do you remember using your personal
13   e-mail with a person Ujin Timan?
14   A    Yes.
15   Q    Who was Ujin Timan?
16   A    He was a client of Tim's.
17   Q    And how did it come about that you used your personal
18   e-mail in having communication with Ujin Timan?
19   A    I don't remember exactly how.  Typically Tim would just
20   rope me in.
21   Q    Okay.  And when you say Tim roped you in, what do you
22   mean by maybe Tim roped me in?
23   A    Roped me in.  He added me to the e-mail chain or he
24   connected me.
25   Q    Because he was a partner and you were not; right?
```

Michele Lucchese, RPR, CRR

230

```
 1   A    That's correct.
 2   Q    All right.  And there are times when you yourself gave
 3   your personal e-mail address to a potential client; correct?
 4   A    I don't remember that.
 5   Q    Okay.  Do you remember if certain people at 1MDB had your
 6   personal e-mail addresses?
 7   A    I think they -- yes.
 8   Q    Do you remember -- do you remember specifically if
 9   Terence Geh might have had it?
10   A    He may have had it.
11   Q    You do know Terrence; right?
12   A    Yes.
13   Q    And do you know if he and Roger knew each other?
14   A    Yes, they knew each other.
15   Q    Do you know if they were both bicycle riders?
16   A    I've heard that before, yes.
17   Q    That they road bicycles together?
18   A    Yes.
19   Q    Roger rides a bicycle; correct?
20   A    Yes.
21   Q    Do you remember him being out of the office for some
22   extended period of time because of a bike accident?
23   A    I remember the bike accident.  I don't remember if -- if
24   he was actually out.
25   Q    Okay.  And did you -- not at the time that he was out of
```

Michele Lucchese, RPR, CRR

232

```
 1   A    That's correct.
 2   Q    Okay.  Could Tim sometimes be forceful with you?  Let me
 3   not use that word.
 4        Could Tim be insistent with you.
 5   A    I don't know if I'm answering your question correct, but
 6   Tim was the partner.  I just do whatever he tells me to do.
 7   Q    Okay.  And why is it that you would do whatever Tim told
 8   you to do because he was the partner?  Explain that to us.
 9   A    I mean, he was head of the office and my boss, basically,
10   so you have to take his direction.
11   Q    Okay.  And if you didn't take Tim's direction, what were
12   you concerned could happen to you?
13   A    He may not like me -- I don't know.  Compensation, get
14   fired.  Like, just negative.  Yeah.
15   Q    So let's unpack that.
16   A    Yeah.
17   Q    It could affect your compensation; correct?
18        You have to answer yes or no.
19   A    I'm sorry.  Yes.
20   Q    And how could Tim affect your compensation?
21   A    He was a partner, so he had, you know, influence over how
22   I would be compensated and performance review.
23   Q    And, so, it was your understanding that if Tim said
24   negative things about your performance and if Tim said that
25   you didn't listen to the direction of your superiors, that
```

Michele Lucchese, RPR, CRR

357

A. COHEN - CROSS - MR. INTRATER

1    Q    So you're saying Strategic Escorts LLC, but that's not an

2    actual entity that Strategic ran, you're just making a joke?

3    A    Correct.

4    Q    I want to move forward to this, what you said, was the

5    biggest party that Strategic threw for Jho Low.  This is

6    November of 2012?

7    A    Yes.

8    Q    Where is this November 2012 party, where was that held?

9    A    Nevada.

10   Q    Can you give the jurors a sense of what happened at this

11   party, like, was something set up special?  Can you give an

12   overview?

13   A    I wasn't there but I understand it to have been a built

14   out, if you will.  Almost like a circus like atmosphere with

15   staging and decor and lighting and power.  And sort of in

16   somewhere in the desert, so sort of like almost like a

17   festival, a mini festival that was built out.

18             THE COURT:  Counsel, before you continue, do you

19   have a lot more for this witness?

20             MR. INTRATER:  I have about 15 minutes.

21             THE COURT:  I haven't given the jurors an afternoon

22   break.

23             MR. INTRATER:  I'm sorry, okay.

24             THE COURT:  I was planning to end 15 minutes early.

25   I didn't want to deprive them of their break.

                    Rivka Teich CSR RPR RMR FCRR
                       Official Court Reporter

---

358

A. COHEN - CROSS- MR. INTRATER

1             MR. INTRATER:  Do you want to end now?

2             THE COURT:  Sidebar.

3             (Continued on the next page.)

                    Rivka Teich CSR RPR RMR FCRR
                       Official Court Reporter

---

359

SIDEBAR CONFERENCE

1             (Sidebar conference.)

2             THE COURT:  One question about this witness, what is

3    the basis for his knowledge about this party since he wasn't

4    there?

5             MR. INTRATER:  I think he was still there in late

6    2012, your Honor.  I believe that they separated in

7    January 2013.  He was still employed by the company at this

8    time.

9             THE COURT:  But his basis for his knowledge of what

10   happened in Las Vegas.

11            MR. INTRATER:  He's the CFO.  He's putting together

12   all of the -- he's running the numbers for all of the

13   different things that are happening.

14            THE COURT:  Just establish that.  Because I

15   understand his testimony just now to be based on what he was

16   told about the party --

17            MR. INTRATER:  I'm not going to go further into it.

18            THE COURT:  -- as opposed to what he saw from

19   whatever invoices he might have looked at.

20            MR. INTRATER:  I'll do that then a couple of

21   questions.  I don't want to hold them up.

22            (End of sidebar conference.)

23            (Continued on the next page.)

                    Rivka Teich CSR RPR RMR FCRR
                       Official Court Reporter

---

360

A. COHEN - CROSS- MR. INTRATER

1             (In open court.)

2    BY MR. INTRATER:

3    Q    A couple of last questions.  Do you recall that the

4    Government showed you Government's Exhibit 2812, this was a

5    guest list from, this is 2812 which is in evidence, I'm

6    putting it on to the Elmo.  Is this a guest list, an invite

7    list?

8    A    Guest list.

9    Q    This is November 2012, right, and is the first heading

10   Malaysia?

11   A    Yes.

12   Q    Line number four is Tim Leissner, right?

13   A    Yes.

14   Q    He's sandwiched in between Jasmine Loo and Nik Kamil?

15   A    Yes.

16   Q    Number 11 is Jho Low?

17   A    Yes.

18   Q    Then really dim, but right below there you see Singapore?

19   A    Yes.

20   Q    And there is one name highlighted there Yak Yew Chee,

21   right?

22   A    Yes.

23            MR. INTRATER:  Your Honor, I have nothing further

24   for this witness.  Thank you.

25            THE COURT:  Thank you, counsel.

                    Rivka Teich CSR RPR RMR FCRR
                       Official Court Reporter

**Proceedings** 368

1  system when we got it two nights ago, but it is not yet in a
2  reviewable form for us to start looking at.  We will let you
3  know once it is.  I just wanted to keep you apprised of the
4  situation.
5  　　　　　THE COURT:  Okay.  So the other thing we should
6  consider is not sitting at all tomorrow and you using that
7  time to come up to speed on the additional information.
8  　　　　　MR. ROLLE:  Judge, that was going to be I think our
9  initial reaction from the Government.  We certainly don't
10  mind.
11  　　　　　MS. GERAGOS:  If it's loaded in, that would make
12  sense.  But right now it's not.
13  　　　　　THE COURT:  If it's not, you won't have access to
14  anything?
15  　　　　　MS. GERAGOS:  Right.
16  　　　　　THE COURT:  So we will discuss that further today.
17  Is the witness here?
18  　　　　　MR. ROLLE:  Yes, Your Honor.
19  　　　　　THE COURT:  You should have him ready to come in as
20  soon as the jury is in.  Just bring him in on the side.
21  　　　　　(The jury enters the courtroom.)
22  　　　　　THE COURT:  Please be seated, everyone.  Good
23  morning, members of the jury.
24  　　　　　THE JURY:  Good morning.
25  　　　　　THE COURT:  I hope you had a great night last night

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

**Proceedings** 369

1  and we're going to continue this morning with the Government's
2  next witness.
3  　　　　　Could the Government please call its witness?
4  　　　　　MR. ROLLE:  Yes, Your Honor.
5  　　　　　The Government calls Tim Leissner.
6  　　　　　THE COURT:  Good morning.  Could you please stand
7  and raise your right hand.
8  　　　　　THE COURTROOM DEPUTY:  Do you solemnly swear or
9  affirm that the answers you're about to give to the Court will
10  be the truth, the whole truth and nothing but the truth?
11  　　　　　THE WITNESS:  I do swear.
12  　　　　　THE COURT:  Please state your name for the record.
13  　　　　　THE WITNESS:  Tim Leissner.
14  　　　　　THE COURT:  Please have a seat and spell your last
15  name for the record.
16  　　　　　THE WITNESS:  Leissner, L-E-I-S-S-N-E-R.
17  　　　　　THE COURT:  Thank you.  And I'm going to ask you to
18  speak into the mic when you do speak.  Please proceed.
19  　　　　　THE WITNESS:  Yes, Your Honor.
20  　　　　　MR. ROLLE:  Thank you, Your Honor.
21  TIM LEISSNER,
22  　　called as a witness, having been first duly
23  　　sworn/affirmed, was examined and testified as follows:
24  DIRECT EXAMINATION
25  BY MR. ROLLE:

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

**Leissner - direct - Rolle** 370

1  Q   Good morning, Mr. Leissner.  If you could remove your
2  mask at this point.
3  　　　　　How old are you, Mr. Leissner?
4  A   I'm 52 years old.
5  　　　　　MR. ROLLE:  And the microphone is a little low.  I
6  think that we can raise it up a little bit so we can be sure
7  everyone in the courtroom can hear you.
8  　　　　　THE WITNESS:  Sure.
9  　　　　　THE COURT:  Just pull it closer to you.  Go ahead,
10  Pierre, just make sure it is working properly.
11  A   Is this better?  All right.
12  Q   Just try to keep your voice up --
13  A   Yep.
14  Q   -- so everyone can hear you recognize and clearly?
15  A   Certainly.
16  Q   How old are you?
17  A   I'm 52-year-old.
18  Q   Where were you born?
19  A   In Berlin, Germany.
20  Q   What is your first language?
21  A   German.
22  Q   Do you speak and understand English?
23  A   I do so, sir.
24  Q   Where did you grow up?
25  A   I grew up in Germany for most of my young life and then I

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

**Leissner - direct - Rolle** 371

1  was traveling around the world working in many different
2  places.
3  Q   Are you a citizen of any other countries?
4  A   I'm also a Brazilian citizen.
5  　　　　　THE COURT:  Mr. Rolle, we are not hearing you
6  clearly, so you need to speak into the mic.
7  　　　　　MR. ROLLE:  Yes, Your Honor.
8  Q   What countries are you a citizen of?
9  A   Germany and Brazil.
10  Q   What country do you currently live in?
11  A   In the United States.
12  Q   How far did you go in school?
13  A   I went to graduate school and have an M.B.A. and a D.B.A.
14  Q   Did you go to undergraduate as well?
15  A   Yes, I did.
16  Q   Sir, when did you get your bachelor's degree?
17  A   1989.
18  Q   What was that in?
19  A   In business.
20  Q   And you said you had an M.B.A.  What is that?
21  A   A Master of Business Administration, sir.
22  Q   Did you get any degrees after that?
23  A   A D.B.A., which is a Doctorate of Business
24  Administration.
25  Q   Where did you get that from?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

**A-233**

*Leissner - direct - Rolle*      372

1   A   In Somerset University.

2   Q   How have you spent most of your professional life?

3   A   I've always been an investment banker, sir.

4   Q   When did you begin your career in investment banking?

5   A   I started in late 1992, early 1993 at JP Morgan in

6   Frankfurt, and then moved on from there.

7   Q   Where did you go after JP Morgan?

8   A   So I was at JP Morgan in London until 1997, when I moved

9   to Lehman Brothers in Hong Kong, and then in 1998 I joined

10  Goldman Sachs in Hong Kong as well.

11  Q   And how long did you work for Goldman Sachs?

12  A   I was there until January, February of 2016.

13  Q   How many years was that?

14  A   Approximately 18 years.

15  Q   And in your time as an investment banker, did you have

16  any specialty or area of focus for your work?

17  A   Yes.  I've always been in the investment banking

18  division.  I started off in merger and acquisitions at Goldman

19  Sachs.  I was the Chief of Staff in Asia, CEO of Asia for two

20  years.  And then in 2002, I was back in investment banking,

21  where I stayed until I retired.

22  Q   Where did you geographically join Goldman Sachs when you

23  joined?

24  A   In Asia Pacific, I joined in Hong Kong.

25  Q   How long did you work in Asia?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*      373

1   A   So, with the one year at Lehman Brothers, I was there for

2   19 years.

3   Q   You mentioned you were Chief of Staff at some point at

4   Goldman Sachs, and then what did you transition to?

5   A   I went to our Goldman offices in Singapore where I was an

6   MD and the head of investment banking for Southeast Asia at

7   the outset.

8   Q   And what were your responsibilities as an MD in

9   Singapore?

10  A   So after I finished my stint as a Chief of Staff, I

11  basically became a coverage banker, which is a

12  client-relationship person covering and worked with

13  relationships with our clients in that region.  It was

14  Southeast Asia, which included the ASEAN countries of

15  Singapore, Malaysian, Indonesia, Thailand, the Philippines,

16  Vietnam.  Those were the main markets at that time that I

17  covered.

18  Q   You said you were an MD in Singapore?

19  A   Yes, I was.

20  Q   What's that title?

21  A   So it was actually more distinctly an extended managing

22  director, an EMD, which was one level below a partner.  It

23  carried significant responsibilities, of course, as a managing

24  director.  And I also was overseeing really our coverage

25  effort in that market, which included six countries.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*      374

1   Q   And what was your title when you first joined Goldman

2   Sachs?  Was it an MD?

3   A   No, sir.  I was an associate.  I joined Goldman as an

4   associate and became VP, vice president, in 1998, and an MD in

5   2003.

6   Q   You mentioned that part of your responsibility was

7   overseeing coverage?

8   A   Yes, sir.

9   Q   What does that mean?

10  A   Coverage really means that you deal with the clients of

11  the investment banking division, which included large

12  corporates, institutions, governments, and the like.  As a

13  coverage banker, I, in general, you are responsible for the

14  clients that are assigned to you that you choose to cover and

15  that means you are in constant dialogue with them.  You try to

16  get business from them for Goldman Sachs, and you're

17  responsible for the interaction between the company for the

18  firm, Goldman Sachs, and those clients.

19  Q   In your time at Goldman Sachs, I assume your work was

20  intended to generate money for Goldman Sachs?

21  A   That's correct.  That was the main focus, of course.  I

22  was on the revenue producing side, which meant my job was to

23  bring in revenues from those clients that I had.

24  Q   How did a coverage banker bring in revenue for Goldman?

25  A   In -- well, getting mandates and working on transactions

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*      375

1   for our clients, but that, of course, was a skill.  You had to

2   basically be in constant dialogue with your clients, talk to

3   them, find out what they wanted to do, and then compete with

4   other investment banks to win that piece of business.

5   It was a very competitive environment, sir.

6   Q   Who are these clients?

7   A   As I mentioned, large corporates.  In America, you would

8   say General Motors, the Fords, the AT&Ts in this world.

9   In Asia, it was the Singapore telecommunications,

10  the Hutchinson, so they included big companies.  They were big

11  companies at the time.

12  In addition, those were there were large

13  institutions, such as sovereign wealth funds.  They were

14  financial institutions, banks, insurance companies.  And also

15  for us in Asia, at least, many of the Governments as well.

16  Q   Now, you said that you were covering the ASEAN countries.

17  Sorry, how do you spell that?

18  A   A-S-E-A-N.  It was the Association of Southeast Asian

19  nations.

20  Q   So, as a coverage banker, were you responsible for

21  clients across those countries?

22  A   I personally was, yes, sir.

23  I maintained relationships and had clients in pretty

24  much every one of those countries.  But, in addition, because

25  I was also overseeing the coverage effort for those

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

**A-234**

Leissner - direct - Rolle                                      376

1   essentially six countries, there were bankers who were focused
2   on each market specifically.  So, there were coverage bankers
3   for Singapore, for Malaysia, for Indonesia.  So each country
4   had effectively one person and I had clients in every one of
5   those countries.
6   Q    What was the purpose for having these separate folks who
7   were responsible for covering these particular countries?
8   A    Like in many other, you know, companies, when you have a
9   country that you would like to get business from, from those
10  clients that I mentioned before, it helps to have somebody or
11  a team that's focused just on that country because they live
12  there or they travel there frequently.  They have a background
13  in those countries.  They are either nationals of that country
14  or have lived there for a very long time.  So they are in the
15  system in each one of those countries, engrained as, you know,
16  one of -- as friends or, you know, relationships that you've
17  built with time.
18       It's less effective when you're -- well, you know,
19  like me, for example, you travel in and out, you go to one
20  country and the next country that work for certain clients,
21  but generally you wanted somebody with a focus in that
22  country.
23  Q    Did those people who covered countries specifically,
24  particular countries, did they have any titles?
25  A    Yes.  We always called them the head of the country or

Michele Lucchese, RPR, CRR
Official Court Reporter

---

Leissner - direct - Rolle                                      378

1   responsibility.
2        In addition, however, of course, because of my
3   seniority and my position as the head of that group in
4   Southeast Asia, each one of the country heads reported back to
5   me, so they were telling me what their business was, why they
6   were successful or not, et cetera.
7   Q    When did you become a partner?  You used the term
8   partner.
9   A    In 2006, I was elected to be a participating managing
10  director, which we also refer to as a partner.
11  Q    And how many partners are there -- were there at the time
12  at Goldman Sachs?
13  A    It's roughly always one percent of the population of
14  Goldman Sachs.  At that time, I think we were roughly 30 to
15  35,000 employees around the world.  So it was, you know,
16  somewhere around 300 to 400 partners, approximately.  I don't
17  remember the exact number.
18  Q    Is that the highest title that you can get as a banker at
19  Goldman Sachs?
20  A    That's correct.
21  Q    What is the second highest?
22  A    One that I mentioned before, the extended managing
23  director, the EMD.
24  Q    How many managing directors were there?
25  A    There was probably double the number of partners.

Michele Lucchese, RPR, CRR
Official Court Reporter

---

Leissner - direct - Rolle                                      377

1   the head of investment banking in each particular country.
2        So we had the head of investment banking for
3   Singapore.  We had the head of investment banking for
4   Malaysia.  We had the head of investment banking for
5   Indonesia.
6        So each country had a person that was dedicated and
7   had that kind of title.
8   Q    So just to understand a little bit more of how these
9   country heads' responsibility differ from your responsibility?
10  A    The very basic was similar.  We -- each country had --
11  was given a set of clients.  Sometimes they chose their
12  clients too, or it was a collaborative effort, but the goal
13  was to generate revenues for Goldman Sachs.  That was the
14  clearly stated Goldman.
15       Those revenues would come from clients whose
16  transactions with Goldman Sachs as an advisor or as an
17  underwriter or as a provider of capital.
18       So each bank had that responsibility.  They had a
19  set of clients.  They had a country that they were responsible
20  for, not just for winning business, but they were, of course,
21  also responsible if they lost business.  There was to be an
22  explanation for that.
23       For me, I had my own set of clients, and I was
24  responsible for them just as much.  If I won a piece of
25  business or lost a piece of business, that was my

Michele Lucchese, RPR, CRR
Official Court Reporter

---

Leissner - direct - Rolle                                      379

1   Roughly, two percent of the population.  Call it 6- to
2   700-plus MDs.
3   Q    So MDs and EMDs made up the top two, three percent of the
4   firm?
5   A    That's correct, sir.
6   Q    What was the last title you held at Goldman Sachs when
7   you left in 2016?
8   A    I was a partner, a participating managing director, and I
9   was also the chairman of Goldman Sachs Southeast Asia.
10  Q    And when you were a partner in Southeast Asia investment
11  banking, who was the country head for Malaysia?
12  A    That was Roger Ng.
13  Q    Looking around the courtroom today, do you see Mr. Ng in
14  the courtroom here today?
15  A    Yes, I do.
16  Q    If you can identify him by an article of clothing he is
17  wearing.
18  A    The dark suit and a dark tie.  The gentleman second to
19  the right.
20       MR. AGNIFILO:  Indicating the defendant.
21       THE COURT:  The record will reflect that he has
22  identified Roger Ng.
23       MR. ROLLE:  Thank you, Your Honor.
24  Q    Mr. Leissner, when were you last outside of the United
25  States?

Michele Lucchese, RPR, CRR
Official Court Reporter

---

**A-235**

1   A    That was in 2008.  '18, sorry.  Apologize.

2   Q    2018?

3   A    2018.

4   Q    Where were you?

5   A    I was traveling between Europe, the Middle East and Asia

6   at that time.

7   Q    Do you recall what day you returned to the United States?

8   A    There was June 10, 2018.

9   Q    Where did you fly into in the United States?

10  A    I flew into Washington, D.C.

11  Q    What, if anything, happened when you arrived in

12  Washington, D.C.?

13  A    I was arrested at the airport.

14  Q    You were arrested?

15  A    Yes, sir.

16  Q    Who arrested you?

17  A    The FBI.

18  Q    What were you arrested for?

19  A    I was arrested for criminal charges relating to the

20  breach of the FCPA laws and regulations, as well as breaching

21  the laws of money laundering.

22  Q    You said FCPA.  What's that?

23  A    That's the Foreign Corrupt Practices Act in the United

24  States.

25  Q    Had you, in fact, violated the Foreign Corrupt Practices

1   Act and committed money laundering at the time of your arrest?

2   A    Yes, sir.

3   Q    Could you tell us what the conduct was at the core of

4   those crimes that you had committed?

5   A    I had conspired to work with a group of individuals,

6   including Jho Low, Roger, and several others, at a state fund

7   called 1MDB in Malaysia to essentially take money that Goldman

8   Sachs was raising, or part of the money that Goldman Sachs was

9   raising for that state fund, 1MDB, to pay bribes and kickbacks

10  on the one hand.  Those were the FCPA rules that I broke.

11  And, then, secondarily, to hide the fund flow of those bribes

12  as well.  That was the money laundering part.

13  Q    What do you mean bribes?

14  A    Those were payments to Government officials in Malaysia

15  and Abu Dhabi, as well as officials of Government-linked

16  entities in those two as well, sir.

17  Q    Why were those bribes paid?

18  A    Those bribes were paid to ensure the success and that all

19  the approvals that were obtained to ensure the success of

20  these Goldman Sachs transactions that were raising the funds

21  for 1MDB at that time.

22  Q    During your participation in the scheme, who was bribed?

23  A    A number of government officials in Malaysia, in Abu

24  Dhabi, and officials at several firms that were government

25  linked:  1MDB, on the one hand, and the Malaysian Government;

1   as well as on the Abu Dhabi side, government officials of Abu

2   Dhabi, and IPIC and Abbar, to funds under the government of

3   Abu Dhabi.

4   Q    You used the word kickbacks.  What's that?

5   A    Those were payments made to individuals who are not part

6   of Government, or Government-linked entities, yet who worked

7   on the scheme that we just described, and that included myself

8   and Roger and potentially others as well.

9   Q    Why did you get kickbacks for the scheme?

10  A    Well, at the time of these transactions, I was the senior

11  partner in Southeast Asia.  I was a lead on the transactions

12  for Goldman Sachs and I helped internally at Goldman Sachs to

13  ensure that we did everything possible at the time that these

14  transactions ended up successfully executed, and we did do so.

15       We raised six-and-a-half billion dollars of funds

16  for 1MDB over a year and a half or so.

17  Q    Why did the defendant receive kickbacks?

18  A    He held the same role within Goldman Sachs essentially.

19  Albeit I was the most senior banker, Roger was also tasked

20  with ensuring, at Goldman Sachs, that everything was done to

21  ensure the success of these transactions, coordinating within

22  Goldman Sachs, but also outside of Goldman Sachs with external

23  parties at 1MDB, as well as with Jho Low and his team.

24  Q    Why was the transaction's success within Goldman Sachs --

25  why did that matter?

1   A    Very simply because without Goldman Sachs, there was no

2   fundraising.  We were able to take these transactions and

3   underwrote those transactions, which meant that Goldman Sachs

4   was effectively a provider of the capital to 1MDB.

5       We then sold on that position to other investors,

6   but initially we were the provider of that capital, 1MDB.

7   That allowed the bribes to pay, and reversing, of course, the

8   bribes and kickbacks made these transactions possible.  So it

9   was kind of a mutual beneficial thing.

10  Q    You're talking about Goldman Sachs providing capital to

11  1MDB.  But what does that mean in plain terms?

12  A    In very plain terms, it's a debt product.  So 1MDB was

13  borrowing money from Goldman Sachs, essentially, with a very

14  complex and complicated structure that then Goldman Sachs gave

15  them money for.  So we bought a debt instrument, which were

16  these bonds at Goldman Sachs and gave them the money.  We

17  then, in turn, funded ourselves, or sold those bonds on to

18  investors.

19  Q    Where did the bribes and kickbacks come from?

20  A    From those funds raised.

21  Q    So when you were talking about money laundering, you used

22  the words hide the bribes and kickbacks.

23  A    Yes, sir.

24  Q    Please explain what you mean about hiding those things.

25  A    Because the funds generated to pay the bribes, to

---

*Leissner - direct - Rolle*     384

1 actually pay the bribes were illegal in nature, we had to
2 disguise the flow of funds at the time.  And "we" meaning
3 myself and other participants in the scheme.  And we hid those
4 flows of payments through a number of offshore shell companies
5 established around the world that allowed the funds to be
6 disguised, effectively, from its origin, but also from people
7 like myself, Roger, or others, and Jho Low, so that, you know,
8 there was no suspicion raised when these funds flowed through
9 the banking system around the world.
10 Q    Disguised as what, though?
11 A    As legitimate business transactions, legitimate money
12 flows for reasons other than the real ones, which were
13 obviously bribes to be paid or kickbacks to be paid from
14 monies that 1MDB had -- had raised from Goldman Sachs.  Yeah.
15        There were reasons given every time, contracts
16 potentially made, not on every potentially -- every flow, but,
17 in general, there was a mechanism established and rationales
18 established to justify without telling the truth.
19 Q    So those justifications and contracts that you said, were
20 those true?
21 A    No.
22 Q    Were they real?
23 A    I'm sorry.
24 Q    Were they real?
25 A    No, sir.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*     385

1 Q    Were they lies?
2 A    Yes.
3 Q    And why?  Why did you have to lie?
4 A    Because if we were to tell the truth at the time, if I
5 was sending money as part of the scheme, no bank would
6 transact on that basis if they knew the truth, that all the
7 banking laws around the world are essentially the same; they
8 don't allow for illegal funds to be transferred, you know, as
9 part of the banking system.  So, had it been told anywhere, to
10 any bank the truth, this wouldn't have worked.
11        Plus, of course, the whole scheme would have fallen
12 a part because it would take one leak or one time that it
13 didn't work to potentially bring the whole house of cards down
14 at that time.
15        MR. AGNIFILO:  Your Honor, could I just ask that the
16 witness defines who he means by "we"?  He keeps saying "we."
17 Q    Who do you mean "we," sir?
18 A    So, everybody as part of the scheme, everybody was
19 working on the same thing.  And when I say we, in particular,
20 it's me, it's Roger, it's Jho Low, it's people at 1MDB who
21 made these things happen.  I can go through the names of 1MDB
22 if that's so desired.
23 Q    I think we'll get to that, but first I'd like you to tell
24 us what you mean by shell company.
25 A    So a shell company is essentially a company established

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*     386

1 for the sole and single purpose of -- of allowing funds to
2 flow through it for a purpose.
3        Shell companies don't have an operation.  Shell
4 don't have a business per se.  They get established for maybe
5 a single purpose.  It could be a tax purpose.  It could be,
6 like in our case, trying to hide funds because a shell company
7 has a name but in many jurisdictions outside of America, for
8 example, those names who actually are the owners, beneficial
9 owners, can be removed or hidden.  So it allows a level of
10 separation, if you were, from the people who are really behind
11 the shell companies.
12 Q    You used the word "beneficial owner" of a shell company.
13 What is that?
14 A    The beneficial owner of the company -- of a shell company
15 would be the person who actually is getting benefit of, let's
16 say, any funds by this company received.  The company itself
17 doesn't have anything to do, doesn't have any business,
18 doesn't have to pay expenses or the like, or if it does, it's
19 minimal, but the owner, who may be hidden, who may be removed
20 from that entity, is actually the beneficiary of what this
21 company holds.
22 Q    How do you get one of shell companies?
23 A    It's actually not a very difficult process.  In many
24 jurisdictions, you pay a fee.  You might get a lawyer.  And
25 within a short number of days, you have a shell company

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle*     387

1 established.  You could be, maybe, able to pick a name.  And
2 there it is.
3 Q    In terms of the names, you can pick what name?  Any name?
4 A    Yes.  You can -- you can pick any name in general, unless
5 it's already been taken.  But, yes, you can essentially pick
6 any name.
7 Q    Did you pick your own name?
8 A    That would sort of defeat the purpose of having a shell
9 company, because again, if it was my name, it would highlight
10 my ownership of it.  So a shell company is supposed to
11 separate the company from who the beneficial owner is.
12 Q    And do you use shell companies in the course of the
13 criminal scheme that you described?
14 A    Yes, sir.
15 Q    And what shell companies did you use?
16 A    There were two companies that I used:  One was Capital
17 Place Holdings in Hong Kong and the other one was called World
18 Merit in Hong Kong as well.
19 Q    Those shell companies weren't in your name?  They didn't
20 say Tim Leissner; right?
21 A    They did not, sir.
22 Q    But were you the listed owner of those companies?
23 A    No.  It was my ex-wife, but I directed everything that
24 was done in those companies.
25 Q    Who's your ex-wife?

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

**A-237**

*Leissner - direct - Rolle* 388

1  A    Jude Chen.
2  Q    And in the course of the scheme, were you aware if the
3  defendant used any shell companies?
4  A    Yes, he did.
5  Q    What companies?
6  A    They were two companies in Singapore, one was called
7  Silken Waters, I believe, and the other one was Victoria
8  something, I don't know the name anymore.
9  Q    How do you know that he used those shell companies?
10 A    He directed me to those shell companies that were owned
11 by his wife to send money as part of the scheme.
12 Q    You said those shell companies were owned by his wife?
13 A    Yes, sir.
14 Q    Is that in the same way that your shell companies were
15 owned by your wife?
16 A    Exactly the same way.
17 Q    What was the defendant's wife's name?
18 A    Lim Hwee Bin.
19 Q    Why did you use these shell companies?
20 A    I had worked on -- I was a very prominent Goldman Sachs
21 banker at the time.  It was well-known that I worked on 1MDB
22 transactions and, therefore, I had to -- I felt I had to
23 distance myself from those monies flows to raise no suspicions
24 in the system, in the banking system that those funds may
25 actually come from the 1MDB fundraising exercises.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle* 389

1  Q    But how would the use of those shells obscure your
2  identify or your involvement?
3  A    Well, as you mentioned, sir, my name did not appear on
4  those companies.  While I was controlling them, my name didn't
5  appear officially on there.  So my name was disassociated with
6  those companies.  The bank would see it was Capital Place
7  Holdings that was sending money from one place to the other
8  places.  My name did not appear ever.  There was no signature
9  required or anything like that.
10 Q    You mentioned shell companies don't have operations
11 normally?
12 A    That's correct, sir.
13 Q    Did Capital Place have any operations?
14 A    No.
15 Q    Did World Merit have any operations?
16 A    Also no.
17 Q    Did Silken Waters, the defendant's shell, have any
18 operations?
19 A    Not I'm aware of, sir.
20 Q    Did the other shell, you said Victoria something, have
21 any operations?
22 A    Again, not as far as I know.
23 Q    How do you know again that the defendant received
24 kickbacks through this scheme?
25 A    This was part of the scheme, sir.  We had early on --

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle* 390

1  early on, as we were structuring and designing both in 1MDB
2  actual transactions at Goldman Sachs but also the scheme that
3  would pay the bribes and kickbacks, we had decided -- or we
4  came to the conclusion that everybody that is part of the
5  scheme is going to get paid something.  After the transaction
6  closed, the amount became clear, and I was instructed to make
7  that payment to Roger at the time.
8  Q    Who instructed you?
9  A    A gentleman called Jho Low.
10 Q    Who told you -- well, did you hand him money in a bag?
11 A    No.  It was a wire transfer from Capital Place, as well
12 as I think one other transfer from Judy's account of
13 longstanding to those accounts.
14 Q    How did you know where to send the money?
15 A    Roger told me the account details.
16 Q    You talked a number of times now about the scheme
17 relating to transactions, certain transactions; right?
18 A    Yes, sir.
19 Q    What were these transactions related to this scheme?
20 A    I briefly described before that we were doing bond
21 transactions.  We were raising money for 1MDB in three
22 different projects:  One was called Project Magnolia, Project
23 Maximus, and then Project Catalyze.  Those were three
24 transactions.  They were all bond transactions, meaning these
25 were debt obligations of 1MDB that Goldman Sachs underwrote in

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

*Leissner - direct - Rolle* 391

1  the way that I described before, and they were underlying a
2  number of strategic merger and acquisition transactions that
3  were the reason for the fundraising in the first place.
4  Q    You call them fundraisings.  How much money was raised on
5  Project Magnolia?
6  A    Project Magnolia raised 1.75 billion, sir.
7  Q    How much was raised on Project Maximus?
8  A    1.75 billion as well.
9  Q    How much was raised on Project Catalyze?
10 A    3 billion.
11 Q    Did these three transactions happen over a long period of
12 time?
13 A    No.  It was a very short period of time.  We started
14 Project Magnolia and the underlying acquisition of power
15 assets, power generation assets in Malaysia in early 2012 and
16 we concluded Project Catalyze, which was the last transaction,
17 in Aril -- March or April of 2013.
18 Q    How long is that?
19 A    So, it's roughly a year, and, you know, four months, let's
20 say.
21 Q    16 months?
22 A    Yeah.
23 Q    And how much was raised in total?
24 A    Six and a half billion.
25 Q    In your career at Goldman Sachs, have you ever raised six

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

**A-238**

Leissner - direct - Rolle                          392

1  and a half billion dollars in 16 months?
2  A    We did -- I did in those days many transactions that were
3  several billion dollars.
4       Six and a half billion was a very large amount of
5  money, yes.  It may have been one of the largest transactions
6  that I've ever done -- I had ever done at the time.
7       What was made more significant, however, is the fees
8  that Goldman Sachs earned on these transactions, which were
9  the most we've ever made on any transaction at Goldman Sachs.
10 Q    How much?
11 A    So on each transaction, we made roughly 200 million
12 dollars at the time, for a total over 600 million.  With
13 advisory fees and, you know, other things that we were doing
14 at that time, my estimate is probably closer to 700 million,
15 in fact.
16 Q    Had you ever made that much money for Goldman Sachs in
17 Asia?
18 A    No, sir.  No, sir.
19      This was unprecedented, not just for myself and
20 Goldman Sachs in Asia, but it was unprecedented, and
21 recognized at Goldman Sachs as such, celebrated by Goldman
22 Sachs as such in Asia but also around the world.  This was --
23 these were significant transactions that were highlighted at
24 the highest level at Goldman Sachs many times.
25 Q    And how was it that you were able to secure these

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                          393

1  transactions for Goldman Sachs?
2  A    Well, we had -- Roger and I had worked on this
3  relationship with 1MDB for several years prior to doing the
4  first transaction.
5       The actual execution and success of the transaction
6  relied essentially on the bribes and kickbacks that were paid,
7  because without those, the approvals would not have been
8  received to make these transactions happen.
9  Q    So within Goldman Sachs, who worked on these three 1MDB
10 bond transactions?
11 A    The two lead coverage bankers were Roger and myself.  We
12 had extensive teams around them.  We had teams that worked on
13 the merger and acquisition side of the transactions.  Those
14 were Cameron Poetzscher, the head of the M and A in Southeast
15 Asia.  It included Gabe Santos, Andy Tai, many junior bankers
16 to provide the analysis.
17      On the funding side, the structuring side, we had
18 Andrea Vella at the highest level.  He was in investment
19 banking, capital markets.
20      We had Toby Watson, who ran the desk in Asia, who
21 actually did the underwriting for these transactions.
22      We had his structure head in MD by the name of John
23 Donne.
24      You had the trading desk behind that.  You had
25 senior people in New York.  Ram Sundaram was the head of that

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                          394

1  desk who did the underwriting.
2       So it was a very extensive team, also partly because
3  we were going to make so much money, quite frankly.
4  Q    You said that you and the defendant were the lead
5  coverage bankers on the transaction?
6  A    That's correct, sir.
7  Q    What group or section of Goldman Sachs did you work in at
8  the time of these transactions?
9  A    I was in the lead investment banking division of Goldman
10 Sachs.
11 Q    At that time, did the defendant report to you?
12 A    No, sir, he did not.  He was at that time in a different
13 division, the securities division.
14 Q    What's the securities division?
15 A    So if you distinguish investment banking, which is the
16 client, the corporate side of the business, which means we
17 originate large capital market transactions, we do the
18 advisory work, consulting work on M and A.  We really deal
19 with the corporates, the people who raised money.
20      The securities division was on the other side, which
21 was dealing with investors, really, institutional investors
22 largely, but also other ones who were investing in the
23 securities that we raised or other people raised.  So you
24 think of it the traders on stock market, you think of the bond
25 traders, the like of that.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                          395

1       So they are really separate from investment banking.
2  They have their own floor.  They are not inside the famous
3  Chinese wall of information.  They're really on the public
4  side of Goldman Sachs, whereas investment banking is on the
5  private side of that business.
6  Q    So, just to maybe make that clearer, at least for me,
7  what do you mean by public side and a private side?
8  A    The private side, again, is where you deal with material
9  -- non-public information, is a term that you hear very often.
10      We deal with the corporates when they decide to do
11 the strategic business with investment banks, that strategic
12 business can be capital markets, raising big amounts of money
13 in the debt or equity markets, doing mergers and acquisitions.
14      So, for example, if T-Mobile merges with Sprint,
15 that's one of the things that Goldman Sachs would advise on.
16 That information, before it becomes publicly announced, is
17 private because it can move the share price of a company.
18 Therefore, we were walled off from the rest of the firm
19 because we had information that you could do insider trading
20 on if you knew it, for example.  And, so, it was a very strict
21 procedure and process that kept us away from the other side of
22 the business of Goldman Sachs, which is the public side that
23 doesn't have that information.  Therefore, it's free to trade
24 itself or with its clients in those markets, the stock
25 markets, the bond markets, freely at any point in time.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Leissner - direct - Rolle                                          396

1   Q    If the defendant was on this public side, the securities
2   division and not in investment banking, not according to
3   you --
4   A    Correct.
5   Q    -- why was he involved in the 1MDB bond transaction?
6   A    Roger had held the relationship with 1MDB, as well as the
7   key decisionmaker at 1MDB, who happened to be Jho Low, over
8   many years.  He had started that relationship in 2008.  He
9   kept that throughout the years.  And even when he moved into
10  the securities division, he maintained relationships with 1MDB
11  and Jho, and also some other -- small number of other clients
12  at that time, because he was the key person for that.  He was
13  the key point person, the key contact person, and it was
14  commercially rational for us at Goldman Sachs to allow him to
15  keep those relationships because nobody was otherwise as close
16  to him as he was.  So it was decided at the time that some of
17  these relationships he would keep.
18  Q    You said earlier that you've never seen fees as big as
19  you saw on the bond transactions?
20  A    Yes.
21  Q    Was working on those transactions from the securities
22  division, would that be beneficial to someone in the security
23  division even if they weren't in investment banking?
24  A    Goldman Sachs had a very strong team culture.  We were
25  always looking to.  We always wanted to cross sell.  We always

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                                          397

1   wanted to help each other.
2        For fees like this, it's a no-brainer that somebody
3   would cross the divisions to help out.
4        Of course, also -- and this is the other part that's
5   important to remember -- once these bonds were raised, they
6   became tradable.  So they were, you know, in Project Magnolia,
7   for example, also Catalyze, our investors started trading
8   those.  And Goldman Sachs on the other side, the securities
9   division, was actively in that flow at times.
10       So, yes, it would also benefit the securities
11  division that we were raising those bonds because they would
12  get business over time as well.
13       (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                          398

1   DIRECT EXAMINATION
2   BY MR. ROLLE:  (Continued.)
3   Q    You talked about Goldman Sachs trading.  Is that like
4   trading stocks?
5   A    That's right.  Trading stocks, trading fixed income
6   instruments such as bonds, notes, you know, things like this,
7   yes, mutual funds.
8   Q    Did Goldman Sachs make money from trading bonds like the
9   1MDB bonds?
10  A    Yes, sir.
11  Q    And who was responsible for trading within the Goldman
12  Sachs group?
13  A    It was the fixed income -- we are talking about -- we
14  called it the securities division, sir, which Roger was part
15  of.  In particular, for those bonds, it was the fixed income
16  part of the securities division.  The head of that division at
17  the time was a gentleman by the name of Pablo Salame, and he
18  was running that group on a worldwide basis.
19  Q    You said it was a no-brainer why someone who would want
20  to be working on these deals.  Why?
21  A    It's a little bit of a colloquial term, but to work on
22  the 1MDB transactions at the time and make $20 million of
23  fees, which was really unheard of -- that was just something
24  that, you know, instantaneously at Goldman Sachs made us
25  heroes.  Everybody that worked on these transactions became

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                          399

1   known within the organization, and, literally, yes, we all --
2   we received a hero status within Goldman Sachs.  We were
3   mentioned by our chief executives in the conferences,
4   conferences were held around our deals.  So, yeah, working on
5   these transactions elevated your status at Goldman Sachs very
6   significantly.
7   Q    What was the stated purpose of these transactions?
8   A    The funding transactions originally were to back the
9   acquisition of these power assets that 1MDB was acquiring.  It
10  was first power asset -- power generation assets by the name
11  of Tanjong; and then, secondarily, Genting's power assets in
12  deal number two.  Those were the underlying -- required a need
13  for money at 1MDB.  The Catalyze project was supposed to raise
14  the 3 billion for a joint venture that 1MDB had with the
15  institution in Abu Dhabi called Aabar; and the 3 billion was
16  to be used for development projects in Malaysia to benefit the
17  people.
18       In general, 1MDB, and any transactions it was doing,
19  was meant to benefit the people of Malaysia.  It was a
20  sovereign wealth fund.  It was directly held by the
21  Government, and, therefore, its intention was to help the
22  people of Malaysia.  Whether it's development --
23  developmental, bring the economy forward, or the like, that
24  was the stated goal, and the transactions all were supposed to
25  support that goal.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

**A-240**

1 Q What happened to the money that you raised through these
2 transactions?
3 A Some of the money was used for the strategic
4 transactions, so in the case of Tanjong, 1MDB successfully
5 acquired those assets from Usaha Tegas Group. In Project
6 Maximus, those monies were partially used to make the
7 acquisition off the Genting power assets. In all cases,
8 however, also, money was used and essentially siphoned off
9 from 1MDB for the bribes and kickbacks, in the case of
10 Catalyze, to fund the election that happened shortly
11 thereafter in Malaysia.
12 Q What entities were involved in the three 1MDB bond
13 transactions?
14 A So you had essentially two -- two buckets, sir. You had
15 the Malaysian side of it, which is -- was 1MDB -- the actual
16 issue of the bonds, Goldman Sachs's client, and with it came
17 the Malaysian Government, as its sole shareholder at the time,
18 the ministry finance, in particular, of the Malaysian
19 Government. And then on the Abu Dhabi side, it was IPIC,
20 again, a sovereign wealth fund under the Government of Abu
21 Dhabi, and Aabar, which was a subsidiary of IPIC. Those were
22 really the institutions that were involved.
23 Q What was this entity IPIC's role in Abu Dhabi? What was
24 that entity's role in the transactions?
25 A It was a critical role. IPIC provided the credit

1 guarantee for 1MDB, and the reason that was critical was that
2 1MDB by itself wasn't able to raise any substantial amounts of
3 money, and certainly could not raise had 1.75 billion in the
4 case of the first transaction, or even the subsequent
5 transactions.
6 So 1MDB, without any kind of credit support, was not
7 able to raise anything close to it; therefore, with the help
8 of Goldman Sachs's structuring group, the idea was generated
9 it should be a credit guarantee on 1MDB's debt obligations,
10 and it was then Jho Low and his relationships in Abu Dhabi
11 that enabled us to find and engage IPIC to provide that credit
12 guarantee. With that, IPIC guaranteed all the obligations of
13 1MDB to make payments on that response, so that's principle
14 payments or interest payments.
15 Q Without that, you said credit support and guarantee, what
16 would have happened to these transactions?
17 A They would have never happened, sir.
18 Q You mentioned Aabar?
19 A Yes, sir.
20 Q Another entity in Abu Dhabi, you said?
21 A Yes, sir.
22 Q What was Aabar's role in the transaction?
23 A Aabar was involved because it was a subsidiary of IPIC.
24 It received part of the -- consideration for providing the
25 guarantee. Of course, when such a credit guarantee was to be

1 given by IPIC, it's not free -- it's a very valuable financial
2 instrument, if you will -- and in exchange for giving that
3 valuable financial guarantee, IPIC was going to receive to its
4 subsidiary -- Aabar -- warrants in that business that was to
5 be acquired, so that was like the payment for it.
6 In addition, the CEO of Aabar was also a key person
7 doing all the, essentially, day-to-day legwork in Abu Dhabi to
8 ensure that the guarantee by IPIC was forthcoming. So not
9 only were they receiving consideration, if you were, but also
10 what the CEO was very much involved in actually getting the
11 guarantee from IPIC, as well as subsequently ensuring that the
12 scheme was -- was done. So he had many different roles, but
13 that is the rationale for Aabar being involved under IPIC.
14 Q You and the defendant worked at Goldman Sachs, of course,
15 at the time; right?
16 A Yes, sir.
17 Q What was Goldman Sachs's role in these three
18 transactions?
19 A As I had mentioned early, Goldman Sachs's role was
20 absolutely critical because we were, at Goldman Sachs, the
21 underwriters of these bonds. It was important to 1MDB, and it
22 was important to Jho Low that there was one point of
23 fund-raising. Meaning, he didn't have to go to several banks
24 to raise the money. He didn't have to go to many investors to
25 raise the money. It was only Goldman Sachs that was able to

1 underwrite and give the money in purses worth 1.7 billion,
2 then 1.7 billion on the second case, and then 3 billion on the
3 last one.
4 Again, without Goldman Sachs willingness to do so
5 and provide that capital and that funding, the transactions
6 wouldn't have happened.
7 Q As Goldman Sachs bankers, in general terms, what role did
8 you and the defendant play in the criminal scheme related to
9 these transactions?
10 A We were -- we were acting -- Roger and I -- as the key
11 point people in Goldman Sachs interacting between all the work
12 that we were doing -- and Jho Low, in particular, but also his
13 team, whether it was at 1MDB or outside of 1MDB -- and
14 communicate any issues that we saw at Goldman Sachs that may
15 cause an issue. We would communicate that back to Jho and his
16 team. We would try to find solutions.
17 And, also, we were really the champions within
18 Goldman Sachs for these transactions. Meaning, we were -- our
19 support -- lending our support was absolutely critical within
20 Goldman Sachs to hear that as client bankers we wanted to do
21 these transactions. So it was an internal Goldman Sachs
22 coordination role, I would say, and an external coordination
23 role as well with the people around Jho Low and our client,
24 1MDB.
25 Q What banking did you personally receive by participating

1  in this criminal scheme, Mr. Leissner?

2  A    I received the amounts of money that I agreed to forfeit,

3  you know, around about 44 million U.S. dollars, and the family

4  also received more than that --

5  Q    Sorry.  The family?  Who was that?

6  A    My ex-wife.  And so, all and all, it was probably 50- to

7  $60 million.

8  Q    You said you received the monies you agreed to forfeit.

9  A    Yes, sir.

10  Q    Forfeit to whom?

11  A    Forfeit to the United States Government.

12  Q    And do you know how much the defendant received for his

13  participation in the scheme?

14  A    Yes, sir.

15  Q    How much?

16  A    Approximately $35 million.

17  Q    How do you know that?

18  A    Because it was sent from Jho to my account, and from my

19  account to Roger's.  The shell companies again, of course, I'm

20  referring to.

21  Q    At the time you engaged in this criminal scheme, how long

22  had you known the defendant?

23  A    Roger and I met first in 2005 or 2006 when he first

24  joined Goldman Sachs.  We worked very, very closely over the

25  years, and we became very close friends.

1  Q    In what ways did you work closely together?

2  A    Well, we -- I mean, in Malaysia, we did almost all

3  transactions together.  We worked constantly on executing

4  transactions, meaning actually working with our clients to

5  transact to do transactions.  We would be jointly, on many

6  instances, on those transactions.  From the day Roger joined

7  to us, we met on a transaction involving Southern Bank of

8  Malaysia, then it merged with another big bank called CIB.  We

9  covered some clients together where Roger had relationships

10  with one set of people in that client, and I had maybe had

11  relationships with other sets of people in that client.  We

12  worked in the -- in Roger actually covering clients, and then

13  quoting me, as head of investment banking, to update me on the

14  progress he was making with the clients so that we constantly

15  worked together at different -- at different levels.

16  Q    During both of your times at Goldman Sachs, what was his

17  position relative to yours through time?

18  A    Roger was -- was junior to me when he was in the

19  investment banking division.  He started off, I believe, in

20  debt capital markets, which was not my particular group, but

21  he worked on many transactions in Malaysia, so while there was

22  no direct -- there was no direct reporting line to me, we

23  still worked very closely together.  And Malaysia wasn't a

24  very big market, so we would constantly talk about what other

25  business we could do, where we could, you know -- you know,

1  where we could cover clients, who did we know, where could we

2  find other revenue sources for Goldman Sachs.

3         And so he was -- while junior, we worked almost as

4  partners together over the years.  He then -- when he moved

5  over to the securities division, he was no longer -- sorry,

6  then -- then he actually reported to me directly for a few

7  years when he was head of investment banking for Malaysia.

8  There was a direct reporting line to me because I was heading

9  that group for the Southeast Asian markets again.

10         Then when he moved into the securities division,

11  that formal link was broken because he does not report to me.

12  In fact, he sits on the other side of the wall.  That didn't

13  stop us from constantly communicating, talking.  Again, we

14  were best friends, so -- and we had -- our interests were in

15  the Malaysian market, largely, so we interacted all the time,

16  even when he was in the securities division.

17  Q    So you talked a lot about work as colleagues closely.

18  You mentioned that you were friends.  Did you have a

19  relationship with the defendant outside of Goldman Sachs?

20  A    Yes, we were really close friends.  We would talk all the

21  time.  We wouldn't, you know -- we would do -- we would do

22  meals together; we will have lunches together.  Most of the

23  interaction was then related back to business or we -- because

24  at those days, you know to understand, he and I were living

25  and breathing our work.  You know, we loved our work.  We

1  enjoyed it.  We talked about it all the time.  It was our

2  life -- our work was our life, basically, so we -- we -- it

3  wasn't -- you know, it interacted just closely that our

4  private relationship also was a friendship, but it linked all

5  the time.

6  Q    How many hours would you say you worked on average in a

7  week?

8  A    It's so hard to say, but it was -- there wasn't -- I

9  would put it the other way around maybe.  There wasn't a day

10  that we wouldn't talk about something related to our business,

11  what we are looking at, what we might be looking at.  We would

12  constantly communicate.  We may not be working five hours a

13  day together or something like that, but we would always be in

14  touch.  We would text each other; we would keep each other

15  updated as to what we were doing.  Largely, between Roger and

16  I, about our Malaysian business, of course, because that's

17  where we intersected.  I had similar relationships, although

18  not as close, with some of the other bankers, whether it was

19  Indonesia or Singapore, I would interact with them just as

20  frequently -- or I would interact with them frequently, just

21  not as much as with Roger.  With Roger, we communicated all

22  the time.

23  Q    How long did the defendant work at Goldman Sachs?

24  A    Roger left Goldman after the last 1MDB transactions in

25  2014.

**A-242**

Leissner - Direct - Rolle                     408

1  Q   Now, you obviously worked together on the 1MDB bond
2  transactions, but through the years, did you have success at
3  Goldman Sachs with the defendant?
4  A   Yeah.  We did have plenty of success in Malaysia.  We --
5  we were, for many years, the number one investment bank in the
6  country.  We worked on business for other Government entities,
7  such as Sarawak -- the state of Sabah, which is one of the
8  states, in Sarawak, which is one of the states in Malaysia.
9  We worked on several bank transactions, whether it was RHB,
10 one of the largest banks.  Some of the smaller banks, Southern
11 Bank, EON Capital, so we had -- we were the number one
12 investment bank in Malaysia, and it was really -- to Roger's
13 credit, he was -- he was the head of that -- that market, and
14 I was there all the time with him because we were so
15 successful.
16 Q   Did you ever work with the defendant to make money
17 outside of Goldman Sachs?
18 A   Yes.  Because of our close relationship, we also had --
19 we were looking at opportunities that sometimes didn't fit
20 into the Goldman Sachs business; or it might be that we
21 actually looked at transactions privately that could have a
22 future business for Goldman Sachs, but maybe too small at that
23 point in time.  So, yes, we did engage on business outside of
24 Goldman Sachs that could, you know, make us money or could, at
25 some point -- us personally money, Roger and myself -- or

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                     410

1  within Malaysia were government-linked or government -- partly
2  government-owned.  There was Telephone Malaysia, which was the
3  largest telephone company; Tenaga, which was an electricity
4  utility; so those were government-linked entities, and Roger
5  was covering those entities, in addition to private clients,
6  of course.
7        We had the state of Sarawak, which I mentioned to
8  you before, which was a small state, but very powerful because
9  it had all the gas resources of the country.  Sixty percent
10 of, I think, Tokyo's gas supply came from Sarawak making it a
11 very rich state.  We worked on the set of both 1MDB called TIA
12 at the time.  Roger worked on Khazanah, which was another
13 sovereign wealth fund of Malaysia.  So, yes, there were quite
14 a few interactions with Malaysian Government entities.
15       Also, sir, we were always trying to see if we could
16 work for the Government itself doing, you know, fund-raising,
17 essentially.  In Asia, many of the governments or the
18 countries themselves need to raise money in the international
19 bond markets, and there was something that was attractive to
20 Goldman Sachs, not necessarily always for the fees, but for
21 the franchise and brand value that both bring to us.
22 Q   So did the work with the defendant in Malaysia, did that
23 include seeking business from 1MDB?
24 A   Yes, sir.
25 Q   Prior to the 1MDB bond transactions you described

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                     409

1  could be a potential transaction for Goldman Sachs one day
2  down the road.
3        We also explored jointly setting up a fund or funds
4  over time, so we had several discussions like this as well.
5  Q   Was that allowed, to try and generate money for
6  yourselves personally outside of Goldman Sachs while you were
7  employed at Goldman Sachs?
8  A   It was against the rules that and policies and procedures
9  at Goldman Sachs without disclosure to Goldman Sachs to pursue
10 those opportunities.
11 Q   Did you ever disclose your outside business activities
12 with the defendant to Goldman Sachs?
13 A   I did not, sir.
14 Q   Were you both ever successful in you're attempts to
15 generate money for yourselves outside of Goldman Sachs?
16 A   No, we never succeeded.  We had several discussions.  We
17 had several projects that were going on, but we were never
18 successful.
19 Q   Now, as the country head in Malaysia -- in your time at
20 Goldman Sachs working with the defendant, who was country
21 head, did this type of work secure business from Malaysian
22 Government entities?
23 A   Yes.  Absolutely sir, yes.
24 Q   Did that include -- what entities?
25 A   Well, at the very simple level, many of the corporates

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                     411

1  earlier, were you personally involved in efforts to get 1MDB
2  business for Goldman Sachs?
3  A   Yes.
4  Q   And who else was involved in those efforts?
5  A   Roger.  Roger was the lead banker covering 1MDB, and also
6  what he and I -- some of our other colleagues -- knew to
7  be the case, which was that Jho Low was the key decision-maker
8  always from the setup of 1MDB to the transactions, the key
9  decision-maker; and so, therefore, the coverage of 1MDB as a
10 client include -- had to include Jho Low as well.
11 Q   So how did you go about trying to get Goldman Sachs
12 business from 1MDB?
13 A   At the very simple level, we had to present ideas to 1MDB
14 and to Jho, and Roger was the lead on that.  He took the ideas
15 we generated at Goldman Sachs -- and he had many of those
16 himself -- and brought them to both 1MDB's personnel and Jho,
17 and, in many cases -- it would go the other way around, too --
18 Jho would say, 1MDB wants to do this; or the Government wants
19 1MDB to do that; and then he would come back to Goldman Sachs
20 and say, can we do this?  Can we be creative?  Can we help
21 them raise money, or can we help them make acquisitions in the
22 energy field -- you know, energy area?  So it was a bit of a
23 two-way flow in terms of generating or trying to generate
24 business from 1MDB.
25 Q   What position did Jho Low have at 1MDB?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

**A-243**

1    A    He had no official position ever at 1MDB, other than, at
2    the very outset of the setup of 1MDB, Jho was an advisor to
3    the king of the state that this sovereign wealth fund was set
4    up for, which was the state of Terengganu, which was why it
5    was called Terengganu Investment Authority -- or TIA -- and
6    Jho Low was on the panel of advisors to the king to select the
7    advisors to the setup, as well as, I think, the setup in
8    general.  So he was -- that was the only time that he had an
9    official role in the fund of 1MDB or around 1MDB.
10   Q    So this thing called TIA, is it Terengganu Investment
11   Authority?
12   A    That's correct.
13   Q    After it became 1MDB, what role did Jho Low have at this
14   entity that was now known as 1MDB?
15   A    He never had any role, any official role, yet he was the
16   key decision-maker.
17   Q    Who was the primary client contact for 1MDB?
18   A    Roger was the primary client contact.
19        MR. ROLLE:  I would like to pull up for the witness
20   for identification Government's Exhibit 6.
21   BY MR. ROLLE:
22   Q    Do you recognize that, sir?
23   A    Yes, that's Jho Low.
24   Q    That's Jho Low.
25   A    That's Jho Low.

1        MR. ROLLE:  Judge, we offer Government's Exhibit 6.
2        MR. AGNIFILO:  No objection.
3        THE COURT:  It's admitted.
4        (Government's Exhibit 6 received in evidence.)
5        MR. ROLLE:  We would ask to publish it.
6        (The above-referred to exhibit was published.)
7    BY MR. ROLLE:
8    Q    Where was Jho Low from?
9    A    He was -- he is Malaysian.
10   Q    Malaysian?
11        And you mentioned before that he was involved in the
12   Project Magnolia, Maximus, Catalyze; correct?
13   A    Yes, sir.
14   Q    What was his involvement in those deals?
15   A    Well, he was involved in every aspect of those deals is
16   the very simple answer.  From day one when we first heard
17   about the acquisition opportunity, this power generation
18   assets called Tanjong, it actually came out of one of my other
19   clients in Malaysia, Usaha Tegas Group, U-S-A-H-A, and then
20   T-E-G-A-S.
21        Roger -- backing up, my client said, we are selling
22   these assets.  It's a three-and-a-half-billion-dollar type of
23   transaction.  We have an advisor already, which was Standard
24   Chartered Bank.  Go and find somebody that you can represent
25   on the buy side, which was kind of a little gift to us

1    because, at Goldman Sachs, to lose a
2    three-and-a-half-billion-dollar transaction, in our culture,
3    wasn't good news.  We had to be part of that.  That was our
4    mandate.  We were -- we -- we had to be part of this, so we
5    went out to our client base to see if there was a suitable
6    buyer that we could advise.
7        Roger went to talk to 1MDB and to Jho about
8    possibility of 1MDB wanting to buy this.  1MDB has a stated
9    intention to be active -- an active participant in the energy
10   sector -- again, to the benefit of the Malaysian people -- and
11   so Roger approached Jho and 1MDB -- sorry.  He really
12   approached Jho, because he knew that Jho was the key
13   decision-maker, and asked him the question, look, you know --
14   and under the commissioner, it was the owner, Usaha Tegas --
15   he's going to sell these assets, should 1MDB look at that?
16   And Jho said absolutely and connected Roger and me to the then
17   CEO at 1MDB, Shahrol Halmi, to have that first discussion.
18   So, really, Jho was there day one when we pitched the idea
19   that 1MDB should have made this acquisition, and then he would
20   be the key person throughout the merger and acquisition side
21   of the transaction, and the fund-raising, to ensure that all
22   1MDB actions and authorizations and approvals were obtained,
23   including linking into the Middle East to provide the
24   guarantee for the credit of 1MDB that was, again, crucial to
25   the transactions as well.

1        So, really, it's -- when you ask what role did he
2    have, he had really the most important role on the other side
3    for Goldman Sachs.
4    Q    Was that role, in all of these aspects of this
5    transaction you work on, was that role an official role?
6    A    Absolutely not.  He didn't -- as mentioned before, he did
7    not have the official role at 1MDB.
8    Q    Was Jho Low involved in the criminal scheme you described
9    that surrounded these transactions?
10   A    Yes, sir.  Again, like on the actual fund-raising side or
11   on the main side, that was the official business.  Jho was the
12   key person designing the scheme, which included deciding how
13   much money would be used to pay bribes and kickbacks, who
14   would get that money, and what time, and how much would go to
15   himself.  He was the key person in all of this.
16   Q    What, if anything, did Jho Low receive, to your
17   knowledge, as part -- in taking part in this criminal scheme?
18   A    He was -- he received a large amount of what was siphoned
19   off of 1MDB.  In meetings with Roger and myself, he would tell
20   us that he would keep quite a bit of that.  I would never -- I
21   was never told how much he would keep.  He was very careful
22   not to ever disclose that to anyone that I was aware of, but
23   it was clear that he would keep a large chunk of it.
24   Q    Now, when did you first ever hear the name Jho Low?
25   A    It was back in 2008.  Roger and I had a meeting in Kuala

1    Lumpur at a -- at an office of another investment banker
2    called Seow, and his company was Newfields. It was a -- it
3    was a person that we had worked with on different transactions
4    over time. In particular, in Sarawak -- the state of
5    Sarawak -- and it was in that meeting where we were reviewing
6    the business that Goldman Sachs was thinking of doing in
7    Malaysia with this gentleman because we were trying to see if
8    we could work together in winning some of that business, then
9    it was highlighted to me that day, or around that day, there
10   was a large merger acquisition being talked about and actually
11   appeared in the press. That was the acquisition of IJM, one
12   of the big construction companies in the country --
13   construction infrastructure companies in the country. I think
14   it was a transaction of somewhere in the order of 2 billion --
15   or several billion dollars worth at least. Again, one of
16   those transactions that Goldman Sachs -- or we at Goldman
17   Sachs could not afford to lose.
18        So Roger presented this as saying, look this is a
19   transaction that's talked about in the market, clearly -- and
20   Seow knew about this, too, our partner there, or potential
21   partner -- and Roger said, this young gentleman, Jho Low, had
22   put together a consortium from the Middle East, including Abu
23   Dhabi, Southern wealth funds, and otherwise, you know, large
24   institutions from the Middle East that were trying to make
25   this acquisition. Given that it was such a big acquisition,

1    we felt -- I felt I had to be part of this. This was a
2    franchise and a transaction for Goldman Sachs and we shouldn't
3    miss this.
4         So Roger agreed to try to establish a relationship
5    with this young gentleman, Jho Low, who had just appeared on
6    our radar screen for the first time.
7    Q    Did you ever meet Jho Low after you first learned about
8    him back in 2008?
9    A    I never met him in 2008. Roger went to establish a
10   relationship, and he was successful in doing so, and then he
11   introduced me to Jho in January -- I believe it was January of
12   2009.
13   Q    Why was establishing a relationship with Jho Low relevant
14   to your work at Goldman Sachs?
15   A    Well -- sorry -- yes, at the same meeting, of course we
16   talked a little bit about his background. He was a young --
17   young businessman appearing on the scene, and why was he able
18   to pull together that kind of consortium to make a $2 billion
19   transaction. It doesn't happen for somebody often who is in
20   his 20s at that time. And Roger said that -- first of all, he
21   knew a little bit of background at the time. He said that he
22   knew many of the sovereign wealth funds -- or sovereign wealth
23   companies -- in the Middle East from some of his schooling
24   that he had undertaken before --
25   Q    And, I'm sorry, identify who "he" is.

1    A    Sorry.
2         Roger was saying that Jho had established some of
3    these ties with Middle-Eastern organizations during schooling
4    both in the UK as well as working afterwards; and, in
5    addition, he highlighted the fact that Jho was very close to
6    Matchirizok, the then deputy prime minister and finance
7    minister of One Malaysia, and his wife, was Rosmah Mansour
8    which -- who had a very close -- had a lot of influence on the
9    prime minister, and so that seemed also very important to us
10   at Goldman Sachs at the time.
11   Q    Why, though? Why would someone's ties to Malaysian
12   Government officials or people in the Middle East matter to
13   you as an investment banker at Goldman Sachs?
14   A    Again, at the very -- at the very simple level, because
15   it would -- it held the promise of business, and at Goldman
16   Sachs, we were tasked to always find new business
17   opportunities. Our relationship with the Malaysian Government
18   was -- I don't -- I don't know how to describe it. It was
19   just not very strong, or it was just -- it was okay, but there
20   was nothing to write home about. It wasn't like we were
21   getting any big transactions out of our own relationship with
22   the government that we had at the time, so it seemed important
23   that we actually find somebody who has a closer relationship
24   to pursue business with the Government.
25        As I had mentioned, you know, a little time ago,

1    governments in our part of the world, in Southeast Asia, were
2    actually giving out business themselves, you know,
3    fund-raising bond transactions that the governments would do
4    themselves. They owned stakes in some of the biggest
5    companies in the country. Again, the word of a very senior
6    government official to those companies would carry a lot of
7    weight for us in our business.
8         The Middle East, from the Asian perspective --
9    although we had, of course, a Middle-Eastern office -- was
10   also attractive because the Middle East lending institutions
11   were also looking into Asia, in particular, Malaysia and
12   Indonesia, the two big Muslim countries at the time, to
13   invest -- to bring billions of dollars into those countries;
14   and so, therefore, again, it was really being in the flow of
15   that business that seemed important; and Jho had a unique
16   position that looked like, at that time -- at least as it was
17   presented to me -- to combine relationship with Government of
18   Malaysia and some of his relationships in the Middle East; and
19   so we thought, let's be friends with him and find ways of
20   seeing if he could leverage us into what these -- these
21   entities were doing in terms of business.
22   Q    So after that point, how, if at all, did you try and use
23   any of those ties Jho Low had or you believe he had? How did
24   you go about using them?
25   A    As I mentioned, Roger made him one of his clients --

**A-245**

*Leissner - Direct - Rolle* 420

1  client contacts. He called him, he established a
2  relationship, and started discussing with him business
3  opportunities, in general. You know, anything -- and it's a
4  skill of a client banker to actually listen rather than
5  present. If you present yourself, you will never learn
6  because you just hear yourself talking, so the key was for Jho
7  to tell what he knew was business.
8       Of course, the businesses, again, were some of his
9  own businesses -- his own private businesses -- but also his
10  main link to the government of Malaysia and the entities in
11  the first place because that was really the most direct to the
12  businesses in Southeast Asia that we were running.
13       MR. ROLLE: I would like to show for the witness
14  Government's Exhibit 1 for identification.
15  BY MR. ROLLE:
16  Q    Do you recognize that, sir?
17  A    That's Roger.
18       MR. ROLLE: Now, if we can go back to Government's
19  Exhibit 6.
20  BY MR. ROLLE:
21  Q    During the years that you and the defendant tried to --
22  that you just described, tried to get into this business flow
23  through Low, was Jho Low ever a formal Goldman Sachs client?
24  A    No. He never became any form of a Goldman Sachs client.
25  Q    Was Jho Low ever proposed to be a former Goldman Sachs

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 421

1  client?
2  A    Yes, he was going to -- on a number of occasions, he was.
3  Q    Who proposed him?
4  A    Roger did in the initial stages, and I did propose him at
5  least once in the later stages.
6  Q    What was the purpose behind proposing him the first time?
7  A    Roger had established a relationship with Jho. We -- he
8  helped us very actively to get the mandate for the
9  establishment of the TIA, Terengganu Investment Authority,
10  that would later become 1MDB.
11       He then came to Roger and told him that he wanted to
12  be a private wealth client of Goldman Sachs. A private wealth
13  client is essentially a wealthy individual whose money Goldman
14  Sachs would manage in our asset management division. So Roger
15  proposed this to our Swiss private bank as a potential client.
16  Q    Was Jho Low accepted as a Swiss private banking client
17  after the defendant proposed him?
18  A    No. He was rejected.
19  Q    Why was he rejected?
20  A    There were two main reasons for the rejection and the
21  combination of those two.
22       The first one, very simply, was that Goldman Sachs
23  could not get comfortable with the source of Jho Low's funds.
24  It's a very common and essential KYC procedure, or your
25  customer procedure at any bank, would undertake whether it's

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 422

1  for a wealthy person, or not wealthy person, but it is where
2  is that person's money coming from, and essentially wanting to
3  make sure that it comes from proper sources, not illegal
4  sources, very bluntly; and Goldman Sachs could not get itself
5  comfortable that it could track Jho Low's source of funds.
6       The second reason was that Jho had, at the same time
7  as, you know, he became known as a -- as a business person, he
8  also appeared in the gossip and tabloid papers as somebody who
9  was spending millions of dollars on parties and extravagant
10  lifestyles, including paying for celebrities, and, you know,
11  private jets and boats, et cetera, et cetera, and government
12  officials -- members of Parliament in Malaysia were starting
13  to ask questions around this person and why he was spending so
14  much money. It was just a reputational risk that we were also
15  seeing at Goldman Sachs.
16  Q    So --
17  A    Sorry.
18  Q    You could finish.
19  A    Combining those two facts basically made Goldman Sachs
20  reject him as a client.
21  Q    So you are talking about Goldman Sachs not getting
22  comfortable with these things. Were you personally
23  comfortable with his lifestyle of partying as you just
24  described? Were you aware of those things at the time the
25  defendant proposed him?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 423

1  A    I was aware of that. I had read the newspaper articles
2  as well, and I had also met Jho. Regrettably so, I did not
3  really care about that. It wasn't really -- for me, I didn't
4  care. For -- at the time I wanted to get business for Goldman
5  Sachs, and his lifestyle, or the rumors about his lifestyle,
6  and whatever else, yes, I knew it was a reputational issue,
7  but, quite frankly, business opportunities for me outweighed
8  that reputational issue.
9  Q    So you, as a banker, didn't reject Jho Low; is that
10  right?
11  A    Correct. No. I was supportive of -- I was very
12  supportive of, in fact, Roger's effort to bring him on board.
13  Q    When you say Goldman Sachs rejected Jho Low as a client,
14  who rejected him?
15  A    It was our control function at Goldman Sachs, so, for
16  that, you have to understand that there are essentially two
17  parts of Goldman Sachs that work together, but also may have
18  different views at different times. There's the
19  revenue-generating side of Goldman Sachs, which Roger and I
20  were part of, that was always looking to make money for the
21  firm, to get transactions to work with clients, and clients on
22  board, so we, you know -- it was our business and our mandate
23  to bring in revenues. That's one side.
24       The other side was the control function of the
25  business, which really was there to make sure there was a

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

**A-246**

Leissner - Direct - Rolle                    424

1   checks and balance on us on the revenue side.  That checks and
2   balance required things like the KYC process -- know your
3   customer process -- making sure that we weren't engaged in
4   activities or with clients that were engaged in activities
5   that were illegal or otherwise didn't meet our standards at
6   Goldman Sachs.  So those two sides of the business existed --
7   as I said, they were working together at times -- but
8   sometimes, like in the case of Jho, have different points of
9   view.
10          The control side would always have the ability to
11  stop us from doing piece of business or work with a certain
12  client if they weren't comfortable with what I just described
13  on their side.
14          (Continued on the following page.)
15
16
17
18
19
20
21
22
23
24
25

Denise Parisi, RPR, CRR
Official Court Reporter

Leissner - Direct - Rolle                    425

1   DIRECT EXAMINATION (Continued)
2   BY MR. ROLLE:
3   Q    So in the case of Jho Low, were these control functions
4   comfortable?
5   A    They were not.
6   Q    And they rejected him?
7   A    That's correct.
8   Q    Was Jho Low proposed as a formal client of Goldman Sachs
9   just that one time in Switzerland?
10  A    No, sir.  They were other attempts going forward from
11  that point, as well.
12  Q    Who was responsible for those attempts?
13  A    As I mentioned before, Roger was really responsible for
14  almost all of these attempts.  I did propose Jho later at some
15  point as a private client again.
16  Q    Did you support all of those attempts?
17  A    I did.
18  Q    And for all of those attempts, was Jho Low rejected each
19  time?
20  A    Yes.
21  Q    By the control functions?
22  A    Yes.
23  Q    So if Jho Low had been rejected multiple times by control
24  functions, why were you and the defendant working with him on
25  1MDB bond transactions and Magnolia, Maximus and Catalyze?

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    426

1   A    At the very basic level, because we wanted that business.
2   Roger and I had covered 1MDB since its inception in 2009.
3   Roger was the lead banker.  We were looking for business with
4   1MDB all through those years, and we knew by working with Jho,
5   by working with 1MDB, on potential transactions, that Jho was
6   the key decision-maker, and because we were so keen on getting
7   this business -- again, Goldman Sachs didn't allow us
8   really, -- of course they would allow us, but Goldman Sachs
9   wanted us very badly, to win any business that was of size,
10  you know, franchise value.
11          So the Tanjong, when they were being sold for three
12  and a half billion dollars, was one of those transactions we
13  wanted to be part of very badly.  And 1MDB wanted to hire us.
14  1MDB meant we had to work with Jho, because he was the key
15  decision-maker.  So there was -- you know, there was no way
16  that we could go around Jho if we wanted business with 1MDB.
17  Q    This key decision-making authority with at 1MDB, you said
18  Jho Low had that, right?
19  A    Yes.
20  Q    Did you ever disclose the key decision-making authority
21  that Jho Low had at 1MDB?
22  A    Well, we -- I never disclosed to Goldman Sachs control
23  functions.
24  Q    Were you required to do that?
25  A    Yes, sir.

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    427

1   Q    When would you have been required to disclose Jho Low's
2   key decision-making authority?
3   A    At the very outset of the transaction.  Before you could
4   accept the mandate, there was a process in Goldman Sachs that
5   was a business selection and conflicts check, and the BIG
6   check as well, B-I-G section.  B-I-G stands for Business
7   Intelligence Group.  That check had to be into and done before
8   we could accept any mandate.  And part of that check requires
9   any disclosure so that Goldman Sachs can get comfortable with
10  it, with any person that was relevant or even in control
11  position of our client, of our potential client.
12          So yes, there was a clear requirement by the
13  procedures of Goldman Sachs to disclose that to control
14  functions.
15  Q    And did you ever disclose Jho Low's key decision-making
16  authority to the control functions?
17  A    I did not.
18  Q    Why didn't you?
19  A    Because his involvement, in my view, and Roger shared
20  that, as did others in Goldman Sachs also who, on the business
21  side, who we talked to about Jho's involvement who were aware
22  of his control position, so collectively, we decided that we
23  would not make that disclosure.
24  Q    But why?
25  A    Because we knew -- again, collectively we knew that any

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    428

1  such mention would basically shut down the deal at Goldman
2  Sachs and essentially raise the red flag, the famous red flag
3  that would stop a transaction at any bank.  And in particular,
4  at Goldman Sachs, this would have happened had we disclosed.
5  Q    And at the time of the 1MDB bond transactions, had Jho
6  Low already been rejected by control functions previously?
7  A    On several occasions, yes.
8  Q    Do you have an understanding as to why you were required
9  to disclose Jho Low's key decision-making authority?
10  A    The firm -- and I think, it's again, a general principle,
11  requires this hurled of, know, any client which means know
12  your customer.  Knowing your customer is a very white term, of
13  course.  But at the very basics, it wants to know who is
14  actually behind any client, who are the key decision-makers,
15  who are the owner, who the beneficiaries of those entities.
16  That really is the first hurled or the first level of
17  knowledge you must have as a bank and to proceed with a
18  client.
19  Q    Who is responsible to -- who is required to make this
20  disclosure of key decision-making authority?
21  A    Anybody who has knowledge of that.  So it's not just
22  restricted to, let's say, myself as a senior banker.  Roger
23  you know, as the client person -- and actually, I think the
24  obligation is on anyone who has knowledge of that and can
25  raise that with the control functions.

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                    430

1  A    Yes.  And I need to give, maybe, a full perspective of
2  this, if I may.
3       The other bankers that knew about Jho Low, knew of
4  him through myself and Roger and discussions we had on many
5  occasions throughout 1MDB's life, almost.  But in particular,
6  during the transactions of Magnolia, Maximus, and Catalyze.
7       (Court reporter interrupts for clarification.)
8  A    The knowledge that those bankers had came from direct
9  discussions I had and Roger and I had with those bankers.
10  Through the life of 1MDB, before the transactions and then
11  very much so during the transactions in particular, because we
12  would have meetings all the time, these were the biggest
13  transactions in Goldman Sachs history, as far as we were
14  concerned, and therefore, we would have a constant -- I mean,
15  constant dialogue amongst ourselves.  Those bangers included
16  Andrea Vella, who was on the investment banking side, you
17  know, kind of the deal captain for all the activities we were
18  doing on 1MDB, Toby Watson, who was the head of that desk who
19  was going to be doing the underwriting, John Dunne who was,
20  again, working for Toby as a structurer, Roger and I, we would
21  have mainly discussions where we would talk about Jho's
22  involvement where we would actually decide that we needed
23  Jho's help for certain elements of the transaction, and then
24  Roger and I were asked by those other bankers to go out and
25  get Jho's help, get something from IPIC, get something from

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                    429

1       There is a process, as I mentioned before, that we
2  go through at the outset of any transaction which includes
3  providing details of that KYC, you know, questionnaire, of a
4  KYC questionnaire.  That is prepared by the deal team which
5  included Roger and myself and others, as well.
6  Q    Was disclosure of Jho Low's key decisions making
7  authority only required at the outset of three 1MDB bond
8  transactions?
9  A    No.  At the outset, the memo is prepared and the
10  disclosure is made.  But the disclosure obligation doesn't
11  stop there.  The disclosure obligation continues throughout
12  the transaction or any time thereafter.  You know, disclosure
13  does not stop at the outset of the transaction, no.
14  Q    In the course of the 1MDB bond transactions, were you
15  ever asked questions about Jho Low's involvement in 1MDB?
16  A    Yes, I was.
17  Q    Did you tell the truth about your full knowledge of Jho
18  Low's key decision-making authority at 1MDB when you were
19  asked those questions?
20  A    I did not.
21  Q    Now, you mentioned that other bankers were aware of Jho
22  Low's key decision-making authority?
23  A    Yes.
24  Q    How do you know -- well, did you tell any other bankers
25  about Jho Low's key decision-making authority?

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                    431

1  1MDB, or the prime minister of Malaysia.
2       In addition, post-Project Magnolia, right after the
3  first transaction concluded, Roger and I took our chairman at
4  the time for Asia, a gentleman by the name of Mike Evans, to
5  1MDB CEO to say thank you for the business.  We had just made
6  $200 million, plus our advisory fee, so I think we made
7  $220 million of 1MDB, and it was only appropriate for us to go
8  say thank you for the business because Goldman had just
9  received $220 million.  The CEO of 1MDB, Shahrol Halmi, at the
10  time, turned to Mike in front of Roger and myself and said,
11  don't thank me for this business, you have to say -- thank Jho
12  Low for this business.  So Mike from that moment knew also
13  that Jho was involved.  Mike was somebody who had -- excuse
14  me.  Mike was somebody who had asked me throughout the project
15  Magnolia before this meeting if Jho was involved.  It was one
16  of those examples where I lied, because I said, no, Jho was
17  not involved.  I may have added the fact that he had made
18  certain contacts for 1MDB in the middle east, but I said -- I
19  lied outright and said no, he was not involved, otherwise.
20  Q    I'd like to pull up Government Exhibit 3 for
21  identification.
22       Can you see that on your screen, sir?
23  A    Yes, sir.
24  Q    Do you recognize it?
25  A    That's Andrea Vella, who, as I mentioned, he was deal

*Avery Armstrong, RPR*
*Official Court Reporter*

---

**A-248**

*Leissner - Direct - Rolle* 432

1  captain at the time of the fundraising of 1MDB's bond
2  transactions.
3       MR. ROLLE:  At this point, we would offer Government
4  Exhibit 3.
5       MR. AGNIFILO:  We have no objection.
6       THE COURT:  It's admitted.
7       (Government Exhibit 3 was received in evidence.)
8       You never offered 1.
9       MR. AGNIFILO:  Not yet.
10      THE COURT:  I'm sorry.
11      MR. ROLLE:  They hadn't offered it just yet, but
12  we have no objection to it.
13      MR. ROLLE:  Yes, Judge, we would offer it.
14      THE COURT:  You offer 1 also?
15      MR. ROLLE:  Government Exhibit 1 is in evidence,
16  Judge.
17      THE COURT:  I never admitted it.  You showed it for
18  identification.
19      MR. AGNIFILO:  We don't object.  We can submit it
20  now if it wasn't in before.
21      MR. ROLLE:  I would offer it now, Judge.
22      THE COURT:  Sure.  1 and 3 are admitted.
23      (Government Exhibit 1 received in evidence.)
24 Q   What decision was Andrea Vella in?
25 A   Andrea Vella was in the investment banking division, sir.

*Avery Armstrong, RPR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 433

1  He was the head of the capital markets group within investment
2  banking Asia at that time of the transactions.
3  Q   And just I'll just remind you keep close to the
4  microphone and keep your voice up.
5  A   Yes, sir.
6  Q   Why did you disclose Jho Low's key decisions-making
7  authority to Andrea Vella?
8  A   Because I trusted him, he trusted me, and it was one of
9  those things that was actually crucial, as I had said before,
10 to the transactions happening.  And Andrea attended at the
11 outset of Project Magnolia, a very important lunch in Kuala
12 Lumpur where Roger and I had lunch with Jho, Jasmine Loo,
13 and -- who was the general counsel of 1MDB, and Andrea joined
14 this meeting as well, this lunch.  It was very observe, again,
15 and I believe Andrea knew at that time already that Jho was
16 the key decision-maker.  But in that meeting, in that lunch
17 meeting, Andrea and Jho discussed what was required from a
18 credit structuring perspective for 1MDB to raise $1.7 billion.
19 And they were in dialogue at that time.  Andrea, over the
20 years, afterwards would meet Jho on many occasions all of
21 which was hidden from Goldman Sachs in a way.
22      THE COURT:  Mr. Rolle, we're to take our morning
23 break.
24      I'll remind the jurors please don't discuss the case
25 at all.  You'll have a 15-minute break.  Please be back at a

*Avery Armstrong, RPR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 434

1  quarter to 12:00.
2       THE COURTROOM DEPUTY:  All rise.
3       (Jury exits the courtroom.)
4       (A recess was taken at 11:30 a.m.)
5       THE COURT:  You may step down, Mr. Leissner.  You
6  may step out.
7       (The witness steps down.)
8       THE COURT:  Please be seated, everyone.
9       So the jurors have requested that the Court either
10 provide them with lunch or provide them with a longer lunch
11 break.  I've never had that question.  I think their concern
12 is not being able to get lunch quickly enough in the
13 cafeteria.  I've asked Winnie to speak to the cafeteria to try
14 to get them to the front of the line so that they can get
15 their lunch quickly.  So we're going to try that today and see
16 if the half an hour works.  If they're still complaining about
17 it, we may have to extend their lunch by another 10 minutes or
18 15 minutes.
19      So I just wanted to notify the parties of that and
20 to give you an opportunity to think about it.  I think if
21 we're able to get them to the in front of it line -- and I
22 don't know if Winnie was able to do that yet, that it should
23 be fine.
24      Winnie, were you able to work out everything with
25 lunch?

*Avery Armstrong, RPR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle* 435

1       THE COURTROOM DEPUTY:  Yes, Judge.  They are able to
2  accommodate when they go downstairs.
3       THE COURT:  So they'll make sure they get to the
4  front of the line and get their lunch right away?
5       THE COURTROOM DEPUTY:  Yes.  And I'll go downstairs
6  with them.
7       THE COURT:  So that should really resolve the
8  problem.  If not, I'll let the parties know.
9       MR. AGNIFILO:  Thank you judge.
10      THE COURT:  Great.  Enjoy your break.
11      (Judge MARGO K. BRODIE exits the courtroom.)
12      (Recess taken.)
13      (Judge MARGO K. BRODIE enters the courtroom.)
14      (Jury enters the courtroom.)
15      THE COURT:  Please be seated, everyone.
16      Please proceed, counsel.
17      MR. ROLLE:  Thank you, Your Honor.
18 Q   Mr. Leissner, before we took a break, we were talking
19 about Andrea Vella?
20 A   Yes.
21 Q   If you could publish -- thank you.
22 A   Andrea was the head of capital markets and investment
23 banking which was, on our transaction, really the more senior
24 role to be paid on 1MDB transactions.  He was really in charge
25 of all the financial structuring, the internal work at Goldman

*Avery Armstrong, RPR*
*Official Court Reporter*

**A-249**

1  Sachs, he was sitting on some of the committees.  He was
2  really, I would say, the deal captain, other than, perhaps,
3  Roger and myself who were the courage people.  But he was
4  really the person who was within Goldman Sachs, the deal
5  captain.
6  Q    You mentioned earlier that you did have discussions
7  directly with bankers about Jho Low's key decision-making
8  authority, right?
9  A    That's correct.
10       (Court reporter interrupts for clarification.)
11 Q    That's something you and the defendant had known,
12 correct?
13 A    Yes.
14 Q    Those bankers included Mr. Vella, who we see here,
15 correct?
16 A    That's correct.
17 Q    Toby Watson, you mentioned?
18 A    Yes, sir.
19 Q    Someone named Jonathan Dunne?
20 A    Jonathan Dunne, Yes.
21 Q    Within that group of people, including the defendant, was
22 there any understanding of how you would handle this
23 information about Jho Low being the key decision-making?
24 A    Yes.  On numerous occasions, as a group, we discussed
25 that we have to keep this information away from the control

1  calls, basically.
2  Q    Did you have an understanding at the time of the 1MDB
3  bond transactions that your Goldman Sachs e-mail accounts
4  could be surveilled?
5  A    Yes.  We were very much aware of that.
6  Q    Who could look at your e-mails?
7  A    The control functions.
8       And this was the point that Andrea had made in my
9  previous statement that he had an experience where that
10 surveillance had resulted in a deal to be stopped.
11 Q    On the 1MDB bond transactions, did you use -- you said
12 private phones -- did you use private e-mails that wasn't
13 Goldman Sachs e-mail?
14 A    Yes.  I certainly did.  I used always my private phone,
15 and on many occasions, the communication with Jho or other key
16 members of Jho's team and also Roger on some of the more
17 sensitive points went on to the private e-mails.
18 Q    Was the -- were the 1MDB bond transactions the first
19 time, though, that you used personal e-mail to communicate
20 with Jho Low?
21 A    No.  We -- I had communicated with Jho before on other
22 transactions that we were contemplating -- that Roger and I
23 were contemplating with Jho on our private e-mails.  There was
24 something in Indonesia where we discussed with Jho, and there
25 were many instances where we would communicate with him and

1  functions.  And not only that, we agreed, as a team, to be
2  very careful about our internal communications.  In
3  particular, the usage of our e-mail system within Goldman
4  Sachs and also any telephones that Goldman Sachs had provided
5  to us.  Some of the lines of Andrea and Toby and others,
6  Roger, Jonathan.  I think mine was probably in that small
7  team, the only one that was not recorded.  All the other
8  telephones in the office were recorded.  Blackberrys issued by
9  Goldman Sachs, we believed were recorded.
10      And so we had one very crucial meeting in Andrea's
11 office where it was Roger and myself, Andrea, Toby, and
12 Jonathan, where very specifically, Andrea said we have to keep
13 everything off the Goldman Sachs e-mail network, because on
14 the previous transaction that he had undertaken in his group,
15 there was some legal compliance issue that was put on the
16 Goldman Sachs e-mail system which was discovered in some of
17 the sweeps that, on occasions, the control functions would
18 conduct on our e-mail system.  This was discovered, and you
19 know, brought a transaction which I'm not aware of what it
20 was, but it brought a transaction to a stop.  And therefore,
21 Andrea, having had this experience, cautioned us to ensure
22 that we keep any mention of Jho, his involvement, his
23 decision-making power, or anything related to that, off that
24 e-mail system and insisted to either talk in-person, when it
25 became important, or use our private telephones.  So making

1  his team, again, on our private e-mails.
2  Q    Prior to the 1MDB bond transactions, did the defendant
3  use his private non-Goldman Sachs e-mail to communicate with
4  Jho Low?
5  A    Yes, he did as well.
6  Q    How do you know that?
7  A    Because I was copied on some of those messages, I was
8  forwarded some of those messages, and, again, between Roger
9  and myself, we talked about these activities with Jho that
10 were off the Goldman Sachs network all the time.
11 Q    Was your personal e-mail address in your own name?
12 A    Yes, it was.
13 Q    Did the defendant have an e-mail address in his name?
14 A    Yes, he did.
15 Q    Did he use that to communicate with Jho Low?
16 A    Yes, he did.  And he also used other e-mails, personal
17 e-mails in other names.
18 Q    What other names do you remember for those e-mail
19 accounts?
20 A    I believe one was Queensgate@Gmail.com.  I think there
21 was something, again, with Victoria as well.  There were
22 several other names that he used.
23 Q    Now, you and other bankers at Goldman Sachs at the time
24 of the 1MDB bond transactions knew of Jho Low's key
25 decision-making authority, correct?

Leissner - Direct - Rolle   440

1  A  Yes, that's correct.
2  Q  Did you or the defendant ever disclose to those bankers
3  the full scope of what you knew about Jho Low and the criminal
4  scheme that surrounded these bond transactions?
5  A  No.  We never disclosed the scheme to other bankers.  The
6  scheme only Roger and I knew at Goldman Sachs, as far as I
7  know.  I never made any disclosure of such to the other
8  bankers.  They only knew of his influence and rumors or other
9  things that Jho may be doing.  But they didn't know from me
10  about the scheme.
11  Q  You said the bankers may know of rumors on the deal.
12     But what do you mean they may have known of rumors?
13  A  Certainly, following the first transaction, but even
14  prior to it, Jho, there were many question marks around Jho
15  and his relationship with the prime minister, the first lady,
16  and those included, yeah, lavish gifts to the first lady of
17  the prime minister and things like that.  So Asian conclusion
18  to that was that many of these bankers new about that Jho was
19  paying -- maybe not necessarily yet on our transaction, but
20  paying certainly the first lady, as well as maybe, perhaps,
21  the prime minister.  I however did not provide any such
22  disclosure and to my knowledge, neither did Roger.
23  Q  You said that the Asian conclusion that maybe Jho Low was
24  paying Government officials on deals, right?
25  A  Correct.

Leissner - Direct - Rolle   441

1  Q  When you say the Asian conclusion, who were you referring
2  to?
3  A  Sorry for using such a broad term.  However, when you
4  work -- when I worked in Asia and my colleagues in Asia too,
5  we shared a cynical view that in many of the countries, bribes
6  were paid, certainly amongst local community to ensure
7  transactions or just business was conducted with the approval
8  by the government.
9  Q  Did you ever confirm for your fellow bankers that you
10  knew bribes were being paid and kickbacks were being paid on
11  the 1MDB bond transactions?
12  A  No.
13  Q  Do you know if the defendant ever confirmed for your
14  fellow bankers that bribes and kickbacks would be paid on the
15  1MDB bond transactions?
16  A  I don't know that he did.
17  Q  And why wouldn't you disclose that to your fellow
18  bankers?
19  A  Because this was really the most sensitive part of this
20  arrangement.  We could not be sure, Roger and I, that other
21  people, other bankers that we might disclose to that he and I
22  were going to receive kickbacks, that they might not raise the
23  red flag within Goldman Sachs, or that bribes were, in fact,
24  being paid to government officials.
25     It is one thing to suspect, to speculate, in the

Leissner - Direct - Rolle   442

1  like, amongst the bankers that maybe something happens, but
2  confirmation by colleagues, myself or Roger, would have --
3  could have resulted in them saying, well, if we have
4  confirmation, we have to report that.  That's why we didn't
5  disclose it and we -- Roger and I, made that conscious
6  decision the moment we learned that bribes and kickbacks were
7  going to be paid.  We had this discussion and we concluded
8  that we will keep this to ourselves.
9  Q  So I'd like to talk about that moment, if we can.  We'll
10  talk in detail about it.
11     But when did you first learn that bribes would be
12  paid in and around the 1MDB bond transactions?
13  A  It was at the meeting in London at the end of February
14  2012, where Roger had arranged a meeting with Jho and his very
15  close team in London to discuss Project Magnolia at that time.
16  Q  Who did you learn this fact about the bribery -- who did
17  you learn it from?
18  A  From Jho -- in that meeting.
19  Q  And who was with you at that meeting?
20  A  Roger was with me from Goldman Sachs, and on the one --
21  on Jho's side, he had -- it was himself, Jasmine Loo, who was
22  the general counsel of 1MDB and also a key person for Jho, you
23  know, liaison between him and 1MDB, and Nik Faisal, the CEO of
24  a subsidiary of 1MDB called SRC at that time.
25  Q  Where specifically did this meeting happen?

Leissner - Direct - Rolle   443

1  A  It happened at Jho's residence in London in Mayfair, at a
2  place called Stratton house.
3  Q  Did 1MDB maintain any offices in London?
4  A  They did not.
5  Q  At that point in time in February -- you said late
6  February 2012?
7  A  Yes.  It was in late February 2012.
8  Q  At that point in time, were all the details of Project
9  Magnolia set in stone in terms of the project and your work at
10  Goldman Sachs?
11  A  No.  They weren't.  We, in fact, traveled to London to
12  discuss the Goldman Sachs side of the structure, and that was
13  my understanding from Roger, who had set up the meeting, that
14  we were going to talk about, again, the Goldman Sachs side,
15  the requirements that we had for making this transaction a
16  success.  It was still early on from a funding perspective
17  that we were in this project.  Yeah, that was the background
18  of our trip.
19  Q  At an early -- at an early stage in a transaction like
20  Project Magnolia, who are the things that Goldman Sachs is
21  working on, what were you working on, what was the defendant
22  working on at such an early stage?
23  A  So there are many -- at an early stage, there are many
24  moving parts to a transaction.  At a very -- one end,
25  actually the merger and acquisition work was going on and was

**A-251**

1  in full esteem.  So again, the fundraising was, at that time,
2  to fund the acquisition of these power-generation assets in
3  Malaysia.  So that work was being conducted.  On the funding
4  side, we had put in -- put together the parameters of what was
5  required and started to work on some of the structural
6  elements.  The most important piece of that really was that
7  1MDB would issue a 10-year bond that Goldman Sachs would
8  privately underwrite, and private -- it was very important to
9  1MDB and Jho Low, and that this would be a 10-year bond, with
10 a guarantee for with that 10 years from IPIC in Abu Dhabi.
11 Those were the broad parameters that we were working on that
12 might sound very simple and should take one hour, but actually
13 putting some of those things into gear and on paper, actually
14 takes quite a bit of time, thinking, analysis and the like.
15 Q    And who would have to do that time, thinking, analysis
16 and work?
17 A    Really the whole team.
18 Q    Goldman Sachs?
19 A    Goldman Sachs, yes.  The whole time was working on that.
20 Q    At that point in time in February, had any entity -- you
21 mentioned a number of them, 1MDB, IPIC, Aabar, Goldman
22 Sachs -- had any of them authorized the fundraising that you
23 were discussing by that point?
24 A    No.  Nobody had authorized any part of the fundraising
25 yet.  Goldman Sachs had gotten the internal clearance to work

1  on this project which is a -- it is an approval that's
2  required, but other than that, no.
3  Q    At that meeting at Jho Low's apartment in London, did you
4  discuss the potential structure of the fundraising?
5  A    That was really the start of the meeting.  When we got to
6  London, it was the afternoon, and we laid out the very basic
7  terms of what we were going to do.
8  Q    Who's we?
9  A    I apologize.  Roger and I.  Roger actually was taking the
10 lead at that time to have the discussion, because he was a
11 capital market's banker, so he actually was more knowledgeable
12 than me as to those more technical elements of it, like, how
13 we would keep the underwriting private.
14 Q    How could that be?
15      If you're a senior Goldman Sachs banker, how is it
16 that the defendant had any more expertise than you on these
17 points?
18 A    My technical background, it was sort of -- not rocket
19 science, but my technical background was really on the mergers
20 and acquisitions side.  That's how I had grown up within
21 Goldman Sachs, as well as the previous jobs I had.  Roger came
22 from the debt capital management side.  The issues that we
23 were talking about here was mostly debt capital markets
24 structuring elements.  Like, you know, if we were to buy this
25 privately, would a rating be required, could that rating be

1  kept private, things like that, he just had more knowledge of
2  because he'd done it more times.  Yes, I had work on some of
3  these transactions for my client, but really, I was not a
4  complete expert in it.  Roger had done this all his life
5  previously before joining Goldman Sachs, and then as his first
6  job at Goldman.
7  Q    So in that meeting, how did the topic of bribery come up?
8  A    So after we had -- Roger are -- I was there and I added
9  my pieces of wisdom to it as well, after we had gone through
10 the Goldman Sachs element of the bond transactions, and I
11 think talking a little bit about the M and A side of it as
12 well, as I recall it, Jho started talking about the scheme of
13 having to basically buy approvals and authorizations within
14 Malaysia and within Abu Dhabi.
15      The way he did it, he took a piece of paper,
16 literally, a white piece of paper and drew for Roger and
17 myself, two columns on the piece of paper, a Malaysian column
18 and an Abu Dhabi column.  In the Malaysian column, he
19 described how payments had to be made to the prime minister,
20 Najib Razak, slash -- there was a slash -- Rosmah Mansor, his
21 wife, in one box.  There was a second box, as I recall it, of
22 1MDB officials.  There wasn't really a specific number of
23 names in there, but there was that box.  And there was a box
24 for Malaysian government officials.
25      On the Abu Dhabi side, at the top level, he put

1  Sheikh Mansour, then the deputy prime minister and chairman of
2  IPIC at the same level as the prime minister of Malaysia and
3  his wife in one box.  He put Khadem Al-Qubaisi who was the CEO
4  of IPIC into the next box underneath Sheikh Mansour.  Then he
5  had a box for Mohamed Badawy Al-Husseiny, the CEO of Aabar at
6  the time, and then there was another box, as I recall it, for
7  IPIC in general.
8       So he put this piece of paper in front of us and
9  said, okay, for us to move forward with this transaction to
10 get all the approvals to make it happen, the $1.7 billion
11 fundraising and the guarantee for it, these are the people
12 that have to be -- he called it, taken care of.  That was the
13 term he used.
14 Q    When he says taken care of, what did that mean?
15 A    That was that meant to pay bribes to them to pay money to
16 them to make these approvals happen.
17 Q    You talked about these boxes related to Malaysia and Abu
18 Dhabi, right?
19 A    Correct.
20 Q    Associated with the Government and with entities?
21 A    Correct.
22 Q    Were there any boxes for people who were not part of the
23 entities at all?
24 A    There was no specific boxes, as I recall it, for, like,
25 myself or Roger.  No, that's not what I recall.  I recall

1  just -- or Jho. I recall those boxes that I just described.

2  Q   You said Malaysian government officials was a box?

3  A   Yes.

4  Q   Separate from the prime minister --

5  A   Correct.

6  Q   -- box and his wife?

7  A   Yes. That's right.

8  Q   What did you understand the purpose of this other bucket

9  of Malaysian officials?

10  A   While the prime minister in his capacity as Minister of

11  Finance one, and shareholder of 1MDB, was actually the person

12  that had the power to approve, as shareholder of 1MDB, the

13  transactions. There were a number of people around the prime

14  minister who really acted as go-betweens between him and our

15  transactions. Those would include his private secretaries.

16  For example, that were activity engaged over the years between

17  us, Jho, and him, and us and Roger, mainly, but myself also.

18  We had engaged with these before. So you needed people in the

19  government structure of Malaysia to help coordinate the

20  efforts as well. The ultimate decision really was with

21  Minister of Finance one who happened to be the prime minister.

22  Q   You talked about these people serving as go-betweens in

23  Malaysia?

24  A   Yes.

25  Q   Were there any go betweens on the Abu Dhabi side that

1  were discussed at the meeting?

2  A   Yes. Sorry, and you're right, there was one box that I

3  had forgotten to mention as a go-between. I apologize for

4  that.

5        There was two go-between people on that piece of

6  paper. The first one was Aabar, Aabar CEO Mohamed Badawy.

7  He, of course, was part of the structure to receive payment

8  for the guarantee that IPIC was going to give. He was

9  described as a key go-between person coordinating within Abu

10  Dhabi.

11        And there was another box, and I apologize, I had

12  not mentioned it before, for a gentleman called Yousef Otiba

13  who was then the ambassador of Abu Dhabi to Washington, D.C.,

14  who Jho described in that meeting as a close friend and as a

15  person that he would call upon when, you know, things would be

16  required in Abu Dhabi and, you know, things get stuck,

17  perhaps. And by stuck, I mean that people wouldn't respond or

18  people would move slow or whatever, he said that Yousef was

19  going to help him to speed and -- speed up things and expedite

20  approvals and people doing their job in Abu Dhabi.

21  Q   Why -- what was your understanding as to why any of these

22  people would need to be bribed?

23  A   Jho was very clear about this in that meeting to Roger

24  and myself. Jho said that without payments, we can forget

25  this transaction completely. It's only going to happen if

1  these people get paid.

2  Q   Did you learn at that meeting how much money would need

3  to be paid as part of the scheme and bribes?

4  A   There was only a very brief discussion on this topic.

5  Jho outlined that at the very top level, if you recall the top

6  boxes were Najib Razak, his wife Rosmah Mansor on the one

7  hand, and on the other hand there was Sheikh Mansour of Abu

8  Dhabi. He said those two had to be equal, otherwise, they

9  would not be happy and accept this. And it had to be equal

10  and it had to be perceived to be equal. Meaning, they had to

11  know, each side, that they were getting equal payment.

12        He further said, at that time, that Sheikh Mansour

13  in Abu Dhabi, wouldn't get out of bed, quote, unquote, for

14  anything less than $100 million. And therefore, by

15  implication, that would apply to the Malaysian side as well.

16  Q   At the meeting, did you learn where the money would come

17  from to pay these bribes that Jho Low outlined for you and the

18  defendant?

19  A   From the bonds, the fundraising that we were going to

20  undertake with Project Magnolia.

21  Q   And what was explained in that regard at the meeting?

22  A   It was still early days in terms of structuring the

23  scheme. But we discussed that the money had to be -- had to

24  come from the Goldman Sachs fundraising exercise and that we

25  had to find a way through the guarantee that Abu Dhabi was

1  providing, to find an excuse to make a payment to Aabar as a

2  guarantee fee or otherwise -- we weren't quite yet sure how we

3  would do this -- that would then be used to make these bribes

4  and kickbacks.

5  Q   From a banking perspective and a structuring, you can

6  say, how can you create a link between two entities involved

7  in a structured fundraising like this where you could just

8  send money out of 1MDB?

9  A   It was -- the only way that you can do so is if you have

10  a reason. Meaning, there has to be a commercial reason to

11  make such a payment. There was such a reason. The guarantee

12  that IPIC was providing was of significant value. 1MDB, as I

13  had mentioned before, could not by itself, raise this kind of

14  money. Therefore, it required the credit guarantee from IPIC.

15        In all circumstances -- by the way, credit

16  guarantees happen all the time whether they're big or small.

17  They require a payment for that guarantee.

18        Now, in the case of our structure, what we discussed

19  and this was part of the discussion at the outset of the

20  meeting, that Aabar, the subsidiary of IPIC, would receive

21  warrants in the business that was being required. Those

22  warrants were financial instruments with value again. One

23  could question the value of them, but there was positive

24  value. These were 10 year, effectively, options to buy into

25  the business for Aabar, the subsidiary of IPIC.

Leissner - Direct - Rolle                                    452

1    In addition, we discussed that there could be a cash
2  payment in terms of fees for the guarantee to Aabar from
3  IPIC -- 1MDB, and that was the link to allow to have a
4  commercial reason to make a cash payment to Aabar.
5  Q   You said those credit arrangements are sometimes common
6  in corporate finance transactions?
7  A   Yes.
8  Q   That type of payment are there other terms that might be
9  used for that?
10 A   Guarantee fees.  I'm drawing a blank here.
11 Q   Guarantee fee is one of them?
12 A   Yeah, guarantee fee is one of them for sure.
13 Q   Now, at that point in late February, at this apartment,
14 what was Goldman Sachs' role in this transaction and in this
15 scheme?
16 A   Goldman Sachs' role was the critical one of being the
17 underwriters on this which really meant that Goldman was going
18 to lend the money to 1MDB in the first instance.  We would
19 then sell those bonds into the market to investors, but very
20 importantly -- and this was part of the first discussion that
21 we were having, Roger and I, and Roger outlined to Jho -- we
22 would be the initial purchasers of the bonds so we would buy
23 bonds, give them the money for those bonds, and then sell them
24 on.  This would establish a private contract, effectively,
25 between 1MDB and Goldman Sachs.  So we were the critical

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                    453

1  funder, if you will, of 1MDB within Project Magnolia.
2  Q   Was your work at Goldman Sachs -- did you understand if
3  it would be important to this scheme's success at the time of
4  your meeting?
5  A   Yes.  The whole --
6  Q   How?
7  A   -- the reason for Roger and I to be in this meeting and
8  to be told about this scheme was that we would act as the
9  coordinators within Goldman Sachs.  And again, Goldman was the
10 critical element to get the one.  Without Goldman, no one,
11 therefore no scheme.  We were to coordinate within Goldman
12 Sachs.  So to really help Goldman get everything done, it was
13 like internal control -- internal coordination function.  But
14 also importantly, coordinate with the team of Jho Low and
15 1MDB, to ensure that other -- that everything on their side
16 would also be achieved, including on-the-ground work in Abu
17 Dhabi including on-the-ground work in Malaysia.  We were the
18 chief coordinators between that team of Jho Low and others and
19 Goldman Sachs.
20 Q   At that meeting, what did you learn -- did you learn if
21 you would get anything out of scheme?
22 A   Yes.  Roger and I were told by Jho that we would also be
23 taken care of as part of the scheme, that we would be paid
24 some money.
25     At that time, it was still undefined how much money

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                    454

1  it was going to be.  But we were told that we would be paid
2  for this work that we were to do.
3
4             (Continued on the following page.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Avery Armstrong, RPR*
*Official Court Reporter*

---

Leissner - direct - Rolle                                    455

1  BY MR. ROLLE:  (Continuing.)
2  Q   When Jho Low laid out these boxes and the fact that these
3  people would need to be bribed and you are sitting there, what
4  was your reaction to hearing that?
5  A   It -- it wasn't -- it wasn't a surprise that -- again, in
6  Asia we had the perception -- I had the perception that bribes
7  were somewhat common when it came to doing business with the
8  Government.  As a result, it was not a surprise.  I have to
9  say, given the state of mind at the time, I was solely focused
10 on getting these transactions done so my focus was if that
11 required that bribes be paid, and I really wanted these
12 transactions to proceed, well, that's what it has to be.
13     The fact that I then would also be paid some money
14 as a result of it was of course additional motivation.  It
15 wasn't maybe the crucial motivation.  A part of me wanting
16 this for Goldman Sachs was much more important for me at that
17 point in time and also because, quite frankly, I didn't know
18 how much money I would be getting out of the scheme.
19     So, yes, I was motivated as well.  So I was, on the
20 one hand, not surprised and on the other hand kind of happy we
21 knew what it would take to make it work.
22 Q   You said you weren't surprised about hearing about
23 bribes.  Did you think it was legal?
24 A   No, not at all.  I knew it was illegal.
25 Q   Did you care that it was illegal?

SN      OCR      RPR

---

**A-254**

Leissner - direct - Rolle                 456

1   A    Regrettably at that time in my life I didn't care whether
2   it was illegal or not.  I wanted this to be done for Goldman
3   Sachs.  I wanted to be a hero at Goldman Sachs.
4   Q    When you learned that you would get money from the scheme
5   as you sat there, what was your reaction hearing that?
6   A    It was one of those things where I was happy -- yes, I
7   have to admit I was happy at the time that I was going to be
8   paid.  The main focus for are me was whatever it takes to get
9   these transactions done for Goldman Sachs.  But, yes, I was
10  also happy that I was going to be paid.
11  Q    Did the defendant have any reaction to learning these
12  facts at the meeting?
13  A    Just like me, we -- after -- after we finished the
14  meeting, we went for a dinner with Jho and his team.  We took
15  cars into Chinatown and to Chinese dinner.  We walked back to
16  our hotel.  He was -- he was also not surprised.  He took us
17  and, yeah, this is how things get done.  He was also happy
18  that he knew that the deals had a way forward.  He in
19  particular was happy that he was going to be paid some money
20  because I think over the years he had felt that he wasn't --
21  he wasn't adequately compensated at Goldman Sachs for some of
22  the success we had scored in Malaysia.  And, don't forget, we
23  were the number one bank in Malaysia for many years and so he
24  was happy about receiving money as a recall of the scheme.
25  Q    Had he complained about his compensation at Goldman Sachs

SN        OCR        RPR

---

Leissner - direct - Rolle                 457

1   through the years up to that point?
2   A    Yes.
3   Q    Now after you learned of this criminal scheme at the
4   meeting, again, did you tell anyone about all the aspects of
5   the scheme?
6   A    Absolutely not, I did not.
7   Q    Who would you talk to about the scheme?
8   A    Roger.
9        MR. ROLLE:  Judge, at this point, I think we will
10  use the demonstratives that we put in the courtroom.  I would
11  ask if Ms. Smith would be free to walk around the courtroom to
12  do that.
13       THE COURT:  Of course.
14       MR. ROLLE:  But first we want to mark for
15  identification Government Exhibits 4, 5, 7, 12, 13, 16, 17,
16  19, 20, 21, 22, and 23 for identification.
17  BY MR. ROLLE:
18  Q    And, Mr. Leissner, you should have a binder of documents
19  next to you in the chair.  Do you see that?
20  A    Yes.
21  Q    There's a number of tabs in that binder and we are going
22  to go through them.  But, first -- so I want you to first take
23  a look.  If you could turn to tab two in your binder, which is
24  Government Exhibit 16 for identification.
25  A    Yes, yes.

SN        OCR        RPR

---

Leissner - direct - Rolle                 458

1   Q    Do you recognize that?
2   A    Yes.
3   Q    What is it?
4   A    Yes, it's a picture of Najib Razak, the prime minister of
5   Malaysia during the time of the 1MDB transactions.
6   Q    If you could turn to tab 3, Government Exhibit 17, for
7   identification.
8   A    That's his wife, Rosmah Mansor, the wife of Najib Razak.
9   Q    If you could turn to tab five, Government Exhibit 22, for
10  identification.
11  A    That's a picture of Sheikh Mansor, deputy prime minister
12  of Abu Dhabi and chairman of IPIC at the time of the 1MDB
13  transactions.
14  Q    If you would turn to tab 6, Government Exhibit 19 for
15  identification.
16  A    That's Khadem Al-Qubaisi, the CEO of IPIC at the time of
17  the transactions.
18  Q    Turn to tab seven, Government Exhibit 20 for
19  identification.
20  A    That's Mohamed Badawy Al-Husseiny, the CEO of Aabar at
21  the time of the transactions.
22  Q    If you could turn to tab 8, Government Exhibit 21 for
23  identification.
24  A    Yes.  Yousef A-Otaiba, the ambassador to the U.S. of Abu
25  Dhabi in -- well, during the time of the transactions up to

SN        OCR        RPR

---

Leissner - direct - Rolle                 459

1   now as well.
2   Q    Government Exhibit 12 for identification, tab nine.
3   A    That's a picture of the late Dato Azlin, the principal
4   private secretary of Najib Razak, the prime minister.
5   Q    You said the late?
6   A    Yes, he has passed away since.
7   Q    Was he alive at the time of the 1MDB transactions?
8   A    Yes, he was.
9   Q    If you could turn to tab 14, Government Exhibit 23 for
10  identification.
11  A    That's Eric Tan, a close associate of Jho Low.
12  Q    That was Government Exhibit 23 for identification.  If
13  you could turn to tab 15, Government Exhibit 5 for
14  identification.
15  A    That's Judy Leissner Chan, my ex-wife.
16  Q    If you could turn to tab 16, Government Exhibit 4 for
17  identification.
18  A    That's Lim Hwee Bin, Roger's wife.
19  Q    If we could -- just look at your screen for a moment.  I
20  don't believe this is in your binder, but if you could pull up
21  Government Exhibit 7 for identification.
22       (Exhibit published.)
23  Q    Who is that?
24  A    That's Nik Faisal, the CEO of the SRC subsidiary of 1MDB
25  at the time of the transactions.

SN        OCR        RPR

**A-255**

Leissner - direct - Rolle                    460

1     MR. ROLLE:  And, Mr. Youkilis, please pull up
2   Government Exhibit 13 for identification.
3         (Exhibit published.)
4   A    That's Amhari.  He was a principal -- private -- a
5   private secretary of Najib Razak as well.  He was under Dato
6   Azlin.
7         MR. ROLLE:  Your Honor, at this time we would offer
8   Government Exhibit 16 -- well, Government Exhibit 4, 5, 7, 12,
9   13, 16, 17, 19, 20, 21, 22, and 23 into evidence.
10        MR. AGNIFILO:  No objection, Your Honor.
11        THE COURT:  They are all admitted.
12        (Government Exhibits 4, 5, 7, 12, 13, 16, 17, 19,
13   20, 21, 22, and 23 received in evidence.)  *
14   BY MR. ROLLE:
15   Q    If you could turn back to tab two in your binder.
16        MR. ROLLE:  And if we could pull up and public
17   Government Exhibit 16.
18        (Exhibit published.)
19   Q    Do you have tab two open?
20   A    Yes, sir.
21   Q    Who is that?
22   A    That's Najib Razak, prime minister at the time of the
23   transactions of Malaysia as well as the Minister of Finance at
24   the time.
25   Q    And was prime minister, Najib Razak involved in the 1MDB

SN      OCR      RPR

---

Leissner - direct - Rolle                    461

1   bond transactions, Magnolia, Maximus and Catalyze?
2   A    Yes, he was, sir.
3   Q    How was he involved?
4   A    He was the ultimate decision maker and authorizer on the
5   1MDB side as the shareholder of 1MDB -- as shareholder of
6   1MDB, he had to give the approval of 1MDB to the institution
7   into enter into the M&A transactions and, two, to do the
8   fundraising.
9   Q    I believe you testified earlier he was close to Jho Low;
10   is that right?
11   A    Yes, correct.
12   Q    Now -- sorry, but why would the prime minister have to be
13   involved in anything to do with these financial transactions
14   for 1MDB?
15   A    Again, 1MDB was a government sovereign wealth fund,
16   meaning it was directly owned by the Government, by the
17   ministry of finance.  So, it was one share in one 1MDB that
18   was held by the minister of finance and he was the minister of
19   finance.  So he had to approve every major transaction that
20   1MDB was undertaking.
21   Q    What power or authority did he have over these bond
22   investments?
23   A    On the 1MDB side, ultimate power and approval power to
24   approve the transactions.
25   Q    From your attendance with the defendant at the meeting in

SN      OCR      RPR

---

Leissner - direct - Rolle                    462

1   London, what if anything did you understand that Najib Razak
2   would be getting in the scheme?
3   A    That he would be paid for his approval and support of the
4   transactions.
5   Q    Go to tab 3.
6         MR. ROLLE:  And please pull up Government Exhibit
7   17.
8         (Exhibit published.)
9   Q    Who is that, sir?
10   A    That's Rosmah Mansor, Najib's wife.
11   Q    Did she have a title as the prime minister's wife?
12   A    There was no official title for her.  I don't believe so.
13   She sometimes referred to as the first lady.
14   Q    Was she involved in the 1MDB bond transactions?
15   A    She was to the extent that she had influence on her
16   husband and a very close relationship to Jho.  So she was a --
17   she was a person that Jho would at times speak to to get
18   certain approvals from her husband.
19   Q    And do you know if Rosmah Mansor received anything in
20   connection with the 1MDB bond transaction?
21   A    Yes, I do.
22   Q    How do you know that?
23   A    Because, one, she was on the list that I described before
24   with that sheet of paper on the Malaysian side next to her
25   husband.  I also know that I made a transfer to a jeweler in

SN      OCR      RPR

---

Leissner - direct - Rolle                    463

1   New York that was going to buy -- that was a financial
2   statement for a diamond that was earmarked by Jho for her and
3   also from direct communications with Jho did I know that she
4   received money as part of these transactions.
5   Q    You said you made a transfer to a New York jeweler?
6   A    That's right.
7   Q    How did you make that transfer?
8   A    By wire out of Capital Place.
9   Q    Do you remember how much it was?
10   A    I believe it was around about $4 million.
11   Q    And what was the purpose of sending that money to the
12   jeweler in New York?
13   A    It was at the direction of Jho to buy a diamond for the
14   first lady of Malaysia.
15   Q    And do you recall when that happened in relation to the
16   bond transactions?
17   A    It was part and parcel of the payments that I received to
18   pass on to other people at the request of Jho.
19   Q    If you could turn to tab nine.
20        MR. ROLLE:  And we could pull up Government Exhibit
21   12?
22        (Exhibit published.)
23   Q    Who did you say this was?
24   A    That's Dato Azlin, the private secretary of Najib Razak,
25   the prime minister.

SN      OCR      RPR

Leissner - direct - Rolle                    464

1  Q   Could you repeat his title?
2  A   He was the principal private secretary to Najib Razak, as
3  prime minister and minister of finance at the time of the
4  transactions.
5  Q   And was -- you said the word dato?
6  A   Yes.
7  Q   What is that?
8  A   It's an honorary title in Malaysia similar to what you
9  would know from the U.K. system as a sir.
10 Q   Was Dato Azlin involved in the 1MDB transactions?
11 A   He was very much the coordinator for Najib to Jho and to
12 many of our interactions with the Government.  He would speak
13 at rating presentations.  He was -- yeah, he was involved
14 every step of the way for the Government.
15 Q   If you could turn to tab ten.
16     MR. ROLLE:  And pull up Government Exhibit 8, which
17 is in evidence.
18     (Exhibit published.)
19 Q   Who is that?
20 A   That's a picture of Jasmine Loo the general counsel of
21 1MDB.
22 Q   What if any role did Jasmine Loo have in the one 1MDB
23 transaction?
24 A   Jasmine Loo was a very key component of the 1MDB Jho Low
25 connection.  She was the general counsel at 1MDB.  She worked

                    SN      OCR      RPR

---

Leissner - direct - Rolle                    466

1  Q   What role did Terence Geh have on the 1MDB bond
2  transactions?
3  A   He was -- one of the most important people on the
4  fundraising.  He was really on the funding side of the
5  transactions.  He helped structure it for 1MDB.  He helped do
6  all the work that was required on the finance side as opposed
7  to Jasmine's work that was more general, but he also
8  importantly was in charge of basically starting all the cash
9  flows and working at 1MDB on that whether it was receiving the
10 money and the funds from Goldman Sachs into the 1MDB account
11 and also from then, there, send the money from 1MDB into other
12 places from there.
13 Q   How do you know Terence Geh was responsible for those
14 cash flows as you described them?
15 A   Post Magnolia there was a meeting that Roger and I
16 attended at Jho's residence in Kuala Lumpur where Terence --
17 he had a meeting -- prior to meeting with Roger and I with
18 Terence where there was -- where they talked about the funds
19 going from 1MDB into another account that was part of the scheme
20 but there was some kind of a hiccup that they were discussing
21 and Jho told Terence to go and sort it out because he was
22 having the communication with a bank -- he being Terence
23 having communications with the banks to -- to forward that
24 particular cash flow transfer of money from 1MDB into this
25 next entity.

                    SN      OCR      RPR

---

Leissner - direct - Rolle                    465

1  on pretty much all of the transaction terms, structuring terms
2  at 1MDB and for 1MDB, but she was also a key person to
3  coordinate with Jho when Roger and I did not have to -- didn't
4  go to Jho directly.  We could also go to her as well as
5  Terence Geh who was the deputy CFO to reach Jho if required.
6  Q   Do you know if Jasmine Loo received -- you mentioned
7  Jasmine Loo was at the meeting in London; is that right?
8  A   Correct.
9  Q   Do you know if she received any money for these
10 transactions through the criminal scheme?
11 A   Yes, she did.
12 Q   How do you know that?
13 A   She told me herself and Jho had confirmed it as well.
14 Q   If we turn to tab 11.
15     MR. ROLLE:  And pull up Government Exhibit 9 which
16 is in evidence.
17     (Exhibit published.)
18 Q   Who is that?
19 A   Terence Geh, the deputy CFO at 1MDB at the time of the
20 transactions.
21 Q   What's a deputy CFO?
22 A   It's the second position within the finance department.
23 The CFO officially is the chief financial officer and the boss
24 of the deputy CFO, but as a deputy CFO you are in charge of
25 the accounting, the cash flows of the entity and the like.

                    SN      OCR      RPR

---

Leissner - direct - Rolle                    467

1  Q   That transfer of money that you're referring to, you
2  mentioned that transfer was in connection with the criminal
3  scheme?
4  A   That was my understanding from the context of the
5  discussion, yes.
6  Q   Was there multiple banks involved as far as you knew in
7  executing the criminal scheme?
8  A   There was really two banks involved as far as I knew
9  from -- that were involved.  There was Sultan Bank, a private
10 bank -- which is a private bank, and then another private bank
11 called BSI.
12 Q   In totality --
13 A   I'm sorry -- sorry, my bank account was Capital Place's
14 bank account was at Cliiyu Bank account in Hong Kong.  There
15 were many other banks involved on the sending side.  Roger's
16 bank I think was UBS and other recipients of the funds from
17 Capital Place.  I think had an account at Nomura, at J.P.
18 Morgan, I believe.  So there are many different other banks
19 that were receiving money as part of the scheme.
20 Q   Going back to Terence Geh, did you have an understanding
21 of which institutions or what banks the cash flow
22 responsibilities you described Terence Geh had, what those
23 were related to?
24 A   The -- they -- well, they related -- first at the very
25 basic level receiving the money from Goldman Sachs and then on

                    SN      OCR      RPR

**A-257**

Leissner - direct - Rolle                    468

```
 1   the second level it was -- the purpose was to send money for
 2   the bribes and the scheme to a separate account which I
 3   believe was at BSI.  So he was -- yeah, that was his work, his
 4   undertaking as it related to the scheme.
 5   Q    Was Terence Geh close to Jho Low?
 6   A    Very close.
 7   Q    Are you aware if he received anything as part of the
 8   scheme?
 9   A    I am only aware of this insofar as Roger told me that he
10   had received money, Terence, as part of the scheme; that he
11   was unhappy about the payment that he had received and that
12   what -- Roger actually had to top him up from his portion of
13   the share -- of the money being -- of his share of the
14   kickback.
15   Q    But this is information about Terence Geh that you
16   learned how?
17   A    From Roger.
18   Q    Did you ever learn if anyone else expressed unhappiness
19   with the money they received as part of the scheme?
20   A    Jasmine was also unhappy.  She expressed that to me in a
21   meeting I had with her in Singapore where she was waiting for
22   her money to arrive into a Credit Suisse account that she had
23   and she felt that that money that she was about to receive and
24   waiting for was also not adequate.
25   Q    If you could turn to Tab 12.
```

SN       OCR       RPR

Leissner - direct - Rolle                    470

```
 1   Q    Did he work at 1MDB?
 2   A    Sorry, yes, he was in Vincent Koh's investment team at
 3   1MDB.
 4   Q    Do you know if he received anything as part of the
 5   scheme?
 6   A    I'm not aware of that.
 7        MR. ROLLE:  If we could pull up Government Exhibit 7
 8   which is in evidence.
 9        (Exhibit published.)
10   Q    It should be on your screen.  Who did you say that was?
11   A    That's Nik Faisal.  He was the CEO of SRC, a subsidiary
12   of 1MDB.
13   Q    Was he involved in the 1MDB bond transactions?
14   A    Not as far as I remember, other than attending that
15   meeting that I had described in London.  He was there and he
16   was present but he did not have an active role in the 1MDB
17   business.
18   Q    Are you aware if he received anything as part of the
19   scheme you described?
20   A    I'm not aware if he ever received any payment.
21   Q    If we could pull up Government Exhibit 13.
22        (Exhibit published.)
23   Q    Who is that?
24   A    That's Amhari.  He was the private secretary of Najib
25   Razak, the prime minister and minister of finance.
```

SN       OCR       RPR

Leissner - direct - Rolle                    469

```
 1        MR. ROLLE:  And if we can pull up Government Exhibit
 2   10 which is in evidence.
 3        (Exhibit published.)
 4   Q    Who is that, sir?
 5   A    Vincent Koh.  He was the chief investment officer at 1MDB
 6   at the time.
 7   Q    What's a chief investment officer?
 8   A    A chief investment officer is really the person who is in
 9   charge of making the investments at an organization such as
10   1MDB.  That was Terrence's job.  He was in charge of the
11   acquisitions being made with some of the funds we had raised
12   at Goldman Sachs.
13   Q    And do you know if Vincent Koh was to receive anything or
14   did receive anything as part of the scheme?
15   A    I'm not aware if he was part of the scheme or received
16   money.
17   Q    If you could turn to tab 13.
18        MR. ROLLE:  We can pull up Government's Exhibit 11
19   which is in evidence.
20        (Exhibit published.)
21   Q    Who is that?
22   A    It's a picture of a gentleman with the first name of
23   Jerome.  I do not remember what his last name is.  He was part
24   of Vincent Koh's investment team working on the acquisitions.
25   I did not work with him very closely.
```

SN       OCR       RPR

Leissner - direct - Rolle                    471

```
 1   Q    What did you understand his role to be with the prime
 2   minister for Malaysian government?
 3   A    Similarly to that of Azlin -- similar to that of Azlin
 4   but not as senior.  He was a coordinator between Jho, the
 5   prime minister and our transactions and the prime minister's
 6   office.  So he was one of the key gatekeepers, if you will, to
 7   Najib to the prime minister.
 8   Q    And do you know if he received anything through the
 9   criminal scheme that you described around the 1MDB bond
10   transactions?
11   A    Knows, I don't know if he received anything.
12   Q    If you could turn to tab 14 which is Government Exhibit
13   23 in evidence.
14        (Exhibit published.)
15   Q    Who did you say that wiretaps?
16   A    That's Eric Tan.  Which tab is that?
17   Q    Tab 14.
18   A    That's Eric Tan, a close, close associate of Jho Low.
19   Q    How do you know he was a close associate of Jho Low?
20   A    I met with -- on several occasions with Jho and Eric was
21   present as well and it was very clear that Eric was very close
22   with Jho and he was doing a lot of running -- I would say
23   running around for Jho, whether it's on the private side or
24   business side he was always doing something for Jho as far as
25   I could see with my eyes when we had these meetings with Jho.
```

SN       OCR       RPR

**A-258**

Leissner - direct - Rolle                472

1  In particular, Roger and I met him in Los Angeles for a dinner
2  where I think I met Eric for the first time and I was
3  surprised at how close he and Jho were.
4      Q    What was his full name?  Was it Eric Tan?
5      A    There's more to it, but I don't recall.
6      Q    And did he work for any of the entities involved in the
7  1MDB bond transactions?
8      A    He did not.
9      Q    Was he involved in the 1MDB bond transactions?
10     A    He was not involved in the bond transactions.  I did
11 communicate with him on e-mail as related to the scheme,
12 meaning the payment of bribes but he was never really
13 involved -- he was never involved in the transactions that
14 Goldman Sachs was doing.
15     Q    What did you communicate with him about in connection
16 with the payment of bribes?
17     A    He had -- if I recall this correctly, he was one -- he
18 had sent me some of the instructions from Jho to make payments
19 to different accounts and I was asked by Jho to coordinate
20 that with Eric to ensure that payments were made.
21     Q    Did he communicate with Eric Tan over any particular
22 e-mail addresses?
23     A    His Eric Tan e-mail, I don't recall what the exact e-mail
24 was.  I believe it involved his full name.  I also suspected
25 at times that while it was his e-mail address or certainly his

SN     OCR     RPR

Leissner - direct - Rolle                473

1  name on the e-mail that potentially I was communicating with
2  Jho Low instead of Eric because from the tone and the wording
3  used and the instructions given, it seemed it could have also
4  been Jho using Eric's e-mail name.
5      Q    How would you be able to differentiate whether it was
6  Eric or Jho Low talking to you?
7      A    To some extent the context of the message but also the
8  tone and the language used seemed very much how Jho would
9  speak and how fluent Jho was in English which was not the same
10 with Eric.
11     Q    If you could turn to tab four in your binder.
12          MR. ROLLE:  And if we could pull up Government
13 Exhibit 52 for identification.
14          (Exhibit published.)
15     Q    Do you recognize that?
16     A    Yes, sir.  It's a map of the Middle East.
17     Q    And you mentioned a number of entities that were in Abu
18 Dhabi?
19     A    That's correct, sir.
20     Q    IPIC and Aabar?
21     A    Yes.
22     Q    Is Abu Dhabi reflected in Government Exhibit 52?
23     A    Yes, it is, sir.
24     Q    Does this map accurately depict that section of the
25 Middle East?

SN     OCR     RPR

Leissner - direct - Rolle                474

1      A    From my understanding, yes.  Abu Dhabi is located east of
2  Doha, Qatar and somewhat southwest of Abu Dhabi.
3      Q    And if we could --
4          MR. ROLLE:  At this point, Judge, we would offer
5  Government Exhibit 52.
6          MR. AGNIFILO:  No objection, Your Honor.
7          THE COURT:  It is admitted.
8          (Government Exhibit 52 received in evidence.) *
9          (Exhibit published.)
10 BY MR. ROLLE:
11     Q    Could you tell me where Abu Dhabi is located on
12 Government Exhibit 52?
13     A    Certainly.  It's east of Qatar, Doha if you see it in the
14 middle of the map and south of Abu Dhabi and Iran which is
15 also on the map.
16     Q    There's a circle now on the map.  Is that accurately
17 showing where Abu Dhabi is?
18     A    Yes, it does, sir.
19     Q    At the London meeting you attended with the defendant
20 what officials within Abu Dhabi did you learn would need to be
21 bribed in connection with the 1MDB bond transaction?
22     A    Again, it was Sheikh Mansor, who at the time was the
23 deputy prime minister and chairman of IPIC.  He was or is the
24 brother of the crown prince and the son of the King and an
25 extremely powerful person in Abu Dhabi and the world.  Khadem

SN     OCR     RPR

Leissner - direct - Rolle                475

1  Al-Qubaisi, who was the CEO at IPIC was also part of the
2  scheme and to be bribed.  Mohamed Badawy Al-Husseiny, the CEO
3  of Aabar, was part of the scheme to be bribed and Yousef
4  Al-Otaiba, who was then and today still is the ambassador to
5  Abu Dhabi to Washington, D.C. was also on that list and
6  highlighted by Jho to receive bribes as part of the scheme and
7  to induce him to get approvals in Abu Dhabi there were.
8          Those were the names and then there was a general
9  box for IPIC as well, which I don't know who would fall into
10 that.  There were several people at IPIC who worked on the
11 transaction, but it wasn't clear who would be part of the
12 scheme.
13     Q    If you could go to tab five.
14          MR. ROLLE:  And if we could pull up preponderance
15 Government Exhibit 22 which is in evidence.
16          (Exhibit published.)
17     Q    Who is that, sir?
18     A    That's Sheikh Mansor, the deputy prime minister, chairman
19 of IPIC in Abu Dhabi at the time.
20     Q    Are you saying the word Sheikh?
21     A    No, Sheikh showed he was part of the royal family and son
22 of the King and an extremely powerful person in the world.
23     Q    Could you explain what you understood Sheikh Mansour's
24 influence was in Abu Dhabi at the time of the transactions?
25     A    Being the younger brother of the crown prince and the son

SN     OCR     RPR

**A-259**

Leissner - direct - Rolle          476

1  of the king made him one of the most powerful people in that
2  country which, given the natural resources, is one of the most
3  powerful countries in the Middle East.  It has potentially
4  more resources than even Saudi Arabia.  He was a very powerful
5  person.
6          On top of that, as relates to the transactions, he
7  was the chairman of IPIC which gave him, similar to Najib
8  Razak at Malaysian side, the ultimate authority to approve the
9  transactions from being undertaken.
10 Q    So when you said he had ultimate authority, Sheikh Mansor
11 said no, what would happen to the transaction?
12 A    There would have been no transaction.
13 Q    And could you have the transaction if he didn't say yes?
14 A    Correct.  We couldn't have because the guarantee from
15 IPIC to 1MDB was absolutely crucial to the transactions to go
16 forward.
17 Q    And what did you understand Sheikh Mansor would be
18 receiving in connection with this criminal scheme?
19 A    As Jho had outlined at the outset, he was going to
20 receive a substantial amount of money and Jho had said at that
21 meeting -- I am quoting now, he would not get out of bed for
22 less than $100 million.
23 Q    At that meeting did you have any additional information
24 about how money would be paid to Sheikh Mansor, the mechanics
25 of it?

SN     OCR     RPR

---

Leissner - direct - Rolle          477

1  A    The mechanics?  No, I did not.  I just knew it was going
2  to happen.
3  Q    Throughout the course of your participation in the
4  scheme, did you ever learn the mechanics of how Sheikh Mansor
5  would receive the bribes sent by Jho Low?
6  A    No.  All payments that I was aware of that I could see
7  were done through shell companies on the receiving side as
8  well.  Meaning that the identities of the actual beneficial
9  owner or the receiver of the money and the funds was hidden
10 from my view as well.  So, no, I never really saw the
11 mechanics of how he was being paid.
12 Q    And you talked the fact that you used shell companies to
13 send payments as part of the scheme?
14 A    That's correct.
15 Q    Do you know if you sent payments to Sheikh Mansor?
16 A    No, I do not know.
17 Q    If you could turn to -- if you could turn to tab six.
18      MR. ROLLE:  And if we could pull up Government
19 Exhibit 19 which is in evidence.
20      (Exhibit published.)
21 Q    Who is that?
22 A    That's Khadem Al-Qubaisi.  He was the CEO of IPIC.
23 Q    He was based where?
24 A    He is based in Abu Dhabi.
25 Q    And was Khadem Al-Qubaisi involved in the 1MDB

SN     OCR     RPR

---

Leissner - direct - Rolle          478

1  transactions?
2  A    Yes, he was.  As the CEO of IPIC who gave the guarantee,
3  he was very involved.
4  Q    What power or authority did he have in the context of the
5  transaction?
6  A    From the corporate governance side of IPIC, he -- as the
7  most senior management figure, he had to approve the
8  transaction as well.  Otherwise it would not happen moving
9  forward.
10 Q    And what, if anything, did you learn that Khadem
11 Al-Qubaisi would receive as part of the criminal scheme
12 surrounding those bond transactions?
13 A    He was mentioned on that piece of paper and he received
14 monies out of the scheme as well.  I do not know his amount.
15 That is not something that I know, but he was motivated by
16 that same scheme.
17 Q    How do you know that?
18 A    From Jho.
19 Q    You mentioned first Sheikh Mansor.  Did you ever meet
20 Sheikh Mansor?
21 A    I never met him personally, but I recall I met Khadem
22 Al-Qubaisi who was my connection to Sheikh Mansor.
23 Q    Turn to tab seven, Government Exhibit 20 which is in
24 evidence.
25      (Exhibit published.)

SN     OCR     RPR

---

Leissner - direct - Rolle          479

1  Q    Who is that, sir?
2  A    Mohamed Badawy Al-Husseiny.  He's the CEO of Aabar which
3  is a subsidiary of IPIC.
4  Q    What was Mohamed Badawy Al-Husseiny's role in the 1MDB
5  transactions?
6  A    He was really the key go-to person on a day-to-day basis
7  in Abu Dhabi to chase the various people to do their work.  He
8  was a very close associate of Jho again.  Jho would speak to
9  him on numerous occasions and he was the guy in Abu Dhabi who
10 literally would go and see people at IPIC, his parent company,
11 like the CFO or the people working for the CFO to ensure that
12 all the day-to-day work that was required to get done was
13 getting done.
14      Just as an example, a bond offering like that
15 required the drafting of a prospectus which is really a
16 lengthy document outlining the transaction and the parties
17 involved.  It took quite a while to get IPIC there to help us
18 work on this particular document.  They were resisting it and
19 Mohamed went to actually sit with the working team to ensure
20 that was happening.  Yousef Al-Otaiba was calling Khadem on
21 behalf of Jho to get Khadem to work faster and encourage his
22 team.  He was more on the ground sitting with people.
23 Q    That's work as part of the official piece of the
24 transaction; right?
25 A    Yes, sir.

SN     OCR     RPR

Leissner - direct - Rolle                480

1    Q    What did you understand his involvement was on the
2    criminal scheme surrounding the transactions?
3    A    He received funds as well and he was also critical in,
4    you know -- in making this whole scheme work.
5    Q    If you could turn to tab 8, Government Exhibit 21 in
6    evidence.
7         (Exhibit published.)
8    Q    Who is that?
9    A    That's Yousef Al-Otaiba, Jho's close friend and also the
10   ambassador of Abu Dhabi to America.
11   Q    How do you know he was Jho Low's close friend?
12   A    Jho mentioned it on several occasions that they were very
13   close, that Yousef would help him with respect to this
14   transaction but also arrange other things.  I think he
15   arranged for a dinner with then-President Obama where Jho and
16   Mohamed attended this dinner.  He worked with Jho on many
17   different things.  I also saw and heard and was in the same
18   room when, on occasion more than once, Jho called Yousef, as
19   well as other officials in Abu Dhabi, to make sure that
20   signatures were obtained, that people were doing their job
21   that Goldman Sachs required them to do.
22         There were many instances during the course of the
23   transaction where we just needed people to focus and get work
24   done and they were somewhat slow and we were afraid that maybe
25   they didn't want to do it and so, Yousef and other people in

SN    OCR    RPR

Leissner - direct - Rolle                481

1    Abu Dhabi were called by Jho to really put their influence to
2    work and encourage people to get everything done.
3    Q    What understanding did you have about whether Yousef
4    Al-Otaiba would receive anything as part of this criminal
5    scheme?
6    A    Again, he was also on that piece of paper that Jho
7    outlined and mentioned and talked about in that meeting in
8    London that he would be part of the payment at the time.
9         MR. ROLLE:  Judge, It's 1 o'clock.  Now is a fine
10   stopping point from our perspective if Your Honor would like
11   to break for lunch.
12        THE COURT:  Yes, I was looking for Ms. Valentin, but
13   I will have Pierre take the jurors down.
14        I did receive your message about your lunch break
15   and we are going to assist you with getting your lunch faster
16   today.  If that doesn't work out, then we will extend the
17   time.
18        So we are going to break for lunch.  Please remember
19   that you cannot discuss the case.  I will see you back at
20   1:30.
21        (Jury exits.)
22        THE COURT:  You can step down, Mr. Leissner.
23        (Witness steps down.)
24        THE COURT:  I will see the parties at 1:30.
25        (Luncheon recess taken.)

SN    OCR    RPR

Leissner - direct - Rolle                482

1                    AFTERNOON SESSION
2         THE COURT:  You can bring them in.
3         (The jury enters the courtroom.)
4         THE COURT:  Please be seated, everyone.
5         Please proceed.
6         MR. ROLLE:  Thank you, Your Honor.
7    DIRECT EXAMINATION (Continuing).
8    BY MR. ROLLE:
9    Q    Mr. Leissner, before we broke for lunch, you had been
10   walking through and identifying a number of officials you
11   understood would need to be bribed as part of one of these
12   bond transactions?
13   A    Yes, sir.
14   Q    One of the people within Malaysia you mentioned was
15   Terence Geh?
16   A    Yes.
17   Q    And sorry, remind us again what Terence Geh's position
18   was?
19   A    He was the deputy CFO at 1MDB, reported to the CFO.
20        MR. ROLLE:  If we could pull up, Mr. Youkilis, I
21   think it is Government Exhibit 9.
22   Q    And while we wait for Government Exhibit 9, you
23   understood that Terence Geh -- you understood Terence Geh had
24   received money in connection with the criminal scheme?
25   A    Yes, that was my understanding.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Leissner - direct - Rolle                483

1    Q    And you learned information about that from the
2    defendant, you said?
3    A    I got that information from Roger.
4    Q    Did you know if Roger Ng and Terence Geh had any
5    relationship?
6    A    Yes, it was my understanding they were personally friends
7    as well outside the work, yes.
8    Q    And how did you know that they were personal friends?
9    A    From Roger's description that they were bicycling
10   together and meeting socially.
11   Q    You said bicycling together?
12   A    Correct.
13   Q    And would -- do you know how frequently they would be
14   socially together?  Would you know that?
15   A    I believe that the bicycling event was like a weekly
16   event.  I don't know how often they would meet outside of
17   that, but it seemed to be a regular friendship.
18   Q    And now, on your screen, is that Terence Geh?
19   A    Correct.  That's Terence.
20        MR. ROLLE:  If we could pull up, Mr. Youkilis,
21   Government Exhibit 13.
22   Q    You mentioned this person's name was Amhari?
23   A    Amhari.
24   Q    Do you know Amhari last name?
25   A    I believe something Amhari Efendi, something like that.

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

Leissner - direct - Rolle                484

1 Q    And what was his relationship to one of 1MDB
2 transactions?
3 A    Again, he was the private secretary to Najib Razak, then
4 Prime Minister, minister of finance one, and the key
5 coordinating person with respect to our interaction with the
6 Government as it was required as shareholder to get those
7 approvals.  So he was one of the people that Jho went to and
8 met on occasion as well as it related to business, even prior
9 to those transactions.
10 Q    As Goldman Sachs employees you said earlier -- well,
11 first, actually, as Goldman Sachs employees, were you
12 prohibited from engaging in any type of bribery, money
13 laundering scheme at Goldman?
14 A    Yes.
15 Q    You understood that not only Goldman's rules prohibited
16 that, but there were other rules and laws that prohibited it?
17 A    Absolutely.  Every country has those laws and they were
18 -- those were illegal.
19 Q    Now, you testified earlier that you hid the bribery and
20 money laundering scheme from other people?
21 A    Yes.
22 Q    Did you hide that from the defendant?
23 A    No.  He was part of all of the discussions we had.  So,
24 no.  Between the two of us, we talked about every part of the
25 scheme.

Leissner - direct - Rolle                485

1 Q    You hid it from bankers at Goldman Sachs?
2 A    Yes, sir.
3 Q    You mentioned Andrea Vella earlier and you talked about
4 his role at Goldman Sachs?
5 A    Yes.
6 Q    What was your understanding of the extent of his
7 knowledge about the 1MDB transactions and the scheme?
8 A    Certainly Andrea Vella was well aware of every aspect of
9 the transactions.  Again, he was the captain of the financing
10 side.  He was involved in every aspect.  He was extremely key
11 for these transactions in order to be successful.
12      He was also a person with very close knowledge of
13 Jho Low's involvement and control over 1MDB.  And we did not
14 disclose to him the scheme itself.  Again, between him and
15 others in that group:  Toby Watson, John Donne, Roger, and
16 myself, at times there were speculations that perhaps those
17 were things to be done, but there was never anything that
18 Roger nor I disclosed as far as I know.
19 Q    Now, for the Government officials that we've looked at
20 and those photographs are on these boards, for those that you
21 knew would be promised bribes or were paid bribes, ultimately
22 what was your understanding of the purpose of those bribe
23 payments?
24 A    It was really one purpose alone, which is seek their
25 approval and consent, or help to make these transactions

Leissner - direct - Rolle                486

1 happen, because without the transaction, there was no money in
2 1MDB to pay these bribes or kickbacks.  Reversely or, you
3 know, in the same vein, without these bribes, kickbacks,
4 transactions weren't going to happen.  So they were really
5 interlocked in that way.  One had to rely on the other one.
6 Q    Do you know if bribes, in fact, were paid as part of the
7 criminal scheme as discussed at the London meeting you
8 attended with the defendant?
9 A    Yes, sir.
10 Q    How do you know that bribes and payments were actually
11 made as part of the criminal scheme?
12 A    For one thing, of course Jho told us, being Roger and
13 myself, that these payments were, in fact, being made, those
14 transactions, meaning he told us on several occasions that
15 people had been paid.
16      In addition, I had acted as an intermediary, if you
17 were, for some of those payments that were directed by Jho to
18 be made to other shell companies that I believe to be to the
19 benefit of people in that scheme as described in the London
20 meeting.
21 Q    When you say you acted as an intermediary for payments,
22 what does that mean?
23 A    That means that Jho sent money, funds to the two entities
24 that I had mentioned at the outset that were controlled by
25 shell companies in Hong Kong, Capital Place Holdings and World

Leissner - direct - Rolle                487

1 Merit, and that it was at his direction I then sent those
2 funds or some of those funds to other shell companies really
3 around the world at the request of Jho.  And those were funds
4 that I believe were part of the scheme.
5 Q    The places you were sending the money to, those were
6 entities?
7 A    All I remember is that those were entities, correct.
8 Q    Who did you understand was behind those shell entities
9 that made those payments from?
10 A    My discussion with Jho, it was my understanding that
11 those shell companies, those entities were, in fact,
12 representing people engaged -- with people as part of the
13 scheme that we had discussed in London.
14      I could not tell who in particular each company
15 belonged to or, you know, who the beneficial owner was of each
16 company, but he made me believe that they were part of that
17 discussion that we had.
18 Q    When you say that you believe the entities were
19 representing people involved in the scheme, do you mean they
20 were the beneficial owners of these entities?
21 A    That's correct.
22 Q    How much -- approximately how much money did you
23 intermediate or act as the intermediary to pay on to these
24 shell entities as part of the scheme?
25 A    I believe in totality, between Capital Place and World

**A-262**

Leissner - direct - Rolle                488

1  Merit, the two entities received around about $200 million, of
2  which I think somewhere in the order of 140 to 150 million was
3  intended for other recipients than myself.
4  Q   Did you, in fact, send the money on to the other
5  recipients?
6  A   Yes, sir, I did.
7  Q   How did you know where to send it?
8  A   Jho gave me instruction -- gave me the instructions and
9  he gave me detailed instructions regarding the destination of
10 those funds, where to go, with bank details, with names, et
11 cetera.  Other than in the case of Roger, who gave me his bank
12 details himself.
13 Q   Why -- what was your understanding as to why it was you
14 who was sending on these types of payments as part of the
15 scheme?
16 A   I have to give a little bit of background, if I may.
17           After Magnolia closed -- and this was the first bond
18 transaction that we did for which Roger and I had promised
19 kickbacks and other people were to receive bribes -- there was
20 a time delay from the moment of closure to receiving the
21 money.
22 Q   Sorry, the moment of closure?
23 A   Closing the transaction, meaning one entity got its
24 funds.  So, we actually successfully had executed this
25 transaction that we had planned to do.  Therefore, it was my

Leissner - direct - Rolle                489

1  expectation that funds -- that I would be paid now my
2  kickback, effectively.  However, there was a delay in the
3  payment; and so, I was getting somewhat anxious and I was
4  talking to Roger at the time about this, that both of us were
5  anxious because we had been successful in what we had promised
6  and now we wanted to get the other side of it, which is what
7  was promised to us at the time.
8            So when there was that delay -- and I discussed this
9  with Roger -- I decided that I would offer Jho my company in
10 Hong Kong, the company I controlled in Hong Kong.  It wasn't
11 in my name, of course, but the company I controlled in Hong
12 Kong, which was Capital Place -- as a vehicle to use to send
13 some of those monies out.  And I thought by offering it up, it
14 would speed up the receipt of my portion of the money as well.
15 Q   How would it do that in your mind?
16 A   In my mind at the time, it was just that if I offered
17 help -- it seemed like the funds were stuck somehow and I
18 couldn't quite figure out why they were stuck, but I thought
19 if I offered my help, I could actually be seen as beneficial
20 to Jho and helpful to Jho and, therefore, he'd send me a chunk
21 of money, which I then would send onwards as requested, and
22 that I could keep my portion to myself.  So I figured by just
23 being the intermediary sitting there to help, I would speed up
24 my receipt of funds.
25 Q   Did you have discussions with the defendant about using

Leissner - direct - Rolle                490

1  your shell company to do exactly what you just described?
2  A   Yes.  We shared at the time our anxiety that monies
3  wasn't forthcoming, that we were both waiting.  We had code
4  words at the time on Blackberry messenger for this.  I think
5  it was that the cakes or the cookies weren't coming fast
6  enough.  And I did check with him and I did discuss with him
7  that I would offer my controlled company as a solution to Jho
8  to maybe unblock any blockage that there was to holding up
9  these funds.
10 Q   What understanding did you have about whether the
11 defendant was speaking to Jho Low about this delayed payment?
12 A   We discussed that.  We both agreed that each one of us
13 individually would chase, so to say, Jho for those payments,
14 because if it came from two sides it would hopefully speed
15 things up or showed that we both wanted to be paid our share.
16 Q   Just to back up, at the London meeting, the early stage
17 of the transaction, you left knowing you would be getting paid
18 as part of the scheme?
19 A   That's right.
20 Q   And the defendant would be getting paid?
21 A   Correct.
22 Q   At that point in time, did you understand that you would
23 have a hand in making the payments that Jho Low described for
24 you at the meeting?
25 A   No, sir, I didn't have that understanding at the time.

Leissner - direct - Rolle                491

1  At the time I didn't know how the payments were going to be
2  paid.  I certainly did not expect at that time that it would
3  involve me.
4            That only was something that I offered up to Jho
5  post Magnolia closing and the anxiety building up in Roger and
6  myself to get our funds, our share of the funds.
7  Q   You offered that up because you wanted to get paid?
8  A   That's correct.
9  Q   Did you offer it up?
10 A   I did.
11 Q   Did you get paid?
12 A   Yes.
13 Q   And what did you do with the money that you got paid?
14 A   So -- well, there was several tranches that Capital Place
15 received at that time, I think in middle of June of 2012, if I
16 remember correctly.  The first payment I shared half of it
17 with Roger.  And then I received subsequent payments shortly
18 thereafter, which I then sent onward at the instruction of
19 Jho.
20 Q   These payments that you received and that you -- and that
21 the defendant received, were those -- those are separate
22 payments from your compensation at Goldman Sachs; right?
23 A   Yes.
24 Q   And your Project Magnolia and Maximus happened in what
25 years?

**A-263**

Leissner - direct - Rolle                                    492

1    A    So Project Maximus -- sorry, Project Magnolia and Maximus
2    were the first two that happened in 2012.
3    Q    And in both of those transactions, did you understand you
4    would receive kickbacks as part of you working on the deal?
5    A    Yes.  That's correct.
6    Q    Did you understand that the defendant would receive
7    kickbacks?
8    A    Yes.
9    Q    In those years -- in 2012, how much did you get paid from
10   Goldman Sachs?
11   A    My total compensation in that year was my best year ever
12   at Goldman Sachs because, as I had mentioned earlier, Goldman
13   Sachs received fees that were unprecedented in our history as
14   a firm, and certainly in Asia, and I was paid my best salary
15   and bonus ever.  I think it was a total compensation, between
16   salary and bonus, of $12 million.
17   Q    Was that the most compensation in a year you'd ever
18   received at goal Goldman?
19   A    It was the highest number I had received to that date and
20   I would receive in the future as well.  This was my best
21   compensation ever.
22   Q    And what was your understanding as to why 2012 was the
23   best compensation you ever received at Goldman Sachs?
24   A    It was on the back of the 1MDB transaction, sir.
25            Yes, we were successful in other parts of our

Leissner - direct - Rolle                                    494

1    Q    In addition to the compensation you received from Goldman
2    Sachs, you were separately receiving millions of dollars from
3    this criminal scheme?
4    A    That's correct.
5    Q    Was it permissible to receive these types of outside
6    payments and compensation at Goldman Sachs?
7    A    Absolutely not, sir.
8    Q    You described earlier that in connection with this money
9    flows and the kickbacks and the bribes, that there were
10   efforts to conceal this?
11   A    Yes.
12   Q    Could you describe sort of what the efforts were that you
13   were involved in to conceal any aspects of these money
14   movements?
15   A    Certainly.
16            The first thing was that we moved all the
17   communication that we thought was sensitive, for sure all
18   communication with Jho on to all of our private accounts,
19   whether those were e-mail accounts, private phones, private
20   Blackberry messengers at that time.  Much of the communication
21   that we deemed to be sensitive was done over Blackberry
22   messenger because, if you recall those days, it was believed,
23   certainly in our community, that server of Blackberry was
24   somewhere in Canada and not accessible to the authorities.
25   So, we felt fairly safe to have those communications on

Leissner - direct - Rolle                                    493

1    Southeast Asia business.  We were doing well in Indonesia.  We
2    were doing well in Singapore as well.  So it was just a really
3    good year for my clients and particularly companies in
4    Southeast Asia, but really it was the 1MDB transactions that
5    made this happen.
6            If you think that in Asia investment banking our
7    total revenues around that time were maybe $500 million, those
8    two transactions, Magnolia and Maximus, constituted over $400
9    million of fees in P&L or revenues to Goldman Sachs.  So, if
10   you can think about this, that's more than half -- more than
11   half of all of our revenues in Asia at that time.  So, it was
12   very significant.
13   Q    Those fees and that revenue, the effect on your
14   compensation, was that just true of its effect on compensation
15   for partners?
16   A    No, sir.
17            Every member of the team received the best
18   performance bonuses they had received.  That's what I recall.
19   Everybody on the team got that reward for being able to be
20   part of that team.
21   Q    Do you know what the defendant's compensation was for
22   2012 for Goldman Sachs?
23   A    I don't remember.
24            We did share compensation levels at the time because
25   we were friends, but I don't remember what it was.

Leissner - direct - Rolle                                    495

1    Blackberry messenger.  That's kind of the communication part
2    of things.
3            In addition, I was also hiding the scheme further by
4    using these shell companies that I had mentioned before in
5    Hong Kong as the agent for me to make those transfers as
6    opposed to me doing those directly myself.
7            I would say that's -- those were the relevant ways
8    of hiding the scheme.
9    Q    Did you use any third-parties who might help you conceal
10   the money flows that you were receiving and sending?
11   A    Well, I used my then wife Judy as an agent, if you were,
12   because I was giving her directions to move money at the time.
13   So, yes, if you consider her a third-party, she was a
14   third-party I used to conceal my identity.
15   Q    That was your spouse at the time?
16   A    That's correct.
17   Q    And the money you sent to the defendant as his kickback,
18   what did you understand -- what aspects were used to conceal
19   that flow on the defendant's side?
20   A    Similarly, it was, you know, on his side in that he used
21   shell companies as well and his wife being the beneficial
22   owner of those shell companies when they were under his
23   control, similar to me with Capital Place and World Merit.
24            MR. ROLLE:  If we could pull up Government Exhibit
25   5, which is in evidence.

Leissner - direct - Rolle                    496

1  Q    Who is that, sir?

2  A    That's my ex-wife, Judy Leissner Chan.

3  Q    She went by Judy Chan?

4  A    She went a lot of time by Judy Leissner.  Now she's Judy

5  Chan.

6  Q    What was Judy Chan's role in this criminal scheme?

7  A    On paper, she was the owner of World Merit and Capital

8  Place, the two entities that I used to make the payments, and

9  I would give her directions and give her directives to move

10  the money in accordance with what Jho had told me to do.  So

11  she was acting on my instructions, if you were.

12  Q    Showing you Government Exhibit 4, who's that?

13  A    That's Roger's wife, Hwee Bin Lim.

14  Q    What role did Hwee Bin Lim play in this scheme?

15  A    Like Judy, she owned -- my understanding, at least, from

16  the transfers I made, she owned the companies in Singapore

17  that I was transferring the money to and she was aware of the

18  scheme that we had undertaken.

19  Q    How did you have that understanding?

20  A    Because that's the reason why she received the money.

21  And from Roger, I understood that she knew that that's why she

22  was getting the money at the time that -- those $35 million.

23         MR. ROLLE:  You can take that down, Mr. Youkilis.

24  Q    After you participated in the 1MDB bond transactions and

25  started to act as an intermediary to move money and pay bribes

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                    497

1  and kickbacks --

2  A    Yes.

3  Q    -- did you give up that role after the one 1MDB bond

4  transaction?

5  A    No, I did not.

6  Q    What did you continue to do?

7  A    I posted 1MDB bond transactions.  I continued to have a

8  relationship with Jho.

9         There were several payments that came later that

10  were part of this scheme and I continued to move that money,

11  at the direction of Mr. Low, Jho Low, to company or entities

12  that were earmarked by him.

13  Q    As the intermediary who was moving those payments, were

14  you assisting in concealing Jho Low's involvement in those

15  payments?

16  A    Yes, at all times.

17  Q    Throughout that time, did you tell the truth ever about

18  what the money was, where it was from, whose money it was?

19  A    No.  If I had told the truth around where the money was

20  coming from, again, any bank would stop any kind of money flow

21  and report it to the authorities; so, therefore, no, I

22  continued to hide the fact of Jho's involvement or being, you

23  know, either the recipient or the sender or where it was going

24  to.  There was always an intent to hide those facts.

25  Q    For the money that you received for your own use and

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                    498

1  benefit through the scheme, did you spend it?

2  A    Yes, sir.

3  Q    Did you move it to other bank accounts?

4  A    To some extent, yes.  I moved monies to my own personal

5  accounts.  I moved money to my later wife here in America.  I

6  made acquisitions or purchases.  I moved it to invest in

7  companies.  So, yes, I did move it to various different

8  accounts as well.

9  Q    Did you ever tell the truth to the banks where you were

10  moving the money, the truth about the money?

11  A    No.

12  Q    Why not?

13  A    Because, again, very simply, those monies would be

14  frozen.  I would not be able to use those monies.  And, more

15  likely than not, any kind of posts would be reported to the

16  authorities, which could lead to the unraveling of the whole

17  scheme at that time.

18  Q    Ultimately, did the scheme unravel?

19  A    Yes.

20  Q    After your arrest in June 2018, did there come a time

21  when you plead guilty to federal crimes?

22  A    Yes, sir, I did.

23  Q    What crimes did you plead guilty to?

24  A    I pled guilty to the conspiracy to commit breaches of the

25  FCPA rules and laws, as well as money laundering; conspiracy

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

---

Leissner - direct - Rolle                    499

1  to commit money laundering.

2  Q    And were those crimes related to the bribery and money

3  laundering scheme you have outlined and described today?

4  A    Yes, sir.  Those were in relation to that scheme.

5  Q    The crimes that you pled guilty to, are those the first

6  crimes that you've pled guilty to in your life?

7  A    Yes, sir.

8  Q    Before June of 2018, had you ever been arrested?

9  A    No, sir.

10  Q    Mr. Leissner, why did you agree to join this criminal

11  scheme?

12  A    It was a very different time for me than it is today.

13  And it's hard it describe this.  Sometimes when you look back

14  and reflect, which I had a lot of time before coming here

15  today -- I had grownup in a fairly modest family.  It was

16  middle class family.  I -- I had been a very ambitious child.

17  And when I came into the investment banking world, that

18  ambition found its home, if you will.  It was an

19  environment -- and certainly when I reached Goldman Sachs and

20  became a partner -- there was a feeling of the ambition that I

21  had built.  And I regret this deeply today, but when it came

22  to the 1MDB transactions, I saw an opportunity at that time to

23  become a hero at Goldman Sachs, which had been my dream pretty

24  much all my life as a banker.  It was when I was at JP Morgan

25  or at Lehman Brothers and it's pretty much -- and I think

*Michele Lucchese, RPR, CRR*
*Official Court Reporter*

**A-265**

Leissner - direct - Rolle                    500

1  other people would agree to me, being a partner at Goldman
2  Sachs is a dream come true.  However, that wasn't enough for
3  me.  I also wanted to be a hero at Goldman Sachs.
4         The transactions that we are talking about were
5  going to transfer my career at Goldman Sachs into something
6  different, and it did result for a while -- until it came
7  crashing down on me, of course -- that level of achievement at
8  the firm, which I was very proud of at the time.
9         In addition, I also became greedy with time.  And it
10 was highlighted by Judy and other friends to me that, you
11 know, greed was going to take over, and that resulted in me
12 wanting more and being more, quite frankly, also, than I ever
13 was.  You know, I wasn't deserving necessarily of all those
14 things.
15        When the scheme revealed that I was going to be paid
16 some extra money and later I learned that it was actually
17 substantial amounts of money, I jumped at the opportunity to
18 make that extra money and maybe be able to be something that I
19 wasn't really and to have a lifestyle that I wasn't accustomed
20 to over the years.
21        So, the short answer to your question was really
22 that my greed and ambition took over at the time, but now I'm
23 looking at a life that has been destroyed as a result of that.
24 That's what I have to say.
25        I'm not proud of it.  My kids will not be proud of

Leissner - direct - Rolle                    501

1  it.  But now is the time to do the right thing and admit and
2  take responsibility for what I have done.  And that's what I'm
3  here for.  You know, it's to take that responsibility.  I did
4  wrong and there's no going back on that.
5  Q   So after you were arrested in June of 2018, what did you
6  decide to do?
7  A   I decided that I would cooperate and work with the
8  Government.  I had actually returned to the United States from
9  my extensive travel abroad to meet with my lawyers at the time
10 in the Washington, D.C. airport to discuss how I could
11 cooperate with the authorities in America.
12        You have to understand that at that time there were
13 reports everywhere around the world that the authorities were
14 looking at these 1MDB transactions.
15        My family at that time was in America.  I had
16 remarried.  I was -- I had a child here.  And I felt that with
17 all that pressure around the world, it was time to turn over a
18 new chapter in my life and work with the Government.
19        You know, events took over real quick.  I was
20 arrested.  And the lawyer who had come to the airport for
21 debriefing of how I would cooperate was there to help me work
22 on this cooperation now in realtime, so I decided to cooperate
23 with the authorities and provide details and facts of the
24 scheme and the transactions that we had taken with 1MDB.
25 Q   How soon after you were arrested in June 2018 did you

Leissner - direct - Rolle                    502

1  plead guilty?
2  A   I pled guilty on August 28, 2018.
3  Q   When you pled guilty, did you do that in this courthouse?
4  A   Yes, I did.
5  Q   Did you have an agreement with the Government at the time
6  that you pled guilty?
7  A   Yes.  We entered into an cooperation agreement between
8  the Government and myself.
9  Q   If you could turn to tab 17 in the binder next to you.
10        MR. ROLLE:  And it's Government Exhibit 3001 for
11 identification, Judge.
12 Q   Sir, do you recognize this document?
13 A   Yes, sir.
14 Q   What is this document?
15 A   It's my cooperation agreement with the Government.
16 Q   Turn to the last page of Government Exhibit 3001.  Your
17 signature is on that page?
18 A   Yes, sir.
19 Q   Do you recognize any of them?
20 A   My signature above Tim Leissner.
21 Q   Is this document dated?
22 A   Yes.  It's August 28.
23 Q   Is this your cooperation agreement?
24 A   Yes, it is.
25        MR. ROLLE:  Your Honor, we would offer Government

Leissner - direct - Rolle                    503

1  Exhibit 3001.
2         MR. AGNIFILO:  No objection, Your Honor.
3         THE COURT:  It is admitted.
4         (Government's Exhibit 3001 received in evidence.)
5  Q   Just look at the first page, obviously it's your name on
6  the top left; correct?
7  A   Yes.  Yes, sir.
8  Q   Going to the last page, page 13 that you were just
9  looking at, that's your signature on the line, it says "Tim
10 Leissner" underneath?
11 A   Yes, it is.
12        (Continued on next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

**A-266**

1  DIRECT EXAMINATION
2  BY MR. ROLLE: (Continuing.)
3  Q    As part of your guilty plea, and under this cooperation
4  agreement, were you required to forfeit anything?
5  A    Yes.  I was required to forfeit $43.7 million.
6  Q    Have you agreed to forfeit anything else in connection
7  with this agreement and your guilty plea?
8  A    Yes, sir.
9  Q    What have you agreed to forfeit?
10  A    I agreed to forfeit my interest in a number of Celsius
11  shares that I had acquired through 2015 and 2017.
12  Q    Celsius shares, is that stock?
13  A    That's stock, yes.
14  Q    On the stock market?
15  A    NASDAQ Stock Exchange, yes, sir.
16  Q    How much have you agreed to forfeit of those shares?
17  A    I've agreed to forfeit my interest in those shares, the
18  value of which I think right now is about $200 million, plus
19  or minus.
20  Q    I'm sorry, how much?
21  A    200 million.
22  Q    Were those shares that you purchased with proceeds of
23  your criminal scheme?
24  A    Yes, sir.
25  Q    Now, under this agreement -- this cooperation

1  agreement -- what's your understanding of what you are
2  required to do under the terms of this agreement?
3  A    My understanding is that I have to work with the
4  Government; tell the truth; lay out the facts as they were, to
5  my best memory; to attend meetings, as required by the
6  Government; to work on discovery around the scheme and the
7  transactions, and everything before and after as it relates to
8  my criminal activities.  It requires me to appear in court
9  proceedings, as required; it requires me to keep my
10  involvement confidential and do anything else I was required
11  to; uncover all the facts of this scheme and all the people
12  involved in the scheme.
13  Q    You mentioned that this agreement requires you to
14  testify.
15  A    That's correct, sir.
16  Q    Does it require you to testify against any particular
17  person or in any particular case?
18  A    No, sir.
19  Q    What's understanding of who decides where and when you
20  testify?
21  A    The Government.
22  Q    Did you choose to be here today?
23  A    No, I did not particularly choose to be here.  No.
24  Q    If you uphold your obligations under this agreement, what
25  do you understand the Government's obligations to be?

1  A    The Government has agreed to provide me a 5K letter under
2  the sentencing guidelines at the time of my sentencing.
3  Q    So, sorry, you mentioned something called the sentencing
4  guidelines?
5  A    Yes, sir.
6  Q    What are they?
7  A    Those are the guidelines for sentencing in criminal
8  activities that are set out in your laws.
9  Q    Now, you mentioned this 5K letter.
10  A    Mm-hmm.
11  Q    What is your understanding about what that letter is?
12  A    It's a letter from the Government to the judge at the
13  time of my sentencing that would outline all my criminal
14  activities, whether related to the scheme or otherwise; it
15  would outline my cooperation with the Government; it would
16  provide thereby a set of facts that may allow the judge to
17  sentence me -- sentence me below the guidelines, as provided
18  by the guideline -- by the sentencing guidelines.
19  Q    As you sit here today, do you have an understanding of
20  what your sentencing guidelines are for the crimes you pled
21  guilty to?
22  A    It is my understanding that it was life imprisonment
23  under the guidelines.
24  Q    For the crimes you pled guilty to, what's the maximum --
25  total maximum sentence that you could face?

1  A    It was 20 years and 5 years consecutively, so 25 years in
2  totality.
3  Q    Who decides what your sentence will be?
4  A    The judge presiding the sentencing.
5  Q    As part of the cooperation agreement, does the Government
6  recommend any particular sentence for you?
7  A    No.
8  Q    I just want to look at page 9 of Government's
9  Exhibit 3001 and the ends of paragraph 14.
10          Could you read the last two sentences of that
11  paragraph, sir?
12  A    "The" -- sorry.  "The offices will not recommend to the
13  Court a specific sentence to be imposed.  Further, the offices
14  cannot and do not make a promise or representation as to what
15  sentence will be imposed by the Court."
16  Q    It says "the offices."  Who is that?
17  A    That's the Government.
18  Q    As you sit here today, do you know what sentence you are
19  going to get in your criminal case?
20  A    No, sir.
21  Q    Has anyone made any promises to you about what your
22  sentence will be at the end of the day?
23  A    Absolutely not.
24  Q    Now, is the maximum 25-year sentence still the maximum
25  sentence for you even when -- if the Government writes a 5K

*Leissner - Direct - Rolle*      508

1   letter for you?

2   A   Yes, sir.

3   Q   Sitting here today, do you know if you are going to get a

4   5K letter?

5   A   No, I don't, sir.

6   Q   What's your hope in that regard?

7   A   I do hope I will get it.

8   Q   Is the judge required to give you a lower sentence if the

9   Government does write that letter?

10   A   No, sir.  The judge can decide on her -- his or her own

11   judgment what the sentencing would be.

12   Q   As you sit here today, what sentence are you hoping to

13   get from the judge?

14   A   I hope that I don't have to go to prison, sir.

15   Q   As you sit here today, do you know if you are going to go

16   to prison?

17   A   No, absolutely not.

18   Q   What's your understanding of what happens if you lie?

19   A   This agreement will become null and void.

20   Q   Sorry?

21   A   This agreement will become null and void.

22   Q   If that happens and the agreement is null and void

23   because you lied, do you get to take back your guilty plea?

24   A   No, sir.

25   Q   You would still be bound by the guilty pleas?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle*      509

1   A   Yes, sir.

2   Q   For the crimes you pled guilty to, the FCPA crimes, the

3   money laundering crimes?

4   A   Yes, sir.

5   Q   Would you still be sentenced for those crimes if the

6   agreement was ripped up?

7   A   Yes, sir.

8   Q   Would your maximum sentence still be 25 years in prison?

9   A   Yes.

10   Q   Would you get a letter -- the 5K letter -- if you lied?

11   A   No, absolutely not.

12     MR. ROLLE:  We can take that down, Mr. Youkilis.

13   BY MR. ROLLE:

14   Q   We will come back to the crimes that you committed and

15   that you pled guilty to, but I think, first, I would like to

16   understand a bit more about your background.

17     In total, how many years did you work in finance?

18   A   It was a total of almost 23 years.

19   Q   And I think you mentioned you worked predominately in

20   Asia?

21   A   For 18 years of that, yes, in Asia.

22   Q   What other countries did you work in?

23   A   I worked in Germany, in London.  And from London, I

24   worked in, again, different jurisdictions as well.

25   Q   What brought you to work in Asia in the first place?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle*      510

1   A   I was based in London working for JPMorgan, and when --

2   JPMorgan wanted me to move to Frankfort as a banker.  At the

3   time, a very good friend of mine was transferring from

4   JPMorgan to Lehman Brothers in Hong Kong.  He was based in

5   Hong Kong, and he went from JPMorgan to Lehman Brothers and

6   said that they were looking for bankers at Lehman Brothers,

7   and if I wanted to interview.  This is in early 1997 -- late

8   '96, early '97, and I said sure, I will do that.  I went to

9   interview, and I got a job offer from Lehman Brothers in Hong

10   Kong, which I accepted because I wanted to be an international

11   banker.  Rather than going back to Germany, I wanted to spend

12   some time overseas and abroad, and Asia was a very exciting

13   place at that time.

14   Q   Now, you testified earlier that at the time of the 1MDB

15   bond transactions, you had already been a partner for a number

16   of years; correct?

17   A   That's correct.

18   Q   What was the highest position -- understanding you were a

19   partner -- the highest title or position you held at Goldman

20   Sachs?

21   A   Well, being a partner is kind of the highest position;

22   however, the highest position I reached in terms of functional

23   titles was being a chairman of Southeast Asia and being on the

24   partnership committee at Goldman Sachs.

25   Q   When were you elevated to the chairman of Southeast Asia?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

*Leissner - Direct - Rolle*      511

1   A   It was post the 1MDB transactions.  I think I elevated in

2   2014 to that position.

3   Q   This was after you successfully had completed the bond

4   transactions you talked about today?

5   A   That's correct, sir.

6   Q   At the time of those transactions, did you hold any

7   position like that, chairman of anything?

8   A   I was -- I believe I was still the co-president for

9   Goldman Sachs Singapore, which really was the co-president for

10   Goldman Sachs Southeast Asia.

11   Q   What did it mean to be co-president?

12   A   It meant that -- the various divisions that -- I was

13   coordinating and managing the various decisions out of the

14   Singapore office.

15   Q   Obviously, you've already said today Goldman Sachs paid

16   you for your work.

17   A   Yes, they did.

18   Q   Over the course of your career, how much were you paid at

19   Goldman Sachs?

20   A   I would estimate that was probably somewhere in the order

21   of 50- to $60 million over all those years.

22   Q   And what form did that compensation come?  Was it all

23   cash?  How did you get paid $60 million?

24   A   Our pay structure was that we received a cash salary that

25   was paid out on a monthly basis.  Then there was a bonus at

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

**A-268**

Leissner - Direct - Rolle                                512

1    the year-end that I would be paid in cash, as well as shares
2    in Goldman Sachs.  Those shares were restricted and,
3    therefore, they had to vest and get unrestricted over time.
4    Q    What do you mean shares in Goldman Sachs?
5    A    Stock in Goldman Sachs.  So, you know, common shares
6    which are tradable on the exchange; one can buy and sell them.
7    It's what you would see on the stock market listed under the
8    ticket GS.
9    Q    Goldman Sachs is a publicly-traded company?
10   A    It is.
11   Q    Now, that compensation structure with the monthly salary
12   and then a bonus and shares, was that only true of partners
13   that that was the way you were paid?
14   A    No.  This was true for everyone at Goldman Sachs.  When
15   you reach a certain level -- and it pretty much starts when
16   you're an analyst and above, meaning when you start at Goldman
17   Sachs -- a part of your bonus is intended to be in shares to
18   motivate everyone to increase the share price for our
19   shareholders, because part of our compensation was linked to
20   that success of our share price.
21   Q    Did anything happen to your Goldman Sachs compensation as
22   a result of your guilty plea?
23   A    Yes.  The shares -- the remaining shares that were held
24   by Goldman Sachs -- which, in my belief, I was owed -- were
25   frozen and retained by Goldman Sachs as well as the dividends

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                513

1    that had -- were accruing, or have accrued, and that were
2    accruing as well.  Those shares are still frozen, and those
3    dividends are still frozen, and that's subject to an
4    arbitration between me and Goldman Sachs.
5    Q    Now, I want to understand -- and you talked a lot about
6    the work Goldman Sachs did on the 1MDB transactions, but could
7    you just explain, kind of, generally, how the services you
8    offered at Goldman Sachs differed from a regular bank someone
9    may have on the street?
10   A    Yeah.  Goldman Sachs, at the time I was there, was really
11   what I would say a wholesale bank rather than a retail bank.
12   A wholesale bank transacts really in bigger amounts and with
13   bigger clients.  We, at that time, didn't have branches that
14   any one of us here could go to and have an ATM machine or get
15   checks from, et cetera.  Goldman Sachs was not in the retail
16   business at that time.  I think it's changed since then, but
17   when I was there, it hadn't done that.
18        So our clients were really the big corporates, the
19   big institutional investors, the wealthy clients, so it was
20   really for large sums of money.
21   Q    You testified earlier that there was an account the
22   defendant proposed Jho Low to have at Goldman Sachs.
23   A    Yes.
24   Q    Where did that fit into Goldman Sachs's services as a
25   bank?

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                514

1    A    It's -- it fell between a -- into a group called the
2    Private Wealth Management Group that was within the IMD
3    Division -- the Investment Management Division, which had two
4    parts -- the private wealth management part and the
5    institutional asset management part where we would represent
6    endowments, pension funds, and the like, insurance companies.
7        On the private wealth management side, we would take
8    on clients that had this certain net worth -- and I forget
9    whether it was $10 million of assets or investable assets -- I
10   can't quite be sure anymore -- but it was that kind of level
11   that you had to be able to reach to be able to be a Goldman
12   Sachs client.
13   Q    In your role in investment banking, what were you helping
14   your clients do at the bank?
15   A    On the investment banking side, our job was to -- to be
16   agents and -- and capital providers for large corporate --
17   corporates.  I had mentioned those before.  In the U.S., AT&T,
18   Apple, Amazon.  I mean, any big corporate was and is Goldman
19   Sachs's client.
20        In addition, we had the sovereign wealth funds
21   around the world -- 1MDB was one of them, of course -- one of
22   them in Abu Dhabi; CIC of China.  In Singapore, Khazanah,
23   GIC -- Temasek and GIC, so there were many sub wealth funds
24   that we would cover.
25        We would cover governments when they were relevant

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                515

1    to our business.  For example, issuing bonds to finance their
2    deficits, for example.  So we had a broad spectrum of clients
3    in investment banking to do two things:  One was capital
4    raising, whether it was debt or equity; or advise them on
5    large merges- and acquisitions-type of transactions.
6    Q    Where did the 1MDB bond transactions fall within this
7    scope of your work in IBD?
8    A    It been all the -- all of the above.  And I say that
9    because the acquisition off the power generation assets was
10   part of our assignment at Goldman.  It was the reason that we
11   first started thinking about how 1MDB was going to raise the
12   money to pay for those acquisitions.  It was part of the
13   capital markets group because the debt funding was part of
14   debt fund-raising bonds that we would raise under the debt
15   capital markets group; and later, post those transactions, we
16   were also involved in the potential initial public offering --
17   the IPO -- of 1MDB's energy assets.  So our work with -- our
18   Goldman Sachs work with 1MDB really spent every single product
19   that investment banking had to offer.
20        THE COURT:  Mr. Rolle, we are going to take a short
21   break.
22        Members of jury, please remember not to discuss the
23   case with anyone.  We are going to take our afternoon break at
24   this time.
25        THE COURTROOM DEPUTY:  All rise.

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

**A-269**

Proceedings 516

1     (Jury exits.)

2     THE COURT:  Mr. Leissner, can you step outside?

3     THE WITNESS:  Yes.

4     THE COURT:  Please be seated, everyone.

5     (Witness exits the courtroom.)

6     THE COURT:  Please make sure the door is closed.

7  Close the door, Winnie.

8     Thanks.

9     So I wanted to follow up with regard to the juror

10 who has an appointment for tomorrow at 10:00.  How do the

11 parties want to proceed?

12    MR. AGNIFILO:  So, I spoke with the Government about

13 it, and is seems like the wild card issue is if the juror knew

14 for a fact that the juror could be here at 1:00 and that

15 really was sort of set, then I think there's some inclination

16 to try to work in the afternoon if the other jurors can do

17 that.  If the juror is aspiring to be here by 1:00 but can't

18 really say for sure that he can be here at 1:00, then I think

19 we are leaning more in the direction of not sitting tomorrow

20 at all, if that was what the Court was leaning toward.

21    THE COURT:  I think he's aspiring; right?

22    Pierre spoke with him yesterday, and he indicated

23 that it's a procedure.  He thinks it will be done in about two

24 hours and that he can get here by one o'clock, so it's unclear

25 what time he will --

*Denise Parisi, RPR, CRR*
Official Court Reporter

---

Proceedings 517

1     MR. AGNIFILO:  Also, if it's a procedure, if there's

2  any discomfort, we can say the day off, I think.

3     THE COURT:  He should be with his wife rather than

4  with us.

5     MR. AGNIFILO:  Yes, that's right.

6     THE COURT:  Okay.  So I will tell the jurors that we

7  won't sit tomorrow, but that we will sit the next day and

8  we'll start at 9:30.

9     MR. AGNIFILO:  Very good.

10    THE COURT:  Now, do the parties have any interest in

11 changing the time periods?  I noticed we don't really need an

12 afternoon break, although I have been offering it, because we

13 are taking a later lunch break at 1:00.  I could give them an

14 extra 15 minutes for lunch and then not break in the

15 afternoon, just go directly to 3:30.

16    MR. AGNIFILO:  That sounds like a good idea for us.

17 That makes sense, Judge.

18    THE COURT:  And I think the jurors would prefer

19 that.

20    MS. SMITH:  That's fine with the Government as well.

21    I just wanted to clarify, we hadn't been planning on

22 sitting on Friday, so I think if we didn't sit tomorrow, then

23 the next day we would sit would be next Tuesday --

24    THE COURT:  Oh, right.

25    MS. SMITH:  -- because of the holiday.  I know it's

*Denise Parisi, RPR, CRR*
Official Court Reporter

---

Proceedings 518

1  Thursday already.

2     THE COURT:  Thanks for reminding me.  I wasn't

3  thinking about the fact that the next day will be Friday.

4     MS. SMITH:  Yes.

5     THE COURT:  Okay.  So that would mean Tuesday, and

6  Tuesday I cannot start until 9:45 since I'm sitting on a panel

7  from 8:30 to 9:30, so I will tell them that they'll come back,

8  they'll have a long weekend, and to be back here Tuesday

9  morning at 9:45.

10    MR. AGNIFILO:  That's fine, Judge.

11    THE COURT:  Okay.  That was the only reason for this

12 break.  I really just wanted to discuss with the parties how

13 best to proceed.

14    MS. SMITH:  And then, Your Honor, if we can just

15 remind them that next Friday we will sit because of the

16 holiday.

17    THE COURT:  Because of the holiday on Monday, yes,

18 so it will be four days next week, but Tuesday through Friday.

19    Thank you.  So I will see the parties back in a few

20 minutes.

21    MS. SMITH:  Thank you, Your Honor.

22    MR. AGNIFILO:  Thank you, Your Honor.

23    (A recess in the proceedings was taken.)

24    THE COURT:  Can you bring the witness back in?

25    (Witness resumes the stand.)

*Denise Parisi, RPR, CRR*
Official Court Reporter

---

Leissner - Direct - Rolle 519

1     (Jury enters.)

2     THE COURT:  Please be seated.

3     Mr. Rolle, please --

4     MR. ROLLE:  Thank you, Your Honor.

5     THE COURT:  -- proceed.

6  BY MR. ROLLE:

7  Q   Mr. Leissner, you were talking about your time, and

8  generally, more specifically, your work within the Investment

9  Banking Division at Goldman Sachs.

10 A   Yes, sir.

11 Q   You talked earlier today about what it meant to be a

12 coverage banker within the Investment Banking Division.

13 A   Yeah.

14 Q   And I could summarize that some of that was covering

15 clients in a variety of countries and finding transactions for

16 those clients to undertake?

17 A   Yes, that would be accurate.

18 Q   That would generate revenue for Goldman Sachs?

19 A   Yes.

20 Q   In what ways did it generate money for Goldman Sachs

21 getting clients to do transactions?

22 A   As an investment bank, we would charge fees on the

23 business that we undertake.  In general, those fees are

24 determined by the size of the transaction and what can be

25 negotiated.  On merges and acquisitions, it's normally a

*Denise Parisi, RPR, CRR*
Official Court Reporter

Leissner - Direct - Rolle                                          520

1  percentage of the total deal value.  In a capital raising, it
2  would be a percentage of the capital being raised.  In terms
3  of fees, sometimes, as for example was the case in the 1MDB
4  transactions, we could also make money on top of that by
5  underwriting at a certain level, meaning you are buying the
6  bonds at a level and selling them on to investors at a
7  different level -- at a higher level -- thereby we would make
8  that, what we would call, a spread between buying and selling
9  as well.
10 Q   Now, did Goldman Sachs have competitors in Southeast
11 Asia?
12 A   We certainly did have many competitors, yes.
13 Q   Who were they?
14 A   It depended a little bit on each country.  We had Credit
15 Suisse, which was a very significant player and competitor to
16 us; JPMorgan; Morgan Stanley; UBS.  So we had quite a few
17 competitors.  In a market like Malaysia, we also had local
18 competitors, which, you know, the biggest one for us there was
19 CIMB, which was the largest bank in Malaysia, so we had
20 international, but also sometimes local competition.
21 Q   As an investment banker, did Goldman Sachs -- how did it
22 review how you were performing -- how good of a job you were
23 doing at Goldman?
24 A   They were several ways of doing that.  Obviously, for us
25 on the revenue-producing side that I had described before,

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                          522

1  answer then to our bosses to say why we weren't part of that.
2          (Continued on the following page.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                          521

1  revenues that we had generated from our clients, or the set of
2  clients that we had, was one measure.  That measure was
3  captured in reports that we would keep per banker.  We had
4  banker sheets, basically, that showed my name at the top and
5  then all the activity undertaken with the clients in my
6  portfolio.
7          And the other way, we had yearly performance reviews
8  where we would be measured by having a 360 review by all of
9  our co-workers, effectively; so I would say those were the two
10 main yardsticks for our performance for a revenue-producing
11 banker.
12 Q   Was your engagement with clients reviewed in real-time at
13 all at Goldman Sachs?
14 A   It was at times.  When we won business, there was usually
15 somewhat an office celebration; and so, therefore, a review,
16 yes, internally, you would get emails saying, congratulations,
17 you've done a good job, we're happy that you got it.
18         Similarly, if we didn't and there was, what we would
19 call, a trade printed, meaning somebody else, another
20 competitor, was doing a transaction with one of our clients,
21 that would also be captured and reviewed in real-time, and
22 then you would get an email saying, why weren't you a part of
23 that transaction?  What are the reasons for not being part of
24 that transaction?  And you would have had to -- you, as the
25 banker -- let's say myself or Roger, who had clients -- had to

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

---

Leissner - Direct - Rolle                                          523

1  DIRECT EXAMINATION (Continued)
2  BY MR. ROLLE:
3  Q   Who would ask you why you missed a transaction?
4          Who would be asking these questions to the banker?
5  A   The first question would normally come from our
6  comptrollers, meaning the financial people that kept track of
7  our revenues, but also our missed business.  It was more a
8  back-office function with investment banking.  That e-mail
9  that they would originally send out to the bankers, you know,
10 whose clients was doing business away from us would also go to
11 senior management.  Meaning, the heads of investment banking
12 in Asia, the head of the Asian office, and sometimes also the
13 heads of global banking, if it was a significant transaction.
14 So senior management would be copied on these e-mails that
15 would allow them to have follow-up questions depending on the
16 answer.
17 Q   Was it a good thing to miss transactions?
18 A   Absolutely not.  In our culture at Goldman Sachs, you
19 have to understand, we were expected to get every transaction
20 there was of size.  The transactions we cared about, there was
21 really an expectation that with our brand at Goldman Sachs, we
22 should be able to get any kind of transaction.  It was
23 engrained in us that it was unacceptable to lose business.
24         MR. ROLLE:  If we could pull up Government
25 Exhibit 1976 for identification.

*Avery Armstrong, RPR*
*Official Court Reporter*

**A-271**

*Leissner - Direct - Rolle* 524

1          And Mr. Leissner, and if you could turn to tab 18 if
2   you'd like to look at a hard copy.
3          One moment, Your Honor.
4   A   Yes, sir.
5   Q   What is this document?
6   A   It's an e-mail to myself and others in our Southeast
7   Asian business dated May 27, 2009.
8   Q   Did you receive this e-mail?
9   A   Yes, sir.
10  Q   Do you see your name on it?
11  A   Yes.  Yes, sir.
12         MR. ROLLE:  Your Honor, we'd offer Government's
13  Exhibit 1976.
14         MR. AGNIFILO:  No objection, your Honor.
15         THE COURT:  Admitted.
16         (Government Exhibit 1976 was received in evidence.)
17         MR. ROLLE:  And we'd ask to publish it.  Thank you.
18         If we could scroll to the bottom e-mail,
19  Mr. Youkilis.
20         Just looking at the recipients of this e-mail at
21  first who's the sender?
22  A   Wendy Lim was the sender.  She was one of those
23  controllers I had mentioned earlier that would basically
24  account and look after our revenues, but also, our missed
25  business.

---

*Leissner - Direct - Rolle* 525

1   Q   Who was this e-mail sent to?
2   A   Chong Lee Tan, Roger Ng, Michael Smith, myself, and Udhay
3   Furtado.
4   Q   What group of Goldman Sachs were you and the defendant in
5   at that point?
6   A   We were in the investment banking division.  Roger was
7   covering Malaysia, and I was the Southeast Asian investment
8   banking, as well as the co-president for Southeast Asia, as
9   well.
10  Q   Who were the people on the CCd line?
11  A   On the CC line we have, Dan Dees, Mark Machin, Ravi
12  Singha, Pooja Grover, Yuwen Huang, and, Jason Tsang.
13  Q   Who were those people?
14  A   All of those were in the management of our investment
15  banking business at the time.  Dan Dees, Mark Machin, and Ravi
16  Singha were senior partners with investment banking.  Pooja,
17  Yuwen, and Jason were on the controlling side.  Meaning, on
18  the -- you know, they weren't very senior, but they were on
19  the management side of the business.
20  Q   What is -- what's Wendy Lim's e-mail to you and the team,
21  including the defendant?
22  A   It is one of those lost business reports where it
23  involves one of our clients, in this case Genting.  We had
24  been trying to get business from Genting for many years.  It
25  was the biggest -- one of the -- the biggest gaming company in

---

*Leissner - Direct - Rolle* 526

1   Malaysia and Singapore, and here, a family member or entity
2   owned by a family member of the Limb family --
3          (Court reporter interrupts for clarification.)
4   A   So in this case, an entity owned by a family member of
5   the Lim family was selling a 9 percent stake in Genting
6   Singapore for $425 million.
7   Q   What does Wendy Lim direct the recipients of this e-mail
8   to do?
9   A   She's asking us the teams that on the two lists to
10  explain the reasons why we weren't part of that transaction.
11  This was what I called the loss business report.  We have to
12  justify why we're not part of a piece of business that we
13  would otherwise want to be part of.  In Genting we had
14  identified as a potential client that we would like to work
15  with, but obviously, we weren't in this case.
16  Q   She's asking for reasons why you missed the business.
17         Where would this information go once you responded
18  to it as a deal team member or investment banker?
19  A   It does say that it goes to basically all the important
20  bosses of us which David Solomon was the head of investment
21  banking at the time, globally -- he today is the chairman CEO
22  of Goldman Sachs -- the IBD operating committee, and the Asia
23  management committee.  These were the two senior management
24  committees, effectively, that were governing my and Roger's
25  business at that time.

---

*Leissner - Direct - Rolle* 527

1   Q   So what -- when you would receive these kinds of e-mails,
2   what was your reaction to that?
3          What did it mean for you?
4   A   I mean, it's essentially bad news.  We had missed a piece
5   of business that the firm had otherwise wanted to do, and we
6   were not part of that business, and we had to explain
7   ourselves, effectively.  Clearly, that wasn't something we
8   wanted to do.  Goldman Sachs expected us to be on every
9   transaction for the clients that we had identified, including
10  in this case, Genting.  So therefore, it was a reason for
11  embarrassment, almost, that we weren't apart of this.
12  Q   How common or frequently were these types of follow ups
13  about business you missed out on?
14  A   Very frequent.  I wish I could tell you that we were
15  100 percent successful with our mission which was to win every
16  piece of business, but that's, of course, not realistic.  So
17  these kind of e-mails were rather common, but something that
18  we were dreading as bankers.  We wanted to, in our own
19  ambition, but also for the firm's ambition, to be on every
20  transaction that we set out for our clients.
21         Meaning, when we decided on the clients that we
22  wanted to cover and get mandates from, we selected them with a
23  view that we would be able to get business from them.  Clients
24  where we had no hope of getting business from, we wouldn't put
25  on that list.  And therefore, if there was business done with

Leissner - Direct - Rolle                    528

1  those clients, you know for whatever, reputational reason or
2  otherwise we had decided that we didn't want to do business
3  with them, that was fine.  That was acceptable.  Losing
4  business or not being part of a business with clients that we
5  had identified as something that was going to be -- we were
6  going to cover, that was unacceptable.
7  Q    There's a reference in this, this is about an entity
8  called Genting?
9  A    Correct.
10  Q    And this entity Genting have any relation later to the
11  1MDB bond transactions?
12  A    Yes.  In deal number two --
13  Q    Which one was that?
14  A    That was Project Maximus.
15       We did that fundraising to help 1MDB acquire the
16  Genting power assets in Malaysia.  I believe those were three
17  electricity-producing power stations, effectively, that
18  Genting owned and they sold to 1MDB.
19  Q    Were there any improper payments made in the course of
20  that transaction, Project Maximus?
21  A    Yes, sir.
22  Q    Were there any involving Genting itself?
23  A    Yes.  One of the family members of the Genting family --
24  sorry, of the Lim family which is, as you see here, the
25  controlling family of Genting, received a kickback.

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    529

1  Q    How do you know that?
2  A    I made that payment, sir.
3  Q    Why?
4  A    Because it was directed by Jho Low to entice that family
5  member to help push that transaction to sale of those power
6  assets to 1MDB.
7  Q    How did you make the payment?
8  A    The payment was made through World Merit if the memory
9  serves correct.
10  Q    That was one of the shell companies you controlled?
11  A    That's right.
12       MR. ROLLE:  You can take that down, Mr. Youkilis.
13  Q    I think you said this earlier, sir, but when did you
14  first meet the defendant?
15  A    2005, 2006, somewhere around that time when he first
16  joined Goldman Sachs.
17  Q    You met him when he joined Goldman Sachs?
18  A    Yes.
19  Q    Did you know him prior to him joining Goldman Sachs?
20  A    Sorry, sir.
21       No.  I did not.
22  Q    Did you have an understanding of how he came to Goldman
23  Sachs?
24  A    Yes.  My memory is that Richard Ong, who was at the head
25  of investment banking --

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    530

1  Q    Can you spell his name, please.
2  A    Richard and then Ong, O-N-G.
3       Richard was, at that time, our senior partner in
4  Southeast Asia and the head of that business.  He was actually
5  my predecessor as president for that office.  He had -- if
6  memory serves me right, he hired Roger into Goldman Sachs into
7  debt capital markets.
8  Q    How many bankers were working in investment banking in
9  that office at the time; hundreds of bankers?
10  A    Well, I have to clarify.  I believe Roger joined us in
11  the Hong Kong office in debt capital markets.  So there was --
12  in the capital markets group, you know, there were probably 10
13  or 20 at that time.  But in all of investment banking, yeah,
14  probably 200 or more.  In Asia.
15       Again, Southeast Asia was a different story.  It was
16  much much smaller.  It was maybe 25 to 30 bankers.
17  Q    Within Southeast Asia it was smaller?
18  A    Yes.  Those were 25 to 30 bankers maximum at any time.
19  Q    Now, at the time the defendant joined Goldman Sachs, how
20  was Goldman Sachs' investment banking business in Southeast
21  Asia relative to its peers?
22  A    We had come through a difficult restructuring of our
23  Southeast Asian business.  When I moved to Singapore at the
24  end of 2003, I believe, we had -- we were basically at almost
25  no business in Southeast Asia.  We had 35, 40 bankers.  So we

Avery Armstrong, RPR
Official Court Reporter

Leissner - Direct - Rolle                    531

1  were seriously overstaffed.  And the firm, Goldman Sachs,
2  decided to send Richard Ong and myself to run the Southeast
3  Asian business.  So I moved to Singapore and I think Richard
4  was in Hong Hong maybe too.  We both moved to Singapore and
5  established our base there.  And we had just turned the
6  business around.  We had effectively cut the work force to a
7  more manageable size.  I think we went from maybe 35 bankers
8  to maybe 15, a very small number, and we started to have
9  business in Malaysia prior to Roger's arrival.  Malaysia was
10  one of the better markets for us.  We were also doing okay in
11  Indonesia and the Philippines, but Malaysia started to be a
12  major market.
13       (Court reporter interrupts for clarification.)
14  A    We had done - in Malaysia in particular, we had done more
15  transactions, we had done IPOs which are initial public
16  offerings, we had done some mergers, for example, the merger
17  of Telecom Malaysia and Celcom.  And so we were actually doing
18  quite well, starting to do quite well in that market.  And
19  Roger joined us and participated in that -- you know, in the
20  effort in Malaysia straight-away.  And with his help and the
21  work that Richard and I were doing there, we really started to
22  take off even more.
23  Q    And you said Richard Ong recruited the defendant to
24  Goldman Sachs?
25  A    That's how I remember it, yes.

Avery Armstrong, RPR
Official Court Reporter

1  Q    What was the defendant's position when he joined Goldman
2  Sachs?
3  A    He was a vice president or an executive director.  That
4  title was synonymous.
5  Q    And how soon after he joined, did you start working with
6  him?
7  A    Immediately.
8  Q    What was the first time you had worked on a transaction
9  or engagement with the defendant?
10  A    I recall it was in 2005 or 2006, again, the sale of
11  Southern Bank.  Southern Bank was a smaller Chinese owned bank
12  in Malaysia that was being sold to CIB, then, the second
13  largest bank in Malaysia, and we advised Southern Bank.
14  Q    After the early transaction you worked on with the
15  defendant, did his position change within Goldman Sachs after
16  that?
17  A    Yeah, because the debt capital market business was
18  somewhat more quiet and it was clear that Roger's talents
19  really lay in the relationships he had in Malaysia.  He had
20  very strong relationships, he was really active there, his
21  home-base was in Malaysia, that it made more sense for the
22  firm, for Goldman Sachs, to have Roger focused on the
23  Malaysian business.  And he took over our investment banking
24  business for Malaysia which really encompassed
25  the capital market products and the M and A products as well.

1  Q    And was there a title that went along with those
2  responsibilities?
3  A    Yes.  It was the head of investment banking for Malaysia.
4  I don't know the year that projector got that title, but that
5  was really the next step for me.
6  Q    During that time, did you -- did the defendant report to
7  you directly?
8  A    Yes.  Initially, he was reporting to the head of debt
9  capital markets.  When he came into the coverage universe as
10  head of investment banking for Malaysia, he reported to me.
11  Q    For how long was that the case?
12  A    I believe it was until he joined the securities division
13  which was, I think, somewhere in 2011, perhaps.  Certainly,
14  before in the 1MDB transactions.
15  Q    And you described that division earlier as people engaged
16  in sales of products?
17  A    The trade and the sales of products, yes.  The investment
18  banking side was really on the origination side for us to get
19  the securities from the companies and the corporates that then
20  the security's decision was involved with selling to
21  institutional investors or trading.  So really very distinct
22  businesses.
23  Q    Did you have an understanding about why the defendant
24  moved from investment banking to the securities division?
25  A    I think it was a mutual decision, if I recall this

1  correctly.  I think Roger felt somewhat dissatisfied with the
2  compensation he was receiving in investment banking and
3  thought that, perhaps, in the securities division there was an
4  ability to make more money.
5       At the same time, I think that the firm recognized
6  that he actually had very good relationships with
7  institutional investors, and therefore, could leverage off
8  those relationships as well.  So I think it was a mutual
9  decision for him to move over.
10       It was sad for me because, you know, we had been
11  working so closely together at that time and losing a close
12  companion in Malaysia into the securities division wasn't the
13  easiest thing, but I was supportive of him at all times with,
14  you know, what he wanted to do.
15  Q    How did you have the understanding around his
16  expectations around compensation and potential in the
17  securities division?
18  A    We -- again, I mean, we were super close colleagues, we
19  were super close friends during those years and we would talk
20  all the time about our views on compensation within Goldman
21  Sachs whether that directly our compensation in a given year,
22  whether it was too little -- I mean, it was never too much --
23  but it was too little or it was adequate or whatever.  So we
24  had these conversations all the time.
25       We also felt, he and I, that if you were on the

1  trading side, if you were in the securities division, you
2  would actually make more, because at that time, the particular
3  traders, yeah, if you were a good trader, you would make, you
4  know, a lot more money than even I did when we did the
5  successful bond deals.  As a trader, you had a direct PNL,
6  meaning, you could see on your screen how much money you were
7  making every day.  So we always had the perception on the
8  investment banking that you could make a lot of more money if
9  you were in the securities division.
10  Q    Were those common discussions among Goldman Sachs bankers
11  about what other people were making?
12  A    Totally.  As you can imagine, in any organization, you
13  know, compensation is always -- is a big topic in how much
14  money you were making.  So yes, those were common.  What Roger
15  when I shared, of course, was a much closer relationship than
16  I had with many other people.  They were really just a small
17  handful of people that I had a relationship with as close as
18  with Roger.
19  Q    Did you stop working with him when he moved to securities
20  division?
21  A    No.  Even though he was now on the other side of the
22  proverbial Chinese wall which as I described earlier, really
23  sets out a distinction and a separation between who has public
24  information and who has -- who doesn't, who has private
25  information.  We continued to work on many clients together,

**A-274**

*Leissner - Direct - Rolle*  536

1  in particular, in Malaysia.
2  Q    So with that separation, public and private, what was
3  your working relationship like?
4  A    At a practical level, not much changed.  We discussed
5  business all the time, all potential business all the time.
6  From a practical perspectives within Goldman Sachs, however,
7  every time that Roger was involved in a investment banking
8  project, for example, 1MDB, but others, as well, he had to be
9  formally wall-crossed.  The wall crossing basically means that
10  you have to apply and it has to be supported by investment
11  banking to go from the public side of information to the
12  private side of information.  Meaning, you now are allowed for
13  this particular project, to receive material not public
14  information, MMPI.
15  Q    Were there rules around that at Goldman Sachs?
16  A    Yes.
17  Q    Why were there rules?
18  A    By the way, those rules exist for every investment bank.
19  The reason is that when you are on the private side, the
20  investment banking side, that material, not public
21  information, has a lot of value.  You can trade -- if you
22  trade it on that information, you can potentially make
23  unlimited amounts of money because now you had insider
24  information.  You would be very familiar with the term insider
25  information.  And that's why there was a very clear separation

*Leissner - Direct - Rolle*  537

1  between the two divisions.
2         In fact, the investment banking division was behind
3  closed doors.  You had to have special access to it.  You
4  couldn't just walk in, because we had that private
5  information.
6  Q    You said not much changed, though, in terms of how you
7  worked with the defendant even though he was in the securities
8  division?
9  A    In practical terms we kept talking all the time, that's
10  correct, sir.
11  Q    Now, were you aware the defendant had client
12  relationships in Malaysia throughout the time that he worked
13  at Goldman Sachs?
14  A    Yes.  He had excellent relationships in Malaysia, that's
15  correct.
16  Q    Why do you say they were excellent?
17  A    Because he -- I mean, I witnessed this.  He really knew
18  the key decision-makers in many of our clients or potential
19  clients, and he was a very likeable banker who could open
20  doors very easily.  And I witnessed this because Malaysia was
21  my -- personally, one of my number one markets as well.  So I
22  was spending a lot of time there.  And we worked on many
23  transactions together.
24         Roger really had a good success in that country and
25  very strong relationships at the highest levels of these

*Leissner - Direct - Rolle*  538

1  corporates and organizations.
2  Q    Are you aware that the defendant had relationships with
3  government officials in Malaysia?
4  A    He did.  He did have relationships with government
5  officials.  He had good relationships with them.  I don't
6  think he had strong relationships with Najib Razak who we
7  talked about before, but he leveraged, for example, of
8  somebody like Jho Low in order to get closer to Najib and
9  that's not so unusual either in the Southeast Asian markets.
10  Sometimes bankers don't always know key the key people in
11  governments, but other people do, and you try to leverage off
12  of their relationships.
13  Q    Now, you would go on to work with the defendant on the
14  1MDB bond transactions, correct?
15  A    Yes.
16  Q    Was that the only one 1MDB work you did together?
17  A    No.  We go back with respect to 1MDB, to the setup of the
18  predecessor to 1MDB, called TIA, the Tringganu Investment
19  Authority.  We pitched that business together and we won that
20  business and executed it to the extent that the institution
21  was established with our advice and help.
22  Q    When did that work happen, approximately?
23  A    It was early 2009, sir.
24  Q    And who assisted you and the defendant in that work
25  outside of Goldman Sachs?

*Leissner - Direct - Rolle*  539

1  A    Outside of Goldman Sachs, Jho Low was the key person who
2  helped us.  In addition, to his team, but Jho really was the
3  key person.  And from day one, when Roger introduced me to Jho
4  in Singapore, the TIA had come up as something that Jho was
5  working on advising the king.  From that day onwards in early
6  January, we identified that as something that we wanted to do
7  at Goldman Sachs, and we being here, Roger, myself, but also
8  Goldman Sachs as an organization, sovereign wealth funds were
9  important to our business on a global basis.  Those were some
10  of the most important clients we had around the world, and
11  being at the outset of the establishment was something that
12  was important to Goldman Sachs.
13         So from early 2009, Jho -- Roger approached Jho
14  first and brought -- Jho had brought us up to him, he brought
15  up in my meeting, but Roger and Jho, communicated a lot in
16  getting Jho's help to get that mandate.
17  Q    Did Goldman Sachs actually help set up this TIA?
18  A    Yes.  We were selected by a committee that included Jho
19  Low and the King of Malaysia at the time to set up the TIA
20  that later became 1MDB.
21  Q    Apart from the TIA setup, after that entity, TIA, becomes
22  1MDB, did you ever have success winning 1MDB for Goldman Sachs
23  until -- apart from the bond deals?
24  A    No.  We had numerous discussions with Jho, Roger and I,
25  we had numerous discussions, again, Roger and I, with 1MDB

Leissner - Direct - Rolle        540

1  officials about getting business from them including
2  financing, include potential investments, but we were never
3  successful in completing any of those transactions until the
4  bond financings and the underlying M and A for those
5  transactions.
6  Q    Through your time working with 1MDB, or trying to work
7  with 1MDB, did you learn how that entity operated and
8  functioned?
9  A    Yes.  It became very apparent, quite frankly, at the very
10  outset.
11  Q    Did you interact with the personnel who worked there
12  through the years?
13  A    Yes.  I didn't have the main relationship with 1MDB, nor
14  with Jho.  Roger had that.  But yes, I did learn how it
15  operated and how decisions were made at 1MDB.
16  Q    You described it as a sovereign wealth fund?
17  A    That's correct.
18  Q    Please explain a little bit more about what that is.
19  A    A sovereign wealth fund is basically an entity that
20  governments establish.  It's more common in the Middle East
21  and Asia than in other parts of the world.  But Government
22  establishes sovereign wealth funds to manage part of their
23  reserves to invest strategically both in the country and
24  outside of the country for the benefit of its citizens.
25          And that's an important piece because those

---

Leissner - Direct - Rolle        542

1  some of those investments, buying selling, et cetera.
2          The same applied in Singapore where two of the
3  biggest sovereign wealth funds in the world, Temasek and GIC.
4  Similarly, those were really important clients to us.  We
5  wanted to be in the buying and selling of investments that
6  they were making and funding those as well.  Very much part of
7  our business at Goldman Sachs of the highest importance.
8
9          (Continued on the following page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Leissner - Direct - Rolle        541

1  sovereign wealth fund are really acting almost like other
2  funds that we know here in America, for example, whether those
3  are private equity funds or otherwise, to get greater returns
4  than just having it sit in the bank, if you were, which of
5  course, the Government can do with its surplus funds as well.
6  But the idea was to leverage those funds, surplus funds that
7  the Government has, to make bigger returns and greater returns
8  for the benefit of the people.
9  Q    Does the United States have a sovereign wealth fund?
10  A    No.
11  Q    How common are they outside of the United States?
12  A    As I mentioned, it's really more common in Asia, as well
13  as the Middle East.  There are some in Europe, as well.  Like
14  Norway, I believe has the biggest sovereign wealth fund in the
15  world.  But even in Europe, it's not as common as in Asia and
16  the Middle East.
17  Q    How did sovereign wealth funds relate to your work in
18  Southeast Asia?
19  A    Well, they were super and extremely important.  One, they
20  held stakes in companies that were of strategic importance to
21  us on behalf of the government.  So for example, in Malaysia,
22  a sovereign wealth fund apart from 1MDB was called Khazanah.
23  Khazanah held, you know, stakes in many different governing
24  entities with which we wanted to do business.  Or we wanted to
25  work with the sovereign wealth funds to potentially manage

---

Leissner - direct - Rolle        543

1  BY MR. ROLLE:  (Continued.)
2  Q    So we've looked at a number of photographs of individuals
3  who were working at a part of 1MDB.
4  A    Yes.
5  Q    We talked about Najib Razak, the prime minister?
6  A    Correct.
7  Q    And as the prime minister he was also the minister of
8  finance; is that right?
9  A    Yes.
10  Q    He was a sole shareholder of 1MDB?
11  A    That's correct.
12  Q    Did 1MDB have a CEO who worked at the company?
13  A    Yes.  It had throughout the term that I worked with 1MDB
14  for it was Sharol Halmi from day one.
15  Q    Did you ever meet Sharol Halmi?
16  A    On numerous occasions.
17  Q    How did you first meet Sharol Halmi?
18  A    I believe that the first time that I met him was really
19  just in passing during the establishment of TIA and 1MDB.  So
20  the memories relate to that, but then he was really introduced
21  to me and Roger in early 2012 when we had brought -- when
22  Roger had brought the potential acquisition of Tundra Power
23  assets to Jho.  And Jho then introduces -- I think it was
24  reintroduces Sharol to Roger and myself to have a meeting to
25  kick start that process and that acquisition.

**A-276**

Leissner - direct - Rolle          544

1  Q    You talked about Jasmine Loo at 1MDB.
2  A    Yes.
3  Q    She was -- what was her position?
4  A    She was the general counsel for 1MDB.
5  Q    And how did you first meet her?
6  A    That is vague to me.  The only thing that I consciously
7  remember is that when previously Roger and I had set up a
8  meeting with Jho in Geneva where he was in the hospital
9  undergoing some kind of medical treatment, we were going there
10 to discuss a completely separate transaction from 1MDB with
11 Jho and we brought another client of ours there as well.  And
12 I remember distinctly that Jasmine was in the room, Jho's
13 hospital room, sitting on a couch.  I didn't at that time
14 associate her with 1MDB.  I didn't really know who she was.
15      And then she reappears again in early 2012 when we
16 have that lunch where I mentioned before Andrea Vella talked
17 to Jho Low about the structure of the potential fundraising
18 for 1MDB at that time.
19 Q    We talked about Vincent Koh earlier.
20 A    Right.
21 Q    He was the chief investment officer; is that right?
22 A    That's correct.
23 Q    As the chief investment officer did he have power over
24 what investments 1MDB might make?
25 A    Actually, his job was to identify and the transact on

SN          OCR          RPR

Leissner - direct - Rolle          546

1  Q    That's a generalization, right?
2  A    That's correct.
3  Q    Was that true at 1MDB?
4  A    No.  It wasn't true.  The power and control -- the
5  decisionmaking power really rested within Jho.  Everybody at
6  1MDB in the official positions had to go back to him for
7  effectively their approval in that decisionmaking process.
8  Q    What was your understanding of the source of Jho Low's
9  authority if he had no official role?
10 A    His source really his close relationship with the prime
11 minister, one, Najib Razak and his wife also Rosmah Mansor.
12 It stemmed from that close relationship that he could
13 basically make all of the decisions at 1MDB.
14 Q    How did you get that understanding that his power came
15 from his closeness to the prime minister of Malaysia?
16 A    From Jho himself from telling us that, being open about
17 it, but quite frankly also from the management team at 1MDB
18 who would very much refer to him as having that power by
19 virtue of him being so close to the prime minister and almost
20 like acting like an agent for the prime minister.
21 Q    Did you talk to Jho Low about the prime minister of
22 Malaysia?
23 A    We would talk about the prime minister all the time.  He
24 would call him The Boss.  He would show him messages between
25 him and The Boss, us being Roger and myself.  He would show us

SN          OCR          RPR

Leissner - direct - Rolle          545

1  potential investments and acquisitions.  It was his job to
2  investigate the Tundra Power assets acquisition, and with that
3  I mean analysis, et cetera.
4  Q    And then Terence Geh was chief financial officer?
5  A    He was deputy chief financial officer.
6  Q    And then I think you explained he was in charge of the
7  money flows in relation to the entity?
8  A    Yes, the fundraising and the money flows, that's correct.
9  Q    All of these positions CEO, general counsel, CIO, deputy
10 CFO, were these all official 1MDB positions?
11 A    Yes, sir.  Those are all official positions of the
12 management at 1MDB.
13 Q    Are they high-level positions at an entity?
14 A    Yes.  I would call those the C-suite, yes.  They formed
15 the management committee of 1MDB.
16 Q    Now, with being in the C-suite, would they have
17 decisionmaking authority in any other entity that may have a
18 CEO, CFO and general counsel?
19 A    Certainly those are the positions that in any normal
20 company would call all the shots colloquially; meaning they
21 had all the decision power to -- at the management level to
22 transact.  They may always need board of director approval
23 depending on the corporate governance of any institution, but
24 certainly on a day-to-day basis, yes, those would be the
25 people making all the decisions at an institution.

SN          OCR          RPR

Leissner - direct - Rolle          547

1  or text us some of the messages that -- exchanges that he had
2  with the prime minister.
3  Q    Did he call the prime minister by any other names?
4  A    He would refer to him as Boss.  He would refer on his
5  BlackBerry it was referred -- he had the name Optimus Prime.
6  Q    Who was Optimus Prime?
7  A    Optimus Prime was the prime minister, Najib Razak.
8  Q    Do you know if Jho Low was close to anyone in the prime
9  minister's family?
10 A    Yes.  He was very close to Rosmah Mansor the wife and he
11 was very close to all the three children she and she shared.
12 Q    And how did you know that Jho Low was close to Rosmah
13 Mansor?
14 A    He mentioned it all the time.  Again, he would share
15 messages with Roger and myself that he had received from
16 Rosmah.  He would call her Madam Boss and, you know, he always
17 indicated how close he was.  On one flight that I took at some
18 point I think it was from Paris back to Kuala Lumpur, I bumped
19 into Jho Low in that plane and he was literally carrying
20 luxury handbags that he told me were going back to Rosmah as
21 gifts.
22 Q    Over the course of time after you learned about Jho Low,
23 did you, in fact, develop a relationship with Jho Low; you,
24 personally?
25 A    Yes, I did.  Over the years Roger who had -- Roger was

SN          OCR          RPR

Leissner - direct - Rolle                548

1  the first point of contact.  He had the strongest relationship
2  with Jho for many years, but over time Roger made a point to
3  introduce me to Jho as well and we shared that kind of
4  relationship all the time.  And I started to develop a
5  relationship.
6        By the time of the 1MDB transactions that we had
7  been talking about Roger was still the point person, but I was
8  slowly interacting more and more with Jho and forming a closer
9  and closer relationship.
10 Q   How did your relationship with Jho Low change after the
11 closing of Project Magnolia?
12 A   It changed, of course, quite significantly.  The reason
13 was we had established a level of trust during the course of
14 Magnolia.  You know, Roger and I were both the champions of
15 the scheme as well as the transactions within Goldman Sachs,
16 but I helped -- I did my share of the work which is, you know,
17 help shepherd the deal through Goldman Sachs and its network
18 with my position and my influence within Goldman Sachs.
19       So I did my job in that respect and that got me
20 closer to Jho, but also post Project Magnolia as I had
21 explained before, when I was trying to get my share of the
22 kickbacks, I offered to him to use the entity I controlled in
23 Hong Kong as a shell company to send out the money.  That, of
24 course, you know, turned out to be valuable to Jho and changed
25 our relationship significantly.  He trusted me more and more

SN    OCR    RPR

---

Proceedings                550

1        MS. SMITH:  No, Your Honor.  We are good.
2        THE COURT:  Have a great weekend, everyone.
3        MS. SMITH:  We may file a letter just to follow up
4  on the character witness issue from yesterday and the one or
5  two things we highlighted in opening.
6        THE COURT:  Okay.  Did you discuss them with
7  Mr. Agnifilo?
8        MS. SMITH:  It's the same issues.
9        THE COURT:  Have the conversation and if it can't be
10 resolved then file it with the Court.
11       MS. SMITH:  Thank you, Your Honor.
12       THE COURT:  Thank you, everyone.
13
14       (Matter adjourned until Tuesday, February 22, 2022
15 at 9:45 a.m.)
16
17                    - ooOoo -
18
19
20
21
22
23
24
25

SN    OCR    RPR

---

Leissner - direct - Rolle                549

1  as a result.
2        THE COURT:  Mr. Rolle --
3        MR. ROLLE:  Judge, I think it's a fine place to
4  stop.
5        THE COURT:  It's 3:30.  We are going to end for
6  today.  We are not sitting tomorrow, members of the jury,
7  because one of you has a commitment and we are not sitting on
8  Fridays.  So I won't see you on Friday either.  You will have
9  a long weekend because Monday is a federal holiday.  So the
10 Court will be closed.  So I will next see you on Tuesday.  If
11 you could please be here by 9:45 on Tuesday, we are going to
12 start at 9:45 Tuesday morning.  Please remember you cannot
13 discuss the case with anyone.  You cannot research the case.
14 You cannot allow anyone to speak to you about the case.
15 You cannot read about it.  All of my preliminary instructions,
16 please remember them.
17       Have a great long weekend and I will see you Tuesday
18 at 9:45.  Please remember to leave your notes in the jury
19 room.  You cannot take your notes home with you.
20       (Jury exits.)
21       THE COURT:  Mr. Leissner, you can step out.
22       (Witness steps down.)
23       THE COURT:  Please be seated, everyone.  Is there
24 anything we need to address?
25       MR. AGNIFILO:  Nothing from us, Your Honor.

SN    OCR    RPR

---

551

                    I N D E X

WITNESS                                        PAGE


     DIRECT EXAMINATION
     BY MR. ROLLE                              369

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Denise Parisi, RPR, CRR*
*Official Court Reporter*

552

1    E X H I B I T S

2

4    Government's Exhibit 6                           413

5

6    Government Exhibit 1                             432

7

8    Government Exhibits 4, 5, 7, 12, 13, 16, 17,

9    19, 20, 21, 22, and 23                           460

10

11   Government's Exhibit 52                          474

12

13   Government's Exhibit 3001                        503

14

15   Government's Exhibit 1976                        524

16

17

18

19

20

21

22

23

24

25

**Denise Parisi, RPR, CRR**
*Official Court Reporter*

---

554

2

3    Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                      Official Court Reporter
                      Telephone: (718) 613-2487
4                     Facsimile: (718) 613-2694
                      E-mail:  Anthony_Frisolone@nyed.uscourts.gov

5    Proceedings recorded by computerized stenography.  Transcript
6    produced by Computer-aided Transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

---

553

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - -X
3    UNITED STATES OF AMERICA,    :  18-CR-538(MKB)

4                                 :

5                                 :  United States Courthouse
                                  :  Brooklyn, New York
6        -against-                :

7                                 :

8    NG CHONG HWA,                :  Tuesday, February 22, 2022
                                  :  9:30 a.m.
9           Defendant.            :

10   - - - - - - - - - - - - - - -X

11        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
         BEFORE THE HONORABLE MARGO K. BRODIE
12     CHIEF UNITED STATES DISTRICT JUDGE, AND A JURY

13            A P P E A R A N C E S:

14   For the Government:   UNITED STATES ATTORNEY'S OFFICE
                           Eastern District of New York
15                         271 Cadman Plaza East
                           Brooklyn, New York 11201
16                         BY: DREW G. ROLLE, ESQ.
                               ALIXANDRA E. SMITH, ESQ.
17                             Assistant United States Attorneys

18   For the Defendant:    BRAFMAN & ASSOCIATES, P.C.
                           Attorneys for the Defendant -
19                         Ng Chong Hwa
                           265 Fifth Avenue
20                         2nd Floor
                           New York, New York 10001
21                         BY: MARC A. AGNIFILO, ESQ.
                               TENY GERAGOS, ESQ.
22                             ZACH INTRATER, ESQ.
                               JACOB KAPLAN, ESQ.
23

24

25

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

---

Proceedings                                         555

1         (In open court.)

2         (Defendant present in open court.)

3         THE COURT:  Are we ready to proceed?

4         Please be seated, everyone.

5         COURTROOM DEPUTY:  Criminal cause for trial, Docket

6    No. 18-CR-538, United States of America versus Ng.

7         State your appearances for the record starting with

8    the Government.

9         MS. SMITH:  Drew Rolle, same as last week, for the

10   Government, Judge.

11        THE COURT:  Thanks.

12        MR. AGNIFILO:  For us, too, your Honor.

13        THE COURT:  Thank you both.  Hope you all had a

14   good weekend.

15        MR. AGNIFILO:  You, too, your Honor.

16        THE COURT:  I hope you didn't spend all of it

17   working like I did, although not on trial-related matters.

18        Is the witness available?

19        (Jury enters courtroom at 10:07 a.m.)

20        THE COURT:  Please be seated, everyone.

21        Good morning, members of the jury.

22        THE JURY: (Collectively) Good morning.

23        THE COURT:  I hope you haul had a great, long

24   holiday weekend and you're ready to sit for the next four

25   days.  Just a reminder, because we didn't sit yesterday,

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

T. Leissner - Direct/Mr. Rolle                556

1  we're sitting this Friday.
2            Is the witness available?
3            MR. ROLLE:  Yes, Your Honor, we would recall Tim
4  Leissner.
5            THE COURT:  Please.  Mr. Leissner, you're still
6  under oath.
7            (Witness takes the witness stand.)
8  TIMOTHY LEISSNER, called as a witness, having been previously
9  duly sworn, was examined and testified as follows:
10           THE COURT:  Please proceed, Mr. Rolle.
11           MR. ROLLE:  Thank you, your Honor.
12 DIRECT EXAMINATION
13 BY MR. ROLLE:
14 (Continuing.)
15 Q   Mr. Leissner, when we ended last week, you had walked
16 the jury through the criminal scheme around the 1MDB bond
17 transactions?
18 A   That's correct.
19 Q   And you had talked at length about the person, Jho Low,
20 who I think you described was one of the masterminds behind
21 the scheme?
22 A   Yes, sir.
23 Q   You described that that was a person that you and the
24 defendant had cultivated a relationship with?
25 A   Yes, that's correct.

---

T. Leissner - Direct/Mr. Rolle                557

1  Q   Was that over the course of multiple years leading up to
2  the 1MDB bond transactions?
3  A   Yes, sir, that relationship had been built since 2008.
4  Q   Now, you also mentioned that the fact of Jho Low's key
5  decision-making authority at 1MDB was something that would
6  need to be disclosed to control functions you called them?
7  A   That's correct, sir.
8  Q   Could you describe what those control functions were in
9  more detail?
10 A   Certainly.  At Goldman Sachs and most other investment
11 banks as well, there are essentially two parts to a firm.
12 One is what I would describe as the revenue-producing side of
13 the firm which is supposed to make money for a commercial
14 enterprise as a bank.  And then there is the other side,
15 which is the checks and balances of the system, which is what
16 I would describe as the control function.
17           The control function consists of legal compliance,
18 audit, BIG, and conflicts.  So there is many departments
19 within the control function that really acts as a checks and
20 balance to the revenue side.
21 Q   You said the word BIG, that's Business Intelligence
22 Group.
23 A   That's correct.
24 Q   Also sometimes called BIG?
25 A   Correct, sir.

---

T. Leissner - Direct/Mr. Rolle                558

1  Q   Was BIG involved in the review of the 1MDB bond
2  transactions?
3  A   Yes BIG, as in all transactions, had to review at the
4  outset any transaction that we would undertake.
5  Q   Was BIG only involved at the outset, or would it have a
6  role going on a transaction like the 1MDB bond transaction?
7  A   BIG has a role, a continuous and ongoing role in any
8  transaction and it did so on the 1MDB transactions as well
9  until the completion and even afterwards to some extent as
10 well.
11 Q   You say the role was ongoing.  How did it continue
12 beyond the initial chat with BIG?
13 A   Well, in any transaction as the deal or the transaction
14 progresses, new information is obtained, new information gets
15 processed, different parts may change, and any and all of
16 those changes of circumstances information may be important
17 to our control functions including BIG.  So they will have an
18 ongoing role to play to just monitor that all these different
19 parts are checked.
20           At the very end of a transaction, when we go to
21 committee and get approval, final approval for a transaction
22 to proceed, they sit on that committee as well and we'll have
23 a vote at the committee as well as provide the information
24 they have obtained throughout the transaction to the
25 committee.

---

T. Leissner - Direct/Mr. Rolle                559

1  Q   When bankers interact with BIG, is it important to be
2  truthful in what they tell BIG?
3  A   It's critical.
4  Q   Is it important to be responsive to the questions BIG is
5  asking?
6  A   Yes.  Again that's critical, too.
7  Q   In the course of the 1MDB bond transactions, did BIG ask
8  questions about Jho Low's involvement with the transactions?
9  A   Yes.  From the outset, BIG was interested in Jho's role
10 within 1MDB.
11 Q   Did you tell BIG the truth about Jho Low's involvement
12 in the 1MDB bond transactions?
13 A   I did not, sir.  I kept it to --
14 Q   What did you lie about?
15 A   Yes.  Myself, as well as the rest of the team that
16 worked on this transaction, knew about Jho's broad
17 involvement kept it to two very basic points of Jho's
18 involvement with 1MDB.  And we had agreed as a team, again,
19 to maintain that story at all times.
20           The two points of Jho's involvement were, one, that
21 he was an advisor and committee member at the outset of the
22 establishment of 1MDB or its predecessor which was called the
23 TIA.  So he had a role in that officially.  And that he
24 secondarily had helped us in Abu Dhabi, or had helped 1MDB to
25 be precise, to get connected to some of the institutions in

**A-280**

T. Leissner - Direct/Mr. Rolle          560

1  Abu Dhabi that were to form part of the transaction itself.
2  Those were the two points that we maintained.
3  Q    Sorry.  Did the two points -- you, in fact, disclosed
4  two points about Jho Low throughout the 1MDB bond
5  transactions?
6  A    That's correct, yes.
7  Q    One, you said, was his relationship to the king of
8  Malaysia?
9  A    It was his role as an advisor to the king and part of
10 the committee that selected the advisors to -- in the set up
11 and establishment of the predecessor of 1MDB, correct.
12 Q    And that had happened way back in 2009 at that point?
13 A    Yes, that was in 2009.
14 Q    So you had disclosed that piece.  What was the second
15 piece?
16 A    Second piece was that he had connected 1MDB to certain
17 institutions in Abu Dhabi such as IPIC and Aabar that would
18 form the transaction as we know it with the guarantees and
19 the payment of or the consideration for the guaranty.  So it
20 was just disclosed that he had made that connection to the
21 institutions in Abu Dhabi.
22 Q    As, like, an introducer?
23 A    That's correct.
24 Q    Was Jho Low's actual role disclosed?
25 A    No.

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle          561

1  Q    Why were just those two pieces of information the ones
2  that you disclosed to BIG?
3  A    Those were the two pieces of information that were more
4  broadly known.  Certainly, the first role was more broadly
5  known in the world, but also within Goldman Sachs.  The
6  second role was also something that was more broadly known
7  within Goldman; therefore, as a team, we had decided at that
8  time that those were the two things that would be safe and
9  kind of already known.  Therefore, something that we had to
10 be maintaining to have credibility about his involvement.
11 Q    You said the word safe?
12 A    Yes.
13 Q    What were things that would be safe?
14 A    Yes, because had we disclosed the broader role of Jho
15 Low as a key decision-maker with 1MDB, we would have been
16 certainly turned down by our control functions.  The two
17 roles that we described that were more known, were already
18 known, within Goldman Sachs broadly as well, as to some
19 extent, the outside and, therefore, you know, one, we
20 couldn't hide those facts; and, two, we believed that was the
21 team that had decided to focus on those two points only.  We
22 believed that that was actually something that would give us
23 credibility.  It wouldn't just deny Jho's involvement, but we
24 would point to those two points.
25 Q    Now, were clients or parties involved in a transaction

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle          562

1  who were tied to government officials, were those viewed as
2  sensitive parties within Goldman Sachs?
3  A    Yes.  I mean, they're more broadly referred to as PP's,
4  Politically Exposed People, and in this case connected to
5  those, yes.  Those were very sensitive and, yes, they were
6  very important to Goldman Sachs.
7  Q    Politically Exposed Persons?
8  A    Yes.
9  Q    Were they subject to additional scrutiny?
10 A    Yes.
11 Q    By whom?
12 A    By our control functions, sir.
13 Q    And why?
14 A    Because the -- when, as it involves government
15 officials, the fear always is that to entice in decisions,
16 and certainly, in the more emerging markets in Asia, for
17 example, and also other parts of the world, of course, to
18 entice decision-making that there would be bribes paid.  So
19 it is as a result that our control functions were more
20 sensitive and more stringent in their analysis of those kind
21 of individuals.
22 Q    At Goldman Sachs, you mentioned there were policies and
23 procedures that governed your conduct as bankers?
24 A    That's correct.
25 Q    There are policies related to bribery?

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle          563

1  A    Yes, absolutely.
2  Q    Related to money laundering?
3  A    Of course, yes.
4  Q    Conflicts of interest?
5  A    Yes.
6  Q    Did you receive training on those policies while at
7  Goldman Sachs?
8  A    Yes, sir.
9  Q    How frequently?
10 A    I don't recall the exact number in any given year.  I do
11 know we had to get that training at least once a year, and we
12 had to get more broader training on any kind of policies and
13 procedures several times a year.
14 Q    Did you receive that training only as a partner at
15 Goldman Sachs?
16 A    No, everybody from start -- from when you join Goldman
17 Sachs in your training to, you know, yes, the highest levels.
18 That training is mandatory for everyone.  And, by the way,
19 it's clocked as well.  So you know how many hours and what
20 you have spent and it is monitored by management so you
21 cannot get an exemption on that.
22 Q    The 1MDB bond transactions you mentioned a committee
23 that was involved in the review of the transactions?
24 A    Yes, sir.
25 Q    Yes.  And what committees are you referring to?

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

**A-281**

T. Leissner - Direct/Mr. Rolle                564

1   A    Well, at the beginning of any transaction, those were
2   the business selection committee that has to review whether a
3   transaction should be taken by Goldman Sachs and it ends up
4   at the very end with the approving committees which were, in
5   this case, and generally, in capital markets transactions the
6   firm-wide Capital and Suitability Committee, those were two
7   committees.  There normally is a step in Asia between those
8   which is the Asian Capital and Asian Suitability Committee.
9   But because of the size and importance of these transactions,
10  those were collapsed into the firm-wide committees.
11  Q    You're using the word "firm-wide"?
12  A    Correct.
13  Q    What does that mean?
14  A    Those were global committees.  They didn't a specific
15  regional focus, they were global in nature.
16  Q    Where did the firm-wide committees sit?
17  A    It was headquartered, if you would, in New York.  It was
18  centered, the secretary would sit in New York.  It had
19  members in all parts of the world.  Whether it was London,
20  Asia.  So, yeah, in all parts of the world they participated
21  by conference call.  The seat of it was here in New York.
22  Q    And were these -- what type of seniority were the
23  members of the Firm-Wide Capital Committee and the other
24  firm-wide committees in the 1MDB transactions?
25  A    They were all at the most senior level.  They would

---

T. Leissner - Direct/Mr. Rolle                566

1   A    There would be no deal.
2   Q    You mentioned before that some of the control functions
3   were represented in the committees?
4   A    That's correct, sir.
5   Q    That included the Business Intelligence Group?
6   A    Yes, sir.
7   Q    Now, you mentioned that through the transaction the
8   control functions asked about Jho Low; is that right?
9   A    That's correct.
10  Q    You didn't close the truth, right?
11  A    I did not.
12  Q    Did the defendant disclose the truth?
13  A    He did not.
14  Q    During the committee review process, was the committee
15  asking about Jho Low's involvement?
16  A    The committee asked the same question about his
17  involvement.  It was a general concern over the whole time of
18  the transactions, and it was asked -- it was asked also in a
19  separate call afterwards, again, by the head of BIG.
20  Q    In a call after what?
21  A    Sorry.  After the committee meeting.  At the initial
22  Capital Committee meeting that we had with Firm-Wide Capital
23  Committee.
24  Q    So you had questions about Jho Low raised in the
25  committee?

---

T. Leissner - Direct/Mr. Rolle                565

1   include our CFO, our head of BIG, head of compliance.  You
2   know, senior, senior partners of Goldman Sachs at the very
3   highest level.
4   Q    Now, what role did the Firm-Wide Capital Committee have
5   in terms of its decision-making authority on the 1MDB bond
6   transactions?
7   A    Those committees are the final authority to approve a
8   transaction.  So unlike what you might think, you know, it's
9   the CEO or, you know, the COO of Goldman Sachs, no.  It was
10  those committees that gave the approval to proceed with a
11  transaction and that included 1MDB transactions.
12  Q    Can a transaction like the bond deals in 2012 or '13,
13  can those deals go forward without the committee saying yes?
14  A    No, absolutely not.
15  Q    So in the 1MDB bond transactions, whose money was being
16  sent to 1MDB?
17  A    It was Goldman Sachs' money.  We were the initial
18  purchaser, the underwriter of those bonds, so it was Goldman
19  Sachs' money that we were sending to 1MDB.
20  Q    Did Goldman Sachs send its money to 1MDB without the
21  Firm-Wide Capital Committee's approval of the deal?
22  A    Certainly not.
23  Q    You said the committee has the ultimate approval, right?
24  So if the CEO of Goldman Sachs wanted to do the deal, and the
25  committee said no, what would happen to the deal?

---

T. Leissner - Direct/Mr. Rolle                567

1   A    Yes.
2   Q    And also separately after the committee?
3   A    Correct.
4   Q    The separate questions, those were questions to you?
5   A    That's correct.  It was a telephone call to me while I
6   was in Abu Dhabi on that call, or right after the call.
7   Q    In the committee or in phone calls and ask questions
8   about Jho Low, did you tell the truth about his full
9   involvement in the deals?
10  A    I did not.
11  Q    Were you aware if the defendant said anything about his
12  involvement, Jho Low's involvement, in these deals?
13  A    Not to my knowledge, sir.
14  Q    Why did you withhold the truth about Jho Low's
15  involvement in the transactions from the committees?
16  A    I was aware and, again, we had as a team which included
17  Roger, Andrea Vella, Toby Watson, John Dunne, myself.  We had
18  this discussion at the outset.  It was clear to all of us
19  that Jho was the key decision-maker and we had to go on
20  several occasions to get his help, to get these transactions
21  through, on the finish line by their side.
22       However, had we raised Jho's name in his true
23  capacity and his role as a key decision-maker at committee
24  all prior to that, you know, into any of the control
25  functions prior to committee, we would have not been able to

T. Leissner - Direct/Mr. Rolle          568

1  proceed with the transaction.  This would have been a red
2  flag that, in my view, would have stopped the transaction.
3  Q    If you told the truth, what would have happened, your
4  understanding, what would have happened to the committee
5  approval?
6  A    It would have been denied.
7  Q    The people you mentioned that knew the key
8  decision-making authority:  The defendant yourself, Toby
9  Watson, Andrea Vella.  I think you said Jonathan Dunne; is
10 that right?
11 A    That's correct.
12 Q    Did you all use any code names to refer to Jho Low in
13 your discussions during the deals?
14 A    Yes, sir, we used two main ones.  Friend was always a
15 reference to Jho Low.  And the PMO, the Prime Minister's
16 Office, was another code name for Jho.
17 Q    Again, why use those code names?
18 A    Because even if overheard by people that may not be part
19 of the inner circle at that time of the 1MDB senior
20 leadership team, if you will, the 1MDB transactions senior
21 leadership team.  If it was overheard by others, you know,
22 everybody has an obligation to raise red flags if they're
23 aware of red flags.  So we just did not want to have anybody
24 else potentially understand that Jho Low was the key
25 decision-maker by overhearing us talk about his time.

---

T. Leissner - Direct/Mr. Rolle          570

1  A    That's right.
2  Q    After that meeting, were you later introduced to Jho Low
3  in person?
4  A    Yes, I was, sir.
5  Q    By whom?
6  A    Roger set up a meeting for me with Jho in Singapore.
7  Q    When did that take place, approximately?
8  A    It was early in January of 2009.
9  Q    You should have a binder of documents, I believe, next
10 to you, Mr. Leissner.  If you could pick that up, we're going
11 to look at Tabs 25, 26, 28, 29, and 30.  These are Government
12 Exhibits 1501, 1502, 1504, 1505, and 1511 for identification.
13       So, Mr. Leissner, take a look at Tabs 25 through 29
14 and let me know when you've had a chance to look at those.
15 A    After 29, sir?
16 Q    And if you could also look at Tab 30, Government's
17 Exhibit 1511, for identification.
18 A    Yes, sir.
19 Q    Do you recognize these documents?
20 A    Yes, sir.
21 Q    What are they?
22 A    They are e-mails and calendar invites for a meeting with
23 Jho Low.
24 Q    For a meeting with Jho Low?
25 A    That's correct.

---

T. Leissner - Direct/Mr. Rolle          569

1         So, yes, at times, we thought it would safer to use
2  these code words and it became kind of established practice
3  almost.
4  Q    In the committee process that you were involved in, was
5  the defendant also involved in the committee review process?
6  A    Yes, he was, sir.
7  Q    And you participated in the Firm-Wide Capital Committee
8  calls how?
9  A    Just with the rest of the team by conference call from
10 our location where we were.
11 Q    And can anyone speak on those phone calls?
12 A    Yes, everybody's encouraged to speak.
13 Q    Are there leaders who lead the presentation of
14 information about the deals on the calls?
15 A    Yes, there is normally a deal captain.  In this case, it
16 was Andrea Vella and Toby Watson for the capital market side,
17 let's put it this way.  They were the lead on that
18 transaction.  Then everyday like Dan Swift had a role
19 corporate finance.  So people were given roles if questions
20 would arise.  But then, yes, anybody could speak up and
21 answer a question if it was required.
22 Q    So last week you described first hearing about Jho Low
23 in 2008?
24 A    That's correct.
25 Q    That was at a meeting with the defendant?

---

T. Leissner - Direct/Mr. Rolle          571

1  Q    You received these e-mails?
2  A    That's correct.
3       MR. ROLLE:  Your Honor, we would offer 1501, 1502,
4  1504, 1505, and 1511.
5       MR. AGNIFILO:  No objection, your Honor.
6       THE WITNESS:  They're admitted.
7       (Government's Exhibits 1501, 1502, 1504, 1505, and
8  1511 were received in evidence as of this date.)
9  Q    So if we look at Tab 25, Government Exhibit 1501.  What
10 is this?
11 A    It's a the acceptance of a meeting request by Roger to
12 me.
13 Q    And what's the meeting?
14 A    Meeting is with Jho Low, Wynton Group.
15 Q    It says Jho Low, and then in parenthesis Wynton Group.
16 What's Wynton Group?
17 A    Wynton Group was one of his private investment vehicles
18 opened by him and the family, I believe.
19 Q    What's the date of this acceptance of the defendant's
20 meeting request?
21 A    It's January 2, 2009.
22 Q    If we can turn to 1502, which is Tab 26.  What's this?
23 A    This is the actual meeting request to have that meeting
24 with Jho Low of Wynton Group at the Ritz Carlton in Singapore
25 from 8:00 to 9:00 a.m. on the 4th of January, 2009.

**A-283**

T. Leissner - Direct/Mr. Rolle                572

1    Q    This is early January of 2009?
2    A    That's correct.
3    Q    If you could turn to Tab 28, which is Government's
4    Exhibit 1504.
5              What is this document?
6    A    It's an e-mail from Roger to myself.
7    Q    What's the date of the top e-mail from the defendant to
8    you?
9    A    It is also January 4, 2009.
10   Q    Who started this e-mail chain?
11   A    I did.
12   Q    If we could go down to the first e-mail it's from you to
13   the defendant?
14   A    Yes, sir.
15   Q    What's the date?
16   A    It's also -- it's January 4, 2009.
17   Q    What's the subject?
18   A    Jho Low.
19   Q    Is that how you spell his name?
20   A    No, it's not.  At that time, I wasn't familiar with him
21   so I misspelled it.
22   Q    You misspelled it?
23   A    Yes.
24   Q    In your e-mail, you say, I like this guy very much.
25   A    Yes, sir.

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                573

1    Q    You're talking about Jho Low?
2    A    Yes.
3    Q    Do you recall why you liked him very much as of early
4    January of 2009?
5    A    I recall that meeting had gone very well with Jho; that
6    he had quite a number of business ideas for Goldman Sachs
7    and, therefore, I thought that from a business perspective,
8    this actually was a very attractive prospective client or
9    somebody who is very well connected in Malaysia which was a
10   really important market for us in Southeast Asia.  And,
11   therefore, I thought, yeah, he was somebody that would bring
12   attractive business to us.
13   Q    What did the defendant say in response to your comment
14   about liking Jho Low very much?
15   A    I'm glad, still having a drink with him at Ayub place.
16   Q    What is Ayub place?
17   A    Ayub was a friend that Roger and I shared.  And I
18   believe it was one either at Ayub's house or at a place that
19   Ayub frequented a lot.  But he was a common friend of ours,
20   Roger's and mine.
21   Q    Jumping up to the first -- the last e-mail, the one at
22   the top.  That's from the defendant to you?
23   A    That's correct.
24   Q    He says, Yeah, Jho will play ball with us.  He seems to
25   want to be -- is that associated?

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                574

1    A    I believe so, yes.
2    Q    He seems to want to be associated with us.  He is
3    comfortable?
4    A    Yes.
5    Q    What is your understanding to be talking about?
6    A    He is talking about the willingness of Jho to work with
7    Goldman Sachs on business opportunities that he would help us
8    with or give to us as a client.
9    Q    Would that be a good thing for Goldman Sachs?
10   A    It did sound that day, yes.  That's why I started the
11   e-mail saying I liked the guy.
12   Q    Would that benefit you?
13   A    Yes.
14   Q    So this is early in your relationship with Jho Low; is
15   that right?
16   A    This is the first I met him.
17   Q    This type of meeting or having drinks in a social
18   setting, is that common for an investment banker?
19   A    It is very common, yes.  It's one way of, you know,
20   taking it out of an office.  It's actually probably better to
21   get business, or have a business discussion when it is not
22   always in an office.
23   Q    Why is that?
24   A    Because a business setting, a discussion with -- in a
25   business setting in an office is somewhat stiff.  In a

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                575

1    setting that's, like, more relaxed, you have a greater
2    ability to really strike a relationship with a prospective
3    client, or a client.  It's not as stiff, it's more relaxed,
4    more casual, and that allows more of a free-flowing
5    discussion perhaps.  Both can work, of course, but this is
6    not an uncommon thing nor is it bad, it is probably a good
7    setting.
8    Q    Did you try to build social relationships with your
9    clients?
10   A    Always.
11   Q    Did you encourage the defendant to do that?
12   A    Yes.
13   Q    Did he do that?
14   A    Yes.  He had very close relationships as did I with our
15   clients and that would involve social settings of meetings.
16   Q    How would having developed a social relationship with
17   someone like Jho Low or another client benefitted you at
18   Goldman Sachs in the end?
19   A    At the end of the day, the single most important benefit
20   to Goldman is to receive mandates, transactions, that we
21   could work with clients on.  That's the only way that we earn
22   revenues.  We don't earn revenues just meeting people, we
23   earn revenues by executing transactions.
24             So, at the end of the day, having meetings or
25   having any kind of meeting, you are trying to explore

*Anthony D. Frisolone, FAPR, RDR, CRR, CRI*
*Official Court Reporter*

**A-284**

T. Leissner - Direct/Mr. Rolle                576

1    transactions, what's possible.  You learn from the client,
2    what they might want to do, what they hear others might want
3    to do, and you try to follow up on those kind of discussions.
4    Q    So, at this early stage, you met with Jho Low.  What did
5    you have as your understanding of the business potential that
6    a relationship would Jho Low gave you?
7    A    There were really two main elements I would say in
8    summary.  One was some of the business he was thinking of
9    himself for some of the entities he was leading.  But he also
10   had very strong government relations.  And one of the topics
11   early on became the TIA, the predecessor to 1MDB.  So there
12   were already two important things, one the business that he
13   was going to do, or he was thinking about doing himself, but
14   also his ability to plug into and establish or get us
15   connected into key decision makers within the Government.
16   Q    The Government of Malaysia?
17   A    Correct.
18   Q    If we could turn to Tab 29, sir.  And we could pull up
19   Government Exhibit 1505 which is in evidence.
20        This is another e-mail, sir?
21   A    That's correct.
22   Q    From who to who?
23   A    It's from Roger to Jho Low and a copy to me.
24   Q    And what is the defendant laying out in his e-mail to
25   Jho Low?

---

T. Leissner - Direct/Mr. Rolle                577

1    A    It's a very common thing that once you have a meeting
2    with a client to follow up with them to ensure that there is
3    a continuous discussion, a dialogue, with the client after
4    the meeting.  And what he's doing, what Roger is doing here,
5    is basically summarizing the key points that we had discussed
6    from a business perspective with Jho the brief day.
7    Q    The date of this e-mail is January 5, 2009?
8    A    January 5, 2009.
9    Q    You mentioned TIA throughout your testimony.  That was
10   the Terengganu Investment Authority.
11   A    That's the Terengganu Investment Authority.
12   Q    It's referenced here in the second bullet?
13   A    Yes, sir.
14   Q    What he did say about that?
15   A    He says, TIA, we will pull together some materials,
16   experiences, of other sovereign wealth funds and can explore
17   the idea of managing the commodity price risk to enhance
18   through the fundraising that TIA will be doing.
19   Q    In the first bullet, there's a reference to
20   Genting Sanyen Oil & Gas?
21   A    Yes.
22   Q    And also Mubadala.
23        Can you explain to us what the first item is on the
24   list?
25   A    Genting was one of those clients in Malaysia that we

---

T. Leissner - Direct/Mr. Rolle                578

1    had, Roger and I had, targeted for a long period of time.
2    This firm was we were keen on establishing a relationship
3    with Genting.  It was the large gaming company in Malaysia.
4    It was listed in Malaysia as well as Singapore.  It was a
5    very big potential client but we had not been able to
6    penetrate them as a client.  I don't exactly recall the
7    discussion, but from this e-mail it looks like Mubadala was
8    in discussions with Genting at the time to buy some of the
9    oil and gas assets.  And we definitely would have wanted to
10   be part of that dialogue and discussion and potential
11   transaction.
12   Q    What is Mubadala?
13   A    Mubadala was one of the sovereign wealth funds of
14   Abu Dhabi.
15   Q    Now, Genting would be become part of the 1MDB bond
16   transactions?
17   A    Genting.  Yes, it did.
18   Q    In what way?
19   A    It became the seller of the power assets in Deal No. 2
20   which was funded by Project Maximus.
21   Q    So Mubadala was a government-related entity in
22   Abu Dhabi.
23   A    Correct.
24   Q    TIA would be a government-related entity in Malaysia?
25   A    That's correct.

---

T. Leissner - Direct/Mr. Rolle                579

1    Q    So, even in 2009, you were discussing with Jho Low
2    government-linked projects in both countries?
3    A    That's correct.
4    Q    At that point in time, how did you understand Jho Low
5    may assist Goldman Sachs in any of these projects?
6    A    Like Roger suggested in the e-mail before of him playing
7    ball in that meeting, it appeared to me that Jho would be
8    willing to use his relationships to steer that kind of
9    business towards Goldman Sachs, meaning, that he would work
10   with Goldman Sachs, especially Roger and myself, to move the
11   business in our direction.
12   Q    After the meeting in January of 2009, did that begin to
13   happen, pursuing business opportunities with Jho Low?
14   A    Yes.
15   Q    And who led the pursuit of that business?
16   A    Roger did.
17   Q    During that time, did you communicate with Jho Low?
18   A    Yes, I was on a number of e-mails and communications
19   with Jho as well.
20   Q    What e-mail accounts did you use at that time?
21   A    Our Goldman Sachs e-mail accounts.
22   Q    Did you have any concerns about communicating with Jho
23   Low using your Goldman Sachs e-mails at that time?
24   A    At that time, no, sir.
25   Q    Did Goldman Sachs begin work on the TIA after this

**A-285**

T. Leissner - Direct/Mr. Rolle          580

1  initial meeting?
2  A    Yes, we very quickly started working on this.  Yes.
3  Q    What was Jho Low's role in getting you started on that?
4  A    He was really instrumental, first of all, as you can see
5  from this e-mail exchange, he brought this to us.  We had
6  heard about the TIA being established before from our own
7  resources, but this is the first time that we actually
8  understand that we may be able to work on the setup of the
9  TIA.  And he very quickly becomes engaged with Goldman Sachs
10 through Roger to work on the transaction and actually
11 pitch -- we actually had to win this piece of business, it
12 was not our business at this point in time, but Jho took
13 every step to help us, to guide us, to the eventual mandate
14 of where we received to work on the setup.
15 Q    At the time of that setup of that TIA what, if any,
16 business did Goldman Sachs have in the State of Terengganu?
17 A    We had no business there.
18 Q    Where was the Goldman Sachs Malaysia business focused at
19 that time?
20 A    At that time, I would say, essentially, all our business
21 was focused on two places.  One was Kuala Lumpur, the capital
22 of Malaysia, and the State of Sarawak which was one of the
23 states one of the states rich in oil and gas of Malaysia.
24 Q    Did you personally have any ties to the State of
25 Terengganu at the time?

T. Leissner - Direct/Mr. Rolle          581

1  A    No, I did not, sir.
2  Q    Any government officials in that state?
3  A    No.
4  Q    What ties did you understand Jho Low had in that state?
5  A    My understanding was that his relationship had, you
6  know, was with the king and that he, in fact, was going to be
7  an advisor to the King's Council in the setup of the TIA.
8  Q    When you say "king," what do you mean?
9  A    So Malaysia is made up of a number of states, most of
10 which have a king, a sultan, of that state.  A little bit
11 like the king you would know, or the queen you would know, in
12 England.  They also had a king for the country of Malaysia
13 that would by rotation come from the sultans or kings of each
14 one of the states.
15      So in this year, when we are talking -- that we are
16 talking about 2009, the Sultan or King of Terengganu was also
17 the King of Malaysia.
18 Q    So Malaysia has a king, you also mentioned a prime
19 minister?
20 A    Yes.
21 Q    In your work in Malaysia, how did those differ?  First,
22 were they the same person?
23 A    No, they were not the same person.  The king had more a
24 ceremonial role to play.  The prime minister was really the
25 most senior representative of the Government, meaning, the

T. Leissner - Direct/Mr. Rolle          582

1  executive power of the Government.
2  Q    Now, for Goldman Sachs' work on TIA, did that have a
3  project name internally?
4  A    Yes, sir, it was called Project Tiara.
5  Q    Tiara?
6  A    Yes, sir.
7  Q    Who else worked on project Project Tiara at Goldman
8  Sachs with you?
9  A    Roger was the lead banker given his relationship.  It
10 was Boon-Kee Tan who was head of the Financial Institutions
11 Group at the time.  It was Chun-be Chong who I believe was an
12 associate at the time and several other members as well.
13 Terence Lim was another person in Boon-Kee's group that
14 worked on it.
15 Q    Did you remain in touch with Jho Low throughout
16 Project Tiara?
17 A    Yes, sir.
18 Q    Throughout that work on Project Tiara, who was the main
19 point of contact with Jho Low at Goldman Sachs?
20 A    That was Roger.
21 Q    If you can look at your binder, I'd like you to take a
22 look at Tabs 31, 32, 33, 34, and 35 and let me know when
23 you've hd a chance to look at each of those documents.  And
24 these are for identification Government's Exhibit 1513, 1514,
25 1520, 1521, and 1975.

T. Leissner - Direct/Mr. Rolle          583

1  A    Yes, sir.
2  Q    Do you recognize these documents?
3  A    Yes, sir.
4  Q    What do you recognize all of them to be?
5  A    They're e-mails that I'm copied on or I'm sent to.
6  Q    Is there a timeframe of all of these e-mails?
7  A    January 2014 through the end of January.  So the middle
8  month of January, 2009.
9  Q    You said January 2014?
10 A    '14.
11 Q    Sorry, January 14th?
12 A    January 14, 2009, to the end of January 2009.
13      MR. ROLLE:  Your Honor, at this time, we would
14 offer Government's Exhibits 1513, 1514, 1520, 1521, and 1975.
15      THE COURT:  Is there any objection, Mr. Agnifilo?
16      MR. AGNIFILO:  No just a clarification.  Just one
17 second.
18      MR. ROLLE:  If we could look at Tab 35.
19      THE COURT:  For identification?
20      MR. AGNIFILO:  Yes.
21      MR. ROLLE:  It's still 1975 for identification,
22 Judge.
23 Q    And the date on the e-mail, sir?
24 A    You're right.  That's February 19, 2009.
25      MR. AGNIFILO:  We have no objection to these all

T. Leissner - Direct/Mr. Rolle                    584

1   coming into evidence, Judge.

2            THE COURT:  They're admitted.

3            (Government's Exhibits 1513, 1514, 1520, 1521, and

4   1975 were received in evidence as of this date.)

5   Q    Now, first, what did all of these e-mails relate to,

6   Mr. Leissner?

7   A    They're all the start of work on Project Tiara and the

8   setup of the TIA at the time.

9   Q    So we have Government's Exhibit 1513 up.  This is an

10  e-mail chain that you're added to?

11  A    Yes, that's correct.

12  Q    And it's the subject is Terengganu?

13  A    Yes.

14  Q    Directing -- well, first, what's generally being

15  discussed in this e-mail?

16  A    What's being discussed is the possible funding of the

17  TIA which was of particular interest for us at Goldman Sachs

18  through out Project Tiara.

19  Q    Why was the funding of TIA be of particular interest?

20  A    At the outset of the TIA, we thought that we could use

21  some of the, I believe was it was oil or gas receivables that

22  the state was getting similar to the State of Sarawak to

23  provide them with funding against similarly structured

24  transaction we had done in the State of Sarah back before.

25  That had ended up being a very significant revenue

---

T. Leissner - Direct/Mr. Rolle                    586

1   A    He's basically trying to find some more technical

2   answers to questions that would allow him to size the

3   potential transaction or to potential fundraising for the

4   TIA.  That's really what he's trying to get at.

5            (Continued on the next page.)

---

T. Leissner - Direct/Mr. Rolle                    585

1   opportunity for Goldman Sachs, you know, in excess of a

2   hundred million dollars.  So we thought even if this would

3   not be even as big, you know, smaller perhaps, because

4   Terengganu was a smaller state than Sarawak was in terms of

5   those revenues, that we could still make a significant amount

6   of money on the funding side using some of these commodity

7   structured transactions for the TIA.

8   Q    So would that be follow-on business once the TIA is set

9   up?

10  A    Yeah.  Well, we thought it would be sort parallel.  Yes,

11  it would have been a follow-on to the actual establishment

12  because, of course, you have to have an established entity.

13  But it was something that we had early on identified as an

14  attractive piece of business involving the TIA.

15  Q    Looking at the first e-mail in this document it's from

16  Cyrus Shea?

17  A    That's right.

18  Q    Who was is that?

19  A    Cyrus Shea was our head of Debt Capital Markets for

20  Southeast Asia at that time and also through the years after.

21  Q    There's two questions that follow the words:  Roger, a

22  few questions?

23  A    Yes.

24  Q    And what -- generally, what questions did Cyrus Shea

25  have for the defendant?

---

T. Leissner - Direct/Mr. Rolle                    587

1   DIRECT EXAMINATION (Continued)

2   BY MR. ROLLE:

3   Q    Looking at the top e-mail, it's a response from the

4   defendant?

5   A    That's correct.

6   Q    Cyrus Shey?

7   A    That's correct.

8   Q    Yet, he adds you to the e-mail chain?

9   A    Yes.

10  Q    He has responses to those questions in his e-mail?

11  A    Yes.

12  Q    What's the response to the second question?

13  A    He says, from our friend that are currently vice and

14  chairman of TIA, HM -- which is His Majesty which is the

15  king.

16  Q    Who was the defendant talking about from our friend --

17  A    He was talking about Jho.

18  Q    And examine that was in response to question, what is

19  our source for the information that Cyrus Shey asked?

20  A    Yes.  That's right.  Cyrus is asking for, I believe,

21  the royalties and the oil -- the amount of oil that was

22  available, perhaps for funding and the source of that

23  information that we had received, and Roger's response was,

24  effectively, Jho.

25  Q    Did you use the name Jho Low?

T. Leissner - Direct/Mr. Rolle                    588

1    A    Sorry.

2    Q    Did he use the name Jho Low?

3    A    No, he did not.

4    Q    Looking at tab 32, sir, Government Exhibit 1514.

5    A    Yes, sir.

6    Q    The longer e-mail chain that you're on, correct?

7    A    Yes.  That's correct.

8    Q    The subject is Project Tiara?

9    A    That's correct.

10   Q    Just generally, what's being discussed in this e-mail

11   chain about the project?

12   A    We are now getting into the start of actually actual

13   setup work with Project Tiara, and it is starting to have --

14   discuss the request from some of the people, in particular

15   Casey Tang, who was originally working for Jho, and then

16   later, became a member of TIA and wanting to be, requesting

17   certain information that would help him analyze the

18   potential setup of the TIA and the work that needs to be

19   done for that.

20        He's asking that question through Roger and

21   Chan Vee Chong, who was, at that time, another banker

22   covering the Malaysian and the Singapore, Southeast Asian

23   market.  So he had met with them before.

24   Q    These are communications with Jho Low and the team

25   involving the TIA setup?

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                    589

1    A    That's correct.

2    Q    And they're trying to coordinate meetings in relation

3    to this project?

4    A    Yes.  The first e-mail is to ask for information from

5    us and some input, and then it's about a meeting.

6    Q    If you just look at the second to last e-mail at the

7    top.

8    A    Yes.

9        MR. ROLLE:  We can enlarge both of them.

10   A    Yes.

11   Q    In the second to last e-mail, it's from the defendant?

12   A    That's correct.

13   Q    To Jho Low and a number of other people including

14   yourself?

15   A    Yes.

16   Q    He says Jho, let's me meet at 8:30 at Mandrin on

17   Friday?

18   A    That's right.

19   Q    Tim is in town as well?

20   A    Yes.

21   Q    He wanted to catch up on the matters aside from Tiara?

22   A    Yes.

23   Q    What matters aside from Tiara were being discussed at

24   that time?

25   A    The same topics that we had seen on the original e-mail

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                    590

1    post -- that Roger had summarized post first meeting on

2    January 4th with Jho Low.

3    Q    And the second paragraph of the e-mail it says from the

4    defendant, Casey, do let us know a good time for a quick

5    call with the team over the next 48 hours.  Just Nick and

6    you sufficient.

7        Is that right?

8    A    That's correct.  Yes.

9    Q    What was the response to that e-mail?

10   A    Casey, who again, had worked with Jho in the past, was

11   going to join the TIA and 1MDB later, saying that I think it

12   is best to get Jho involved in every stage.  Jho will revert

13   on the suitability of dates and time for the next 48 hours.

14        Casey is basically saying we should -- the

15   suggestion from Roger should include Jho, any meeting should

16   involve Jho.

17   Q    What was your understanding of why Jho Low would need

18   to be involved at every stage?

19   A    Because he was the key decision-maker already at this

20   stage, which is effectively pre the inception of TIA.  He is

21   driving force as to how that would be done, how the setup of

22   the TIA and any selection of advisers, et cetera, would be

23   run.  He is the key person, Jho.

24   Q    What was the initial and stated role of Jho Low in the

25   setup of the TIA?

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                    591

1    A    He really was only on the committee that the king had

2    formed around him to help advise on how to select and which

3    advisers to select.

4        Meaning, for example, at Goldman Sachs or

5    JPMorgan or the like.  There was a committee that he had

6    formed around him, the king had, and Jho was part of that

7    committee.

8    Q    Is that the role, the advising on the committee, as you

9    described it, is that the role that Jho Low ultimately

10   played on TIA?

11   A    No.  He goes much beyond that.

12   Q    How?

13   A    In that he's really involved in every key

14   decision-making of this.  It's not just advising, it's

15   actually making most of those decisions.

16   Q    Would a decision-making role like that at an entity

17   like TIA be something that would be reviewed in Goldman

18   Sachs even in 2009?

19   A    Yes.  Any key decision-maker, any key influencer in a

20   company would have to be discussed and disclosed.

21   Q    At that point, had Goldman Sachs, to your knowledge,

22   ever reviewed Jho Low?

23   A    Not to my knowledge.

24   Q    And who would be conducting the review of

25   decision-makers back in 2019?

*Avery Armstrong, RPR*
*Official Court Reporter*

**A-288**

T. Leissner - Direct/Mr. Rolle          592

1  A   It would be undertaken in the first instance by BIG, as
2  well as our conflicts team.
3  Q   Was Jho Low's -- the full scope of Jho Low's role in
4  the TIA reviewed by the Goldman Sachs control functions in
5  connection with Project Tiara?
6  A   No.  The full extent of his influence and his work at
7  TIA, no, it was not.
8  Q   If you could turn to tab 33 which is
9  Government Exhibit 1520 in evidence.
10 A   Yes.
11 Q   If we could take a look at the second e-mail in the
12 chain.  Sorry, third.
13 A   Yes.
14 Q   It's January 27th, 2009; is that right?
15 A   That's right.  Correct.
16 Q   Looking at the last paragraph, actually, of the
17 defendant's e-mail, it says, we have -- give the RFP terms
18 of reference to Jho.
19 A   A check is there?
20 Q   What are the RFP terms?
21     What's a reference to?
22 A   RFP refers to the request for proposal.  It's often a
23 reference to banks being asked to, effectively, pitch for
24 business.  What I mean pitch for business, means we present
25 our credentials and why we should be hired as an adviser for

---

T. Leissner - Direct/Mr. Rolle          593

1  that.  There's request for proposal that states what we
2  should and how would -- what questions we should answer in
3  our proposal, you know, how should woe present our
4  qualifications and things like that.
5  Q   That process is supposed to be competitive?
6  A   Yes.  When there is an RFP issued, it is a competitive
7  process, correct.
8  Q   Other banks respond to the RFP?
9  A   Yes.
10 Q   And ultimately, your hope is Goldman Sachs gets
11 selected to do the work?
12 A   Yes.  If we go through an RFP process, we would do so,
13 of course, to win that.  Otherwise, you know, we wouldn't
14 spend the time on it.  But if we are
15 responding to an RFP, we would like to win that.
16 Q   Did you have an understanding as to why the defendant
17 would be giving the RPF terms of reference to Jho?
18 A   Yes.  As Jho was the key decision-maker in this
19 process, by this time, we had learned that to be the fact,
20 not least with Casey's e-mail also confirming that, you
21 know, Jho should really be involved at every step.  Giving
22 him the terms of reference for an RFP would help Goldman
23 steer the business towards us because we would basically
24 write an RPF to help us.  We'd ask the questions that are --
25 you know, that we'd have to answer in the way that would

---

T. Leissner - Direct/Mr. Rolle          594

1  benefit us and help us win that business, because depending
2  on how the question is asked, it may benefit us, you know,
3  because we know the answers is beneficial to Goldman Sachs.
4  Q   Like taking a test that you wrote yourself?
5  A   That's correct.  Yes.  Just like that.
6  Q   So looking at the first paragraph of the defendant's
7  e-mail, and specifically, the third sentence that starts on
8  BIG.
9      MR. ROLLE:  Blow that up.
10 Q   It says, on BIG, they asked if we had a consultant.
11 Did we run a check on Jho now or later.
12 A   Yes.
13 Q   BIG is the Business Intelligence Group that we talked
14 about at length?
15 A   That's correct.
16 Q   When the defendant says they asked if we have a
17 consultant, do we run a check on Jho now or later, what do
18 you understand him to be talking about, run a check?
19 A   A check is really -- the BIG check is where BIG reviews
20 all the people that are relevant to a transaction and
21 ensures that, you know, we first know who they are, and if
22 there's any issues relating to them, perhaps.  And so this
23 is really, at the very outset, a check that we would run for
24 any of our clients.
25 Q   And in this e-mail, he's reporting to you that BIG had

---

T. Leissner - Direct/Mr. Rolle          595

1  asked if there was a consultant involved in the TIA setup?
2  A   That's correct.  Yes.
3  Q   Now he's coming to you and asking do we run a check on
4  Jho now or later, right?
5  A   Yes.  That's correct.
6  Q   Then he continues, we don't have a deal structure or
7  know how much we are making yet.  Is it possible to advise
8  BIG down the road we have a consultant, or we should say
9  there is one, but we don't have the engagement terms etched
10 out yet?
11 A   Right.
12 Q   What is he talking about?
13 A   The -- he's asking for my advice or a strategy as to
14 how we should introduce Jho into the system at that time.
15 It's a little bit of a conflicted question, because on the
16 one hand, we already know that his role actually isn't going
17 to be a consultant to us, but rather a adviser to the king,
18 and a consultant to us would actually put him in the
19 conflict situation, a conflict point.
20 Q   Sorry, just explain that.
21     How would that be a conflict?
22 A   It's like being on the two sides of the same
23 transaction.  You can't be a buyer and seller, effectively,
24 without a conflict, so to say.  His job we knew, at this
25 time, was to be the adviser to the king and actually making

**A-289**

T. Leissner - Direct/Mr. Rolle          596

1  the selection of an adviser.  If he was Goldman Sachs'
2  consultant, then he would be incentivized or motived to help
3  us get that business.
4              So in him, there is a conflict now, am I
5  representing the king or am I representing Goldman Sachs.
6  Now, of course, that was actually the conflict that he was
7  facing, but that would be a definite problem for Goldman
8  Sachs.
9              Roger then goes on to say that we don't have a
10 structure yet, and therefore, maybe we don't -- we should
11 wait, perhaps, until we know what the structure would look
12 like.  I advise BIG later whether we have Jho working for us
13 or not.
14 Q    When BIG in your work as an investment banker, when
15 they ask you, as a banker, a question, what's your
16 responsibility at that point?
17 A    We have to tell them the facts as they are at that
18 time.
19 Q    So what is the reason the defendant's asking you how to
20 respond, at this point, having been asked?
21 A    Because --
22              MR. AGNIFILO:  I'm going to the form of the
23 question.
24              THE COURT:  Rephrase.
25 Q    Why would you have a conversation with the defendant

---

T. Leissner - Direct/Mr. Rolle          597

1  about a question he's already been asked by BIG and how to
2  respond to it?
3  A    Because of the conflict I just described.  We're
4  already aware, Roger and I, and others on the deal time, by
5  the way, from Casey's message before, that Jho is the key
6  person that should be involved in every step of the way.
7              Now, at the same time, as Roger is saying,
8  maybe he's working for us as well.  So Roger is aware in
9  this question that there's a conflict --
10             MR. AGNIFILO:  Your Honor, I'm going to object to
11 his basis of knowledge as to what my client is aware of.
12             THE COURT:  He can answer as to his understanding
13 based on the communications he had.
14             Go ahead.
15             THE WITNESS:  Right.  I was just trying to explain
16 the sentence that he's asking here.
17             THE COURT:  And that's based on your
18 understanding?
19             THE WITNESS:  My understanding, that's correct.
20 Yes, ma'am.  Yes, your Honor.
21 A    At that time, we had collectively been told that Jho
22 was the key decision-maker because he had to be involved at
23 every step of the way.  Now we come to a point of
24 decision-making where BIG is asking Roger, in first instance
25 of the question, if we have a consultant.  Jho is, of

---

T. Leissner - Direct/Mr. Rolle          598

1  course, already acting in a way to help us, as you saw from
2  the previous e-mail.  So now it's a question of how do we
3  strategically position Jho into the system, understanding
4  that there is a conflict inherently in the two roles that
5  he's playing.
6  Q    What was your response to the defendant?
7  A    I'm suggesting that we would -- we should leave BIG
8  until the structure is decided, effectively, until we know
9  how the structure works, and then I go on to give some other
10 experience that would relevant.
11 Q    If you knew about Jho Low's key decision-making in TIA,
12 and you've said before, when BIG asks you a question, you
13 need to answer it, why would you say leave BIG to when we
14 know how the structure works?
15 A    I'm in my own mind at that point also not sure how to
16 handle Jho's conflicting role within the TIA governance, if
17 you were, with the king, and the role that he was starting
18 to play for Goldman Sachs which is helping us.
19 Q    Why not just tell BIG that?
20 A    Because I was afraid that without clarity around which
21 way that conflict work, we would be shutdown and we
22 couldn't proceed with this transaction.
23             MR. ROLLE:  We can take that down.
24 Q    So as you walked us through, Jho Low was assisting
25 Goldman Sachs directly in getting this TIA engagement at the

---

T. Leissner - Direct/Mr. Rolle          599

1  time?
2  A    Yes.
3  Q    And you've described this RFP process?
4  A    Yes.
5  Q    Is that formal retention process to be retained on
6  the deal?
7  A    That's correct.  Yes.
8  Q    Now, did you have any understanding of Jho Low's
9  relationships with Government officials in Terengganu would
10 play any role in Goldman Sachs' retention?
11 A    Yes.  As time progresses and we work on the
12 assignment -- and you saw some of this just now -- we are
13 giving Jho, our RFP terms of reference -- which was already
14 given to Jho Low, that we had given him the terms of
15 reference in the RFP which gave Goldman Sachs already a
16 significant advantage by being able to, as you mentioned,
17 you know, it's like a test that you wrote yourself.  So that
18 was already an important step.
19             It also becomes clear that actually Jho is one
20 of the key people in that whole decision-making process.
21 And so as we progress in the assignment, Jho is very helpful
22 to us, giving us tips along the way, what we should say,
23 what we shouldn't say, and the like.  So he is a very
24 influential role in really helping us present us in the best
25 way.

**A-290**

T. Leissner - Direct/Mr. Rolle     600

1 Q    If you could turn to tab 34.  It's Government Exhibit
2 1521.
3 A    Yes.
4 Q    The first e-mail is from the defendant to you?
5 A    Yes.
6 Q    The subject's TIA tentative date with the king?
7 A    Yes.
8 Q    And what does the defendant report to you in that
9 e-mail?
10 A    He is telling me that there is a possible date that we
11 have with the king over at dinner or just a meeting.  And
12 that there would be other people present, as well.  And it
13 was really through a -- to get to know each other.  That's
14 what he -- the purpose to put face to names, to get to know
15 each other.
16 Q    He mentions that Jho Low would be present for that?
17 A    Yes.  Present will be Jho, Dato' Ramli, who had
18 covered, and then Tengu Zarful.
19 Q    Now, the last sentence in that paragraph says, The king
20 has not met anyone yet from the banks and we are managing
21 this process.
22 A    Right.
23 Q    What did you understand him to mean?
24 A    First of all, it describes a key competitive advantage
25 if the king is meeting us first, if he has not met anybody

---

T. Leissner - Direct/Mr. Rolle     601

1 else.  That is a clear -- I would call a leg up in the RFP
2 process.  And we are managing the process refers to my
3 understanding that Jho was managing this process on our
4 behalf.  That's my understanding of what this means.
5 Q    If you could turn to tab 35, Government Exhibit 1975 in
6 evidence.
7         There's an e-mail, right?
8 A    Yes.
9 Q    Is there an attachment?
10 A    Yes, sir.
11 Q    If we could just pull up the attachment.
12         What is this document?
13 A    This is the actual request for proposal for the setup
14 of the TIA or the Terengganu Investment Authority.
15 Q    The RFP --
16 A    The RFP.
17 Q    And going to the second page of the RPF, there's a
18 cover letter; is that right?
19 A    That's correct.
20 Q    And going to the third page of the RFP, second page of
21 the cover letter.
22 A    Yes.
23 Q    And line item six, it lists a number of banks; is that
24 right?
25 A    That's correct.

---

T. Leissner - Direct/Mr. Rolle     602

1 Q    Who are those banks?
2 A    Goldman Sachs, JP Morgan, Nomura, and UBS.
3 Q    Were those banks also competing for the TIA business?
4 A    That's correct.
5 Q    Who signed this cover letter?
6 A    It was signed from the secretary of the Steering and
7 Coordination Committee of the TIA, a gentleman by the name
8 of Amhari Efendi Nazaruddin.
9 Q    You mentioned that name before?
10 A    Yes, sir.
11 Q    And what context have mentioned him in your testimony?
12 A    That he was the principal secretary of the prime
13 minister of Malaysia.
14         MR. ROLLE:  If we could pull up
15 Government Exhibit 13 for a moment.
16         THE COURT:  It's already in evidence.
17         MR. ROLLE:  It is in evidence, Judge.
18 Q    Who is that?
19 A    That's Amhari.
20 Q    So going back to 1975 in evidence.  And if we could
21 look at the first e-mail on the first page.
22         It's from the defendant; is that right?
23 A    Yes, sir.
24 Q    February 18, 2009?
25 A    That's right.

---

T. Leissner - Direct/Mr. Rolle     603

1 Q    If you could just read his e-mail, please.
2 A    Sure.  It is addressed to the teamwork on the advisory
3 side of the business, Boon-Kee Tan, Chong Chan Vee, and
4 Terrence Lim, subject TIA.  Just got a call from Amhari of
5 DPM slash MOF1's office, at that time, Najib Razan.  He will
6 deliver the RFP by hand himself.  Met Jho with Tim this
7 morning.  We should try to run the pitch by him before
8 submission.  Please advise BCG which is Boston Consultant
9 Group.
10 Q    What did you understand the defendant to mean that we
11 should try and run the pitch by him before submission?
12         What was that about?
13 A    Again, here, what he says, we met with Jho and that the
14 suggestion to him to run the pitch by him is to Jho.  So we
15 should run the submission, which is our answer to the
16 request of proposal, the RFP, by Jho, before we actually put
17 it in as part of our proposal.
18 Q    That e-mail was the 18th of February?
19 A    That's correct.
20 Q    Then the response to that same e-mail the next day?
21 A    Yes.
22 Q    If you could look at the second e-mail from the top.
23 A    Yes.
24 Q    And directing your attention to the -- the first part
25 says, we have received the formal RFP from TIA?

**A-291**

T. Leissner - Direct/Mr. Rolle                604

1   A   Yes.

2   Q   That's the RFP we looked at that's the attachment to

3   this e-mail?

4   A   That's correct.

5   Q   The second sentence says the RFP pretty much our

6   recommendation and three our banks JPM, UBS and Nomura --

7       THE COURT:  Slow down Mr. Rolle.

8   Q   -- have been invited as part of the formality.

9   A   Yes.

10  Q   When did you understand the defendant to mean?

11  A   It was my understanding that first, the RFP, as I

12  described before, was following the examples and terms that

13  we had actually given to Jho, and it now was -- the actual

14  RFP was reflecting that, you know, that what we had given to

15  Jho before, and that three other banks, the other banks

16  which have named in the RFP, we just looked at, had also

17  been invited as part of the formality.

18      It was my understanding that Jho was certainly

19  helping us to steer this business towards us, but that as

20  part of this, being an important government project, there

21  had to be a formality of other banks to be invited too.  It

22  couldn't just go to Goldman Sachs and we win the business.

23  It had to go to here.  This was a high-profile mandate by

24  the king of the country for a -- for the setup of a

25  government entity.  So it had to look like it had actually

Avery Armstrong, RPR
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle                605

1   gone through a proper process.

2   Q   It says in the next sentence, we know from our friends

3   in the steering committee we are in good standing.

4       Who was the defendant referring to?

5   A   It's my understanding that that's Jho.  The reference

6   is to Jho.

7       MR. ROLLE:  You could take that down,

8   Mr. Youkilis.

9       Mr. Leissner, if we could look at tabs 37,

10  38, 39, and 40.  These are Government Exhibits 15 all for

11  identification.  1528, 1530, 1533, and 1534.

12      Let me know when you've had a chance to

13  review those, sir.

14  A   I'm going to tab 40, sir?

15  Q   Thirty-seven, 38, 39, and 40.

16  A   Yes, sir.

17  Q   Do you recognize all of these documents?

18  A   Yes, sir.

19  Q   What do you recognize them to be?

20  A   They're e-mails that I've received or been copied on.

21  Q   And did they relate to the TIA work we've been talking

22  about today?

23  A   That's right.

24      MR. ROLLE:  Judge, we would offer 1528, 1530,

25  1533, and 1534, Judge.

Avery Armstrong, RPR
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle                606

1       MR. AGNIFILO:  No objection, your Honor.

2       THE COURT:  They're admitted.

3       (Government Exhibits 1528, 1530, 1533, and 1534,

4   were received in evidence.)

5   Q   In these e-mails, do they include communications with

6   Jho Low?

7   A   Yeah.  There are descriptions of communications with

8   Jho Low, as well, yes.

9   Q   Sorry, descriptions of communications with Jho Low?

10  A   Yes.

11  Q   Throughout these e-mails, who is reporting back on Jho

12  Low?

13  A   Roger is.

14  Q   If we could look at 1528 which is on the screen.

15      MR. ROLLE:  You could zoom in on the second to

16  last e-mail, Mr. Youkilis.

17  Q   It's from the defendant to you, Mr. Leissner?

18  A   Yes.

19  Q   March 6, 2009?

20  A   Yes.

21  Q   His e-mail says, boss, checked with Jho for TIA

22  meeting.  We need to give comfort that we can principal the

23  MYR 5BN equivalent?

24  A   Yes.

25  Q   Sorry, what's that mean?

Avery Armstrong, RPR
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle                607

1   A   That's Malaysian ringgits.  So that's the currency of

2   Malaysia, and it refers to 5 billion equivalent government

3   guaranteed.

4   Q   MYR is the abbreviation for that currency, Malaysian

5   ringgit?

6   A   Yes.

7   Q   Defendant then says we are wired?

8   A   Yes.

9   Q   What is he talking about?

10  A   It's my understanding that in the meeting, that was

11  described in one -- two of the e-mails prior to the one that

12  we are focusing on here, the steering committee had met --

13  the steering committee of TIA and Jho was part of that

14  meeting, and then coming out of the meeting, we get it

15  again, a tip as to what's important to put into our proposal

16  that we can, in fact -- principal which means we can take in

17  our own balance sheet, the Goldman Sachs balance sleet, the

18  5 billion ringgit equivalent bond, for example.  5 billion

19  was roughly 1.25 billion US dollars or so at that time.  And

20  he made -- my understanding that what he means that we are

21  wired means that Jho was giving us comfort that we are going

22  to win this business.

23  Q   The second paragraph has a number of points,

24  development plan is important too.  BCG can cover that.

25  Keep it simple on legal.

Avery Armstrong, RPR
Official Court Reporter

---

T. Leissner - Direct/Mr. Rolle                608

1    What are those points in relation to?
2  A    Those are other points to be covered in the proposal,
3  in our proposal to pitch this business, BCG, Boston
4  Consulting Group was one of the partners to Goldman Sachs.
5  And the reference here is that they would cover that portion
6  of the proposal.  And keep it simple on legal, again, we
7  also had a legal firm that Kadir Andri -- there was a more
8  complicated name, but Kadir was the law firm that was our
9  partner in the pitch, as well.  So just saying that keep it
10  simple on the legal side, that's less important than the
11  other points.  So he's just summarizing those points for our
12  partners.  And Vincent was the partner at BCG and Cherie was
13  the partner at Kadir.
14  Q    If you could turn to tab 30 which is Government Exhibit
15  1530 -- sorry, tab 38 for you.
16  A    Yes.
17  Q    In general, what's being discussed in this e-mail
18  chain?
19  A    Again, it's an effort to tighten up our presentation to
20  focus on things that were important by feedback from Jho.
21  Q    Presentation to whom?
22  A    Presentation to the committee, including the king.
23  Q    For the TIA business?
24  A    For the TIA business, yes.
25  Q    If we could look at the March 9, 19:05 56 e-mail from

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                609

1  the defendant.
2  A    Yeah.
3  Q    He says, Jho called me after the JPM slash Mackenzie
4  pres before Nomura.  His message, we need to beef up our bis
5  dev section.  Mackenzie laid out what to invest and the
6  portfolio makeup should be, et cetera.  I am waiting to meet
7  him for details after he finishes with Nomura.
8        What is the defendant reporting back to you in
9  this e-mail?
10  A    He is communicating with Jho that Jho called him after
11  the JPMorgan Mackenzie presentation before Nomura.  JPMorgan
12  Mackenzie was one of the consortiums that was competing with
13  Goldman at the time for the business as was Nomura.  So Jho
14  called Roger right after the meeting with JPMorgan
15  Mackenzie.
16        His message, the message from Jho, was to beef
17  up our business development.  Bis dev is business
18  development section.  Mackenzie that should be Mackenzie,
19  laid out what to invest and the portfolio makeup should be,
20  et cetera.  That's really a tip from Jho as to how we can
21  tighten up our presentation and make it better.  So he's
22  giving us, basically, feedback to win this business.
23  Q    If you could turn to tab 39, and it's
24  Government Exhibit 1533 in evidence.
25        The first e-mail in this looks a little

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                610

1  different; is that right?
2  A    Yes.  It looks like it's a form of an SMS, a text
3  message.
4  Q    At Goldman Sachs, were you able to get text messages to
5  your e-mail?
6  A    Not that I remember.
7  Q    So this is a text message that -- how do you receive
8  this?
9  A    It's forwarded to me by Roger from his Goldman Sachs
10  e-mail.  But previously, there is a message from his
11  private -- a private Gmail address to him at Goldman Sachs.
12        MR. ROLLE:  If we could, Mr. Youkilis, make the
13  first 2-E-mails larger so we can say what you're talking
14  about Mr. Leissner.
15  Q    I'm sorry could you just orient us with what we're
16  looking at here.
17  A    Certainly.  At the bottom is the SMS message from a
18  number that I recognize to be Jho's number.  And it's
19  basically is them forwarded from an e-mail of Roger, his
20  private Gmail address to himself at Goldman Sachs which is
21  the two -- the two now.
22  Q    The text message from Jho Low to the defendant, could
23  you read what that was?
24  A    Yes.  E-mail me this latest presentation with pricing
25  that you will be doing on Wednesday morning.  Just the

*Avery Armstrong, RPR*
*Official Court Reporter*

---

T. Leissner - Direct/Mr. Rolle                611

1  slides that cover for the IB stuff.  IB is investment
2  banking.  Rest of economic stuff, et cetera, don't need.
3  Boarding plane in 12 hours time.
4        MR. ROLLE:  If we could look at the top e-mail.
5  Mr. Youkilis.
6  Q    When you receive it, Mr. Leissner.
7  A    Yes.  I'm copied on the e-mail.
8  Q    The defendant says, CV, can you e-mail the latest
9  version of the TIA pres only on sections that cover
10  financing to Jho over the next C12 hours.
11  A    Yes.
12  Q    He's directing CV.
13        Who's that?
14  A    That's Chan Vee Chang.  He was the associate working on
15  that transaction.
16  Q    And directing him to forward on the presentation
17  requested by Jho Low?
18  A    That's correct.
19  Q    And at the bottom it says R?
20  A    Yes.
21  Q    With the defendant -- would the defendant sign his
22  e-mail with initials from time to time?
23  A    At times, yes.
24  Q    Was Goldman Sachs formally retained on the TIA
25  engagement?

*Avery Armstrong, RPR*
*Official Court Reporter*

T. Leissner - Direct/Mr. Rolle                 612

1   A    Not at this point yet.
2   Q    At some point after this --
3   A    Yes, we were.
4   Q    And if you turn to tab 40, Government Exhibit 1534.
5   You can look at the top e-mail.
6   A    Yes, sir.
7   Q    And what is this e-mail -- what's the date?
8   A    The date is March 20th, 2009.  It is an e-mail from the
9   partner at BCG, Vincent Chin to a number of us who had
10  worked on the response to the RFP on the setup of the TIA.
11  Q    And what does Vincent Chin report back to all of you in
12  the first paragraph of his e-mail?
13  A    That, in fact, this consortium of us had won this
14  business, that we had been selected as the adviser to the
15  set up of the TIA.
16           Dato Azlin just called me with good news.
17  Dato Azlin was also on the committee to the king.
18           The committee has selected us, which is
19  winning the business, and has attached some conditions.
20           And there are two conditions here set out.
21  It's basically saying we won the business.
22  Q    You mentioned the name Dato Azlin?
23  A    Yes, sir.
24  Q    You said the name Dato Azlin before in your testimony?
25  A    No, I had not yet.  That was Dato Azlin.

---

T. Leissner - Direct/Mr. Rolle                 613

1            Dato Azlan is a different person.
2   Q    Different person?
3   A    Different person.
4   Q    Thank you.
5            MR. ROLLE:  One moment, your Honor.
6            THE COURT:  Ladies and gentlemen, it's 11:30.
7            We're going to take our 15-minute break and
8   be back at a quarter to 12:00.  Thank you.
9            (Jury exits the courtroom.)
10           THE COURT:  Seated, everyone.
11           I'll see the parties at a quarter to.
12           MR. AGNIFILO:  Yes, your Honor.
13           (A recess was taken at 11:30 a.m.)
14           (Judge MARGO K. BRODIE enters the courtroom.)
15           THE COURT:  You can be seated until the jury comes
16  in.
17           (Jury enters the courtroom.)
18           THE COURT:  Please be seated, everyone.
19           Please proceed, Mr. Rolle.
20           MR. ROLLE:  Thank you, your Honor.
21  Q    Mr. Leissner, after Goldman Sachs' work on the TIA
22  setup, were there continued discussions with Jho Low about
23  additional business with Goldman Sachs?
24  A    Yes, sir.
25  Q    Who led those discussions with Jho Low?

---

T. Leissner - Direct/Mr. Rolle                 614

1   A    Roger had those discussions.
2   Q    At the time, would you engage with Jho Low to get
3   access to the prime minister or government officials in
4   Malaysia?
5   A    Yes, we did, as well.
6   Q    Around that time, still in 2009, were there government
7   projects that you were pursuing through Jho Low?
8   A    Yes.  There were several other discussions that Roger,
9   in particular, was engaged in and I was copied in on
10  many occasions, that would involve the prime minister, the
11  Minister of Finance, who had now become the prime minister,
12  as well.  So there were several projects that we were
13  pursuing or transactions that we were pursuing over that
14  time, yes.
15  Q    Would Jho Low, in fact, deliver and help you get access
16  to the Malaysian prime minister in that timeframe in 2009?
17  A    Yes, he did.
18  Q    How did he do that?
19  A    He arranged for meetings with the prime minister and
20  our senior management in New York.  He helped us at Goldman
21  Sachs to engage on a particular project with one of our
22  clients in China that also involved meeting the prime
23  minister and other government officials in Malaysian and
24  overseas.  So he helped us engage with the prime minister
25  and other government officials on several occasions.

---

T. Leissner - Direct/Mr. Rolle                 615

1   Q    And when you say us, who was he helping?
2   A    He -- Roger coordinated the effort, and us refers to
3   Goldman Sachs.  So we had several projects for Goldman Sachs
4   that required us to meet the prime minister.
5   Q    If you could turn to tab 41 in your binder, and this is
6   Government Exhibit 1544 for identification.
7            Do you recognize this document, sir?
8   A    Yes.
9   Q    An e-mail that you received?
10  A    That's correct.
11           MR. ROLLE:  Judge, we would offer
12  Government Exhibit 1544.
13           MR. AGNIFILO:  No objection, your Honor.
14           THE COURT:  It's admitted.
15           (Government Exhibit 1544, was received in
16  evidence.)
17           MR. ROLLE:  We'd ask to publish it, Judge.
18           Thank you.
19  Q    This e-mail, May 25th, 2009, is the last e-mail in the
20  chain?
21  A    It's May 25, 2009, correct.
22  Q    And it's between you and the defendant?
23  A    That's correct.
24  Q    Are you on every e-mail in the chain?
25  A    No, sir.  I'm only on the last three.

**A-294**

T. Leissner - Direct/Mr. Rolle          616

1  Q   So looking at the third e-mail from the top, it's from
2  the defendant to you, May 25, 2009, at 1:27 a.m.
3  A   That's correct.  Yes.
4  Q   Looking at the second section after thoughts.
5  Defendant writes, the PM has given the green light for the
6  special officer to meet with Chexim China State Grid and
7  Water players to help resolve, and then there's a number of
8  bullets there.
9  A   That's right.
10 Q   What is the defendant recording to you in this e-mail
11 here about that?
12 A   He is reporting back to me that the prime minister has
13 given the green light for one of his special officers, I
14 believe that to be Amhari, to enter into dialogue with these
15 Chinese companies to establish projects and transactions in
16 Malaysia that he lists here.
17 Q   And the special officer, that would be a government
18 official in Malaysia?
19 A   Yes.
20 Q   And what was your understanding, looking at this
21 e-mail -- and we can actually look at the whole e-mail
22 Mr. Youkilis -- of where the defendant got this information
23 about these projects?
24 A   From a discussion that he had with Jho and Casey, Jho
25 Low and Casey.

---

T. Leissner - Direct/Mr. Rolle          617

1  Q   And the first sentence of the e-mail, it says, hi, Tim.
2  Have been speaking with Jho and Casey in the past 48 hours
3  to get our full fees back.
4  A   That's correct.
5  Q   What was the discussion about fees in this e-mail?
6  A   When we had agreed to take on the TIA assignment at
7  that time, in the first quarter of 2009, we had put forward
8  a fee of $2 million.  That was our expected fee that we had
9  agreed to within Goldman Sachs internally.  However, as the
10 setup progressed, Jho only agreed to pay us 1 million
11 of those 2 million fees.  So Roger was trying to get the
12 full 2 million paid for Goldman.
13 Q   In the discussion of the fees, it says they are
14 agreeable if we help them deliver, and there's a series of
15 names Michael, Eissner, Jeff Immelt, and Bernard Arnault?
16 A   That's correct.
17 Q   As members of the board of advisers?
18 A   Yes.
19 Q   What is he reporting to you about the fees and these
20 people listed here?
21 A   He's saying that they, Jho and Casey, would be
22 agreeable to pay us our full $2 million fees if we, through
23 the Goldman Sachs connections, are able to get three very
24 well-known and important people to join their board of
25 advisers.  Michael Eissner, at the time, was the CEO of

---

T. Leissner - Direct/Mr. Rolle          618

1  Disney, Jeff Immelt, the CEO of General Electric, GE, and
2  Bernard Arnault was the and still is the CEO chairman of the
3  LVMH group, the luxury goods group.  Jho wanted to get those
4  three onto the board of the adviser of the TIA.
5  Q   There's two names that follow that sentence, Sheikh
6  Khaldoon, CEO of Mubadala, and Sheikh Mohammad Al-Sabah.
7  A   That's correct.
8  Q   It says, has already agreed, and we can capitalize on
9  this.
10 A   Yes.
11 Q   What was the defendant reporting about those two
12 people?
13     First, who are they?
14 A   Khaldoon is actually not a Sheik.  But Khaldoon was
15 then and still is, the CEO of the largest sovereign wealth
16 fund of Abu Dhabi, Mubadala.  Jho had mentioned Mubadala in
17 the first meeting was had as a very close relationship that
18 he personally had.  And Sheik Mohammad Al-Sabah was part of
19 the royal family of Kuwait, and as described here, the
20 deputy prime minister at the time.
21     And both of those had agreed to already join
22 the advisory board of the TIA, at that time, and in getting
23 or trying to get these other three gentleman in the previous
24 sentence to agree to it, get on the board of advisers, Roger
25 is suggesting here that we can capitalize on those two

---

T. Leissner - Direct/Mr. Rolle          619

1  names.
2  Q   Sorry, capitalize how?
3  A   By saying they already agreed to join the board,
4  therefore, you know, join as well.  It would help make up
5  the minds of the three others to join the board.
6      You have to understand, Mr. Rolle, that
7  Khaldoon at that time, and even today, in the business
8  world, at least, that we operated in was probably one of the
9  most powerful people by far.  At Goldman Sachs, nobody other
10 than maybe our chairman CEO could meet this gentleman.  So
11 he was one of the more senior important people in the world
12 of business.
13 Q   At this point, did you understand that Jho Low had a
14 relationship with this CEO of Mubadala, Khaldoon?
15 A   Yes.  You know, in the first meeting, that was one of
16 the names he threw out.  That's how we knew about the
17 Mubadala interest in the Genting oil and gas assets, that he
18 was, in fact, very close to Khaldoon.
19     So you know, in that e-mail that we had looked
20 before that Mubadala was referenced and Khaldoon was the CEO
21 of Mubadala.  So in that first meeting, Jho made me aware of
22 his close relationship with Khaldoon already.
23
24     (Continued on the following page.)
25

**A-295**

620

BY MS. SMITH:

Q    Why would a relationship like that be important to your

work at Goldman Sachs?

A    As I mentioned Khaldoon in the world of business is

probably one the most powerful people and has been for

decades now.  A relationship with him would be very, very

important for Goldman Sachs in general; but in Southeast

Asia, in particular, because Mubadala was many times looking

inward into Southeast Asia to make investments.  So that

would always constitute a potential business for Goldman

Sachs.  So, having a relationship at the very top is actually

valuable to us bankers.

Q    At this point or at any point in your time at Goldman

Sachs, would you be able to meet with Khaldoon?

A    No, sir.  As I mentioned, the only person -- my

understanding at the time was the only person who could meet

Khaldoon was our chairman and CEO.  He was a very difficult

person to be able to have a relationship with or even meet.

It was very difficult.  I wouldn't have been able to

penetrate to that level.

Q    In the course of the 1MDB bond transactions in 2012 and

2013, were there any other business leaders who were

similarly situated to Khaldoon -- meaning, you just couldn't

get a meeting with them?

A    Khaldoon was one of them, but also Sheikh Mansour would

---

621

fall into that category of people that somebody like me would

not be able to penetrate to in that context.  Yeah, I think

those would be the two main people.

Oh, sorry.  Hamid Hashemi, who is the CEO of IPIC,

was also very difficult to get to and our Middle Eastern team

had not been able to meet him.  He was the CEO of IPIC.  So,

yeah, in Abu Dhabi there were several individuals like that

who were of that importance.

Q    And through the course of the 1MDB bond transactions in

2012 and '13, how was it that you were ever able to even

connect with those people?

A    It with Jho's help.  Jho was the key person to make that

happen.

Q    Looking back at this email now in 2009, 1544, if we can

go to -- before we turn from this page actually, what was

your understanding as to why Jho Low would have to come to

you all to connect with these people -- Michael Eissner, Jeff

Immelt, and Bernard Arnault?  Why was this a request to you?

A    While Jho had extremely strong relationships in certain

parts of the world -- like obviously Malaysia, Abu Dhabi,

Kuwait, Qatar, and other places in the Middle East, and Asia

also to some extent, like, Thailand he was quite powerful in

as well -- his relationships and his reach did not really go

as far in the Western world; meaning, Europe or the

United States.

---

622

Goldman Sachs on the other hand is one of the

biggest investment banks in the world had those kinds of

relationships.  So Michael Eissner was at Disney.  Disney was

one of our biggest clients out of the Los Angeles office.

General Electric we had as a client since -- for over a

hundred years.  LV was a big client of ours in the European

office.  So, those individuals work for companies and led

companies that we had very strong relationships with that Jho

did not -- was not able to reach.

Q    In the very last paragraph of the defendant's email

there is a reference to arranging a meeting ahead of the PM's

meeting on 4 to 5 June meeting in Beijing?

A    Yes, sir.

Q    Are you aware if there was in fact a meeting in Beijing

after this email?

A    Yes.  There was a meeting in Beijing and there was a

state visit by the Prime Minister to Beijing, which I believe

was the Prime Minister's first official foreign trip after

his election to be prime minister.

Q    That is Prime Minister Najib Razak?

A    That's correct.

Q    Did you go to that meeting?

A    I went to the meeting with Jho Low in Beijing, yes.

Q    Did anyone else from Goldman Sachs go on the trip to

Beijing.

---

623

A    Yes, Roger did.

Q    How was that trip coordinated and organized?

A    Roger coordinated that trip.

Q    Did anyone one interface with Jho Low on the trip?

A    Yes.  Roger and I had -- upon my arrival in Beijing, I

remember that we had a lunch meeting with Jho.

Q    If we can look at Tab 42 and 43 in your binder, sir,

Government Exhibit 1545 and 1548 for identification.

A    Yes, sir.

Q    Do you recognize these documents?

A    Yes.

Q    What are they?

A    They are emails that I was copied in or received.

Q    What did they all relate to?

A    They relate about to setting up meetings in Beijing with

Jho and also government officials.  Mostly Amhari.

MR. ROLLE:  Judge, we would offer Government

Exhibits 1545 and 1548.

MR. AGNIFILO:  No objection, your Honor.

THE COURT:  They are admitted it.

(Government's Exhibits 1545 and 1548 received in

evidence.)

Q    We have both of them up on the screen.

I will direct your attention briefly to 1548.

A    Yes.

---

**A-296**

624

1  Q   The second email from the top is from the defendant?
2  A   That's correct.
3  Q   It's sent to Amhari?
4  A   Yes.
5  Q   That's Amhari that we have talked about?
6  A   Yes, that's correct.  That's the secretary of Prime
7  Minister Najib Razak.
8  Q   Who are the other people it is sent to?
9  A   It is Jho Low; Casey Tang, who again worked with Jho
10 before and was at TIA at the time; Seet; Tiffany; Danny; and
11 Jin-Yong, who was a partner and leader of our Goldman Sachs
12 Beijing office, with a copy to myself and Terence Smith.
13 Q   Who are Seet and Tiffany?
14 A   Seet was an analyst working with Jho -- financial
15 analyst.  And Tiffany I cannot recall.  I believe she was a
16 lawyer in Jho's team, but I cannot be sure.
17 Q   In that email is a reference to:  I would propose we
18 have lunch at the Scene A Cafe lobby at 12:00 noon.
19 A   That's right.
20 Q   What meeting was that a reference to?
21 A   That was a pre-meeting with Jho and team as we arrived
22 in Beijing.
23 Q   In fact, you met with Jho during that trip?
24 A   That's correct, but not in the lobby.  We met at the
25 Chinese restaurant on the ground level of the same China

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

---

626

1  A   Yes.  Upon our arrival, we met in the lobby of the hotel
2  and Roger met Elia.
3  Q   Did he know you were having an affair with Ms. Geneid?
4  A   Yes, he did.
5  Q   Is that something you had told him previously?
6  A   Yes.
7  Q   Did there come a time when you were engaged to Ms.
8  Geneid?
9  A   Yes.
10 Q   Was that at the same time you were still married to Ms.
11 Judy Chan?
12 A   Yes.
13 Q   Did you ever get married?
14 A   No.
15 Q   Now, you said Goldman Sachs had done business in Sarawak
16 at the same time you are having this affair with Ms. Geneid?
17 A   Yes.
18 Q   Did Goldman Sachs have policies related to relationships
19 with relatives of clients or government officials?
20 A   Yes, we did.
21 Q   What would those policies have required you to do.
22 A   Disclosure of my relationship with her.
23 Q   Did you ever disclose that?
24 A   No, not to the control functions, sir.
25 Q   Not to the control functions?

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

---

625

1  World Hotel.
2  Q   Did you travel with anyone else on this trip?
3  A   Yes.
4  Q   Who?
5  A   I traveled with Elia Geneid at the time.
6  Q   Can you say that name again?
7  A   Elia Geneid.
8  Q   Who is that?
9  A   That was my girlfriend at the time.
10 Q   Were you married at the time?
11 A   Yes, sir.
12 Q   Who were you married to?
13 A   Judy Leissner, Judy Chan.
14 Q   So were you having an affair of Ms. Geneid?
15 A   Yes.
16 Q   And who was she, Ms. Geneid?
17 A   She was Malaysian and she was the niece of the chief
18 minister of Sarawak.
19 Q   She was related to a government official?
20 A   She was the niece of the chief minister, yes.
21 Q   At that point had Goldman Sachs done business in
22 Sarawak?
23 A   Yes, we had.
24 Q   On the trip to Beijing with Elia, did the defendant see
25 and meet Elia?

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

---

627

1  A   Yes, sir.
2  Q   Who did you disclose it to?
3  A   Roger and a number of other people, including Andrea
4  Bella, Toby Watson, and other people in our Malaysian --
5  around our Malaysian business, but those three in particular.
6  Q   The bankers?
7  A   Yes.
8  Q   Did your relationship with Ms. Geneid ever benefit you
9  at Goldman Sachs in terms of your work?
10 A   Not directly, sir.  There was one transaction that we
11 did in the state of Sarawak during our relationship which she
12 did not help me get for Goldman Sachs, but we did still -- we
13 didn't require any intermediary at that time because of my
14 relationship with her.
15 Q   Please explain what you mean by you didn't have to have
16 an intermediary because of your relationship?
17 A   During the -- during all the transactions we had done
18 previously in Malaysia, and there were quite a number of
19 transactions we had done very profitably at Goldman and we
20 had done those in the state of Sarawak, in each one of those
21 we always had to involve an intermediary by the name of Mr.
22 Seow.  He worked in a firm called Newfields.  He also was the
23 same person that Roger and I had attended meetings where I
24 first heard about Jho Low.  In each one of those
25 transactions, we had to pay a fee for the work that Mr. Seow

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

**A-297**

628

1  was doing as an intermediary between Goldman Sachs and the
2  state of Sarawak and.  When I had my relationship with Elia,
3  we did one transaction -- one restructuring mandate with the
4  state of Sarawak where we did not have to pay that fee
5  because of my relationship was so well known in the state
6  that there was no need for an intermediary for his role or
7  paying him a fee for that.
8  Q    Was Elia Geneid the only client related person with whom
9  you had an affair during your time at Goldman Sachs?
10 A    No, sir.
11 Q    Who else?
12 A    I had a longstanding relationship with a lady CEO of a
13 media company in Malaysia called Rohana Rozhan.  The media
14 company was called Astro and we had a long-standing
15 relationship stemming from 2003.
16        And I also had an affair with the daughter of the
17 ambassador of Malaysia to U.S. at some point.
18 Q    Who was the second?
19 A    Her name was Anis Jamaludin.
20 Q    You said you had a longstanding relationship with Ms.
21 Rozhan?
22 A    That's correct.
23 Q    How long?
24 A    From 2003 until 2012, '13.
25 Q    Did you ever benefit in your work at Goldman Sachs from

629

1  your relationship you maintained with Rohana Rozhan?
2  A    Not directly.  She was the CEO of Astro, which was the
3  largest media company in Southeast Asia and we, Goldman
4  Sachs, did do work for Astro, two IPOs.  However, my
5  relationship with her did not get us those mandates.  In
6  fact, I would say that my relationship would have been
7  detrimental to that -- to that -- to getting that business
8  because the owner, who I was also close to, Ananda Krishnan
9  was not in favor of this relationship.  So, we still got
10 those mandates despite that relationship I would say.
11 Q    Did you ever tell the control functions at Goldman Sachs
12 about your relationship with Rohana Rozhan?
13 A    I never had a discussion with the control function, sir;
14 but I did have a call from the CEO Goldman Sachs Asia
15 sometime in 2003 I believe after the beginning of my
16 relationship with Ms. Rozhan telling me that I should be
17 careful about this relationship with a client.
18 Q    Did you listen to Mr. Ananda's advice?
19 A    Well, I continued with the relationship for another 10
20 years.
21 Q    Did you tell anyone else at Goldman Sachs about your
22 relationship with Ms. Rozhan?
23 A    Yes.  Pretty much everyone in the Southeast Asia team,
24 including Roger and everybody else in that office.
25 Q    Did you ever tell your wife about these affairs with Ms.

630

1  Geneid or Ms. Rozhan?
2  A    Yes.
3  Q    After the 1MDB bond transactions and your involvement in
4  the criminal scheme, you received a large amount of money for
5  that scheme; right?
6  A    That's correct.
7  Q    Did you spend any of the money you received through the
8  scheme on Ms. Rozhan?
9  A    Yes, sir.
10 Q    How?
11 A    I financed her acquisition of a house in London.
12 Q    How much was the house?
13 A    Approximately $10 million.
14 Q    What happened to the house?
15 A    She -- she lived in and she owned it.  I don't know if
16 that is still the case, but she owned it certainly at the
17 time.
18 Q    Why did you buy her that house at the time?
19 A    Ms. Rozhan was very upset that I was ending our
20 relationship to be with my future wife Kamora and she put it
21 to me that we had spent ten years in a relationship and that
22 if I didn't buy her a house, she would, for example, tell
23 authorities about my involvement in the 1MDB scheme, not that
24 I disclosed all the details to her about that but I did
25 mention to her that I had received money out of that scheme.

631

1  Q    So why did you buy the house?
2  A    Because she was threatening me to expose my involvement
3  and at the time -- this was in 2013 -- I was very fearful of
4  that -- of that.
5  Q    So going back in time of your work after the setup of
6  the TIA, you testified last week, I believe, that the TIA
7  becomes 1MDB at some point?
8  A    During the course of 2009 it becomes 1MDB.  That's
9  correct.
10 Q    Once it became 1MDB, did you pursue business with that
11 entity at Goldman Sachs?
12 A    Yes, we -- Goldman Sachs was -- had set up the -- had
13 helped to set up the entity and we felt that there were --
14 there was a strong relationship as an institution we had as a
15 result of that setup and so we pursued many different
16 opportunities, but I was on the funding side or on the
17 investment side with 1MDB.
18 Q    Who was pursuing those opportunities at the with you?
19 A    The lead coverage banker with 1MDB and therefore the
20 lead on pursuing those transactions was Roger.
21 Q    What role, if any, did Jho Low have in those efforts?
22 A    He was the key person to go to.  He was at the outset
23 and continued to be the key decision-maker at 1MDB.
24 Q    If you could turn to Tab 44 in your binder, and it is
25 Government Exhibit 1560 for identification.

**A-298**

632

1        Do you recognize that document, sir?
2        Do you recognize that document, sir?
3   A    Yes.
4   Q    What is it?
5   A    It's an email between Roger and myself.
6        MR. ROLLE:  Judge, we would offer
7   Government Exhibit 1516 at this time.
8        MR. AGNIFILO:  We have no objection, your Honor.
9        THE COURT:  Admitted.
10       (Government's Exhibit 1560 received in evidence.)
11  Q    What is the date of this email with the defendant?
12  A    It's September 26, 2009.
13  Q    And the first email is from you to the defendant; right?
14  A    That's correct.
15  Q    You say, Let's get one more trade done.  Best would be
16  MOF trade.  What other ones can we do in October?  Taliworks?
17  K & M?  Any other one?
18  A    Yes.
19  Q    The defendant responds to that?
20  A    Yes.  He gives me --
21  Q    What are you guys talking about?
22  A    As we are approaching year end -- at the time in general
23  I did this with all the other bankers covering countries like
24  Malaysia, Singapore, etc.  As it was coming to the year end,
25  I was trying to see if we were able to do more -- a few more

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

633

1   transactions before we closed off our revenues on those
2   transactions.  So I was basically chasing the bankers who
3   were working for me at the time to see what else was doable
4   for the rest of the year.
5        I made some suggestions to Roger at this time of
6   things that I thought could be possible candidates for those
7   transactions, and he responds with his list that he thought
8   may be doable again before year end.
9   Q    One of those was another engagement with the TIA?
10  A    That's correct.
11  Q    The last bullet in his list?
12  A    Yes.  The TIA equity investment.
13  Q    You respond, Yes, that's the spirit?
14  A    That's correct.
15  Q    And in response to your email looking at the second
16  paragraph, the defendant writes, Met with Jho.  He will get
17  us a date for week of October 19th for presentation to PM.
18       That's prime minister of Malaysia?
19  A    That's correct.
20  Q    He says, Saudi Petroleum will set up JV with 1MDB to
21  co-invest $1 billion.  Saudi Petroleum will invest US
22  $2 billion.  This arose from PM Saudi visit?
23  A    Yes, sir.
24  Q    At this time what was your understanding about how the
25  defendant had any of this information about potential --

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

634

1   these potential business deals?
2   A    I -- by meeting with Jho and having a dialogue with Jho
3   on an ongoing basis.
4        What he is describing here is very confidential.
5   Wouldn't necessarily be known to outsiders.  For example, I
6   didn't know these facts before Roger reported them back to
7   me, but they stem from his discussion with Jho and Jho's
8   knowledge.
9   Q    That information would include -- it says a JV with
10  1MDB?
11  A    That's correct, yes.
12  Q    What is a JV?
13  A    It's a joint venture.  It is when two companies come
14  together and form a new company that they would jointly own.
15  Q    What was Saudi Petroleum?
16  A    Saudi Petroleum was and still is one of the largest
17  companies in the world, a Saudi Arabian state owned oil and
18  gas company.  It basically owns the oil reserve -- oil and
19  gas reserves of the country of Saudi Arabia.
20  Q    How large of a potential transaction is the defendant
21  reporting to you here?
22  A    Well, he is talking about several billion dollars'
23  worth.  I cannot exactly say whether it is two or three, but
24  somewhere between 2 and $3 billion here that we are talking
25  about.  It is a joint venture between one of our biggest

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

635

1   potential clients in the world, 1MDB, that we had just set
2   up.  This would have been an extremely attractive business
3   for Goldman Sachs.
4   Q    What was your reaction to the defendant's report from
5   Jho Low about 1MDB contemplating a billion-dollar transaction
6   in 2009?
7   A    I mean, that's very significant use, sir.  That would --
8   that ranks very high on the list of business that we would
9   want to do.  Again, number one, the size.  Anything above a
10  billion was certainly attractive.  Our threshold at Goldman
11  was probably $300 million upwards that made that transaction
12  attractive.  Here, we are talking several billion dollars and
13  we are talking about Saudi Petroleum, which again was -- was
14  and is one of the largest companies in the world.  So,
15  extremely important if there was a joint venture between 1MDB
16  and Saudi Petroleum.
17  Q    The defendant said in the third paragraph, I have
18  requested to advice JV once it is set up.
19  A    That's right.
20  Q    What did you understand him to be reporting?
21  A    My understanding is that he is saying -- he requested
22  from Jho that we would -- that he wanted to get Goldman Sachs
23  to be the adviser on this setup of the joint venture and the
24  investment -- the several-billion dollar investment.
25  Q    In 2009 up to that point had any entity in Malaysia

*Jennifer Thun, CSR, RPR, RMR*
*Official Court Reporter*

**A-299**

636

1  completed a transaction of that size internationally?
2  A    Not to my knowledge internationally.  Clearly Malaysian
3  companies weren't able to do billion-dollar type of
4  transactions, but there was no precedent in the country that
5  would rival this kind of transaction.  I say that again
6  because of the size on the one hand, but also the fact that
7  it was a teaming up with Saudi Petroleum, which is just an
8  enormous opportunity as a client for Goldman.
9  Q    Had any Malaysian sovereign wealth fund undertaken a
10 transaction of that size?
11 A    Not that I am aware.
12 Q    Had any sovereign wealth fund it in Southeast Asia
13 undertaken transactions of that size?
14 A    In Southeast Asia, sir, the only other one that was
15 doing transactions in this size was another really important
16 client of Goldman Sachs called Temasek.  It was a sovereign
17 wealth of Singapore.
18 Q    At the time of this email, how long had Temasek existed
19 in Singapore?
20 A    It had existed for decades, sir.  It was the owner on
21 behalf the Government of all the Singapore lead companies
22 like Singapore Airline, Singapore Power, the port, etc.  It
23 was a very significant company.  I think it estimated over
24 200 billion, and it was really the Government ownership in
25 many of these companies.

637

1  Q    At the time of this email, how long had 1MDB existed?
2  A    Three months -- six months.
3  Q    Just briefly again in the last paragraph there is a
4  reference again Mubadala?
5  A    Correct.
6  Q    That is again the Abu Dhabi based sovereign wealth fund?
7  A    Totally.  The description of this particular project is
8  also highly attractive Goldman Sachs business that Jho was
9  discussing there, a joint venture intent with 1MDB, and the
10 Government giving 10 billion ringgit to 11MDB was very large.
11 Ten billion ringgit was about two and a half billion dollars
12 at the time in U.S. dollars.  So again a two and a half
13 billion dollar JV with Mubadala, the sovereign wealth fund of
14 Abu Dhabi, became highly attractive business.
15 Q    These are potential transactions of Jho Low's reported
16 that are being reported to you?
17 A    That's right.
18 Q    Did any of these happen?
19 A    The first transaction you described, this joint venture
20 with Saudi Petroleum did not end up being a joint venture
21 with Saudi Petroleum.  It ended up being a joint venture with
22 PetroSaudi, not to be confused.  It is a much smaller and
23 younger entity than Saudi Petroleum.
24 Q    Did you or Goldman Sachs have any involvement in the
25 joint venture between PetroSaudi and 1MDB?

638

1  A    No, we did not.
2  Q    Did you try and get involved with that JV setup?
3  A    Yes, we did.  We tried to get involved in it, yes, sir.
4  Q    But you weren't successful?
5  A    We weren't successful.
6  Q    Did you ever subsequently seek business from the
7  PetroSaudi 1MDB joint venture or related to PetroSaudi 1MDB
8  joint venture?
9  A    Yes, we did.
10 Q    Who is "we"?
11 A    Roger and I.  Roger in particular.  It was became known
12 in the market, Roger reported this back to me, that 1MDB
13 had set up a $1 billion joint venture with PetroSaudi and had
14 in fact made the investment of a billion dollars in this
15 joint venture.
16      At the time we thought the one -- Roger and I
17 discussed this at our office in Kuala Lumpur with a gentleman
18 named Dr. Heuchling, I believe, who was our chair from
19 Malaysia.  We wanted to potentially do a foreign exchange
20 business for the billion dollar investment by 1MDB and
21 PetroSaudi.  That would have been maybe not as an attractive
22 business, but it was still attractive not for us to want to
23 do that.
24 Q    In connection with your discussions about this potential
25 foreign exchange business with PetroSaudi 1MDB joint venture,

639

1  did you ever discuss issues at PetroSaudi and 1MDB?
2  A    Yes.
3  Q    Who did you discuss that with?
4  A    Roger.  When it became known that 1MDB had made that
5  $1 billion investment, Roger relayed back to me what he had
6  heard about how that money was invested.  You have to
7  understand in 2009 Malaysia still had capital controls in
8  place, which would require an investment of that size to be
9  approved by Bank Negara in terms of the money leaving the
10 country.
11 Q    Who had to approve money leaving the country of Malaysia
12 back then?
13 A    An institution called Bank Negara.  It is the central
14 bank of Malaysia.  The Federal Reserve equivalent in
15 Malaysia.  They would have to approve a billion dollars
16 leaving Malaysia basically.  And what Roger reported back to
17 me was that he had heard that the money had left over night,
18 the country.  A billion dollars was wired overnight to
19 Malaysia to the joint venture and that it had been done
20 because the husband of the then Governor Zeti at Bank Negara
21 had received a bribe to make that happen.  So overnight that
22 money was transferred, which was unprecedented at that time.
23 No approval was obtained that quickly with Bank Negara.
24 Q    When the defendant was telling you this, did he tell you
25 why he believed that that had happened?

**A-300**