# 23-6333

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LOW TAEK JHO, AKA JHO LOW,

*Defendant,*

NG CHONG HWA, AKA ROGER NG,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

ALEXANDRA A.E. SHAPIRO
THEODORE SAMPSELL-JONES
AVERY D. MEDJUCK
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................iv

INTRODUCTION.................................................................................................1

JURISDICTIONAL STATEMENT.......................................................................3

ISSUES PRESENTED .........................................................................................3

STATEMENT OF THE CASE .............................................................................4

    A. Background ................................................................................................4

    B. Ng's Trial ..................................................................................................6

        1. Leissner's Testimony ...........................................................................7

        2. Lim's Testimony................................................................................11

        3. Other Evidence Of Ng's Involvement Was Equivocal At Best..............14

            a. Personal And Professional Relationship With Low ...........................14

            b. Ng's Attendance At Deal Planning Meetings...................................17

        4. Summations ......................................................................................20

    C. Conviction And Sentence..........................................................................22

SUMMARY OF ARGUMENT ............................................................................22

STANDARDS OF REVIEW ...............................................................................24

ARGUMENT .....................................................................................................24

I. THE DISTRICT COURT ERRONEOUSLY EXCLUDED CRITICAL
   DEFENSE EVIDENCE CORROBORATING LIM'S TESTIMONY THAT
   THE $35.1 MILLION WAS PROCEEDS OF AN INVESTMENT .................24

    A. Background ................................................................................................25

1. Recorded Call Between Lim And Leissner ............................................25

2. District Court Ruling ....................................................................27

B. The District Court's Ruling Was Erroneous ...................................29

1. Inquiries Are Not Assertions, So Are Not Hearsay ................................29

2. Inquiries Are Not Hearsay Even If They Demonstrate The Declarant's Underlying Assumptions ...........................................................31

3. Because Both Lim And Leissner Testified, Admitting The Recording Presented No Hearsay Dangers..................................................33

4. Hearsay Exceptions Applied To Portions Of The Conversation ............35

5. Wholesale Exclusion Of The Recording Was Unjustified ....................36

C. The Error Was Not Harmless..........................................................38

II. THE GOVERNMENT VIOLATED ITS AGREEMENT WITH NG BY SUPERSEDING NEW OFFENSES INTO THE INDICTMENT....................42

A. Background ...................................................................................42

1. The Agreement ........................................................................42

2. The Motion To Dismiss ............................................................44

B. The Government Violated The Agreement.....................................46

1. The Agreement Expressly Prohibited The Government From Superseding To Add New Facts And Theories .......................................46

2. Any Ambiguity In The Agreement Must Be Construed Strictly Against The Government........................................................49

III. VENUE WAS IMPROPER .............................................................52

A. Background ...................................................................................53

B. The Allegations Were Insufficient To Confer Venue
In The Eastern District ................................................................... 54

IV. THE $35.1 MILLION FORFEITURE JUDGMENT WAS
UNCONSTITUTIONAL AND UNAUTHORIZED BY STATUTE ............. 58

A. Background ..................................................................................... 58

B. The Forfeiture Was Unconstitutionally Excessive ........................ 59

C. Forfeiture Money Judgments Are Not Authorized By The Applicable
Statutes ......................................................................................... 60

CONCLUSION ................................................................................... 61

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Barikyan v. Barr*,
  917 F.3d 142 (2d Cir. 2019)................................................................47

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ........................................................................33

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
  746 F.3d 42 (2d Cir. 2014).................................................................24

*Dobbs, Inc. v. Loc. 614, Int'l Broth. of Teamsters*,
  813 F.2d 85 (6th Cir. 1987)................................................................47

*Filner v. Shapiro*,
  633 F.2d 139 (2d Cir. 1980)...............................................................52

*Koon v. United States*,
  518 U.S. 81 (1996) ..........................................................................24

*Lexington Ins. Co. v. W. Penn. Hosp.*,
  423 F.3d 318 (3d Cir. 2005)..........................................................30, 32

*Plaster v. United States*,
  720 F.2d 340 (4th Cir. 1983)..............................................................46

*Quartararo v. Hanslmaier*,
  186 F.3d 91 (2d Cir. 1999).................................................................29

*Torry v. City of Chicago*,
  932 F.3d 579 (7th Cir. 2019)..............................................................31

*United States v. Alcorta*,
  853 F.3d 1123 (10th Cir. 2017)...........................................................30

*United States v. Bajakajian*,
  524 U.S. 321 (1998) ........................................................................59

*United States v. Beech–Nut Nutrition Corp.*,
  871 F.2d 1181 (2d Cir. 1989)..............................................................57

iv

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990)...................................................................38

*United States v. Blum*,
    62 F.3d 63 (2d Cir. 1995)......................................................................38

*United States v. Brennan*,
    183 F.3d 139 (2d Cir. 1999)............................................................55, 57

*United States v. Cain*,
    671 F.3d 271 (2d Cir. 2012)...................................................................33

*United States v. Calonge*,
    --F.4th--, 2023 WL 4535754 (2d Cir. July 14, 2023) ..........................56

*United States v. Cook*,
    668 F.2d 317 (7th Cir. 1982)..................................................................52

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012).....................................................................30

*United States v. Corsentino*,
    685 F.2d 48 (2d Cir. 1982).....................................................................52

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012)...................................................................55

*United States v. Deitrich*,
    865 F.2d 17 (2d Cir. 1988).....................................................................32

*United States v. Hamdi*,
    432 F.3d 115 (2d Cir. 2005).........................................................48, 49, 51

*United States v. Harris*,
    733 F.2d 994 (2d Cir. 1984)...................................................................36

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010)...................................................................33

*United States v. Kirk Tang Yuk*,
    885 F.3d 57 (2d Cir. 2018).............................................................55, 56

*United States v. Kuthuru,*
    665 F. App'x 34 (2d Cir. 2016)................................................30

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016) ..................................................57

*United States v. Lawlor,*
    168 F.3d 633 (2d Cir. 1999)................................................46

*United States v. Levesque,*
    546 F.3d 78 (1st Cir. 2008) ................................................60

*United States v. Lewis,*
    902 F.2d 1176 (5th Cir. 1990)..............................................30

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015)..........................................24, 38

*United States v. Long,*
    905 F.2d 1572 (D.C. Cir. 1990) .....................................30, 32

*United States v. McPartlin,*
    595 F.2d 1321 (7th Cir. 1979)..............................................33

*United States v. Mergen,*
    764 F.3d 199 (2d Cir. 2014)................................................49

*United States v. Nejad,*
    933 F.3d 1162 (9th Cir. 2019)..............................................61

*United States v. Oguns,*
    921 F.2d 442 (2d Cir. 1990)................................................29

*United States v. Ojudun,*
    915 F.3d 875 (2d Cir. 2019)................................................36

*United States v. Padilla,*
    186 F.3d 136 (2d Cir. 1999)................................................49

*United States v. Pelletier,*
    898 F.2d 297 (2d Cir. 1990)................................................46

*United States v. Pulliam*,
   973 F.3d 775 (7th Cir. 2020).................................................................30

*United States v. Purcell*,
   967 F.3d 159 (2d Cir. 2020)................................................................34

*United States v. Rauscher*,
   119 U.S. 407 (1886).............................................................................45

*United States v. Reed*,
   773 F.2d 477 (2d Cir. 1985)................................................................57

*United States v. Rivera*,
   780 F.3d 1084 (11th Cir. 2015)..........................................................30

*United States v. Rodriguez*,
   553 U.S. 377 (2008).............................................................................47

*United States v. Rodriguez-Moreno*,
   526 U.S. 275 (1999).......................................................................54, 58

*United States v. Stearns*,
   479 F.3d 175 (2d Cir. 2007)................................................................24

*United States v. Stewart*,
   907 F.3d 677 (2d Cir. 2018)................................................................34

*United States v. Strother*,
   49 F.3d 869 (2d Cir. 1995)..................................................................34

*United States v. Surgent*,
   No. 04-CR-364 (JG), 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009).................61

*United States v. Thomas*,
   451 F.3d 543 (8th Cir. 2006)..............................................................30

*United States v. Tzolov*,
   642 F.3d 314 (2d Cir. 2011)..........................................................24, 54

*United States v. Varrone*,
   554 F.3d 327 (2d Cir. 2009)................................................................24

*United States v. Viloski*,
   814 F.3d 104 (2d Cir. 2016)..........................................................59, 60

*United States v. Wright*,
   343 F.3d 849 (6th Cir. 2003)................................................................30

*United States v. Zenni*,
   492 F. Supp. 464 (E.D. Ky. 1980) ...............................................31, 32

*Williamson v. United States*,
   512 U.S. 594 (1994) ...........................................................................36

**Statutes and Rules**

15 U.S.C. §78dd-3 ...........................................................................4

15 U.S.C. §78ff ................................................................................4

15 U.S.C. §78m ...............................................................................4

18 U.S.C. §1956 ..............................................................................4

18 U.S.C. §3231 ..............................................................................3

18 U.S.C. §981 ..............................................................................60

18 U.S.C. §982 .........................................................................60, 61

21 U.S.C. §853 ..............................................................................61

28 U.S.C. §1291 ..............................................................................3

28 U.S.C. §2461 ............................................................................60

Fed. R. Crim. P. 12 .......................................................................55

Fed. R. Evid. 106 ..........................................................................37

Fed. R. Evid. 403 ..........................................................................39

Fed. R. Evid. 613 .....................................................................34, 35

viii

Fed. R. Evid. 801 ................................................................29, 31, 32, 34

Fed. R. Evid. 803 ..............................................................................35, 36

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ................................................47

Extradition Treaty Between the Government of the United States
    of America and the Government of Malaysia, Malay.-U.S.,
    Aug. 3, 1995, T.I.A.S. No. 97-602 ........................................................50

*Federal Evidence* §8:73 (4th ed. July 2022) ..........................................35

*Webster's Third New International Dictionary* (1981) ...........................47

*Wigmore on Evidence* §1018 (3d ed. 1940) ...........................................33

*Williston on Contracts* §32:11 (4th ed.) ....................................48, 49, 50

## **INTRODUCTION**

The charges against defendant-appellant Roger Ng arose out of the 1MDB scandal, a massive fraud and bribery scheme perpetrated on the Malaysian sovereign wealth fund. The government alleged that the scheme was hatched by Jho Low, who worked with Tim Leissner and Ng, both investment bankers at Goldman Sachs. Leissner cooperated with the government and was the government's star witness against Ng, his subordinate. The case attracted worldwide attention, and many commentators questioned why Ng—a small fish compared to Low and Leissner—was the only person tried. The more important questions for this Court's consideration are whether the trial was fair, and why Ng was prevented from presenting his most powerful piece of exculpatory evidence.

As became clear through days of testimony, the number and scope of Leissner's lies were truly stunning. Despite his undisputed mendacity, the government asked the jury to convict Ng based largely on Leissner's testimony. Leissner testified that Ng was a willing participant in the scheme and had accepted a $35.1 million kickback, which was the centerpiece of the government's case. The defense, by contrast, rested substantially on Ng's wife, Hwee Bin Lim, who testified that the $35.1 million was the return on an investment she had made with Leissner's wife in China.

The jury struggled to determine whose version of events to believe. Early in its deliberations, it asked to review Lim's entire testimony. It then deliberated for over two more full days before reaching a verdict.

But the jury never saw the single most important piece of evidence proffered by the defense: an FBI-recorded video call between Leissner and Lim. In the recording, Lim requested Leissner's assistance in locating documents relating to her prior investment with Leissner's wife—documents that would have established that the $35.1 million was the return on her investment. Rather than responding with incredulity or denying that such documents existed, as would be expected if the investment was a fabricated cover story, Leissner agreed that Lim could contact his wife regarding the documents. The recording thus contradicted Leissner's testimony and corroborated Lim's. But the district court excluded it on utterly dubious hearsay grounds. That error fatally undermined Ng's defense.

The manner in which the case was brought was also flawed. The government obtained Ng's agreement to waive extradition by promising to try him only on the "offenses" alleged in the initial indictment. Once Ng was in the United States, however, the government reneged and impermissibly superseded twice to clean up fundamental errors in the initial indictment. Venue was also improper, as none of the essential criminal elements occurred in the Eastern District of New

2

York. Indeed, virtually all of the conduct occurred abroad, and what little did take place in this country occurred outside the District.

Finally, the district court illegally imposed a massive $35.1 million forfeiture money judgment, even though Ng and his family had *already* forfeited all the alleged proceeds of the crime, and more. That forfeiture order violated the Excessive Fines Clause.

The judgment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. The judgment of conviction was entered on March 24, 2023. (SPA-223). Ng filed a notice of appeal on April 5, 2023. (A-1220). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1. Whether the district court erred by excluding as hearsay a recorded video call between the government's key witness and the defense's key witness.

2. Whether the government violated its extradition agreement with the defense by twice superseding the indictment to add additional theories of the offenses.

3. Whether venue was proper.

3

4.      Whether the forfeiture money judgment violated the Eighth

Amendment.

## STATEMENT OF THE CASE

### A.      Background

Ng was charged and convicted of (1) conspiracy to commit bribery in

violation of the FCPA, 15 U.S.C. §§78dd-3 & 78ff(a); (2) conspiracy to

circumvent internal accounting controls in violation of the FCPA, *id*.

§§78m(b)(2)(B), 78m(b)(5), & 78ff(a); and (3) conspiracy to commit money

laundering, 18 U.S.C. §1956(h).

The charges arose out of a bribery and kickback scheme orchestrated by a

famous international businessman and playboy named Jho Low.  1Malaysia

Development Berhad ("1MDB") was a Malaysian sovereign wealth fund

established to invest government funds in sustainable development projects and to

alleviate poverty in Malaysia.

Through three transactions in 2012 and 2013, 1MDB raised $6 billion in

debt financing to purchase energy and infrastructure assets.  In the first, Project

Magnolia, which closed in May 2012, 1MDB raised $1.5 billion to purchase

several power plants, the Tanjong Energy assets.  The second, Project Maximus,

raised $1.6 billion dollars in the fall of 2012 to purchase the Genting Berhad

energy assets. The third, Project Catalyze, raised $3 billion in the spring of 2013 to fund a joint venture with a Middle Eastern investment firm.

Goldman Sachs served as underwriter and advisor for each transaction. The transactions also involved International Petroleum Investment Company ("IPIC"), the United Arab Emirates' sovereign wealth fund. IPIC was much larger than 1MDB, and had better credit, so IPIC was guarantor for the bonds.

Of the $6 billion, over $1 billion was diverted to pay bribes and kickbacks, mostly to government officials in Malaysia and Abu Dhabi to ensure their permission. For example, several hundred million dollars were paid to Malaysian PM Najib Razak and his family. Similar amounts were paid to Khadem Al-Qubaisi, the managing director of IPIC. Lesser amounts were paid to other 1MDB, IPIC, and government officials. The payments were disguised as bond guarantee payments and routed through various bank accounts.

Jho Low planned all of this. Low had for years worked as an intermediary and fixer for major businessmen and sovereign wealth funds in Asia and the Middle East. He cultivated relationships with government officials in various countries, in part by throwing absurdly lavish parties with Hollywood celebrities, sports stars, and models. Low himself siphoned hundreds of millions in kickbacks from 1MDB. The undisputed mastermind of the scheme, Low has not been prosecuted and remains a fugitive.

5

### B.    Ng's Trial

The existence of the scheme was not disputed at trial.  What was disputed was whether Ng participated in it.  Ng was a banker at Goldman's Singapore office; Leissner was a Goldman partner.  Like Low, Ng is Malaysian.  He got to know Low several years before the 1MDB transactions and eventually introduced Low to Leissner.  Collectively, they worked together on various business deals, ultimately leading to the 1MDB transactions.

But Ng's own involvement with the transactions was limited in various ways.  He was indisputably junior to Leissner.  Ng did not attend numerous several key meetings leading up to the deals.  (Indeed, the overall structure of this prosecution is unusual, since Leissner—the government's star witness—essentially "flipped down" to help convict a lesser player.)  The government nonetheless contended that Ng was a central player in the conspiracy.

The core dispute at trial focused on a series of payments totaling $35.1 million from Leissner's family to Ng's family.  The government alleged that those payments were a kickback from the 1MDB transactions and that Ng's receipt of those funds proved his membership in the conspiracy.  The defense countered that the payments were unrelated to 1MDB and were proceeds of an investment.

The government's theory of the case and the $35.1 million payment was based on Leissner's testimony.  The defense's theory of the case and the payment

was based on the testimony of Ng's wife, Hwee Bin Lim. These two were by far the most important witnesses at trial. Their testimony totaled approximately 2,500 transcript pages, over half of the trial. And they told starkly different versions of events.

1.  Leissner's Testimony

Leissner was the government's star witness. Like all cooperators, his credibility was questionable since he was trying to save himself. But beyond that, Leissner was exposed as a pathological liar—his lies were truly extraordinary and far-reaching. Among other things, he was a serial philanderer and serial bigamist—he twice created false divorce documents so he could illegally re-marry and posed as his ex-wife in emails with his then-current wife. When the 1MDB scandal broke, after a failed attempt to flee to a non-extraditing country, he sought to cooperate and falsely tried to place the blame entirely on others, including his ex-wife. His story changed over the years and over dozens of meetings with investigators. His trial testimony veered between preternaturally specific recollections and total failure of memory on key points. And, as explained below, his recollections were at times flatly contradicted by other evidence.

Nonetheless, the government depended on Leissner's say-so to prove Ng was knowingly involved in the bribery scheme; Leissner provided the only direct evidence of Ng's participation. Leissner testified that Ng was involved in planning

7

the illegal scheme and knowingly accepted $35.1 million as a kickback for his role in shepherding the 1MDB deals. The claim that Ng took this kickback was the lynchpin for the government's argument that Ng was a knowing participant in the scheme, and critical to the outcome of the case.

Leissner, a German and Brazilian citizen, was Goldman's head of investment banking for Southeast Asia. (A-234). He was one of only 300 or 400 partners worldwide. (A-235). Ng was his junior, working in several positions, including as head of investment banking for Malaysia from 2009 to 2010. In that role, Ng reported directly to Leissner. (A-242). Ng knew Jho Low, and in early 2009, introduced Leissner to Low. (A-284). Leissner liked Low and was excited about possibly working with him—he knew Low was a potential source of deals. (*Id.*). Low had connections to important businessmen and politicians in the Middle East and Asia, including the head of Abu Dhabi's sovereign wealth fund and the Prime Minister of Malaysia. (A-294-97).

In early 2012, they learned that Tanjong—a Malaysian energy company— planned to sell its power assets in a potential multi-billion-dollar deal. (A-244-47; A-339). Leissner testified that he, Ng, and Low saw an opportunity for 1MDB to buy the assets. (A-339-41). They pitched the deal to 1MDB officials, who were receptive. Other investment banks sought to get involved, but 1MDB chose Goldman, in part based on Low's recommendation. (A-344). The deal was

complicated. 1MDB did not have sufficient funds to cover the entire purchase, so some debt financing was required, and Low suggested involving IPIC, the Emirati sovereign wealth fund. (A-347). Numerous approvals were needed from various officials and agencies for both the financing and other aspects of the deal. (A-356-57). Eventually, the deal came together.

Leissner claimed that at a key meeting in February 2012, Low outlined bribes and kickbacks necessary to complete the deal. Leissner testified that he and Ng met at Low's apartment in London with Low and several key 1MDB executives. (A-358). The purpose of the meeting was to discuss Goldman's underwriting approval process. According to Leissner, during the meeting Low drew a chart with Malaysian officials on one side and Emirati officials on the other, and said each would need to be paid. (A-360). Leissner said he was not particularly surprised, because he had worked in Asia for a long time, and "bribes and kickbacks had to be paid for a very major transaction in that part of the world." (*Id.*). Leissner understood that Low would pay the bribes and kickbacks. (A-362).

Leissner testified that at the end of the meeting, Low said he and Ng would receive kickbacks. (A-360-61). After the meeting, the group went out to dinner. According to Leissner, after dinner, he and Ng walked back to Leissner's hotel together and discussed the fact that they would be receiving the kickbacks, which pleased them both. (A-362-63).

9

Leissner's account of Low's supposed bribery chart and the alleged post-dinner walk were both heavily discredited. The bribery chart was a vivid and unforgettable part of the story, but Leissner never told investigators about the chart until years into his cooperation. (A-535-56). His testimony about the attendees was also unreliable—he incorrectly insisted, for example, that Nik Faisal was present. (A-362; A-750). And while he initially offered a detailed story about his post-dinner walk with Ng, records showed they stayed at different hotels, that Leissner and Ng separately flew out of Heathrow that night, and that Ng left for the airport early in the evening. (A-537-38; A-750-51). Leissner could not explain how his story was possible given those records.

After the London meeting, Leissner testified that he, Low, Ng, and others continued to work hard to close the deal. Among other things, they worked to obtain the necessary internal committee approvals at Goldman. Throughout this process, Leissner said, they misled Goldman about various aspects of the deal, including Low's involvement and the purpose of the "credit guarantee fee," which was to be used to pay bribes. (A-368-70). Leissner testified that Ng was a key player in this, though, as discussed below, he admitted Ng did not attend numerous important meetings.

Leissner testified he and Ng received the kickbacks that Low had promised. According to Leissner, Low, who took $1.4 billion for himself, wired money into

10

an account in the name Capital Place, which Leissner set up in his wife Judy's name to receive the 1MDB funds. Leissner received over $70 million and claimed Ng received $35.1 million. (A-421; A-985). Leissner testified that Ng's payments were initially sent to the Capital Place account, and he and Judy then forwarded them on to the Victoria Square/Silken Waters account that Lim and her mother had set up. (A-387; A-389-91). Leissner also testified that he and Roger discussed a "cover story": if ever questioned, they would say the payments were for an investment in Judy's family business. (A-388). However, Leissner did not discuss this "cover story" with investigators until years into his cooperation. (*See* A-682).

### 2. Lim's Testimony

Ng's wife Lim testified on his behalf and provided the foundation of the defense. She testified that the $35.1 million in payments were a return on an investment she had made several years prior with Leissner's wife Judy.

Lim is a Malaysian citizen of ethnic Chinese descent. (A-798). She met and started dating Ng when they were both students in London in 1990. (A-800). Around that time, she met another ethnic Chinese man named Kim Sung, who became part of their social circle. (A-801). He had established businesses in China and also engaged in foreign currency trading, in part as a way around the strict capital controls imposed by the Chinese government. (A-801-02). Several

11

years later, Lim met with Kim Sung in Hong Kong and discussed the possibility of investing with him. (A-802-03).

Lim believed investing in China could be very profitable given the country's growth, but also knew it was difficult. She needed someone she could trust, and someone with government connections, which Kim Sung had. (A-803-05). She did not expect any documentation or formal contract for the investment, since as a non-Chinese citizen, she would be unable to enforce a contract within China anyway. (A-805-06). She testified that this sort of arrangement was common in Asia. She and her family invested approximately 500,000 pounds in the late 1990s. (A-804-806). The investment did well. By 2005, when Kim Sung was ready to wind up the investment, it had grown to approximately 48 million renminbi, or $6 million. (A-808-09).

In the meantime, Lim and Ng had gotten married. They lived together in Hong Kong. Earlier in 2005, Ng left his job at Deutsche Bank and began working at Goldman Sachs, reporting to Leissner. Lim met Leissner and his wife Judy Chan. The four of them met for meals socially, and Lim became friends with Judy. (A-807-08). Lim was impressed with Leissner and Judy, and she knew that Leissner was very well connected and respected in the local business community.

When she learned that her investment with Kim Sung was about to yield a substantial return, Lim called Judy for advice about how to repatriate the money,

12

because she knew Judy's family had businesses established in China. (A-808-09). Judy initially suggested her family hold the money in China while she and Lim tried to repatriate it. Later, Judy offered Lim an opportunity to invest in her family's extensive businesses in China. (A-809-10). She and Judy had several subsequent conversations about it, and Judy promised 20-25% returns. Lim felt very confident in the investment based on her friendship with Judy and Judy's extensive business connections—bolstered by the fact Leissner was a partner at Goldman, the world's leading investment bank. (A-810-12).

Lim proceeded to invest approximately $6 million in Judy's family businesses in China. She testified that after making the investment, she received a two-page letter from Judy with an acknowledgment that the funds had been received. (A-812).

In subsequent years, although she visited one of the business's vineyards in China, Lim did not receive regular updates from Judy regarding the investment. That was because their social relationship became strained over Leissner's (many) extra-marital affairs. For example, when Lim and Ng began to have dinner occasionally with Leissner and Rohana Rozhan, one of Leissner's girlfriends, Judy called Lim and confronted her, accusing her and Ng of helping cover Leissner's affairs. (A-813; A-815). Judy suggested that it would be best if Lim divested her interest in Judy's family business. (A-815).

13

In 2012, Judy informed Lim that she would be returning the investment, which had grown since its initiation, and the first payment would be approximately $26 million. (A-816). Lim created an account to receive the investment funds and named it Victoria Square, after her and Ng's daughter. (A-817-18).

### 3. Other Evidence Of Ng's Involvement Was Equivocal At Best

Much of the case boiled down to a credibility contest between Leissner and Lim. The government attempted to corroborate his testimony with documentary evidence, including emails and travel records, but the evidence on these points was at best ambiguous. For example, the government relied heavily on the fact that Leissner and Ng used personal email accounts to communicate about 1MDB and that Ng deleted some accounts later. But the evidence suggested that the use of such personal emails was fairly common for other deals as well, despite Goldman's policy against employees' using personal emails to communicate about company business. (A-226).

#### a. *Personal And Professional Relationship With Low*

The government tried to show that Ng was the primary point of contact for Low. It presented evidence that Ng met Low first and that Ng and Low had a business and social relationship in 2009 and 2010, which included Ng taking a trip on Low's yacht. The government cited evidence that before the 1MDB deal Ng had endorsed Low to become a client of Goldman's exclusive private client

14

services. But the evidence regarding that "endorsement" was equivocal. In fact, documentary evidence showed Ng advised caution to Goldman's review team—he told them not to accept Low's financial disclosures at face value. (A-760-61; A-1137; A-1139-42). And Goldman witnesses testified that it was primarily other people, not Ng, who unsuccessfully lobbied for Low. (A-764-75; A-769).

More importantly, while it was true that Ng knew Low first, Leissner largely took over the relationship by 2012, when the 1MDB deal started to come together. One particularly salient example of this had to do with Low's infamous 30th birthday party in Vegas in 2012. Leissner initially testified that he was absolutely certain Ng had attended. (A-601). He told investigators very specific stories about Ng's attendance, including that he and Ng were in a room with Benicio Del Toro when they saw Low emerge from a room with Kate Upton. (A-602). But various documents proved that while Leissner attended the Vegas birthday party, Ng had not. (*E.g.* A-232; A-1192-96). The government admitted in closing that Leissner was "mistaken" in his memory of the party. (A-974).

Vegas aside, the trial evidence made clear that in 2012 and beyond, Leissner, Low, and others started to cut Ng out of the loop. In December 2010, long before the 1MDB deals, Ng transferred to a different division and no longer worked directly under Leissner. And while Leissner claimed that he still worked closely with Ng, he admitted that Ng became less and less involved in the three successive

15

deals over the course of 2012. Leissner admitted that after the 1MDB deals, he continued to communicate and meet with Low on follow-up work and other deals—without Ng's involvement. (*E.g.*, A-644-47; A-652-53; A-655-572). When Ng received Low's emails, it was often because Leissner forwarded them to him after the fact. (A-780-82).

In a May 2012 chat with Terence Geh—a senior 1MDB executive—Low said he hadn't spoken with Ng, and then went on to instruct Geh what to tell Ng. Low appeared to express some frustration with Ng's work. (A-1185-91; A-783-84). Leissner and Low met repeatedly without Ng as 2012 progressed, including in London in August and October, while Ng's travel with Low entirely ceased. (A-792-95; *see also* A-749-50; A-752-57). In November 2012, Ng and Leissner both traveled to Hong Kong. Low was there at the same time, and the evidence suggests Leissner secretly met with Low—without including or even informing Ng. (A-795-96). Leissner texted another meeting attendee and said: "Please don't tell Roger about our meeting with [Low.]" (A-1210). When Leissner organized a meeting in New York in September 2013 with PM Najib Razak, Goldman leaders, and others, in part to build on the success of the 1MDB deals, he excluded Ng. In fact, when Ng asked Leissner's assistant to include him, Leissner rejected the idea. (A-796-97).

16

In sum, while Ng knew Low first, during the time that the 1MDB deals were being executed, Leissner was the primary contact.

### b. Ng's Attendance At Deal Planning Meetings

In order to bolster its case that Ng was a key player in the scheme, the government noted that Ng attended some important meetings as the deal was getting set up. The government pointed to four supposedly "critical" meetings. (A-984; *see* A-922). But Leissner had dozens of critical meetings, including with senior IPIC executives, where Ng was not present. Indeed, Leissner's own travel records proved that throughout the alleged conspiracy, Leissner traveled without Ng to get the deal together. Leissner often traveled with Jasmine Loo, 1MDB's general counsel, a key player in the deal. (A-1203-06; A-787-88). As a Goldman employee testified, Leissner had a very close relationship with Loo, and traveled with her almost constantly as the deal came together. (A-226-27). Ng was not part of many of those meetings and trips.

In early 2012, when the deal started to come together, the evidence showed Leissner was the primary mover. In fact, in January 2012, Leissner was considering leaving Goldman and joining Lazard, a competing investment bank. (A-508; A-511; A-515-16). At that time, he pitched the deal to Lazard without telling his superiors at Goldman. (A-511-13). Leissner said he told Ng about his potential move, but there was no evidence that he planned to bring Ng with him.

17

When Leissner eventually determined that he would have to stay at Goldman and complete the deal there, he worked with Ng, but the latter was clearly in a subordinate role.

On January 12, 2012, Leissner met with 1MDB's CEO and CIO at a critical early meeting to get their approval. Although he claimed Ng attended, the meeting entries and travel documents showed otherwise, and at that time Ng was sidelined by an injury. (A-509; A-1207-08). Also in mid-January, Leissner met twice with the owner of Tanjong Energy—again, without Ng. (A-510-11). The same week, he met with Low in Hong Kong. (A-510; A-1209). The trend of Leissner sidelining Ng only accelerated through 2012 and beyond. The four meetings cited by the government were a mere fraction of the whole.

Moreover, even as to those four meetings, the evidence was mixed. For instance, documentary evidence undermined Leissner's account of the February 2012 London meeting where Low supposedly drew up the bribery chart and offered Leissner and Ng kickbacks. Leissner testified in great (and oddly specific) detail about that meeting, but his testimony was largely uncorroborated, as no other attendees testified. Between his initial meetings with investigators and trial, his accounts changed. (A-530-35). And as discussed above, his vivid story of the meeting's aftermath—the post-dinner walk where Ng accepted his role in the conspiracy—was contradicted by travel records.

18

Leissner's account of another critical meeting—where he went to Abu Dhabi to present a letter from PM Najib Razak to IPIC officials—was similarly spotty.[1] Leissner claimed Ng traveled with him (even though Ng did not attend the meeting), and he said the trip was on March 3 and 4. But other evidence suggested the IPIC meeting actually took place several days later, on a different trip, and that Ng wasn't on that trip at all.[2]

In sum, Leissner's colorful and detailed accounts of the four meetings were in significant respects contradicted by other evidence. And of course, when it came to all the *other* meetings he had without Ng—such as a January meeting with Low in London, or his later spring trips to Abu Dhabi with Low—Leissner claimed he remembered nothing. (*E.g.*, A-513-14; A-567-69). The government was apparently just very fortunate that Leissner, after dozens of sessions with

---

[1] Leissner initially lied and said he met with Sheikh Mansour—chairman of IPIC— but later admitted he only met with Mansour's underling. (A-545-46). And he was unable to precisely describe any specific details of the meeting. (A-542-43; A-565; A-590).

[2] Low emailed the letter from PM Najib Razak to Leissner on March 7. (A-1174-75). Leissner's travel and expense records show he had breakfast with Loo in Kuala Lumpur on March 8 and traveled to Abu Dhabi later that day. (A-791; A-1203; A-1035). On March 9, he emailed Loo and others, including Ng, and reported that he had a good meeting in Abu Dhabi, and that the IPIC team wanted to move ahead quickly. (A-1157). Leissner could not explain these discrepancies with his account.

Moreover, Leissner traveled numerous other times to Abu Dhabi and Dubai without Ng. This included a May 2012 meeting, around the time Project Magnolia closed. (A-776-77; *see* A-754-55).

investigators over several years, happened to perfectly recollect the details of those few "critical" meetings that Ng attended.

Finally, the government argued that Leissner and Ng conspired to deceive Goldman committees to obtain their approval of the transactions. But meeting records and other Goldman witnesses demonstrated only Leissner actually spoke and presented at these meetings. (A-229; A-767; A-776; *see also* A-986; A-1023). That was understandable given that, as one government witness testified, only Goldman partners had true power. (A-229-30). Leissner was a partner; Ng was not.

### 4. Summations

The prosecution focused extensively on the $35.1 million payment in its closing arguments and attacked Lim's credibility. It argued that Ng's receipt of that money proved his motive and intent, and thus involvement in the scheme:

> Why did he do it? Simple. Glory and greed.
>
> The defendant was making millions of dollars a year as a banker at Goldman Sachs, but that wasn't good enough for him. He wanted the glory…and, most importantly, he wanted the money he had been promised if the scheme succeeded, which ultimately was $35 million.
>
> $35 million. It's an almost incomprehensible amount of money for one person…. (A-908-09).

20

The government argued that "the defendant and his wife lied multiple times about the money that was coming in" and that they fabricated the story about the investment. (A-938).

The defense relied on Lim's testimony that the $35.1 million was the proceeds of an investment with Judy Chan to argue that Ng never joined a criminal conspiracy or took kickbacks.

In rebuttal, the prosecution attacked Lim's credibility in strong terms:

> You're asked to credit the truly fantastical tale woven from that stand by the defendant's own wife, Hwee Bin Lim…. The core to the story that you've been asked to credit from the defense is that this $35 million in kickbacks was just a repayment of some Chinese debt or investment. (A-966).

The government characterized Lim's testimony as "wholly incredible." (A-968).

It said the reason her story was incredible, and Leissner's credible, boiled down to corroboration: "A critical way you can be confident that Tim Leissner came in here and told the truth is that his testimony is backed up by all the other documents that he never saw." (A-969; *see also* A-974). As for Lim, the government argued "it's exactly the opposite" because "she had zero documents to back up her story." (A-969).

The government emphasized the lack of corroboration again and again—it said that the lack of documentary support proved the falsity of Lim's story and thus the defendant's guilt.

21

And the most glaring piece of it all, she doesn't have any documents whatsoever. None. Not for Kim Sung, not for Judy Chan…. It's all at odds with the evidence and your common sense. The story is implausible on its face, but it's also inconsistent with the documentary proof that you've seen. (A-971).

## C.     Conviction And Sentence

After a few hours of deliberations, the jury requested all of Lim's testimony. (A-977). The jury continued deliberating for over two days. On April 8, 2022, it convicted Ng on all counts. (A-981).

On March 9, 2023, the district court sentenced Ng principally to 120 months' imprisonment. (SPA-205). It subsequently imposed a forfeiture money judgment of $35.1 million. (SPA-196).

## SUMMARY OF ARGUMENT

Ng's conviction and sentence were marred by a series of erroneous rulings.

*First*, the trial was tainted by a fundamental error that gutted Ng's defense. The district court wrongly excluded a recorded video call between the two most important trial witnesses. In the call, Lim asked Leissner to help her obtain copies of documents relating to her investment with Leissner's ex-wife Judy, and Leissner did not suggest there was no such investment. Her demeanor on the call and the tenor of the exchange undermined the government's attack on her credibility at trial. Although this Court has repeatedly held that such inquiries are not hearsay, the district court excluded the entire recording as hearsay—even though both

22

declarants testified. And even if the recording contained *some* stray hearsay statements, that was no reason to exclude the whole. By excluding key evidence that would have corroborated Lim's testimony—and Ng's entire defense—the district court deprived Ng of a fair trial.

*Second*, the government violated its extradition agreement with Ng. In exchange for Ng's agreement to waive extradition, the government promised not to supersede the indictment except to add lesser included offenses or any new offenses committed after Ng's initial appearance. Ng fulfilled his side of the bargain by irrevocably forfeiting all substantive and procedural protections associated with the formal extradition process. The government, by contrast, breached the agreement as soon as it became tactically convenient to do so, then claimed—over eighteen months after Ng was brought to the U.S. in reliance on its promises—that the agreement was not binding.

*Third*, venue was improper. The alleged overseas conspiracy had only a few random touches with the Eastern District—such as wire transfers moving through underwater cables—that were neither foreseeable to Ng nor substantial, as this Court's cases require.

*Fourth*, because Ng had already disgorged the alleged proceeds of the crimes, the forfeiture money judgment was unconstitutional and unauthorized by the forfeiture statutes.

23

## STANDARDS OF REVIEW

"Whether certain evidence is hearsay is generally a question of law that is reviewed *de novo*." *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 54 (2d Cir. 2014). Evidentiary rulings are reviewed for abuse of discretion, *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015), and "an error of law" is "by definition" an abuse of discretion, *Koon v. United States*, 518 U.S. 81, 100 (1996).

Agreements between the government and criminal defendants relating to fundamental rights are interpreted "de novo in accordance with principles of contract law." *United States v. Stearns*, 479 F.3d 175, 178 (2d Cir. 2007).

Whether venue is proper is reviewed *de novo*. *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). Whether a forfeiture order is legally valid is reviewed *de novo*. *United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009).

## ARGUMENT

## I. THE DISTRICT COURT ERRONEOUSLY EXCLUDED CRITICAL DEFENSE EVIDENCE CORROBORATING LIM'S TESTIMONY THAT THE $35.1 MILLION WAS PROCEEDS OF AN INVESTMENT

The government's case against Ng turned on its allegation that the $35.1 million payment was the proceeds of a kickback, rather than a legitimate investment by Lim. It vigorously attacked the defense theory and Lim's testimony,

24

claiming it was uncorroborated by any evidence. It said that Lim's testimony about the Chinese investment was a cover story with no evidentiary backing aside from her say-so. But the district court excluded key evidence that would have supported Lim's testimony. Several years before trial and before Ng's arrest, in a video call recorded by the FBI, Lim and Leissner discussed the ongoing investigations, and Lim asked for Leissner's assistance in recovering copies of documents relating to the investment. Rather than rejecting Lim's request as a mere cover story or otherwise expressing disbelief, Leissner agreed that Lim could contact Judy for assistance. The recording supported Lim's account of the source of the critical $35.1 million and undermined Leissner's.

The district court erroneously excluded the recording in its entirety, as hearsay. The most important part of the recording was, as the district court admitted, a request for assistance. As this Court has repeatedly held, such inquiries are not hearsay. Many other portions of the recording also were not hearsay or were admissible under hearsay exceptions. The district court excluded it based upon clear legal errors, and severely hamstrung the defense.

### A. Background

1. Recorded Call Between Lim And Leissner

On October 16, 2018, when he was already secretly cooperating with authorities, Leissner initiated a video call with Lim at the direction of the FBI. The

investigators were no doubt hoping to produce inculpatory evidence. Instead they got the opposite.

After exchanging pleasantries, Leissner and Lim began discussing the investigations and demands of Malaysian authorities. Lim stated that the Malaysian authorities had started requesting forfeiture of funds they believed were obtained illicitly. (A-199-200). Lim said she informed them that the funds should not be forfeited because they were proceeds of a legitimate business investment from years before. (A-200-201). Lim said the authorities had demanded to see documentation verifying the investment and noted that she had not kept documents from the investment over a decade prior. (A-201). Lim said the authorities were "insistent" about the need to provide documentation. (A-202).

Lim then asked Leissner if either he or his ex-wife Judy had saved copies of any documents, and whether they could help her obtain copies:

| | |
|---|---|
| Lim: | So, just, just start as a friend, just wanted to see if there is anything, um, you know. But, uh— |
| Leissner: | Nothing. |
| Lim: | Whether we have any form of documents, and I mean if you could help me with any form of— |
| Leissner: | Oh, I got you, you mean with Capital Place, with Judy? |
| Lim: | Yeah, if she still kept any, any, any, any form of documents. If I could contact her. |

26

Leissner:     Yeah, maybe so, maybe so.  I would have to tell—I would have to speak with her.

(A-203).  Lim suggested she could reach out to Judy herself, and that she had discussed doing so with the authorities, but she was concerned that the authorities would say she should not be speaking with Judy.  (A-204).  Leissner responded ambiguously, but suggested it would be ok for Lim to contact Judy.

Leissner changed the subject and raised other topics—apparently fishing (without success) for incriminating statements.  Lim eventually returned to the topic of the investment documents.  She said: "what I'll do is I'll try to reach out to [Judy] myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there."  (A-208).  Leissner responded: "Okay.  I think that's perfect, Hwee Bin."  (*Id.*).

The two chatted about other topics for a few minutes, and the call ended.  Notably, at no point in the call did Leissner suggest there was no investment, or that there were no documents.  Neither participant in the conversation suggested that the investment was a mere "cover story."

## 2.     District Court Ruling

Prior to trial, the defense moved to admit the recording into evidence.  (A-182).  It noted that the evidence was relevant and admissible "for several different reasons," including that it demonstrated Lim and Ng's innocence and would contradict Leissner's testimony.  (A-182-85).  It argued that many critical portions

27

were non-hearsay, in part because they were inquiries rather than assertions (A-193-94), and in the alternative that several hearsay exceptions applied (A-187-93).

The government objected. It did not dispute relevance or make any argument regarding Rule 403. It argued only that the recording was hearsay not within any exception. (A-219-24).

The district court agreed with the government and excluded the recording. (SPA-184-195). The district court reasoned that because Lim did not command Leissner to do anything, her statements were hearsay:

> The Government is correct that Lim did not direct Leissner to help her do anything — she asked him if Judy Leissner has documents relating to the investment. The Government is also correct that Ng is attempting to admit Lim's inquiries about the documents not for the fact that they were said but rather for the truth of the matter asserted — that there are documents establishing the investment between Lim's family and Judy Leissner's family that explain the $35 million transfer to the Silken Water / Victoria Square account. Therefore, the October 2018 Recording is not admissible….

(SPA-194).

The court reaffirmed its ruling during trial. During its cross of Leissner, the defense began to ask him about what statements he did or did not make in his 2018 calls with Lim. The prosecution objected to the first question, and the judge sustained the objection. (A-699). The court reiterated that the defense could not ask Leissner questions about anything said on the call with Lim. (A-713-14).

## B. The District Court's Ruling Was Erroneous

### 1. Inquiries Are Not Assertions, So Are Not Hearsay

The call was relevant for many different reasons including, as discussed below, the overall tone and tenor of the conversation between Lim and Leissner. But perhaps the most critical portion of the call occurred when Lim asked Leissner whether he or Judy could assist her in finding documents regarding her investment. Lim's statements were questions rather than declarative statements and were therefore plainly admissible as non-hearsay.

This Court has long held that "[a]n inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." *Quartararo v. Hanslmaier*, 186 F.3d 91, 98 (2d Cir. 1999) (quoting *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990)). The reason is simple. Inquiries, unlike declarative statements, are generally not intended to communicate statements of fact. They are therefore not assertions within the meaning of Federal Rule of Evidence 801(a). Moreover, inquiries are neither true nor false. If a person asks "what time is it?", it would be insensible to respond "that's false." Consequently, inquiries cannot be admitted for "the truth of the matter asserted" within the meaning of Rule 801(c)—because there is nothing asserted that can be true or false.

It is thus hornbook law that inquiries are generally not hearsay. Other Circuits agree. *See, e.g.*, *United States v. Pulliam*, 973 F.3d 775, 783 (7th Cir.

29

2020) ("We have held that questions are not statements under Rule 801 and therefore are not hearsay."); *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (questions are "incapable of being true or false" and thus are not hearsay); *accord United States v. Alcorta*, 853 F.3d 1123, 1141 (10th Cir. 2017); *United States v. Thomas*, 451 F.3d 543, 547-48 (8th Cir. 2006); *Lexington Ins. Co. v. W. Penn. Hosp.*, 423 F.3d 318, 330 (3d Cir. 2005); *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003); *United States v. Long*, 905 F.2d 1572, 1579-80 (D.C. Cir. 1990); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990).

The district court here nonetheless ruled that Lim's questions were hearsay because Lim did not command Leissner to do anything. According to the court, Lim "did not direct Leissner to help her do anything — she asked him if Judy Leissner has documents relating to the investment." (SPA-194). The court admitted that Lim's statements were "inquiries." (*Id.*). But then, unaccountably, the district court appeared to assume that *imperatives* are non-hearsay while *inquiries* are hearsay.

That is simply wrong. As this Court has held, *both* "[q]uestions *and* commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted." *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) (summary order); *see United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012). The district court thus excluded the recording based upon a clear legal error.

30

2.      Inquiries Are Not Hearsay Even If They Demonstrate The Declarant's
        Underlying Assumptions

The government argued, and the district court accepted, that Lim's questions
were hearsay because they reflected an underlying factual premise—that is, that
documents existed.  According to the government, the questions were necessarily
offered "for the truth of the matter asserted—i.e., that there are documents
establishing the investment between Lim's family and Judy Chan's family that
explains the $35 million transfer."  (A-225).  That argument rests on a fundamental
mistake of hearsay law.  That a question is offered to prove a fact does not mean
the question *itself* is hearsay.  A statement that circumstantially reflects a belief in
some underlying fact is not hearsay unless the declarant intends to assert that fact.

Then-Judge Barrett explained this distinction well in *Torry v. City of
Chicago*, 932 F.3d 579 (7th Cir. 2019).  A declarant's statements are non-hearsay
even if offered to prove the "implicit" facts and "underlying assumptions" reflected
by the statement.  *Id*. at 585 n.5.  "Assertions often reflect a declarant's underlying
assumptions, but only the assertions themselves meet Rule 801's definition of
hearsay."  *Id*.  Judge Barrett also pointed to the "classic" case *United States v.
Zenni*, 492 F. Supp. 464 (E.D. Ky. 1980).

In *Zenni*, police searched an alleged gambling house, and while there,
received phone calls where callers made statements such as "Put $2 to win on Paul
Revere in the third at Pimlico."  *Id*. at 466 n.7.  These statements were offered to

31

prove that the premises were, in fact, a gambling house. The court ruled that the instructions were directions rather than declarations and were therefore non-hearsay. Of course, the callers' statements reflected an underlying assumption that it was a gambling house—but that is not what the callers were intending to assert or communicate. After extensively analyzing the history of Rule 801, the court ruled that these implicit factual matters were not asserted and were therefore non-hearsay. *Id*. at 467-69.[3]

Thus, as the Third Circuit has held, questions are not hearsay "*even if* the question 'convey[s] an implicit message' or provides information about the declarant's assumptions or beliefs." *Lexington Ins*., 423 F.3d at 330 (emphasis added) (quoting *Long*, 905 F.2d at 1579-80). And as this Court has likewise held, statements are not hearsay where they are admitted as circumstantial evidence of the declarant's state of mind. *United States v. Deitrich*, 865 F.2d 17, 21 (2d Cir. 1988).

Even if Lim's questions suggested an underlying assumption—or conveyed an implicit message, or circumstantially demonstrated her beliefs regarding the

---

[3] "The key to the definition [of 'statement'] is that nothing is an assertion unless intended to be one.... The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility." Fed. R. Evid. 801(a), adv. comm. notes. Notably in this regard, Leissner's responses indicated he interpreted Lim's statements as a request for assistance, not a declaration of fact.

existence of investment documents—they were not hearsay. The law is clear that statements may be admitted to prove facts unless the declarant *intended* to communicate those same facts by her statement. Indeed, all questions reflect underlying assumptions, and all questions are offered to prove some fact at trial. They are nonetheless not hearsay.

       3.    <u>Because Both Lim And Leissner Testified, Admitting The Recording</u>
               <u>Presented No Hearsay Dangers</u>

Even viewed more pragmatically, the video presented none of the reliability dangers the hearsay rule guards against, because both parties to the conversation testified at trial. The "central concern of the hearsay rule" is protecting the right to cross-examination. *United States v. Kaiser*, 609 F.3d 556, 576 (2d Cir. 2010) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1350-51 (7th Cir. 1979)). In other words, the "purpose of the rule is to exclude from the jury's consideration factual assertions made by declarants whose credibility is neither supported by an oath nor subject to testing by cross-examination." *United States v. Cain*, 671 F.3d 271, 300 (2d Cir. 2012). Those concerns do not arise where the declarant testifies. *See Bridges v. Wixon*, 326 U.S. 135, 177 (1945) (noting that the "whole purpose" of the hearsay rule is "satisfied" where the declarant testifies and so there is "ample opportunity to test him as to the basis for his former statement") (quoting III *Wigmore on Evidence* §1018 (3d ed. 1940)).

33

To be sure, that a declarant testifies at trial does not make all her prior statements non-hearsay—but it does significantly alter the analysis. A witness's prior consistent statements can be admitted for the non-hearsay purpose of rehabilitation under Rule 801(d)(1)(B). That rule was amended in 2014 to expand the basis for admitting such statements, such that when opposing counsel makes a general attack on a witness's "candor and veracity," the witness's prior consistent statements may be admitted for rehabilitation. *United States v. Purcell*, 967 F.3d 159, 196-97 (2d Cir. 2020). And yet when the defense tried to ask Lim about her prior consistent statements on the call, the government objected—making arguments based on the pre-amendment version of the rule—and the district court sharply limited the questioning. (A-849-52). That was error. Once Lim testified, her statements on the call should have been admissible for rehabilitation.

Conversely, once Leissner testified, prior *inconsistent* statements on the call were admissible for the non-hearsay purpose of impeachment under Rule 613. As this Court has held, statements need not be diametrically opposed to be inconsistent. To the contrary, when trial testimony displays "any variance" with a prior statement, the latter is admissible because it bears on credibility. *United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018). Even prior silence can be admissible. *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995).

34

Leissner's statements and omissions on the call were inconsistent with his trial testimony. They were therefore admissible under Rule 613.

But when defense counsel tried to cross-examine Leissner about what he said on the call, the prosecution immediately objected, and the district court sustained the objection. (A-699). The prosecution reiterated its argument that the contents of the call were inadmissible for any purpose, and the district court agreed. (A-713-14). That too was wrong.

### 4. Hearsay Exceptions Applied To Portions Of The Conversation

Some portions of the recording, even if they were hearsay, were admissible hearsay. For example, even if Lim's inquiry were recast as an assertion—that she planned to ask Judy for documents—it nonetheless should have been admitted as a statement of intent under Rule 803(3). The district court ruled that 803(3) did not apply because the statement was ultimately being offered to prove past events—namely, the prior investment Lim made with Judy's family business. (SPA-188).

Once again, the district court confused a fundamental distinction in hearsay law. A statement is admissible under Rule 803(3) if the statement itself is forward-looking. Once the statement is admitted, a jury is allowed to draw backward-looking inferences from the statement. *See* 4 Mueller & Kirkpatrick, *Federal Evidence* §8:73 (4th ed. July 2022). Thus, as this Court has held, a court examining statements proffered under 803(3) must perform a "rigorous analysis"

35

of the literal meaning of the statement, because admissibility will "frequently turn on the actual language, particularly the tense of the proffered testimony, as well as its time frame." *United States v. Harris*, 733 F.2d 994, 1004 (2d Cir. 1984). The fact that a forward-looking statement circumstantially reflects on past events does not render it inadmissible—admissibility turns on the tense of the statement itself.

Moreover, at least some of Lim's statements were unquestionably statements of future intent. In the portion of the call where she returned to discussing the investment documents, Lim stated: "what I'll do is I'll try to reach out to [Judy] myself and then ask her whether she still has any form of our documents prior to all those things and then we'll see how it goes from there." (A-208). That is plainly a forward-looking statement of future intent. Indeed, it is in the very heartland of what Rule 803(3) is intended to cover.

### 5. Wholesale Exclusion Of The Recording Was Unjustified

Finally, even if the recording contained *some* inadmissible hearsay, that did not justify excluding the *entire* conversation. The hearsay rule operates at the level of individual assertions, not entire conversations. *See Williamson v. United States*, 512 U.S. 594 (1994); *United States v. Ojudun*, 915 F.3d 875 (2d Cir. 2019). When a conversation contains a mix of inadmissible and admissible statements, the presence of the former does not render the latter inadmissible. In such circumstances, a district court has several options to deal with the inadmissible

36

portions. It can admit them to show context pursuant to the rule of completeness, Rule 106. It can admit them with a limiting instruction, telling the jury not to consider the hearsay portions for their truth. Or it can redact inadmissible portions. The inquiry calls for nuance and care—trial courts should use scalpels rather than cleavers.

And as the defense noted in its motion below, the conversation had relevance beyond any one individual statement because of what was *not* said. "[W]hen Ms. Lim asks numerous times for records establishing the investment, Leissner does not once challenge Ms. Lim that the investment happened." (A-193). In other words, if Ng, Lim, and Leissner were in fact coconspirators who had previously committed a crime together and agreed on a cover story, one might have expected Leissner to respond along the lines of: "Of course there are no documents, because as we all know, there was no investment in the first place!" He never said anything of the sort—at any point in the conversation—and the fact that he did not is telling.

The tone of the conversation and Lim's and Leissner's demeanor are also not suggestive of a conversation between two knowing participants in a crime. To the contrary, Lim's tone and demeanor are suggestive of consciousness of

37

innocence—something the jury should have been allowed to assess on its own.[4]
*See United States v. Biaggi*, 909 F.2d 662, 690-91 (2d Cir. 1990).  Evidence of
demeanor, like other evidence of nonassertive conduct, is not hearsay.

Instead of carefully assessing the video's overall relevance, the district court
took a blunderbuss approach.  It focused only on a single portion of the recording,
and because it (wrongly) concluded that that portion contained hearsay, it excluded
the entire recording.

### C.    The Error Was Not Harmless

The erroneous exclusion of the recorded call cannot be held harmless unless
this Court concludes that the error "did not substantially influence the jury."
*Litvak*, 808 F.3d at 184.  Here, because the error went "to the heart" of the defense
it was plainly not harmless.  *United States v. Blum*, 62 F.3d 63, 68-69 (2d Cir.
1995).

*First*, the source and purpose of the transfers between Judy Chan and Lim
were *the* primary dispute between the government and the defense at trial.  The
government argued that the funds were kickbacks, proceeds of the illegal scheme,
and thus proved Ng's involvement in the conspiracy.  The defense offered a

---

[4] We have lodged a copy of the video itself and urge the Court to review it rather
than merely relying on the transcript, which does not capture Lim's tone and
demeanor.

competing explanation for the transfers which, if credited, would have thoroughly undermined the government's theory and strongly supported Ng's innocence.

*Second*, the government never disputed that the recording was relevant and indeed powerful evidence, nor did it make any argument for exclusion under Rule 403. The government thus tacitly conceded that the probative value of the evidence was high. Its sole argument for exclusion—hearsay—was spurious, as explained above.

*Third*, having obtained pretrial exclusion of the recording, the government exploited the evidentiary lacuna by repeatedly attacking Lim's testimony as uncorroborated by any evidence. In its cross-examination of Lim, the government emphasized again and again that Lim's testimony could not be trusted because it was not corroborated by any extrinsic evidence. It started by hammering the lack of documentation for the predecessor investment with Kim Sung (A-866; *see also* A-877; A-872); questioned Lim about what documents she reviewed before the investment (A-873-75); and questioned her extensively about the agreement she and Judy signed—who reviewed it, what edits were made, how many copies there were, and why she did not have a copy. (A-875-76). The prosecution obviously sought to convey incredulity on this point:

Q: You didn't retain a copy of that?
A: I retain a copy of that for a long, long time.

…

39

Q.    It was a piece of paper, right?

A.    Yes.

Q:    You could have made another copy of it?

A:    No.  I don't know whether Judy make another copy, but I've got a copy myself.

Q.    Did you make another copy?

A:    I did not make another copy.

…

Q:    You were a lawyer, right?

A:    Yes.  (A-876).

The government pursued the same line regarding the 2012 repayment:

Q:    You didn't document anything around the repayment either?

A:    We have the documentation on the investment in '05, that's correct.

Q:    You don't have that any more?

A:    Now?  No.  I don't have that any more.

Q:    You don't have any documentation around the calculation in early 2012 with the Renminbi?

A:    Now?  No.  I don't have it, but the document existed.

Q:    The original document existed?

A:    The original document existed.

Q:    What about any documentation around the 2012 Renminbi calculation?

A:    I have gotten my money that was paid back to me in 2013.  As of now, I don't have documents.  (A-878-79).

(*See also* A-884-85).

The government likewise used the lack of documentation in its closing

arguments to attack Lim's credibility.  *See supra* at 20-22.

Had the recording been admitted, Ng could have responded and rehabilitated

Lim's testimony.  Without it, however, Ng was stripped of his ability to defend

40

against the government's powerful attack on his explanation for the payment. Exclusion of the recording eviscerated his defense.

*Fourth*, the jury's deliberations make clear that the recording could have altered the result. The jury's first request was to review Lim's entire testimony, both direct and cross. (A-977). That shows the jury recognized the central importance of Lim's testimony—testimony that, if believed, would have led to acquittal. And the deliberations lasted several days, which suggests that the jury struggled to determine whether Leissner's version was so much more believable than Lim's that guilt was proven beyond a reasonable doubt. The jury already had some doubts, and the recording, by providing support to Lim's version, would have amplified those doubts significantly.

Indeed, the recording was a unique piece of evidence. A picture says a thousand words, and a video can say a million. This recording would have given the jury a chance to see something otherwise unavailable to it—it would have allowed the jury to see two supposed coconspirators—the two competing star witnesses—having a conversation about the charged offense. It would have allowed the jury to see Lim in an honest, un-coached, and un-lawyered interaction that took place years before trial. The recording sheds a different light on Lim, it sheds a different light on Leissner, and it therefore sheds a different light on the entire case.

41

It could have tipped the scales in favor of a reasonable doubt and was plainly not harmless.

## II.   THE GOVERNMENT VIOLATED ITS AGREEMENT WITH NG BY SUPERSEDING NEW OFFENSES INTO THE INDICTMENT

Ng, a Malaysian citizen, was arrested in Malaysia.  In February 2019, the government entered into a written agreement promising that if Ng waived extradition, he would "not be detained, tried or punished…except for (1) the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded."  (A-110).  In reliance on that promise, Ng waived extradition.

The government broke its promise by superseding to allege new offenses. (*See* A-77).  And it broke that same promise *again* when it filed a second superseding indictment.  (A-146).  Because the indictment on which Ng was tried violated the government's promise, his convictions must be vacated.

### A.   Background

1.   <u>The Agreement</u>

On October 30, 2018, Ng was arrested in Malaysia on a warrant based on the October 2018 indictment (the "Original Indictment") (A-43; *see also* A-113).  Ng was incarcerated in a Malaysian jail for six months pending extradition to the United States.  (Dkt.226 at 16-18).

42

In early 2019, the government and defense counsel discussed whether Ng would waive extradition. During a January 23, 2019 phone call, the defense explained that Ng would consider waiving extradition if the government agreed "that it would not change the [Original Indictment] after Mr. Ng came to the United States." (A-114 ¶7). During a subsequent February 7 phone call, the government promised, in substance, that, if Ng waived extradition by February 15th, he would only be "detained, tried, [or] punished" on the Original Indictment. (A-140-41 ¶9; A-145).

On February 12, 2019, while defense counsel was en route to Malaysia to meet with Ng to discuss extradition (A-115 ¶11), the government sent Ng's counsel the "final approved letter" embodying the terms of the parties' agreement (the "Agreement") "as discussed" on the parties' February 7 phone call. (A-135). The Agreement stated, in relevant part:

> To the extent your client knowingly and willfully waives extradition to the United States no later than February 15, 2019 ("the Deadline"), the Offices agree that *your client will not be detained, tried or punished at the request of our Offices except for* (1) *the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded*, and (2) any offense committed after the waiver of extradition and initial appearance in the Eastern District of New York.

(A-110) (emphasis added) (footnote omitted).

43

In reliance on these promises, Ng waived extradition on February 15th (A-115 ¶12).  In May 2019, he was transported to Brooklyn for trial.  (Dkt.58 at 5).

2.    The Motion To Dismiss

Ng moved to dismiss the Original Indictment on numerous grounds, including (1) improper venue, (2) the failure to allege that Ng was employed by an "issuer" of securities, and (3) the failure to provide notice of alleged money laundering predicates.  (Dkt.46).  The government opposed the motion, but, less than a week later, obtained a superseding indictment (the "S-1") (A-77).

The government conceded that the S-1 "added factual allegations and amended charging language" against Ng.  (Dkt.59 at 5).  For example:

- The S-1 adopted a new legal theory underlying Count One by adding the allegation that Ng was "a stockholder" of Goldman Sachs Group, Inc., and that Ng was "acting on behalf of such issuer" for the purposes of the FCPA (A-78 ¶2; A-99 ¶59(a)).

- In connection with Count Three, the S-1 inserted a citation to 18 U.S.C. §1956(c)(7) and added "bribery of a public official" as a potential "offense against a foreign nation" that could constitute the "specified unlawful activity" underlying a substantive money laundering offense.  (A-105 ¶65(a)).

In his reply, Ng argued the S-1 violated the Agreement, which required dismissal of the superseder.  (Dkt.58 at 3-9).  In response, the government claimed it had no obligation to follow through on its promise because Ng had *consented* to, rather than *waived* extradition and that consequently the extradition treaty rather than the Agreement governed the case.  (Dkt.59 at 9-11).

44

The district court rejected the government's contention that it was not bound by the Agreement. (SPA-29-35). Nonetheless, the court denied Ng's motion to dismiss because the government's conduct would not have violated "Rule of Specialty"[5] provision of the U.S.-Malaysian Extradition Treaty, because (1) the government had not added new statutory *charges* against Ng and (2) because, according to government counsel, the Malaysian government had raised no objection to the S-1. (SPA-35-40). In short, the district court held that it made no difference whether the government was bound by the Agreement.

Apparently emboldened by the court's ruling, in December 2021, less than one month before the then-scheduled start date for trial, the government obtained a second superseding indictment (the "S-2") (A-146) which incorporated the changes made in the S-1 and added numerous additional new factual allegations against Ng.[6]

---

[5] The "Rule of Specialty" holds that an extradited defendant "can only be tried on one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition." *United States v. Rauscher*, 119 U.S. 407, 430 (1886).

[6] The S-2 added numerous new alleged overt acts (*e.g.* A-170-71 ¶62(a)-(b), (h)-(i); A-175 ¶65(c)-(e)) in part to try to bolster the government's deficient venue allegations (*e.g.*, A-170 ¶62(e)-(f)).

45

## B.     The Government Violated The Agreement

The government promised that it would not supersede the indictment except to add (1) lesser included offenses proved by the facts therein or (2) any new offense committed after Ng's initial appearance.  (A-110).  The government then violated that promise by twice superseding to add new theories of the case.

If the government makes a promise and a criminal defendant relinquishes fundamental rights in reliance on that promise, the government's breach violates due process.  "[D]ue process requires that the government adhere to the terms" of agreements with criminal defendants.  *United States v. Pelletier*, 898 F.2d 297, 302 (2d Cir. 1990); *accord Plaster v. United States*, 720 F.2d 340, 352 (4th Cir. 1983) (same).  The district court erred by allowing the government to proceed to trial on an indictment obtained in violation of its promises.  Specific performance of the Agreement, requiring a retrial on the Original Indictment, is therefore required. *See United States v. Lawlor*, 168 F.3d 633, 638 (2d Cir. 1999) (specific performance is appropriate remedy for government's breach of its agreement with criminal defendant).

### 1.     The Agreement Expressly Prohibited The Government From Superseding To Add New Facts And Theories

a.     The Agreement embodied the government's promise not to detain, try, or punish Ng except for the "offenses" charged in the Original Indictment, or lesser included offenses.  (A-110).  The Supreme Court has distinguished between the

46

statutory terms "law" and "offense," and held that "offense" refers to the
defendant's specific violative conduct—*i.e.*, the specific *facts* underlying the
crime—as opposed to the criminal *statute* at issue, in the abstract.  *United States v.
Rodriguez*, 553 U.S. 377, 382-83 (2008); *accord Dobbs, Inc. v. Loc. 614, Int'l
Broth. of Teamsters*, 813 F.2d 85, 88 (6th Cir. 1987) ("'Offense' is commonly
understood to mean simply a violation of the applicable rule of conduct.") (citing
*Webster's Third New International Dictionary* (1981)).  In short, an "offense" is
the criminal conduct which amounts to "a 'violation of the law.'"  *Barikyan v.
Barr*, 917 F.3d 142, 145 (2d Cir. 2019) (quoting *Black's Law Dictionary* (10th ed.
2014)), rather than the section of the criminal code proscribing that conduct.

   Thus, understood based on the ordinary meaning of its terms, the Agreement
prohibited the government from superseding the Original Indictment to add new
theories of criminality premised on new alleged facts and conduct—that is, new
"offenses."

   b. The overall structure of the Agreement also confirms that, as used
therein, "offenses" refers to the specific factual allegations in the Original
Indictment.  As then-Judge Sotomayor has observed, agreements between the
government and criminal defendants must be "construed as a whole and the
intention of the parties is to be collected from the entire instrument."  *United States*

*v. Hamdi*, 432 F.3d 115, 125 (2d Cir. 2005) (quoting 11 *Williston on Contracts* §32:11 (4th ed.)).

The Agreement states that Ng can be charged with "lesser included offense[s]," so long as they are "proved by the *facts*" on which the Original Indictment was grounded. (A-110) (emphasis added). There would have been no reason to reference the specific "facts" alleged in the Original Indictment if the promises embodied within the Agreement merely prevented the government from charging different statutes. If that had been the parties' intent, the government could have simply drafted an agreement saying it agreed that Ng would not be tried except on the "counts" or "statutory charges" alleged in the Original Indictment. There would have been no need to mention "the facts" at all. But the government chose not to include such language, even though it had complete control over the precise wording of the Agreement. Interpreting the Agreement to allow new factual theories would violate the axiom that "contracts should not be interpreted to render a portion of the writing superfluous or inexplicable." *Hamdi*, 432 F.3d at 123) (cleaned up).

As the government conceded (Dkt.59 at 5) and the district court acknowledged (SPA-35), the government added new factual allegations against Ng in the superseders. (*Compare* A-43-75 *with* A-77-108 & A-146-81). In doing so, it violated its promise to try Ng only on the offenses in the Original Indictment.

48

2. Any Ambiguity In The Agreement Must Be Construed Strictly Against The Government

Even if the Agreement were *arguably* susceptible to the government's interpretation, the Court would nonetheless be bound to adopt the construction more favorable to Ng. This Court has repeatedly held that contracts between the government and a criminal defendant requiring the defendant to waive substantive rights—like the one here—are construed strictly against the government. "[C]ourts construe plea agreements strictly against the Government. This is done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power." *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999). "In particular, waivers of constitutional and statutory rights are to be interpreted narrowly…. [A]ny ambiguities in the agreement must be resolved in favor of the defendant." *Hamdi*, 432 F.3d at 122-23 (cleaned up).

Given the circumstances here, construing the Agreement strictly against the government makes particular sense. *First*, it is undisputed the Agreement was drafted by the government (A-119-20; *see also* A-114-15 ¶¶8, 11). "Since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter." 11 *Williston on Contracts* §32:12 (4th ed.); *see also, e.g.*, *United States v. Mergen*, 764 F.3d 199, 208-09 (2d Cir. 2014).

49

*Second*, the government unquestionably had "awesome advantages in bargaining power" in negotiating the Agreement. The written contract was (1) presented on a take-it-or-leave-it basis while defense counsel was already en route to Malaysia, where Ng was imprisoned (A-115 ¶¶11-12),[7] and (2) required Ng to waive extradition within a matter a matter of days (*id.*). The Agreement was, in effect, a paradigmatic adhesion contract. "[A]ny contract of adhesion, which is a contract entered without any meaningful negotiation by a party with inferior bargaining power, is particularly susceptible to the rule that ambiguities will be construed against the drafter." 11 *Williston on Contracts* §32:12 (4th ed.).

*Third*, the Agreement unquestionably required Ng to waive significant substantive and procedural protections that he would have enjoyed within the formal extradition process. *See* Extradition Treaty Between the Government of the United States of America and the Government of Malaysia, Malay.-U.S., Aug. 3, 1995, T.I.A.S. No. 97-602 ("Extradition Treaty"). For example, Ng waived the right to argue extradition was not permissible because (1) the U.S. charges were not punishable under Malaysian law and therefore violated the "dual criminality" principle, *see* Extradition Treaty art. 2(1); (2) the alleged offenses were committed within Malaysia's jurisdiction, *id.* art. 2(4); (3) the crimes alleged were committed

---

[7] While incarcerated in Malaysia, Ng became severely ill with leptospirosis—a disease spread via rat urine—and malaria. (Dkt.226 at 3-4).

50

outside the U.S. and Malaysia would not prosecute in similar circumstances, *id.* art. 2(5); or (4) the Malaysian government should otherwise exercise its discretion to decline to extradite a Malaysian citizen, *id.* art. 3(1). By waiving extradition in reliance on the Agreement, Ng irrevocably relinquished numerous substantive rights.

It is irrelevant that (according to the government's unsworn say-so (Dkt.59 at 11-12 n.5)) the Malaysian government was "apprised of the contents of the Superseding Indictment" and "raised no objection." (SPA-39). Malaysia was not a party to the Agreement. Its conclusions about the propriety of the government's conduct and whether that conduct *would have* violated the Extradition Treaty, had Ng not waived extradition, is both counterfactual and irrelevant. *See Hamdi*, 432 F.3d at 122 (contract interpretation is based on "the reasonable understanding of *the parties* as to the terms of the agreement.") (emphasis added).

For the same reason, the district court's reliance on cases interpreting the scope of "Rule of Specialty" protections provided by *other* countries' extradition treaties with the United States (SPA-37-40), was misplaced. The Agreement does not even mention the Extradition Treaty or its Rule of Specialty provision (*see* A-110-11), much less silently incorporate prior judicial decisions interpreting the scope of similar provisions in other treaties. "Under the guise of interpreting a contract, a court should not rewrite it." *Filner v. Shapiro*, 633 F.2d 139, 141 n.1

51

(2d Cir. 1980)); *cf. United States v. Corsentino*, 685 F.2d 48, 51 (2d Cir. 1982)

("The Government may not rely on favorable judicial construction to cure

significant ambiguities in its plea agreements.") (quoting *United States v. Cook*,

668 F.2d 317, 321 (7th Cir. 1982)).  To the contrary, the Agreement contains a

merger provision stating that the written contract "memorializes the entirety of the

agreement" between the government and Ng.  (A-111).  There is no basis for

interpreting the Agreement as incorporating terms not included.

* * * *

Interpreted based on its plain language, resolving any ambiguities in Ng's

favor, the Agreement prohibited the government from superseding the Original

Indictment to allege new facts and theories against Ng.  The government breached,

and proceeded to trial on an indictment that violated the Agreement.

Consequently, the conviction must be vacated, and if the government seeks to retry

Ng, it should be required to do so on the allegations in the Original Indictment.

## III.  VENUE WAS IMPROPER

The alleged crimes had only a tenuous connection to the United States.  Ng

was a Malaysian citizen based in Singapore.  The alleged coconspirators were

citizens of other countries who worked overseas.  The alleged fraud pertained to

foreign entities and assets: the victim was the Malaysian sovereign wealth fund,

and the fraudulent transactions involved assets overseas. The vast majority of the acts in furtherance took place overseas.

The connection to the Eastern District was even more tenuous. None of the deal planning meetings—including the four "critical" meetings cited by the government—occurred in the Eastern District. (A-984). Leissner and Ng worked for Goldman Sachs, but Goldman is headquartered in Manhattan, not the Eastern District.

The defense moved to dismiss the indictment based on the insufficiently pleaded venue allegations. The district court erroneously denied the motion.

## A.    Background

The Original Indictment contained sparse venue allegations. In Paragraphs 37 and 45, it alleged that for Projects Magnolia and Maximus, Goldman wired money to a 1MDB entity and that those wires passed through the Eastern District. (A-57; A-60). The allegations for Count One stated that acts in furtherance of the conspiracy took place "within the Eastern District of New York," but then listed several alleged overt acts, none of which took place in the Eastern District—such as meetings in Los Angeles and Singapore and a jewelry purchase in Manhattan. (A-67-68 ¶60(a)-(j)). The allegations for Count Two identified two meetings Goldman employees attended in New York and alleged that people used telecommunications facilities that "transited through the Eastern District." (A-70-

71 ¶63(e)-(f).  Count Three contained no venue allegations whatsoever and merely reincorporated the background paragraphs.  (A-71 ¶64).

Ng moved to dismiss the Original Indictment, in part for lack of venue. (Dkt.46).  Relying primarily on district court cases, the government argued that any bare allegation of venue in an indictment is sufficient to support an indictment. (Dkt.54 at 11-12). The district court agreed, holding that barebones allegation of venue are sufficient at the pleading stage and that any wire passing through a district is sufficient to confer venue.  (SPA-40-53).

As discussed above, the government also superseded twice.  The second superseder added some additional, trivial venue allegations—that Low and Leissner traveled through the Eastern District in March 2012 on their way from Los Angeles to a meeting in Manhattan.  (A-170 ¶62(f)).  At trial, the government relied on these same acts to establish venue.  (A-936-37).

### B. The Allegations Were Insufficient To Confer Venue In The Eastern District

Both the Constitution and the rules of criminal procedure require federal prosecutions in a district where the "*locus delicti*" of the charged offense was committed.  *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278-79 (1999).  As this Court has said:  "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place."  *Tzolov*, 642 F.3d at 318 (quoting *Rodriguez-Moreno*, 526 U.S. at 280).  Here, none of the "essential

54

conduct elements" of the alleged offense took place in the Eastern District. The alleged connection between the 1MDB fraud scheme and the Eastern District was insubstantial.

As a matter of fairness and logic, this Court has "interpreted the venue requirement to demand 'some sense of venue having been freely chosen by the defendant.'" *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)). Ng is a foreign national who had no contact with the Eastern District. The idea that he somehow "freely chose" that district as the locus of prosecution defies belief. The indictment should have been dismissed at the outset.

Three points merit emphasis.

*First*, venue challenges can and indeed *must* be raised prior to trial. Relying largely on district court authority, the court below suggested that challenges to venue generally should not be considered at the pleading stage, but rather should be "deferred" until after trial. (SPA-42-43). That position makes no sense as a matter of law or logic. To the contrary, Federal Rule of Criminal Procedure 12 *requires* that venue challenges be raised prior to trial if the nature of the challenge is "reasonably available" at that time. Fed. R. Crim. P. 12(b)(3) & (b)(3)(A)(i); *see United States v. Brennan*, 183 F.3d 139, 149 (2d Cir. 1999) (noting that defendants properly raised venue challenge with a motion to dismiss—and reversing

conviction).  Deferring venue challenges until after trial would be extraordinarily inefficient.

Here, Ng properly challenged venue in a pretrial motion, as required by Rule 12.  The district court should have addressed that challenge fully rather than deferring it.

*Second*, contrary to the ruling below, venue requires more than a single random "touch" with a district.  As this Court has held, "the venue analysis does not end...when we find a single overt act performed in the district of prosecution." *Kirk Tang Yuk*, 885 F.3d at 69.  Rather, the government must also allege and prove (a) that the acts were reasonably foreseeable to the defendant, to ensure that venue was in some sense "freely chosen" by him; *id*. at 69-70; and (b) that the contacts with the district were "substantial," *id*. at 70.[8]

Neither requirement was met here.  There is no reason to believe Ng could have foreseen, for example, that wire transfers between Goldman and 1MDB

---

[8] *Kirk Tang Yuk* suggests in dicta that the substantial contacts test doesn't apply in conspiracy cases and that the test is satisfied by a single act within the district.  885 F.3d at 70.  Neither proposition is consistent with prior Second Circuit precedents. As this Court re-affirmed recently, "[t]he 'substantial contacts' test applies 'where the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice to him, or undermine the fairness of his trial.'" *United States v. Calonge*, --F.4th--, 2023 WL 4535754, at *4 n.1 (2d Cir. July 14, 2023). Here, Ng was plainly prejudiced by being forced to face trial in the Eastern District, as he has consistently argued, and the government has never disputed. (*See* Dkt.46 at 35-36).

would pass through the Eastern District (apparently via underwater cables). And taken in the context of this massive global scheme, the contacts with the Eastern District were decidedly *in*substantial. Ng's personal contacts with the district were nonexistent. And the overall conspiracy's few touches were minimal. This is not a case where the conspiracy targeted victims in the district. *See United States v. Lange*, 834 F.3d 58, 71-72 (2d Cir. 2016). Nor is it a case where the core criminal conduct, although it took place elsewhere, was "inextricably bound" with the district. *United States v. Reed*, 773 F.2d 477, 483 (2d Cir. 1985).

Rather, this is simply a case where prosecutors chose to pursue the case in the Eastern District based on their own convenience rather than any logical connection. This Court has never approved venue in a case where contacts were as minimal as those alleged here.

*Third* and finally, venue must be analyzed separately for each count. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188-91 (2d Cir. 1989). Even where venue is proper as to one count of an indictment, it may not be proper as to all counts. That is because analysis of venue involves determining, as a matter of statutory interpretation, what the essential conduct elements of each alleged offense are. *See Brennan*, 183 F.3d at 144-46.

The venue allegations were particularly deficient as to Count Three, the money laundering conspiracy charge. The gist of Count Three was that Ng and

57

coconspirators allegedly engaged in transactions designed to conceal the 1MDB scheme and that involved proceeds of the 1MDB scheme. (A-71-73 ¶65). The "*locus delicti*" of that offense is necessarily different from those of the FCPA charges. *Rodriguez-Moreno*, 526 U.S. at 278. The money laundering allegations involve the downstream monetary transactions after completion of the 1MDB deals, which all occurred overseas. The indictment contains no allegations that any of the downstream acts had any connection with the Eastern District—much less that those acts were foreseeable to Ng, or that the Count Three contacts with the Eastern District were substantial.

It is doubtful that it made sense to prosecute Ng in the United States at all. But it certainly was not proper to pursue that prosecution in the Eastern District. Consequently, this Court should reverse all counts and remand with instructions to dismiss the indictment, or, at a minimum, Count Three.

## IV. THE $35.1 MILLION FORFEITURE JUDGMENT WAS UNCONSTITUTIONAL AND UNAUTHORIZED BY STATUTE

### A. Background

The government moved for an order imposing a $35.1 million forfeiture money judgment against Ng, arguing that Ng had obtained at least that amount in kickbacks as a part of the scheme. (*See* Dkt.228; Dkt.230 at 51-56).

Ng objected, arguing that he and his family had *already* forfeited to Malaysia and Singapore all funds traceable to 1MDB, and more (including shares

of stock presently valued at over $50 million) and that an additional money judgment was neither appropriate nor authorized. (*See* A-1212-13; *see also* Dkt.226 at 43-49; Dkt.235). Ng also argued that ordering forfeiture of $35.1 million would violate the Excessive Fines Clause because (1) all funds traceable to 1MDB, and more, had already been forfeited to Malaysia; and (2) such a massive money judgment would destroy Ng's ability to earn a livelihood in the future. (Dkt.235 n.2; Dkt.237).

The district court imposed the $35.1 million forfeiture money judgment, despite recognizing that there was no evidence Ng was capable of paying *any* fine at all. (A-1219). The court concluded that "even assuming that he is destitute at this time, Ng has not shown that he will be incapable of earning money in the future." (SPA-201).

### B. The Forfeiture Was Unconstitutionally Excessive

If a forfeiture can be characterized as punitive, a court must consider "whether the forfeiture is unconstitutionally excessive." *United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016). In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court "emphasize[d] that the Excessive Fines Clause grew out of the English constitutional tradition, including Magna Carta, which required that a fine 'should not deprive a wrongdoer of his livelihood.'" *Viloski*, 814 F.3d at 111. This Court has held that, in appropriate cases, courts should consider

"[w]hether a forfeiture would destroy a defendant's livelihood" in addition to the non-exhaustive *Bajakajian* factors, because "hostility to livelihood-destroying fines is deeply rooted in our constitutional tradition." *Id.* at 111-12.

Here, there can be no doubt that the forfeiture imposed will destroy Ng's future livelihood, given the size of the judgment and that Ng and his family have *already* ceded to Malaysia the full proceeds allegedly derived from the crime, and much more. Ng is fifty years old and has been sentenced to a 120-month term of imprisonment in the United States; he will likely eventually be tried in Malaysia on charges relating to 1MDB. (A-1216). Even if, following release, he is able to earn a million dollars a year—a near impossibility given that the allegations against him will prevent him from having any career in finance—he would still be unlikely to ever satisfy the judgment. Thus, independent of any other relevant considerations, the district court should have rejected the requested forfeiture, or at minimum conducted a more probing inquiry into whether the forfeiture would be "ruinous" to Ng's ability to earn a livelihood in the future. *See United States v. Levesque*, 546 F.3d 78, 83-85 (1st Cir. 2008).

### C. Forfeiture Money Judgments Are Not Authorized By The Applicable Statutes

The government obtained forfeiture against Ng pursuant to 18 U.S.C. §§981(a)(1)(c) and 982(a)(1), and 28 U.S.C. §2461(c). Those statutes do not, however, authorize a forfeiture money judgment, as opposed to the forfeiture of

specific assets derived from the crime (or substitute assets, pursuant to the procedures of 21 U.S.C. §853(p)). Where—as here—the text of the statutes at issue do not explicitly provide for a forfeiture money judgment, courts lack the power to impose one. *See, e.g.*, *United States v. Nejad*, 933 F.3d 1162, 1164-65 (9th Cir. 2019) ("The criminal forfeiture statutes at issue…lack any textual basis for imposing a personal money judgment."); *United States v. Surgent*, No. 04-CR-364 (JG), 2009 WL 2525137, at *5-16 (E.D.N.Y. Aug. 17, 2009) (holding that neither §982 nor §853 authorize forfeiture money judgments; discussing flawed reasoning of decisions imposing such judgments; observing that "Congress knows how to explicitly authorize" a forfeiture money judgment when it desires to).[9]

## **CONCLUSION**

For the foregoing reasons, the convictions should be vacated, and the indictment dismissed for lack of venue. If the government seeks to retry Ng, it should be required to do so on the allegations in the Original Indictment. At a minimum, the forfeiture order should be vacated.

---

[9] Although this argument is foreclosed by current Circuit law, Ng seeks to preserve the issue.

61

Dated:  New York, New York
        July 19, 2023

                                 /s/ Alexandra A.E. Shapiro
                                 Alexandra A.E. Shapiro
                                 Theodore Sampsell-Jones
                                 Avery D. Medjuck
                                 SHAPIRO ARATO BACH LLP
                                 1140 Avenue of the Americas, 17th Floor
                                 New York, New York 10036
                                 (212) 257-4880

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(g) and Local Rule 32.1 because it contains 13,939 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 16.74 in 14-point font.

Date: July 19, 2023

  /s/ Alexandra A.E. Shapiro  
Alexandra A.E. Shapiro