# 23-6333

*To Be Argued By*:
ALIXANDRA E. SMITH

# United States Court of Appeals

## For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LOW TAEK JHO, also known as JHO LOW,

*Defendant,*

NG CHONG HWA, also known as ROGER NG,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF FOR THE UNITED STATES

NICOLE M. ARGENTIERI,
*Acting Assistant Attorney General*
*Criminal Division*

BREON PEACE,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

BRENT WIBLE,
SAMANTHA BATEMAN,
*Trial Attorneys,*
*Of Counsel.*

AMY BUSA,
ANTHONY BAGNUOLA,
ALIXANDRA E. SMITH,
DREW G. ROLLE,
DYLAN A. STERN,
*Assistant United States Attorneys,*
*Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ v

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ................................................................. 3

    I.      The Indictment and Pre-Trial Motions .................................. 3

    II.     The Government's Case ......................................................... 5

          A.    Overview.................................................................... 5

          B.    Ng's Relationship with Jho Low .................................. 8

          C.    The Bribery Scheme.................................................. 13

               1.    Project Magnolia ........................................... 13

               2.    Project Maximus and
                      Project Catalyze ................................................ 20

          D.    Circumvention of Goldman's
              Internal Accounting Controls .................................... 24

          E.    Money Laundering Conspiracy................................... 27

               1.    Corrupt Payments from
                      Project Magnolia ............................................... 27

                2.    Additional Corrupt
                      Payments Received by Ng................................... 30

                3.    Account Activity After the
                      Corrupt Payments............................................... 31

4.    Additional Laundering Transactions by Co-Conspirators ........................ 34

III.   Jury Deliberations and Verdict ................... 35

IV.   Sentencing and Forfeiture ......................... 35

SUMMARY OF ARGUMENT ..................................... 36

ARGUMENT ................................................................. 38

POINT ONE - THE DISTRICT COURT PROPERLY EXCLUDED THE RECORDED CALL BETWEEN LEISSNER AND LIM ...................... 38

I.   Background ......................................... 38

    A.   The Recorded Call ................................... 38

    B.   The District Court's Decision ........................ 40

    C.   Lim's Testimony ................................... 42

    D.   Standard of Review ............................. 46

II.   The District Court's Decision Was Not Erroneous ................................... 47

    A.   The District Court Did Not Err in Excluding the Recorded Call .......................... 47

        1.   Lim's Purported Inquiries of Leissner Were Properly Excluded as Hearsay ................................. 47

        2.   The Remainder of the Recorded Call Was Appropriately Found Inadmissible ............................. 52

B.   Any Error from the Exclusion of
the Recorded Call Was Harmless ....................... 57

POINT TWO - NG'S PROSECUTION DID NOT
VIOLATE THE RULE OF SPECIALTY
OR ANY AGREEMENT WITH THE
GOVERNMENT .................................................... 63

I.   Applicable Law and Standard of
Review ........................................................... 63

II.   Background .................................................... 66

III.   Ng's Challenge is Waived and Meritless .................... 70

A.   The Rule of Specialty Controls
Whether Ng's Prosecution Was
Proper. ................................................... 71

1.   The Rule of Specialty,
Rather Than the February
Letter, Applies Because Ng
Consented to Extradition ........................... 71

2.   Even if the February Letter
Applied, That Letter
Merely Incorporates the
Rule of Specialty. ...................................... 74

B.   The District Court Correctly
Rejected Ng's Rule-of-Specialty
Challenge. ............................................... 78

POINT THREE - THE INDICTMENT SUFFICIENTLY
ALLEGED EDNY VENUE ............................... 83

I.   Applicable Law ............................................... 84

A.   Pretrial Motions to Dismiss and
Standard of Review ................................... 84

iv

B.    Venue.................................................................85

II.  The District Court Properly
Denied Ng's Motion to Dismiss...............................86

POINT FOUR - THE DISTRICT COURT'S FORFEITURE
ORDER WAS AUTHORIZED BY STATUTE
AND NOT EXCESSIVE......................................92

I.  Applicable Law and Standard of
Review ........................................................................92

II.  Discussion...................................................................95

A.    The Forfeiture Order Was Not
Excessive ............................................................95

B.    The Forfeiture Order Was
Authorized by Statute.......................................97

CONCLUSION ...................................................................99

v

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>CASES</u>

<u>Armour Packing Co. v. United States</u>,
 209 U.S. 56 (1908)................................................................91

<u>Barikyan v. Barr</u>,
 917 F.3d 142 (2d Cir. 2019) ........................................78 n.9

<u>Dobbs, Inc. v. Local No. 614, Int'l Brotherhood of Teamsters</u>,
 813 F.2d 85 (6th Cir. 1987)..........................................78 n.9

<u>Fiocconi v. Attorney Gen. of U.S.</u>,
 462 F.2d 475 (2d Cir. 1972) ....................................... passim

<u>Hollerbach v. United States</u>,
 233 U.S. 165 (1914)...............................................................75

<u>In re Platinum and Palladium Antitrust Litigation</u>,
 61 F.4th 242 (2d Cir. 2023)..........................................53 n.6

<u>Johnson v. United States</u>,
 520 U.S. 461 (1997)...............................................................66

<u>Lexington Ins. Co. v. Western Pennsylvania Hosp.</u>,
 423 F.3d 318 (3d Cir. 2005) .........................................50-51

<u>Quartararo v. Hanslmaier</u>,
 186 F.3d 91 (2d Cir. 1999) ....................................48, 51 n. 5

<u>Smith v. United States</u>,
 599 U.S. 236 (2023)...............................................................85

<u>Torry v. City of Chicago</u>,
 932 F.3d 579 (7th Cir. 2019).................................................50

<u>United States v. 38 Whalers Cove Drive</u>,
 954 F.2d 29 (2d Cir. 1992) ...................................................93

vi

United States v. Abdallah,
   840 F. Supp. 2d 584 (E.D.N.Y. 2012)....................................................89

United States v. Abdallah,
   528 F. App'x 79 (2d Cir. 2013) ...........................................................89

United States v. Aleynikov,
   676 F.3d 71 (2d Cir. 2012) ..................................................................84

United States v. Alfonso,
   143 F.3d 772 (2d Cir. 1998) ................................................................84

United States v. Awad,
   598 F.3d 76 (2d Cir. 2010) ...........................................................94, 97

United States v. Baez,
   349 F.3d 90 (2d Cir. 2003) ..................................................................66

United States v. Bajakajian,
   524 U.S. 321 (1998)......................................................................94, 95

United States v. Bala,
   236 F.3d 87 (2d Cir. 2000) ........................................................83 n.11

United States v. Barrow,
   400 F.3d 109 (2d Cir. 2005) ...............................................................75

United States v. Bellomo,
   176 F.3d 580 (2d Cir. 1999) ...............................................................93

United States v. Blake,
   195 F. Supp. 3d 605 (S.D.N.Y. 2016)................................................55

United States v. Calonge,
   74 F.4th 31 (2d Cir. 2023)...................................................................90

United States v. Capoccia,
   503 F.3d 103 (2d Cir. 2007) ...............................................................93

United States v. Cardascia,
   951 F.2d 474 (2d Cir. 1991) ...............................................................53

United States v. Castello,
611 F.3d 116 (2d Cir. 2010) ................................................... 95

United States v. Collado,
348 F.3d 323 (2d Cir. 2003) ................................................... 94

United States v. Coplan,
703 F.3d 46 (2d Cir. 2012) ........................................... 46, 51 n.5

United States v. Cummings,
858 F.3d 763 (2d Cir. 2017) ................................................... 46

United States v. Daidone,
471 F.3d 371 (2d Cir. 2006) ............................................ 83 n.11

United States v. Daley,
702 F.3d 96 (2d Cir. 2012) ................................................... 84

United States v. Dietrich,
865 F.2d 17 (2d Cir. 1988) ................................................... 50

United States v. DiTommaso,
817 F.2d 201 (2d Cir. 1987) ................................................... 65

United States v. Elfgeeh,
515 F.3d 100 (2d Cir. 2008) ................................................... 94

United States v. Ferguson,
676 F.3d 260 (2d Cir. 2011) ................................................... 46

United States v. George,
779 F.3d 113 (2d Cir. 2015) ................................................... 95

United States v. Gomez,
617 F.3d 88 (2d Cir. 2010) .............................................. 46, 58

United States v. Harwood,
998 F.2d 91 (2d Cir. 1993) ................................................... 53

United States v. Ho,
984 F.3d 191 (2d Cir. 2020) ................................................... 58

United States v. Kalish,
  626 F.3d 165 (2d Cir. 2010) .................................................. 94

United States v. Kirk Tang Yuk,
  885 F.3d 57 (2d Cir. 2018) ........................................... 89, 90

United States v. Kuthuru,
  665 F. App'x 34 (2d Cir. 2016) ...................................... 51 n.5

United States v. Levy,
  25 F.3d 146 (2d Cir. 1994) ..................................... 63, 81, 82

United States v. McCallum,
  584 F.3d 471 (2d Cir. 2009) ......................................... 47, 58

United States v. Miller,
  263 F.3d 1 (2d Cir. 2001) .................................................. 66

United States v. Monsanto,
  491 U.S. 600 (1989) ......................................................... 92

United States v. Montague,
  67 F.4th 520 (2d Cir. 2023) ............................................. 84

United States v. Nejad,
  933 F.3d 1162 (9th Cir. 2019) .......................................... 97

United States v. Netschi,
  511 F. App'x 58 (2d Cir. 2013) ......................................... 54

United States v. Oguns,
  921 F.2d 442 (2d Cir. 1990) ............................... 48, 49, 51 n.5

United States v. Paroutian,
  299 F.2d 486 (2d Cir. 1962) ...................................... passim

United States v. Powell,
  469 U.S. 57 (1984) ........................................................... 61

United States v. Powers,
  40 F.4th 129 (4th Cir. 2022) ............................................ 88

United States v. Pulliam,
   973 F.3d 775 (7th Cir. 2020) ................................................................. 49

United States v. Roberts,
   660 F.3d 149 (2d Cir. 2011) ................................................................. 93

United States v. Rodriguez,
   553 U.S. 377 (2008) ..................................................................... 78 n.9

United States v. Rommy,
   506 F.3d 108 (2d Cir. 2007) ........................................................ 85, 86, 87

United States v. Rosemond,
   841 F.3d 95 (2d Cir. 2016) ................................................................... 75

United States v. Rossi,
   545 F.2d 814 (2d Cir. 1976) ........................................................... 81, 82

United States v. Royer,
   549 F.3d 886 (2d Cir. 2008) ................................................................ 85

United States v. Rutigliano,
   790 F.3d 389 (2d Cir. 2015) ........................................................... 86, 87

United States v. Sabhnani,
   599 F.3d 215 (2d Cir. 2010) ................................................................ 92

United States v. Skelos,
   988 F.3d 645 (2d Cir. 2021) ................................................................ 46

United States v. Stearns,
   479 F.3d 175 (2d Cir. 2007) ................................................................ 66

United States v. Suarez,
   791 F.3d 363 (2d Cir. 2015) ................................................................ 64

United States v. Summers,
   414 F.3d 1287 (10th Cir. 2005) ........................................................... 49

United States v. Surgent,
   No. 04-CR-364 (JG), 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009) ..... 97

x

United States v. Tanner,
   942 F.3d 60 (2d Cir. 2019) ................................................58

United States v. Torres,
   794 F.3d 1053 (9th Cir. 2015)......................................49, 50

United States v. Tzolov,
   642 F.3d 314 (2d Cir. 2011) .........................................85, 86

United States v. Varrone,
   554 F.3d 327 (2d Cir. 2009) ................................................97

United States v. Viloski,
   814 F.3d 104 (2d Cir. 2016) ........................................ passim

United States v. Wasylyshyn,
   979 F.3d 165 (2d Cir. 2020) ...........................................57 n.7

United States v. Wedd,
   993 F.3d 104 (2d Cir. 2021) .........................................84, 88

United States v. Williams,
   519 F. App'x 303 (5th Cir. 2013).........................................93

United States v. Yousef,
   327 F.3d 56 (2d Cir. 2003) ...........................................86-87

United States v. Zenni,
   492 F. Supp. 464 (E.D. Ky. 1980) .......................................51

STATUTES

18 U.S.C. § 1956(h).................................................. passim

18 U.S.C. § 1956(c)(7)(B)(iv)............................................80

18 U.S.C. § 981(a)(1)(C)................................................92

18 U.S.C. § 982(a)(1)..................................................92

28 U.S.C. § 2461(c) ...................................................92

## RULES AND TREATY

Fed. R. Crim. P. 12(b)(2) ...................................................... 84

Fed. R. Crim. P. 32.2(b)(1)(A) .............................................. 94

Fed. R. Evid. 106 ........................................................ passim

Fed. R. Evid. 613 ................................................... 56, 57 n.7

Fed. R. Evid. 801(d)(1)(B) ..................................................... 56

Fed. R. Evid. 803(3) ..................................................... passim

Fed. R. Evid. 807 ....................................................... passim

Malay-U.S., Aug. 3, 1995, T.I.A.S. No. 97-602 ............................. passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 23-6333

———————————

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

LOW TAEK JHO, also known as JHO LOW,

<u>Defendant</u>,

NG CHONG HWA, also known as ROGER NG,

<u>Defendant-Appellant</u>.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendant-appellant Ng Chong Hwa, also known as "Roger Ng," appeals from a judgment of conviction entered on March 10, 2023, in the United States District Court for the Eastern District of New York (Brodie, C.J.).

2

On December 20, 2021, a grand jury in the Eastern District of New York ("EDNY") returned a second superseding indictment charging Ng with (1) conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), in violation of 18 U.S.C. § 371; (2) conspiracy to violate the internal accounting controls provisions of the FCPA, in violation of 18 U.S.C. § 371; and (3) conspiracy to commit international money laundering, in violation of 18 U.S.C. § 1956(h). On April 8, 2022, following a nine-week jury trial, Ng was convicted of all counts. He was sentenced to 120 months' imprisonment and two years' supervised release and ordered to forfeit $35.1 million.

On appeal, Ng argues that (1) the district court improperly excluded evidence that he asserts would have supported his defense; (2) the superseding indictment violated an agreement between the government and Ng granting him the protections of the rule of specialty after his extradition from Malaysia; (3) the court should have dismissed the superseding indictment for failing to sufficiently allege venue; and (4) the $35.1 million forfeiture order violated the Excessive Fines Clause and was not authorized by statute.

These arguments lack merit.

STATEMENT OF FACTS

I.   The Indictment and Pre-Trial Motions

On October 3, 2018, a grand jury in EDNY returned an indictment against Ng and his co-conspirator Low Taek Jho, also known as "Jho Low."  (A:43-76) ("Initial Indictment").[1]  This indictment charged Ng with one count each of conspiracy to violate the FCPA's anti-bribery provisions, conspiracy to violate the FCPA's internal accounting controls provisions, and money laundering conspiracy.  These counts detailed Ng's role in a scheme to bribe foreign government officials in Malaysia and Abu Dhabi to win business for Ng's New York-headquartered employer, The Goldman Sachs Group, Inc. ("Goldman"); to obtain the necessary approvals to proceed with that business by circumventing Goldman's internal controls; and to launder the proceeds of the co-conspirators' violations of the FCPA and Malaysian law through the U.S.

Ng was arrested in Malaysia pursuant to a provisional arrest warrant, and the U.S. formally requested Ng's extradition to stand trial.

---

[1]     References to "BR," "A" and "SA" refer to Ng's brief, appendix and special appendix.  References to "T," "GX," and "DX" are to the trial transcript, the government exhibits and defense exhibits at trial, respectively.  "DE" refers to docket entries below.

4

Ng consented to extradition, and, on May 3, 2019, was surrendered to the custody of the U.S.

Ng moved to dismiss the Initial Indictment, asserting a failure to allege venue and failure to include certain charging language in the money laundering count. (DE:43). While that motion was pending, an EDNY grand jury returned a superseding indictment ("Superseding Indictment"), which added no new charges but clarified the charging language to which Ng had objected and added factual allegations. (A:77-109). Ng supplemented his pending motion, alleging that the Superseding Indictment violated the rule of specialty protections the government had promised him. The district court denied Ng's motion to dismiss, finding that the Superseding Indictment did not violate the rule of specialty and that it sufficiently alleged venue. (SPA:29-54).

On December 20, 2021, an EDNY grand jury returned a second superseding indictment ("Second Superseding Indictment"), which added no new charges but included additional factual allegations and overt acts. (A:146-81). Ng did not move to dismiss this indictment.

II.     The Government's Case

        Ng's trial commenced on February 7, 2022, and concluded on
April 8, 2022, when the jury convicted him of all counts.  During trial, the
government called 27 witnesses and admitted more than 2,100 exhibits.
Ng presented a defense, calling three witnesses, including his wife, Hwee
Bin Lim ("Lim").  The government's proof established the following:

        A.     Overview

        1Malaysia Development Berhad ("1MDB") was a strategic
investment and development company wholly owned and controlled by
the government of Malaysia.  The International Petroleum Investment
Company ("IPIC") was a sovereign wealth fund wholly owned by the
government of Abu Dhabi.

        In 2012 and 2013, 1MDB engaged in three bond transactions
(the "1MDB Bond Transactions"), which collectively raised more than $6
billion for 1MDB.  The 1MDB Bond Transactions were either directly or
indirectly guaranteed by IPIC.  The purpose of the funds raised by the
1MDB Bond Transactions was to support energy- and infrastructure-
related projects to benefit the Malaysian people.

6

Goldman, and its subsidiaries and affiliates, collectively facilitated the 1MDB Bond Transactions. Ng was a Managing Director of Goldman during this period. In connection with the 1MDB Bond Transactions, Ng agreed with others, including co-conspirators Tim Leissner, another Goldman employee, and Jho Low, a Malaysian financier, to pay bribes to foreign officials in Malaysia and Abu Dhabi, including to those at 1MDB and IPIC. In exchange for these corrupt payments, the 1MDB officials agreed to hire Goldman to orchestrate the 1MDB Bond Transactions. For its work on those transactions, Goldman earned more than $600 million.

Ng, Leissner and Low conspired to launder billions of dollars that were raised through the 1MDB Bond Transactions into accounts Low personally controlled. From there, the U.S. government traced approximately $1.6 billion in bribes paid to officials at 1MDB and IPIC, and other government officials in Malaysia and Abu Dhabi, and traced more than $1 billion in kickbacks that were paid to Ng, Leissner, Low and their co-conspirators.

To execute the scheme, Ng, Leissner and others at Goldman affirmatively lied and failed to disclose information to multiple Goldman

committees responsible for authorizing the 1MDB Bond Transactions. Specifically, Ng, Leissner and others concealed from Goldman that Low was the ultimate decisionmaker behind the 1MDB Bond Transactions. Ng and Leissner also concealed from Goldman's committees that (1) corrupt payments would be made to government officials in Malaysia and Abu Dhabi to complete the 1MDB Bond Transactions, (2) funds raised from the 1MDB Bond Transactions would be diverted from 1MDB to make the corrupt payments, and (3) Ng and Leissner would receive kickbacks from the 1MDB Bond Transactions.

Ng conspired to conceal his connection to the criminal proceeds from the 1MDB Bond Transactions by using his close relatives. He used an account for a shell company in his mother-in-law's name to receive approximately $35.1 million in kickback payments from Low and Leissner. He and his wife provided false statements about the funds' source, used the shell company account to make purchases and investments in excess of $10,000, and dissolved the shell company account after disbursing the funds.

The scheme perpetrated by Ng and his co-conspirators occurred in part in EDNY: Low and Leissner traveled to and through

EDNY for several meetings in furtherance of the scheme; Ng and his co-conspirators engaged in email and telephone communications to and from Goldman's New York headquarters through EDNY; and wire transfers in furtherance of bribes, kickbacks, and money laundering transactions, including transfers to and from accounts controlled by Ng, passed to and through EDNY.

### B.   Ng's Relationship with Jho Low

Ng's close professional and personal relationship with Low predated the 1MDB Bond Transactions.  Ng first met Low in 2008 and agreed to "try to establish a relationship" with Low to benefit Goldman in January 2009, at which point Low introduced Ng to Leissner.  (T:416-17).  In the months that followed, Ng and Low coordinated trips to discuss potential business opportunities.  (GX-1538, GX-1546).  Ng knew about Low's close connections to government officials in the Malaysian and Abu Dhabi governments; that the source of Low's wealth was unknown; and that Goldman's compliance and legal departments considered Low a serious business risk as a result.  In July 2009, Ng forwarded himself an article about the inner circle of Najib Razak, the Malaysian prime minister, which identified Low as a member of that inner circle.  (GX-

1554).  In November 2009, shortly after 1MDB was created, Ng met with Low and Razak's three children in Low's Manhattan apartment, and told Leissner that he would "work on getting them to join GS [i.e. Goldman Sachs]."  (GX-1027-B, GX-1575, GX-3004, GX-3005).

Ng was aware that Low did not want it to be publicly known that he had a close relationship with Razak and officials at 1MDB.  In one email, Low asked Ng to "[p]lease remove any reference to [Low] being close to the PM [i.e. the Malaysian Prime Minister] or advisor to the King."  (GX-1558).  Low later wrote, "[w]hen emailing the 1mdb guys, please bcc me."  (GX-1567).

In October 2009, Ng referred Low to Goldman for a private wealth management ("PWM") account in Switzerland.  (GX-1564, GX-1591; T:2736-37, 3130, 3135).  As part of the PWM process, Goldman's compliance personnel identified multiple "red flags," including that they could not identify the source of Low's wealth and that Low was associated with government officials in "high risk" jurisdictions.  (T:2728).  The "Red Flag Summary" compiled by Goldman compliance personnel noted Ng's awareness of these issues.  (GX-1601).  When Ng was briefed on Low's claims, Ng "advised caution in accepting the claims at face value, " (id.),

10

but did not recommend that Low be rejected as a PWM client and continued to support his referral (T:2759-60, 3160; GX-1627).

The Red Flag Summary also showed that Ng lied about his relationship to Low. Ng reported that he had not heard of Low apart from meeting him on a single occasion. (GX-1601). To the contrary, Ng and Low had met in person more than 20 times and had been in consistent contact by email and phone for more than a year. (GX-77, GX-1546, GX-1575).

In May 2010, the Goldman compliance division informed Ng that they continued to have significant concerns about Low. (GX-1632, GX-1638). Ng subsequently told Leissner that Goldman would not accept Low as a PWM client because they were not "comfortable" with the source of Low's wealth. (T:687).

Nevertheless, Ng continued to pursue business opportunities with Low. In December 2010, Ng and Leissner brought a business opportunity with Low to Goldman, and members of the legal department again expressed concern about Low's source of wealth and that he was a politically-exposed person; Ng was ultimately informed that the

11

opportunity would not move forward because Goldman "could not clear buyer." (GX-1659, GX-1669).

In March 2011, Ng supported another attempt to establish Low as a PWM client. (GX-1679, 1680). Ng was informed that it was unlikely that Low would clear the compliance division's background investigation. (GX-1692; T:2766).

Ng continued to serve as a point of contact between Low and Goldman. In an April 2011 email exchange about a business opportunity, Ng wrote that he would "get this material to JL [Low] and have him speak with the PM [Prime Minister Razak] as well." (GX-1696). Later that year, Ng discussed opportunities that involved Low using his personal email address, roger.ng1@gmail.com (the "Ng Gmail Account"). (GX-2215, GX-2216).

Ng and Leissner also considered side deals with Low which they did not disclose to Goldman in violation of Goldman's policies. For example, in October 2010, Leissner forwarded information about a business venture to Ng and added, "[w]hat do you think for JL [Low]?" (GX-2204). A few months later, Ng told Leissner that he and Low discussed a deal involving Petronas, an oil and gas company owned by

the Malaysian government. (GX-2208). Ng wrote that they would need to "pay Omar [a Petronas board member] so that he plays ball." (GX-2208). Leissner testified that he understood Ng to be referring to bribing the board member. (T:782-85).

Ng also developed a personal relationship with Low. In November 2010, Ng traveled to Las Vegas on Low's private jet and gambled with Low, Low's brother, and Low's associate, Eric Tan Kim Loong ("Eric Tan"). (GX-2841-C, GX-2841-E, GX-2841-F, GX-2841-G, GX-2855). In May 2011, Ng traveled to France to meet Low on a yacht Low rented and then traveled to London with Low on his private jet. (GX-1113-A-02, GX-2825, GX-2826, GX-2831-H).

Throughout their relationship, Ng communicated with Low using personal email accounts (GX-1525, GX-1531), in violation of Goldman policies. (T:4081-82). In addition to the Ng Gmail Account, Ng created queensgate.capital@gmail.com (the "Queensgate Email Account") to communicate with Low and Leissner. (GX-2207). Low also used email accounts that did not reference his name to communicate with Ng and Leissner, including dealrainman1@gmail.com (the "Deal

13

Rainman Account") and project.lionfish@gmail.com. (GX-2207, GX-2555-E).

* * * * *

By early 2012, the strengthening relationship among Ng, Leissner and Low, Ng and Leissner's desire to bring 1MDB business to Goldman, and Low's close connections to government officials in Malaysia and Abu Dhabi all culminated in the criminal schemes.

C.    The Bribery Scheme

1.    Project Magnolia

In the first 1MDB Bond Transaction, "Project Magnolia," Goldman helped 1MDB raise approximately $1.5 billion to facilitate 1MDB's purchase of Tanjong Energy Assets ("Tanjong Energy"), a company that operated power plants in Asia and the Middle East.   In advance of the transaction, Ng, Leissner, and Low agreed to make a series of corrupt payments to government officials in Malaysia and Abu Dhabi to ensure that the deal would be consummated and to enrich themselves and Goldman.   These corrupt payments were sourced from the funds Goldman raised for Project Magnolia and two other bond transactions.   At trial, the government presented evidence of four

14

meetings prior to Project Magnolia in furtherance of the bribery conspiracy. The government also presented evidence that, while Ng and Leissner were attempting to close the deal at Goldman, they continually communicated with Low, Jasmine Loo (1MDB's general counsel) and others using personal email accounts to conceal Low's involvement in the deal and the true aim of the bribery conspiracy. (GX-1753, GX-1758, GX-1764, GX-1766, GX-1767, GX-1768, GX-1812, GX-2251, GX-2266).

First, on February 26, 2012, at Low's London apartment, Ng, Leissner, and Low met with, among others, Loo and Nik Faisal, the CEO of a 1MDB subsidiary, to address Goldman's role in Project Magnolia. (T:442-43; GX-1107-A-03, GX-1349-A-03, GX-1751, GX-2831-A).[2] During the meeting, Low discussed "the scheme" and how to "buy approvals and authorizations within Malaysia and within Abu Dhabi," explaining that the money used to "buy approvals" would be sourced from the funds raised by Project Magnolia. (T:446-47, 450).

---

[2] A trial witness who reviewed travel documents stated he did not recall seeing records to reflect whether Faisal was in London. (A:750).

15

To explain the plan, Low drew two columns on a sheet of paper: one for Malaysia, and one for Abu Dhabi. (T:446-47). In the Malaysia column, Low included Razak, Razak's wife, multiple 1MDB officials, and members of the Malaysian government. (Id.). Under Abu Dhabi, Low listed several government officials: Sheikh Mansour, the deputy prime minister of the United Arab Emirates and chairman of IPIC; Khadem Al-Qubaisi, the managing director of IPIC; Mohamed Badawy Al-Husseiny, the CEO of Aabar, a subsidiary of IPIC; and Yousef Al-Otaiba, the United Arab Emirates's ambassador to the United States. (T:446-49). After the meeting, Loo sent a chart displaying the structure of Project Magnolia to Ng and Leissner's personal email accounts. (GX-1745).

Second, on March 3 and March 4, 2012, Ng, Leissner, and Low met representatives from IPIC and Aabar in Abu Dhabi. (GX-1114-A, GX-1352-A-02, GX-1780, GX-2831-B). After the meeting, Ng wrote to another Goldman employee, stating that the CEOs of IPIC and Aabar had agreed in principle to provide a guarantee for Project Magnolia. (GX-1780). Ng also emailed a document detailing Tanjong Energy cash flows from his Goldman email account to the Ng Gmail Account. (GX-1781).

16

Low used the Deal Rainman Account to discuss delivery of a letter from Razak to Sheikh Mansour to help secure IPIC's involvement in Project Magnolia; Leissner delivered the letter to Al-Qubaisi to provide to Sheikh Mansour. (GX-1791, GX-2252; T:1656).

Third, Ng attended a meeting in the U.S. to arrange the purchase of Tanjong Energy assets in connection with Project Magnolia. The meeting was scheduled to occur in New York but Low told Ng that the meeting had been moved to the L'Ermitage Beverly Hills hotel, which Low partly owned. (GX-1113-A-01, GX-1808; T:921). As a result, Ng met with Leissner and Low to discuss Project Magnolia at the L'Ermitage. (GX-1113-A-01, GX-1808, GX-2007, GX-2264; T:921-22). From there, Ng returned to Asia, while Leissner and Low flew on Low's private jet from Los Angeles to New Jersey and traveled through EDNY waters into Manhattan to attend the meeting with Ananda Krishnan, the owner of Tanjong Energy, to discuss the assets that would be sold to 1MDB as part of Project Magnolia. (GX-1352-A, GX-1352-A-04, GX-2831-D, GX-2852; DX-2219; T:922). Leissner then flew out of JFK Airport to Asia. (GX-2852; T:4216, 4239).

17

Shortly thereafter, Ng and Leissner communicated with Loo using their personal email accounts about Project Magnolia. On March 28, 2012, Loo used a personal email account under the name "Janet Lane" to discuss Project Magnolia with Ng and Leissner. (GX-2266). In reply, Leissner asked Loo to forward the email to his Goldman email account so they could "handle officially"; Loo complied, sending the same message from her official 1MDB email account to Ng and Leissner's Goldman accounts. (Id.; GX-1812).

Fourth, on April 21, 2012, Ng, Low and Leissner met with representatives of BSI Bank, an entity Ng used to siphon proceeds from Project Magnolia that were used for bribe payments, in Singapore. (GX-1118-A-03, GX-1355-A01, GX-2897-A). The co-conspirators endeavored to assure BSI Bank that the transaction would occur; Ng dismissed concerns about due diligence. (T:943, 945, 3238-40; GX-2269).

On May 21, 2012, Project Magnolia was finalized, and Goldman wired $907.5 million to a bank account controlled by a 1MDB subsidiary (the "1MDB Energy Account"). (GX-151, GX-810, GX-1860). The next day, the 1MDB Energy Account wired approximately $577 million to an account at BSI Bank in the name of "Aabar PJS Limited,"

which appeared to be an account affiliated with Aabar, the subsidiary of IPIC that guaranteed the 1MDB bonds, but was controlled by Low (the "Fake Aabar Account"). (GX-151, GX-159, GX-2282). The payment, described as a "guarantee fee," was authorized by Ng's friend, Terence Geh, the deputy CEO of 1MDB who received bribe payments for his involvement. (GX-152, GX-153, GX-2282). Geh sent a copy of the wire authorization to an email account used by Low. (Id.). On May 25, 2012, and July 25, 2012, the Fake Aabar Account wired approximately $295 million and $133 million, respectively, to "Blackstone Asia Real Estate Partners" (the "Blackstone Account"), a bank account controlled by Low's associate, Eric Tan. (GX-151).

After the deal closed and the co-conspirators siphoned over $425 million from the transaction, Ng discussed the anticipated bribes and kickbacks. (T:981). Ng and Leissner expected to receive their kickbacks shortly after the closing, but they were not paid immediately; Leissner also learned from Loo that she was experiencing a delay in payment, as was Geh. (T:981, 995). Both Ng and Leissner spoke to Low about the delay; Leissner suggested using one of his "entities" in Hong Kong, a shell company called Capital Place Holdings in the name of

19

Leissner's wife, Judy Chan Leissner ("Chan"), as a conduit to pay Ng, Leissner and others. (Id.). Leissner subsequently used the bank account for Capital Place Holdings (the "Capital Place Account") to help distribute bribe and kickback payments, although he and Ng heard that some individuals, including Loo and Geh, still were not timely paid from Project Magnolia and Project Maximus, a subsequent 1MDB bond transaction. (T:1028). The bribe payments' timing reflects this initial delay; Project Magnolia closed in May 2012, but Leissner, Low and Loo did not receive payments until June and July 2012, and Geh did not receive a payment until after Project Maximus closed later in 2012. (GX-151, GX-152).

The Blackstone Account made several corrupt payments to Leissner and the government officials involved in Project Magnolia. (GX-151). On June 11, 2012, the Blackstone Account wired approximately $35 million to the Capital Place Account. The Capital Place Account then wired approximately $17.5 million to a bank account in the name of Ng's mother-in-law, Tan Kim Chin ("Tan"), which originally had the name "Silken Waters" and later changed its name to "Victoria Square" (the "Silken Waters/Victoria Square Account" or "SW/VS Account"). On July

9, 2012, the Blackstone Account wired an additional $16.96 million to the Capital Place Account; one week later, the Capital Place Account transferred $6.9 million to the SW/VS Account. (Id.).

Several wires transferring bribe and/or kickback payments for Project Magnolia passed through EDNY, including the initial transfer of funds from Goldman to the 1MDB Energy Account; the transfer of funds from the 1MDB Energy Account to the Fake Aabar Account; and the transfers of $17.5 million and $6.9 million in kickbacks for Ng from the Capital Place Account to the SW/VS Account. (T:2542, 2546, 2553, 3603-04; GX-159).

### 2. Project Maximus and Project Catalyze

Shortly after Project Magnolia concluded, Low told Ng and Leissner that "the scheme had worked well" and that "there was more money to be made in a similar scheme." (T:1005-06). Subsequently, Ng and his co-conspirators completed two additional bond transactions in furtherance of the bribery conspiracy. First, five months after Project Magnolia's closing, Goldman underwrote another 1MDB Bond Transaction called "Project Maximus," which purported to facilitate 1MDB's investment in domestic energy projects. (GX-53-A). Ng and

Leissner served on the Project Maximus deal team and continued to use their personal email accounts to discuss the deal with Low.  (GX-811, GX-814, GX-1878).  When the transaction closed, Ng attended a celebratory "closing dinner" with 1MDB officials in Hong Kong.  (GX-1885).  The day before, Ng had a private dinner with Leissner and Loo, and Ng's wife purchased diamonds using more than $300,000 in diverted 1MDB bond funds in the SW/VS Account.  (GX-154, GX-348, GX-349, GX-350, GX-1149-A).

When Project Maximus closed in October 2019, Goldman wired approximately $1.64 billion to the account of a 1MDB subsidiary (the "1MDB Energy Langat Account").  (GX-152).  That same day, the 1MDB Energy Langat Account transferred approximately $790 million to the Fake Aabar Account.  (Id.).  The Fake Aabar Account forwarded approximately $664 million to the Blackstone Account.  Hundreds of millions of dollars in corrupt payments were then laundered from the Blackstone Account to various accounts controlled by individuals corruptly associated with Project Maximus.  (Id.).  Because not all of the government officials involved in Project Magnolia were paid through the first round of bribe payments, Low asked Leissner to pay those officials

from the Capital Place Account. (T:1040, 1043). The Blackstone Account wired approximately $20.5 million to the Capital Place Account, and then Leissner wired approximately $3.7 million to the bank accounts of shell companies controlled by the scheme's participants. (GX-152).

In March 2013, Ng continued the scheme through a third 1MDB bond transaction underwritten by Goldman, "Project Catalyze." While Ng did not work on that deal team, he sold bonds issued during Project Catalyze and helped Low identify investors who could purchase the bonds. (GX-2409).

After Project Catalyze closed in March 2013, Ng received a second set of corrupt payments in relation to his involvement in the bribery scheme. (GX-153). On March 19, 2013, Goldman wired approximately $2.72 billion to an account affiliated with a third subsidiary of 1MDB (the "1MDB Global Investment Account"). (Id.). Approximately $65 million from the 1MDB Global Investment Account passed through an intermediary account to the Leissner-controlled Capital Place Account. (Id.). On September 18, 2013, the Capital Place Account wired $4.2 million directly to the SW/VS Account. (Id.). That

same day, the SW/VS Account received an additional $6.5 million from another account controlled by Chan. (Id.).

Many of the wires transferring bribe and/or kickback payments for Projects Maximus and Catalyze passed to or through EDNY. (GX-159). In addition, Ng, Leissner, Low and others made several trips to New York in furtherance of 1MDB business during and after these deals, passing through EDNY each time. (DX:3).

\* \* \* \* \*

As a result of the bribery and money laundering scheme, at least 12 foreign officials in Malaysia and Abu Dhabi received more than $1.6 billion in bribes, which were traceable to the funds raised in the 1MDB Bond Transactions:

- $756 million to Razak;
- $472.75 million to Al-Qubaisi;
- $76.6 million to Al-Husseiny;
- $12.6 million to Loo;
- $238 million to Riza Aziz, Razak's son;
- $4.9 million to Yan Yahaya, a Malaysian government official and advisor to Razak;
- $1.7 million to Jerome Lee, a 1MDB official;
- $40 million to Al-Otaiba;
- $2 million to Geh;

24

- $2 million to Nurzahid Taib, a 1MDB official;
- $2 million to Vincent Koh, a 1MDB official;
- $895,000 to Amhari Nazaruddin, a Malaysian government official and advisor to Razak; and
- $980,000 to Azlin Alias, a Malaysian government official and advisor to Razak.

(GX-157, GX-158). For their roles in the conspiracies, Low and his associates received more than $1.42 billion, Leissner received approximately $73.4 million, and Ng received $35.1 million. (GX-157).

### D. Circumvention of Goldman's Internal Accounting Controls

In order for Goldman to approve and underwrite the 1MDB Bond Transactions, the deal teams were required to obtain authorization from Goldman's Firmwide Capital Committee (the "Capital Committee") and Firmwide Suitability Committee (the "Suitability Committee"), which were part of Goldman's internal accounting controls. (T:108, 112, 278, 3047-48, 3647, 4407-08; GX-513, GX-952). At trial, a Goldman committee member testified that the 1MDB Bond Transactions would not have proceeded if the deals included the use of bribes or undisclosed monetary transactions. (T:3053, 3060-61). Other committee members testified that Goldman agents executing the transactions were expected to report the use of third-party intermediaries, and it would be a "very

25

significant concern" if a Goldman employee had a personal financial interest in the deals. (T:286-87, 3657). Ng knew of these internal controls; his employee records indicated that he completed multiple Goldman anti-bribery and anti-money laundering trainings that discussed the anti-bribery and internal accounting controls provisions of the FCPA. (T:4077-78, 4084-85, 4087).

Ng, Leissner and others thus agreed to be "very careful" with their internal communications to hide Low's authority at 1MDB from Goldman's control functions and used private email accounts to discuss the transactions. (T:436-37). Ng attended several meetings with the Project Magnolia bond transaction committees. (GX-1815, GX-1821, GX-1822, GX-1849, GX-1854, GX-2014). These meetings, along with internal memos and emails, noted the risk of government corruption and inquired about Low's role at 1MDB and relationship to Sheikh Mansour; at no point did Ng disclose Low's involvement. (T:266-67, 3067; GX-803). When similar questions about Low's role were raised during the approval process for the Project Maximus bond transaction, Ng concealed information from the committees. (T:1025; GX-814, GX-823).

26

Ng and Leissner also concealed from Goldman's committees that the purpose of the "guarantee fee," the wire payment sent to the Fake Aabar Account, was to pay bribes and kickbacks. (T:919-20). A committee member testified that the committee reviewed all payments in a transaction to identify any impropriety, and the deal team was expected to disclose all payments and personal interests in a deal. (T:285-88). Finally, Ng and Leissner did not report their anticipated millions of dollars in kickbacks to any committee charged with authorizing the transactions. (T:287-88, 3060, 3657).

Ng and his co-conspirators circumvented Goldman's internal controls in EDNY. The Capital Committee and Suitability Committee were based in New York, as were some members of the committees, who attended the meetings remotely from New York. (T:273-75, 288-89, 3637-38, 3641, 3657-58). During the conspiracy, emails and telephone calls involving New York-based Goldman employees were routed through EDNY. (T:3405-29).

E.    Money Laundering Conspiracy

    1.    Corrupt Payments from Project Magnolia

In anticipation of receiving millions of dollars in kickbacks from the 1MDB Bond Transactions, Ng and his co-conspirators formed a network of bank accounts designed to conceal their connection to the funds.   On May 18, 2012, Goldman's committees approved Project Magnolia.  (GX-61).  Two days later, Leissner asked Chan to send him the account information for the Capital Place Account and told her to inform the bank about an expected transfer of funds.  (GX-2276).  That same day, Lim called Evelyn Teah, a banker at UBS in Singapore.  (GX-463, GX-701-A, GX-1870).

On May 21, 2012, Goldman wired approximately $907.5 million to the 1MDB Energy Account.  (GX-159).  Leissner and Ng were notified of this payment.  (GX-1860).  On that day, Lim contacted Teah via email (using a personal Gmail account) and expressed interest in arranging a shell company under the name "Victoria Square Capital Limited" (i.e., the SW/VS Account).  (GX-2463).

Tan was listed as the beneficial owner of the SW/VS Account on UBS records but Ng and Lim controlled and managed the account.

Lim's correspondence with UBS clarified that she intended to open the account (GX-701-A, GX-2463); the SW/VS Account listed Lim's phone number as the beneficiary's contact information (GX-303, GX-346, GX-701-A); and Lim and Teah discussed the account using their private email addresses (GX-2464).

Ng and Lim also created two email accounts to impersonate Tan and monitor the expected incoming wire transfers. The first was kctan9983@gmail.com (the "Tan Email Account"), which was created on May 21, 2012, the day Project Magnolia closed. (GX-2566-A). Though the account purportedly belonged to Tan, the account user agreed to the terms of service from the same IP address that was associated with Ng's Apple account. (GX-2557-A-02, GX-2566-A). Ng and Lim created the email account victoriasquare.investment@gmail.com (the "Victoria Square Email Account") to track the activity of the Victoria Square Account. In August 2012, the Victoria Square Email Account sent an email regarding investments signed "R," a signature used by Ng (GX-2479), and several emails sent to the Tan and Victoria Square Email Accounts were addressed to "Mr. and Ms. Ng" (GX-2465, GX-2466, GX-2467).

29

On May 22, 2012, the 1MDB Energy Account wired approximately $577 million to the Fake Aabar Account, which the co-conspirators then disbursed to themselves and government officials in Malaysia and Abu Dhabi. (GX-151, GX-159, GX-204-A, GX-2282). That day, UBS internal records indicated that Tan and other members of Ng's family met with representatives from the bank at Ng's Malaysian residence to discuss the SW/VS Account, a meeting scheduled by Lim using her personal email account. (GX-305, GX-2463). Tan falsely reported the source of the funds for the new account as "recently taken profit on her equity investments in Switzerland totaling about $26m." (GX-305).

On June 5, 2012, Leissner sent the wire information for the Capital Place Account to Ng's personal email address. (GX-2287, GX-2287-A). Six days later, the Capital Place Account received a $35 million wire transfer from the Blackstone Account. (GX-151). The Capital Place Account then forwarded half ($17.5 million) to the SW/VS Account. (GX-151, GX-307). Between these two transfers, Ng and Leissner communicated nine times. (GX-57).

30

On July 9, 2012, the Blackstone Account sent the Capital Place Account an additional wire transfer of $16.96 million. (GX-151). One week later, Chan emailed herself the wire information for the SW/VS Account, noting that the account was "[f]or Roger," a transfer Leissner directed. (GX-2297; T:996). The Capital Place Account subsequently wired $6.9 million to the SW/VS Account. (GX-151, GX-159, GX-307).

### 2.  Additional Corrupt Payments Received by Ng

Following Project Maximus and Project Catalyze, Ng received a second set of corrupt payments. (GX-153). On August 22, 2013, a UBS banker sent instructions on incoming wire payments for the SW/VS Account to the Tan Email Account and the Victoria Square Email Account. (GX-352). Shortly thereafter, Leissner sent Chan a copy of the wire information, noting that the instructions were "[f]or next week." (GX-2395).

After receiving the wire instructions, Chan authorized two transfers to the SW/VS Account: $4.2 million from the Capital Place Account and $6.5 million from Chan's account at Morgan Stanley. (GX-153, GX-307). Subsequently, Ng and Lim received a total of $10.7 million in stolen proceeds. (Id.).

After the wires were processed, UBS inquired about the payments' source. The bank's call logs reported that the SW/VS Account's owner was "in a gold PE [private equity] venture with her friends which has been liquidated" and that the payments were sent by two different banks because "she has 2 different portions/percentage with 2 friends." (GX-362-A, GX-362). These statements were false: both wires were sent by Chan and the payments were Ng's kickback payments for executing the 1MDB Bond Transactions, not a "gold PE venture."

According to UBS records, the SW/VS Account only ever received four deposits – the four corrupt payments that Leissner transferred to Ng from Capital Place, totaling $35.1 million, which were traceable to the 1MDB Bond Transactions. (GX-154; T:2950-51).

### 3. Account Activity After the Corrupt Payments

After receiving these wire transfers, Ng and Lim made several personal purchases and investments. On December 27, 2012, Lim used her personal email address to request that a payment of $300,500 be prepared for a seller of luxury jewelry. (GX-349). Later that day, an email from the Tan Email Account requested instructions for a wire transfer to "make payment for [Lim's] bling bling purchase," which

included a six-carat diamond. (GX-348, GX-349). On January 2, 2013, the SW/VS Account wired $300,500 to the jeweler's account; that transaction, which passed through EDNY, exceeded $10,000. (GX-154, GX-159). Lim also testified that she wanted to purchase an antique hourglass. (T:4735). On March 5, 2013, the SW/VS Account wired $20,000 to the Rose Trading Company to purchase an hourglass filled with diamonds; that transaction also traversed EDNY and exceeded $10,000. (GX-154, GX-159, GX-451-A). In March 2014, the SW/VS Account transferred over $200,000 to purchase shares of Bristol Myers Squibb, a publicly-traded company based in the U.S. (GX-154). Trial evidence indicated that Ng intended to use the funds to purchase real estate in London. (GX-65, GX-351, GX-456-A, GX-456-B, GX-456-C, GX-456-D, GX-1895, GX-1901, GX-1912, GX-1915, GX-1918, GX-2337, GX-2341, GX-2346, GX-2361, GX-2366, GX-2751).

Ng and Lim also transferred approximately $26.78 million from the SW/VS Account to shell companies they controlled. Approximately $2.5 million passed through an intermediary to an account named "River Blue" held by Lim. (GX-154). Four days later, Ng added himself to the account as an authorized signer. (GX-403). Another

$9.78 million was wired to an account nominally held by Tan but "effectively managed by Lim Hwee Bin and Roger Ng." (GX-154, GX-385). In October 2013, $4.1 million passed through an intermediary to an account held by Lim and Tan. (GX-154). The wire authorization form listed Lim as the funds' recipient to purchase land in Johor, Malaysia. (GX-397). On the day of the wire transfer, Ng researched real estate investment opportunities in Johor. (GX-1932).

In March 2014, Lim attempted to destroy the mail affiliated with the SW/VS Account but was informed that the mail would be retained for five years. (GX-359-T). In response, Lim said she wanted the mail to "stop," and questioned whether dissolving the company would allow her to destroy the mail. (Id.). UBS representatives then met with Ng, Lim, and Tan to discuss closing the SW/VS Account. (GX-356). Lim dissolved the account in May 2014. (GX-355; T:5018-19).

Ng and the co-conspirators took additional steps to destroy evidence of their communications about the schemes during and after the course of the conspiracies. (GX-359-T, GX-2267, GX-2389). Significantly, in early 2015, news reports about corruption issues at 1MDB increased dramatically. (GX-101, GX-1968, GX-1969, GX-1973). Between

34

February and March of 2015, Ng and/or Lim deleted four email accounts related to the conspiracies: the Ng Gmail Account, the Queensgate Email Account, the Victoria Square Email Account and another personal email account that Ng had used to communicate with Leissner and Low about the schemes. (GX-72). Low and other co-conspirators deleted eight additional email accounts related to the schemes, including the Deal Rainman Account. (Id.). Moreover, Low and Ng stopped traveling to the U.S. (GX-2851, GX-2853).

    4.   <u>Additional Laundering Transactions by Co-Conspirators</u>

Ng's co-conspirators engaged in additional money laundering transactions involving proceeds of the schemes. Many co-conspirators used family members and associates to conceal their connections to the accounts through which the payments were laundered (GX-155); purchased luxury items with laundered funds (GX-153, 154, 207-K, 451-A, 452-I, 454-F); and lied to banks about the source of funds (GX-215-A, 219-H). Some transactions were completed using wires traversing EDNY, including for the purchase of art from Christie's in New York and luxury handbags from a company on Long Island. (GX-159, GX-207-K, GX-452-I, GX-454-F; T:3396).

III.    Jury Deliberations and Verdict

The jury began deliberating on April 5, 2022, and returned a guilty verdict on all counts on April 8, 2022.

IV.    Sentencing and Forfeiture

On March 9, 2023, the district court sentenced Ng to concurrent 60-month terms on Counts One and Two and a consecutive 60-month term on Count Three.  (SPA:203-05; DE dated March 10, 2023).

The court also entered a $35.1 million forfeiture order, rejecting Ng's claim that his family's relinquishment of assets to the Malaysian government negated his forfeiture obligation to the U.S. (A:1212-13; DE:247).  Consistent with United States v. Bajakajian, 524 U.S. 321 (1998), the court held that the order was not constitutionally excessive under the Excessive Fines Clause.  (Id. at 3-5).

This appeal followed.

## SUMMARY OF ARGUMENT

On appeal, Ng seeks to reverse his conviction on four grounds. First, Ng argues that the district court improperly excluded a consensually recorded telephone call between his wife and Leissner, which he claims bolstered his defense. The court, however, properly excluded this evidence, and its exclusion was harmless in any event.

Second, Ng argues that the grand jury's superseding indictment violated an agreement between the government and Ng granting him the protections of the rule of specialty after his extradition from Malaysia. But as the district court found, the superseding indictment was consistent with the rule of specialty and this Court's precedents.

Third, Ng asserts that the district court should have dismissed the indictments for failing to sufficiently allege venue in EDNY as to all three counts. Given the detailed venue allegations in the indictments, his argument is meritless and Ng cannot show prejudice.

Finally, Ng asserts the $35.1 million forfeiture order violated the Excessive Fines Clause and was not authorized by statute. The court

below properly rejected the first of these arguments and Ng concedes the

second is foreclosed by this Court's precedents.

<u>ARGUMENT</u>

<u>POINT ONE</u>

THE DISTRICT COURT PROPERLY EXCLUDED
<u>THE RECORDED CALL BETWEEN LEISSNER AND LIM</u>

Ng argues that the district court improperly excluded an October 16, 2018 recorded call between Leissner and Lim (the "Recorded Call"), claiming that its exclusion was "based upon clear legal errors" and that the decision "severely hamstrung the defense." (BR:25). The court did not commit any error in excluding the Recorded Call, and Ng's efforts to mischaracterize the substance and context of the Recorded Call should be rejected. Even if the court erred in excluding the Recorded Call, such error was harmless.

I.  <u>Background</u>

A.  <u>The Recorded Call</u>

On October 16, 2018, while the Initial Indictment remained sealed, Lim contacted Leissner and asked Leissner to arrange a time for a call with "us," which Leissner understood to be a request for a call between Leissner, Lim and Ng. Leissner, at the direction of federal agents, arranged a call, which was recorded on October 16, 2018.

In that call, Lim informed Leissner that Malaysian law enforcement was "looking at . . . forfeiture" related to criminal proceeds traced to Silken Waters/Victoria Square and wanted to know from Leissner "if everything's okay." (A:199). Lim told Leissner that she repeated to authorities a false story that Ng, Lim, Leissner and Chan had concocted to explain the movement of money between Capital Place Holdings and Silken Waters/Victoria Square, namely that the criminal proceeds were "an investment" and that there "is a real business ongoing." (A:200-01). Lim claimed "this thing happened like way back in 2005 . . . and then we decided to wind down in 2011. . . . I mean, who kept documents since those days?" (A:201).

Lim said that she "wanted to see if there is anything . . . [w]hether we have any form of documents" that could be used to satisfy Malaysian law enforcement and suggested contacting Chan. (A:203). After Leissner told Lim that he and Chan "don't speak that much anymore," Lim resolved to contact Chan and see if she had "our documents." (A:203-08).

40

B.    The District Court's Decision

Ng moved in limine for admission of the entire Recorded Call under Federal Rules of Evidence 803(3), 106, 807 and various "other grounds," including that Lim "asked and directed Leissner to help her obtain records of the investment" and that these "requests of Leissner are . . . best understood . . . as a directive or imperative."  (A:187-94) (internal quotation marks omitted).[3]  Although Ng now argues that the "most critical portion[s] of the call" were inquiries that are non-hearsay, (BR: 29), that argument constituted a single sentence of his thirteen-page, single-spaced moving brief (A:193).

The district court denied Ng's motion in a thorough opinion. First, the court held that Rule 803(3) did not apply because "Ng [was] attempting to introduce the October 2018 Recording as proof of the matter asserted — that the $35 million [Chan] transferred into the Silken Water/Victoria Square account was repayment of a 2005 investment

---

[3]     Although Ng criticizes the court for "t[aking] a blunderbuss approach" and using a "cleaver[]" rather than a "scalpel" when assessing the admissibility of the Recorded Call, (BR:37-38), that was the approach he requested in seeking its wholesale admission.  (A:187, 189, 192, 193). Ng neither isolated particular passages for review nor directed any of his scattershot arguments to portions of the Recorded Call.

rather than Ng's cut of the 1MDB proceeds." (SPA:188). Moreover, the Recorded Call was a "self-serving explanation of past events" that "renders the 'state of mind' exception inapplicable." (Id.). Furthermore, the court correctly realized that "most of Lim's statements in the recording contain embedded hearsay, as she is relating what she told the Malaysian authorities about the nature of the transfers to the Silken Waters/Victoria Square account." (SPA:189).

The district court also rejected the claims that the Recorded Call was admissible under Rule 106 or Rule 807. (SPA:190-94). Ng argued that the Recorded Call was admissible under Rule 106 because other communications from months earlier had been found admissible. The court rejected this argument, explaining, "[T]his is . . . a situation where the statements Ng seeks to admit occurred approximately four months after each of the Admitted Communications, during which time Leissner's potential cooperation with the Government was a subject of press speculation in both the United States and Malaysia." (SPA:191). The court continued, "Lim . . . was already concerned about speaking to [Leissner] honestly four months prior, and the fact that news of Leissner's potential cooperation leaked in the interim would only escalate

those concerns." (Id.). For this reason, the court held that the Recorded Call occurred in a "distinct[] context" from the other admitted communications, and Rule 106 did not apply. (Id.). With regard to Rule 807, the court noted that "there are numerous reasons to doubt the trustworthiness of Lim's statements," including the news of Leissner's potential cooperation. (SPA:194; 192-93 (listing six reasons to question Lim's trustworthiness on the Recorded Call)).

Finally, regarding the other proffered bases for admission, including Ng's passing claim that Lim's statements constituted non-hearsay inquiries, the court found that "Ng is attempting to admit Lim's inquiries about the documents not for the fact that they were said but rather for the truth of the matter asserted — that there are documents establishing the investment between Lim's family and [Chan's] family that explain the $35 million transfer to the Silken Water/Victoria Square account." (SPA:194).

C.  Lim's Testimony

During Lim's trial testimony, the district court gave counsel another opportunity to provide a basis for admission. (A:850). Counsel

43

argued that the Recorded Call was a "verbal act" and not hearsay—an argument no longer advanced on appeal.  (A:851).

The government conceded that Lim should be permitted to testify about the inquiries that are the core of Ng's appellate claim, stating,

> The government doesn't object to her saying, whatever the back story with the Malaysian police is, fine, saying I then contacted Tim Leissner in October 2018 and I asked him for documents.  She can testify to what she did as Your Honor explained.   Our objection is the remainder is hearsay . . . .

(A:851).

Lim then testified on direct examination about the questions she asked Leissner on the Recorded Call:

> Q:    Why did you contact her?
>
> A:    I contacted Judy because I needed to get the documents from her, the document that we signed back in 2005 on my family's investment into Judy's family, the two pages that we mentioned yesterday. . . . [A]nd any other documents that Judy could help me to show that my family indeed invested with her company.
>
> Q:    And did Judy send you anything?
>
> A:    No, she didn't. . . .

44

> Q: And did you talk to Tim Leissner about trying to get the documents from Judy?
>
> A: Yes, that's correct.
>
> Q: And did Tim ever provide you documents from Judy?
>
> A: Yes, Tim said he would get the documents for me from Tim, from Judy, yes.
>
> Q: But did he ever do it?
>
> A: No, he didn't.

(A:854).

While Lim was on direct, the question of the permissible scope of her testimony regarding the Recorded Call resurfaced. The government reiterated that it would not object to Lim "describing that [she] had conversations . . . in October 2018 and asked about documents and asked to get them." (A:857). Lim then testified as follows:

> Q: And did there come a time after you were having this conversations with Rajagopal and the others at CCID that you were reaching out for Tim Leissner? . . . .
>
> A: Correct. I asked them if I can speak to either Judy or Tim to get the documents and Rajagopal specifically said to me yes, you can. . . .
>
> Q: And on or around October 16, 2018, did you and Tim have a video conversation?

A:     It was a very long video . . . call . . . .

Q:     Don't tell us what Tim said.  Let me just ask you some questions and you tell me if this is right. . . . You told Tim that you were speaking with Malaysian authorities, right?

A:     Yes.

Q:     You told Tim that the Malaysian authorities said that you can speak to Tim and you could speak to Judy?

A:     Yes.

Q:     And you asked Tim for the documents?

A:     That's correct, yes.

Q:     And you never got any documents?

A:     No.

(A:859).  Thus, the jury heard Lim testify that she had a "very long video call" with Leissner in which she told him that she "needed the documents" substantiating her investment, and that she asked Leissner for the documents and to speak with Chan about them.[4]  (Id.).

---

[4]      Ng incorrectly claims that the court immediately ceased any questioning about the Recorded Call during Leissner's testimony.  (BR: 28 (citing A:699, A:713-14)).  The only question that defense counsel asked Leissner was whether he asked Lim on the call if he could speak to Ng.  (A:699).  The court sustained the government's objection to that question.  (A:713-14).  The court did not, as Ng claims, "reiterate[] that the defense could not ask Leissner questions about anything said on the

D.    Standard of Review

This Court reviews the district court's decision to exclude evidence as hearsay for abuse of discretion.  United States v. Coplan, 703 F.3d 46, 84 (2d Cir. 2012).  Such an evidentiary ruling is not an abuse of discretion unless it is "manifestly erroneous."  United States v. Skelos, 988 F.3d 645, 662 (2d Cir. 2021).  A "court's hearsay rulings based upon factual findings or the exercise of its discretion warrant additional deference."  United States v. Ferguson, 676 F.3d 260, 285 & n.27 (2d Cir. 2011).

"Even if a district court abuses its discretion by making an erroneous evidentiary ruling, that error is ordinarily subject to harmless error analysis."  United States v. Cummings, 858 F.3d 763, 771 (2d Cir. 2017).  "Error is harmless if it is highly probable that it did not contribute to the verdict."  United States v. Gomez, 617 F.3d 88, 95 (2d Cir. 2010) (internal quotation marks omitted).  This Court has "repeatedly held that the strength of the government's case is the most critical factor in

---

call with Lim," nor did the defense seek to ask Leissner about anything Lim said to him on the Recorded Call.  (BR:28).

47

assessing whether error was harmless." <u>United States v. McCallum</u>, 584

F.3d 471, 478 (2d Cir. 2009).

## II.   The District Court's Decision Was Not Erroneous

### A.   The District Court Did Not Err in Excluding the Recorded Call

#### 1.   Lim's Purported Inquiries of Leissner Were Properly Excluded as Hearsay

Ng's core argument is that the district court abused its

discretion by excluding the specific portion of the Recorded Call "when

Lim asked Leissner whether he or Judy could assist her in finding

documents regarding her investment," claiming that these few

"statements were questions rather than declarative statements and were

therefore plainly admissible as non-hearsay."  (BR:29).  This argument

misses the mark.

Lim's statements on the Recorded Call that Ng describes as

"inquiries" are not obviously questions.   The exchange at issue is as

follows:

> Lim:       Whether we have any form of documents, and I mean if you could help me with any form of—
>
> Leissner:  Oh, I got you, you mean with Capital Place, with Judy?

48

> Lim:        Yeah, if she still kept any, any, any, any form of documents.  If I could contact her.
>
> Leissner:   Yeah, maybe so, maybe so.  I would have to tell—I would have to speak with her.

(BR:26-27 (quoting A:203)).  From this colloquy, it is not clear what, if anything, Lim is asking Leissner for or to do; in fact, Ng argued to the court that these statements are "best understood" not as questions, but "as a directive or imperative."   (A:194) (internal quotation marks omitted).  For this reason, Ng's argument fails at the threshold.

Assuming, <u>arguendo</u>, that Lim's statements are properly understood as inquiries, they were still properly excluded as hearsay. Although this Court has said that "[a]n inquiry is not an 'assertion'"— <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 98 (2d Cir. 1999); <u>United States v. Oguns</u>, 921 F.2d 442, 449 (2d Cir. 1990))—this general rule should not be extended to inquiries that are mere shells for factual assertions and plainly offered for the truth of those assertions.

Ng analogizes Lim's statements to Leissner on the Recorded Call to asking, "What time is it?," (BR:29), but this comparison is inapt. The question "What time is it?" does not have an embedded assertion.

Here, however, Lim's statements amount to her asking, "Does Chan have the documents?" and Ng's purpose in admitting the statement would be to support the embedded assertion that such documents exist. Lim's "inquiry" was therefore inadmissible hearsay. E.g., United States v. Torres, 794 F.3d 1053, 1061 (9th Cir. 2015) ("Because there may be instances where a party attempts to admit hearsay by cloaking statements under the guise of a question, the focus of the inquiry should be on what the declarant intended to say, whether implied or directly asserted."); United States v. Summers, 414 F.3d 1287, 1300 (10th Cir. 2005) (similar); accord United States v. Pulliam, 973 F.3d 775, 783-84 (7th Cir. 2020) (concluding that the statement, "What gun?," was inadmissible hearsay and explaining that "the intent behind a remark dictates whether it is a statement or a question for hearsay purposes . . . [a]nd the context surrounding the remark may help us ascertain the declarant's intent").

Moreover, Ng did not offer Lim's comments "simply as evidence that such a statement was made." Oguns, 921 F.2d at 449 (internal quotation marks omitted). Rather, Ng sought to convey that the documents Lim referenced on the Recorded Call were real. The

50

district court properly considered this purpose in concluding that Lim's statements were hearsay.  (SPA:194); Torres, 794 F.3d at 1056 ("where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the hearsay definition"); United States v. Dietrich, 865 F.2d 17, 20 (2d Cir. 1988) ("Whether or not a statement is hearsay depends upon what use the offeror intends the fact-finder to make of it.").

The cases cited by Ng, (BR:31-33), are not to the contrary.  For example, Torry v. City of Chicago, 932 F.3d 579 (7th Cir. 2019), does not address the issue of an embedded assertion in a question; it addresses the admissibility of a police report.  Id. at 585-86.  Torry, however, clarifies that "assertions"—which are "what the declarant was intentionally trying to convey"—are excludable hearsay.  Id. at 585 n.5. This supports the district court's decision:  Lim's inquiries of Leissner were "intentionally trying to convey" that there were documents that explained the transfer of criminal proceeds into Ng's account, and Ng sought to introduce the statement to support this claim.

The Third Circuit used a similar analysis in Lexington Ins. Co. v. Western Pennsylvania Hosp., 423 F.3d 318 (3d Cir. 2005),

51

explaining that "questions and inquiries are generally <u>not</u> hearsay because the declarant does not have the requisite assertive intent." <u>Id.</u> at 330. Lim's statements here, however, are not within this general rule as she made the statements to Leissner with intent to assert that there were substantiating documents.

United States v. Zenni, 492 F. Supp. 464 (E.D. Ky. 1980), (BR:31-32), is similarly unhelpful for Ng. In <u>Zenni</u>, the statements at issue were directives from callers to a gambling house, and it was "obvious these persons did not intend to make an assertion about the fact sought to be proved." <u>Id.</u> at 469. Here, Lim intended her statements to Leissner, although arguably phrased as a question, to assert that the criminal proceeds were derived from a lawful investment—and this was precisely "the fact sought to be proved" at trial. (<u>Id.</u>).[5]

---

[5] This Court's cases cited in Ng's brief also rest on different facts and are therefore inapposite. <u>See, e.g.</u>, <u>Coplan</u>, 703 F.3d at 84 (concluding that questions posed by an IRS agent in a deposition were not hearsay); <u>Quartararo</u>, 186 F.3d at 98 (determining that testimony that the declarant "said 'something' to petitioner" was not inadmissible hearsay); <u>Oguns</u>, 921 F.2d at 448-49 (finding that the question of "Have the apples arrived there?" was admissible because it was offered "as circumstantial evidence of Oguns' knowledge and intent," rather than for the truth of any matter asserted); <u>United States v. Kuthuru</u>, 665 F. App'x

The portion of the Recorded Call at issue involves a series of statements made by Lim, an unindicted co-conspirator, to Leissner, whom she suspected was a government cooperator, about the existence and location of paperwork documenting a $35 million windfall that was, based on overwhelming evidence, criminal proceeds. Ng offered these statements not for the fact that they were said, but to support the embedded assertion that the investment was legitimate and there were documents to prove it. Against this backdrop, it was not an abuse of discretion for the district court to preclude admission of this portion of the Recorded Call.

    2.   <u>The Remainder of the Recorded Call Was Appropriately Found Inadmissible</u>

Although Ng focuses his argument primarily on the purported "inquiries" in the Recorded Call, he claims, with minimal explanation, that "at least some of Lim's statements were unquestionably statements

---

34, 37-38 (2d Cir. 2016) (holding it was not an abuse of discretion to admit testimony that declarant asked the defendant "if she had a problem").

of future intent" that should have been admitted under Rule 803(3). (BR:36).[6] This claim should be rejected.

Rule 803(3) carves out a narrow exception to the hearsay rule for "statement[s] of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)." Fed. R. Evid. 803(3). To satisfy Rule 803(3), "the statement must face forward, rather than backward." United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993). Specifically, it is inappropriate to admit a statement pursuant to Rule 803(3) when the statement concerns prior conduct or events. See, e.g., United States v. Cardascia, 951 F.2d 474, 488 (2d Cir. 1991) ("To admit statements of one's state of mind with regard to conduct that occurred eight months earlier as in this case would significantly erode the intended breadth of this hearsay exception."); United States v. Netschi, 511 F. App'x 58, 61 (2d Cir. 2013) ( "the statements sought to be

---

[6]    Ng does not raise on appeal the arguments he made below that the Recorded Call should have been admitted under Rule 106, Rule 807 or as a "verbal act." Such arguments are therefore waived. See In re Platinum and Palladium Antitrust Litigation, 61 F.4th 242, 277 (2d Cir. 2023).

introduced must relate to the declarant's state of mind <u>during</u> the various fraudulent transactions," not "<u>after</u> the fraudulent transactions had taken place and as the scheme itself was being discovered").

The district court's conclusion that the Recorded Call was inadmissible under Rule 803(3) was not an abuse of discretion. The court correctly noted that Ng was seeking to introduce the Recorded Call not to show Lim's state of mind, but to prove that documents exist that explain the $35 million in criminal proceeds that Ng received. (SPA:188). This conclusion applies to the single statement highlighted in Ng's brief—Lim's statement that she would "reach out to [Chan] myself and then ask her whether she still has any form of our documents." (BR:36). Ng sought to offer this statement not to show what Lim planned to do, but instead to establish that the referenced documents were real and were created in connection with a legitimate transaction. This falls outside the ambit of Rule 803(3).

Second, the district court properly situated the Recorded Call within the complicated facts of the case, recognizing that this conversation occurred many years after the purported investment and after Lim was aware that Ng was under investigation and that Leissner

might be cooperating. (SPA:188). Based on this timeline, the entirety of the Recorded Call, including Lim's statements about seeking documents, was "a self-serving explanation of past events," rendering Rule 803(3) inapplicable. Id. (quoting United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016)). Moreover, given that the Recorded Call came years after the criminal conduct, "there was ample time for fabrication," undercutting any argument for admissibility under Rule 803(3). Id. (internal quotation marks omitted).

Ng also suggests that portions of the Recorded Call beyond Lim's "inquiries" should have been admitted "because of what was not said"—namely, that Leissner did not say to Lim something "along the lines of '[o]f course there are not documents, because as we all know, there was no investment in the first place!'" (BR:37). This argument is nonsensical given the context of the Recorded Call. As the district court appreciated (SPA:191), Leissner was cooperating with law enforcement at the time and had been told not to raise alarms or attempt to elicit information. Accordingly, Leissner responded affirmatively to Lim's statements on the Recorded Call. This fact undermines any claim that

the Recorded Call was relevant based on any statements (or lack thereof) from Leissner.

Finally, Ng asserts that because both Lim and Leissner testified, admitting the Recorded Call in full "presented no hearsay dangers." (BR:33-35). This assertion is incorrect. Ng's argument here invokes Rule 801(d)(1)(B) as to Lim and Rule 613 as to Leissner, but neither rule applies. Rule 801(d)(1)(B)(ii) covers rehabilitation when the witness's credibility has been attacked. But the portion of Lim's testimony Ng cites as the moment when the Recorded Call should have been admitted under Rule 801(d)(1)(B) occurred during Lim's <u>direct examination</u>, prior to any attack on her credibility. (BR:34 (citing A:849-52)).

Rule 613 states that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613. Ng asserts that "Leissner's statements and omissions on the call were inconsistent with his trial testimony," (BR:34-35), but fails to identify any inconsistency with Leissner's statements on

the Recorded Call. That is because the only question asked of Leissner about the call was, "did you ever ask, Hey, is Roger there?," to which the government objected.[7] (A:699).

In sum, Ng's claims regarding the admissibility of the Recorded Call do not withstand scrutiny. The district court's decision to preclude admission of the Recorded Call was not an abuse of discretion.

## B. Any Error from the Exclusion of the Recorded Call Was Harmless

Even if the district court erred by excluding the Recorded Call, such error was harmless. Initially, Lim testified at trial about what Ng claims was "the most critical portion of the call:" when she "asked Leissner whether he or Judy [Chan] could assist her in finding documents regarding her investment." (BR:29; A:845, 859). This alone renders harmless any error relating to the exclusion of the Recorded Call.

Moreover, given the overall strength of the government's case and the substantial evidence that established Ng's guilt, the exclusion of

---

[7] Moreover, defense counsel never raised the argument below that Leissner's statements on the Recorded Call were admissible as impeachment evidence under Rule 613. This argument should therefore be considered waived. See, e.g., United States v. Wasylyshyn, 979 F.3d 165, 172 (2d Cir. 2020).

58

the Recorded Call was plainly harmless. <u>Gomez</u>, 617 F.3d at 95; <u>McCallum</u>, 584 F.3d at 478; <u>United States v. Tanner</u>, 942 F.3d 60, 66 (2d Cir. 2019). As this Court has explained, an "error is harmless if we can conclude that the evidence was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." <u>United States v. Ho</u>, 984 F.3d 191, 207 (2d Cir. 2020) (internal quotation marks and alterations omitted).

In light of everything the jury considered, any error in excluding the Recorded Call was harmless. Over the course of the nine-week trial, the evidence established that Ng played a critical role in a massive bribery and money laundering scheme that stole billions of dollars intended for Malaysian infrastructure projects and used the money to line the pockets of corrupt government officials, his accomplices and himself. Ng was instrumental in securing Goldman's participation in the relevant bond transactions, which was necessary to provide the deals with a veneer of legitimacy. When Ng received his portion of the corrupt proceeds—over $35 million—he concealed his illegal profits and his participation in the scheme. The evidence demonstrating Ng's role and participation in the charged conspiracies was overwhelming,

59

especially with regard to the provenance and purpose of Ng's $35 million in corrupt payments, which is the focus of the Recorded Call.

Ng's arguments to the contrary lack merit. He argues that because the Recorded Call "offered a competing explanation" for the $35 million payment, its exclusion could not have been harmless. (BR:38-39). However, when compared to the overwhelming evidence submitted at trial, the thin reed of the Recorded Call—especially given the numerous factors undermining its credibility—would not have significantly damaged the government's case were it admitted. Second, Ng misleadingly claims that the government "tacitly conceded that the probative value of the evidence was high." (BR:39). The government did no such thing. The fact that the government did not explicitly make a Rule 403 argument is not an agreement that the Recorded Call was highly probative. Moreover, the Rule 403 balancing test—which considers the individual piece of evidence unto itself—is not the same as the harmless error analysis—which compares the individual piece of evidence to the full quantum of evidence adduced at trial.

Ng also claims that the exclusion of the Recorded Call "stripped [him] of his ability" to rehabilitate Lim's testimony. (BR:40-

60

41). This is not accurate. Ng raised to the district court the prospect of using the Recorded Call to rehabilitate Lim, and the court recognized that if her credibility were attacked regarding the Recorded Call, she could be rehabilitated. (A:852). But Lim's credibility regarding the contents of the Recorded Call was never attacked on cross-examination, and Ng never sought to rehabilitate Lim using the Recorded Call. Ng elicited from Lim that she had a call with Leissner during which she requested the missing investment documents. Lim even testified, "I know the documents are there with her, with Judy, the investment in China, the accounting everything is there." (A:879).[8] Thus, Ng's argument that the exclusion of the Recorded Call prevented him from mounting a defense should be rejected.

Finally, the fact that the jury asked to review Lim's testimony (BR:41), does not mean that the exclusion of the Recorded Call was

---

[8]    On cross-examination, the government affirmatively elicited from Lim that she "tried to contact Tim Leissner . . . after talking to the Malaysian authority . . . [and] it was on that call that [Lim] asked for a document." (A:899). Thus, the jury heard from Lim herself what Ng says was the "key" portion of the Recorded Call (BR:25), significantly diminishing the impact of the district court's evidentiary decision.

61

anything more than harmless error. Lim's testimony included her description of the Recorded Call; if the jury wanted to credit her description of what occurred, it could have done so. Moreover, there were numerous other statements in Lim's testimony that beggared belief. (A:828-29 (explaining that she deleted email accounts because there was a leak in the roof of her house); A:856-57 (describing a random encounter with an individual in Hong Kong that led Lim, as a 25-year-old, to invest nearly $1 million in an undocumented transaction)). The admission of the Recorded Call—which did not itself establish the existence of any documents—would not have caused the jury to believe Lim's otherwise unbelievable testimony. The fact that jury deliberations lasted several days does not suggest that the jury "had some doubts" or "struggled" to reach a verdict. (BR:41). Three days of deliberation on complex charges following a nearly nine-week trial are relatively short, and any argument based on possible jury doubts is improper. Cf. United States v. Powell, 469 U.S. 57, 66 (1984) (cautioning against "inquiries into the jury's deliberations" based on "pure speculation").

62

Given the strength of the government's evidence and the cumulativeness of the excluded evidence, any error in excluding such evidence is harmless.

## POINT TWO

## NG'S PROSECUTION DID NOT VIOLATE THE RULE OF SPECIALTY OR ANY AGREEMENT WITH THE GOVERNMENT

Ng contends that "his convictions must be vacated" because "the government violated its [extradition] agreement with [him] by superseding new offenses into the indictment." (BR:42). This claim lacks merit. The government did not charge Ng with any new offenses following his extradition. Rather, it made minor alterations in two superseding indictments, each of which charged Ng with the same three offenses with which he was originally charged, and for which he was extradited from Malaysia. As a result, the district court correctly denied Ng's motion to dismiss the charges against him because the government did not violate the rule of specialty under the relevant extradition treaty, nor did it breach any agreement with Ng that incorporated that rule. (SPA:40).

## I.    Applicable Law and Standard of Review

The "rule of specialty" generally provides that a criminal defendant brought to the United States for trial via extradition pursuant to an extradition treaty can be tried only for the specific offense or offenses upon which he was extradited. United States v. Levy, 25 F.3d

64

146, 159 (2d Cir. 1994); Fiocconi v. Attorney Gen. of U.S., 462 F.2d 475, 481 (2d Cir. 1972). "The basis of this rule . . . is comity," and "[i]t is designed to protect the extraditing government against abuse of its discretionary act of extradition." United States v. Paroutian, 299 F.2d 486, 490 (2d Cir. 1962); United States v. Suarez, 791 F.3d 363, 366 (2d Cir. 2015). The test for whether a prosecution violates the rule of specialty is not based on "some technical refinement of . . . law," but instead depends on "whether the extraditing country would consider the offense actually tried 'separate'" from the offense for which the defendant was extradited. Paroutian, 299 F.2d at 490–91.

Accordingly, in applying the rule, this Court has consistently held that the government is not limited to prosecuting a defendant strictly on the charges or factual circumstances described in the extradition warrant or original indictment. Rather, the government may supersede to include additional facts, and even add new charges in a superseding indictment, so long as those additional offenses are still "of the same character as the crime [or crimes] for which [the defendant was] extradited." Fiocconi, 462 F.2d at 481; Paroutian, 299 F.2d at 491.

If a defendant was not extradited—for example, if he waived extradition and appeared voluntarily in the United States for trial, or if the foreign country surrendered him pursuant to its domestic law—the rule of specialty does not apply. See United States v. DiTommaso, 817 F.2d 201, 212 (2d Cir. 1987) (stating that the rule of specialty is "limit[ed] . . . to cases involving a formal extradition pursuant to treaty," and does not apply where a defendant "was not extradited; [and] voluntarily waive[s] his right to extradition").

The Extradition Treaty Between the Government of the United States and the Government of Malaysia ("Extradition Treaty") is the controlling agreement governing extraditions from Malaysia to the United States. (DE:59-2; SPA:17 (citing Malay-U.S., Aug. 3, 1995, T.I.A.S. No. 97-602)). Article 16 of that Extradition Treaty lists the rule-of-specialty protections for defendants extradited from Malaysia and provides, in relevant part, that "[a] person extradited under this treaty may not be detained, tried, or punished in the Requesting State except for: (a) the offense for which extradition has been granted or any lesser offense proved by the facts on which the first mentioned extradition was grounded . . . ." (DE:59-2 at 16).

A district court's "interpretation of an extradition agreement and application of the principle of specialty involve questions of law" and are therefore subject to de novo review. United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam). Likewise, to the extent that Ng alleges a breach of an agreement between him and the government, such claims are also reviewed "de novo in accordance with principles of contract law." United States v. Stearns, 479 F.3d 175, 178 (2d Cir. 2007). "Issues not raised in the district court," however, "will be deemed forfeited on appeal and addressed only upon a showing that the [district] court committed plain error." United States v. Miller, 263 F.3d 1, 4 (2d Cir. 2001). To make that showing, a defendant must identify "(1) an error that (2) is 'plain' and (3) 'affect[s] substantial rights'; if these elements are satisfied, then the court may correct the error, but only if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. (quoting Johnson v. United States, 520 U.S. 461, 467 (1997)).

II.  Background

The Initial Indictment charged Ng with two counts of conspiracy to violate the FCPA and one count of conspiracy to commit

67

money laundering. (A:43–76). On October 30, 2018, Malaysian authorities arrested Ng in Malaysia pursuant to a provisional arrest warrant based on that indictment. (A:113). In November 2018, the U.S. made a formal request to Malaysia for Ng's extradition pursuant to the Extradition Treaty. (SPA:17). Malaysia then initiated extradition proceedings against Ng.

In early 2019, the government and Ng, through counsel, discussed potential avenues for Ng's transfer to the U.S. outside of the formal extradition process, including the possibility that he might waive the extradition procedures and protections afforded to him as a Malaysian citizen under the Extradition Treaty. (A:114; SPA:17). During those discussions, Ng expressed concern that by coming to the U.S. outside of the formal extradition process, he would be relinquishing the rule-of-specialty protections afforded under the Extradition Treaty. (Id.; A:140). Accordingly, Ng requested that the government agree to provide him the same rule-of-specialty protections as would be afforded through formal extradition, "explicitly calling [the proposed agreement] a 'rule of specialty agreement.'" (SPA:17-18; DE:59-3 at 2).

The government agreed that if Ng waived extradition, it would provide him rule-of-specialty protections congruent with those in the Extradition Treaty. The government accordingly sent Ng a letter dated February 12, 2019, memorializing that offer and closely tracking the Extradition Treaty's rule-of-specialty provisions ("February Letter"). (A:110–11). The February Letter stated that such agreement would be effective upon Ng's "knowing[] and willful[] waive[r]" of extradition and voluntary appearance in the U.S. (A:110). But the letter explicitly provided that it "pertains only to your client's waiver of extradition and not to any consent to extradition," id.—because if Ng were extradited, the rule-of-specialty protections in the Extradition Treaty would apply.

On February 15, 2019, Ng consented to extradition to the U.S. in proceedings before the Sessions Court in Kuala Lumpur, Malaysia. (DE:59-4). In April 2019, the Malaysian government issued a warrant to temporarily surrender Ng to the U.S., pursuant to the Extradition Treaty and Article 22 of the Malaysian Extradition Act of 1992. (DE:59-6). On May 3, 2019, Ng was released to the custody of U.S. law enforcement agents and appeared in EDNY on May 6, 2019. (SPA:19).

69

The Superseding Indictment was returned on December 9, 2020, and added no new charges or counts beyond those contained in the Initial Indictment. (A:98-106). It simply added certain factual allegations and clarified some charging language to address arguments that Ng had raised in a motion to dismiss. (SPA:3, 23-24). Before obtaining the Superseding Indictment, the U.S. confirmed with the Malaysian government that the changes reflected in the Superseding Indictment did not violate the rule of specialty. (SPA:39).

Ng moved to dismiss the Superseding Indictment, arguing that it was barred by the agreement reflected in the February Letter. (SPA:27). The district court rejected that argument, finding that "[o]n the record before the Court, there can be no dispute that the purpose of the February 2019 Letter was to afford Ng the rule-of-specialty protections he would have been provided through formal extradition," and further holding that "the Superseding Indictment violates neither the rule of specialty nor the provision in the February 2019 Letter, which mirrors the language in the Extradition Treaty." (SPA:36-39). The court therefore denied Ng's motion. (SPA:40).

70

The Second Superseding Indictment was returned on December 20, 2021, and contained the same three counts with which he had been charged. (A:168-78). It also added a handful of alleged overt acts in the FCPA conspiracy counts. (Compare, e.g., A:81-106 with A:151-76). Ng did not move to dismiss the Second Superseding Indictment, and that was the operative indictment on which he was tried and convicted. (A:38-39).

III.   Ng's Challenge is Waived and Meritless

Initially, because Ng never moved to dismiss the Second Superseding Indictment on which he was tried, he forfeited any challenge to the specific alterations in that document, and such arguments must now be reviewed only for plain error. Ng cannot satisfy that stringent standard because he cannot show any plain error, much less one that affected his substantial rights and seriously affected the fairness of his trial.

Even if this Court reviews Ng's claims de novo, however— whether across the board or solely as to the changes in the Superseding Indictment that he moved to dismiss—it should reject those arguments. Nothing about Ng's prosecution violated either the rule of specialty or the

February Letter, which does not apply here but, in any event, simply reflects and incorporates that rule.

### A. The Rule of Specialty Controls Whether Ng's Prosecution Was Proper.

#### 1. The Rule of Specialty, Rather Than the February Letter, Applies Because Ng Consented to Extradition.

Ng's argument (BR:46-52) is premised on his mistaken assertion that the February Letter, rather than the Extradition Treaty, controls his presence for trial in the U.S. Because Ng consented to his extradition, rather than waiving his rights under the Extradition Treaty—as was expressly required by the February Letter—his presence in the U.S. is governed by the terms of the Extradition Treaty, not the February Letter.

The February Letter states that it applies "[t]o the extent your client knowingly and willfully waives extradition to the United States." (A:110). Footnote 1 further emphasizes that "[t]his agreement pertains only to your client's waiver of extradition and not to any consent to extradition." (<u>Id.</u>). Ultimately, however, Ng—who was represented by both Malaysian and U.S. counsel in the Malaysian extradition proceedings—did not "waive[] extradition." Rather, as the supporting

72

documents filed in Malaysia reflect, he <u>consented</u> to extradition to the U.S. as part of the formal extradition process. (DE:59-5 at 3 (Warrant of Committal notes that Ng was "advised in accordance with the provision of paragraph 22(1)(b) of the Extradition Act [of] 1992" and then "consent[ed] to the waiver of the committal proceedings," whereupon he was held in custody "safely until [he was] delivered pursuant to the provisions of the said Act.")). Critically, the warrant's reference to paragraph 22 of the Extradition Act is an express reference to the rule-of-specialty protections to which Ng was entitled in light of his consent to extradition under the Extradition Treaty. That paragraph states:

> (1) When the fugitive criminal is brought before the Sessions Court he may inform the Court that he consents to a waiver of the committal proceedings before the Court and the Court shall— . . .
>
> (b) upon being satisfied that such consent is given voluntarily, advise the fugitive criminal that the effect of so consenting will be that—
>
> (i) he will be committed to prison; . . .
>
> (iii) upon his return to the country which made the requisition for his return, <u>he shall be tried for the extradition offense in respect of which his extradition was requested or he may be tried for any lesser offence proved by the facts on which that extradition offence was grounded.</u>

(DE:59-7 at 19 (emphasis added)). That language parallels the language used in Article 16 of the Extradition Treaty, which outlines the rule of specialty. (DE:59-2 at 16). Moreover, both the Warrant of Committal and the Temporary Surrender Warrant cited the three offenses upon which Ng's extradition was based. (DE:59-5 at 3;DE:59-6 at 2). Those are the same offenses with which Ng was charged in each indictment.

The upshot is that Ng waived further proceedings in the Malaysian courts leading up to his consensual extradition to the U.S. He did <u>not</u> waive all substantive protections afforded to him under the Extradition Treaty and voluntarily appear in the U.S. outside of the formal extradition process, as was required for the February Letter to take effect. The Warrant of Committal makes this clear, directing that Ng be held in custody until he was "delivered [into U.S. custody] <u>pursuant to the provisions of the said Act</u>"—that is, the Malaysian Extradition Act referenced in the immediately preceding sentence. (DE:59-5 at 3 (emphasis added)).

Accordingly, because Ng consented to extradition "pursuant to the provisions of" the Extradition Act, he already received the full

74

benefit of the rule of specialty by virtue of the Extradition Treaty—just as he was advised before he consented to being extradited. (Id.). The February Letter, which was unsigned and was expressly tied to a "knowing[] and voluntar[y] waiver" of Ng's extradition rights in Malaysia, does not control.

### 2. Even if the February Letter Applied, That Letter Merely Incorporates the Rule of Specialty.

To be sure, Ng's counsel appeared to believe that he was waiving extradition, in compliance with (and reliance on) the February Letter. (A:113–38). But even if that were true, it would not alter the outcome. Even had Ng waived extradition, such that the February Letter applied, the district court still correctly denied his motion to dismiss the charges against him because the February Letter merely tracks and incorporates the Extradition Treaty's rule of specialty—which, as explained infra, Ng's prosecution under the Second Superseding Indictment did not violate.

It is a bedrock principle of contract law that, just as with other contractual agreements, agreements involving the government "should be interpreted as are contracts between individuals, with a view to

75

ascertaining the intention of the parties and to give it effect accordingly."
<u>Hollerbach v. United States</u>, 233 U.S. 165, 171–72 (1914).  This principle
holds even when the agreement involves a criminal defendant.  <u>See, e.g.</u>,
<u>United States v. Rosemond</u>, 841 F.3d 95, 107 (2d Cir. 2016) ("Like all
contracts, proffer agreements must be interpreted 'to give effect to the
intent of the parties.'") (quoting <u>United States v. Barrow</u>, 400 F.3d 109,
117 (2d Cir. 2005)).

Here, the district court correctly concluded that "the purpose
of the February 2019 Letter was to afford Ng the rule-of-specialty
protections he would have been provided through formal extradition."
(SPA:36).  The letter was <u>not</u> intended to provide him any extra
protections beyond the rule of specialty itself.  Both the text and context
of the February Letter confirm this interpretation.  As to the text, the
February Letter tracks the key language of the Extradition Treaty's
"Rule of Specialty" provision faithfully:

| February Letter | Extradition Treaty, Article 16 ("Rule of Specialty") |
|---|---|
| [T]he Offices agree that your client will not be detained, tried or punished at the request of our Offices except for | 1.  A person extradited under this treaty may not be detained, tried, or punished in the Requesting State except for: |

| | |
|---|---|
| (1) the offenses charged in the indictment returned on October 3, 2018 in the above-referenced case, or any lesser included offense proved by the facts on which this indictment was grounded, and<br><br>(2) any offense committed after the waiver of extradition and initial appearance in the Eastern District of New York.<br><br>(A:110). | (a) the offense for which extradition has been granted or any lesser offense proved by the facts on which the first mentioned extradition was grounded; [and]<br><br>(b) any offense committed after the extradition of the person.<br><br>(DE:59-2 at 16). |

As this chart shows, the language in the February Letter is coterminous, in all relevant respects, with that of the Extradition Treaty. ((SPA:39 (finding that "the provision in the February 2019 Letter . . . mirrors the language in the Extradition Treaty")). The effect is also clear: the February Letter was intended to provide Ng with the same rule-of-specialty protections as outlined in the Extradition Treaty, no more and no less.

To the extent the plain text of the February Letter leaves any possible ambiguity, the parties' contemporaneous communications dispel it. As the district court noted, Ng's counsel explicitly referred to the proposal that was memorialized in the February Letter as "a 'rule of specialty agreement.'" (SPA:18; DE:59-3 at 2). One of Ng's attorneys

also summarized discussions with the government as follows: "[W]e discussed with the Government that Mr. Ng should not lose the right commonly known as the Rule of Specialty. . . . The Government said that it would draft a letter agreement providing Mr. Ng the protections afforded him under the Rule of Specialty as provided by the U.S./Malaysian Extradition Treaty." (A:114; accord A:140 (contemporaneous attorney notes reflect Ng asking "if [the] U.S. Attorney's Office would consider 'that the rule of specialty would apply even if [the defendant] waives [extradition]'" (quoting A:143)). The parties' communications underscore that the February Letter was intended to apply the Extradition Treaty's rule-of-specialty protections.

As a result, this Court should reject Ng's belated efforts to re-interpret the February Letter as a promise not to "supersed[e] . . . to allege new facts and theories against Ng." (BR:51). Nowhere in the February Letter did the government so promise. (BR:46-47). Rather, the government agreed to afford Ng standard rule-of-specialty protections, which allow the government to make some alterations to the factual allegations or even the statutory offenses charged, so long as any superseding indictment still continues to charge the defendant with

78

offenses of "the same character as the crime[s] for which [he was] extradited." <u>Fiocconi</u>, 462 F.2d at 481. Ng's misplaced reliance on case law outside of the rule-of-specialty context is thus beside the point.[9] The only relevant question is whether Ng's prosecution violated the Extradition Treaty's rule-of-specialty protections—whether those protections apply by their own force or by virtue of their incorporation into the February Letter. As explained below, it did not.

B. The District Court Correctly
   <u>Rejected Ng's Rule-of-Specialty Challenge.</u>

As the district court correctly observed, "[a]lthough the Superseding Indictment adds several factual allegations, it is substantially the same as the original Indictment and the statutory charges remain the same." (SPA:39). The same is true of the Second

---

[9]    For example, Ng cites (BR:46-47) <u>United States v. Rodriguez</u>, 553 U.S. 377, 382-83 (2008), which addressed the definition of a "serious drug offense" under the Armed Career Criminal Act; <u>Barikyan v. Barr</u>, 917 F.3d 142, 145 (2d Cir. 2019), which concerned whether a defendant's prior conviction was an "aggravated felony" for purposes of removal in the immigration context; and <u>Dobbs, Inc. v. Local No. 614, Int'l Brotherhood of Teamsters</u>, 813 F.2d 85, 88 (6th Cir. 1987), an out-of-Circuit civil case that interpreted a provision of a collective bargaining agreement regarding employment offenses for "habitual tardiness." These cases plainly have no bearing on the interpretation of the rule-of-specialty protections outlined in the February Letter.

Superseding Indictment.  Accordingly, because Ng was never charged with any new offense that would contravene the rule-of-specialty protections in the Extradition Treaty, the court properly concluded that his prosecution "violate[d] neither the rule of specialty nor the provision in the February 2019 Letter," which "mirrors the language in the Extradition Treaty."  (Id.).

Both the Superseding Indictment and the Second Superseding Indictment charged Ng with the same statutory offenses as those in the Initial Indictment, and thus with the same offenses on which he was extradited.  (Compare A:168-78 and A:98-106 with A:65-73).  The changes reflected in the Superseding Indictment can be summarized as: (1) specifically identifying "The Goldman Sachs Group, Inc." as the relevant "issuer" under the FCPA, rather than the anonymized references to "U.S. Financial Institution #1;" (2) elaborating on the manner in which Ng violated the FCPA by noting that in addition to being an employee and agent thereof, he also owned stock in Goldman Sachs Group, and was thus "a stockholder . . . acting on behalf of such issuer;" and (3) providing additional notice and detail regarding the specified unlawful activities that served as the predicate for the money

laundering conspiracy, by specifying that the "offenses against a foreign nation" could include bribery offenses "as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv)." (A:98-106; SPA:24).[10] Likewise, the Second Superseding Indictment charged Ng with the same three offenses and used the same charging language as in the Superseding Indictment but added a handful of specific overt acts in Counts One and Two. (A:170-76).

Neither superseding indictment added any new statutory charges against Ng, nor did they change the core factual scheme underlying those charges. To the contrary, the central allegations regarding the "criminal scheme" to "pay[] bribes to foreign officials" and "launder the proceeds of that criminal conduct in and through the U.S. financial system" remained the same across his indictments, as did the offenses charged and the time periods of all three charged conspiracies. (Compare A:151-78 and A:81-107 with A:47-73). Under these circumstances, and consistent with well-settled Circuit precedent, Ng's

---

[10]     These alterations responded to complaints that Ng had raised in his motion to dismiss the Initial Indictment, in which he alleged that it failed to provide him with adequate notice regarding the charged offenses. (See SPA:3).

81

prosecution did not violate the rule of specialty. Fiocconi, 462 F.2d at 481.

This Court has repeatedly rejected rule-of-specialty challenges to superseding indictments even where those superseding indictments added new charges, expanded the time periods alleged in connection with conspiracy charges, or both. United States v. Levy, 25 F.3d 146, 159 (2d Cir. 1994) (finding no rule-of-specialty violation where defendant was extradited on a narcotics conspiracy charge and tried on five additional substantive narcotics offenses; explaining that "defendant was not actually tried on separate offenses" from those that formed the basis for extradition); Fiocconi, 462 F.2d at 476-77, 481-82 (finding no violation where defendant was extradited on an indictment alleging a conspiracy spanning 1968 to 1969 and subsequently charged by superseding indictment alleging a conspiracy spanning 1970 to 1972 and additional substantive offenses); United States v. Rossi, 545 F.2d 814, 815 (2d Cir. 1976) (similar); Paroutian, 299 F.3d at 491 (finding no violation where defendant was extradited on a narcotics conspiracy charge and tried in a different district on a different indictment alleging substantive narcotics charges not contained in the original indictment).

The changes in the superseding indictments here are far less extensive than those approved by this Court in cases like <u>Levy</u>, <u>Fiocconi</u>, <u>Rossi</u>, and <u>Paroutian</u>.  The superseding indictments against Ng neither added new charges against him nor altered the time frames for the conspiracies with which he was charged.  Consistent with this Court's prior cases, therefore, the district court correctly rejected Ng's rule-of-specialty challenge.  Indeed, as the court observed, "the Malaysian government has been apprised of the contents of the Superseding Indictment and ha[s] raised no objection."  (SPA:39).  That further strengthens the conclusion that Ng's prosecution did not violate the rule-of-specialty protections.  <u>See</u> <u>Paroutian</u>, 299 F.2d at 491.

In sum, whether the February Letter applies or not, Ng has received the rule of specialty's protections.  This Court should reject Ng's attempts to stretch that rule—or the language in the February Letter, which simply mirrors the rule itself—far beyond its well-settled bounds.

## POINT THREE

## THE INDICTMENT SUFFICIENTLY ALLEGED EDNY VENUE

Ng asserts that this Court must decide "whether venue was proper" in EDNY, asserting that "[i]t is doubtful that it made sense to prosecute Ng in the United States at all." (BR:2-3, 58). But Ng's actual claim on appeal is narrow. Ng does not argue that the government's extensive trial proof failed to establish venue.[11] Rather, Ng asserts that the district court erred by denying his pre-trial motion to dismiss the indictment because, according to Ng, it did not sufficiently allege venue in EDNY. Ng's claim is meritless.

---

[11] Ng affirmatively waived any challenge to the sufficiency of the trial evidence establishing venue when he failed to raise a venue objection in his detailed Rule 29 motion for acquittal. (T:4365, 4470-85; DE:186). See, e.g., United States v. Daidone, 471 F.3d 371, 377 (2d Cir. 2006) ("A defendant waives any venue objections unless they are 'specifically articulated in defense counsel's motion of acquittal.'" (quoting United States v. Bala, 236 F.3d 87, 95 (2d Cir. 2000))).

84

I.     Applicable Law

   A.     Pretrial Motions to Dismiss and Standard of Review

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." United States v. Aleynikov, 676 F.3d 71, 75-76 (2d Cir. 2012); Fed. R. Crim. P. 12(b)(2).   A district court's denial of a motion to dismiss an indictment presents a mixed question of law and fact and is reviewed de novo.   United States v. Montague, 67 F.4th 520, 527 (2d Cir. 2023).   The district court's factual findings are reviewed for clear error.   United States v. Daley, 702 F.3d 96, 100 (2d Cir. 2012).

An indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and (2) "enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Wedd, 993 F.3d 104, 120 (2d Cir. 2021) (quoting United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)).   "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Id. (internal quotation marks omitted).   "Unless the government has made

what can fairly be described as a full proffer of the evidence it intends to present at trial . . . , the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." <u>Id.</u> at 121 (internal quotation marks omitted).

B.   <u>Venue</u>

"[T]he Venue Clause permits a defendant charged with conspiracy to be tried in any State in which any co-conspirator took any overt act in furtherance of the endeavor." <u>Smith v. United States</u>, 599 U.S. 236, 244 (2023). The relevant overt act, "need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." <u>United States v. Tzolov</u>, 642 F.3d 314, 320 (2d Cir. 2011).

In a conspiracy, venue-conferring acts include "not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy." <u>United States v. Royer</u>, 549 F.3d 886, 896 (2d Cir. 2008). Applying this standard, "a defendant need not himself have ever been physically present in a district for a conspiracy charge against him to be venued there." <u>United States v. Rommy</u>, 506 F.3d 108, 120 (2d Cir. 2007). Indeed, simply passing

through a district in furtherance of a criminal conspiracy is sufficient to confer venue. Tzolov, 642 F.3d at 320 (preparatory travel through EDNY to attend face-to-face meetings in furtherance of scheme was sufficient to properly venue conspiracy in EDNY). Telephone calls and wires through a district can confer venue. United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015) (affirming venue in the Southern District of New York where, as part of the scheme, "payments were made by wire, and traveled through the waters over which the Southern and Eastern Districts share jurisdiction"); Rommy, 506 F.3d at 120 ("It is beyond question that telephone calls can constitute overt acts in furtherance of a conspiracy.").

## II. The District Court Properly Denied Ng's Motion to Dismiss

Contrary to Ng's objection, each count alleged, and provided notice of how the government would prove at trial, venue in EDNY. Counts One, Two and Three specifically alleged that the conspiracies occurred "within the Eastern District of New York and elsewhere." (A:168, 174, 177). This identification of the venue in each Count is sufficient. See United States v. Yousef, 327 F.3d 56, 115 (2d Cir. 2003)

("Each count in the airline bombing case alleged that Yousef was 'first brought to and first arrested in' the Southern District of New York.").

In addition, as to Count One and Count Two, the Superseding Indictment specifically identified overt acts in furtherance of the conspiracy that occurred in EDNY, including a meeting of co-conspirators in New York City (requiring travel through EDNY) and international calls traversing EDNY. (A:67-70, 100-04). The Second Superseding Indictment alleged additional overt acts for Counts One and Two, including details about how co-conspirators traveled through EDNY "to attend a meeting in [Manhattan] to discuss, among other things, Project Magnolia." (A:170-76). The Second Superseding Indictment further supplemented those allegations with facts about the wiring of funds in furtherance of the scheme through EDNY. (A:160, 163). Under the well-settled law in this Circuit, alleged calls, wires, and physical travel through EDNY, when taken as true at the motion to dismiss stage, are sufficient to establish venue. See, e.g., Rutigliano, 790 F.3d at 398; Rommy, 506 F.3d at 120.

Ng argues that the district court "should have addressed [his venue] challenge fully rather than deferring it" (BR:56), but that

assertion misreads the record. The court did not "defer" Ng's venue challenge; it considered and rejected it in a detailed written opinion that assessed the sufficiency of the Superseding Indictment's venue allegations, the foreseeability of the alleged venue, and Ng's substantial contacts there. (SPA:40-54).

Because the government had not yet proffered the full scope of evidence to be offered at trial, the district court accepted the Superseding Indictment's allegations as true and expressly noted that Ng could renew his objection via a Rule 29 motion, a path he declined to take. (SPA:27, 49); Wedd, 993 F.3d at 121; see also United States v. Powers, 40 F.4th 129, 134 (4th Cir. 2022).

As he did below, Ng asserts that the acts in EDNY were not reasonably foreseeable to him and were not sufficiently "substantial." (BR:56). The district court properly rejected these arguments. As alleged in the Superseding Indictment and proved at trial, the co-conspirators committed the charged crimes while Ng, Leissner and others were employed by a bank headquartered in New York; they diverted billions of dollars wired directly from the bank's accounts in New York to other accounts, many via wires that passed to and through New York

89

(including transfers that Ng directed to and from his own bank accounts); they repeatedly communicated with personnel at Goldman in New York to further the scheme via wires that passed through EDNY; and the co-conspirators met in New York on multiple occasions to further 1MDB business during the conspiracy period. As a legal matter, it would have been reasonably foreseeable on those facts that Ng would be called to stand trial in EDNY. These allegations were therefore sufficient to defeat a motion to dismiss the indictment prior to trial. See United States v. Kirk Tang Yuk, 885 F.3d 57, 73-74 (2d Cir. 2018) (finding it reasonably foreseeable to be tried in the Southern District of New York where confederate stated that he was in "New York"); United States v. Abdallah, 840 F. Supp. 2d 584, 602 (E.D.N.Y. 2012) (reasonably foreseeable to be tried in EDNY where confederate "told the defendant that he was going to be in New York"), aff'd. 528 F. App'x 79, 81-82 (2d Cir. 2013) (finding single telephone call "sufficient to establish venue because it was an overt act in furtherance of the conspiracy"). Whether

it was, in fact, reasonably foreseeable to Ng was a question resolved by the jury at trial, a finding which Ng declined to challenge.

Ng's "substantial contacts" argument was also properly rejected by the district court. Where, as here, "an overt act in furtherance of a criminal conspiracy has been committed in the district," the substantial contacts "supplemental inquiry has no relevance." Kirk Tang Yuk, 885 F.3d at 70; see also id. ("A defendant who is participating in a conspiracy that is being conducted, in part, in the district of prosecution necessarily has sufficient 'substantial contacts' to justify a finding of venue that is otherwise proper." (citing cases)). Ng cites United States v. Calonge, 74 F.4th 31 (2d Cir. 2023) (BR:56) to suggest that, contrary to Kirk Tang Yuk's express terms, the substantial contacts test nevertheless applied. But Calonge did not involve a conspiracy and did not address any aspect of Kirk Tang Yuk, which controls here. See Calonge, 74 F.4th at 35-37.

Finally, even if there were a deficiency in the Superseding Indictment's venue allegations, that error would be harmless. Where a court rejects a defendant's pretrial objection to an indictment's sufficiency, the Supreme Court has explained that there would still be no

91

reversible error "unless it appeared that the substantial rights of the accused were prejudiced by the refusal to require a more specific statement of the particular mode in which the offense charged was committed." Armour Packing Co. v. United States, 209 U.S. 56, 84 (1908).  Here, there was no prejudice.  The Second Superseding Indictment provided additional venue allegations which were supported through extensive pretrial discovery.  At trial, Ng put the government to its burden as to venue, and the proof precisely tracked the allegations in the indictment.  The question of venue was put to the jurors, who, having heard the parties' detailed arguments, convicted Ng on each count.  Thus, Ng received the notice of venue-related allegations to which he was entitled and saw them proven at trial.

POINT FOUR

THE DISTRICT COURT'S FORFEITURE ORDER
WAS AUTHORIZED BY STATUTE AND NOT EXCESSIVE

Ng asserts that the $35.1 million forfeiture money judgment was unconstitutionally excessive because it "will destroy [his] future livelihood." (BR:59-61). Because that argument is inconsistent with this Court's prior decisions and the district court's considered analysis, it is insufficient to warrant reversal.

Ng also argues that the forfeiture was not authorized by statute but concedes that argument is foreclosed by the Court's precedents. (BR:60-61).

I.    Applicable Law and Standard of Review

Regarding the forfeiture order, this Court will review the district court's legal conclusions de novo and its factual findings for clear error. United States v. Sabhnani, 599 F.3d 215, 261 (2d Cir. 2010).

Criminal forfeiture is a mandatory part of sentence where the defendant is convicted of a statute that carries a corresponding forfeiture provision. See 28 U.S.C. § 2461(c); 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1); United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be

mandatory in cases where the statute applied . . . ."); <u>United States v. Viloski</u>, 814 F.3d 104, 111 n.11 (2d Cir. 2016) (noting that where the statutes apply, "a district court has no discretion not to order forfeiture in the amount sought").

The government must prove the amount of forfeiture sought to be imposed by a preponderance of the evidence. <u>United States v. Capoccia</u>, 503 F.3d 103, 116 (2d Cir. 2007); <u>United States v. Bellomo</u>, 176 F.3d 580, 595 (2d Cir. 1999)). In meeting that burden, the forfeiture amount may be reasonably estimated by evidence already in the record. <u>Capoccia</u>, 503 F.3d at 109-10; <u>United States v. Roberts</u>, 660 F.3d 149, 166 (2d Cir. 2011).

It is immaterial to this analysis that the defendant may have disgorged in another jurisdiction the ill-gotten gains from the same crime. "The Double Jeopardy Clause is inapplicable when separate governments prosecute the same defendant, for the defendant has offended both sovereigns." <u>United States v. 38 Whalers Cove Drive</u>, 954 F.2d 29, 38 (2d Cir. 1992); <u>United States v. Williams</u>, 519 F. App'x 303, 304 (5th Cir. 2013). Where the defendant does not have the assets available to satisfy a forfeiture order, forfeiture may be sought in the form

94

of a money judgment.  United States v. Awad, 598 F.3d 76, 78 (2d Cir.

2010); United States v. Kalish, 626 F.3d 165, 168-69 (2d Cir. 2010).

In determining the amount of forfeiture the defendant is

required to pay, see Fed. R. Crim. P. 32.2(b)(1)(A), the district court's role

is "significant[ly] differ[ent]" from its role in imposing an appropriate

sentence, Viloski, 814 F.3d at 112 n.11.  The court's "only role is to

conduct the gross disproportionality inquiry" under the Eighth

Amendment's Excessive Fines clause.  Id. (citing United States v.

Bajakajian, 524 U.S. 321, 339 n.11 (1998)).  To assess a forfeiture's

proportionality to the defendant's crimes, courts must consider: (1) "the

essence of the [defendant's] crime" and its relation to other criminal

activity; (2) "whether the [defendant] fit into the class of persons for

whom the statute was principally designed;" (3) "the maximum sentence

and fine that could have been imposed;" and (4) "the nature of the harm

caused by the [defendant's] conduct."  United States v. Elfgeeh, 515 F.3d

100, 139 (2d Cir. 2008) (quoting United States v. Collado, 348 F.3d 323,

328 (2d Cir. 2003)).  Courts in the Second Circuit may, but "need not

consider [a] fifth factor:" "whether the forfeiture would deprive the

defendant of his livelihood, i.e., his 'future ability to earn a living.'"

95

Viloski, 814 F.3d at 111-12 (internal quotation marks omitted). No single factor controls the analysis and a determination can be made only by reference to the totality of factors. See, e.g., United States v. George, 779 F.3d 113, 124 n.6 (2d Cir. 2015). "The burden rests on the defendant to show the unconstitutionality of the forfeiture." Viloski, 814 F.3d at 109 (quoting United States v. Castello, 611 F.3d 116, 120 (2d Cir. 2010)).

II. Discussion

A. The Forfeiture Order Was Not Excessive

In determining Ng's forfeiture obligation, the district court applied the four Bajakajian factors to conclude that: (i) Ng "willfully engaged in a multi-year financial scheme;" (ii) Ng conceded he fits into the class of persons for whom the statute exists; (iii) the forfeiture sought was "grossly proportional to the gravity of the offense;" and (iv) Ng "played a role in one of the largest financial crimes of all time" that "resulted in enormous tangible harm" and "intangible harm to the public's confidence in democracy and government," all of which weighed in favor of the forfeiture sought. (SPA:199-200).

While not required to do so, the district court also considered and rejected Ng's argument that the forfeiture would destroy his future

96

livelihood. (SPA:200-01). Consistent with <u>Viloski</u>, 814 F.3d at 112, the court found that Ng's reliance on then-present personal circumstances— his age, length of remaining sentence, personal debts, and PTSD diagnosis—failed to establish a future inability to earn a living. (SPA:201). The court also found Ng's reliance on a sum he paid to the Malaysian government to be defeated by principals of dual sovereignty. (<u>Id.</u>).

On appeal, Ng simply repeats the same arguments rejected below. (BR:59-60). He again cites his age and remaining carceral sentence, but those personal factors are "irrelevant in themselves."[12] <u>Viloski</u>, 814 F.3d 114-15. He also repeats that he and his family have paid substantial monies to the Malaysian government but disregards the

---

[12] On appeal, Ng shifts his argument away from his future earning capacity and toward the likelihood of satisfying the judgment, suggesting that even if he earns a million-dollar annual salary after release, "he would still be unlikely to ever satisfy the judgment." (BR:60). This argument is purely speculative and unsupported by any relevant authority. In addition, Ng suggests that the district court should have "conducted a more probing inquiry" into the effect the forfeiture would have on his future livelihood. (<u>Id.</u>). But again, district courts imposing forfeiture "need not consider" the forfeiture's effect on the defendant's livelihood at all. <u>Viloski</u>, 814 F.3d at 111-12.

97

district court's invocation of dual sovereignty principles and otherwise fails to establish a factual or legal basis for an offset. Under these circumstances, Ng falls well short of establishing the unconstitutionality of the forfeiture, which accurately reflects the kickbacks he received as part of a globe-spanning criminal scheme. See United States v. Varrone, 554 F.3d 327, 333 n.4 (2d Cir. 2009) ("We emphasize that a forfeiture that exceeds the statutory maximum fine is not necessarily constitutionally excessive, and that the ultimate question before the court is how the amount of the forfeiture [compares] to the gravity of the defendant's offense." (internal quotation marks omitted))

B.  The Forfeiture Order Was Authorized by Statute

Ng also asserts that the relevant forfeiture statutes do not authorize a forfeiture money judgment. (BR:60-61). As Ng correctly observes, though, that argument is foreclosed by this Court's precedents. See Awad, 598 F.3d at 78-79. The two cases he cites in support do not warrant any departure from the Court's settled law. E.g., United States v. Nejad, 933 F.3d 1162 (9th Cir. 2019) (affirming forfeiture money judgment); Awad, 598 F.3d at 79 n.5 (finding reliance on United States

98

v. Surgent, No. 04-CR-364 (JG), 2009 WL 2525137 (E.D.N.Y. Aug. 17, 2009), to be "unpersuasive").

      Accordingly, imposition of the $35.1 million forfeiture order should be affirmed.

99

CONCLUSION

For the reasons stated above, the judgment should be affirmed.

Dated:     Brooklyn, New York
           October 18, 2023


                                    Respectfully submitted

NICOLE M. ARGENTIERI              BREON PEACE,
Acting Assistant Attorney General  United States Attorney,
Criminal Division                  Eastern District of New York
                                   271-A Cadman Plaza East
                                   Brooklyn, New York 11201
                                   (718) 254-7000


BRENT WIBLE,                       AMY BUSA,
SAMANTHA BATEMAN,                  ANTHONY BAGNUOLA,
Trial Attorneys,                   ALIXANDRA E. SMITH,
(Of Counsel).                      DREW G. ROLLE,
                                   DYLAN A. STERN
                                   Assistant United States
                                   Attorneys,
                                   (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of this Court's order dated October 17, 2023 authorizing the submission of a brief no more than 18,000 words because the brief contains 17,778 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        October 18, 2023

                              /s/ AMY BUSA
                              AMY BUSA
                              Assistant U.S. Attorney